Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

**Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**APPENDIX OF CAL. LABOR CODE & REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION; & OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

**Under Cal. Labor Code 98.6, 1102.5 6310, & the Tamney Termination in Violation of Public Policy**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

i

## TABLE OF CONTENTS

I.   CAL. LABOR CODE SECTION 98.6                                    1

II.   CAL. LABOR CODE SECTION 96(K)                                  2

III.   CAL. LABOR CODE SECTION 232.5                                 2

IV.   CAL. LABOR CODE SECTION 1102.5-1102.6                          2

V.   CAL. LABOR CODE SECTION 6310                                    3

VI.   CAL. GOV. CODE SECTION 12940                                   4

VII.   CAL. CIV. CODE SECTION 51.9                                   4

VIII.   CAL. CIV CODE SECTION 1001                                   5

IX.   CAL. PENAL CODE 266(I); 647(B); CACI                           5

X.   BILL AB-1883 (WORKPLACE SURVEILLANCE TOOLS)                     6

XI.   BILL AB-1898 WORKPLACE ARTIFICIAL INTELLIGENCE TOOLS           7

XII.   BILL AB-1331 WORKPLACE SURVEILLANCE                           8

XIII.   EXHIBITS                                                    10

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT | 3:23-CV-04597-EMC          MAY 21 2026

**APPENDIX OF CAL. CODE AND REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE MATERIALS**

**IN SUPPORT OF PL.'S MOTION FOR SUMMARY JUDGMENT AND P.I.; & OPPOSITION TO DEF'S CROSS-MOTION FOR SUMMARY JUDGEMENT**

1.     This Appendix of Cal. Code and Request for Judicial Notice of California legislative materials is filed under Federal Evidence Code () and in support of the Plaintiff's Reply in support of her Motion for Summary Judgement & Preliminary Injunction (Dkt. 375, 359) and her Opposition to Defendant's Cross-Motion for Summary Judgment (Dkt. 375, 367).

## I.     CAL. LABOR CODE SECTION 98.6

2.     Attached as Exhibit A is PDF copy of the Cal. Labor Code entry for Section 98.6-98.7 from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. Section 98.6(a) includes a prohibition on discharge, discrimination, retaliation, and adverse actions taken, including, "because the employee or applicant engaged in any conduct delineated in this chapter" (Ch. 4 – Division of Labor Standards Enforcement), or because the employee filed a "complaint or claim or instituted or caused to be instituted any proceeding under or relating to their rights that are under the jurisdiction of the Labor Commissioner." (Id).

3.     Section 98.6(b) includes that employees who are subjected to those actions because of their protected activity "shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer" and "an employer who willfully refuses to hire, promote, or otherwise restore an employee or former employee who has been determined to be eligible for rehiring or promotion by a grievance procedure, arbitration, or hearing authorized by law, is guilty of a misdemeanor." (Id). It further provides civil penalties for each violation. 98.6(b)(3).

4.     Section 98.6(b) also provides that "if an employer engages in any action prohibited by this section within 90 days of the protected activity specified in this section, there

1

shall be a rebuttable presumption in favor of the employee's claim."

## II.    CAL. LABOR CODE SECTION 96(K)

5.    Attached as Exhibit B is PDF copy of the Cal. Labor Code entry for Section 96(k) from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. Section 96(k) creates protections specific to "demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises." This Section is incorporated into Section 98.6(a): "A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96…" (Id).

## III.    CAL. LABOR CODE SECTION 232.5

6.    Attached as Exhibit C is PDF copy of the Cal. Labor Code entry for Section 232.5 from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. Section 232.5(a) includes prohibitions on unlawful rules and policies that prevent employees from "disclosing information about the employer's working conditions." Section 232.5(b) extends this prohibition to contracts, waivers, and other documents. Section 232.5(c) includes a prohibition on discipline, discharge, and discrimination. Section 232.5(d) limits any confidentiality exclusion to legally privileged information, trade secret information, or proprietary information.

## IV.    CAL. LABOR CODE SECTION 1102.5-1102.6

7.    Attached as Exhibit D is PDF copy of the Cal. Labor Code entry for Section 1102.5-1102.62 from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. Cal. Labor Code Section 1102.5(a) includes a prohibition on

2

unlawful rules and policies, 1102.5(b)-(c) include prohibitions on retaliation, 1102.5(f) includes civil penalties, and 1102.5(g) only limits exclusions related confidentiality to "lawyer-client privilege… physician-patient privilege… or trade secret information."

8.    1102.6 explains the legal standard stating: "In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (Id.)

9.    Sections 1102.61-1102.62 provides that employees may petition for "temporary or preliminary injunctive relief" and the court "shall have jurisdiction to grant such temporary injunctive relief as the court deems just and proper." They provide that in considering the request for injunction, "the court shall consider the chilling effect on other employees asserting their rights under that section in determining whether temporary injunctive relief is just and proper" and "appropriate injunctive relief shall be issued on a showing that reasonable cause exists to believe a violation has occurred." (Id).

## V.    CAL. LABOR CODE SECTION 6310

10.    Attached as Exhibit E is PDF copy of the Cal. Labor Code entry for Section 6310 from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. Section 6310(a) prohibits discharge and discrimination in retaliation for enumerated protected activity. Section 6310(b) provides that employees "discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by their employer" in violation of the Section, is "entitled to reinstatement and

reimbursement for lost wages and work benefits caused by the acts of the employer" and "any employer who willfully refuses to rehire, promote, or otherwise restore an employee or former employee who has been determined to be eligible for rehiring or promotion by a grievance procedure, arbitration, or hearing authorized by law, is guilty of a misdemeanor." (Id.)

## VI.  CAL. GOV. CODE SECTION 12940

11.     Attached as Exhibit F is PDF copy of the Cal. Gov. Code entry for Section 12940, under from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. The Section prohibits discrimination and discharge against employees due to their sex, gender, gender expression, and other protected characteristics. 12940(a). Section 12940(h) prohibits discharge and discrimination "because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

12.     Section 12940(j) also prohibits harassment due to sex, gender, gender expression, and other protected characteristics if the employer "or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." Further, "An employer may also be responsible for the acts of nonemployees… if the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action." Id. Section 12940(k) also prohibits and employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Id. Section 12940(j)(4)(c) provides that harassment "because of sex includes sexual harassment, gender harassment… Sexually harassing conduct need not be motivated by sexual desire." Id.

## VII.  CAL. CIV. CODE SECTION 51.9

13.     Attached as Exhibit G is PDF copy of the Cal. Civ. Code entry for Section 51.9,

4

under from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. Section 51.9 prohibits sexual harassment if "the defendant has made sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe" and "the plaintiff has suffered or will suffer economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right, as a result…" Section 51.9(a)(2).

## VIII. CAL. CIV CODE SECTION 1001

14.     Attached as Exhibit H is PDF copy of the Cal. Civ. Code entry for Section 1001, under from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. The Section prohibits settlement agreements that, among others, " prevents or restricts the disclosure of factual information related to a claim filed in a civil action" related to "an act of sexual harassment, as defined in Section 51.9 of the Civil Code" and/or "an act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing harassment or discrimination, as described in…  Section 12940 of the Government Code." Section 1001(b) instructs that "in a civil… a court shall not enter, by stipulation or otherwise, an order that restricts the disclosure of information in a manner that conflicts with…" (the section).

## IX.    CAL. PENAL CODE 266(I); 647(B); CACI

15.     Attached as Exhibit I is PDF copy of the Cal. Pen. Code entry for Section 266(i), under from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. Section 266(i) of the Penal code defines "pandering" as "any person who" "by fraud or artifice, or by duress of person or goods, or by abuse of any position of confidence or authority, procures another person for the purpose of prostitution" or "receives or gives, or agrees to receive or give,

5

any money or thing of value for procuring, or attempting to procure, another person for the purpose of prostitution…" 266(i)(5)-(6). Also attached as Exhibit I is a PDF copy of the CACI CALCRIM 1151 Jury Instructions for Pandering which defines "a prostitute" as "a person who engages in sexual intercourse or any lewd act with another person in exchange for money [or other compensation]. [Pandering requires that an intended act of prostitution be with someone other than the defendant.]"

16.    Also attached as Exhibit I is PDF copy of the Cal. Pen. Code entry for Section 647(b), under from the California Legislative Information website at: https://leginfo.legislature.ca.gov/. Section 647(b) defines a prostitute as "an individual who solicits, or who agrees to engage in, or who engages in, an act of prostitution with the intent to receive compensation, money, or anything of value from another person. An individual agrees to engage in an act of prostitution when, with specific intent to so engage, the individual manifests an acceptance of an offer or solicitation by another person to so engage, regardless of whether the offer or solicitation was made by a person who also possessed the specific intent to engage in an act of prostitution." 647(b)(1).

## X.    BILL AB-1883 (WORKPLACE SURVEILLANCE TOOLS)

17.    Attached as Exhibit J is a PDF copy of the pending bill which is active in the California Legislature (session 2025-2026) and seeks to amend the Cal. Labor Code. Bill AB-1883 seeks to "generally regulate the use of workplace surveillance tools and an employer's use of worker data. The bill would prohibit an employer from using a workplace surveillance tool on workers for various purposes, including preventing compliance with laws or regulations, inferring information about workers engaging in a protected activity, making inferences about an individual's emotional state or based on their gait, or collecting neural data. The bill would

prohibit an employer from using facial recognition technology to make inferences about a worker for firing, deactivation, or disciplinary purposes…" (Digest).

18. The bill defines "Workplace surveillance tool" as "any system, application, instrument, or device that collects or facilitates the collection of worker data, activities, communications, actions, biometrics, or behaviors by means other than direct observation by a person, including, but not limited to, video or audio surveillance… photoelectronic tracking, or that utilizes a photo-optical system or other means." Bill AB-1883 1580(f). The bill prohibits the use of "a workplace surveillance tool on workers" to, among other things, "prevent compliance with or violate any federal, state, or local labor, occupational health and safety, employment, or civil rights laws or regulations" or "infer information about workers engaging in activity protected by state or federal law." Section 1581(a)(1)(A)-(B).

19. Section 1581(a)(1)(2) states that "an employer shall not use facial recognition technology to make inferences about a worker for firing, deactivation, or disciplinary purposes." The bill formalizes remedial action against employers who violate the section through Cal. Labor Code 98.7, or private civil action, and includes injunctive relief for reinstatement. Section 1582(a)-(d). It also includes civil penalties for violations. 1582(e).

20. Also included as Exhibit J is a copy of AB-1883 bill analysis by the Assembly Committee on Privacy and Consumer Protection from April 16 2026.

## XI. BILL AB-1898 WORKPLACE ARTIFICIAL INTELLIGENCE TOOLS

21. Attached as Exhibit K is a copy of the pending bill which is active in the California Legislature (session 2025-2026) and seeks to amend the Cal. Labor Code. "Workplace surveillance tool" is defined as "any system, application, instrument, or device that collects or facilitates the collection of worker data, activities, communications, actions, biometrics, or behaviors, or those of the public that are also capable of passively surveilling

7

workers, by means other than direct observation by a person, including, but not limited to, video or audio surveillance… photoelectronic tracking, or that utilizes a photo-optical system or other means." Bill AB-1898 Section 1600(i). "Workplace AI tool" is defined to include workplace surveillance tools that use artificial intelligence. Section 1600(h).

22.     This bill seeks to "require an employer to provide a written notice to an a worker that a workplace AI tool, as defined, was used to assist the employer in making employment-related decisions or to surveil workers in the workplace."  (Digest). Further, "the bill would provide for enforcement by the Labor Commissioner or a public prosecutor, and alternatively would authorize any worker who has suffered damages, or their exclusive representative, to file a civil action for damages caused by the adverse action." (Digest). The required notice would include, among other things, "the purpose and justification for the use of the workplace AI tool," "description of the workplace AI tool, including the categories of input data it was trained on, input data it uses, and the output data it generates," and "whether and which  job roles can access worker data." Bill 1898 Section 1601(f).

23.     Also included as Exhibit K is a copy of AB-1898 Bill Analysis by the Assembly Committee on Privacy and Consumer Protection from March 25 2026.

## XII.   BILL AB-1331 WORKPLACE SURVEILLANCE

24.     Attached as Exhibit L is a PDF copy of the bill AB-1331 in the California Legislature (session 2025-2026) and had sought to amend the Cal. Labor Code. The bill is inactive as of Sept. 2025, but passed the Assembly Floor, Assembly committees on Privacy and Consumer Protection and Labor and Employment, Senate Judiciary, Senate committee on Public Employment and Retirement, and both Appropriates committee.

25.     AB-1331 sought to "limit the use of workplace surveillance tools, as defined, by employers, including by prohibiting an employer from monitoring or surveilling workers…" and

"provide workers with the right to leave behind workplace surveillance tools that are on their person or in their possession…" (Digest). In addition to prohibiting certain types of surveillance, he bill would prohibit retaliation (discharge, suspension, discrimination, etc.) against employees "for using, or attempting to use, the employee's rights under this part, filing a complaint with the department or alleging a violation of this part, cooperating in an investigation or prosecution of an alleged violation of this part, or opposing any policy or practice or act that is prohibited by this part." (Bill Section 1563). It would also provide civil penalties for employer violations and injunctive relief including reinstatement. Id.

26.    Section 1560(e) of the bill defined "Workplace surveillance tool" as "a system, application, instrument, or device that collects or facilitates the collection of worker activities, communications, actions, biometrics, or behaviors, or those of the public that are capable of passively surveilling workers, by means other than direct observation by a person, including, but not limited to, video or audio surveillance, electronic workplace tracking, geolocation, electromagnetic tracking, photoelectronic tracking, or utilization of a photo-optical system or other means." Id.   Also included as Exhibit L is a copy of AB-1331 Bill Analysis by the Assembly Committee on Privacy and Consumer Protection from April 22 2025 and the Senate Committee On Labor, Public Employment And Retirement dated June 24 2025.

Respectfully filed,

/s/ **Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed May 24 2026 in San José, California
(408) 883-4428 | ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

9

## XIII. EXHIBITS

**A.**     <u>**EXHIBIT A: CLC §§ 98.6-98.7**</u>

**State of California**

**LABOR CODE**

**Section  98.6**

---

98.6.  (a)  A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, or because the employee or applicant for employment has filed a bona fide complaint or claim or instituted or caused to be instituted any proceeding under or relating to their rights that are under the jurisdiction of the Labor Commissioner, made a written or oral complaint that they are owed unpaid wages, or because the employee has initiated any action or notice pursuant to Section 2699, or has testified or is about to testify in a proceeding pursuant to that section, or because of the exercise by the employee or applicant for employment on behalf of themselves or others of any rights afforded them.

(b)  (1)  Any employee who is discharged, threatened with discharge, demoted, suspended, retaliated against, subjected to an adverse action, or in any other manner discriminated against in the terms and conditions of their employment because the employee engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, or because the employee has made a bona fide complaint or claim to the division pursuant to this part, or because the employee has initiated any action or notice pursuant to Section 2699 shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer. If an employer engages in any action prohibited by this section within 90 days of the protected activity specified in this section, there shall be a rebuttable presumption in favor of the employee's claim.

(2)  An employer who willfully refuses to hire, promote, or otherwise restore an employee or former employee who has been determined to be eligible for rehiring or promotion by a grievance procedure, arbitration, or hearing authorized by law, is guilty of a misdemeanor.

(3)  In addition to other remedies available, an employer who violates this section is liable for a civil penalty not exceeding ten thousand dollars ($10,000) per employee for each violation of this section, to be awarded to the employee or employees who suffered the violation.

(c)  (1)  Any applicant for employment who is refused employment, who is not selected for a training program leading to employment, or who in any other manner is discriminated against in the terms and conditions of any offer of employment because the applicant engaged in any conduct delineated in this chapter, including

the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, or because the applicant has made a bona fide complaint or claim to the division pursuant to this part, or because the employee has initiated any action or notice pursuant to Section 2699 shall be entitled to employment and reimbursement for lost wages and work benefits caused by the acts of the prospective employer.

(2)  This subdivision shall not be construed to invalidate any collective bargaining agreement that requires an applicant for a position that is subject to the collective bargaining agreement to sign a contract that protects either or both of the following as specified in subparagraphs (A) and (B), nor shall this subdivision be construed to invalidate any employer requirement of an applicant for a position that is not subject to a collective bargaining agreement to sign an employment contract that protects either or both of the following:

(A)  An employer against any conduct that is actually in direct conflict with the essential enterprise-related interests of the employer and where breach of that contract would actually constitute a material and substantial disruption of the employer's operation.

(B)  A firefighter against any disease that is presumed to arise in the course and scope of employment, by limiting their consumption of tobacco products on and off the job.

(d)  The provisions of this section creating new actions or remedies that are effective on January 1, 2002, to employees or applicants for employment do not apply to any state or local law enforcement agency, any religious association or corporation specified in subdivision (d) of Section 12926 of the Government Code, except as provided in Section 12926.2 of the Government Code, or any person described in Section 1070 of the Evidence Code.

(e)  An employer, or a person acting on behalf of the employer, shall not retaliate against an employee because the employee is a family member of a person who has, or is perceived to have, engaged in any conduct delineated in this chapter.

(f)  For purposes of this section, "employer" or "a person acting on behalf of the employer" includes, but is not limited to, a client employer as defined in paragraph (1) of subdivision (a) of Section 2810.3 and an employer listed in subdivision (b) of Section 6400.

(g)  Subdivisions (e) and (f) shall not apply to claims arising under subdivision (k) of Section 96 unless the lawful conduct occurring during nonwork hours away from the employer's premises involves the exercise of employee rights otherwise covered under subdivision (a).

(Amended by Stats. 2023, Ch. 612, Sec. 1.  (SB 497)  Effective January 1, 2024.)

**State of California**

**LABOR CODE**

**Section 98.7**

---

98.7. (a) (1) Any person who believes that they have been discharged or otherwise discriminated against in violation of any law under the jurisdiction of the Labor Commissioner may file a complaint with the division within one year after the occurrence of the violation. The one-year period may be extended for good cause. The complaint shall be investigated by a discrimination complaint investigator in accordance with this section. The Labor Commissioner shall establish procedures for the investigation of discrimination complaints, including, but not limited to, relief pursuant to paragraph (2) of subdivision (b). A summary of the procedures shall be provided to each complainant and respondent at the time of initial contact. The Labor Commissioner shall inform complainants charging a violation of Section 6310 or 6311, at the time of initial contact, of the complainant's right to file a separate, concurrent complaint with the United States Department of Labor within 30 days after the occurrence of the violation.

(2) The division may, with or without receiving a complaint, commence investigating an employer, in accordance with this section, that it suspects to have discharged or otherwise discriminated against an individual in violation of any law under the jurisdiction of the Labor Commissioner. The division may proceed without a complaint in those instances where suspected retaliation has occurred during the course of adjudicating a wage claim pursuant to Section 98, or during a field inspection pursuant to Section 90.5, in accordance with this section, or in instances of suspected immigration-related threats in violation of Section 244, 1019, or 1019.1.

(b) (1) Each complaint of unlawful discharge or discrimination shall be assigned to a discrimination complaint investigator who shall prepare and submit a report to the Labor Commissioner based on an investigation of the complaint. The Labor Commissioner or the commissioner's designee shall receive and review the reports. The investigation shall include, where appropriate, interviews with the complainant, respondent, and any witnesses who may have information concerning the alleged violation, and a review of any documents that may be relevant to the disposition of the complaint. The identity of a witness shall remain confidential unless the identification of the witness becomes necessary to proceed with the investigation or to prosecute an action to enforce a determination. The investigation report submitted to the Labor Commissioner or designee shall include the statements and documents obtained in the investigation, and the findings of the investigator concerning whether a violation occurred. The Labor Commissioner may hold an investigative hearing whenever the Labor Commissioner determines that a hearing is necessary to fully establish the facts. In the hearing the complainant and respondent shall have the

opportunity to present evidence. The Labor Commissioner shall issue, serve, and enforce any necessary subpoenas. If a complainant files an action in court against an employer based on the same or similar facts as a complaint made under this section, the Labor Commissioner may, at the commissioner's discretion, close the investigation. If a complainant has already challenged the complainant's discipline or discharge through the State Personnel Board, or other internal governmental procedure, or through a collective bargaining agreement grievance procedure that incorporates antiretaliation provisions under this code, the Labor Commissioner may reject the complaint.

(2) (A) The Labor Commissioner, during the course of an investigation pursuant to this section, upon finding reasonable cause to believe that any person has engaged in or is engaging in a violation, may petition the superior court in any county in which the violation in question is alleged to have occurred or in which the person resides or transacts business, for appropriate temporary or preliminary injunctive relief, or both temporary and preliminary injunctive relief.

(B) Upon filing of a petition pursuant to this paragraph, the Labor Commissioner shall cause notice of the petition to be served on the person, and the court shall have jurisdiction to grant temporary injunctive relief as the court determines to be just and proper.

(C) In addition to any harm resulting directly to an individual from a violation of any law under the jurisdiction of the Labor Commissioner, the court shall consider the chilling effect on other employees asserting their rights under those laws in determining if temporary injunctive relief is just and proper.

(D) If an employee has been discharged or faced adverse action for raising a claim of retaliation for asserting rights under any law under the jurisdiction of the Labor Commissioner, a court shall order appropriate injunctive relief on a showing that reasonable cause exists to believe that an employee has been discharged or subjected to adverse action for raising a claim of retaliation or asserting rights under any law under the jurisdiction of the Labor Commissioner.

(E) The temporary injunctive relief shall remain in effect until the Labor Commissioner issues a determination or citations, or until the completion of review pursuant to subdivision (b) of Section 98.74, whichever period is longer, or at a time certain set by the court. Afterwards, the court may issue a preliminary or permanent injunction if it is shown to be just and proper. Any temporary injunctive relief shall not prohibit an employer from disciplining or terminating an employee for conduct that is unrelated to the claim of the retaliation.

(F) Notwithstanding Section 916 of the Code of Civil Procedure, injunctive relief granted pursuant to this section shall not be stayed pending appeal.

(c) (1) If the Labor Commissioner determines a violation has occurred, the Labor Commissioner may issue a determination in accordance with this section or issue a citation in accordance with Section 98.74. If the Labor Commissioner issues a determination, the commissioner shall notify the complainant and respondent and direct the respondent to cease and desist from any violation and take any action deemed necessary to remedy the violation, including, where appropriate, rehiring or

reinstatement, reimbursement of lost wages and interest thereon, payment of penalties, payment of reasonable attorney's fees associated with any hearing held by the Labor Commissioner in investigating the complaint, and the posting of notices to employees. If the respondent does not comply with the order within 30 days following notification of the Labor Commissioner's determination, the Labor Commissioner shall bring an action promptly in an appropriate court against the respondent. An action by the Labor Commissioner seeking injunctive relief, reimbursement of lost wages and interest thereon, payment of penalties, and any other appropriate relief, shall not accrue until a respondent fails to comply with the order for more than 30 days following notification of the commissioner's determination. The Labor Commissioner shall commence an action within three years of its accrual, regardless of whether the commissioner seeks penalties in the action. If the Labor Commissioner fails to bring an action in court promptly, the complainant may bring an action against the Labor Commissioner in any appropriate court for a writ of mandate to compel the Labor Commissioner to bring an action in court against the respondent. If the complainant prevails in their action for a writ, the court shall award the complainant court costs and reasonable attorney's fees, notwithstanding any other law. Regardless of any delay in bringing an action in court, the Labor Commissioner shall not be divested of jurisdiction. In any action, the court may permit the claimant to intervene as a party plaintiff to the action and shall have jurisdiction, for cause shown, to restrain the violation and to order all appropriate relief. Appropriate relief includes, but is not limited to, rehiring or reinstatement of the complainant, reimbursement of lost wages and interest thereon, and any other compensation or equitable relief as is appropriate under the circumstances of the case. The Labor Commissioner shall petition the court for appropriate temporary relief or a restraining order unless the commissioner determines good cause exists for not doing so.

(2) If the Labor Commissioner is a prevailing party in an enforcement action pursuant to this section, the court shall determine the reasonable attorney's fees incurred by the Labor Commissioner in prosecuting the enforcement action and assess that amount as a cost upon the employer.

(3) An employer who willfully refuses to comply with an order of a court pursuant to this section to hire, promote, or otherwise restore an employee or former employee who has been determined to be eligible for such relief, or who refuses to comply with an order to post a notice to employees or otherwise cease and desist from the violation shall, in addition to any other penalties available, be subject to a penalty of one hundred dollars ($100) per day for each day the employer continues to be in noncompliance with the court order, up to a maximum of twenty thousand dollars ($20,000). Any penalty pursuant to this section shall be paid to the affected employee.

(d) (1) If the Labor Commissioner determines no violation has occurred, the commissioner shall notify the complainant and respondent and shall dismiss the complaint. The Labor Commissioner may direct the complainant to pay reasonable attorney's fees associated with any hearing held by the Labor Commissioner if the Labor Commissioner finds the complaint was frivolous, unreasonable, groundless, and was brought in bad faith. The complainant may, after notification of the Labor

Commissioner's determination to dismiss a complaint, bring an action in an appropriate court, which shall have jurisdiction to determine whether a violation occurred, and if so, to restrain the violation and order all appropriate relief to remedy the violation. Appropriate relief includes, but is not limited to, rehiring or reinstatement of the complainant, reimbursement of lost wages and interest thereon, and other compensation or equitable relief as is appropriate under the circumstances of the case. When dismissing a complaint, the Labor Commissioner shall advise the complainant of their right to bring an action in an appropriate court if the complainant disagrees with the determination of the Labor Commissioner, and in the case of an alleged violation of Section 6310 or 6311, to file a complaint against the state program with the United States Department of Labor. Any time limitation for a complainant to bring an action in court shall be tolled from the time of filing the complaint with the division until the issuance of the Labor Commissioner's determination.

(2) The filing of a timely complaint against the state program with the United States Department of Labor shall stay the Labor Commissioner's dismissal of the division complaint until the United States Secretary of Labor makes a determination regarding the alleged violation. Within 15 days of receipt of that determination, the Labor Commissioner shall notify the parties whether the commissioner will reopen the complaint filed with the division or whether the dismissal will be reaffirmed.

(e) The Labor Commissioner shall notify the complainant and respondent of the commissioner's determination under subdivision (c) or paragraph (1) of subdivision (d), not later than one year after the filing of the complaint. Determinations by the Labor Commissioner under subdivision (c) or (d) shall be final and not subject to administrative appeal except for cases arising under Sections 6310 and 6311, which may be appealed by the complainant to the Director of Industrial Relations pursuant to an appeal process, including time limitations, that is consistent with the mandates of the United States Department of Labor. The appeal from a determination for cases arising under Sections 6310 and 6311 shall set forth specifically and in full detail the grounds upon which the complainant considers the Labor Commissioner's determination to be unjust or unlawful, and every issue to be considered by the director. The director may consider any issue relating to the initial determination and may modify, affirm, or reverse the Labor Commissioner's determination. The director's determination shall be the determination of the Labor Commissioner for cases arising under Sections 6310 and 6311 that are appealed to the director. The director shall notify the complainant and respondent of the director's determination within 10 days of receipt of the appeal.

(f) The rights and remedies provided by this section do not preclude an employee from pursuing any other rights and remedies under any other law.

(g) In the enforcement of this section, there is no requirement that an individual exhaust administrative remedies or procedures.

(Amended by Stats. 2020, Ch. 344, Sec. 1.  (AB 1947)  Effective January 1, 2021.)

**B.**     <u>**EXHIBIT B: CLC § 96K**</u>

PL'S CAL. CODE APPENDIX IN SUPPORT OF PL'S MSJ | 3:23-CV-04597-EMC     MAY 24 2026

**State of California**

**LABOR CODE**

**Section 96**

---

96. The Labor Commissioner and the deputies and representatives authorized by the commissioner in writing shall, upon the filing of a claim therefor by an employee, or an employee representative authorized in writing by an employee, with the Labor Commissioner, take assignments of:

(a) Wage claims and incidental expense accounts and advances.

(b) Mechanics' and other liens of employees.

(c) Claims based on "stop orders" for wages and on bonds for labor.

(d) Claims for damages for misrepresentations of conditions of employment.

(e) Claims for unreturned bond money of employees.

(f) Claims for penalties for nonpayment of wages.

(g) Claims for the return of workers' tools in the illegal possession of another person.

(h) Claims for vacation pay, severance pay, or other compensation supplemental to a wage agreement.

(i) Awards for workers' compensation benefits in which the Workers' Compensation Appeals Board has found that the employer has failed to secure payment of compensation and where the award remains unpaid more than 10 days after having become final.

(j) Claims for loss of wages as the result of discharge from employment for the garnishment of wages.

(k) Claims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises.

(l) Claims for violations of standards issued by the Fast Food Council pursuant to Part 4.5.5 (commencing with Section 1470) of Division 2.

(Amended by Stats. 2022, Ch. 246, Sec. 3. (AB 257) Effective January 1, 2023.)

**C.**    **EXHIBIT C: CLC § 232.5**

PL'S CAL. CODE APPENDIX IN SUPPORT OF PL'S MSJ | 3:23-CV-04597-EMC    MAY 24 2026

**State of California**

**LABOR CODE**

**Section  232.5**

---

232.5.  No employer may do any of the following:

(a)  Require, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions.

(b)  Require an employee to sign a waiver or other document that purports to deny the employee the right to disclose information about the employer's working conditions.

(c)  Discharge, formally discipline, or otherwise discriminate against an employee who discloses information about the employer's working conditions.

(d)  This section is not intended to permit an employee to disclose proprietary information, trade secret information, or information that is otherwise subject to a legal privilege without the consent of his or her employer.

(Added by Stats. 2002, Ch. 934, Sec. 2.  Effective January 1, 2003.)

**D.**     <u>**EXHIBIT D: CLC §§ 1102.5-1102.6**</u>

PL'S CAL. CODE APPENDIX IN SUPPORT OF PL'S MSJ | 3:23-CV-04597-EMC     MAY 24 2026

**State of California**

**LABOR CODE**

**Section 1102.5**

---

1102.5. (a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

(d) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for having exercised their rights under subdivision (a), (b), or (c) in any former employment.

(e) A report made by an employee of a government agency to their employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

(f) (1) In addition to other remedies available, an employer is liable for a civil penalty not exceeding ten thousand dollars ($10,000) per employee for each violation of this section to be awarded to the employee who was retaliated against.

(2) In assessing this penalty, the Labor Commissioner shall consider the nature and seriousness of the violation based on the evidence obtained during the course of the investigation. The Labor Commissioner's consideration of the nature and

seriousness of the violation shall include, but is not limited to, the type of violation, the economic or mental harm suffered, and the chilling effect on the exercise of employment rights in the workplace, and shall be considered to the extent evidence obtained during the investigation concerned any of these or other relevant factors.

(g)  This section does not apply to rules, regulations, or policies that implement, or to actions by employers against employees who violate, the confidentiality of the lawyer-client privilege of Article 3 (commencing with Section 950) of, or the physician-patient privilege of Article 6 (commencing with Section 990) of, Chapter 4 of Division 8 of the Evidence Code, or trade secret information.

(h)  An employer, or a person acting on behalf of the employer, shall not retaliate against an employee because the employee is a family member of a person who has, or is perceived to have, engaged in any acts protected by this section.

(i)  For purposes of this section, "employer" or "a person acting on behalf of the employer" includes, but is not limited to, a client employer as defined in paragraph (1) of subdivision (a) of Section 2810.3 and an employer listed in subdivision (b) of Section 6400.

(j)  The court is authorized to award reasonable attorney's fees to a plaintiff who brings a successful action for a violation of these provisions.

(Amended by Stats. 2023, Ch. 612, Sec. 2.  (SB 497)  Effective January 1, 2024.)

**State of California**

**LABOR CODE**

**Section  1102.6**

---

1102.6.  In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.

(Added by Stats. 2003, Ch. 484, Sec. 3.  Effective January 1, 2004.)

**State of California**

**LABOR CODE**

**Section  1102.61**

---

1102.61.  In any civil action or administrative proceeding brought pursuant to Section 1102.5, an employee may petition the superior court in any county wherein the violation in question is alleged to have occurred, or wherein the person resides or transacts business, for appropriate temporary or preliminary injunctive relief as set forth in Section 1102.62.

(Added by Stats. 2017, Ch. 460, Sec. 3.  (SB 306)  Effective January 1, 2018.)

**State of California**

**LABOR CODE**

**Section  1102.62**

---

1102.62.  (a)  Upon the filing of the petition for injunctive relief, the petitioner shall cause notice thereof to be served upon the person, and thereupon the court shall have jurisdiction to grant such temporary injunctive relief as the court deems just and proper.

(b)  In addition to any harm resulting directly from the violation of Section 1102.5, the court shall consider the chilling effect on other employees asserting their rights under that section in determining whether temporary injunctive relief is just and proper.

(c)  Appropriate injunctive relief shall be issued on a showing that reasonable cause exists to believe a violation has occurred.

(d)  The order authorizing temporary injunctive relief shall remain in effect until an administrative or judicial determination or citation has been issued or until the completion of a review pursuant to subdivision (b) of Section 98.74, whichever is longer, or at a time certain set by the court. Thereafter, a preliminary or permanent injunction may be issued if it is shown to be just and proper. Any temporary injunctive relief shall not prohibit an employer from disciplining or terminating an employee for conduct that is unrelated to the claim of the retaliation.

(e)  Notwithstanding Section 916 of the Code of Civil Procedure, injunctive relief granted pursuant to this section shall not be stayed pending appeal.

(Added by Stats. 2017, Ch. 460, Sec. 4.  (SB 306)  Effective January 1, 2018.)

E.   **EXHIBIT E: CLC § 6310**

PL'S CAL. CODE APPENDIX IN SUPPORT OF PL'S MSJ | 3:23-CV-04597-EMC   MAY 24 2026

**State of California**

**LABOR CODE**

**Section 6310**

_____

6310.  (a) No person shall discharge or in any manner discriminate against any employee because the employee has done any of the following:

(1)  Made any oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, their employer, or their representative.

(2)  Instituted or caused to be instituted any proceeding under or relating to their rights or has testified or is about to testify in the proceeding or because of the exercise by the employee on behalf of themselves, or others of any rights afforded to them.

(3)  Participated in an occupational health and safety committee established pursuant to Section 6401.7.

(4)  Reported a work-related fatality, injury, or illness, requested access to occupational injury or illness reports and records that are made or maintained pursuant to Subchapter 1 (commencing with Section 14000) of Chapter 1 of Division 1 of Title 8 of the California Code of Regulations, or exercised any other rights protected by the federal Occupational Safety and Health Act (29 U.S.C. Sec. 651 et seq.), except in cases where the employee alleges they have been retaliated against because they have filed or made known their intention to file a workers' compensation claim pursuant to Section 132a, which is under the exclusive jurisdiction of the Workers' Compensation Appeals Board.

(b) Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by their employer because the employee has made a bona fide oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, their employer, or their representative, of unsafe working conditions, or work practices, in their employment or place of employment, or has participated in an employer-employee occupational health and safety committee, shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer. Any employer who willfully refuses to rehire, promote, or otherwise restore an employee or former employee who has been determined to be eligible for rehiring or promotion by a grievance procedure, arbitration, or hearing authorized by law, is guilty of a misdemeanor.

(c) An employer, or a person acting on behalf of the employer, shall not retaliate against an employee because the employee is a family member of a person who has, or is perceived to have, engaged in any acts protected by this section.

(d)  For purposes of this section, "employer" or "a person acting on behalf of the employer" includes, but is not limited to, a client employer as defined in paragraph (1) of subdivision (a) of Section 2810.3 and an employer listed in subdivision (b) of Section 6400.

(e)  Notwithstanding Section 6303 or other law, as used in this section, "employee" includes a domestic work employee, except for a person who performs household domestic service that is publicly funded, including publicly funded household domestic service provided to a recipient, client, or beneficiary with a share of cost in that service.

(Amended by Stats. 2020, Ch. 288, Sec. 1.  (AB 2658)  Effective January 1, 2021.)

**F.**    **EXHIBIT F: CGC § 12940**



15

**State of California**

**GOVERNMENT CODE**

**Section  12940**

---

12940.  It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

(a)  For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, reproductive health decisionmaking, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

(1)  This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability, or subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee with a physical or mental disability, if the employee, because of a physical or mental disability, is unable to perform the employee's essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations.

(2)  This part does not prohibit an employer from refusing to hire or discharging an employee who, because of the employee's medical condition, is unable to perform the employee's essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations. Nothing in this part shall subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee who, because of the employee's medical condition, is unable to perform the employee's essential duties, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations.

(3)  Nothing in this part relating to discrimination on account of marital status shall do either of the following:

(A)  Affect the right of an employer to reasonably regulate, for reasons of supervision, safety, security, or morale, the working of spouses in the same department, division, or facility, consistent with the rules and regulations adopted by the council.

(B)  Prohibit bona fide health plans from providing additional or greater benefits to employees with dependents than to those employees without or with fewer dependents.

(4)  Nothing in this part relating to discrimination on account of sex shall affect the right of an employer to use veteran status as a factor in employee selection or to give special consideration to Vietnam-era veterans.

(5)  (A) This part does not prohibit an employer from refusing to employ an individual because of the individual's age if the law compels or provides for that refusal. Promotions within the existing staff, hiring or promotion on the basis of experience and training, rehiring on the basis of seniority and prior service with the employer, or hiring under an established recruiting program from high schools, colleges, universities, or trade schools do not, in and of themselves, constitute unlawful employment practices.

(B)  The provisions of this part relating to discrimination on the basis of age do not prohibit an employer from providing health benefits or health care reimbursement plans to retired persons that are altered, reduced, or eliminated when the person becomes eligible for Medicare health benefits. This subparagraph applies to all retiree health benefit plans and contractual provisions or practices concerning retiree health benefits and health care reimbursement plans in effect on or after January 1, 2011.

(b)  For a labor organization, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, reproductive health decisionmaking, or veteran or military status of any person, to exclude, expel, or restrict from its membership the person, or to provide only second-class or segregated membership or to discriminate against any person because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, reproductive health decisionmaking, or veteran or military status of the person in the election of officers of the labor organization or in the selection of the labor organization's staff or to discriminate in any way against any of its members or against any employer or against any person employed by an employer.

(c)  For any person to discriminate against any person in the selection, termination, training, or other terms or treatment of that person in any apprenticeship training program, any other training program leading to employment, an unpaid internship, or another limited duration program to provide unpaid work experience for that person because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, reproductive health decisionmaking, or veteran or military status of the person discriminated against.

(d)  For any employer or employment agency to print or circulate or cause to be printed or circulated any publication, or to make any nonjob-related inquiry of an employee or applicant, either verbal or through use of an application form, that expresses, directly or indirectly, any limitation, specification, or discrimination as to

race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, reproductive health decisionmaking, or veteran or military status, or any intent to make any such limitation, specification, or discrimination. This part does not prohibit an employer or employment agency from inquiring into the age of an applicant, or from specifying age limitations, if the law compels or provides for that action.

(e) (1) Except as provided in paragraph (2) or (3), for any employer or employment agency to require any medical or psychological examination of an applicant, to make any medical or psychological inquiry of an applicant, to make any inquiry whether an applicant has a mental disability or physical disability or medical condition, or to make any inquiry regarding the nature or severity of a physical disability, mental disability, or medical condition.

(2) Notwithstanding paragraph (1), an employer or employment agency may inquire into the ability of an applicant to perform job-related functions and may respond to an applicant's request for reasonable accommodation.

(3) Notwithstanding paragraph (1), an employer or employment agency may require a medical or psychological examination or make a medical or psychological inquiry of a job applicant after an employment offer has been made but prior to the commencement of employment duties, provided that the examination or inquiry is job related and consistent with business necessity and that all entering employees in the same job classification are subject to the same examination or inquiry.

(f) (1) Except as provided in paragraph (2), for any employer or employment agency to require any medical or psychological examination of an employee, to make any medical or psychological inquiry of an employee, to make any inquiry whether an employee has a mental disability, physical disability, or medical condition, or to make any inquiry regarding the nature or severity of a physical disability, mental disability, or medical condition.

(2) Notwithstanding paragraph (1), an employer or employment agency may require any examinations or inquiries that it can show to be job related and consistent with business necessity. An employer or employment agency may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that worksite.

(g) For any employer, labor organization, or employment agency to harass, discharge, expel, or otherwise discriminate against any person because the person has made a report pursuant to Section 11161.8 of the Penal Code that prohibits retaliation against hospital employees who report suspected patient abuse by health facilities or community care facilities.

(h) For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.

(i) For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so.

(j) (1) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, reproductive health decisionmaking, or veteran or military status, to harass an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract. Harassment of an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the acts of nonemployees, with respect to harassment of employees, applicants, unpaid interns or volunteers, or persons providing services pursuant to a contract in the workplace, if the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing cases involving the acts of nonemployees, the extent of the employer's control and any other legal responsibility that the employer may have with respect to the conduct of those nonemployees shall be considered. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment.

(2) The provisions of this subdivision are declaratory of existing law, except for the new duties imposed on employers with regard to harassment.

(3) An employee of an entity subject to this subdivision is personally liable for any harassment prohibited by this section that is perpetrated by the employee, regardless of whether the employer or covered entity knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

(4) (A) For purposes of this subdivision only, "employer" means any person regularly employing one or more persons or regularly receiving the services of one or more persons providing services pursuant to a contract, or any person acting as an agent of an employer, directly or indirectly, the state, or any political or civil subdivision of the state, and cities. The definition of "employer" in subdivision (d) of Section 12926 applies to all provisions of this section other than this subdivision.

(B) Notwithstanding subparagraph (A), for purposes of this subdivision, "employer" does not include a religious association or corporation not organized for private profit, except as provided in Section 12926.2.

(C) For purposes of this subdivision, "harassment" because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions. Sexually harassing conduct need not be motivated by sexual desire.

(5) For purposes of this subdivision, "a person providing services pursuant to a contract" means a person who meets all of the following criteria:

(A) The person has the right to control the performance of the contract for services and discretion as to the manner of performance.

(B)  The person is customarily engaged in an independently established business.

(C)  The person has control over the time and place the work is performed, supplies the tools and instruments used in the work, and performs work that requires a particular skill not ordinarily used in the course of the employer's work.

(k) For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

(*l*) (1) For an employer or other entity covered by this part to refuse to hire or employ a person or to refuse to select a person for a training program leading to employment or to bar or to discharge a person from employment or from a training program leading to employment, or to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer or other entity covered by this part demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with the person's religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue hardship, as defined in subdivision (u) of Section 12926, on the conduct of the business of the employer or other entity covered by this part. Religious belief or observance, as used in this section, includes, but is not limited to, observance of a Sabbath or other religious holy day or days, reasonable time necessary for travel prior and subsequent to a religious observance, and religious dress practice and religious grooming practice as described in subdivision (q) of Section 12926. This subdivision shall also apply to an apprenticeship training program, an unpaid internship, and any other program to provide unpaid experience for a person in the workplace or industry.

(2) An accommodation of an individual's religious dress practice or religious grooming practice is not reasonable if the accommodation requires segregation of the individual from other employees or the public.

(3) An accommodation is not required under this subdivision if it would result in a violation of this part or any other law prohibiting discrimination or protecting civil rights, including subdivision (b) of Section 51 of the Civil Code and Section 11135 of this code.

(4) For an employer or other entity covered by this part to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted.

(m) (1) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship, as defined in subdivision (u) of Section 12926, to its operation.

(2) For an employer or other entity covered by this part to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted.

(n)  For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.

(o)  For an employer or other entity covered by this part, to subject, directly or indirectly, any employee, applicant, or other person to a test for the presence of a genetic characteristic.

(p)  For an employer to require, as a condition of employment, continued employment, or a benefit of employment, the disclosure of information relating to an applicant's or employee's reproductive health decisionmaking.

(q)  (1)  For an employer to include a statement in a job advertisement, posting, application, or other material that an applicant must have a driver's license unless both of the following conditions are satisfied:

(A)  The employer reasonably expects driving to be one of the job functions for the position.

(B)  The employer reasonably believes that satisfying the job function described in paragraph (1) using an alternative form of transportation would not be comparable in travel time or cost to the employer.

(2)  For purposes of this subdivision, "alternative form of transportation" includes, but is not limited to, all of the following:

(A)  Using a ride hailing service.

(B)  Using a taxi.

(C)  Carpooling.

(D)  Bicycling.

(E)  Walking.

(r)  Nothing in this section shall be interpreted as preventing the ability of employers to identify members of the military or veterans for purposes of awarding a veteran's preference as permitted by law.

(Amended by Stats. 2024, Ch. 877, Sec. 1.  (SB 1100)  Effective January 1, 2025.)

## 2505. Retaliation—Essential Factual Elements (Gov. Code, § 12940(h))

[*Name of plaintiff*] **claims that** [*name of defendant*] **retaliated against** [**him/her**/*nonbinary pronoun*] **for** [*describe activity protected by the FEHA*]. **To establish this claim,** [*name of plaintiff*] **must prove all of the following:**

1. **That** [*name of plaintiff*] [*describe protected activity*]**;**

2. **[That** [*name of defendant*] **[discharged/demoted/**[*specify other adverse employment action*]**]** [*name of plaintiff*]**;]**

   **[or]**

   **[That** [*name of defendant*] **subjected** [*name of plaintiff*] **to an adverse employment action;]**

   **[or]**

   **[That** [*name of plaintiff*] **was constructively discharged;]**

3. **That** [*name of plaintiff*]**'s** [*describe protected activity*] **was a substantial motivating reason for** [*name of defendant*]**'s [decision to [discharge/demote/**[*specify other adverse employment action*]**]**

   [*name of plaintiff*]**/conduct];**

4. **That** [*name of plaintiff*] **was harmed; and**

5. **That** [*name of defendant*]**'s decision to [discharge/demote/**[*specify other adverse employment action*]**]** [*name of plaintiff*] **was a substantial factor in causing** [**him/her**/*nonbinary pronoun*] **harm.**

**[[***Name of plaintiff***] does not have to prove [discrimination/harassment] in order to be protected from retaliation. If [he/she/***nonbinary pronoun***] [reasonably believed that** [*name of defendant*]**'s conduct was unlawful/requested a [disability/religious] accommodation], [he/she/***nonbinary pronoun***] may prevail on a retaliation claim even if [he/she/***nonbinary pronoun***] does not present, or prevail on, a separate claim for [discrimination/harassment/**[*other*]**]].]**

---

*New September 2003; Revised August 2007, April 2008, October 2008, April 2009, June 2010, June 2012, December 2012, June 2013, June 2014, June 2016, December 2016*

### Directions for Use

In elements 1 and 3, describe the protected activity in question. Government Code section 12940(h) provides that it is unlawful to retaliate against a person "because the person has opposed any practices forbidden under [Government Code sections

12900 through 12966] or because the person has filed a complaint, testified, or assisted in any proceeding under [the FEHA]." It is also unlawful to retaliate or otherwise discriminate against a person for requesting an accommodation for religious practice or disability, regardless of whether the request was granted. (Gov. Code, § 12940(*l*)(4) [religious practice], (m)(2) [disability].)

Read the first option for element 2 if there is no dispute as to whether the employer's acts constituted an adverse employment action. Read the second option and also give CACI No. 2509, *"Adverse Employment Action" Explained*, if whether there was an adverse employment action is a question of fact for the jury. For example, the case may involve a pattern of employer harassment consisting of acts that might not individually be sufficient to constitute retaliation, but taken as a whole establish prohibited conduct. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1052–1056 [32 Cal.Rptr.3d 436, 116 P.3d 1123].) Give both the first and second options if the employee presents evidence supporting liability under both a sufficient-single-act theory or a pattern-of-harassment theory. (See, e.g., *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 423–424 [69 Cal.Rptr.3d 1].) Also select "conduct" in element 3 if the second option or both the first and second options are included for element 2.

Retaliation in violation of the FEHA may be established by constructive discharge; that is, that the employer intentionally created or knowingly permitted working conditions to exist that were so intolerable that a reasonable person in the employee's position would have had no reasonable alternative other than to resign. (See *Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1253 [76 Cal.Rptr.3d 632].) If constructive discharge is alleged, give the third option for element 2 and also give CACI No. 2510, *"Constructive Discharge" Explained*. Also select "conduct" in element 3 if the third option is included for element 2.

Element 3 requires that the protected activity be a substantial motivating reason for the retaliatory acts. (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232 [152 Cal.Rptr.3d 392, 294 P.3d 49]; *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 479 [161 Cal.Rptr.3d 758]; see also CACI No. 2507, *"Substantial Motivating Reason" Explained*.)

Note that there are two causation elements. There must be a causal link between the retaliatory animus and the adverse action (see element 3), and there must be a causal link between the adverse action and damages (see element 5). (See *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713 [81 Cal.Rptr.3d 406].)

This instruction has been criticized in dictum because it is alleged that there is no element requiring retaliatory intent. (See *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1229–1231 [136 Cal.Rptr.3d 472].) The court urged the Judicial Council to redraft the instruction and the corresponding special verdict form so as to clearly state that retaliatory intent is a necessary element of a retaliation claim under FEHA.

The jury in the case was instructed per element 3 "that Richard Joaquin's reporting that he had been sexually harassed was a motivating reason for the City of Los

CACI No. 2505          FAIR EMPLOYMENT AND HOUSING ACT

Angeles' decision to terminate Richard Joaquin's employment or deny Richard Joaquin promotion to the rank of sergeant." The committee believes that the instruction as given is correct for the intent element in a retaliation case. (Cf. *Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 127–132 [199 Cal.Rptr.3d 462] [for disability discrimination, "substantial motivating reason" is only language required to express intent].) However, in cases such as *Joaquin* that involve allegations of a prohibited motivating reason (based on a report of sexual harassment) and a permitted motivating reason (based on a good faith belief that the report was falsified), the instruction may need to be modified to make it clear that plaintiff must prove that defendant acted based on the *prohibited* motivating reason and not the *permitted* motivating reason.

## Sources and Authority

- Retaliation Prohibited Under Fair Employment and Housing Act. Government Code section 12940(h).

- Retaliation for Requesting Reasonable Accommodation for Religious Practice and Disability Prohibited. Government Code section 12940(*l*)(4), (m)(2).

- "Person" Defined Under Fair Employment and Housing Act. Government Code section 12925(d).

- Prohibited Retaliation. Title 2 California Code of Regulations section 11021.

- "[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz, supra*, 36 Cal.4th at p. 1042, internal citations omitted.)

- "Actions for retaliation are 'inherently fact-driven'; it is the jury, not the court, that is charged with determining the facts." (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 299 [156 Cal.Rptr.3d 851].)

- "It is well established that a plaintiff in a retaliation case need only prove that a retaliatory animus was at least a substantial or motivating factor in the adverse employment decision." (*George v. California Unemployment Ins. Appeals Bd.* (2009) 179 Cal.App.4th 1475, 1492 [102 Cal.Rptr.3d 431].)

- "Retaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context. Accordingly, although an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as

1550

well as the workplace context of the claim." (*Yanowitz, supra*, 36 Cal.4th at p. 1052.)

- "Contrary to [defendant]'s assertion that it is improper to consider collectively the alleged retaliatory acts, there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries. Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute." (*Yanowitz, supra*, 36 Cal.4th at pp. 1055–1056, internal citations omitted.)

- "[U]nder certain circumstances, a retaliation claim may be brought by an employee who has complained of or opposed conduct, even when a court or jury subsequently determines the conduct actually was not prohibited by the FEHA. Indeed, this precept is well settled. An employee is protected against retaliation if the employee reasonably and in good faith believed that what he or she was opposing constituted unlawful employer conduct such as sexual harassment or sexual discrimination." (*Miller v. Department of Corr.* (2005) 36 Cal.4th 446, 473–474 [30 Cal.Rptr.3d 797, 115 P.3d 77], internal citations omitted.)

- "Clearly, section 12940, subdivision (h) encompasses a broad range of protected activity. An employee need not use specific legal terms or buzzwords in opposing discrimination. Nor is it necessary for an employee to file a formal charge. The protected activity element may be established by evidence that the plaintiff threatened to file a discrimination charge, by a showing that the plaintiff mistakenly, but reasonably and sincerely believed he was opposing discrimination, or by evidence an employer believed the plaintiff was a potential witness in another employee's FEHA action." (*Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 652 [163 Cal.Rptr.3d 392], internal citations and footnote omitted.)

- " 'Standing alone, an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination.' '[C]omplaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct.' [¶] But employees need not explicitly and directly inform their employer that they believe the employer's conduct was discriminatory or otherwise forbidden by FEHA." (*Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, 1046 [207 Cal.Rptr.3d 120], internal citation omitted.)

- "The relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1193 [220 Cal.Rptr.3d 42].)

- "Notifying one's employer of one's medical status, even if such medical status

constitutes a 'disability' under FEHA, does not fall within the protected activity identified in subdivision (h) of section 12940—i.e., it does not constitute engaging in opposition to any practices forbidden under FEHA or the filing of a complaint, testifying, or assisting in any proceeding under FEHA." (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 247 [206 Cal.Rptr.3d 841].)

• "[Plaintiff]'s advocacy for the disabled community and opposition to elimination of programs that might benefit that community do not fall within the definition of protected activity. [Plaintiff] has not shown the [defendant]'s actions amounted to discrimination against disabled citizens, but even if they could be so construed, discrimination by an employer against members of the general public is not a prohibited *employment* practice under the FEHA." (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 383 [209 Cal.Rptr.3d 809], original italics.)

• "Moreover, [defendant]'s actions had a substantial and material impact on the conditions of employment. The refusal to promote [plaintiff] is an adverse employment action under FEHA. There was also a pattern of conduct, the totality of which constitutes an adverse employment action. This includes undeserved negative job reviews, reductions in his staff, ignoring his health concerns and acts which caused him substantial psychological harm." (*Wysinger, supra*, 157 Cal.App.4th at p. 424, internal citations omitted.)

• "A long period between an employer's adverse employment action and the employee's earlier protected activity may lead to the inference that the two events are not causally connected. But if between these events the employer engages in a pattern of conduct consistent with a retaliatory intent, there may be a causal connection." (*Wysinger, supra*, 157 Cal.App.4th at p. 421, internal citation omitted.)

• "Both direct and circumstantial evidence can be used to show an employer's intent to retaliate. 'Direct evidence of retaliation may consist of remarks made by decisionmakers displaying a retaliatory motive.' Circumstantial evidence typically relates to such factors as the plaintiff's job performance, the timing of events, and how the plaintiff was treated in comparison to other workers." (*Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1153 [119 Cal.Rptr.2d 131], internal citations omitted.)

• "The retaliatory motive is 'proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter.' 'The causal link may be established by an inference derived from circumstantial evidence, "such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision." ' " (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615 [262 Cal.Rptr. 842], internal citations omitted.)

• "[A]n employer generally can be held liable for the retaliatory actions of its

supervisors." (*Wysinger, supra*, 157 Cal.App.4th at p. 420.)

- "Where a supervisor or other person of authority obstructs and threatens to punish a reporting employee if she persists in bringing a complaint to higher level officials, such acts may be considered by a jury to constitute actionable retaliation." (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 640 [323 Cal.Rptr.3d 369, 552 P.3d 430].)

- "Plaintiff, although a partner, is a person whom section 12940, subdivision (h) protects from retaliation for opposing the partnership-employer's harassment against those employees." (*Fitzsimons v. California Emergency Physicians Medical Group* (2012) 205 Cal.App.4th 1423, 1429 [141 Cal.Rptr.3d 265].)

- "[A]n employer may be found to have engaged in an adverse employment action, and thus liable for retaliation under section 12940(h), 'by permitting . . . fellow employees to punish [him] for invoking [his] rights.' We therefore hold that an employer may be held liable for coworker retaliatory conduct if the employer knew or should have known of coworker retaliatory conduct and either participated and encouraged the conduct, or failed to take reasonable actions to end the retaliatory conduct." (*Kelley v. The Conco Cos.* (2011) 196 Cal.App.4th 191, 213 [126 Cal.Rptr.3d 651], internal citation omitted.)

- "[T]he employer is liable for retaliation under section 12940, subdivision (h), but nonemployer individuals are not personally liable for their role in that retaliation." (*Jones v. The Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173 [72 Cal.Rptr.3d 624, 177 P.3d 232].)

- " 'The legislative purpose underlying FEHA's prohibition against retaliation is to prevent employers from deterring employees from asserting good faith discrimination complaints . . . .' Employer retaliation against employees who are believed to be prospective complainants or witnesses for complainants undermines this legislative purpose just as effectively as retaliation after the filing of a complaint. To limit FEHA in such a way would be to condone 'an absurd result' that is contrary to legislative intent. We agree with the trial court that FEHA protects employees against preemptive retaliation by the employer." (*Steele, supra*, 162 Cal.App.4th at p. 1255, internal citations omitted.)

- " 'The plaintiff's burden is to prove, by competent evidence, that the employer's proffered justification is mere pretext; i.e., that the presumptively valid reason for the employer's action was in fact a coverup. . . . In responding to the employer's showing of a legitimate reason for the complained-of action, the plaintiff cannot " 'simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," . . . and hence infer "that the employer did not act for the [asserted] non-discriminatory reasons." ' " ' " (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1409 [194 Cal.Rptr.3d 689].)

**CACI No. 2505**      FAIR EMPLOYMENT AND HOUSING ACT

- "The showing of pretext, while it may indicate retaliatory intent or animus, is not the sole means of rebutting the employer's evidence of nonretaliatory intent. ' "While 'pretext' is certainly a relevant issue in a case of this kind, making it a central or necessary issue is not sound. The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus. The employer's mere articulation of a legitimate reason for the action cannot answer this question; it can only dispel the *presumption* of improper motive that would otherwise *entitle* the employee to a judgment in his favor." ' " (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 94 [221 Cal.Rptr.3d 668], original italics.)

- "Government Code section 12940, subdivision (h), does not shield an employee against termination or lesser discipline for either lying or withholding information during an employer's internal investigation of a discrimination claim. In other words, public policy does not protect deceptive activity during an internal investigation. Such conduct is a legitimate reason to terminate an at-will employee." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1528 [152 Cal.Rptr.3d 154], footnotes omitted.)

- "Although appellant does not argue she was constructively discharged, such a claim is not necessary to find unlawful retaliation." (*McCoy, supra*, 216 Cal.App.4th at p. 301.)

- "The phrase 'because of' [in Gov. Code, § 12940(a)] is ambiguous as to the type or level of intent (i.e., motivation) and the connection between that motivation and the decision to treat the disabled person differently. This ambiguity is closely related to [defendant]'s argument that it is liable only if motivated by discriminatory animus. [¶] The statutory ambiguity in the phrase 'because of" was resolved by our Supreme Court about six months after the first jury trial [in *Harris, supra*, 56 Cal.4th at p. 203]." (*Wallace, supra*, 245 Cal.App.4th at p. 127.)

- " '[W]hile discrimination may be carried out by means of speech, such as a written notice of termination, and an illicit animus may be evidenced by speech, neither circumstance transforms a discrimination suit to one arising from speech. What gives rise to liability is not that the defendant spoke, but that the defendant denied the plaintiff a benefit, or subjected the plaintiff to a burden, on account of a discriminatory or retaliatory consideration.' " (*Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 772 [244 Cal.Rptr.3d 238].)

### Secondary Sources

8 Witkin, Summary of California Law (11th ed. 2017) Constitutional Law, §§ 1028, 1052–1054

Chin et al., California Practice Guide: Employment Litigation, Ch. 7-A, *Title VII And The California Fair Employment And Housing Act*, ¶¶ 7:121–7:205 (The Rutter Group)

1 Wrongful Employment Termination Practice (Cont.Ed.Bar 2d ed.) Discrimination Claims, §§ 2.83–2.88

2 Wilcox, California Employment Law, Ch. 41, *Substantive Requirements Under Equal Employment Opportunity Laws*, § 41.131 (Matthew Bender)

11 California Forms of Pleading and Practice, Ch. 115, *Civil Rights: Employment Discrimination*, §§ 115.37, 115.94 (Matthew Bender)

California Civil Practice: Employment Litigation, §§ 2:74–2:75 (Thomson Reuters)

**G.**   **EXHIBIT G: CCC § 51.9**

PL'S CAL. CODE APPENDIX IN SUPPORT OF PL'S MSJ | 3:23-CV-04597-EMC     MAY 24 2026

**State of California**

**CIVIL CODE**

**Section 51.9**

---

51.9.  (a)  A person is liable in a cause of action for sexual harassment under this section when the plaintiff proves all of the following elements:

(1)  There is a business, service, or professional relationship between the plaintiff and defendant or the defendant holds himself or herself out as being able to help the plaintiff establish a business, service, or professional relationship with the defendant or a third party. Such a relationship may exist between a plaintiff and a person, including, but not limited to, any of the following persons:

(A)  Physician, psychotherapist, or dentist. For purposes of this section, "psychotherapist" has the same meaning as set forth in paragraph (1) of subdivision (c) of Section 728 of the Business and Professions Code.

(B)  Attorney, holder of a master's degree in social work, real estate agent, real estate appraiser, investor, accountant, banker, trust officer, financial planner loan officer, collection service, building contractor, or escrow loan officer.

(C)  Executor, trustee, or administrator.

(D)  Landlord or property manager.

(E)  Teacher.

(F)  Elected official.

(G)  Lobbyist.

(H)  Director or producer.

(I)  A relationship that is substantially similar to any of the above.

(2)  The defendant has made sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe.

(3)  The plaintiff has suffered or will suffer economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right, as a result of the conduct described in paragraph (2).

(b)  In an action pursuant to this section, damages shall be awarded as provided by subdivision (b) of Section 52.

(c)  Nothing in this section shall be construed to limit application of any other remedies or rights provided under the law.

(d)  The definition of sexual harassment and the standards for determining liability set forth in this section shall be limited to determining liability only with regard to a cause of action brought under this section.

(Amended by Stats. 2018, Ch. 951, Sec. 1.  (SB 224)  Effective January 1, 2019.)

**H.**     **EXHIBIT H: CCC § 1001**

**State of California**

**CODE OF CIVIL PROCEDURE**

**Section  1001**

---

1001.  (a)  Notwithstanding any other law, a provision within a settlement agreement that prevents or restricts the disclosure of factual information related to a claim filed in a civil action or a complaint filed in an administrative action, regarding any of the following, is prohibited:

    (1)  An act of sexual assault that is not governed by subdivision (a) of Section 1002.

    (2)  An act of sexual harassment, as defined in Section 51.9 of the Civil Code.

    (3)  An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing harassment or discrimination, as described in subdivisions (a), (h), (i), (j), and (k) of Section 12940 of the Government Code.

    (4)  An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination by the owner of a housing accommodation, as described in Section 12955 of the Government Code.

    (b)  Notwithstanding any other law, in a civil matter described in paragraphs (1) to (4), inclusive, of subdivision (a), a court shall not enter, by stipulation or otherwise, an order that restricts the disclosure of information in a manner that conflicts with subdivision (a).

    (c)  Notwithstanding subdivisions (a) and (b), a provision that shields the identity of the claimant and all facts that could lead to the discovery of the claimant's identity, including pleadings filed in court, may be included within a settlement agreement at the request of the claimant. This subdivision does not apply if a government agency or public official is a party to the settlement agreement.

    (d)  Except as authorized by subdivision (c), a provision within a settlement agreement that prevents or restricts the disclosure of factual information related to the claim described in subdivision (a) that is entered into on or after January 1, 2019, is void as a matter of law and against public policy.

    (e)  This section does not prohibit the entry or enforcement of a provision in any agreement that precludes the disclosure of the amount paid in settlement of a claim.

    (f)  In determining the factual foundation of a cause of action for civil damages under subdivision (a), a court may consider the pleadings and other papers in the record, or any other findings of the court.

    (g)  The amendments made to paragraphs (3) and (4) of subdivision (a) by Senate Bill 331 of the 2021–22 Regular Session apply only to agreements entered into on or after January 1, 2022. All other amendments made to this section by Senate Bill 331

of the 2021–22 Regular Session shall not be construed as substantive changes, but instead as merely clarifying existing law.

(Amended by Stats. 2022, Ch. 28, Sec. 26.  (SB 1380)  Effective January 1, 2023.)

# I.    EXHIBIT I: CPC 266; 647

## 1151. Pandering (Pen. Code, § 266i)

---

The defendant is charged [in Count _____] with pandering [in violation of Penal Code section 266i].

To prove that the defendant is guilty of pandering, the People must prove that:

<Alternative 1A-persuaded/procured>

[1. The defendant successfully (persuaded/procured) _____ <insert name> to become a prostitute(;/.)]

<Alternative 1B-promises/threats/violence used to cause person to become prostitute>

[1. The defendant used (promises[,]/ threats[,]/ violence[,]/ [or] any device or scheme) to (cause/persuade/encourage/induce) _____ <insert name> to become a prostitute[, although the defendant's efforts need not have been successful](;/.)]

<Alternative 1C-arranged/procured a position>

[1. The defendant (arranged/procured a position) for _____ <insert name> to be a prostitute in either a house of prostitution or any other place where prostitution is encouraged or allowed(;/.)]

<Alternative 1D-promises/threats/violence used to cause person to remain>

[1. The defendant used (promises[,]/ threats[,]/ violence[,]/ [or] any device or scheme) to (cause/persuade/encourage/induce) _____ <insert name> to remain as a prostitute in a house of prostitution or any other place where prostitution is encouraged or allowed(;/.)]

<Alternative 1E-used fraud>

[1. The defendant used fraud, trickery, or duress [or abused a position of confidence or authority] to (persuade/procure) _____ <insert name> to (be a prostitute/enter any place where prostitution is encouraged or allowed/enter or leave California for the purpose of prostitution)(;/.)]

<Alternative 1F-received money>

[1. The defendant (received/gave/agreed to receive/agreed to give) money or something of value in exchange for (persuading/attempting to persuade/procuring/attempting to procure) _____ <insert name> to (be a prostitute/enter or

922

---

18

SEX OFFENSES                                         CALCRIM No. 1151

leave California for the purpose of prostitution)(;/.)]

   AND

   2.  The defendant intended to influence _____ <insert name> to be a prostitute(;/.)

   <Give element 3 when defendant charged with pandering a minor.>

   [AND

   3.  _____ <insert name> was (16 years old or older/under the age of 16) at the time the defendant acted.]

[It does not matter whether _____ <insert name> was (a prostitute already/ [or] an undercover police officer).]

A *prostitute* is a person who engages in sexual intercourse or any lewd act with another person in exchange for money [or other compensation]. [Pandering requires that an intended act of prostitution be with someone other than the defendant.] A *lewd act* means physical contact of the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification.

[*Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that would cause a reasonable person to do [or submit to] something that he or she would not do [or submit to] otherwise. When deciding whether the act was accomplished by duress, consider all the circumstances, including the person's age and (her/his) relationship to the defendant.]

[Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun.]

_____

*New January 2006; Revised April 2011, February 2012, August 2012, February 2015, April 2020, March 2021*

## BENCH NOTES

*Instructional Duty*

The court has a **sua sponte** duty to give this instruction defining the elements of the crime.

In element 1, give the appropriate alternative A–F depending on the evidence in the case. (See *People v. Montgomery* (1941) 47 Cal.App.2d 1, 12, 24, 27-28 [117 P.2d 437] [statutory alternatives are not mutually exclusive], disapproved on other grounds in *People v. Dillon* (1983) 34 Cal.3d 441, 454 fn. 2 [194 Cal.Rptr. 390, 668 P.2d 697] and *Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 301 fn. 11 [124 Cal.Rtpr. 204, 540 P.2d 44].)

923

**CALCRIM No. 1151**                                                    **SEX OFFENSES**

The committee included "persuade" and "arrange" as options in element one because the statutory language, "procure," may be difficult for jurors to understand.

Give bracketed element 3 if it is alleged that the person procured, or otherwise caused to act, by the defendant was a minor "over" or "under" the age of 16 years. (Pen. Code, § 266i(b).)

Give the bracketed paragraph defining duress on request if there is sufficient evidence that duress was used to procure a person for prostitution. (Pen. Code, § 266i(a)(5); see *People v. Leal* (2004) 33 Cal.4th 999, 1004-1010 [16 Cal.Rptr.3d 869, 94 P.3d 1071] [definition of "duress"].)

Give the bracketed paragraph about calculating age if requested. (Fam. Code, § 6500; *In re Harris* (1993) 5 Cal.4th 813, 849-850 [21 Cal.Rptr.2d 373, 855 P.2d 391].)

There is a split of authority on whether pandering requires that services be procured for a person other than the defendant. (*People v. Dixon* (2011) 191 Cal.App.4th 1154, 1159-1160 [119 Cal.Rptr.3d 901] [third person required]; *People v. Jacobo* (2019) 37 Cal.App.5th 32, 47 [249 Cal.Rptr.3d 236] [no third person required].) If the court concludes that Penal Code section 266i(a)(2) requires a third person, give the bracketed sentence that begins with "Pandering requires."

**Defenses-Instructional Duty**

If necessary for the jury's understanding of the case, the court must instruct **sua sponte** on a defense theory in evidence, for example, that nude modeling does not constitute an act of prostitution and that an act of procuring a person solely for the purpose of nude modeling does not violate either the pimping or pandering statute. (*People v. Hill* (1980) 103 Cal.App.3d 525, 536-537 [163 Cal.Rptr. 99].)

## AUTHORITY

- Elements. Pen. Code, § 266i.

- Prostitution Defined. Pen. Code, § 647(b); *People v. Hill* (1980) 103 Cal.App.3d 525, 534-535 [163 Cal.Rptr. 99]; *People v. Romo* (1962) 200 Cal.App.2d 83, 90-91 [19 Cal.Rptr. 179]; *Wooten v. Superior Court* (2001) 93 Cal.App.4th 422, 431-433 [113 Cal.Rptr.2d 195] [lewd act requires touching between prostitute and customer].

- Procurement Defined. *People v. Montgomery* (1941) 47 Cal.App.2d 1, 12 [117 P.2d 437], disapproved on other grounds in *People v. Dillon* (1983) 34 Cal.3d 441, 454 fn. 2 [194 Cal.Rptr. 390, 668 P.2d 697] and *Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 301 fn. 11 [124 Cal.Rtpr. 204, 540 P.2d 44].

- Proof of Actual Prostitution Not Required. *People v. Osuna* (1967) 251 Cal.App.2d 528, 531-532 [59 Cal.Rptr. 559].

- Duress Defined. *People v. Leal* (2004) 33 Cal.4th 999, 1004-1010 [16 Cal.Rptr.3d 869, 94 P.3d 1071]; *People v. Pitmon* (1985) 170 Cal.App.3d 38, 50 [216 Cal.Rptr. 221]; *People v. Cochran* (2002) 103 Cal.App.4th 8, 13-14 [126 Cal.Rptr.2d 416].

924

PL'S CAL. CODE APPENDIX IN SUPPORT OF PL'S MSJ | 3:23-CV-04597-EMC     MAY 24 2026

**SEX OFFENSES**                                             **CALCRIM No. 1151**

- Good Faith Belief That Minor Is 18 No Defense to Pimping and Pandering. *People v. Branch* (2010) 184 Cal.App.4th 516, 521-522 [109 Cal.Rptr.3d 412].
- Specific Intent Crime. *People v. Zambia* (2011) 51 Cal.4th 965, 980 [127 Cal.Rptr.3d 662, 254 P.3d 965].
- Victim May [Appear to] Be a Prostitute Already. *People v. Zambia* (2011) 51 Cal.4th 965, 981 [127 Cal.Rptr.3d 662, 254 P.3d 965].
- Encouraging Person to Become Prostitute Need Not Be Successful. *People v. Zambia* (2011) 51 Cal.4th 965, 980 [127 Cal.Rptr.3d 662, 254 P.3d 965].
- This Instruction Upheld. *People v. Campbell* (2020) 51 Cal.App.5th 463, 495-496 [265 Cal.Rptr.3d 136].

## LESSER INCLUDED OFFENSES

- Attempted Pandering. Pen. Code, §§ 664, 266i; *People v. Charles* (1963) 218 Cal.App.2d 812, 819 [32 Cal.Rptr. 653]; *People v. Benenato* (1946) 77 Cal.App.2d 350, 366-367 [175 P.2d 296], disapproved on other grounds in *In re Wright* (1967) 65 Cal.2d 650, 654-655, fn. 3 [56 Cal.Rptr. 110, 422 P.2d 998].

There is no crime of aiding and abetting prostitution. (*People v. Gibson* (2001) 90 Cal.App.4th 371, 385 [108 Cal.Rptr.2d 809].)

## RELATED ISSUES

See Related Issues section to CALCRIM No. 1150, *Pimping*.

## SECONDARY SOURCES

2 Witkin & Epstein, California Criminal Law (4th ed. 2012) Sex Offenses and Crimes Against Decency, § 85.

6 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 144, *Crimes Against Order*, § 144.11[3] (Matthew Bender).

Couzens & Bigelow, Sex Crimes: California Law and Procedure §§ 12:16, 12:17 (The Rutter Group).

925

21

**State of California**

**PENAL CODE**

**Section  266i**

---

266i.  (a)  Except as provided in subdivision (b), any person who does any of the following is guilty of pandering, a felony, and shall be punishable by imprisonment in the state prison for three, four, or six years:

(1)  Procures another person for the purpose of prostitution.

(2)  By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute.

(3)  Procures for another person a place as an inmate in a house of prostitution or as an inmate of any place in which prostitution is encouraged or allowed within this state.

(4)  By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages an inmate of a house of prostitution, or any other place in which prostitution is encouraged or allowed, to remain therein as an inmate.

(5)  By fraud or artifice, or by duress of person or goods, or by abuse of any position of confidence or authority, procures another person for the purpose of prostitution, or to enter any place in which prostitution is encouraged or allowed within this state, or to come into this state or leave this state for the purpose of prostitution.

(6)  Receives or gives, or agrees to receive or give, any money or thing of value for procuring, or attempting to procure, another person for the purpose of prostitution, or to come into this state or leave this state for the purpose of prostitution.

(b)  Any person who does any of the acts described in subdivision (a) with another person who is a minor is guilty of pandering, a felony, and shall be punishable as follows:

(1)  If the other person is a minor 16 years of age or older, the offense is punishable by imprisonment in the state prison for three, four, or six years.

(2)  If the other person is under 16 years of age, the offense is punishable by imprisonment in the state prison for three, six, or eight years.

(Amended by Stats. 2010, Ch. 709, Sec. 9.  (SB 1062)  Effective January 1, 2011.)

**State of California**

**PENAL CODE**

**Section  647**

---

647.  Except as provided in paragraph (5) of subdivision (b) and in subdivisions (k) and (*l*), a person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor:

(a)  An individual who solicits anyone to engage in or who engages in lewd or dissolute conduct in a public place or in a place open to the public or exposed to public view.

(b)  (1)  An individual who solicits, or who agrees to engage in, or who engages in, an act of prostitution with the intent to receive compensation, money, or anything of value from another person. An individual agrees to engage in an act of prostitution when, with specific intent to so engage, the individual manifests an acceptance of an offer or solicitation by another person to so engage, regardless of whether the offer or solicitation was made by a person who also possessed the specific intent to engage in an act of prostitution.

(2)  An individual who solicits, or who agrees to engage in, or who engages in, an act of prostitution with another person who is 18 years of age or older in exchange for the individual providing compensation, money, or anything of value to the other person. An individual agrees to engage in an act of prostitution when, with specific intent to so engage, the individual manifests an acceptance of an offer or solicitation by another person who is 18 years of age or older to so engage, regardless of whether the offer or solicitation was made by a person who also possessed the specific intent to engage in an act of prostitution.

(3)  An individual who solicits, or who agrees to engage in, or who engages in, an act of prostitution with another person who is a minor in exchange for the individual providing compensation, money, or anything of value to the minor. An individual agrees to engage in an act of prostitution when, with specific intent to so engage, the individual manifests an acceptance of an offer or solicitation by someone who is a minor to so engage, regardless of whether the offer or solicitation was made by a minor who also possessed the specific intent to engage in an act of prostitution.

(4)  A manifestation of acceptance of an offer or solicitation to engage in an act of prostitution does not constitute a violation of this subdivision unless some act, in addition to the manifestation of acceptance, is done within this state in furtherance of the commission of the act of prostitution by the person manifesting an acceptance of an offer or solicitation to engage in that act. As used in this subdivision, "prostitution" includes any lewd act between persons for money or other consideration.

(5)  Notwithstanding paragraphs (1) to (3), inclusive, this subdivision does not apply to a child under 18 years of age who is alleged to have engaged in conduct to

receive money or other consideration that would, if committed by an adult, violate this subdivision. A commercially exploited child under this paragraph may be adjudged a dependent child of the court pursuant to paragraph (2) of subdivision (b) of Section 300 of the Welfare and Institutions Code and may be taken into temporary custody pursuant to subdivision (a) of Section 305 of the Welfare and Institutions Code, if the conditions allowing temporary custody without warrant are met.

(c)  Who accosts other persons in a public place or in a place open to the public for the purpose of begging or soliciting alms.

(d)  Who loiters in or about a toilet open to the public for the purpose of engaging in or soliciting a lewd or lascivious or an unlawful act.

(e)  Who lodges in a building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it.

(f)  Who is found in a public place under the influence of intoxicating liquor, a drug, controlled substance, toluene, or a combination of an intoxicating liquor, drug, controlled substance, or toluene, in a condition that they are unable to exercise care for their own safety or the safety of others, or by reason of being under the influence of intoxicating liquor, drug, controlled substance, toluene, or a combination of an intoxicating liquor, drug, or toluene, interferes with or obstructs or prevents the free use of a street, sidewalk, or other public way.

(g)  If a person has violated subdivision (f), a peace officer, if reasonably able to do so, shall place the person, or cause the person to be placed, in civil protective custody. The person shall be taken to a facility, designated pursuant to Section 5170 of the Welfare and Institutions Code, for the 72-hour treatment and evaluation of inebriates. A peace officer may place a person in civil protective custody with that kind and degree of force authorized to effect an arrest for a misdemeanor without a warrant. A person who has been placed in civil protective custody shall not thereafter be subject to criminal prosecution or juvenile court proceeding based on the facts giving rise to this placement. This subdivision does not apply to the following persons:

(1)  A person who is under the influence of a drug or under the combined influence of intoxicating liquor and a drug.

(2)  A person who a peace officer has probable cause to believe has committed a felony, or who has committed a misdemeanor in addition to subdivision (f).

(3)  A person who a peace officer in good faith believes will attempt escape or will be unreasonably difficult for medical personnel to control.

(h)  Who loiters, prowls, or wanders upon the private property of another, at any time, without visible or lawful business with the owner or occupant. As used in this subdivision, "loiter" means to delay or linger without a lawful purpose for being on the property and for the purpose of committing a crime as opportunity may be discovered.

(i)  Who, while loitering, prowling, or wandering upon the private property of another, at any time, peeks in the door or window of an inhabited building or structure, without visible or lawful business with the owner or occupant.

**J.**     <u>**EXHIBIT J: AB-1883**</u>

AMENDED IN ASSEMBLY MAY 18, 2026

AMENDED IN ASSEMBLY APRIL 13, 2026

AMENDED IN ASSEMBLY MARCH 12, 2026

CALIFORNIA LEGISLATURE—2025–26 REGULAR SESSION

# ASSEMBLY BILL No. 1883

### Introduced by Assembly Member Bryan

February 12, 2026

An act to add Part 5.8 (commencing with Section 1580) to Division 2 of the Labor Code, relating to employment.

LEGISLATIVE COUNSEL'S DIGEST

AB 1883, as amended, Bryan. Workplace surveillance tools.

Existing law establishes the Division of Labor Standards Enforcement within the Department of Industrial Relations. Existing law authorizes the division, which is headed by the Labor Commissioner, to enforce the Labor Code and all labor laws of the state, the enforcement of which is not specifically vested in any other officer, board, or commission.

This bill would generally regulate the use of workplace surveillance tools and an employer's use of worker data. The bill would prohibit an employer from using a workplace surveillance tool on workers for various purposes, including preventing compliance with laws or regulations, inferring information about workers engaging in a protected activity, making inferences about an individual's emotional state or based on their gait, or collecting neural data. The bill would prohibit an employer from using facial recognition ~~technology, unless it is used strictly to open a locked device or grant access to locked or secure areas.~~ *technology to make inferences about a worker for firing, deactivation, or disciplinary purposes.* The bill ~~would~~ *would, with certain exceptions,*

96

**AB 1883**                        — 2 —

also prohibit an employer from using a workplace surveillance tool to infer specified categories of information about a worker, including, among others, their veteran status, ancestral history, religious beliefs, or disability status.

This bill would require the Labor Commissioner to enforce the bill's provisions, would authorize an employee to bring a civil action for specified remedies for a violation of the bill's provisions, and would authorize a public prosecutor to enforce the provisions. The bill would subject an employer who violates the bill's provisions to a civil penalty of up to $500 for each violation. The bill would define various terms for purposes of its provisions.

*This bill would exempt from its provisions the use of a workplace artificial intelligence tool or a workplace surveillance tool to the extent that its use is required by, or reasonably necessary to comply with, a federal statute, federal regulation, or binding federal contract relating to the development of aircraft for use in the national airspace or the development of products or services for national security, military, space, or defense purposes.*

The bill would include findings that changes proposed by this bill address a matter of statewide concern rather than a municipal affair and, therefore, apply to all cities, including charter cities.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

*The people of the State of California do enact as follows:*

SECTION 1. Part 5.8 (commencing with Section 1580) is added to Division 2 of the Labor Code, to read:

PART 5.8. WORKPLACE SURVEILLANCE TOOLS

1580. As used in this part:

(a) (1) "Employer" means a person or governmental entity that directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, benefits, other compensation, hours, working conditions, access to work or job opportunities, or other terms or conditions of employment, of any worker, including all branches of state government, and all cities, counties, cities and counties, charter cities, charter counties, special districts, including transit districts, the University of California,

— 3 —                    **AB 1883**

the California State University, community college districts, school districts, or any other state or local governmental entity.

(2) "Employer" includes an employer's labor contractor.

(b) "Facial recognition technology" means any technology that analyzes a worker's facial features to identify, verify, or track a worker in a still or video image.

(c) "Neural data" means information that is generated by measuring the activity of a worker's central or peripheral nervous system, and that is not inferred from nonneural information.

(d) "Public prosecutor" has the same meaning as defined in Section 180.

(e) "Worker" means a natural person, an employee of, or an independent contractor providing service to, or through, a business or a state or local governmental entity in a workplace.

(f) "Workplace surveillance tool" means any system, application, instrument, or device that collects or facilitates the collection of worker data, activities, communications, actions, biometrics, or behaviors by means other than direct observation by a person, including, but not limited to, video or audio surveillance, continuous incremental time-tracking tools, geolocation, electromagnetic tracking, photoelectronic tracking, or that utilizes a photo-optical system or other means.

1581. (a) (1) An employer shall not use a workplace surveillance tool on workers to do any of the following:

(A) Prevent compliance with or violate any federal, state, or local labor, occupational health and safety, employment, or civil rights laws or regulations.

(B) Infer information about workers engaging in activity protected by state or federal law.

(C) Make inferences about an individual's emotional state.

(D) Make inferences about an individual based on their gait.

(E) Collect neural data.

(2) An employer shall not use facial recognition ~~technology, unless it is used strictly to open a locked device or grant access to locked or secure areas.~~ technology *to make inferences about a worker for firing, deactivation, or disciplinary purposes.*

(3) An employer shall not use a workplace surveillance tool to infer a worker's protected status under Section 12940 of the Government Code.

**AB 1883**          — 4 —

(b) This section does not prohibit an employer from using a workplace surveillance tool to ensure safety, provided that the tool does not incorporate artificial intelligence that makes inferences or predictions based on a worker's emotional, ~~facial,~~ gait, neural data, protected status under Section 12940 of the Government Code, or about activity protected by state or federal law.

1582. (a) The Labor Commissioner shall enforce this part, including investigating an alleged violation, and ordering appropriate temporary relief to mitigate a violation or maintain the status quo pending the completion of a full investigation or hearing through the procedures set forth in Section 98, 98.3, 98.7, 98.74, or 1197.1, including issuing a citation against an employer who violates this part and filing a civil action. If a citation is issued, the procedures for issuing, contesting, and enforcing judgments for citations and civil penalties issued by the Labor Commissioner shall be the same as those set out in Section 98.74 or 1197.1, as applicable.

(b) This part may also be enforced by a public prosecutor pursuant to Chapter 8 (commencing with Section 180) of Division 1.

(c) Alternatively to subdivisions (a) and (b), a worker, or their exclusive representative, who has suffered a violation of this part may bring a civil action in a court of competent jurisdiction for damages caused by the violation.

(d) In any civil action brought pursuant to subdivision (a), (b), or (c), the petitioner may seek appropriate temporary or preliminary injunctive relief, including punitive damages, and reasonable attorney's fees and costs.

(e) (1) Except as provided in paragraph (2), in addition to any other remedy, an employer who violates this part may be subject to a penalty of up to five hundred dollars ($500) for each violation.

(2) An employee, the Labor Commissioner, or a public prosecutor may recover a penalty under this part as a statutory penalty paid to the employee or a civil penalty, but not both, for the same violation.

(f) An action brought pursuant to this section may be brought in the superior court in any county in which the violation in question is alleged to have occurred or in which the employer resides.

(g) This part does not preempt any city, county, or city and county ordinance that provides equal or greater protection to workers who are covered by this part.

*1583.  (a) This part shall not apply to the use of a workplace artificial intelligence tool or a workplace surveillance tool to the extent that use of the tool is required by, or reasonably necessary to comply with, a federal statute, federal regulation, or binding federal contract relating to any of the following:*

*(1) The development of aircraft for use in the national airspace.*

*(2) The development of products or services for national security, military, space, or defense purposes.*

*(b) The exemption in this section applies only to the operations covered by a federal statute, federal regulation, or binding federal contract outlined in paragraphs (1) and (2) of subdivision (a).*

SEC. 2.  The Legislature finds and declares that Section 1 of this act adding Part 5.8 (commencing with Section 1580) to Division 2 of the Labor Code addresses a matter of statewide concern rather than a municipal affair as that term is used in Section 5 of Article XI of the California Constitution. Therefore, Section 1 of this act applies to all cities, including charter cities.

O

 

# AB-1883 Workplace surveillance tools.  (2025-2026)

| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |
|---|---|---|---|---|---|---|

**Senate**

**Assembly**    1st    Cmt    2nd    3rd

### Bill Status

| | |
|---|---|
| **Measure:** | AB-1883 |
| **Lead Authors:** | Bryan (A) |
| **Principal Coauthors:** | - |
| **Coauthors:** | - |
| Topic: | Workplace surveillance tools. |
| **31st Day in Print:** | 03/15/26 |
| Title: | An act to add Part 5.8 (commencing with Section 1580) to Division 2 of the Labor Code, relating to employment. |
| **House Location:** | Assembly |
| **Last Amended Date:** | 05/18/26 |

### Type of Measure

| |
|---|
| Active Bill - In Floor Process |
| Majority Vote Required |
| Non-Appropriation |
| Fiscal Committee |
| Non-State-Mandated Local Program |
| Non-Urgency |
| Non-Tax levy |

### Last 5 History Actions

| Date | Action |
|---|---|
| 05/19/26 | Read second time. Ordered to third reading. |
| 05/18/26 | Read second time and amended. Ordered returned to second reading. |
| 05/14/26 | From committee: Amend, and do pass as amended. (Ayes 10. Noes 1.) (May 14). |
| 04/29/26 | In committee: Set, first hearing. Referred to APPR. suspense file. |
| 04/20/26 | From committee: Do pass and re-refer to Com. on APPR. (Ayes 11. Noes 2.) (April 16). Re-referred to Com. on APPR. |

### Daily File Status

| File | File Date | Item |
|---|---|---|
| Asm 3rd Reading File Assembly Bills | 05-26-2026 | 315 |

 

| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

## AB-1883 Workplace surveillance tools. (2025-2026)

| Date | Action |
|------|--------|
| 05/19/26 | Read second time. Ordered to third reading. |
| 05/18/26 | Read second time and amended. Ordered returned to second reading. |
| 05/14/26 | From committee: Amend, and do pass as amended. (Ayes 10. Noes 1.) (May 14). |
| 04/29/26 | In committee: Set, first hearing. Referred to APPR. suspense file. |
| 04/20/26 | From committee: Do pass and re-refer to Com. on APPR. (Ayes 11. Noes 2.) (April 16). Re-referred to Com. on APPR. |
| 04/14/26 | Re-referred to Com. on P. & C.P. |
| 04/13/26 | From committee chair, with author's amendments: Amend, and re-refer to Com. on P. & C.P. Read second time and amended. |
| 03/19/26 | From committee: Do pass and re-refer to Com. on P. & C.P. (Ayes 5. Noes 0.) (March 18). Re-referred to Com. on P. & C.P. |
| 03/16/26 | Re-referred to Com. on L. & E. |
| 03/12/26 | From committee chair, with author's amendments: Amend, and re-refer to Com. on L. & E. Read second time and amended. |
| 03/02/26 | Referred to Coms. on L. & E., P. & C.P. and JUD. |
| 02/13/26 | From printer. May be heard in committee March 15. |
| 02/12/26 | Read first time. To print. |

**AB 1883**
Page 1

Date of Hearing:   April 16, 2026
Fiscal: Yes

ASSEMBLY COMMITTEE ON PRIVACY AND CONSUMER PROTECTION
Rebecca Bauer-Kahan, Chair
AB 1883 (Bryan) – As Amended April 13, 2026

**SUBJECT**:  Workplace surveillance tools

**SYNOPSIS**

*Presumably, the right to privacy should not be a commodity that one is required to exchange for the opportunity of employment – or for people to access goods and services, for that matter. While employers surveilling their workers, both during and after work hours, is far from a new phenomenon, advances in affordable surveillance technology have made that surveillance much more intrusive. As with personal information in general, employers can collect vast dossiers on their employees by gathering sweeping amounts of data about every aspect of their jobs and personal lives. Many workers, while generally aware they are being monitored, are not aware of the extent of the surveillance or what is being done with the information.*

*Employers are using more surveillance technology than ever — digital cameras, motion scanners, Radio Frequency Identity (RFID) badges, Apple Watch badges, Bluetooth beacons, keystroke logging — to track every single movement of workers in the office and to gauge their productivity, potentially without the employee knowing that they are being surveilled or what personal information is being collected. Some workplaces are using biometric data such as eye movements, body shifts, and facial expressions, captured by webcams to evaluate whether employees are being appropriately attentive in their work tasks. Even body temperature, sweat, and frequency of bathroom visits can be tracked and analyzed by employers.*

*This bill, sponsored by the California Labor Federation, seeks to regulate a specific subset of particularly invasive and scientifically questionable practices, including inferring information about workers engaging in a protected activity; making inferences about a person's emotional state; making inferences about an individual based on their gait; or collecting neural data. The bill also states that nothing prohibits employers from using workplace surveillance tools to ensure safety, provided that the tool does not incorporate artificial intelligence that makes inferences or predictions about a worker's emotional state, gait, protected status, a protected activity, or collect neural data.*

*This bill is supported by over one dozen labor and privacy organizations. It is opposed by a number of business and local government organizations, including the California State Association of Counties, League of California Cities, the California Chamber of Commerce, and the California Grocers Association.*

*This bill was previously heard by the Labor and Employment Committee, where it passed on a 5-0 vote. If passed by this Committee, it will next be referred to the Judiciary Committee.*

**EXISTING LAW**:

1)  Provides, pursuant to the California Constitution, that all people are free and independent by nature and have inalienable rights. Among these is the fundamental right to privacy. (Cal. Const. art. I, § 1.)

2)  States that the "right to privacy is a personal and fundamental right protected by Section 1 of Article I of the Constitution of California and by the United States Constitution and that all individuals have a right of privacy in information pertaining to them." Further states these findings of the Legislature:

   a.  The right to privacy is being threatened by the indiscriminate collection, maintenance, and dissemination of personal information and the lack of effective laws and legal remedies.

   b.  The increasing use of computers and other sophisticated information technology has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information.

   c.  In order to protect the privacy of individuals, it is necessary that the maintenance and dissemination of personal information be subject to strict limits. (Civ. Code § 1798.1.)

3)  States that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. (Pen. Code § 630.)

   a.  Prohibits a person from intentionally and without the consent of all parties to a confidential communication, using an electronic amplifying or recording device to eavesdrop upon or record confidential communication.

   b.  For purposes of this section, defines a "person" to mean an individual, business association, partnership, corporation, limited liability company, or other legal entity. (Pen. Code § 632.)

4)  Establishes the California Consumer Privacy Act (CCPA). (Civ. Code §§ 1798.100-1798.199.100.)

5)  Provides a consumer, subject to exemptions and qualifications, various rights, including the following:

   a.  The right to know the business or commercial purpose for collecting, selling, or sharing personal information and the categories of persons to whom the business discloses personal information. (Civ. Code § 1798.110.)

   b.  The right to request that a business disclose the specific pieces of information the business has collected about the consumer, and the categories of third parties to whom the personal information was disclosed. (Civ. Code § 1798.110.)

c.   The right to request deletion of personal information that a business has collected from the consumer. (Civ. Code § 1798.105.)

d.   The right to opt-out of the sale of the consumer's personal information if the consumer is over 16 years of age. (Sale of the personal information of a consumer below the age of 16 is barred unless the minor opts-in to its sale.) (Civ. Code § 1798.12.)

e.   The right to direct a business that collects sensitive personal information about the consumer to limit its use of that information to specified necessary uses. (Civ. Code § 1798.121.)

f.   The right to equal service and price, despite the consumer's exercise of any of these rights, unless the difference in price is reasonably related to the value of the customer's data. (Civ. Code § 1798.125.)

**THIS BILL**:

1)   Prohibits an employer from using a workplace surveillance tool on workers to do any of the following:

   a.   Prevent compliance with or violate any federal, state, or local labor, health and safety, employment or civil rights laws or regulations.

   b.   Infer information about workers engaging in a protected activity.

   c.   Make inferences about a person's emotional state.

   d.   Make inferences about an individual based on their gait.

   e.   Collect neural data.

2)   Prohibits an employer from using facial recognition technology unless it is strictly used to open a locked device or grant access to a secure area.

3)   Defines the following:

   a.   "Employer" means a person or governmental entity that directly or indirectly, or through another person, employs or exercises control over a worker, as defined. "Employer" also includes an employer's labor contractor.

   b.   "Facial recognition technology" means an AI tool that analyzes a person's facial features and attempts to identify, verify, or track the person in a still or video image.

   c.   "Neural data" to mean information that is generated by measuring the activity of a worker's central or peripheral nervous system, and that is not inferred from nonneural information.

   d.   "Worker" to mean a natural person, an employee of, or an independent contractor providing service to, or through, a business or a state or local governmental entity in a workplace.

e.   "Workplace surveillance tool" to mean any system, application, instrument, or device that collects or facilitates the collection of worker data, activities, communications, actions, biometrics, or behaviors, by means other than direct observation by a person, including, but not limited to, video or audio surveillance, continuous incremental time-tracking tools, geolocation, electromagnetic tracking, photoelectronic tracking, or that utilizes a photo-optical system or other means.

4)   States that nothing prohibits employers from using workplace surveillance tools to ensure safety, provided that the tool does not incorporate artificial intelligence that makes inferences or predictions about a worker's emotional state, gait, protected status, a protected activity, or to collect neural data.

5)   Provides for enforcement by the Labor Commissioner, public prosecutor, workers, or the workers' representative.

**COMMENTS**:

1) **Author's statement**. According to the author:

> Workplace surveillance has evolved into highly invasive systems that track worker movements and collect massive amounts of data. Current laws fail to protect workers from these practices. AB 1883 will prohibit the use of invasive surveillance systems in the workplace, systems that pose profound risks not just to employee privacy but also to unaccountable discrimination. It also prohibits the use of surveillance tools to infer protected and personal information about workers, including immigration and health status, and the likelihood of unionizing or speaking up against workplace violations.

2) **Surveillance tools in the workplace.** Employers surveilling their workers, both during and after work hours, is far from a new phenomenon. For almost 200 years, if not longer, employers have been watching their employees' activities. The roots of employers actively surveilling their workers in the United States can be traced back to the counting of the North-Western Police Agency, later known as the Pinkerton National Detective Agency, in 1855. The agency was borne out of employers' desire for more control over their employees, both inside and outside of work. Pinkerton detectives fulfilled that need. Among the roles played by the detectives were monitoring workers who were deemed to be a threat to an employer's interests; infiltrating and busting unions; and enforcing company rules.[1]

Early efforts at surveilling workers were limited by both the cost of hiring people to watch workers and the lack of technology. Henry Ford, often remembered as the inventor of the modern assembly line, infamously used to prowl his factory floor, timing his workers' motions with a stopwatch looking for ways to improve efficiency. As with other employers, he also used private investigators to spy on his workers when they were off work to discover if they had any personal problems that could hinder their work.[2]

---

[1] Ifeoma Ajunwa, et al. "Limitless Worker Surveillance" *105 California Law Review 735* (2017) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2746211.
[2] *Ibid.*

As the 20th century wore on, punch time-clocks, which allowed employers to track their workers' work time down to the minute, gave way to closed circuit video cameras, and then starting in the 1980s, computer monitoring became increasingly common.[3] Even then, it was not humanly possible for employers to monitor their workers 24 hours a day, 7 days a week.

Over the last 40 years, advances in technology have allowed employers to surveil their workers in ways that could only have been imagined in science fiction novels. Punch cards have given way to biometric scans, key cards and workplace badges are giving way to RFID tags.

Over the last five years, surveillance tools have become more affordable and more intrusive. As with personal information in general, employers can collect vast dossiers on their employees, gathering sweeping amounts of data about every aspect of their jobs and personal lives. Often that is done "without employees' full informed or free consent. Many workers, while generally aware they are being monitored, don't know the extent of the surveillance or what is being done with the information."[4]

Employers are using more surveillance technology than ever — digital cameras, motion scanners, RFID badges, Apple Watch badges, Bluetooth beacons, keystroke logging — to track every single movement of workers at their workplace and to gauge their productivity. Some workplaces are using biometric data such as eye movements, body shifts, and facial expressions, captured by computer webcams, to evaluate whether their employees are appropriately attentive in their work tasks. As an example, artificial intelligence (AI) systems at call centers record and grade how workers are handling calls. This technology can be used to "coach" workers while they are talking to customers, telling them to sound happier or be more empathetic.[5] Another example is wearable technology that, among other things, tracks a worker's movements throughout the day, gathering biometric data, measuring how many times they use the bathroom, how long they spend in break areas, and which employees are spending time together. At least one company sells biometric ID badges with microphones, sensors, and other tools to record conversations, monitor speech, body movements, and location.[6] Even body temperature, sweat, and frequency of bathroom visits can be tracked and analyzed by employers.

A recent article in *MIT Technology Review* describes one company's surveillance tool this way:

> Companies that use electronic employee monitoring report that they are most often looking to the technologies not only to increase productivity but also to manage risk. And software like Teramind[7] offers tools and analysis to help with both priorities. While Teramind, a globally distributed company, keeps its list of over 10,000 client companies private, it provides resources for the financial, health-care, and customer service industries, among others—some of which have strict compliance requirements that can be tricky to keep on top of. The platform allows clients to set data-driven standards for productivity, establish thresholds for alerts about toxic communication tone or language, create tracking systems for sensitive file sharing, and more.

---

[3] *Ibid.*
[4] *Ibid.*
[5] Kevin Roose, "A Machine May Not Take Your Job, but One Could Become Your Boss," *New York Times* (Jun. 23, 2019) https://www.nytimes.com/2019/06/23/technology/artificial-intelligence-ai-workplace.html
[6] Humanyze: The Future of Workforce & Market Intelligence https://humanyze.com/
[7] https://www.teramind.co/solutions/compliance-management/

[. . .]

> Selecting and tuning the appropriate combination of data is up to Teramind's clients and depends on the size, goals, and capabilities of the particular company. The companies are also the ones to decide, based on their legal and compliance requirements, what measures to take if thresholds for negative behavior or low performance are hit.[8]

*Case study: Amazon.* Perhaps the most extreme example of the intrusive surveillance tools used by employers can be found at Amazon. According to documents filed by Amazon workers with the National Labor Relations Board, Amazon tracks every minute that their workers spend off of their tasks. To do this, they use handheld scanners that are also used to track packages. The worker claims they "can receive a written warning for accumulating 30 minutes of time off task in a day one time in a rolling one-year period. They can be fired if they accumulate 120 minutes of time off task in a single day or if they have accumulated 30 minutes of time off task on three separate days in a one-year period."[9] Counted among the activities considered "time off task" are going to the bathroom, talking to another worker, or going to the wrong workstation. Workers reported that they were afraid to go to the bathroom or get a drink of water for fear of being disciplined.[10] At the end of each shift, supervisors are required to interrogate the worker with the highest time off task.

Along with the handheld devices, Amazon uses an AI camera system trained on each workstation analyzing workers' movements. The cameras automatically register the location of products and catalog every mistake workers make.[11] Monitoring the workers non-stop manually also helps improve the AI computer system, which learns from the responses of Amazon's video reviewers and becomes more accurate over time.[12]

Oxfam, an international organization focused on fighting global poverty, investigated the workplace surveillance practices at both Amazon and Walmart warehouses in the United States. Employers, like Amazon, often claim that their surveillance systems are designed to make workers safer. "However," Oxfam's report states, "in recent years worker groups have decried the high injury rates and horrific working conditions that workers encounter as Amazon employees."[13] The report describes the surveillance technology as follows:

> The scanners play a key role in the surveillance machine because what the scanner records can lead to "Associate Development and Performance Trackers," or "ADAPTs," which are automated write-ups that penalize workers for not meeting production goals. In addition, hundreds of security cameras are constantly monitoring the warehouse floor, ready to notify a manager when a worker is away from their station for too long.

---

[8] Rebecca Akermann, "Your Boss is Watching," *MIT Technology Review* (Feb. 24, 2025

[9] Lauren Kaori Gurley, "Internal Documents Show Amazon's Dystopian System for Tracking Workers Every Minute of Their Shifts" *Vice* (Jun. 2, 2022) https://www.vice.com/en/article/internal-documents-show-amazons-dystopian-system-for-tracking-workers-every-minute-of-their-shifts/

[10] *Ibid.*

[11] Niamh McIntyre and Rosie Bradbury, *The eyes of Amazon: a hidden workforce driving a vast surveillance system*, The Bureau of Investigative Journalism (Nov. 21, 2022) https://www.thebureauinvestigates.com/stories/2022-11-21/the-eyes-of-amazon-a-hidden-workforce-driving-a-vast-surveillance-system/

[12] *Ibid.*

[13] *At Work and Under Watch: Surveillance and suffering at Amazon and Walmart warehouse*, Oxfam (Apr. 10, 2024) https://www.oxfamamerica.org/explore/research-publications/at-work-and-under-watch/

[. . .]

Another example of the detailed metrics that Amazon monitors is a worker's units per hour (UPH) score, which records how many actions a worker is able to accomplish in an hour. . . . [W]orker metrics are prominently displayed on a monitor, which keeps workers psychologically primed to constantly worry about "making rate" and about how they are doing compared with their co-workers. . . . Importantly, workers are not told what the data that electronic devices are constantly collecting is being used for, nor are they properly notified of their privacy rights.

3) **This bill.** Prior to the recent amendments, this bill prohibited the use of certain technologies by employers on their employees. Specifically, emotion recognition technology, gait recognition technology, and technology that can collect neural data. The amendments substantially tighten the language to narrowly prohibit specific practices. Allowing employers to continue to use surveillance technology. The only technologic specific restriction is related to facial recognition technology, which can only be used for two purposes – to open a locked device or grant access to locked or secured areas. That restriction remains in the bill.

In addition to moving toward largely technology neutral language, to make it clear that surveillance technology was not banned, the amendments added language stating that the bill does not prohibit an employer from using a workplace surveillance tool for safety or security purposes as long as it is not used for the prohibited purposes.

4) **Opposition concerns.** A coalition of local government employers, including the League of California Cities and the California State Association of Counties, have raised several concerns about limiting the use of surveillance technology in the workplace:

It is unclear how a court could interpret the meaning of this bill. While we understand and sympathize with the concerns this bill intends to address, our concern is that a reasonable interpretation could blanketly prohibit routine tools used for security, operations, or public health.

Routine security tools like security cameras, key fobs, ID badges, digital workplace collaboration platforms (e.g. Teams or Slack), or GPS trackers passively collect worker data, including when they are actively working at a computer or cell phone or where they are at a given point in a day. Section 1581(a)(1)(B) prohibits any tool that identifies or infers information about workers engaging in activity protected by state or federal law.

We believe it is critical to protect the civil and labor rights of the public workforce. Our concern is that an overbroad interpretation of what it means to "identify," or "infer," worker information could endanger essential tools that, while not designed or used to intentionally undermine the rights of employees, may passively collect information that happens to meet the law's threshold for an outright ban on their use.

While some technologies identified in the bill conjure images from science fiction, we are concerned that their breadth could sweep in routine or innocuous technologies and have other unforeseen operational or safety consequences for public agencies.

The recent amendments appear to address many of the concerns related to prohibiting the use of surveillance tools. Surveillance technology used in the workplace would still be permitted. Employers simply cannot use them for narrow, overly invasive purposes.

It is important to note that the opposition's suggestion that the bill "conjures images from science fiction" is inaccurate, however. Surveillance technology companies are currently marketing and deploying surveillance tools that claim to collect neural data, make determinations about a person based upon their gait, and determine a person's emotional and psychological state.

*Emotion recognition.* As an example, Affectiva, Inc., a spin-off from the MIT Media Lab, has developed emotion AI, specializing in analyzing facial expressions and vocal tones to assess emotional responses.[14] According to their website, Affectiva is a facial expression module that uses facial analysis and "a suite of other biometric sensors" allowing the tool to "simultaneously capture and analyze facial expressions alongside physiological arousal indicators, brain activity, eye tracking, voice analysis, heart rate, and more. This synergy of data sources allows for a complete and nuanced understanding of human behavior, actions, and thoughts."[15]

*Gait recognition.* Gait recognition is the identification of individuals based on their walking patterns. Researchers point to its potential to accurately identify individuals from a distance. "Gait recognition systems involve a complex integration of technical, operational and definitional choices and have been applied in a variety of contexts such as security, medical examinations, identity management, and access control."[16] Recfaces, a biometric identification company, provides tools intended to identify a person based on their walk and movements. On their website they state:

> A person's gait is as unique as their voice timbre. Leveraging this knowledge, gait recognition technology has been developed using Machine Learning (ML) algorithms. ML-based systems can identify a person from an image even if their face is out of view, turned away from the camera, or concealed behind a mask. The system analyzes the silhouette, height, speed, and walking characteristics to identify individuals from a database. This technique is more convenient than retinal scanners or fingerprints in public places as it is unobtrusive. Moreover, gait recognition is unlikely to be fooled – every person's gait has no duplicates.[17]

*Neural data collection.* The term neurotech device is a catchall term for gadgets that, with the help of dry electrodes, connect human brains to computers and algorithms that analyze the brain-wave data. Neurotechnology, while initially used in medical research, is becoming more common in the workplace as a means to monitor workers. Examples of this technology include SmartCaps, developed and marketed by Wenco, a company that focuses on mine safety equipment. According to the company, "The Wenco SmartCap fatigue monitoring solution is built around the LifeBand, a battery-powered wearable device that produces highly accurate measures of alertness and fatigue impairment by measuring EEG (electroencephalogram), more

---

[14]*Top 10 Companies in Global Emotion AI Market in 2025*, Emergen Research (Nov. 14, 2025). https://www.emergenresearch.com/blog/top-10-companies-in-global-emotion-ai-market.
[15] Product: Human Behavioral Research with iMotions. https://www.affectiva.com/product/imotions-behavioral-research/.
[16] Rani, V., Kumar, M. Human gait recognition: A systematic review. Multimed Tools Appl 82, 37003–37037 (2023). https://doi.org/10.1007/s11042-023-15079-5.
[17] *Gait recognition system: deep dive into this future tech,* https://recfaces.com/articles/what-is-gait-recognition.

commonly known as 'brainwaves'."[18] While marketed as a safety tool designed to alert the wearer if they are becoming fatigued or distracted, the company notes, "The real-time data produced by SmartCap is owned by the customer and hosted on the cloud. Our LifeHub management application allows custom configuration, reporting and monitoring to enable real-time actionable insights."[19]

While many may wish that these technologies were simply science fiction or something imagined for a far-off future, these tools are real. Whether the tools are accurate and work as advertised however remains an open question. Regardless, the tools are increasingly common in the workplace.

*ARGUMENTS IN SUPPORT:* California Federation of Labor Unions, sponsors of the bill, write in support:

> Employers have used surveillance to monitor, manage, and control workers for decades. From auto assembly lines to Amazon warehouses, surveillance has enabled companies to ensure maximum productivity and control. Artificial intelligence has supercharged workplace surveillance and taken it to a new level. Today's employers now have access to surprisingly affordable high-tech surveillance equipment. These AI surveillance tools not only watch workers but extract, compile, and analyze troves of data instantly to recognize emotions, analyze neural data, and detect faces and gait for the sake of maximizing productivity.
>
> Gait recognition technology has become widespread in recent years. Capable of identifying an individual by analyzing their walking pattern and body shape, gait technology is an extremely powerful form of biometric surveillance. Companies such as KZero market gait recognition services across a multitude of industries. KZero touts that these tools can aid in "identifying health risks in individuals…information that may be included as a factor when determining insurance premiums for health and life insurance policies." Evidently, employers can use gait to not only identify workers but make decisions impacting their employment based on a machine analyzing their physical movements.
>
> Emotion recognition technology has also seen a boom in the workplace in recent years. Emotion recognition uses biometric data such as a person's facial expression, heart rate, skin conductance, or tone of voice to infer a person's emotional state. Verint, formerly known as Cogito, has developed emotion recognition technology that has been used on call center workers for MetLife and Humana. In both instances, call center workers were monitored by the emotion recognition tool to ensure the caller provided a happy and receptive tone when speaking to customers. The system would additionally provide a report to supervisors with details of which call center workers received the highest number of suggestions.
>
> Neural recognition technology is a new addition to the workplace surveillance landscape. It is purported to capture the brain activity of a person's central and peripheral nervous system to supposedly identify when a worker is concentrating, tired, or stressed. Emotiv, a developer of neural recognition hardware and software, offers their tools to employers under the premise that "understanding a worker's true mental and cognitive state is the key to…an

---

[18] *The SmartCap Solution,* Wenco. https://www.wencomine.com/our-solutions/safety.
[19] *Ibid.*

improvement in ROI." Employers' use of neural data can ostensibly allow them to extrapolate the private opinions and feelings of workers that they have not chosen to share.

Facial recognition technology, arguably the most normalized form of surveillance, has existed in the workplace for years. Tools, such as Amazon's Rekognition, have become easily accessible for businesses and individual consumers. Employers can use facial recognition for tracking attendance and tardiness, productivity, and location, even without traditional video cameras.

These AI enabled surveillance tools differ from traditional video and audio monitoring in several ways. For one, AI tools combine real time surveillance data with massive stores of data extracted and scraped from a worker's work activity, social media, website browsing, credit scores, and any other data from the workplace or web. Heart rate, perspiration, facial expressions, and eye movements are all tracked and used as data points to target "unproductive" workers and to "minimize risk" in the workplace.

AI tools also notoriously rely on black-box algorithms to analyze workers. Data from emotion recognition, neural sensors, and facial and gait sensors are not just observations, but an analysis of the data collected. Not only is that data potentially unreliable, but it can have bias built in, further exacerbating discrimination and inequities. For example, tools that utilize emotion recognition technology, such as Verint, may very well fail to understand cultural nuances of expression and may be trained on biased data that inaccurately tags certain forms of speech as "aggressive" or "inappropriate." Similarly, facial recognition has a long history of failing to accurately recognize people of color, thus automating discrimination on a massive scale. The biases of these tools can lead to detrimental decisions affecting the livelihood of workers as seen in the recent lawsuit between UberEats and a driver who was deactivated due to faulty facial recognition technology failing to identify the driver for verification purposes.

Increasingly, employers are using sophisticated tools to monitor worker sentiment to prevent workers from unionizing or advocating for their rights. Perceptyx, a company that collects and analyzes employee surveys, digital focus groups, and other information, claims they could create a "union vulnerability index" so employers can see which group of workers is at highest risk of unionizing. The power, scope, and scale of current surveillance tools surpass anything employers have had in the past. Yet, our laws have not caught up with the advances of technology and give workers scant protection from the most invasive, discriminatory, or harmful surveillance tools on the market.

Also writing in support, Oakland Privacy argues:

When the California Consumer Privacy Act (CCPA) was enacted, it contained an exemption or carve-out for workers who were employed by covered employers. That exemption sun-setted and was not renewed and qualified California employers became subject to the CCPA and the succeeding ballot initiative, the California Privacy Rights Act, CPRA.

As one might expect from a law titled the California Consumer Privacy Act, the CCPA and its later amendment (CPRA) are focused on the public as consumers. We recognize that employer/employee is a different kind of relationship than business/customer and that the power dynamics in place are substantially different. That is why we see enhanced protections

for workers on top of the basement protections provided by the comprehensive statewide data privacy law to be appropriate.

An element that Assembly Bill 1883 adds to the privacy protections available to California workers is to extend the protections in this bill to workers who work for public employers in the state, as well as to companies too small to be covered entities under CCPA/CPRA. For that reason alone, workplace privacy protections that are supplementary to CCPA/CPRA are neither duplicative nor excessive.

The protections provided by Assembly Bill 1883 go beyond the right to know, right to correct, and right to opt-out structure provided by CPRA. The bill bans the use of four kinds of biometric surveillance in California workplaces: facial recognition, gait analysis, neural data processing and emotion identification. We agree with the author that these technologies are maximally invasive and impose on an employee's bodily autonomy. Workers are not owned by their employers, they are in an agreement with them to render services.

We should be able to agree that not every technology that can be invented should be unleashed on California's workers, and in many cases, California's most poorly paid and vulnerable workers. Whether we walk more quickly or slowly, what we are thinking silently to ourselves, and how we feel on a given day are literally what privacy is made of.

Business interests like the Chamber of Commerce will likely provide some convincing sounding edge case applications for biometric technologies in the workplace to try to convince you not to ban them. But all of these can be just as effectively performed by other methods, equipment or technologies. These arguments are to evade the central point. California employers want access to the thoughts, feelings and anatomy of their workers in order to exercise more complete control over them during the work day. But if the only way employers can hire, manage and supervise their employees is to have access to their personal thoughts and feelings, then they need to hire robots, not human beings. And if you remember your high school reading of Mary Shelley, the robots won't like it either.

The ability of employees to tolerate their workplaces and to work with positive morale and energy are tied to safe and empowering workplace conditions. We don't think it's debatable that employee energy is crucial to the vitality of California's economy going forward. By making a California a place where workers don't have to fear that their private thoughts and feelings are going to become the property of their employer, the Legislature can ensure that California will remain a desirable place to live and work.

**ARGUMENTS IN OPPOSITION:** In opposition to the bill, a coalition of business organizations, including TechNet and the California Grocers Association, argue:

AB 1883 Contains Certain Provisions that are Unworkable

While we appreciate changes that were made to AB 1883 as compared to its predecessor, AB 1221 (2025) (Bryan), the bill still contains certain provisions that are not workable. For example, Section 1581(a)(1)(B) provides that employers cannot use a workplace surveillance tool that identifies workers engaging in protected activities. A security camera is going to capture whatever footage it captures, which could qualify as "identifying" someone under this language. For example, a camera cannot turn itself off during a strike or if an employee chooses to have a meeting with another employee in an open area. If employees are choosing

to use their company emails or messaging functions to discuss protected activity, those communications are under cybersecurity programs or likely being stored on a server for purposes of record retention. While we appreciate the intent of not wanting to deter employees from exercising their rights, this is just not practical as written.

Proposed Section 1581(a)(2) provides that a workplace surveillance tool cannot be used to infer a person's protected status under FEHA. However, given the breadth of "workplace surveillance tools", this could include information that employees voluntarily share. For example, employees often voluntarily participate in workforce development surveys to evaluate and enhance business culture. The information that employees voluntarily share often includes demographic information like veteran status, religious beliefs, or health status. The responses to the survey are likely collected through databases or even simple email storage systems that may constitute workplace surveillance tools as defined. Further, many larger employers have affinity groups such as for people of certain religions or mentorship programs for neurodivergent employees, so those meetings will occur over computer platforms or potentially in areas where there are security cameras or require badging in and out. While we appreciate the intent of this provision, we want to ensure that there are no unintended consequences that impact legitimate uses of technology. If an employee believes they've been subject to unlawful discrimination, they have the right to bring a claim under FEHA.

Proposed Section 1581(a) prohibits any use of facial recognition, gait recognition, or emotion recognition by a workplace surveillance tool. Again, while we appreciate the intent, there are certain legitimate uses that should be allowed, including:

- Tools used in emergency situations that can determine who is on premises
- Tools that use analytics to detect shouting or calls for help
- In-vehicle tools that may detect unsafe driving behavior
- Logistics tools that assess employees' gait for purposes of evaluating the most efficient way to organize a warehouse or employee job duties
- Tools designed to identify theft, missing persons, or suspicious personnel on premises that would also capture employees or contractors on the premises
- Tools that flag inappropriate behavior during customer interactions

We understand there are scenarios where there should be guardrails about how the tools should be used or when they can be used for an adverse employment action, but a blanket prohibition would impact legitimate uses of certain technologies.

Independent Contractors Should Not Be Included in The Definition of "Worker"

The bill's definition of "worker" includes independent contractors, which should be removed from the bill. Contractors are often limited-term workers who are performing a specific job for a company. By definition they are very different from an employee. Their contract will dictate the terms of that job and any job-specific requirements. This trend of treating them the same as employees in every new bill is at odds with prior legislation and court decisions. Further, their inclusion in such a broad bill compounds the bill's administrative burden on businesses and state and local governments.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

California Federation of Labor Unions, Afl-cio (Sponsor)
Alameda Labor Council
American Federation of Musicians, Local 7
American Federation of State, County and Municipal Employees (AFSCME) California
American Federation of State, County and Municipal Employees (AFSCME), Afl-cio California
California Alliance for Retired Americans (CARA)
California Conference Board of the Amalgamated Transit Union
California Conference of Machinists
California Employment Lawyers Association
California Faculty Association
California Federation of Teachers Afl-cio
California Nurses Association
California Professional Firefighters
California School Employees Association
California State Legislative Board of the Sheet Metal, Air, Rail and Transportation Workers - Transportation Division (SMART-TD)
California State Legislative Board of the Smart - Transportation Division
California State University Employees Union, Seiu Local 2579
California Teachers Association
Central Coast Labor Council
Central Labor Council, Fresno-madera-tulare-kings Counties, Afl-cio
Engineers and Scientists of California, Ifpte Local 20, Afl-cio
Inland Empire Labor Council, Afl-cio
North Bay Labor Council
North Valley Labor Federation
Oakland Privacy
Orange County Labor Federation, Afl-cio
Privacy Rights Clearinghouse
San Mateo County Central Labor Council
Service Employees International Union, California State Council
Teamsters California
Tech Equity
Techequity Collaborative
Unite Here, Afl-cio
Utility Workers Union of America, Afl-cio
What We Will

**Opposition**

American Petroleum and Convenience Store Association Apca
Associated General Contractors of California
Associated General Contractors San Diego
Association of California Healthcare Districts (ACHD)
Building Owners and Managers Association of California
California Apartment Assocation
California Assisted Living Association
California Association of Joint Powers Authorities (CAJPA)

California Association of Sheet Metal & Air Conditioning Contractors National Association
California Attractions and Parks Association
California Automatic Vendors Council
California Business Properties Association
California Chamber of Commerce
California Craft Brewers Association
California Distributors Association
California Farm Bureau
California Grocers Association
California Hospital Association
California Landscape Contractor's Association
California Landscape Contractors Association
California League of Food Producers
California Legislative Conference of Plumbing, Heating & Piping Industry
California Manufacturers and Technology Association
California Manufactures & Technology Association
California Moving and Storage Association
California Restaurant Association
California Retailers Association
California Special Districts Association
California State Association of Counties (CSAC)
California Trucking Association
California's Credit Unions
Civil Justice Association of California (CJAC)
Construction Employers Association
County Health Executives Association of California (CHEAC)
County of Fresno
Finishing Contractors Association of Southern California
League of California Cities
Los Angeles Area Chamber of Commerce
National Association of Independent Property Owners
National Automatic Merchandising Association
National Electrical Contractors Association (NECA)
Northern California Allied Trades
Public Risk Innovation, Solutions, and Management (PRISM)
Resource Recovery Coalition of California
Rural County Representatives of California (RCRC)
Security Industry Association
Self Storage Association
Shrm California
Technet
United Contractors (UCON)
Urban Counties of California (UCC)
Valley Industry and Commerce Association (VICA)
Wall and Ceiling Alliance
Western Growers
Western Line Constructors Chapter, Inc., Neca, INC.
Western Painting and Coating Contractors Association

Western Wall and Ceiling Contractors Association (WWCCA)
Wine Institute

**Analysis Prepared by**:  Julie Salley / P. & C.P. / (916) 319-2200

**K.**     <u>**EXHIBIT K: AB-1898**</u>

AMENDED IN ASSEMBLY MARCH 20, 2026

AMENDED IN ASSEMBLY MARCH 12, 2026

CALIFORNIA LEGISLATURE—2025–26 REGULAR SESSION

## ASSEMBLY BILL                                          No. 1898

### Introduced by Assembly Member Schultz

February 12, 2026

An act to add Part 5.9 (commencing with Section 1600) to Division 2 of the Labor Code, relating to employment.

LEGISLATIVE COUNSEL'S DIGEST

AB 1898, as amended, Schultz. Workplace artificial intelligence tools.

Existing law establishes the Division of Labor Standards Enforcement within the Department of Industrial Relations to administer and enforce various laws relating to employment and working conditions.

This bill would require an employer to provide a written notice to ~~an employee~~ *a worker* that a workplace AI tool, as defined, was used to assist the employer in making employment-related decisions or to surveil *workers in* the workplace. The bill would require the notice to be given to a worker within a specified time and would require the notice to contain specified information, including the specific employment-related decisions ~~potentially~~ *likely to be* affected by the use of the workplace AI tool. The bill would require an employer to maintain an updated list of all workplace AI tools currently in use *and their impact on jobs, as specified,* and to provide the list to workers annually. The bill would provide for enforcement by the Labor Commissioner or a public prosecutor, and alternatively would authorize any worker who has suffered damages, or their exclusive representative, to file a civil action

97

**AB 1898** — 2 —

for damages caused by the adverse action. The bill would establish remedies and penalties for violations, including a penalty of up to $500 ~~per employee~~ for each violation.

The bill would include findings that changes proposed by this bill address a matter of statewide concern rather than a municipal affair and, therefore, apply to all cities, including charter cities.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

*The people of the State of California do enact as follows:*

SECTION 1. Part 5.9 (commencing with Section 1600) is added to Division 2 of the Labor Code, to read:

PART 5.9. ARTIFICIAL INTELLIGENCE TRANSPARENCY AT WORK

1600. For purposes of this part:

(a) "Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.

(b) "Automated decision system" means any computational process derived from machine learning, statistical modeling, data analytics, or artificial intelligence that issues simplified output, including a score, classification, or recommendation, that is used to assist or replace human discretionary decisionmaking and materially impacts natural persons. An automated decision system does not include a spam email filter, firewall, antivirus software, identity and access management tools, calculator, database, dataset, or other compilation of data.

(c) (1) "Employer" means any person who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, benefits, other compensation, hours, working conditions, access to work or job opportunities, or other terms or conditions of employment, of any worker. This shall include all branches of state government, all cities, counties, and cities and counties, including charter cities and charter counties, special districts, transit districts, the University of California, the

97

— 3 —                        **AB 1898**

California State University, community college districts, school districts, and any other governmental entities.

(2) "Employer" includes a labor contractor of a person defined as an employer under paragraph (1).

(d) "Employment-related decision" means any decision by an employer that materially impacts a worker's wages, benefits, compensation, work hours, work schedule, performance evaluation, hiring, discipline, promotion, termination, job tasks, skill requirements, work responsibilities, assignment of work, access to work and training opportunities, productivity requirements, or workplace health and safety.

(e) "Public prosecutor" has the same meaning as defined in Section 180.

(f) "Worker" means a natural person or an employee of, or an independent contractor providing service to, a business or a state or local governmental entity in a workplace.

(g) "Worker data" means any information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a covered worker, regardless of how the information is collected, inferred, or obtained.

(h) "Workplace AI tool" means an automated decision system or workplace surveillance ~~tool.~~ *tool that uses artificial intelligence.*

(i) "Workplace surveillance tool" means any system, application, instrument, or device that collects or facilitates the collection of worker data, activities, communications, actions, biometrics, or behaviors, or those of the public that are also capable of passively surveilling workers, by means other than direct observation by a person, including, but not limited to, video or audio surveillance, continuous incremental time-tracking tools, geolocation, electromagnetic tracking, photoelectronic tracking, or that utilizes a photo-optical system or other means.

1601. (a) An employer shall provide a written notice that a workplace AI tool was used to assist the employer in making employment-related decisions or to surveil *workers in* the workplace.

(b) The notice shall be given to a worker who will likely be directly or indirectly affected and to the exclusive bargaining representative of any affected worker according to the following:

97

**AB 1898**　　　　　— 4 —

(1)  At least 90 days before a workplace AI tool is first deployed by the employer.

(2)  If the employer is using an existing workplace AI tool on or before January 1, 2027, no later than February 1, 2027.

(3)  To a new worker upon hire.

(c)  An employer shall require a worker to sign to confirm they received and understand the notice. ~~The employer shall not use the workplace AI tool subject to this section until affected workers return their signed notices.~~

(d)  An employer shall maintain an updated list of all workplace AI tools currently in use and shall provide that list to workers ~~annually.~~ *on or before February 1, 2028, and annually thereafter. For each workplace AI tool that is added in the year preceding the provision of the list to workers, the employer shall include a description of whether any jobs or job tasks will be replaced or automated by the workplace AI tool and the expected timeline of those impacts.*

(e)  The notice shall satisfy all of the following:

(1)  It shall be written in plain language as a separate, standalone communication.

(2)  It shall be written in the language in which routine communications and other information are provided to workers.

(3)  It shall be provided via a simple and easy-to-use method, including, but not limited to, an email, hyperlink, or other written format.

(f)  The notice shall contain all of the following information, as applicable:

(1)  The purpose and justification for the use of the workplace AI tool.

(2)  The ~~specific~~ *categories of* employment-related decisions ~~potentially~~ *likely to be* affected by the use of the workplace AI tool.

(3)  A description of ~~any~~ *the categories of* worker data collected by the workplace AI tool, the frequency of worker data collection, and ~~how, where, and~~ the duration the worker data will be stored.

(4)  A ~~plain-language~~ description of the workplace AI tool, including the *categories of input data it was trained on,* input data it uses, ~~the analysis and calculations it performs on the data,~~ and ~~the~~ output data it generates.

97

**AB 1898**

(5) ~~If~~ *Whether* and which ~~persons~~ *job roles* can access worker data and ~~if~~ *whether* that data will be sold, transferred, or leased to other entities than the employer.

(6) A description of the general locations and the ~~specific~~ *categories of* activities, communications, and job roles that will be surveilled and the technologies that will be used.

(7) The entity that created the workplace AI tool and the specific name of the model.

(8) A description of each quota set or measured by the workplace AI tool to which the worker is subject, including the quantified number of tasks to be performed or products to be produced, and any potential adverse employment action that could result from failure to meet the quota, as well as whether those quotas are subject to change and ~~if~~ *whether* any notice is given of changes in quotas.

~~(9) Whether any jobs or job tasks will be replaced or automated by the workplace AI tool and the expected timeline of those impacts.~~

*(9) The most recent version of the annual list described in subdivision (d).*

(10) The training given to managers or workers on the use of the workplace AI tool.

(11) ~~The~~ *A high-level summary of the* results of any risk assessments conducted on the workplace AI tool conducted as part of the employer's compliance with *any applicable state law, including* the California Consumer Privacy Act of 2018 (Title 1.81.5 (commencing with Section 1798.100) of Part 4 of Division 3 of the Civil Code).

1602. (a) The Labor Commissioner shall enforce this part, including investigating an alleged violation and ordering appropriate temporary relief to mitigate a violation or maintain the status quo pending the completion of a full investigation or hearing through the procedures set forth in Section 98, 98.3, 98.7, 98.74, or 1197.1, including issuing a citation against an employer who violates this section and filing a civil action. If a citation is issued, the procedures for issuing, contesting, and enforcing judgments for citations and civil penalties issued by the Labor Commissioner shall be the same as those set out in Section 98.74 or 1197.1, as applicable.

**AB 1898**                    — 6 —

(b) This part may also~~alternatively~~ be enforced by a public prosecutor pursuant to Chapter 8 (commencing with Section 180) of Division 1.

(c) Alternatively to subdivision (a) or (b), any worker, or their exclusive representative, who has suffered a violation of this part may bring a civil action in a court of competent jurisdiction for damages caused by that ~~adverse action, including punitive damages.~~ *violation.*

(d) In any civil action brought pursuant to subdivision (a), (b), or (c), the petitioner may seek appropriate temporary or preliminary injunctive relief, punitive damages, and reasonable attorney's fees and costs.

(e) (1) Except as provided in paragraph (2), in addition to any other remedy, an employer who violates this part may be subject to a penalty of up to five hundred dollars ($500) ~~per employee~~ for each violation.

(2) An employee, the Labor Commissioner, or a public prosecutor may recover a penalty under this part as a statutory penalty paid to the employee or a civil penalty, but not both, for the same violation.

(f) An action brought pursuant to this section may be brought in the superior court in any county in which the violation in question is alleged to have occurred or in which the employer ~~resides or transacts business.~~ *resides.*

(g) This part does not preempt any city, county, or city and county ordinance that provides equal or greater protection to employees who are covered by this part.

1603. The Legislature finds and declares that this part addresses a matter of statewide concern rather than a municipal affair as that term is used in Section 5 of Article XI of the California Constitution. Therefore, this part applies to all cities, including charter cities.

O

97

5/24/26, 7:23 PM
Case 3:23-cv-04597-EMC      Document 378      Filed 05/25/26      Page 89 of 145
Bill Status - AB-1898 Workplace artificial intelligence tools.

 

| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

## AB-1898 Workplace artificial intelligence tools. (2025-2026)

**Senate**

**Assembly**   1st     Cmt

| Bill Status | |
|---|---|
| **Measure:** | AB-1898 |
| **Lead Authors:** | Schultz (A) |
| **Principal Coauthors:** | - |
| **Coauthors:** | - |
| **Topic:** | Workplace artificial intelligence tools. |
| **31st Day in Print:** | 03/15/26 |
| **Title:** | An act to add Part 5.9 (commencing with Section 1600) to Division 2 of the Labor Code, relating to employment. |
| **House Location:** | Assembly |
| **Last Amended Date:** | 03/20/26 |
| **Voting Committee Location:** | Asm Privacy and Consumer Protection |
| **Committee Action Date:** | 03/25/26 |
| **Committee Motion:** | Do pass and be re-referred to the Committee on [Judiciary] |
| **Committee Vote Result:** | (PASS) »» Ayes: 10; Noes: 3; Abstain: 2; |

| Type of Measure |
|---|
| Active Bill - In Committee Process |
| Majority Vote Required |
| Non-Appropriation |
| Fiscal Committee |
| Non-State-Mandated Local Program |
| Non-Urgency |
| Non-Tax levy |

| Last 5 History Actions | |
|---|---|
| **Date** | **Action** |
| 05/14/26 | In committee: Held under submission. |
| 04/29/26 | In committee: Set, first hearing. Referred to APPR. suspense file. |
| 04/09/26 | Re-referred to Com. on APPR. pursuant to Assembly Rule 96. |
| 03/25/26 | From committee: Do pass and re-refer to Com. on JUD. (Ayes 10. Noes 3.) (March 25). Re-referred to Com. on JUD. |
| 03/23/26 | Re-referred to Com. on P. & C.P. |

Case 3:23-cv-04597-EMC    Document 378    Filed 05/25/26    Page 90 of 145

 

## California LEGISLATIVE INFORMATION

| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

### AB-1898 Workplace artificial intelligence tools. (2025-2026)

| Date | Action |
|---|---|
| 05/14/26 | In committee: Held under submission. |
| 04/29/26 | In committee: Set, first hearing. Referred to APPR. suspense file. |
| 04/09/26 | Re-referred to Com. on APPR. pursuant to Assembly Rule 96. |
| 03/25/26 | From committee: Do pass and re-refer to Com. on JUD. (Ayes 10. Noes 3.) (March 25). Re-referred to Com. on JUD. |
| 03/23/26 | Re-referred to Com. on P. & C.P. |
| 03/20/26 | From committee chair, with author's amendments: Amend, and re-refer to Com. on P. & C.P. Read second time and amended. |
| 03/19/26 | From committee: Do pass and re-refer to Com. on P. & C.P. (Ayes 7. Noes 0.) (March 18). Re-referred to Com. on P. & C.P. |
| 03/16/26 | Re-referred to Com. on L. & E. |
| 03/12/26 | From committee chair, with author's amendments: Amend, and re-refer to Com. on L. & E. Read second time and amended. |
| 03/02/26 | Referred to Coms. on L. & E., P. & C.P. and JUD. |
| 02/13/26 | From printer. May be heard in committee March 15. |
| 02/12/26 | Read first time. To print. |

Date of Hearing:   March 25, 2026
Fiscal: Yes

ASSEMBLY COMMITTEE ON PRIVACY AND CONSUMER PROTECTION
Rebecca Bauer-Kahan, Chair
AB 1898 (Schultz) – As Amended March 20, 2026

**SUBJECT**:  Workplace artificial intelligence tools

### SYNOPSIS

*As employers across California increasingly deploy artificial intelligence (AI) tools in the workplace, workers are increasingly left in the dark about how they are being monitored and managed by automated systems. This bill, sponsored by California Federation of Labor Unions and Teamsters California, seeks to foster transparency by requiring employers to give workers at least 90 days' advance written notice before deploying any "workplace AI tool," defined to include both automated decision systems and AI-based surveillance technologies. Employers must provide workers a notice that, among other disclosures, lists the tools used by the employers, each tool's purpose, the data it collects, the employment decisions it may affect, and any quotas the tool sets or enforces. Enforcement falls to the Labor Commissioner, public prosecutors, and workers themselves, with civil penalties of up to $500 per violation.*

*The bill is supported by a coalition of labor unions and privacy advocates. The bill is opposed by a broad coalition of organizations led by California Chamber of Commerce, as well as a coalition of local government entities. Recent amendments, now in print, address some of the opposition's key concerns that are germane to this Committee's jurisdiction.*

*The Labor Committee passed the bill on a 5-0 vote. If passed by this Committee, the bill will be sent to the Judiciary Committee.*

**EXISTING LAW**:

1) Establishes the Division of Labor Standards Enforcement, under the direction of the LC, within the Department of Industrial Relations and sets forth its powers and duties regarding the enforcement of labor laws. (Lab. Code § 79 et seq.)

2) Authorizes a public prosecutor to prosecute an action, either civil or criminal, for primarily wage and hour labor code violations or to enforce those provisions of the labor code independently, or to enforce any other provisions of the code as specifically authorized. (Lab. Code § 181(a).)

3) Establishes the California Consumer Privacy Act, which grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. It places attendant obligations on businesses to respect those rights. (Civ. Code § 1798.100 et seq.)

**THIS BILL**:

1) Defines key terms, including:

a) "Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.

b) "Automated decision system" means any computational process derived from machine learning, statistical modeling, data analytics, or artificial intelligence that issues simplified output, including a score, classification, or recommendation, that is used to assist or replace human discretionary decisionmaking and materially impacts natural persons. An automated decision system does not include a spam email filter, firewall, antivirus software, identity and access management tools, calculator, database, dataset, or other compilation of data.

c) "Employer" means any person who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, benefits, other compensation, hours, working conditions, access to work or job opportunities, or other terms or conditions of employment, of any worker. This shall include all branches of state government, all cities, counties, and cities and counties, including charter cities and charter counties, special districts, transit districts, the University of California, the California State University, community college districts, school districts, and any other governmental entities. "Employer" includes a labor contractor of a person defined as an employer.

d) "Employment-related decision" means any decision by an employer that materially impacts a worker's wages, benefits, compensation, work hours, work schedule, performance evaluation, hiring, discipline, promotion, termination, job tasks, skill requirements, work responsibilities, assignment of work, access to work and training opportunities, productivity requirements, or workplace health and safety.

e) "Public prosecutor" means the Attorney General, a district attorney, a city attorney, a county counsel, or any other city or county prosecutor.

f) "Worker" means a natural person or an employee of, or an independent contractor providing service to, a business or a state or local governmental entity in a workplace.

g) "Worker data" means any information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a covered worker, regardless of how the information is collected, inferred, or obtained.

h) "Workplace AI tool" means an automated decision system or workplace surveillance tool, that uses artificial intelligence.

i) "Workplace surveillance tool" means any system, application, instrument, or device that collects or facilitates the collection of worker data, activities, communications, actions, biometrics, or behaviors, or those of the public that are also capable of passively surveilling workers, by means other than direct observation by a person, including, but not limited to, video or audio surveillance, continuous incremental time-tracking tools, geolocation, electromagnetic tracking, photoelectronic tracking, or that utilizes a photo-optical system or other means.

2) Requires employers to provide a written notice that a workplace AI tool was used to assist the employer in making employment-related decisions or to surveil workers in the workplace. The notice must be given to workers likely to be directly or indirectly affected and to the exclusive bargaining representative of any affected worker (1) at least 90 days before the tool is first deployed by the employer, (2) by February 1, 2027, if the tool is used by the employer before January 1, 2027, and (3) to a new worker upon hire.

3) Requires that employers maintain an updated list of all workplace AI tools in use and that employers provide that list to workers by February 1, 2028, and annually thereafter. For each workplace AI tool added during the annual window preceding the issuance of the list, the employer must include a description of whether any jobs or job tasks will be replaced or automated by the workplace AI tool, as well as the expected timeline of the impacts.

4) Requires that the notice is written in plain language as a standalone communication, and in the language in which routine communications and other information are provided to workers, and that it is provided via a simple and easy-to-use method, such as email, hyperlink, or other written format.

5) Requires that the notice contain the following information, as applicable:

   a) The purpose and justification for the use of the workplace AI tool.

   b) The categories of employment-related decisions likely to be affected by the use of the workplace AI tool.

   c) A description of the categories of worker data collected by the workplace AI tool, the frequency of worker data collection, and the duration the data will be stored.

   d) A description of the workplace AI tool, including categories of data the tool was trained on, input data it uses, and the output data it generates.

   e) Whether and which job roles can access worker data and whether that data will be sold, transferred, or leased to other entities than the employer.

   f) A description of the general locations and the categories of activities, communications, and job roles that will be surveilled and the technologies that will be used.

   g) The entity that created the workplace AI tool and the specific name of the model.

   h) A description of each quota set or measured by the workplace AI tool to which the worker is subject, including the quantified number of tasks to be performed or products to be produced, and any potential adverse employment action that could result from failure to meet the quota, as well as whether those quotas are subject to change and whether any notice is given of changes in quotas.

   i) The most recent version of the annual list described above.

   j) The training given to managers or workers on the use of the workplace AI tool.

   k) A high level summary of the results of any risk assessments conducted on the tool as part of the employer's compliance with any state laws.

6) Provides for enforcement by the Labor Commissioner, public prosecutors, or, alternatively, a worker or their exclusive representative, with civil penalties of up to $500 per violation.

**COMMENTS**:

1) **Author's statement**. According to the author:

Artificial intelligence is rapidly transforming the workplace. AI systems currently sold to employers are no longer simple AI chatbots and search engines. Today, employers have access to a wide range of AI-enabled tools to survey and manage workers, such as AI-powered surveillance and automated decision-making systems.

While employers continue to purchase and utilize these AI powered systems, the vast majority of workers are unaware of how these tools are being used to monitor or manage their day-to-day life at the worksite. AB 1898 ensures workers are given at least 90 days' notice before these tools are implemented and requires employers to disclose the purpose of the AI tool, a description of the worker data that will be captured by the tool, what employment-related decision may be affected by the AI tool, and a description of the general locations where these tools will be used in the workplace. By promoting transparency and accountability, this bill allows employees to be informed about technologies that are being used in their workplace.

2) **Workplace AI tools.** This bill applies to "workplace AI tools," defined as a workplace surveillance tool or ADS. Electronic surveillance generally refers to the use of digital technologies to collect data about workers and their activities.[1] Common examples include wearable devices that track motion and location, GPS systems in company vehicles or phones, and software that logs keystrokes, measures productivity, and captures email metadata. Some systems simply collect data for human review, while others feed worker data directly into automated systems that make or influence employment decisions.

ADS typically use predictive AI to produce simplified outputs – such as scores, classifications, or recommendations – to assist or replace human discretionary decision-making.[2] According to the UC Berkeley Labor Center, employers use ADS to perform three core functions:

- Ranking workers by scoring performance, accuracy, customer satisfaction, and behavioral traits. Some platforms display these rankings in real time on leaderboards visible to employees, designed to drive competition among workers.[3]

- Predicting future worker behavior by identifying patterns in datasets that include productivity records, attendance, biometric signals, voice tone, and even mouse

---

[1] Annette Bernhardt & Lisa Krege, "Electronic Monitoring and Automated Decision Systems: Frequently Asked Questions," UC Berkeley Labor Center (May 2025), p. 1, https://laborcenter.berkeley.edu/wp-content/uploads/2025/05/Electronic-Monitoring-and-Automated-Decision-Systems-FAQ.pdf.
[2] Government Code section 11546.45.5(a)(1) defines an ADS as "a computational process derived from machine learning, statistical modeling, data analytics, or artificial intelligence that issues simplified output, including a score, classification, or recommendation, that is used to assist or replace human discretionary decisionmaking and materially impacts natural persons." This bill incorporates that definition.
[3] Bernhardt & Krege, *supra*, at p. 2.

measurements. Example predictions include a worker's likelihood of quitting, struggling with performance, posing a safety risk, or organizing a union.[4]

- Directing work in real time, replacing or supplementing human supervisors. Workers receive task assignments, routes, and productivity quotas through mobile apps, handheld scanners, or kiosks.[5]

Employers use these tools to make a wide range of decisions affecting wages and benefits, work schedules, performance evaluations, hiring, firing, discipline, promotions, and health and safety management. The extent of automation varies considerably: Some employers treat system outputs as just one input among several, relying primarily on human judgment. Others – particularly in warehousing, gig work, and other frontline industries – use these systems to make disciplinary or termination decisions, sometimes with little or no human review. [6]

Documented harms associated with the use of these technologies include discrimination from biased training data, physical injuries caused by productivity systems that push workers to unsafe speeds, lower wages set by algorithm, erosion of privacy, and suppression of workers' right to organize.[7] Workers may also face unfair discipline based on erroneous data, loss of professional discretion as algorithms take over task management, and may experience surveillance that extends beyond working hours.[8]

Biometric surveillance technologies, such as facial recognition, emotion recognition, and gait analysis raise significant concerns, particularly in light of the fact that they tend to perform worse for people of color, women, people with disabilities, and older workers.[9] Emotion recognition systems are particularly concerning: some developers claim they detect stress, honesty, or enthusiasm from facial expressions or voice tone, despite a lack of scientific consensus that emotions can be reliably measured this way.[10]

On top of these concerns, most workers have no idea when they are being monitored, what data is being collected, how it feeds into automated systems, or how it affects the employment decisions made about them.

3) **The importance of notice.** In 2022, the White House Office of Science and Technology Policy released the *Blueprint for an AI Bill of Rights*, which identifies five principles that should "guide the design, use, and deployment of automated systems to protect the American public in the age of artificial intelligence."[11] Most relevant here is the following principle:

- *Notice and Explanation*: You should know that an automated system is being used and understand how and why it contributes to outcomes that impact you. Designers, developers, and deployers of automated systems should provide generally accessible

---

[4] *Ibid.*
[5] *Id.* at p. 3.
[6] *Id.* at p. 4.
[7] *Ibid.*
[8] *Id.* at p. 4.
[9] *Id.* at p. 6.
[10] *Ibid.*
[11] The White House, *Blueprint for an AI Bill of Rights*, (Oct. 2022), p. 14, https://bidenwhitehouse.archives.gov/ostp/ai-bill-of-rights/.

plain language documentation including clear descriptions of the overall system functioning and the role automation plays, notice that such systems are in use, the individual or organization responsible for the system, and explanations of outcomes that are clear, timely, and accessible. Such notice should be kept up-to-date and people impacted by the system should be notified of significant use case or key functionality changes. You should know how and why an outcome impacting you was determined by an automated system, including when the automated system is not the sole input determining the outcome. [ . . . ]

4) **This bill would enact a broad notice requirement for workers who are surveilled or subject to automated decisions by AI tools.** This bill requires employers to provide a written notice that a workplace AI tool was used to assist the employer in making employment-related decisions or to surveil workers in the workplace. The notice must be given to workers likely to be directly or indirectly affected and to the exclusive bargaining representative of any affected worker (1) at least 90 days before the tool is first deployed by the employer, (2) by February 1, 2027, if the tool is used by the employer before January 1, 2027, and (3) to a new worker upon hire.

Under the bill, employers must maintain an updated list of all workplace AI tools in use. The list must be provided to workers by February 1, 2028, and annually thereafter. Each annual list must include a description of whether any jobs or job tasks will be replaced or automated by newly added workplace AI tools, as well as the expected timeline of the impacts.

The notice must contain the following information, as applicable:

- The purpose and justification for the use of the workplace AI tool.

- The categories of employment-related decisions likely to be affected by the use of the workplace AI tool.

- A description of the categories of worker data collected by the workplace AI tool, the frequency of worker data collection, and the duration the data will be stored.

- A description of the workplace AI tool, including categories of data the tool was trained on, input data it uses, and the output data it generates.

- Whether and which job roles can access worker data and whether that data will be sold, transferred, or leased to other entities than the employer.

- A description of the general locations and categories of activities, communications, and job roles that will be surveilled and the technologies that will be used.

- The entity that created the workplace AI tool and the specific name of the model.

- A description of each quota set or measured by the workplace AI tool to which the worker is subject, as specified.

- The most recent version of the annual list described above.

- The training given to managers or workers on the use of the workplace AI tool.

- A high-level summary of the results of any risk assessments conducted on the tool as part of the employer's compliance with state laws.

The bill provides for enforcement by the Labor Commissioner, public prosecutors, or, alternatively, a worker or their exclusive representative, with civil penalties of up to $500 per violation.

5) **Recent amendments address some opposition concerns.** A broad coalition of business and technology groups oppose the bill on a number of grounds. The bill was recently amended to address some of these issues. Chief among their concerns was a provision that, in effect, would have enabled workers to prevent employers from deploying a workplace AI tool by refusing to sign the notice. Additionally, some of the disclosures have been made more general by focusing on, for example, "*categories* of employment-related decisions *likely to be* affected" rather than "specific employment-related decisions potentially affected." Likewise, concerns regarding proprietary information have been addressed by eliminating a required disclosure of "the analysis and calculations" the tool performs on data. And privacy concerns have been addressed by changing the disclosure of "which persons can access worker data" to "which *job roles*" can access that data. Finally, enforcement provisions have also been scaled back to provide that liability is based on the number of violations rather than the number of employees – a key concern for several opponents.

But the larger concern raised by the opposition coalition – that the bill would require an untenable volume of notices – may have purchase with at least one crucial stakeholder. In vetoing last year's SB 7 (McNerney), Governor Gavin Newsom stated of the bill's similar notice provisions: "rather than addressing the specific ways employers misuse this technology, the bill imposes unfocused notification requirements on any business using even the most innocuous tools. This proposed solution fails to directly address incidents of misuse." Opponents point out that the bill uses broad definitions, including that "worker" encompasses employees and independent contractors, and "employment-related decisions" applies to a broad range of work-related issues. As the bill moves forward, the author may wish to continue refining its scope.

*ARGUMENTS IN SUPPORT:* A coalition of supporters writes:

The development and proliferation of artificial intelligence tools have dramatically altered the modern workplace and the lives of millions of workers. AI systems currently sold to employers are no longer simple AI chatbots or search engines. Today, employers have access to a wide range of military grade AI-enabled tools to surveil and manage workers. While employers continue to purchase and utilize these AI powered systems, most workers are unaware these tools are being used to monitor or manage their day-to-day life at the worksite. A 2025 study by ExpressVPN reported that only 22% of workers across various industries were aware when they are being monitored and up to 44% of workers were unaware their employers were using biometric surveillance methods such as facial recognition in the workplace.

Without proper transparency, workers are left in the dark leading to a decimation of privacy rights and trust in the workplace. Constant workplace surveillance has proven to increase psychological distress, stress, and lower job satisfaction among workers. The harms of surveillance extend to the pace of work itself. Employers use AI tools to set and enforce productivity quotas, attendance policies, time spent on tasks, and many other metrics. Workers are often unaware of the expectations, leading to a frantic race to live up to the

machines' seemingly arbitrary requirements. Regarding employer use of ADS, workers are similarly left uniformed when these tools are introduced and used to make decisions impacting their livelihood. Algorithmic firing is reportedly on the rise with recent figures estimating that more than 1 in 5 managers allow AI systems to make final decisions without human input.

In order to foster transparency in the workplace, AB 1898 will require an employer to provide workers with advance notice at least 90 days before an AI powered workplace tool is used to surveil or manage workers. AB 1898 requires employer notices to disclose the purpose of the AI tool, a description of the worker data that will be captured, what employment-related decision may be affected, and a description of the general locations these tools will be used in the workplace. AB 1898 is a crucial first step in ensuring transparency and accountability of the use of AI in the workplace

***ARGUMENTS IN OPPOSITION:*** In opposition to the bill, a broad coalition of opponents, led by California Chamber of Commerce, argues:

The bill's definitions of covered technologies are extremely broad and capture many low-risk tools. For example, the definition of "automated decision system" includes tools that merely "assist" human decision making related to anything about employment, which would encompass something as simple as basic scheduling software or other technologies with minimal automation. Likewise, a "workplace surveillance tool" includes any technology that "collects" or "facilitates" the collection of any information that is "reasonably capable of being associated" directly or indirectly with an employee.

Under AB 1898, an employee must receive notice even if the workplace AI tool only "indirectly" impacts them or merely "assists" with an "employment-related decision," no matter how minimal or inconsequential the impact. The circumstances in which a tool would trigger notice obligations are effectively endless. Additionally, even where a workplace AI tool has no impact on a particular employee, the employer would still have to provide that employee with an annual list of every workplace AI tool used anywhere in the organization. This not only creates a substantial administrative burden, it also raises concerns about broad disclosure of a company's, state agency's, or local government's security systems to a wide audience.

A coalition of local government entities, in opposition, adds:

AB 1898 would impose several rules on how public agencies may use surveillance tools – a term that is vast in its application, including video cameras, ID badge or key fob access, workplace messaging applications (e.g. Microsoft Teams or Slack), and a wide array of tools used to keep workplaces safe, conduct essential government services, and protect against abuse, fraud, and waste of public resources.

We understand the reasonable concerns one could have about the slow creep of surveillance tools into every aspect of daily life, particularly as new technologies emerge. However, this bill and others aimed at limiting employers' use of critical technology are too broad, too expensive, and too dangerous for public agencies and those we serve.

**REGISTERED SUPPORT / OPPOSITION**:

**AB 1898**
Page 9

**Support**

California Federation of Labor Unions, Afl-cio (Sponsor)
American Federation of State, County and Municipal Employees (AFSCME), Afl-cio California
American Federation of State, County and Municipal Employees, Afl-cio
California Conference Board of the Amalgamated Transit Union
California Conference of Machinists
California Faculty Association
California Federation of Teachers Afl-cio
California Nurses Association
California Professional Firefighters
California School Employees Association
California State Legislative Board of the Smart - Transportation Division
California State University Employees Union, Seiu Local 2579
Electronic Frontier Foundation
Engineers and Scientists of California, Ifpte Local 20, Afl-cio
Privacy Rights Clearinghouse
Teamsters California
Tech Equity
Unite Here, Afl-cio
Utility Workers Union of America, Afl-cio

**Opposition**

Acclamation Insurance Management Services
Allied Managed Care
American Petroleum and Convenience Store Association Apca
Anaheim Chamber of Commerce
Associaiton of California School Administrators
Associated Builders and Contractors of California
Associated General Contractors of California
Associated General Contractors San Diego
Association of California Healthcare Districts (ACHD)
Association of California School Administrators
Brea Chamber of Commerce
Building Owners and Managers Association of California
Calbroadband
California Apartment Assocation
California Assisted Living Association
California Association of School Business Officials (CASBO)
California Association of Sheet Metal & Air Conditioning Contractors National Association
California Association of Winegrape Growers
California Business Properties Association
California Cardroom Alliance
California Chamber of Commerce
California Craft Brewers Association
California Farm Bureau
California Fuels and Convenience Alliance
California Grocers Association

California Hispanic Chamber of Commerce
California Hospital Association
California Landscape Contractor's Association
California Landscape Contractors Association
California League of Food Producers
California Manufacturers and Technology Association
California Manufactures & Technology Association
California Moving and Storage Association
California Restaurant Association
California Retailers Association
California Special Districts Association
California Staffing Professionals (CSP)
California State Association of Counties (CSAC)
California Trucking Association
California's Credit Unions
Carlsbad Chamber of Commerce
Citrus Heights Chamber of Commerce
Civil Justice Association of California (CJAC)
Colusa County Chamber of Commerce
Flasher Barricade Association
Glendora Chamber of Commerce
Greater Bakersfield Chamber of Commerce
Greater High Desert Chamber of Commerce
Greater Riverside Chamber of Commerce
Greater Stockton Chamber of Commerce
Hollywood Chamber of Commerce
Huntington Beach Chamber of Commerce
Imperial Valley Regional Chamber of Commerce
LA Canada Flintridge Chamber of Commerce
Leading Age California
League of California Cities
Lincoln Area Chamber of Commerce
Long Beach Chamber of Commerce
Menifee Valley Chamber of Commerce
Murrieta Wildomar Chamber of Commerce
Newport Beach Chamber of Commerce
North San Diego Business Chamber of Commerce
Orange County Business Council
Palm Desert Chamber
Public Risk Innovation, Solutions, and Management (PRISM)
Rural County Representatives of California (RCRC)
Santa Ana Chamber of Commerce
Santa Clarita Valley Chamber of Commerce
Security Industry Association
Shrm California
Simi Valley Chamber of Commerce
Southwest California Legislative Council
Technet
The Greater Coachella Valley Chamber of Commerce

Torrance Area Chamber of Commerce
Urban Counties of California (UCC)
Ventura Chamber of Commerce
Yorba Linda Chamber of Commerce
Yuba Sutter Chamber of Commerce

**Analysis Prepared by**:   Josh Tosney / P. & C.P. / (916) 319-2200

**L.**     <u>**EXHIBIT L: AB-1331**</u>

PL'S CAL. CODE APPENDIX IN SUPPORT OF PL'S MSJ | 3:23-CV-04597-EMC     MAY 24 2026

AMENDED IN SENATE SEPTEMBER 4, 2025

AMENDED IN SENATE AUGUST 29, 2025

AMENDED IN SENATE JULY 17, 2025

AMENDED IN SENATE JUNE 19, 2025

AMENDED IN ASSEMBLY MAY 23, 2025

AMENDED IN ASSEMBLY APRIL 28, 2025

AMENDED IN ASSEMBLY APRIL 10, 2025

CALIFORNIA LEGISLATURE—2025–26 REGULAR SESSION

# ASSEMBLY BILL                    No. 1331

**Introduced by Assembly Member Elhawary**
**(Coauthors: Assembly Members Bryan, Mark González, and Ward)**
(Coauthors: Senators ~~Cortese~~ *Becker, Cortese,* and McNerney)

February 21, 2025

An act to add Part 5.8 (commencing with Section 1560) to Division 2 of the Labor Code, relating to employment.

LEGISLATIVE COUNSEL'S DIGEST

AB 1331, as amended, Elhawary. Workplace surveillance.

Existing law establishes the Division of Labor Standards Enforcement within the Department of Industrial Relations. Existing law authorizes the division, which is headed by the Labor Commissioner, to enforce the Labor Code and all labor laws of the state the enforcement of which is not specifically vested in any other officer, board or commission.

This bill would limit the use of workplace surveillance tools, as defined, by employers, including by prohibiting an employer from

92

**AB 1331** — 2 —

monitoring or surveilling workers in employee-only, employer-designated areas, as specified. The bill would provide workers with the right to leave behind workplace surveillance tools that are on their person or in their possession when entering certain employee-only areas and public bathrooms and during off-duty hours, as specified. The bill would prohibit a worker from removing or physically tampering with any component of a workplace surveillance tool that is part of or embedded in employer equipment or vehicles.

This bill would subject an employer who violates the bill to a civil penalty of $500 per violation and would authorize a public prosecutor to bring specified enforcement actions.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

*The people of the State of California do enact as follows:*

SECTION 1. Part 5.8 (commencing with Section 1560) is added to Division 2 of the Labor Code, to read:

PART 5.8. WORKPLACE SURVEILLANCE OF EMPLOYEES

1560. As used in this part:

(a) (1) "Employer" means a person who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, benefits, other compensation, hours, working conditions, access to work or job opportunities, or other terms or conditions of employment, of any worker.

(2) "Employer" includes an employer's labor contractor.

(3) "Employer" includes private entities and public entities, including, but not limited to, all branches of state government, or the several counties, cities and counties, and municipalities thereof, or any other political subdivision of the state, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof.

(b) "Employer-designated area" means an area in the workplace the employer provides or has historically provided to workers to use for breaks or to purchase, obtain, or consume food or beverages.

(c) "Public prosecutor" has the same meaning as defined in Section 180.

92

— 3 —                          **AB 1331**

(d) "Worker" means an employee of, or an independent contractor providing service to, or through, a business or a state or local governmental entity in a workplace.

(e) "Workplace surveillance tool" means a system, application, instrument, or device that collects or facilitates the collection of worker activities, communications, actions, biometrics, or behaviors, or those of the public that are capable of passively surveilling workers, by means other than direct observation by a person, including, but not limited to, video or audio surveillance, electronic workplace tracking, geolocation, electromagnetic tracking, photoelectric tracking, or utilization of a photo-optical system or other means. "Workplace surveillance tool" does not include smoke or carbon monoxide detectors or weapon detection systems that automatically screen a person's body.

1561. (a) Unless directed by a court order, an employer shall not use a workplace surveillance tool to monitor or surveil workers, including data collection on the frequency of a worker's use of those areas, in the following employee-only, employer-designated areas:

(1) Bathrooms.

(2) Locker rooms.

(3) Changing areas.

(4) Lactation spaces.

(b) ~~A~~ *(1) Except as provided in paragraph (2), a* worker shall have the right to leave behind workplace surveillance tools that are on their person or in their possession in both of the following ~~circumstances, unless a worker is required to remain available during meal or rest periods pursuant to federal law or existing state law:~~ *circumstances:*

~~(1)~~

*(A)* When entering an area listed in subdivision (a), employee-only breakrooms and cafeterias, and public bathrooms.

~~(2)~~

*(B)* During off-duty hours, excluding rest periods.

*(2) Paragraph (1) does not apply in both of the following circumstances:*

*(A) A worker is required to remain available during meal or rest periods pursuant to federal law or existing state law.*

92

**AB 1331** — 4 —

*(B) A worker is required to use a workplace surveillance tool, such as a phone, for communication purposes for the job during off-duty hours.*

(c) An employer shall not require a worker to physically implant a device that collects or transmits data, including a device that is installed subcutaneously in the body.

(d) (1) An employer shall not use audio surveillance to record employee-only breakrooms or cafeterias.

(2) If an employer uses a workplace surveillance tool in an employee-only breakroom or cafeteria, the employer shall post signage in the area notifying workers that they are subject to surveillance that does not record audio.

(3) The workplace surveillance tool in an employee-only breakroom or cafeteria shall not use *generative* artificial intelligence ~~monitoring capacity.~~ *enabled video surveillance. The workplace surveillance tool may use artificial intelligence photo or video correction tools that do not have monitoring or surveillance capacity.*

(e) A worker or their authorized representative may request video surveillance the worker is in.

(f) (1) An employer may use workplace surveillance tools that passively surveil workers in an area not listed in subdivision (a) and employee-only breakrooms and cafeterias, even if an off-duty worker may be present, as long as the worker is made aware in advance that a workplace surveillance tool is in use.

(2) Notwithstanding subdivision (a), an employer may check workplace surveillance tools for the one-time entry and exit in the areas listed in subdivision (a) and employee-only breakrooms and cafeterias for health and safety purposes, as long as it is not used to monitor the frequency of a worker's use of those areas.

(g) (1) On a multiemployer jobsite, the controlling employer shall post a notice at the jobsite providing a general description of the types of activities that may be monitored or surveilled and for what purposes.

(2) A notice posted pursuant to this subdivision by a controlling employer satisfies the requirement for any employer whose employees perform work on that jobsite.

(h) An employer is not in violation of this section in any of the following circumstances:

92

— 5 —                    **AB 1331**

(1) A worker brings a workplace surveillance tool into an area listed in subdivision (a) or employee-only breakrooms or cafeterias because it is required to access a locked or secured area.

(2) A worker uses a workplace surveillance tool to access a locked or secured area during off-duty hours.

(3) A worker voluntarily chooses to bring a workplace surveillance tool into an area listed in subdivision (a) or employee-only breakrooms or cafeterias.

(4) A worker voluntarily keeps a workplace surveillance tool on their person during off-duty hours.

(5) A worker brings a workplace surveillance tool, including a badge or personal alarm system, into an area listed in subdivision (a) or employee-only breakrooms or cafeterias, or a worker keeps a workplace surveillance tool, including a badge or personal alarm system, on their person during off-duty hours, because the employer has a policy that requires that workplace surveillance tool to be in the worker's possession while on work premises for identification or safety purposes, if the workplace surveillance tool meets both of the following conditions:

(a) Does not detect or record audio.

(b) Is not artificial intelligence enabled.

1562. A worker shall not remove or physically tamper with any component of a workplace surveillance tool that is part of or embedded in employer equipment or vehicles.

1563. (a) An employer shall not deny an employee the rights under this part or discharge, threaten to discharge, demote, suspend, or in any manner discriminate against an employee for using, or attempting to use, the employee's rights under this part, filing a complaint with the department or alleging a violation of this part, cooperating in an investigation or prosecution of an alleged violation of this part, or opposing any policy or practice or act that is prohibited by this part.

(b) In addition to any other remedy, an employer who violates this part shall be subject to a civil penalty of five hundred dollars ($500) per violation.

(c) In addition to any other remedy, the Labor Commissioner may enforce this section, including investigating an alleged violation, and ordering appropriate temporary relief to mitigate a violation or maintain the status quo pending the completion of a full investigation or hearing through the procedures set forth in

92

**AB 1331** — 6 —

Section 98.3, 98.7, 98.74, or 1197.1, including issuing a citation against an employer who violates this section and filing a civil action. If a citation is issued, the procedures for issuing, contesting, and enforcing judgments for citations and civil penalties issued by the Labor Commissioner shall be the same as those set out in Section 98.74 or 1197.1, as applicable.

(d) In addition to any other remedy, this part may also be enforced by a public prosecutor pursuant to Chapter 8 (commencing with Section 180) of Division 1.

1564. (a) This part does not preempt any local law that provides equal or greater protection to workers.

(b) The provisions of this part are severable. If any provision of this part or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

(c) This part does not limit the authority of the Attorney General, a district attorney, or a city attorney, either upon their own complaint or the complaint of any person acting for themselves or the general public, to prosecute actions, either civil or criminal, for violations of this part, or to enforce the provisions thereof independently and without specific direction of the commissioner or the division.

(d) This part does not prohibit any employer from using workplace surveillance tools as required by federal law or existing state law.

(e) This part does not authorize any employer to use workplace surveillance tools as prohibited by federal law or existing state law.

1565. This part does not apply to an employer that does either of the following:

(a) Develops products for national security, military, space, or defense purposes.

(b) Develops aircraft for operation in national airspace.

1566. (a) This part does not apply to a law enforcement agency that includes any employee who is a peace officer under any of the following when it acts as a law enforcement agency or as the employer of its own employees:

(1) Subdivision (a) or (b) of Section 830.1 of the Penal Code.

(2) Subdivision (a), (b), (c), (d), or (g) of Section 830.2 of the Penal Code.

92

— 7 —                **AB 1331**

(3)  Section 830.31 of the Penal Code.

(4)  Section 830.33 of the Penal Code.

(5)  Section 830.34 of the Penal Code.

(6)  Subdivision (c) of Section 830.35 of the Penal Code.

(7)  Subdivision (a), (b), or (d) of Section 830.37 of the Penal Code.

(8)  Section 830.38 of the Penal Code.

(9)  Subdivision (a) of Section 830.5 of the Penal Code.

*(10)  Section 830.7 of the Penal Code.*

*(11)  Section 830.75 of the Penal Code.*

~~(10)~~

*(12)*  Section 830.15 of the Penal Code.

(b)  For purposes of this section, a law enforcement agency is not to be deemed the employer of any employees who are not directly employed by the law enforcement agency.

O

92

 

*California* LEGISLATIVE INFORMATION

| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

## AB-1331 Workplace surveillance.  (2025-2026)

| Date | Action |
|------|--------|
| 09/13/25 | Ordered to inactive file at the request of Senator Limón. |
| 09/08/25 | Read second time. Ordered to third reading. |
| 09/04/25 | Read third time and amended. Ordered to second reading. |
| 09/02/25 | Read second time. Ordered to third reading. |
| 08/29/25 | Read second time and amended. Ordered returned to second reading. |
| 08/29/25 | From committee: Amend, and do pass as amended. (Ayes 5. Noes 2.) (August 29). |
| 08/18/25 | In committee: Referred to suspense file. |
| 07/17/25 | Read second time and amended. Re-referred to Com. on APPR. |
| 07/16/25 | From committee: Amend, and do pass as amended and re-refer to Com. on APPR. (Ayes 9. Noes 2.) (July 15). |
| 06/25/25 | From committee: Do pass and re-refer to Com. on JUD. (Ayes 4. Noes 1.) (June 25). Re-referred to Com. on JUD. |
| 06/19/25 | From committee chair, with author's amendments: Amend, and re-refer to committee. Read second time, amended, and re-referred to Com. on L., P.E. & R. |
| 06/18/25 | Referred to Coms. on L., P.E. & R. and JUD. |
| 06/09/25 | In Senate. Read first time. To Com. on RLS. for assignment. |
| 06/05/25 | Read third time. Passed. Ordered to the Senate. (Ayes 55. Noes 15. Page 2113.) |
| 05/27/25 | Read second time. Ordered to third reading. |
| 05/23/25 | Read second time and amended. Ordered returned to second reading. |
| 05/23/25 | From committee: Amend, and do pass as amended. (Ayes 11. Noes 3.) (May 23). |
| 05/23/25 | Assembly Rule 63 suspended. (Ayes 51. Noes 16. Page 1644.) |
| 05/14/25 | In committee: Set, first hearing. Referred to APPR. suspense file. |
| 05/01/25 | Re-referred to Com. on APPR. pursuant to Assembly Rule 96. |
| 04/29/25 | Re-referred to Com. on JUD. |
| 04/28/25 | Read second time and amended. |
| 04/24/25 | From committee: Amend, and do pass as amended and re-refer to Com. on JUD. (Ayes 10. Noes 3.) (April 22). |
| 04/21/25 | Re-referred to Com. on P. & C.P. |
| 04/10/25 | From committee chair, with author's amendments: Amend, and re-refer to Com. on P. & C.P. Read second time and amended. |
| 04/03/25 | From committee: Do pass and re-refer to Com. on P. & C.P. (Ayes 5. Noes 0.) (April 2). Re-referred to Com. on P. & C.P. |
| 03/28/25 | Referred to Coms. on L. & E., P. & C.P. and JUD. |
| 02/24/25 | Read first time. |
| 02/22/25 | From printer. May be heard in committee March 24. |
| 02/21/25 | Introduced. To print. |



## AB-1331 Workplace surveillance.  (2025-2026)

| | | | | | | | | | | 1st | Cmt | 2nd | Cmt | 2nd | 3rd | 2nd | 3rd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Senate** | | | | | | | | | | | | | | | | | |
| **Assembly** | Int | 1st | Cmt | 2nd | Cmt | 2nd | 3rd | Pass | | | | | | | | | |

### Bill Status

| | |
|---|---|
| **Measure:** | AB-1331 |
| **Lead Authors:** | Elhawary (A) |
| **Principal Coauthors:** | - |
| **Coauthors:** | Becker (S) , Bryan (A) , Cortese (S) , Mark González (A) , McNerney (S) , Ward (A) |
| **Topic:** | Workplace surveillance. |
| **31st Day in Print:** | 03/24/25 |
| **Title:** | An act to add Part 5.8 (commencing with Section 1560) to Division 2 of the Labor Code, relating to employment. |
| **House Location:** | Senate |
| **Last Amended Date:** | 09/04/25 |

### Type of Measure

| |
|---|
| Active Bill - In Floor Process |
| Majority Vote Required |
| Non-Appropriation |
| Fiscal Committee |
| Non-State-Mandated Local Program |
| Non-Urgency |
| Non-Tax levy |

### Last 5 History Actions

| Date | Action |
|---|---|
| 09/13/25 | Ordered to inactive file at the request of Senator Limón. |
| 09/08/25 | Read second time. Ordered to third reading. |
| 09/04/25 | Read third time and amended. Ordered to second reading. |
| 09/02/25 | Read second time. Ordered to third reading. |
| 08/29/25 | Read second time and amended. Ordered returned to second reading. |

### Daily File Status

| File | File Date | Item |
|---|---|---|
| Sen Inactive File - Assembly Bills | 05-26-2026 | A- 47 |

Date of Hearing:  April 22, 2025
Fiscal: Yes

ASSEMBLY COMMITTEE ON PRIVACY AND CONSUMER PROTECTION
Rebecca Bauer-Kahan, Chair
AB 1331 (Elhawary) – As Amended April 10, 2025

**PROPOSED AMENDMENTS**

**SUBJECT**:  Workplace surveillance

**SYNOPSIS**

*Presumably, the right to privacy should not be a commodity that one is required to exchange for the opportunity of employment – or for people to access goods and services, for that matter. While employers surveilling their workers, both during and after work hours is far from a new phenomenon, advances in affordable surveillance technology has made that surveillance much more intrusive. As with personal information in general, employers are able to collect vast dossiers on their employees by gathering sweeping amounts of data about every aspect of their jobs and personal lives. Many workers, while generally aware they are being monitored, are not aware of the extent of the surveillance or what is being done with the information.*

*Employers are using more surveillance technology than ever — digital cameras, motion scanners, RFID badges, Apple Watch badges, Bluetooth beacons, keystroke logging — to track every single movement of workers in the office and to gauge their productivity. Some workplaces are using biometric data such as eye movements, body shifts, and facial expressions, captured by webcams to evaluate whether or not employees are being appropriately attentive in their work tasks. Even body temperature, sweat, and frequency of bathroom visits can be tracked and analyzed by employers.*

*This bill, sponsored by the California Labor Federation, seeks to prohibit employers from using a workplace surveillance tool to monitor workers in off-duty areas, including their personal residence and vehicle, and during off-duty hours. The bill provides a civil penalty for each employee per violation. Committee amendments, outlined in Comment #8, are largely clarifying in nature.*

*The bill is sponsored by a large coalition of labor organizations and is opposed by a similarly large coalition of business groups. This bill has been referred to three committees. The Labor and Employment Committee has primary jurisdiction. That Committee passed the bill on a 5-0-2 vote. This Committee is the second committee to analyze and hear this bill. If the bill passes this Committee, it will next be heard in the Judiciary Committee.*

**THIS BILL**:

1) Defines "employer" to mean a person who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, benefits, other compensation, hours, working conditions, access to work or job opportunities, or other terms or conditions of employment, of any worker. "Employer" includes:

   a) An employer's labor contractor.

    b) Private and public entities, including state and local government.

2) Defines "worker" to mean an employee of, or an independent contractor providing service to, or through, a business or a state or local governmental entity in a workplace.

3) Defines "worker data" to mean any information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a covered worker, regardless of how the information is collected, inferred, or obtained.

4) Defines "workplace surveillance tool" to mean a system, application, instrument, or device that collects or facilitates the collection of worker data, activities, communications, actions, biometrics, or behaviors, or those of the public that are capable of passively surveilling workers, by means other than direct observation by a person, including, but not limited to, video or audio surveillance, electronic work pace tracking, geolocation, electromagnetic tracking, photoelectronic tracking, or utilization of a photo-optical system or other means.

5) Defines "public prosecutor" to mean the Attorney General, a district attorney, a city attorney, a county counsel, or any other city or county prosecutor.

6) Prohibits an employer from using workplace surveillance tools to monitor or surveil workers in off-duty areas, including:

    a) Bathrooms

    b) Locker rooms

    c) Changing areas

    d) Breakrooms

    e) Designated smoking areas

    f) Lactation spaces

    g) Employee cafeterias

    h) Lounges

    i) Other areas where workers congregate while off-duty but on work premises.

7) Prohibits employers from collecting data on the frequency of use of the off-duty areas.

8) Authorizes workers to disable or leave behind any workplace surveillance tools on their person or in their possession when entering off-duty areas or during off-duty hours for any tools in their residence or vehicle, including any owned, leased, or used by a worker.

9) Prohibits an employer from requiring that a worker physically implant a surveillance device in their body.

10) Notwithstanding 7) through 9), an employer may use routine workplace surveillance in a work area not listed in 6), even if an employee is present, as long as the employee knows the tool is in use.

11) Prohibits an employer from denying an employee the rights under these provisions or from discharging, threatening to discharge, demoting, suspending, or in any manner discriminating against an employee for using, or attempting to use, the employee's rights under these provisions, filing a complaint with the Department of Industrial Relations (DIR) or alleging a violation of these provisions, cooperating in an investigation or prosecution of an alleged violation of these provisions, or opposing any policy or practice or act that is prohibited by these provisions.

12) States that, in addition to any other remedy, an employer who violates these provisions shall be subject to a civil penalty of $500 per employee for each violation.

13) Requires the Labor Commissioner (LC) to enforce the above provisions, including investigating an alleged violation, and ordering appropriate temporary relief to mitigate a violation or maintain the status quo pending the completion of a full investigation or hearing through the LC's existing procedures, including issuing a citation and filing a civil action against an employer who denies employee rights described in 11) above. If a citation is issued, the LC's existing procedures for issuing, contesting, and enforcing judgments for citations and civil penalties shall be utilized.

14) Provides that, as an alternative to the penalty described in 12) above, any employee who has suffered a violation may bring a civil action in a court of competent jurisdiction for damages caused by that adverse action, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

15) Authorizes, in any civil action brought pursuant to 14) above, an employee or the employee's exclusive representative to petition the superior court in any county wherein the violation in question is alleged to have occurred, or wherein the person resides or transacts business, for appropriate temporary or preliminary injunctive relief.

16) Authorizes any public prosecutor to institute an action for a violation of these provisions, including an action seeking injunctive relief.

17) Provides that the above provisions do not preempt any local law that provides equal or greater protection to workers.

18) States that the above provisions are severable, as described.

19) Provides that these provisions do not limit the authority of the Attorney General, a district attorney, or a city attorney, either upon their own complaint or the complaint of any person acting for themselves or the general public, to prosecute actions, either civil or criminal, for violations of these provisions, or to enforce the provisions independently and without specific direction of the LC or the Division of Labor Standards Enforcement.

**EXISTING LAW**:

1) Provides, pursuant to the California Constitution, that all people are by nature free and independent and have inalienable rights. Among these is the fundamental right to privacy. (Cal. Const. art. I, § 1.)

2) States that the "right to privacy is a personal and fundamental right protected by Section 1 of Article I of the Constitution of California and by the United States Constitution and that all individuals have a right of privacy in information pertaining to them." Further states these findings of the Legislature:

   a) The right to privacy is being threatened by the indiscriminate collection, maintenance, and dissemination of personal information and the lack of effective laws and legal remedies.

   b) The increasing use of computers and other sophisticated information technology has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information.

   c) In order to protect the privacy of individuals, it is necessary that the maintenance and dissemination of personal information be subject to strict limits. (Civ. Code § 1798.1.)

3) States that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. (Pen. Code § 630.)

4) Prohibits a person from intentionally and without the consent of all parties to a confidential communication, using an electronic amplifying or recording device to eavesdrop upon or record the confidential communication.

   a) For purposes of this section, defines a "person" to mean an individual, business association, partnership, corporation, limited liability company, or other legal entity. (Pen. Code § 632.)

5) Enacts the California Electronic Communications Privacy Act (CalECPA), which generally prohibits a government entity from compelling the production of or access to electronic communication information from a service provider or to electronic device information from any person or entity other than the authorized possessor of the device, absent a search warrant, wiretap order, order for electronic reader records, or subpoena issued pursuant to specified conditions, or pursuant to an order for a pen register or trap and trace device, as specified. (Pen. Code § 1546 et seq.)

6) Establishes the California Consumer Privacy Act (CCPA). (Civ. Code §§ 1798.100-1798.199.100.)

7) Defines a "consumer" to mean a natural person who is a California resident, as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017, however identified, including by any unique identifier. (Civ. Code § 1798.140.)

8) Provides a consumer, subject to exemptions and qualifications, various rights, including the following:

a) The right to know the business or commercial purpose for collecting, selling, or sharing personal information and the categories of persons to whom the business discloses personal information. (Civ. Code § 1798.110.)

b) The right to request that a business disclose the specific pieces of information the business has collected about the consumer, and the categories of third parties to whom the personal information was disclosed. (Civ. Code § 1798.110.)

c) The right to request deletion of personal information that a business has collected from the consumer. (Civ. Code § 1798.105.)

d) The right to opt-out of the sale of the consumer's personal information if the consumer is over 16 years of age. (Sale of the personal information of a consumer below the age of 16 is barred unless the minor opts-in to its sale.) (Civ. Code § 1798.12.)

e) The right to direct a business that collects sensitive personal information about the consumer to limit its use of that information to specified necessary uses. (Civ. Code § 1798.121.)

f) The right to equal service and price, despite the consumer's exercise of any of these rights, unless the difference in price is reasonably related to the value of the customer's data. (Civ. Code § 1798.125.)

**COMMENTS**:

1) **Author's statement**. According to the author: "AB 1331 is an important step in securing a worker's right to privacy while new invasive surveillance technologies are being used by employers." In background information provided to the Committee, the author further notes:

As technology's capabilities have increased, employer surveillance of workers has increased. Recent reports from ExpressVPN found that close to 80% of employers use monitoring software to track employee performance. With employer surveillance on the rise, workers have limited access to spaces in their workplace, and homes that are not under constant surveillance. Employers use workplace surveillance to track, monitor, manage, and prevent workers from advocating for their rights. The new surveillance state at the workplace has proven to increase psychological distress, stress, and lower job satisfaction among workers.

Surveillance is used to monitor and increase productivity, but increasingly employers are using sophisticated tools to monitor worker sentiment to prevent workers from unionizing or advocating for their rights. Often the only time workers can gather to talk about wages and working conditions are in break rooms, bathrooms, or other off-duty times at the workplace. These are opportunities for workers to identify potential labor law violations or to exercise their right to organize.

2) **The evolution of workplace surveillance.** Employers surveilling their workers, both during and after work hours, is far from a new phenomenon. For almost 200 years, if not longer, employers have been watching their employees' activities. The roots of employers actively

surveilling their workers in the United States can be traced back to the counting of the North-Western Police Agency, later known as the Pinkerton National Detective Agency, in 1855. The agency was borne out of employers' desire for more control over their employees, both inside and outside of work. Pinkerton detectives fulfilled that need. Among the roles played by the detectives were monitoring workers who were deemed to be a threat to an employer's interests; infiltrating and busting unions; and enforcing company rules.[1]

Early efforts at surveilling workers were limited by both the cost of hiring people to watch workers and the lack of technology. Henry Ford, often remembered as the inventor of the modern assembly line, infamously used to prowl his factory floor timing his workers' motions with a stopwatch looking for ways to improve efficiency. As with other employers, he also used private investigators to spy on his workers when they were off work to discover if they had any personal problems that could hinder their work.[2]

As the 20th century wore on, punch time clocks, which allowed employers to track their workers' work time down to the minute, gave way to closed circuit video cameras, and then starting in the 1980s, computer monitoring became increasingly common.[3] Even then, it was not humanly possible for employers to monitor their workers 24 hours a day, 7 days a week.

Over the last 40 years, advances in technology have allowed employers to surveil their workers in ways that could only have been imagined in science fiction novels. Punch cards have given way to biometric scans, key cards and workplace badges are giving way to Radio Frequency Identity (RFID) tags. A person could not be blamed for finding that technology almost quaint, given the other 21st Century advances in surveillance technology.

Regardless of the type of work employees do, whether it what has been traditionally termed "blue-collar" for the working class, or "white-collar" for the management and professional class, everyone is most likely being constantly watched by their employers. For those using computers, whether desktop or laptop, in an office or working remotely, surveillance tools capture their keystrokes and remotely monitor the websites they search on their browsers. As more workers shifted to remote work during the COVID pandemic, employers required their workers to install "bossware" on their home computers, introducing a plethora of invasive surveillance tools into their personal computers and their homes. Some employers required their employees to keep their cameras and microphones on during the workday.[4] For those who could not work remotely during the pandemic, especially in blue-color trades, workers were subject to mandatory health screenings, temperature checks, and, in some cases, social distancing sensors that allowed employers to track when, for how long, and which employees were together and not practicing the required social distancing.

3) **Where workers find themselves now.** Over the last five years, surveillance tools have become more affordable and more intrusive. As with personal information in general, employers are able to collect vast dossiers on their employees, by gathering sweeping amounts of data about every aspect of their jobs and personal lives. Often that is done "without employees' full

---

[1] Ifeoma Ajunwa, et al. "Limitless Worker Surveillance" *105 California Law Review 735* (2017) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2746211
[2] *Ibid.*
[3] *Ibid.*
[4] Wilneida Negrón and Aiha Nguyen, "The Long Shadow of Workplace Surveillance" *Stanford Social Innovation Review* (Sep. 6, 2023) https://ssir.org/articles/entry/the_long_shadow_of_workplace_surveillance#

informed or free consent. Many workers, while generally aware they are being monitored, don't know the extent of the surveillance or what is being done with the information."[5]

Employers are using more surveillance technology than ever — digital cameras, motion scanners, RFID badges, Apple Watch badges, Bluetooth beacons, keystroke logging — to track every single movement of workers in the office and to gauge their productivity. Some workplaces are using biometric data such as eye movements, body shifts, and facial expressions, captured by computer webcams, to evaluate whether or not their employees are being appropriately attentive in their work tasks. As an example, artificial intelligence (AI) systems at call centers record and grade how workers are handling calls. This technology can be used to "coach" workers while they are talking to customers, telling them to sound happier or be more sympathetic. Another example is wearable technology that, among other things, tracks a worker's movements throughout the day, gathering biometric data, measuring how many times they use the bathroom, how long they spend in break areas, and which employees are spending time together. According to the author, at least one company sells biometric ID badges with microphones, sensors, and other tools to record conversations, monitor speech, body movements, and location. Even body temperature, sweat, and frequency of bathroom visits can be tracked and analyzed by employers.

4) **Case study: Amazon.** Perhaps the most extreme example of the intrusive surveillance tools used by employers can be found at Amazon. According to documents filed by Amazon workers with the National Labor Relations Board, Amazon tracks every minute that their workers spend off of their tasks. To do this, they use handheld scanners that are also used to track packages. The worker claim they "can receive a written warning for accumulating 30 minutes of time off task in a day one time in a rolling one-year period. They can be fired if they accumulate 120 minutes of time off task in a single day or if they have accumulated 30 minutes of time off task on three separate days in a one-year period."[6] Counted among the activities considered "time off task" are going to the bathroom, talking to another worker, or going to the wrong work station. Workers reported that they were afraid to go to the bathroom or get a drink of water for fear of being disciplined.[7] At the end of each shift, supervisors are required to interrogate the worker with the highest time off task.

Along with the handheld devices, Amazon uses an AI camera system trained on each workstation analyzing workers' movements. The cameras automatically register the location of products and catalog every mistake workers make.[8] Monitoring the workers' non-stop manual also helps improve the AI computer system, which learns from the responses of Amazon's video reviewers and becomes more accurate over time.[9]

Oxfam, an international organization focused on fighting global poverty, conducted an investigation into the workplace surveillance practices at both Amazon and Walmart warehouses

---

[5] *Ibid.*

[6] Lauren Kaori Gurley, "Internal Documents Show Amazon's Dystopian System for Tracking Workers Every Minute of Their Shifts" *Vice* (Jun. 2, 2022) https://www.vice.com/en/article/internal-documents-show-amazons-dystopian-system-for-tracking-workers-every-minute-of-their-shifts/

[7] *Ibid.*

[8] Niamh McIntyre and Rosie Bradbury, *The eyes of Amazon: a hidden workforce driving a vast surveillance system*, The Bureau of Investigative Journalism (Nov. 21, 2022) https://www.thebureauinvestigates.com/stories/2022-11-21/the-eyes-of-amazon-a-hidden-workforce-driving-a-vast-surveillance-system/

[9] *Ibid.*

in the United States. Employers, like Amazon, often claim that their surveillance systems are designed to make workers safer. "However, in recent years worker groups have decried the high injury rates and horrific working conditions that workers encounter as Amazon employees."[10] The report describes the surveillance technology as follows:

> The scanners play a key role in the surveillance machine because what the scanner records can lead to "Associate Development and Performance Trackers," or "ADAPTs," which are automated write-ups that penalize workers for not meeting production goals. In addition, hundreds of security cameras are constantly monitoring the warehouse floor, ready to notify a manager when a worker is away from their station for too long. Badges are another form of worker surveillance, allowing managers to track when workers start or end their shifts, when they take their breaks, and their location across the warehouse. Being monitored this minutely takes a physical and mental toll as workers need to make decisions about taking breaks, eating, going to the bathroom, or even drinking water with their pace or performance metrics in mind.

> [. . .]

> Another example of the detailed metrics that Amazon monitors is a worker's units per hour (UPH) score, which records how many actions a worker is able to accomplish in an hour. . . . [W]orker metrics are prominently displayed on a monitor, which keeps workers psychologically primed to constantly worry about "making rate" and about how they are doing compared with their co-workers. . . . Importantly, workers are not told what the data that electronic devices are constantly collecting is being used for, nor are they properly notified of their privacy rights.

5) **What this bill would do.** In order to establish some workplace surveillance guidelines, this bill prohibits the use of surveillance tools in off duty areas, including:

- Bathrooms
- Locker rooms
- Changing areas
- Breakrooms
- Designated smoking areas
- Lactation spaces
- Employee cafeterias
- Lounges
- Other areas where workers congregate while off-duty but on work premises.

This prohibition also includes collecting data on the frequency of use of those areas. The prohibition does not apply to the use of surveillance tools in common work areas, other than those listed above, so long as the tools are routine workplace surveillance tools and employees are made aware that the tools are being used.

In addition, employers are prohibited from surveilling a worker's residence, personal vehicle, or property owned, leased, or used by the worker, *unless the surveillance is strictly necessary.* The

---

[10] *At Work and Under Watch: Surveillance and suffering at Amazon and Walmart warehouse*, Oxfam (Apr. 10, 2024) https://www.oxfamamerica.org/explore/research-publications/at-work-and-under-watch/

bill provides workers with the right to turn off or leave behind any surveillance tools that are on their person or in their possession during off-duty hours or in off-duty areas at the workplace. The bill also prohibits employers from requiring that workers physically implant a device in their body that collects or transmits data.

Finally, the bill provides various remedies for workers if their employer denies their rights under this bill or discharges, demotes, or suspends them. These remedies include the right to file a complaint with the Department of Industrial Relations or bring a civil action against the employer.

6) **Concerns raised by the opposition.** A coalition of business associations led by the California Chamber of Commerce argues that the language is overbroad and undermines workplace safety. Specifically, as it relates to the jurisdiction of this Committee, they write:

> **AB 1331 Is So Broad that It Applies to Every Business in California and Nearly Every Piece of Technology Used by Those Businesses.** There are many scenarios in which companies monitor their workplace, publicly accessible areas, company-owned property, and consumer data for safety and security-related purposes, including preventing theft or security breaches as well as keeping employees and customers safe. For example, hospitals use security cameras to ensure patients are safe and deter theft of medical equipment and medications. Manufacturers use key card systems to keep track of which employees are entering facilities with classified or proprietary information. Contractors use anti-theft measures to ensure expensive equipment is not stolen. Accounting firms use cybersecurity systems to protect consumer financial data.

The April 10th amendments to the bill allow employers to use routine workplace surveillance tools in any area not considered an off-duty space for employees, even if employees are present, as long as the employees are notified of the existence of the tools. This amendment should alleviate the concerns outlined by the opposition. Nothing in the bill would stop businesses from using theft prevention devices, security cameras, or key card systems. In addition, for workers who work remotely or drive company vehicles, surveillance tools are allowed as long as they are strictly necessary.

The coalition further notes:

> **Complying with AB 1331's Provisions Relating to Turning Tools Off and On Is Impossible.** Proposed subdivision (b)'s requirement (that all tools in the employee's possession be disabled during off-duty hours, including breaks) is impossible to implement. Different employees will have different schedules, meaning these tools would be turned off and on throughout the day, undermining their very purpose as described above. Regarding company vehicles, it is not uncommon for employees utilizing a vehicle to sit in that vehicle during a break. Safety or geolocation systems in those vehicles are often installed in a way that they cannot simply be turned off and on.

> Functionally, the only way to guarantee compliance is not to use certain systems at all or to give every employee access to those systems to turn them off and on – an outcome that will cause employers to violate existing laws related to workplace safety, sexual harassment prevention and cybersecurity requirements.

The April 10th amendments to the bill remove the blanket requirement that surveillance tools be disabled during off-duty hours. Instead workers are given the right to disable or leave behind tools that are on their person or in their possession during off-duty hours and in off-duty areas.

In addition, opponents raise the concern that "worker data" is defined as any information that is reasonably capable of being associated with a worker and is overly broad. The author may wish to consider narrowing the definition to ensure that it does not limit legitimate workplace information that constitutes work product or is necessary for payroll or other essential personnel or administrative purposes.

7) **Analysis.** This Committee has heard and analyzed a number of bills seeking to protect the privacy of people in California from intrusive surveillance and collection of their sensitive personal information. Particularly, the Legislature in recent years has prioritized protecting the privacy of individuals who may be most at risk, including immigrants and those seeking reproductive and gender affirming care. Importantly, in the same hearing as this bill, the Committee will be considering AB 1355 (Ward), which aims to prohibit the collection, sale, and sharing of individual's location data, except under certain narrow circumstances.

Presumably, the right to privacy should not be a commodity that one is required to exchange for the opportunity of employment – or for people to access goods and services, for that matter. Given that starting point, ensuring that Californians do not have to give up their fundamental privacy rights in their workplace by limiting the most intrusive surveillance technologies and allowing workers to retain their rights while on their own personal time and in their own private spaces is in keeping with this Committee's efforts to strengthen Californians' right to privacy.

8) **Amendments.** The author has agreed to the following clarifying amendments:

**1561.** (d) Notwithstanding subdivisions (a) to (c), inclusive, an employer may use ~~routine~~ workplace surveillance tools *that passively surveil workers in an area* not listed in paragraph (1) of subdivision (a) even if an ~~employee~~ *off-duty worker* may be present, as long as the employer makes ~~employee~~ *workers* aware in advance that a workplace surveillance tool.

In addition, the Judiciary Committee has requested the following amendment:

**1562.** (e) In addition to other remedies as may be provided by the laws of this state or its subdivisions, *this part may also be enforced by a public prosecutor pursuant to Chapter 8 (commencing with Section 180 of Division 1).* ~~any public prosecutor may also institute an action for a violation of this part, including an action seeking injunctive relief.~~

*ARGUMENTS IN SUPPORT:* The California Labor Federation, sponsors of the bill, and a broad coalition of labor organizations, argue:

Workplace surveillance is not a new phenomenon. Employers have surveilled workers for decades with traditional cameras and microphones. However, today's workplace surveillance capabilities differ in scale, speed, and invasiveness. Employers now have access to a plethora of tools such as wearable devices to monitor worker biometrics, speech, and location, as well as heat and retina tracking technology. With the use of these powerful surveillance tools, workers have limited access to spaces in their workplace and homes that are not under constant surveillance. Areas such as restrooms, lactation spaces, and worker lounges are not protected from being surveilled with advanced technology that does not rely solely on

traditional audio or visual recordings. The new surveillance state at the workplace has proven to increase the likelihood of discrimination, harassment, and psychological distress of workers.

To protect worker privacy in sensitive areas and from developing implantable technology, AB 1331 will update and expand existing workplace privacy laws to address new surveillance technology. AB 1331 will prohibit the use of surveillance tools, such as wearable devices and heat sensing cameras, from being used to monitor private spaces like a restroom, lactation space, or breakroom. AB 1331 also prohibits employers from surveilling workers during non-work hours and limits employer surveillance of a worker's home or vehicle to what is strictly necessary for the job. Lastly, AB 1331 prohibits employers from requiring workers to implant or embed tracking devices in their body to ensure state law is ahead of technology being developed and tested currently.

The California Professional Firefighters write in support:

The explosion of AI programs and applications in recent years has upended many industries and professions, replacing human workers and developing faster than regulatory and oversight bodies have been able to keep pace. But even when AI is not taking the role of a human in the workplace in many cases it is still being implemented in ways that can have significant, life-altering consequences for the people it touches. The implementation of AI in workplace monitoring software, often in increasingly invasive ways and without the knowledge or consent of the workers it is monitoring, can result in the loss of employment for actions taken in what was believed to be private.

AB 1331 would prohibit the usage of surveillance devices and technology in spaces that can reasonably be assumed to be private, including restrooms, locker rooms, lounges, and others. It would also prohibit employers from monitoring employee's private property and vehicles, ensuring that workers are able to fully leave the workplace when they are off-duty and not forced to worry about their employer intruding on private moments. While data monitoring and digital surveillance is increasing in all of our lives, it is crucial that the right to privacy for workers is preserved and that employers are not given free access to every moment of their employees' lives.

*ARGUMENTS IN OPPOSITION:* In opposition to the bill, a coalition of county organizations argue:

We understand the reasonable concerns one could have about the slow creep of surveillance tools into every aspect of daily life and appreciate that one could imagine the appropriate limits are needed to prevent employers from snooping into the private lives of their employees. However, the scope of this bill is vast and would deem banal tools used for everyday work, including badge access, collaboration tools like Teams or Slack, or GPS tools used to track fleets, to be "surveillance tools". Under AB 1331, any device that collects or facilitates collection of data of an employee's movements, actions, communications, or behaviors, is deemed a surveillance tool that cannot be used in "off-duty areas," or can be turned off during "off-duty" hours.

AB 1331 will needlessly endanger public workforces and severely impair our ability to prevent and investigate instances of workplace violence. The bill prohibits local agencies from using a surveillance tool in any "off-duty area," defined to include breakrooms,

smoking areas, cafeterias, and lounges. How could public agencies mitigate or investigate workplace violence dangers if they cannot even monitor common areas like cafeterias? How can we keep our employees safe from the public if we cannot monitor public spaces like smoking areas?

To make matters worse, AB 1331 applies not only to surveillance of employees, but also the public. Section 1561(a) would prohibit local agencies from using routine surveillance tools in "off-duty areas," including designated smoking areas and areas where workers congregate while off-duty but on work premises. This section would effectively require public agencies to disable security cameras or other basic security tools in areas where they are needed to keep building entrances secure.

Under AB 1331, employees must be allowed to disable surveillance tools during off-duty hours or when they are entering off-duty areas. It's unclear how these rules would apply to a variety of tools that public employees may be required to use, including emergency alarms for teachers, body cameras for law enforcement, or tools used for public vehicle fleets, including dash cameras, speed monitors, or GPS tracking. Similarly, it's not clear how public agencies can adhere to the rules regarding off-duty hours for positions that are on-call or on standby, including law enforcement, emergency personnel, laboratory safety officers, and others.

Unfortunately, we have seen rising hostility and threats against government entities and their workforces. That includes violence and threats of violence against government employees whose job requires them to serve the public, like library staff, teachers, firefighters, benefits officers, among myriad other examples. It also includes public officials who are frequently targeted with threats or actual violence, including election workers, health officers, and public officials. AB 1331 would result in all of these public servants facing increased vulnerability at a time of strong anti-government sentiment.

To compound all of these concerns, AB 1331 imposes severe financial penalties and allows for private right of action for noncompliance.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

AFSCME California
California Alliance for Retired Americans (CARA)
California Coalition for Worker Power
California Employment Lawyers Association
California Federation of Labor Unions, Afl-cio
California Federation of Teachers Afl-cio
California Immigrant Policy Center
California Nurses Association
California Professional Firefighters
California School Employees Association
California State Legislative Board of the Smart - Transportation Division
California Teamsters Public Affairs Council
Center for Inclusive Change
Coalition for Humane Immigrant Rights (CHIRLA)

Communications Workers of America, District 9
Community Agency for Resources, Advocacy and Services
Consumer Federation of California
International Lawyers Assisting Workers (ILAW) Network
Laane
National Employment Law Project
National Union of Healthcare Workers (NUHW)
Northern California District Council of the International Longshore and Warehouse Union (ILWU)
Oakland Privacy
Pillars of the Community
Powerswitch Action
Rise Economy
San Diego Black Workers Center
Secure Justice
Seiu California State Council
Surveillance Resistance Lab
Techequity Action
The Workers Lab
Unite Here, Local 11
United Food and Commercial Workers, Western States Council
Workers' Algorithm Observatory
Working Partnerships USA
Worksafe

**Opposition**

Acclamation Insurance Management Services
Agricultural Council of California
Allied Managed Care
American Petroleum and Convenience Store Association
American Property Casualty Insurance Association
Anaheim Chamber of Commerce
Associated General Contractors
Associated General Contractors San Diego
Association of California Healthcare Districts
Association of Orange County Deputy Sheriff's
Brea Chamber of Commerce
Calbroadband
Calforests
California Alliance of Family Owned Businesses
California Apartment Assocation
California Association of Health Facilities
California Association of Licensed Security Agencies, Guards & Associates
California Association of Sheet Metal & Air Conditioning Contractors National Association
California Association of Winegrape Growers
California Attractions and Parks Association
California Beer and Beverage Distributors
California Cardroom Alliance

California Chamber of Commerce
California Construction and Industrial Materials Association
California Credit Union League
California Farm Bureau
California Fraternal Order of Police
California Fuels and Convenience Alliance
California Gaming Association
California Grocers Association
California Hospital Association
California Hotel & Lodging Association
California League of Food Producers
California Moving and Storage Association
California Pest Management Association
California Restaurant Association
California Retailers Association
California Special Districts Association
California State Association of Counties (CSAC)
California Statewide Law Enforcement Association
California Travel Association
California Trucking Association
Carlsbad Chamber of Commerce
Chino Valley Chamber of Commerce
Coalition of Small and Disabled Veteran Businesses
Colusa County Chamber of Commerce
Construction Employers' Association
Corona Chamber of Commerce
Dairy Institute of California
Dana Point Chamber of Commerce
Flasher Barricade Association
Garden Grove Chamber of Commerce
Greater Coachella Valley Chamber of Commerce
Greater High Desert Chamber of Commerce
Housing Contractors of California
Insights Association
LA Canada Flintridge Chamber of Commerce
Lake Elsinore Valley Chamber of Commerce
League of California Cities
Livermore Valley Chamber of Commerce
Long Beach Area Chamber of Commerce
Long Beach Police Officers Association
Los Angeles Area Chamber of Commerce
Morgan Hill Chamber of Commerce
Murrieta Wildomar Chamber of Commerce
National Electric Contractors Association
Oceanside Chamber of Commerce
Orange County Business Council
Paso Robles Templeton Chamber of Commerce
Public Risk Innovation, Solutions, and Management (PRISM)
Rancho Cordova Area Chamber of Commerce

Rancho Cucamonga Chamber of Commerce
Redondo Beach Chamber of Commerce
Rural County Representatives of California (RCRC)
Sacramento County Deputy Sheriff's Association
San Jose Chamber of Commerce
Santa Barbara South Coast Chamber of Commerce
Santa Clarita Valley Chamber of Commerce
Security Industry Association
Sheriff's Employee Benefits Association (SEBA)
South Bay Association of Chambers of Commerce
Southwest California Legislative Council
Technet
Torrance Area Chamber of Commerce
Tulare Chamber of Commerce
United Contractors
Urban Counties of California (UCC)
Walnut Creek Chamber of Commerce
Western Electrical Contractors Association
Western Growers Association
Wilmington Chamber of Commerce
Wine Institute

**Analysis Prepared by**:  Julie Salley / P. & C.P. / (916) 319-2200

**SENATE COMMITTEE ON LABOR, PUBLIC EMPLOYMENT AND RETIREMENT**
**Senator Lola Smallwood-Cuevas, Chair**
**2025 - 2026  Regular**

| | | | |
|---|---|---|---|
| **Bill No:** | AB 1331 | **Hearing Date:** | June 25, 2025 |
| **Author:** | Elhawary | | |
| **Version:** | June 19, 2025 | | |
| **Urgency:** | No | **Fiscal:** | Yes |
| **Consultant:** | Alma Perez-Schwab | | |

**SUBJECT:** Workplace surveillance

**KEY ISSUES**

This bill limits employer use of workplace surveillance tools by 1) prohibiting an employer from using such tools to monitor workers in employer-designated off-duty areas; 2) authorizing employers to use video cameras in certain locations for safety purposes but with limitations, as specified; and 3) authorizes the use of workplace surveillance tools in specified circumstances, including to access locked or secured areas. This bill 1) includes anti-discrimination provisions protecting workers' exercise of these rights; 2) makes an employer who violates these provisions subject to a specified civil penalty; 3) authorizes the Labor Commissioner (LC) to enforce these prohibitions, issue citations, and file civil actions for any violations; 4) additionally authorizes enforcement by public prosecutors; and 5) provides exemptions to specified security, military and airspace employers.

**ANALYSIS**

**Existing law**:

1)  States that the "right to privacy is a personal and fundamental right protected by Section 1 of Article I of the Constitution of California and by the United States Constitution and that all individuals have a right of privacy in information pertaining to them." Further states these findings of the Legislature:

    a.  The right to privacy is being threatened by the indiscriminate collection, maintenance, and dissemination of personal information and the lack of effective laws and legal remedies.
    b.  The increasing use of computers and other sophisticated information technology has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information.
    c.  In order to protect the privacy of individuals, it is necessary that the maintenance and dissemination of personal information be subject to strict limits.
        (Civil Code §1798.1)

2)  States that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties that cannot be tolerated in a free and civilized society. (Penal Code §630)

**AB 1331** (**ElhaEwary**)          Page **2** of **19**

3)  Prohibits a person from intentionally, and without the consent of all parties to a confidential communication, using an electronic amplifying or recording device to eavesdrop upon or record the confidential communication. For purposes of these provisions, defines a "person" to mean an individual, business association, partnership, corporation, limited liability company, or other legal entity. (Penal Code §632)

4)  Establishes the California Consumer Privacy Act (CCPA), which grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. It places attendant obligations on businesses to respect those rights. (Civil Code §1798.100 et seq.)

5)  Establishes the Consumer Privacy Rights Act (CPRA), which amends the CCPA and creates the California Privacy Protection Agency (PPA), which is charged with implementing these privacy laws, promulgating regulations, and carrying out enforcement actions. (Civil Code §1798.100 et seq.; Proposition 24 (2020))

6)  Establishes the Department of Industrial Relations (DIR) in the Labor and Workforce Development Agency (LWDA), and vests it with various powers and duties to foster, promote, and develop the welfare of the wage earners of California, to improve their working conditions, and to advance their opportunities for profitable employment. (Labor Code §50.5)

7)  Establishes within the DIR, various entities including the Division of Labor Standards Enforcement (DLSE) under the direction of the Labor Commissioner (LC), and empowers the LC with ensuring a just day's pay in every workplace and promotes economic justice through robust enforcement of labor laws. (Labor Code §79-107)

8)  Requires employers to provide to each employee, upon hire, a written description of each quota to which the employee is subject, including the quantified number of tasks to be performed or materials to be produced or handled, within the defined time period, and any potential adverse employment action that could result from failure to meet the quota. (Labor Code §2101)

9)  Prohibits an employer from causing an audio or video recording to be made of an employee in a restroom, locker room, or room designated by an employer for changing clothes, unless authorized by court order. No recording made in violation of this prohibition may be used by an employer for any purpose. A violation of this section constitutes an infraction. (Labor Code §435)

10) Authorizes, until January 1, 2029, a public prosecutor to prosecute an action, either civil or criminal, for a violation of certain provisions of the labor code or to enforce those provisions independently. (Labor Code §181)

**This bill:**

1)  Defines, among other terms, the following:

    a.  "Employer" means a person who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, benefits, other compensation, hours,

**AB 1331** (**Elhawary**)           Page **3** of **19**

working conditions, access to work or job opportunities, or other terms or conditions of employment, of any worker.

   i. "Employer" includes an employer's labor contractor.
   ii. "Employer" includes private entities and public entities, including, but not limited to, all branches of state government, or the several counties, cities and counties, and municipalities thereof, or any other political subdivision of the state, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof.

   b. "Employer-designated area" means an area in the workplace the employer provides or has historically provided to workers to use for breaks or to purchase, obtain, or consume food or beverages.

   c. "Worker" means an employee of, or an independent contractor providing service to, or through, a business or a state or local governmental entity in a workplace.

   d. "Workplace surveillance tool" means a system, application, instrument, or device that collects or facilitates the collection of worker activities, communications, actions, biometrics, or behaviors, or those of the public that are capable of passively surveilling workers, by means other than direct observation by a person, including, but not limited to, video or audio surveillance, electronic workplace tracking, geolocation, electromagnetic tracking, photoelectronic tracking, or utilization of a photo-optical system or other means.

   i. "Workplace surveillance tool" does not include smoke or carbon monoxide detectors or weapon detection systems that automatically screen a person's body.

   e. "Public prosecutor" means the Attorney General, a district attorney, a city attorney, a county counsel, or any other city or county prosecutor.

2) Prohibits an employer, unless directed by a court order, from using a workplace surveillance tool to monitor or surveil workers, including data collection on the frequency of a worker's use of those areas, in the following employee-only, employer-designated areas:

   a. Bathrooms.
   b. Locker rooms.
   c. Changing areas.
   d. Breakrooms.
   e. Lactation spaces.
   f. Cafeterias.

3) Authorizes a worker to leave behind workplace surveillance tools that are on their person or in their possession when entering the off-duty areas listed above, including during off-duty hours, such as meal periods, unless a worker is required to remain available during meal or rest periods pursuant to federal law or existing state law.

4) Notwithstanding the above, *authorizes an employer* to do all of the following:

**AB 1331** (**Elhawary**)          Page **4** of **19**

  a.  For worker safety purposes only, use video cameras to record breakrooms, employee cafeterias, or lounges, subject to the following requirements:

   i.  The video camera does not record audio.
   ii.  The employer posts signage in areas recorded by the video camera notifying workers that they are subject to video surveillance.
   iii.  The video camera does not use artificial intelligence or other digital monitoring capacity.
   iv.  The employer does not monitor or review video surveillance of breakrooms, employee cafeterias, or lounges unless one of the following conditions is met:
       1.  A worker or their authorized representative requests video surveillance they are in and the employer only reviews the surveillance to find the requested segment.
       2.  Law enforcement or a court of law requests the video. Video footage provided to law enforcement shall also be made available to a worker who is recorded.
   v.  The video surveillance is stored in a form that can only be accessed by a worker who is reviewing the video surveillance for the purposes specified above.

  b.  Use workplace surveillance tools that passively surveil workers in a work area not listed in (2) above, even if an off-duty worker may be present, as long as the worker is made aware in advance that a workplace surveillance tool is in use.

  c.  Check workplace surveillance tools for the one-time entry and exit in the off-duty areas for health and safety purposes, as long as it is not used to monitor the frequency of a worker's use of those areas.

5)  Prohibits an employer from requiring a worker to physically implant a device that collects or transmits data, including a device that is installed subcutaneously in the body.

6)  On a multiemployer jobsite, requires the controlling employer to post a notice at the jobsite providing a general description of the types of activities that may be monitored or surveilled and for what purposes. Specifies that such a notice satisfy the requirement for any employer whose employees perform work on that jobsite.

7)  Specifies that an employer is not in violation of the bill's provisions in any of the following circumstances:

  a.  A worker brings a workplace surveillance tool into an off-duty area, specified in (2) above, because it is required to access a locked or secured area.
  b.  A worker uses a workplace surveillance tool to access a locked or secured area during off-duty hours.
  c.  A worker voluntarily chooses to bring a workplace surveillance tool into an off-duty area.
  d.  A worker voluntarily keeps a workplace surveillance tool on their person during off-duty hours.

8)  Prohibits an employer from discharging, threatening to discharge, demoting, suspending, or in any manner discriminating against an employee for using, or attempting to use, the employee's rights under this part, including the filing of a complaint, as specified.

9)  Specifies that in addition to any other remedy, an employer who violates these provisions shall be subject to a civil penalty of $500 per employee for each violation.

**AB 1331** (**Elhawary**)          Page **5** of **19**

10) In addition to any other remedy, authorizes the Labor Commissioner to enforce these provisions, including investigating an alleged violation, and ordering appropriate temporary relief to mitigate a violation or maintain the status quo pending the completion of a full investigation or hearing including by issuing a citation and filing a civil action, as specified.

11) Authorizes these provisions to also be enforced by a public prosecutor, as specified.

12) Provides that the above provisions do not preempt any local law that provides equal or greater protection to workers.

13) Specifies that the above provisions are severable and if any provision is held invalid, that invalidity shall not affect other provisions or applications that can be given effect.

14) Provides that these provisions do not limit the authority of the Attorney General, a district attorney, or a city attorney, either upon their own complaint or the complaint of any person acting for themselves or the general public, to prosecute actions, either civil or criminal, for violations of these provisions, or to enforce the provisions independently and without specific direction of the LC or the Division of Labor Standards Enforcement.

15) Specifies that these provisions do not prohibit any employer from using workplace surveillance tools as required by federal law or existing state law.

16) Specifies that these provisions do not authorize any employer to use workplace surveillance tools as prohibited by federal law or existing state law.

17) Exempts from all these provisions, an employer that does either of the following:

   a.  Develops products for national security, military, space, or defense purposes.
   b.  Develops aircraft for operation in national airspace.

### COMMENTS

1.  **Background:**

   *Artificial Intelligence and Workplace Surveillance Tools*
   With technological advancements happening faster than humans can react, we often miss opportunities to pause and evaluate its impact. Until recently, advancements in technology often automated physical tasks, such as those performed on factory floors or self-checkouts, but artificial intelligence (AI) functions more like human brainpower. AI can use algorithms to accomplish tasks faster and sometimes at a lower cost than human workers can. With regards to employee monitoring and surveillance, employers are deploying AI-powered tools that monitor and manage workers, including by tracking their locations, activities, including emotions, and productivity.

   Employee monitoring and surveillance is not a new phenomenon, unfortunately, the technological advancements of the last few years is putting into question just how far is too far? As noted by the Assembly Privacy and Consumer Protection Committee analysis of this bill:

**AB 1331** (**Elhawary**)                    Page **6** of **19**

> "Employers are using more surveillance technology than ever — digital cameras, motion scanners, RFID badges, Apple Watch badges, Bluetooth beacons, keystroke logging — to track every single movement of workers in the office and to gauge their productivity. Some workplaces are using biometric data such as eye movements, body shifts, and facial expressions, captured by computer webcams, to evaluate whether or not their employees are being appropriately attentive in their work tasks. As an example, artificial intelligence (AI) systems at call centers record and grade how workers are handling calls. This technology can be used to 'coach' workers while they are talking to customers, telling them to sound happier or be more sympathetic. Another example is wearable technology that, among other things, tracks a worker's movements throughout the day, gathering biometric data, measuring how many times they use the bathroom, how long they spend in break areas, and which employees are spending time together. According to the author, at least one company sells biometric ID badges with microphones, sensors, and other tools to record conversations, monitor speech, body movements, and location. Even body temperature, sweat, and frequency of bathroom visits can be tracked and analyzed by employers."

Existing law generally allows employers to surveille their employees as long as they notify employees about their surveillance practices, including the places being monitored, and avoid restrooms, locker rooms or places where people change clothes. Some additional limitations and requirements apply for audio recording surveillance.

*Prevalence:*
A 2024 study by the Washington Center for Equitable Growth, which surveyed 1,273 workers and sought to estimate the prevalence of automated management and surveillance technologies at work and their impact on workers' well-being, found that:

- 68.5 percent of workers reported electronic monitoring some or all of the time
- 36.8 percent reported productivity monitoring
- 44.6 percent reported camera monitoring
- 26.6 percent reported location monitoring
- 52.1 percent reported technology monitoring (for those who reported regularly using smartphones, tablets, or computers at work)

Unfortunately, "many workers may be unaware of the extent to which they are being tracked by their employer; only two states, Delaware and Connecticut, mandate that employers inform their employees of electronic tracking."[1]

Amazon is an extreme example of the extent that AI and workplace monitoring and surveillance has taken us. According to various sources, including a claim filed with the National Labor Relations Board by employees, Amazon tracks every minute that workers spend off their tasks.[2] Workers claim they get written warnings for every 30 minutes of time off-task and can be fired if they accumulate 120 minutes of time off-task in a single day or if they have accumulated 30 minutes of time off-task on three separate days in a one-year

---

[1] Ifeoma Ajunwa, Kate Crawford, and Jason Schultz, Limitless Worker Surveillance, 105 Cal. L. Rev. 735 (2017)., Available at SSRN: https:// theguardian ssrn.com/abstract=2746211
[2] The Guardian, Michael Sainato, May 21, 2024. "You feel like you're in prison': workers claim Amazon's surveillance violates labor law." https://www..com/us-news/article/2024/may/21/amazon-surveillance-lawsuit-union

**AB 1331** (**Elhawary**)          Page **7** of **19**

period.[3] Activities that amount to "time off task" include going to the bathroom, talking to another worker, or going to the wrong work station. Workers reported that they were afraid to go to the bathroom or get a drink of water for fear of being disciplined.[4] In addition to tracking time off-task, Amazon also uses AI cameras at workstations to catalog worker mistakes.[5] Monitoring the workers' activities non-stop also helps improve the AI computer system, which learns from the responses of Amazon's video reviewers and becomes more accurate over time.[6]

*California Consumer Privacy Act (CCPA) and Worker Rights:*
As of January 1, 2023, the CCPA covers employees of specified large employers by granting them certain rights and protections with regards to their privacy at work. Specifically, the CCPA grants workers, among other things, the right to know when their employers are collecting data on them, the right to access that data, the right to correct and delete data, and grants employees protections from retaliation for exercising these rights. The CCPA applies to a worker's personal information, such as their IDs, demographics, employment-related data, biometric data, social media data, geolocation data, audio data, and any inferences about the worker's characteristics and abilities, personal information like religious beliefs and sexual orientation, among other information.

Unfortunately, the CCPA only applies to employees at for-profit companies doing business in the State that meet one or more of the following qualifications[7]:

- Have more than $25 million in gross annual revenue;
- Buy, sell, or share the personal information of 100,000 + consumers or households;
- Derive 50 percent or more of their annual revenue from selling or sharing consumers' personal information;

In terms of enforcement, the CCPA applies to independent contractors, job applicants, former employees, and third parties that control the collection of an employer's worker data, as specified. The California Privacy Protection Agency (CPPA) was created to enforce the CCPA and is able to investigate alleged violations and impose administrative fines. California's AG is also authorized to enforce the CCPA. There is no private right of action except in cases of data breaches.[8]

*Recent Legislative Efforts to Regulate AI*
Over the last several years, the Legislature has considered a multitude of bills aimed at regulating AI and its use to ensure that the privacy rights of Californians continue to be protected. AB 2885 (Bauer-Kahan, Chapter 843, Statutes of 2024) was a crucial first step in regulating this technology by establishing key definitions, including a uniform definition for

---

[3]  Lauren Kaori Gurley, "Internal Documents Show Amazon's Dystopian System for Tracking Workers Every Minute of Their Shifts" *Vice* (Jun. 2, 2022) https://www.vice.com/en/article/internal-documents-show-amazons-dystopian-system-for-tracking-workers-every-minute-of-their-shifts/

[4] *Ibid.*

[5] Niamh McIntyre and Rosie Bradbury, *The eyes of Amazon: a hidden workforce driving a vast surveillance system*, The Bureau of Investigative Journalism (Nov. 21, 2022) https://www.thebureauinvestigates.com/stories/2022-11-21/the-eyes-of-amazon-a-hidden-workforce-driving-a-vast-surveillance-system/

[6] *Ibid.*

[7] UC Berkeley Labor Center, Kung Feng, December 6, 2023. "Overview of New Rights for Workers under the California Consumer Privacy Act." https://laborcenter.berkeley.edu/overview-of-new-rights-for-workers-under-the-california-consumer-privacy-act/

[8] *Ibid.*

**AB 1331** (**Elhawary**)              Page **8** of **19**

"artificial intelligence." Other efforts attempted to regulate the industry by establishing requirements on the use of AI. For example, AB 2930 (Bauer-Kahan, 2024), which died on the Senate Inactive File, would have established the right of individuals to know when an Automated Decision System (ADS) is being used, the right to opt out of its use, and an explanation of how it is used.

There were several other bills in 2024, although the focus has mostly been on consumers and their technology rights, such as collection of social media data or the manipulation of elections news via fake postings. In the area of private sector labor and employment specifically, only one bill has attempted to regulate the use of AI. SB 1446 (Smallwood-Cuevas, 2024) attempted to address the issue by requiring, among other things, that a grocery retail store or retail drug establishment that intended to implement a consequential workplace technology, as defined, notify workers, their collective bargaining representatives, and the public at least 60 days in advance of the implementation of the technology with a general description of the technology and the intended purpose of the technology, as specified. SB 1446 was held in the Assembly Rules Committee.

Several other bills regulating AI are pending this year, including SB 7 (McNerney, 2025), which is pending in the Assembly Labor and Employment Committee, would be the first attempt at comprehensively regulating the use of ADS in the workplace. AB 1018 (Bauer-Kahan, 2025) would, among other things, regulate the development and deployment of an ADS used to make consequential decisions, as defined. AB 1355 (Ward, 2025), which was held under submission in the Assembly Appropriations Committee, would have prohibited the collection, sale, and sharing of individual's location data, except under certain narrow circumstances.

AB 1221 (Bryan, 2025) which was specifically on workplace surveillance, was held under submission in the Assembly Appropriations Committee, but would have required an employer, at least 30 days before introducing a workplace surveillance tool, as defined, to provide a worker who will be affected with a written notice regarding the toll and intended uses. Additionally, the bill would have prohibited an employer from using certain workplace surveillance tools, including a workplace surveillance tool that incorporates facial, gait, or emotion recognition technology.

*This bill:*
Finally, this bill (AB 1331 Elhawary) would limit the use of workplace surveillance tools by employers, including by prohibiting an employer from monitoring or surveilling workers in employer-designated off-duty areas, as specified, and authorizing the use of such tools in certain circumstances.

2.  **Committee Comments:**

As noted above, AI and workplace surveillance technology is being used in new ways that we had never previously imagined. This bill attempts to limit the ways in which surveillance tools are used to monitor and control workers in the workplace. Existing law requires employers to ensure a safe and healthful workplace, but this bill is crucial to ensuring workers are not monitored and surveilled to such extremes that their health and safety is put on the line. At the same time, we need to ensure that employers have the tools they need to ensure a safe workplace. It is imperative, for the sake of our workers and their livelihoods, that the Legislature take a proactive and measured approach to address the issue.

**AB 1331** (**Elhawary**)          Page **9** of **19**

As conversations on this bill continue, the author and sponsors may wish to consider the following:

- A previous version of this bill authorized a worker to disable a workplace surveillance tool that is on their person during off-duty hours including meal periods in a worker's residence, personal vehicle, or property owned, leased, or sued by a worker. The current version of this bill authorizes a worker to leave behind a workplace surveillance tool when entering off-duty areas and public bathrooms and *during off-duty hours*, as specified. The bill also specifies that an employer is not in violation of these provisions if "a worker *voluntarily* keeps a workplace surveillance tool on their person during off-duty hours."

  Presumably, the author intends this provision to capture workers who have to take a workplace surveillance tool with them during off-duty hours, but what if the employer requires such equipment to stay with them during those off-duty hours? An employee may have a work laptop that they are required to keep with them at all times. A worker may have a badge that they need to take home in order to unlock the office the next day. *How would this bill's requirements and prohibitions apply in these types of circumstances?*

- The bill specifies that in addition to any other remedy, an employer who violates these provisions shall be subject to a civil penalty of five hundred dollars ($500) *per employee for each violation.* In practice, if an employer were to violate these provisions, would the penalty amount to $500 for each employee who appears in a surveillance video? Or, could it amount to $500 for every employee in the workforce on that given day? *The author may wish to amend the civil penalty provisions further to ensure clarity.*

- The California Gaming Association, California Cardroom Alliance, and the Communities 4 California Cardrooms are seeking an exemption for licensed California cardrooms. They argue that this bill is in direct conflict with current gaming regulations and workplace safety laws, and would make it impossible for cardroom operators to comply with both existing law and this bill. They argue that video surveillance is uniquely crucial in their industry in order to deter money laundering and for law enforcement to go after criminals. *Whether the author decides to exempt this industry or not, the author may wish to amend the bill to at least specify that the bill's provisions do not prohibit any employer from using workplace surveillance tools as required by state and federal law and their implementing regulations.*

  1563(d) This part does not prohibit any employer from using workplace surveillance tools as required by federal law or existing state law, **and their implementing regulations.**

- At the next opportunity for amendments, the author should make this technical fix:

  1561(d) (2) Use workplace surveillance tools that passively surveil workers in ~~an area in~~ a work area not listed in paragraph (1) of subdivision (a) even if an off-duty

**AB 1331** (**Elhawary**)          Page **10** of **19**

worker may be present, as long as the worker is made aware in advance that a workplace surveillance tool is in use.

**3.  Need for this bill?**

According to the author:

"As technology's capabilities have increased, employer surveillance of workers has increased. Recent reports from ExpressVPN found that close to 80% of employers use monitoring software to track employee performance. With employer surveillance on the rise, workers have limited access to spaces in their workplace, that are not under constant surveillance. Employers use workplace surveillance to track, monitor, manage, and prevent workers from advocating for their rights. The new surveillance state at the workplace has proven to increase psychological distress, stress, and lower job satisfaction among workers. Part of the stress stems from the invasiveness of surveillance technology that follows a workers' every movement through wearable devices that eliminate the need for workplace cameras. Humanyze sells biometric ID badges with microphones, sensors, and other tools to record conversations, monitor speech, body movements, & location. Even body temperature, sweat, and frequency of bathroom visits can be tracked and analyzed by employers. Workers often don't know how or when they're being surveilled or what the employer is doing with that sensitive, personal data. …

In 2018 Amazon patented a technology in the form of a wristband to be worn by warehouse workers with the intent of precisely tracking employees in warehouses. The tool could be used to track productivity but also to monitor for potential organizing.  The tool allows supervisors to track where workers were at all times and could even determine how many 'wristbands' were together in a given location, tracking which workers were talking to each other. Amazon also developed a centralized AI system that can detect union-friendly phrases and behaviors in Amazon warehouses in real time. AI then analyzes the data to learn 'how to devise strategies to neutralize their programmed target,' which, in this case, is 'workers in a break room' who are potentially pro-union or at least, asking questions about their rights. Perceptyx – a company that collects and analyzes employee surveys, digital focus groups, and other information – said it could create a 'union vulnerability index' so employers can see which group of workers is at highest risk of unionizing. Wearables and other surveillance tools can be used to track which workers spend time together, giving employers another tool to union-bust.

The future of surveillance is also rapidly developing. A Swedish company called Biohax makes radio-frequency identification chips that can be implanted in workers instead of using key cards or other RFID devices at work. Several companies, including the Swedish railway, have adopted the technology and news outlets report that over 4,000 Swedes have opted to use the implantable devices which could easily be used at workplaces as well as train stations. This bill updates existing workplace privacy laws to cover new and developing high-tech surveillance tools."

**4.  Proponent Arguments:**

According to a coalition of proponents, including the sponsors, the California Federation of Labor Unions:

**AB 1331** (**Elhawary**)          Page **11** of **19**

"Workplace surveillance is not a new phenomenon; employers have surveilled workers for decades with traditional cameras and microphones. However, today's workplace surveillance capabilities differ in scale, speed, and invasiveness. Employers now have access to a plethora of military grade tools, such as wearable devices, to monitor worker biometrics, speech, and location, as well as heat and retina tracking technology. With the use of these powerful surveillance tools, workers have limited access to spaces in their workplace that are not under constant surveillance. A 2024 study found two-thirds (68%) of U.S. workers report at least one form of electronic monitoring. The study also found 88% of large companies (1000 or more workers) have some form of monitoring, compared to 43% in smaller organizations. Areas such as restrooms, lactation spaces, and worker lounges are not protected from being surveilled with advanced technology that does not rely solely on traditional audio or visual recordings. The new surveillance state at the workplace has proven to increase the likelihood of discrimination, harassment, and psychological distress of workers.

To protect worker privacy in sensitive areas and from developing implantable technology, AB 1331 will update and expand existing workplace privacy laws to address new powerful forms of surveillance technology. AB 1331 protects workers by prohibiting employers from using surveillance tools to monitor workers in employee-only, employer designated: restrooms, lactation spaces, changing areas, and locker rooms. AB 1331 also prohibits all methods of surveillance – except video surveillance for purposes of worker safety – in employee-only, employer designated cafeterias and break rooms. To prevent union busting, the video surveillance may not be AI-enabled or have audio capacity. Additionally, AB 1331 gives workers the right to leave behind any surveillance device, including wearables, trackers, company vehicles, or tools, in their possession when off-duty or when entering breakrooms, cafeterias, and bathrooms. Lastly, AB 1331 prohibits employers from requiring workers to implant or embed tracking devices in their body to ensure state law is ahead of technology being developed and tested currently. AB 1331 gives workers a break from the relentless surveillance and monitoring in the workplace so they can rest, talk, eat, and organize without the boss watching."

5.  **Opponent Arguments:**

A coalition of <u>private employer organizations</u>, including the California Chamber of Commerce, are opposed to the measure and write:

*Regarding breakrooms and cafeterias:*
"One of our primary outstanding concerns with AB 1331 is that Section 1561 prohibits monitoring or even reviewing security video footage unless one of two narrow exceptions is satisfied: 1) an employee who is in the video requests review or 2) law enforcement or a court requests review.

Break rooms and cafeterias are high-traffic areas. … Unfortunately, our members have had many incidents occur in these areas, including: theft of personal belongings, theft of merchandise, harassment, suspicious personnel or active shooter alerts, bringing weapons into break rooms, stalking, bringing drugs or alcohol onto work premises, selling drugs on work premises, and physical altercations. We have serious concerns that prohibiting any active monitoring of these areas and severely limiting the circumstances under which footage can be reviewed will increase the frequency of these types of incidents. It also prohibits employers from responding in real time where they are alerted about an incident or there is an active shooter warning or an employee presses a panic button in or around those areas.

**AB 1331** (**Elhawary**)          Page **12** of **19**

Further, its outright prohibition on the use of AI in video or the use of any audio, including audio analytics, would prohibit technology that allows employers to more quickly find suspicious personnel who may be on premises or suspicious activity.

While we understand the concern about using footage to spy on employees who may be organizing, the National Labor Relations Act (NLRA) already prohibits surveillance for this purpose. The NLRB has a long history of prohibiting the use of surveillance for purposes of infringing on employees' rights to organize."

*Regarding the use of video cameras:*
"Pursuant to recent workplace safety legislation (SB 553 – Cortese [2023]) – and in response to multiple high-profile workplace violence incidents – California put into place a workplace violence regulation in 2024. ... Cal/OSHA is now in the rulemaking process, and one of their preferred developments from SB 553's text *is to specifically push employers to use video cameras to monitor and record in the workplace to identify and respond to workplace violence*.[9] Cal/OSHA's draft regulation also requires employers to implement controls like cameras to 'eliminate or minimize employee exposure to identified workplace violence hazards' (section 3342(c)(10)(A)), including potential employee-on-employee violence, identified as 'Type 3 violence' in the regulation. Indeed, employers would be legally prohibited from monitoring cameras even if employees specifically asked them to due to a prior incident.

AB 1331 implicitly contradicts Cal/OSHA's workplace safety draft by *prohibiting employers from monitoring such cameras* in two of the most common places for employees to gather in the workplace – breakrooms and cafeterias.  In fact, a meal break in the cafeteria or break room may be the largest group gathering of the entire work shift, making it all the more likely for violence to occur there.  For that reason, we see AB 1331 as contradicting the draft workplace safety regulation that Cal/OSHA is presently working on."

*Regarding the use of badges:*
"While we appreciate recent amendments to ensure that there is no violation of the bill where an employee chooses to walk into certain areas with a badge (which may be a surveillance tool under the bill's broad definition if it is also used to access secure areas), we do want to make sure that employers are also allowed to *require* identification like badges to be worn while anywhere on premises. This would include if an employee were on a lunch break or using the restroom or break room if they are on premises. Many employers like hospitals, schools, or others have such policies."

*Regarding the inclusion of independent contractors:*
"The bill's definition of 'worker' includes independent contractors, which should be removed from the bill. The above concerns are even more prominent when involving independent contractors. Contractors are often limited-term workers who are coming onto an employer's premises to do a specific job. They are new to the workplace, and often are not previously known to the employer (or its employees, customers, patients, residents, pupils, etc.), so potential security risks are heightened. And, similar to the exempt employees discussed above, the very nature of an independent contractor means that the company does not have

---

[9] *See* Cal/OSHA's recent Revised Discussion Draft, released May 13, 2025, available at: https://www.dir.ca.gov/dosh/doshreg/Workplace-Violence-in-General-Industry/.  Specific text at proposed section 3342(b)(3) – Engineering Controls – "…Video monitoring and recording …"

**AB 1331** (**Elhawary**)          Page **13** of **19**

control over their schedule. They can likely come and go as they please or take breaks at any time or place – making it impossible for an employer to even know when AB 1331's prohibitions would go into effect."

There is additional opposition from several public employer organizations, including the CA State Association of Counties and the League of CA Cities, who argue that the bill would vastly complicate the work of local governments, endanger their ability to perform essential public services, impede their ability to manage and respond to workplace violence threats, and make local governments vulnerable to waste, fraud, and abuse of public resources. In addition to similar concerns raised by private sector employers, they write:

"Unfortunately, we have seen rising hostility and threats against government entities and their workforces. That includes violence and threats of violence against government employees whose job requires them to serve the public, like library staff, teachers, firefighters, benefits officers, among myriad other examples. It also includes public officials who are frequently targeted with threats or actual violence, including election workers, health officers, and public officials. AB 1331 would heighten vulnerability for public servants at a time of strong anti-government sentiment.

The ability for employees to request video footage also raises critical privacy concerns about the disclosure of those in the footage, placing public agencies in the difficult position of potentially violating an employee's privacy or incurring considerable costs to blur or pixelate the images of those in the footage.

To compound all of our concerns, AB 1331 imposes severe financial penalties for non-compliance. For public agencies, these penalties can be staggering and severely impact funds needed to provide essential public services. At a time of significant budget constraints at the state and local level, now is not the time to subject public agencies to nuclear fines for providing basic security measures.

We understand the sponsors are advancing this bill to address activities by private employers that use security tools to undermine efforts to organize a union, influence union elections, or retaliate against union leaders. Existing law already provides significant protections for public employee union activities. For example, Government Code § 3550 provides that a public employer shall not deter or discourage public employees, or applicants to be public employees, from becoming or remaining members of an employee organization. Section 3551.5 imposes significant penalties for violations of § 3550 and grants employee organizations standing to bring the claims.

Put simply, public agencies use the 'surveillance tools' defined in this law to protect public resources, employees, and the public – not to influence employee organization activities. We once again urge the author to amend the bill to remove public agencies entirely from its provisions."

Lastly, there is opposition from the California Gaming Association, California Cardroom Alliance, and the Communities 4 California Cardrooms – in addition to the California Cities for Self-Reliance Joint Powers Authority representing some cities where these cardrooms are located – representing licensed cardrooms across the state who are seeking an exemption for licensed California cardrooms. They argue that this bill is in direct conflict with current

gaming regulations and workplace safety laws making it impossible for cardroom operators to comply with both regulatory requirements and this bill. They write:

"Licensed cardrooms are among the most heavily regulated workplaces in California. Our facilities are required by the California Bureau of Gambling Control and the California Gambling Control Commission to operate under strict surveillance protocols, including continuous video monitoring of gaming areas, cashier cages, and even employee-only areas such as break rooms. These measures are not optional—they are mandated by state law to deter criminal  activity, ensure compliance with gaming regulations, and maintain the trust of law enforcement, the safety of our patrons, employees, and the public. …

AB 1331 conflicts with new and existing Cal/OSHA workplace violence prevention requirements, including SB  553 (2023), which encourages employers to implement robust safety measures—many of which rely on continuous monitoring. It would also impede compliance with numerous public safety and regulatory standards mandated by Cal/OSHA, Title 31, and workplace violence prevention plans. Our industry takes these obligations seriously and must have the tools to meet them without facing lawsuits for simply protecting employees and the public. Even as proposed to be amended, the bill would still create areas where an employer could not adequately protect employees from workplace violence due to the bill's desire to remove surveillance from areas where employees congregate…. In fact, this legislation could hamper Department of Justice and other law enforcement investigations were an incident to involve non-surveilled areas of a cardroom. These unique and cardroom-specific issues require careful consideration and a clean and clear exemption from the bill language both in print and as proposed to be amended."

6. **Double Referral:**

   This bill has been double referred and if approved by this Committee today, will be sent to Senate Judiciary Committee for a hearing.

7. **Prior/Related Legislation:**

   SB 7 (McNerney, 2025), mentioned above, would regulate the use of automated decision systems (ADS) in the employment setting. *SB 7 is pending in the Assembly Labor and Employment Committee.*

   SB 503 (Weber Pierson, 2025) would require the creation of an advisory board related to the use of AI in health care services. *SB 503 is pending in the Assembly Health Committee.*

   AB 1018 (Bauer-Kahan, 2025) would, among other things, regulate the development and deployment of an ADS used to make consequential decisions, as defined. *AB 1018 is pending in the Senate Judiciary Committee.*

   AB 1221 (Bryan, 2025) would have required an employer, at least 30 days before introducing a workplace surveillance tool, as defined, to provide a worker who will be affected with a written notice. The bill would have also prohibited an employer from using certain tools, including one that incorporates facial, gait, or emotion recognition technology. The bill would have required the LC to enforce these provisions, authorized an employee to bring a civil action for violations, and authorized a public prosecutor to also enforce these provisions. *AB 1221 was held under submission in the Assembly Appropriations Committee.*

**AB 1331** (Elhawary)          Page **15** of **19**

AB 2885 (Bauer-Kahan, Chapter 843, Statutes of 2024) established a uniform definition for "artificial intelligence," among other terms, in California law.

AB 2930 (Bauer-Kahan, 2024) would have regulated the use of ADSs in order to prevent "algorithmic discrimination." This bill would have established the right of individuals to know when an ADS is being used, the right to opt out of its use, and an explanation of how it is used. *AB 2930 died on the Senate inactive file.*

SB 1446 (Smallwood-Cuevas, 2024) would have prohibited a grocery or retail drug establishment from providing a self-service checkout option for customers unless specified conditions are met. SB 1446 also included a requirement that a grocery retail store or retail drug establishment that intended to implement a consequential workplace technology, as defined, must notify workers, their collective bargaining representatives, and the public at least 60 days in advance of the implementation of the technology with a general description of the technology and the intended purpose of the technology, as specified. *SB 1446 was held in the Assembly Rules Committee.*

*Several other bills in 2024 addressed related AI issues including: SB 892 (Padilla), SB 893 (Padilla), SB 896 (Dodd), SB 942 (Becker), SB 1047 (Wiener), and AB 2013 (Irwin).*

AB 331 (Bauer-Kahan, 2023) would have prohibited "algorithmic discrimination," as specified. *AB 331 was held under submission in the Assembly Appropriations Committee.*

AB 302 (Ward, Ch. 800, Stats. 2023) required the California Department of Technology (CDT), in coordination with other interagency bodies, to conduct a comprehensive inventory of all high-risk automated decision systems (ADS) used by state agencies on or before September 1, 2024, and report the findings to the Legislature by January 1, 2025, and annually thereafter, as specified.

AB 701 (Gonzalez, Chapter 197, Statutes of 2021) proposed a series of provisions designed to ensure that the use of job performance quotas at large warehouse facilities do not penalize workers for complying with health and safety standards or taking meal and rest breaks. Among other things, this bill (1) required warehouse employers to disclose quotas and pace-of-work standards to workers, (2) prohibited employers from counting time that workers spend complying with health and safety laws as "time off task," and (3) required the Labor Commissioner to enforce these provisions.

AB 13 (Chau, 2021) would have established the Automated Decision Systems Accountability Act, which would have promoted oversight over ADS that pose a high risk of adverse impacts on individual rights. *This bill was eventually gutted and amended to address a different topic.*

AB 1576 (Calderon, 2019) would have required the Secretary of Government Operations to appoint participants to an AI working group to evaluate the uses, risks, benefits, and legal implications associated with the development and deployment of AI by California-based businesses. *The bill was held under submission in the Senate Appropriations Committee.*

**SUPPORT**

**AB 1331** (**Elhawary**)        Page **16** of **19**

California Federation of Labor Unions (Sponsor)
Air Line Pilots Association, International
American Federation of State, County and Municipal Employees (AFSCME) California
Association of Flight Attendants - CWA
California Alliance for Retired Americans
California Coalition for Worker Power
California Conference Board of the Amalgamated Transit Union
California Conference of Machinists
California Employment Lawyers Association
California Federation of Teachers AFL-CIO
California Immigrant Policy Center
California Nurses Association
California Professional Firefighters
California School Employees Association
California State Legislative Board of the SMART - Transportation Division
California State University Employees Union
California Teamsters Public Affairs Council
Center for Democracy and Technology
Center for Inclusive Change
Center on Policy Initiatives
Church State Council
Coalition for Humane Immigrant Rights
Coalition of Black Trade Unionists, San Diego County Chapter
Communications Workers of America, District 9
Community Agency for Resources, Advocacy and Services
Consumer Attorneys of California
Consumer Federation of California
Engineers and Scientists of California, IFPTE Local 20, AFL-CIO
International Cinematographers Guild, Local 600, IATSE
International Lawyers Assisting Workers Network
Los Angeles Alliance for a New Economy
National Employment Law Project
National Union of Healthcare Workers
Northern California District Council of the International Longshore and Warehouse Union
Oakland Privacy
Pillars of the Community
PowerSwitch Action
Rise Economy
San Diego Black Workers Center
Secure Justice
Service Employees International Union, California State Council
Surveillance Resistance Lab
Teamsters California
TechEquity Action
The Center for AI and Digital Policy
The Workers Lab
Transport Workers Union of America, AFL-CIO
UNITE HERE, AFL-CIO
UNITE HERE! Local 11
United Food and Commercial Workers, Western States Council

**AB 1331** (**Elhawary**)          Page **17** of **19**

Utility Workers Union of America
Warehouse Worker Resource Center
Workers' Algorithm Observatory
Working Partnerships USA
Worksafe

## OPPOSITION

Acclamation Insurance Management Services
ADT Security Services
Aerospace and Defense Alliance of California
Agricultural Council of California
Allied Managed Care
American Petroleum and Convenience Store Association
American Property Casualty Insurance Association
Anaheim Chamber of Commerce
Associated General Contractors of California
Associated General Contractors – San Diego Chapter
Association of California Healthcare Districts
Association of California School Administrators
Association of Orange County Deputy Sheriff's
Brea Chamber of Commerce
CalBroadband
Calforests
California Alliance of Family Owned Businesses
California Apartment Association
California Association of Health Facilities
California Association of Joint Powers Authorities
California Association of Licensed Security Agencies, Guards & Associates
California Association of Sheet Metal & Air Conditioning Contractors National Association
California Association of Winegrape Growers
California Attractions and Parks Association
California Automatic Vendors Council
California Bankers Association
California Beer and Beverage Distributors
California Cardroom Alliance
California Chamber of Commerce
California Cities for Self-reliance Joint Powers Authority
California Coalition on Workers Compensation
California Construction and Industrial Materials Association
California Credit Union League
California Farm Bureau
California Fitness Alliance
California Fraternal Order of Police
California Fuels and Convenience Alliance
California Gaming Association
California Grocers Association
California Hospital Association
California Hotel & Lodging Association
California Landscape Contractors Association

**AB 1331** (**Elhawary**)          Page **18** of **19**

California League of Food Producers
California Manufacturers and Technology Association
California Moving and Storage Association
California Pawnbrokers Association
California Pest Management Association
California Restaurant Association
California Retailers Association
California Special Districts Association
California State Association of Counties
California Statewide Law Enforcement Association
California Travel Association
Carlsbad Chamber of Commerce
Chino Valley Chamber of Commerce
Coalition of Small and Disabled Veteran Businesses
Colusa County Chamber of Commerce
Communities 4 California Cardrooms
Construction Employers' Association
Corona Chamber of Commerce
County of Humboldt
Dairy Institute of California
Dana Point Chamber of Commerce
Flasher Barricade Association
Garden Grove Chamber of Commerce
Greater Coachella Valley Chamber of Commerce
Greater Conejo Valley Chamber of Commerce
Greater High Desert Chamber of Commerce
Greater Riverside Chambers of Commerce
Housing Contractors of California
Insights Association
LA Canada Flintridge Chamber of Commerce
Lake Elsinore Valley Chamber of Commerce
League of California Cities
Livermore Valley Chamber of Commerce
Long Beach Area Chamber of Commerce
Long Beach Police Officers Association
Los Angeles Area Chamber of Commerce
Morgan Hill Chamber of Commerce
Murrieta Wildomar Chamber of Commerce
National Association of Theatre Owners of California
National Electrical Contractors Association
National Health and Fitness Association
Oceanside Chamber of Commerce
Orange County Business Council
Pacific Association of Building Service Contractors
Paso Robles and Templeton Chamber of Commerce
Public Risk Innovation, Solutions, and Management
Rancho Cordova Area Chamber of Commerce
Rancho Cucamonga Chamber of Commerce
Redondo Beach Chamber of Commerce
Rural County Representatives of California

**AB 1331** (**Elhawary**)          Page **19** of **19**

Sacramento County Deputy Sheriff's Association
San Diego Regional Chamber of Commerce
San Jose Chamber of Commerce
Santa Barbara South Coast Chamber of Commerce
Santa Clarita Valley Chamber of Commerce
Security Industry Association
Sheriff's Employee Benefits Association
South Bay Association of Chambers of Commerce
Southwest California Legislative Council
TechNet
Torrance Area Chamber of Commerce
Tri County Chamber Alliance
Tulare Chamber of Commerce
United Contractors
Urban Counties of California
Valley Industry and Commerce Association
Walnut Creek Chamber of Commerce & Visitors Bureau
Western Car Wash Association
Western Electrical Contractors Association
Western Growers Association
Wilmington Chamber of Commerce
Wine Institute

**-- END --**