Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

        **Plaintiff**,

        v.

**APPLE INC.**,
*a corporation*,

        **Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**DECLARATION OF PLAINTIFF ASHLEY GJOVIK**

**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION; & REPLY IN SUPPORT (Dkt. 359, 375)**

**Under Cal. Labor Code § § 98.6, 1102.5 6310, & the *Tamney* Termination in Violation of Public Policy**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

i

# TABLE OF CONTENTS

I.   DECLARATION – INTRODUCTION                                                      1

II.  PERSONAL BACKGROUND                                                             1

III. EMPLOYMENT AND PERFORMANCE AT APPLE                                            3

IV.  USER STUDIES, LIVE ON, & AI ETHICS                                             6

V.   2021 COMPLAINTS                                                                7

A.   COMPLAINTS ABOUT MR. POWERS                                                    12

B.   THE SOUS CHEF INCIDENT                                                         14

C.   THE OBSTRUCTION OF JUSTICE INCIDENT                                            18

VI.  HOSTILE WORK ENVIRONMENT                                                       20

VII. COMPLAINTS ABOUT INVESTIGATIONS & ADMINISTRATIVE LEAVE                         22

VIII. THE VERGE:  "APPLE CARES ABOUT PRIVACY UNLESS YOU WORK AT
APPLE" (AUGUST 30 2021)                                                             27

A.   ZOE SCHIFFER/THE VERGE                                                         28

B.   THE PRIVACY ARTICLE                                                            28

C.   COWORKER ORGANIZING & PUBLIC POLICY                                            31

D.   CHER SCARLETT (A.K.A. JOANNA APPLESEED)                                        33

IX.  PUBLIC INFORMATION ABOUT FACE ID DEVELOPMENT                                   38

A.   MCKEON'S ARTICLES                                                              39

B.   APPLE'S ARTICLES                                                               39

X.   AUTHENTICATION & ADMISSIBILITY                                                 40

XI.  REQUEST FOR LEAVE TO FILE LATE                                                 41

XII. CONCLUSION                                                                     45

XIII. EXHIBITS                                                                      46

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT | 3:23-CV-04597-EMC        MAY 26 2026

**PLAINTIFF'S DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION/REPLY FOR SUMMARY JUDGMENT & PRELIMINARY INJUNCTION; & OPPOSITION TO DEF.'S CROSS-MOTION**

## I.   <u>DECLARATION – INTRODUCTION</u>

1.     I, Ashley Gjovik, swear under penalty of perjury that the statements made in this Declaration are true and correct. I am the Plaintiff in the above captioned matter, I have personal knowledge of the facts stated within and can be called to testify to those facts if needed. I write this Declaration in Support of the Plaintiff's Motion for Summary Judgement and request for Preliminary Injunction (Dkt. 359), Reply in Support of her Motion for Summary Judgment (Dkt. 375, 359), and Opposition to Defendant's Cross-Motion for Summary Judgment (Dkt. 375, 367). I file this Declaration with exhibits of evidence under Fed. R. Civ. Pro., Rules 43(c), 56(c)(1)(A), 56(c)(3)-(4), and 56(e); 28 U.S. Code § 1746; Civil L.R. 7-2(d)/7-5; and the Fed. R. of Evid., Rules 201, 803, 901.

2.     This Declaration seeks to correct/expand citations to the record and evidence made in my Motion where I cited my Complaint(s), or simply cited an Answer (though I believe that is an admissible admission), and to respond to other opportunities for improvement regarding evidence refenced, including as flagged by Defendant's attorneys. This Declaration also seeks to provide an expanded factual basis, based on evidence, for topics challenged and new issues raised in Defendant's Opposition/Cross-Motion. Finally, this Declaration seeks to incorporate my own testimony – for reasons above and as described below – including the three depositions taken of me in Dec. 2025-April 2026 (Dkt. 377, Declr. Re: Depositions, Ex. H-J) and my official interview with the U.S. Dept. of Labor in 2021 (Id., Ex. K-M) – as these capture my testimony and occurred prior to me drafting this Declaration or filing my Motion.

## II.   <u>PERSONAL BACKGROUND</u>

3.     My name is Ashley Gjovik. I'm single, have no family or ongoing support/resources, suffer from recent injuries and life-long disabilities (ADHD, anxiety,

1

depression, and PTSD), and live with an Emotional Support Animal (a small dog). I am insolvent with no permanent housing, am in Ch. 7 bankruptcy, and am surviving financially only on the goodwill of the public through donations. I'm currently living in an Extended Stay hotel, have no access to my possessions which are in storage, cannot obtain employment despite extensive attempts to obtain employment (in engineering, legal, or any other field), have no savings, and have no plan for the future regarding living conditions and employment, beyond hopefully obtaining an order against Apple requiring it to pay me the damages it owes me for the harm it caused me.

4.      I became very ill in 2020 while living at a new apartment complex in the City of Santa Clara, the Santa Clara Square Apartments. This was across the street from an Apple facility at 3250 Scott Blvd that's doing semiconductor fabrication and manufacturing activities. I did not know what made me sick at the time and wrote an article about in which was published in SF Bay View on March 26 2021. A true and correct version of that article is attached as Exhibit YY and it can be located at the URL: https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

5.      After discovering Apple's activities at the facility in Feb. 2023, I now believe it was pollution released from Apple's hazardous waste and toxic gas activities that made me so sick and nearly killed me in 2020. I had notified Apple of my injuries and the proximity of their office to that location in 2020, and I notified Apple's management and Health teams in March-April 2021 that other chemical exposure victims had come forward including other Apple employees. The deposition and exhibits on this topic will be including in the pending second day of Apple's Rule 30(B)(6) deposition – which has not yet been released however I think this is important regarding the State of Mind for myself and Apple under Fed. R. Evid. 803(3)) and Apple, as well as being the underlying factual basis for some of the retaliation claims at issue in the pending Motions for Summary Judgement.

2

### III.    EMPLOYMENT AND PERFORMANCE AT APPLE

6.      I started my employment at Apple in February of 2015. I worked in Software Engineering from Feb. 2015 through Jan. 2017, and then in Hardware Engineering from Jan. 2017 through when I was fired in Sept. 2021. My office was located at 825 Stewart Drive in Sunnyvale, California. A true and correct screenshot of my Apple Directory profile showing my name, organization, and office location is attached as Exhibit A.

7.      I received positive performance reviews during the time I worked at Apple. I always received at least one "exceeds performance consistently" ("Performed above the high level expected of the role") and never received a rating that did not meet expectations.  I've included true and correct copies of my reviews from 2017-2020, when I was in my most recent role working for David Powers and Dan West as a Senior Engineering Program Manager ,as Exhibits C-G. The reviews provided in Ex. C-G are authenticated by me below and the reviewed in Ex. D-H also by Apple in producing their copies of the same performance reviews.

8.      My reviews frequently included praise about my work performance including: "she got a lot of positive feedback from the team," "she has quickly made a big impact," "she has a great attitude, find a problem fix a problem work ethic," and "she is smart, and always looking for what is actionable." (Exhibit D, 2017 Review). My 2018 review noted: "you've had a great year in terms of delivering results. Due to your contributions, MSQ is a better run organization today. We have more process (where it makes sense), better access to information, and a stronger network of resources due to your connections." (Exhibit E, 2018 Review).

9.      My 2018 review noted: "when I ask you to drive something, ! know you're going to do so with passion and speed. Others have noticed too. Said one, "From establishing connections, getting us data, to taking on new initiatives. | can't think of someone in PSQ who is so proactive in driving this to closure." (Exhibit E, 2018 Review). It added, "in cross-functional PM situations, you have been excellent…. I got feedback from both Dan and Mark on how

3

excellent you've been." (Exhibit E, 2018 Review).

10.     An Apple Vice President, Tara Bunch wrote me a letter of recommendation when I applied for law school, dated Aug. 23 2017. A true and correct copy is attached as Exhibit I and produced as PL_PROD_12_3409. She wrote "Over the past few years, I have had the opportunity to work closely with Ashley in my role as a Vice President at Apple Inc. During this time, Ashley has demonstrated herself to be highly intelligent, intellectually curious, committed to excellence, and extremely hard working." She added, "I have no doubt that Ashley's fierce intellect and commitment to having a positive impact on the world around her will make her a formidable attorney" and "It is without reservation that | give her my highest recommendation." (Exhibit I).

11.     My 2019 review noted: "Ashley's network across Apple is top notch. She is able to bridge gaps between multiple teams easily. She has helped so many people across the organization." (Exhibit F, 2019 Review). "She brings energy, perseverance, and enthusiasm to any project she works on. Said one person, "I have nothing but positive things to say about Ashley. She is a powerhouse, she's able to juggle things, and she's able to successfully push on others for results." Said another, "she pulls folks together well, is fun to work with, and gets stuff done. I hope she never loses that relentless follow-through - it's fantastic." (Exhibit F, 2019 Review). My 2020 review noted, "Ashley is a great resource to the team, jumping in where needed to fill process gaps, lead program initiatives, and help to provide overall organization." (Exhibit G, 2020 Review).

12.     When I was complaining about retaliation and harassment to Apple Employee Relations in July-Aug. 2021, I drafted a document called "Employment Summary" and provided it to Mr. Okpo. I summarized my roles at Apple, my performance review feedback, and my promotions and pay. A true and correct copy was produced as PL_PRD6_01769 and is attached as Exhibit B.

4

13.    I also received formal feedback in the reviews related to me raising concerns, making complaints, or opposing practices I did not agree with, including: "if you express anger, frustration, or are dismissive, that may cause hesitation with other people coming to you the next time" (Exhibit D, 2017 Review). Another said that if I disagreed with feedback and expressed that I disagreed, that I would "lose opportunities to develop" (Exhibit F, 2019 Review). Another said I should always  "be the voice of calm" and don't let "teams dont get wound up unnecessarily." (Exhibit F, 2019 Review).

14.    Other feedback indicated I should not show emotions and indicated I was overly emotional, including: "Be unflappable. As you are becoming a more senior voice in the team, people will respond to you different based on whether the response is emotional." (Exhibit E, 2018 Review). One review stated that I "can react to certain 'triggers' easily and lose sigh of the truth, which can cause anxiety for herself as well as people around her." (Exhibit E, 2018 Review). My manager was unable to explain what this meant.

15.    Other feedback dictated the way I should speak and how I should manage my facial expressing. In 2017, feedback included: "when closing sentences in presentations, you finish the sentence in a way that sounds like you're asking a question. Something to pay attention to going forward." (Exhibit C, 2017 Mid-Year Review). Another stated, "when you hear something you may not necessarily like or agree with, have a poker face." (Exhibit D, 2017 Review).

16.    My reviews discussed protected activities and characteristics including the "Women of Product Systems Quality" employee group when my reviews credited me for "pioneering it' and being the "front person."  (Exhibit E, 2018 Review). The Women of PSQ group was described as having an "impact across the organization."  (Exhibit F, 2019 Review). My reviews included a formal goals around I&D including to "Continue to lead Women of PSQ" (Exhibit C, 2017 Mid-Year Review; Exhibit F, 2019 Annual Review). In my 2018 review,

5

my review noted: "Continue to lead the Women of PSO initiative… you still need to be at the top helping to provide overall vision…." (Exhibit E, 2018 Review). In 2020, my review noted I had a "strong voice for diversity within the organization… It's a critical area where we all need to get better." (Exhibit G, 2020 Review).

## IV.    USER STUDIES, LIVE ON, & AI ETHICS

17.    My reviews also talked about my participation in user studies, "Live On" and "Carry" programs, and similar programs including my mid-year 2017 performance review noting "Living On" under "Results," and warned me under "Opportunities" to "be unflappable" because I "still have a tendency to say things like '*I cant do living on. This is going to kill me.*' Or, '*please don't make me do it!*' As you move to a more senior role on the team, turn these requests into opportunities." (Exhibit C, 2017 Mid-Year Review). In fall of 2018, I was promoted to a "Senior" role in the team, and I had participated in User Studies and Live On/Carry programs during that time.

18.    My 2019 review noted, "for not being in the day to day QA, she is an amazing bug finder. Everything she touches seems to break. Said one person, 'I'm impressed on ability to find bugs. It's odd that she just goes about her work yet finds so many panics/hangs on hardware that we say is solid." It helps that she's constantly living on as many unreleased products as she can, and is diligent about filing bugs. Good stuff!'" (Exhibit F, 2019 Review).

19.    I also noted in a 2019 Business Conduct ticket (DC119391-TG) regarding law clinic work I was doing in law school that I felt I was expected to use Apple internal devices in my personal life ("My org encourage using these devices for personal stuff in addition to work, as we consider that "live on" and allows me to find bugs that a user might, and I file Radars for the bugs to the engineering teams to analyze"). Business Conduct responded that they were "able to get more clarifying details from the NPS team, as well as my partners in Legal" and "we recommend using a personal, non-AOU device for your studies to protect that data and privacy

6

of all parties you may be working with." A true and correct copy of that Business Conduct ticket is provided at Exhibit II, is a business record, and I can authenticate it at trial.

20. In 2019, I worked in a rotation-type, internship position in Apple Legal, in their Software Products Legal department under Director Alex Caminas and Senior Director Joyce Chow. I also considered that organizing and testified that me "trying to develop Apple's AI ethics policy while I worked in Apple legal and with government affairs was me organizing with some of my coworkers" (Dkt. 377, p. 408, Decl. of Ashley Gjovik, Dec. 16 2025, 258:10-14).

21. My 2020 performance review said I "received high marks" from Apple Legal, quoting feedback from an Apple Legal employee as "Ashley was a gem to work with last summer. She's a terrific team player who has a wonderful can-do attitude." (Exhibit G, 2020 Review). The Legal Internship position included working on Artificial Intelligence and Machine Learning policies with an Apple Legal employee writing "This information continues to influence some of our internal AI/ML policies even today." (Exhibit G, 2020 Review).

22. I summarized this as "performed comprehensive research around the industry direction of AI social responsibility policy. Led conversations with cross-functional sr AI leaders. Synthesized findings and distilled best practices for ongoing policy discussions." (Exhibit G, 2020 Review). In my 2019 review, I noted that "As part of the Legal rotation, drive the framework for AI/ML internal policy at Apple (my main project of the rotation)." (Exhibit F, 2019 Review). I also reported I worked on research for "IP-infringement complaint processes associated w/ the distro of digital assets. Synthesized research findings and learnings, and presented summ to Legal leaders. Became foundation for implementing new process within Eng & Legal teams" (Exhibit G, 2020 Review).

### V.    2021 COMPLAINTS

23. In addition to the allegations in my Complaints in this litigation (which I stand by the statements made), my agency interviews (see, U.S. Dept. of Labor intake interview certified

transcript at Dkt. 377, Pl's Decl. re: Dep. Auth, Ex. K-L), my Aug. 2021 Issue Confirmation at Dkt. 360 (Pl's Decl., Ex. 19), the documentary evidence of my real-time Twitter posts, Apple Slack updates, and other statements – I also will briefly summarize below the timeline of events.

24.    In March 2021, I began asking questions about environmental, health, and safety matters related to my office at 825 Stewart Drive – also known as the TRW Microwave site. My manager, Mr. David Powers told me not to talk to my coworkers about workplace safety or Superfund sites and to only talk to Apple's EH&S & HR teams. I asked to meet with EH&S, and they agreed, but Apple's HR Employee Relations team was also there via Ms. Jenna Waibel. I asked Ms. Waibel to talk to Mr. Powers and explain "labor laws" to him and instead she opened an investigation into Mr. Powers and my other manager Mr. West, despite my complaints that it would only cause me to suffer retaliation (will also cite to Rule 30(b)(6) deposition transcript).

25.    Ms. Waibel said she completed her investigation in late May or early June 2021, said she found no policy violations, and told me she would not talk to my manager about the rules he created about workplace safety – and instead gave me a five-point balancing test for me to follow if I thought I wanted to talk about workplace safety. The NLRB found substantial evidence that this balancing test violates the NLRA and there's a pending complaint against Apple and the balancing test is one of the alleged violations (Dkt. 376, Pl's Opp. To Def.'s Req. for Judicial Notice/Cross-Req. for Judicial Notice, Exhibit A-B, Complaints and Notices of Hearing against Apple Inc, ¶ 6(a)-(c)). The complaints list the actors alleged of violating the NLRA on behalf of Apple as Ms. Jenna Waibel, Mr. David Powers, and Mr. Ekelemchi Okpo.

26.    I was and had been suffering from a hostile work environment in my role and had been looking for a new role at Apple since 2019. I did not want an investigation because I expected retaliation but once Ms. Waibel insisted, I documented some of my concerns about Mr. West and Mr. Powers. However, it appeared Ms. Waibel did not actually investigate my concerns, and instead after her investigation, I faced far worse harassment, discrimination, and

8

retaliation from Mr. West and Mr. Powers then before Ms. Waibel intervened. I asked to complaint to Ms. Waibel's manager, Mr. Tony Lagares, and started corresponding with him in June 2021. In July 2021, I was able to get Mr. Lagares to agree to open a new, second investigation into all of my concerns about my time at Apple and he assigned Mr. Ekelemchi Okpo as the investigator.

27.    Mr. Okpo is named in the NLRB's complaints as an agent of Apple who violated the NLRA including by telling me "not to talk to other employees about Respondent's investigation of employees' workplace health and safety concerns," "to refrain from sharing communications about Respondent's investigation into employees' workplace health and safety concerns," and told me that he was "disappointed" that I "misrepresented" a discussion we had on August 4, 2021 without citing or referencing what he was even talking about. Dkt. 376, Exhibit A-B, ¶ 7(a)-(c)).

28.    I prepared summarizes of my complaints for Mr. Lagares and Mr. Okpo, and used Apple's Box file management tool to share hundreds of documents of evidence. My complaints were documented in email to Apple's HR and management teams, during video/phone call meetings with Mr. Lagares and Mr. Okpo, in my government complaints and press interviews, and in the Aug. 2021 Issue Confirmation.

29.    On example includes a detailed email chain with Mr. Lagares from June 10-July 7 2021, which he forwarded to Okpo on July 20 2021, and which Apple produced as APL-GAELG_00001452-1488. A true and correct copy is attached as Exhibit U. Another example are email updates I sent Mr. Okpo and Mr. Lagares documenting the evidence I was gathering and directing them to topics I thought should be investigated. This included an email from July 28 2021 to Mr. Okpo and Mr. Lagares from me, marked as Exhibit P, authenticated by Mr. Okpo during his deposition, and dually produced by Apple.

30.    In late July 2021, I became to worry that Mr. Okpo was not going to earnestly

9

investigate my concerns, and even if he did, that no action would be taken to remedy the issues I complained about. This was documented in emails, including some of the attached. I complained to him and Mr. Lagares that I did not believe the investigation would result in any outcome to help my current hostile work environment, which had become even more hostile after Ms. Waibel's actions, that I expected to be fired by Apple, and accordingly I wanted to negotiate an exit package to be compensated for the harm Apple had caused me. I also complained that Apple's HR employees had been misrepresenting my statements and that I wanted written communications during this period, out of concern of further retaliation and misrepresentation. I started asking for written communications no later than July 2021, including some of the attached emails as exhibits.

31.    I had also been making complaints to the US EPA since April 2021 about my office including that Apple's EH&S team had not been properly monitoring the site, had not been testing the air, and admitted there were cracks in the slab – which can lead to vapor intrusion in the building and expose the employees to hazardous chemicals including carcinogens. (U.S. Dept. of Labor Interview, Nov. 8 2021, Dkt. 377, Ex. K, p.544-593).. This led the EPA to announce an onsite inspection of my office around July 26 2021 and which occurred August 19 2021. A true and correct copy of the EPA inspection records is attached as Exhibit HH and was authenticated by Apple's witness during the second day of the Rule 30(b)(6) deposition.

32.    I filed a formal complaint to US EPA about Apple's conduct at my office on Aug. 29 2021, however I did not find out there had been an EPA inspection until well after I was fired. A true and correct copy of the EPA complaint is attached as Exhibit O, produced under Plaintiff's BATES PL_PROD_11_05704 and has also been produced by EPA under FOIA.  The EPA found a number of issues including that Apple's building renovations had moved the TCE vapor exhaust on the roof near the HVAC intake and the EPA required that the configuration be

corrected so the TCE and other gases did not enter the HVAC where I worked. A true and correct copy of the EPA inspection records is attached as Exhibit HH and was authenticated by Apple's witness during the second day of the Rule 30(b)(6) deposition.  I told Apple HR I planned to go to my office on August 5 2021 to take pictures of the cracks in the floor and to get evidence (including my older text messages with Dan West) but Apple, via Mr. Okpo, on the morning of Aug. 4 2021 told me Apple was putting me on administrative leave immediately and I was removed from the workplace and all workplace interactions.

33.    In June 2021, I sent a petition to Apple CEO Tim Cook and HR Sr. VP Deidre O'Brien regarding Apple's return-to-work plans during the COVID-19 pandemic.  By late July 2021, I had been providing interviews to the press about my concerns about work conditions at Apple, including an interview with the New York Times who quoted me by name and made me "Quote of the Day" for the newspaper. This was documented in Apple Business Conduct Ticket HRC000015213, Dkt. 360, Declr. Ex. 3. I also started posting on my Twitter account complaining about Apple – despite previously creating it specifically to build a presence as an international law lawyer (and had only been using to share my international law articles that were published in law/policy publications). True and correct copies of some of the survey materials are attached as Exhibit JJJ and produced under the designated BATES numbers, and I could be called to testify to authenticate them.

34.    The NLRB found substantial evidence supports that I engaged in at least the following NLRA protected activity, which was "concerted activities for the purposes of mutual aid and protection," and included: "circulating a petition amongst employees regarding return-to-work concerns, talking to newspaper outlets about employees' workplace complaints and concerns, posting about workplace complaints and concerns on social media as well as on Respondent's Slack channel platform." (Dkt. 376 at 28; NLRB Complaint in Case No. 32-CA-282142, 32-CA-283161, Dec. 18 2024).

35.    Apple's response to Interrogg. Set 3, No. 6 regarding "employee organizing, workplace protests, employee petitions, unionization-related activities, inquiries about labor rights, complaints about potential violations of labor laws, and other concerted activities for mutual aid or protection" stated its is aware of Plaintiff's actions regarding "Apple's response to COVID-19, regarding which Plaintiff signed an employee petition and sent an email to Tim Cook and Deirdre O'Brien." (Dkt. 360, Declr, Ex. 48).

### A.    COMPLAINTS ABOUT MR. POWERS

36.    I complained about discrimination and harassment by my direct supervisor, David Powers, for years to his supervisor and my co-manager, Dan West. This was covered in depth with Ms. Waibel, Mr. Okpo, and in the Issue Confirmation.

37.    In August 2020, when providing my feedback about Mr. Powers to Mr. West, as part of the annual performance review process, I created a document titled "*2020 - Dave Powers Feedback*" and sent it to Mr. West. A true and correct copy of the document is attached as Exhibit L. The document was produced under BATES PL_PROD_11_10128-10133, the timestamp under PL_PROD_11_08189, and the document concurrently produced by Defendant under APL-GAELG_00001025-1030.

38.    In the "Dave Powers Feedback" document I complained about, among other things, not giving me credit for my work and instead giving men on his team credit for my work, frequently undermining me and not supporting me when the men on the team challenge me, saying I'm too emotional, and telling me I'm too aggressive. I also complained that Mr. Powers said that:

> "If any of his peers in PSQ or other orgs disrespect me, that I should never stand up for myself and I should only bring it to him to decide if I should be upset and if so he'll decide what we should do to address it, and he'll be the one to address it. Like, I don't know how to underline how offensive this was. I hope it's clear by the plain meaning of the text and doesn't even need an explanation. And again, this becomes even more atrocious when you consider I'm the only women in MSQ mgmt, and one of the only women in the PSQ "managers." Being told you're not allowed to stand up

12

for yourself if the men do or say anything disrespectful to you, seems like its probably on one of those "things not to do" trainings HR does on gender discrimination. And this issue wasn't a one time thing…. John did something quite offensive & manipulative last January, and Dave told me I wasn't even allowed to tell anyone what he did (let alone talk to him about it)."
Exhibit L.

39. On Oct. 13 2020, Mr. West and I were texting about the feedback and a true and correct copy of those texts are provided as Exhibit M. These are texts from my iMessage account and texts between me and Mr. West were produced to Apple between April 1 2020 – March 29 2021 under BATES PL_PROD_12_6709-6895. Because Mr. West should have a copy, and Apple assumably took a copy of Mr. West's text with me for evidence preservation, and would have copies of Mr. Wests iCloud and other backups, these are independently verifiable by Apple. Further, both myself and Mr. West can testify to the content in the text messages.

40. Mr. West also already confirmed the accuracy of one of the texts in the larger production in his deposition (Dkt. 360, Pl.'s Declr, West Dep. 101:10-23 – "Q·  ·Mr. West, do you recall later text messages where you said that night what you did with Andrew was one of the worst things you've ever done? · · · A·  ·Yeah, I do. · · · Q·  ·Why would you say that? · · · A·  ·Well, I think this goes back to the guidance that I got from… I think this goes back to my discussion with ER…").

41. In the Oct. 13 2020 text messages with Mr. West, I noted that after also giving feedback to Mr. Powers, Mr. Powers "started actually thanking me for my work (instead of randomly thanking men), and taking accountability for stuff that was his fault." Mr. West responded "I think you two are hot and cold. Sometimes it's wonderful other times it's near end of the world." I responded "I don't know if I'd ever call it wonderful." Mr. West responded "we can be better and it's what we should strive for." Mr. West then added "btw - I say this with care…your feedback is insanely long. it makes it far less likely to be used." I responded that I wrote as "as an exit interview / therapy session," I "wanted to document all the reasons I was

13

about to leave the org," and "im still so hurt by some of the stuff he's done, it was hard to stare it all the face." West responded "I'm glad you're seeing improvement." Ex. M.

42.     I complained I did not believe Waibel read it or investigated it.  I sent this feedback to Jenna Wailbel in May 2021 and Mr. Eklemchi Okpo in July-Aug. 2021. A true and correct copy was produced by Plaintiff, attached as Exhibit N, marked with BATES PL-PRD-8-0099. Apple also concurrently produced their own version. I emailed Ms. Waibel on June 3 2021 complaining I "feel like some issues were not properly investigated (including my 2020 feedback about Dave that I sent to Dan, of which you had no memory today of one of the most egregious statements)." (Ex. N).

43.     Apple produced some of Waibel's investigation notes at APL-GAELG_00001380- APL-GAELG_00001381, and it did not include most of the things I complained about, mischaracterized what I did complain about, and found no "policy violations for either Dave or Dan." A true and correct copy is attached as Exhibit V. In fact, Ms. Waibel focused on a couple statements made from a single exchange and condoned the complained off conduct which was criticism to me that I was "being too hard on the white man," arguments to only focus on "equal opportunities" rather than "equal outcomes" for non-white, non-male employees, and some other concerning statements regarding general and race.

**B.     THE SOUS CHEF INCIDENT**

44.     I exchanged emails with Mr. Lagares between June 10-July 7 2021, which was a long email chain produced by APL-GAELG_00001452-1488. A true and correct copy is attached as Exhibit W, but redacted by Apple. This included an email on June 22 2021. In a June 22 2021 email to Mr. Lagares I wrote about the sous chef incident (PL-GAELG_00001463). I wrote to Lagares:

> I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan insisted I try several times, so when I sat down I texted him that I looked

forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, Andrew. Apparently they told Andrew the same thing. Andrew was 24, ten years my junior. I expressed no interest in Andrew or dating him - but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It's was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's is a running topic in the household of how weird and inappropriate it was of Dan to do that." PL-GAELG_00001463.

45.     In the August 23 2021 Issue Confirmation, at page 21, under a header of "DW Concern 4: Sexual harassment; pimping & pandering with receipt of indirect benefits" I included the same text as the prior email with Lagares along with several other bullets including, that I "texted Dan in Dec after the dinner and told him [I'm] dating a professor now and needs to turn down the sous chef and Dan said "I'm not even a little concerned. Regarding Andrew – to bad it didn't work out, but there was absolutely no pressure from me. I don't know him too well. Just learn and move on." I added that I "was supposed to go to [my] office on Aug 5 to retrieve the laptop with the texts send during that night at the restaurant, but ER put me on leave and removed me from the "workplace" on 8/4 before I could & they knew I was planning on it." (Dkt. 360, Pl's. Decl, Ex. 19).

46.     During the Apple/Warner Rule 30(b)(5) depo I read the email version and said it "does not capture what [she] testified to earlier" and pointed me to the Issue Confirmation stating it had a "summary of the incident that night" and that where the "inconsistencies" were – but it was the same text. (Dkt. 337, p.326-327, Apple/Warner Dep. 287:1-289:12).

47.     Additionally, the Issue Confirmation section also included two bullets written by Mr. Okpo from our prior meeting including "*You told me that in March 2021, West's daughter gave you a ride to Stanford, and during the car ride she told you that they still talk at home*

15

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC     MAY 26 2026

*about how bizarre the restaurant incident was*" and that: "*during a meeting, West made a "spanking" gesture with his hand to describe how [I] "keep him in line". Dan asked to delete this video.*" (Dkt. 360, Pl's. Decl, Ex. 19).

48.     On May 29 2020 and Nov. 30 2020, Mr. West and I were texting on iMessage and discussed Chez TJ. In the May 29 2020 text messages, Mr. West was talking about his daughter who had started working at Chez TJ and that there was a change of ownership at Chez TJ. Mr. West wrote "I don't like the owner (George). The guy is an absolute creep." Mr. West added "he tried to get [Mr. West's teenage daughter] to sit with him and have Champagne. Fucker." Mr. West wrote "rest of the staff got her back (thank god)…and she was already telling him no." A true and correct copy is attached as Exhibit X.

49.     In the Nov. 30 2020 messages Mr. West was texting about his family and cooking a large meal and noted his daughter (who then worked at Chez TJ) was "quite the baker." I responded "Whats his face should put her to work… The blonde you tried to arrange marry me to left I guess, so she could be sous chef now." Mr. West responded "oh...lol… #awkward. sorry to do that to you." I responded "#veryawkward." Mr. West responded: "of all the inappropriate things I've done. that might be top of the list. especially since I don't think you were comfortable telling me no." A true and correct copy is attached as Exhibit X.

50.     In these Nov. 30 2020 texts, I responded, "Hey I got like a $300 free meal out of it" but added "I think I texted you no in all caps a few time about you paying and the Andrew thing. He was like 24 man." Mr. West responded, "I paid for it? Lol." I responded "Yes." Mr. West responded "I must have been drunk that's over the top." I responded "And you and the owner both went 1/2ies to get me double the waygu. Yeah, I was cursing at you. And he wouldn't let me pay myself. I think I gave them like a hundred dollar tip." Mr. West responded "good." I responded: "They charge you much more for mail order blondes in Russia...what a deal. He got dumped after he kept texting me at 3am, and spent his weekends gambling in Chino

Way to make me feel 70 years old." Mr. West responded "thanks for not yelling at me." I replied "I did in real time." Mr. West responded "I don't remember you yelling at me. I'm so sorry." A true and correct copy is attached as Exhibit X.

51.    In these same texts, I replied "You and whats his face too… You were both plotting." Mr. West responded, "Jarrod." Mr. West responded "he's a good friend." I responded "I drank too much to remember but he kept telling me secrets about Yannick." Mr. West responded: "it was actually his idea." I responded "I just keep remember thinking "Yannick would be pisssssssed if he heard this." Mr. West responded "probably." I replied "so we can call your dinner intervention a plot to get me too drunk to remember Yannick's dirty laundry" and "Jarrod had A LOT of options about YB not racing anymore." Mr. West responded "oh yeah. he wasn't happy." A true and correct copy is attached as Exhibit X.

52.    A true and correct copy of the text messages are included as Exhibit X., Oct. 2020 marked PL_PROD_12_ 6845- 6848, and May 2020 marked PL_PROD_12_6747- 6748), excerpted from the same April 1 2020 – March 29 2021 iMessage production under BATES PL_PROD_12_6709-6895, referenced for Exhibit M above with the same authentication notes. In these excerpts, the name of Mr. Wests daughter and wife redacted out of privacy.

53.    The Aug. 23 2021 Issue Confirmation also included several additional complaints of sexual harassment including one about Mr. Gerfen with Okpo writing in his Aug. 16 2021 version:

> "You mentioned that after you joined Apple, you heard that during your on-site interview, Bodhi Gerfen saw you and said something about your ass, and things he wanted to do to your ass. You stated that in 2015, Gerfen texted you in the middle of the night talking about your body, your Tinder profile, etc. (see Box folders). You told him to stop and he would not. You told me that you reported this text incident to Andie Andragna, your manager, Linda Keshishoglou , Reigel, Marini, and Memula. ▪ You mentioned that you did not report this text incident to the People team because you believe that based on an unrelated matter that you shared with me, reporting concerns to the People team was frowned upon."

(Dkt. 360, Pl's. Decl, Ex. 19).

54.     There were also issues from the start of my employment including feedback from a senior manager, Neela, that *"the team shouldn't hire me because I'm a "tattooed floozy and the boys just want to flirt with me." Venkat confirmed and said he "lost her feedback" on purpose."* (Dkt. 360, Pl's. Decl, Ex. 19, Iss. Confim. Pg. 5).

## C.     THE OBSTRUCTION OF JUSTICE INCIDENT

55.     One of the things I raised to Employee Relations in July-August of 2021, was a concern about Dan West and Yannick Bertolus related to Mr. Bertolus changing Mr. West's work assignments in order to "protect" Mr. West from anticipated litigation against Apple.

56.     Feedback was given to Mr. West about this on May 10 2018, from the Women of PSQ leadership (including myself), a copy of that email was provided to Employee Relations in July-August 2021 and was noted in the August 2021 Issue Confirmation. (Dkt. 360, Pl's Declr. Ex. 19, Issue Confirmation). In the Issue Confirmation I wrote "5/8/2018 Dan told a story when he was supposed to present on something but Yannick switched him out and had Dan's direct present instead — and Dan said he was mad until Yannick told him that Apple will probably get sued about whatever it was and that the direct can take the fall instead of Dan. Dan asked to delete this video." . (Dkt. 360, Pl's Declr. Ex. 19, Issue Confirmation).

57.     This was included in my final Aug. 23 2021 Issue Confirmation and I emailed Mr. Okpo letting him know I added it specifically stating "it took me a long time to add all the missing items and rephrase all the misleading items… I added Dan West's obstructive of justice comments from the Fireside Chat video (that was missing too)." A true and correct copy is attached as Exhibit AA, and authenticated in Section VIII.

58.     In a July 28 2021 email to Mr. Okpo and Lagares I complained: "Dan told a story when he was supposed to present on something but Yannick switched him out and had Dan's direct present instead — and Dan said he was mad until Yannick told him that Apple will

18

probably get sued about whatever it was and that the direct can take the fall instead of Dan." (Exhibit P,).

59.     I texted Mr. Okpo about this on July 29 2021. I had uploaded a video recording of Mr. West saying these things to Box. The video also included Mr. West making a "spanking" gesture where he talked about how I kept him inline. When I found the full video from the "spanking" incident, I was also reminded of the obstruction issue and notified Mr. Okpo saying "Also I forgot in that video, he did the spanking…. Dan told a story when he was supposed to present on something but Yannick switched him out and had Dan's direct present instead — and Dan said he was mad until Yannick told him that Apple will probably get sued about whatever it was and that the direct can take the fall instead of Dan." A true and correct screenshot of this text is attached as Exhibit Y and was authenticated during the deposition of Mr. Okpo in April 2026.

60.     The May 10 2018 email described the issue as "At some point, when Dan was sharing a story where he felt excluded that Yannick asked Dan's direct instead of Dan to present at a meeting. Later on, Dan found out that Yannick did it partially due to protecting Dan, as that meeting was involved with possibility of Apple being sued. This implicitly implied that it is OK to expense Dan's direct - even though Yannick out of good intention, wanted to protect Dan." (Exhibit (add)). Mr. West responded the same day with his response which included: "I 100% love this feedback" and "#BeCarefulWhatYouWishFor." Exhibit Z.

61.     I've attached a true and correct copy of the email exchange in May 2018 between the leaders of the "Women of PSQ" employee ground (myself, and two other women, Monu and Kai) – and my supervisor, Sr. Director Dan West and one of his reports, a Director named John Basanese – as Exhibit Z.. The email was produced as PL_PROD13_007247-7249 and then I subsequently redacted the names of other individuals for privacy as well as the URLs of some hosted files.

19

62.    When I asked Apple, via their witness Ms. Warner, about this complaint, Apple's counsel objected stating "·Instruct you not to answer to the extent it ·related to anything that was done in connection with a privileged investigation" and Apple's witness then refused to answer. (Dkt. 377, Declr. Re. Dep., Dep. Of Apple Inc/Warner, 339:22-340:9. When I asked: "did Apple consider using Yannick as the final decision-maker in terminating my employment related to my sexual harassment complaint against Dan knowing that one of my open complaints was that Yannick was trying to obstruct future litigation in order to protect Dan?" Apple's counsel interrupted stating: "There's so much wrong with that question, I don't know where to start. Assumes facts not in evidence…" I responded: "It's in the issue confirmation.  It's in the email.So it is in evidence.· It's just a strange choice of decision-maker." (Id, 340:11-24).

## VI.    <u>HOSTILE WORK ENVIRONMENT</u>

63.    I had been looking for a new role at Apple since at least 2019. My 2020 performance review employee comments even noted that I planned to "continue to look for opps @ Apple with a legal/policy focus." (Exhibit G, 2020 Review). I had also told West it was because of the hostile work environment, including with Mr. Powers, as noted above. However, things became far worse after Waibel's actions – including an increased workload by Mr. Powers, and Mr. West reassigning my existing projects, and Mr. Powers assigning me new projects I was certain would make our organization and partner teams upset with me by the nature of the work – for example, assigning another team's work to me despite Mr. Powers admitting it was not our work and that team did not want us interfering.

64.    I also could tell by Ms. Waibel and Mr. Powers reactions to my EHS complaints, that I was likely going to be fired. I emailed one of my law school professors, Dorothy Glancy, in April 27 2021-May 2 2021 PL6-01268-01269. A true and correct copy is attached as Exhibit JJ., however I redacted lawyer/lawfirm names. On April 27 2021 I wrote: "a lawyer friend and they not only warned me to look out for retaliatory firing with this much whistleblowing — but

20

that the HR BP may have pushed for workers comp because I guess it waives some litigation rights." May 2 2021, I wrote "the work stuff is very very urgent now…. And it appears I'm being pushed out of my current role, maybe even [A]pple." Exhibit JJ.

65.     On Apr 15, 2021 I emailed Dr. Cohen, a Senior Director at Apple and told him that "I told our senior director he either needs to move me under him or another director, or I'm going to look for another job at Apple or elsewhere." A true and correct copy of that email is attached as Exhibit K and Mr. Cohen could be called to testify at trial to authenticate.

66.     On May 5 2021, I emailed Dr. Josh Cohen and told him: "things are getting increasingly complicated at work & I'm not expecting an outcome in my favor, so looking externally" and asked if he would write a letter of recommendation for me. Dr. Cohen responded asking for a deadline for the letter and I responded that day asking for it by May 16 2021. I had not received it by May 30 2021 and sent a follow up email and he responded that day  saying "letter written….check your messages…" (Exhibit K, J. Cohen emails). Dr. Cohen's letter of recommendation included:

> "I know Ms. Gjovik because we worked together on a few projects at Apple, with her in an Engineering Project Manager role…. I know her well. Gjovik is a remarkable person… In the projects we worked on at Apple, she was an essential player, both because she kept us focused on moving the work forward step by step, made sure all the meetings stayed focused, and contributed greatly, with real insight, to the substance of our discussions… Gjovik is very much a self-starter, with a sharp analytical mind, a passionate commitment to doing the right thing, a capacity to work with great energy and to great effect, and a deep sense of personal responsibility. She is also a wonderful collaborator: she listens attentively, respects the insights and expertise of the people she is working with, and expresses, clearly and forthrightly, her own insights and ideas…. I recommend her with great enthusiasm and without any hesitation: she will be a fantastic colleague and make everyone's work better, more interesting, and more enjoyable…."

(Exhibit K, J. Cohen letter of rec.).

67.     Dr. Cohen signed the letter as "Faculty, Apple University; Distinguished Senior Fellow in Law, Philosophy, and Political Science, UC Berkeley; Editor, *Boston Review*" and provided his Apple email address in the signature.  A true and correct copy of the letter of recommendation is attached as Exhibit J with one redaction of his phone number due to privacy

21

concerns, and a true and correct copy of the emails are attached as Exhibit K (PL_PROD_12_6929-6932).

68.   By late-July 2021, I knew I was going to be fired and felt Apple was creating an increasingly hostile work environment in order to force me to quit, so they did not have to fire me, which I complained was to reduce their legal exposure. I put Apple on notice that I would sue them if needed, but tried to reach a resolution with them instead, including discussing settlements and exit packages.

69.   In June-July 2021, Mr. Powers and Mr. West had also begun reassigning my work, taking away my best projects, and assigning me projects destined to fail. One of the projects I caught Mr. West reassigning from me was the How I Got Here articles and I escalated it to Employee Relations but never heard any outcome. My 2019 and 2020 performance reviews had mentioning that project in my achievements. For example, saying I had: "run a number of PSQ projects over the past year, working with Dan and his staff to drive important initiatives. These include the… HIGH articles that profile unique people throughout the organization." (Exhibit G, 2020 Review). "She worked with numerous people throughout PSQ to come up with "How I Got here" articles." (Exhibit F, 2019 Review).

70.   On July 29 2021, I emailed Mr. Lagares and Mr. Okpo writing "There was so much terrible stuff that happened to me at Apple and continues to happen to me — I think it will help everyone during litigation if we can draw a clear line of what events Apple has already closed investigation into (Jenna's round) and which things Ekelemchi will be investigating (which I know I still in progress) — and then the closure of each of Ekelemchi's items as well with outcomes. Ideally if we can also sort by area of law, it will help me route to the different lawyers." (Exhibit Q).

## VII.   COMPLAINTS ABOUT INVESTIGATIONS & ADMINISTRATIVE LEAVE

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

71.    I complained to Mr. Okpo that I thought Ms. Waibel had not investigated my concerns including in an email dated July 28 2021, authenticated during Mr. Okpo's deposition, and which stated: "Jenna called 6/3 to tell me she finished and didn't find any issues. She never contacted me after 5/23 until she completed on 6/3. There were zero follow up questions from anything I sent her on 5/20-5/22. June 3-10 below — clear to me Jenna didn't look into most of the stuff I sent her." A true and correct copy is included as Exhibit N., as discussed above.

72.    On July 29 2021, I emailed Mr. Okpo and Mr. Lagares writing: I talked to Ekelemchi about Jenna's investigation at length today. As I've mentioned before, there are numerous areas I have reason to believe she didn't investigate at all. I forwarded several emails to Ekelemchi along with a timeline I find very suspicious for a quick resolution with no follow up questions from Jenna." A true and correct copy of this email is attached as Exhibit Q, and was authenticated by Mr. Okpo during his deposition.

73.    On July 28 2021, I emailed Mr. Okpo and Mr. Lagares complaining about feedback from numerous coworkers about what appeared to be systemic "sexism, hostile work environment, harassment, and retaliation" and "received no real help from HR or ER in resolving the issue." I attached screenshots of the Slack conversation I was referencing to my email. A true and correct copy of this email is provided as Exhibit S and was authenticated during Mr. Okpo's deposition. It was produced by Plaintiff under BATES PL-PRD-8-0026-0038.

74.    I provided Mr. Okpo hundreds of evidence files using Apple's "Box" file management tool. I downloaded a copy of the complete file/folder structure and printed the file/folder structure and names. A true and correct copy of that printout is attached as Exhibit add. Apple assumably still has a copy of these Box folders and files and could authenticate and confirm this is correct from their copy. The printout was produced to Apple as PL_PRD6_00644- 00649 and a true and correct copy is at Exhibit SS.

23

75.    On July 28 2021, I messaged a friend in Apple HR, Scott Lilly who worked in HR I&D, about Mr. Okpo in July 2021 and wrote – "after i screamed at our HWE ER BP for being literally the opposite of helpful, Antonio L stepped in and he and Ekelemchi are doing another round. Jenna is the worst.. … I've spent 20hrs in the last 2 week screaming at ER (Antonio & Ekelemchi) about Apple's ER being a sham & worthless & supporting the culture of discrimination and impunity - not to mention all of my workplace safety concerns actively being ignored, etc." A true and correct copy is at Exhibit VV, produced under BATES PL_PROD_11_11997, & PL_PROD13_008284-8285.

76.    By July 30 2021, I was also complaining on Slack about Employee Relations and some additional disputes we were having about medical leave and ADA accommodations. A true and correct copy of that Slack post is at Exhibit UU, produced as PL_PROD13_008295. Among other things, I wrote: "This year, when I complained about workplace sexism & a hostile work environment, HR & ER repeatedly recommended to reach out to EAP therapist, while also refusing to offer any accommodations to mitigate the trauma I was experiencing at work. When I complained that my complaints were now causing retaliation, and even another constructive termination at this godforsaken company, ER recommended I consider going on medical leave for my mental health." Exhibit UU, I also complained about it on Twitter, and Zoe Schiffer "retweeted" my post saying "Wow — an Apple employee says the company told her to take medical leave after she spoke up about sexism and discrimination at work." A true and correct copy as at Exhibit WW, produced under BATES PL_PROD13_004520.

77.    Apple placed me on administrative leave on August 4 2021. I posted on Slack and Twitter about it, and Zoe Schiffer at the Verge asked to write an article about it and I agreed. I was interviewed and quoted by Ms. Schiffer and the article was published that day and was titled: "*Apple places female engineering program manager on administrative leave after tweeting about sexism in the office: Ashley Gjøvik says the employee relations team implied she*

24

*should stay off Slack pending an ongoing investigation.*" The URL is https://www.theverge.com/2021/8/4/22610112/apple-female-engineering-manager-leave-sexism-work-environment. A true and correct copy of the article is attached as Exhibit TT. and was produced to Apple under BATES PL_PROD13_002022-002026. Schiffer also posted on Twitter about it, marked as the same exhibit, produced under PL_PROD14_01998.

78.    The article and my Twitter posts (including the screenshots in the article) capture my Present Sense Impression (Fed.. R. Evid. 803(1)) at that time and I stand behind my quoted statements made. However, there is additional context, documentary evidence, and testimony – so this is not the exclusive summary or statement. That said, the article quotes me saying:

> "For months, I have been raising concerns with Apple employee relations about years of experiences with sexism, a hostile work environment, sexual harassment, unsafe working conditions, and retaliation," Gjøvik says in an interview with The Verge. "I asked them to mitigate the hostile work environment while they investigate, and they initially offered me EAP therapy and medical leave. I told them that made no sense, and said they should talk to my leadership and set up oversight and boundaries. I added that if there was no other option they could give me paid administrative leave. They apparently made no effort to set boundaries and instead said they were placing me on administrative leave and implied they did not want me on Slack where I had been vocal about my concerns with certain policies at the company. They also implied they didn't want me to meet one-on-one with other women at the company about their concerns with Apple policies, which I had been doing."

Aug. 4, 2021; Ashley Gjovik via The Verge; Exhibit TT.

79.    On Aug. 18 2021, I posted on Apple Slack that I did not think Apple was going to let me come back. A true and correct copy of the post is at Exhibit XX, and produced under PL_PROD_8-119. I wrote I had "been talking to LOT of other women currently at Apple (in purgatory) or who left (alumni) who have gone through the same thing where indefinite paid administrative leave was used as forcing function to get them to quit or push them out, as retaliation for raising concerns to employee relations. These women also never got an actual investigation into anything, from what they're aware, just intimidation and retaliation." Exhibit XX,

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

80.     On Aug. 19 2021, I asked to attend a racial justice training I had been registered for and noted the instructors – including my friend Dr. Cohen – had approved me attending. On Aug. 20 2021, Mr. Okpo told me I could not go to the training because I was on leave. On. Aug. 20 2021, I emailed Okpo complaining the administrative leave felt like "punishment, retaliation, or otherwise a negative employment action." A true and correct copy of the email exchanges with Mr. Okpo and Mr. Cohen are attached as Exhibit R, with the Okpo email authenticated by Mr. Okpo during his deposition and the Dr. Cohen email able to be authenticated by Mr. Cohen at trial.

81.     On Aug. 23 2021, I asked Mr. Okpo for an update and some ETA of when he'd e done and we could talk about next steps writing: "I look forward to hearing your response and some sort of ETA for an update, even if it's "at least a week / month" etc. As of now I currently have zero timeframe from you on next steps whatsoever." Mr. Okpo responded on Aug. 24 2021, "am not able to communicate a timeframe on next steps, but as the investigation progresses, I will provide you with additional updates." A true and correct copy of this email is attached as Exhibit AA, produced under BATES PL-PRD-8-0147, and authenticated by Mr. Okpo during his deposition.

82.     By the end of August 2021 I was certain I was going to be fired, would have to sue Apple, and needed to ensure I completed all of the filings necessary to meet statute of limitations requirements.  I posted on Twitter on Aug. 31 2021: "Y'all, the process is so broken. The only way I'm figuring out what paperwork I need to submit is by reading old lawsuits against #Apple & listing all the reasons Apple was able to act like Teflon (mostly missing paperwork)." I noted so far I'd filed complaints with "SEC, OSHA, & CA DIR Whistleblowers, Claims/intake with: EEOC, DEFH, & NLRB, Federal EPA" and added "But I'm sure I'm still missing something. This is the worst puzzle." A true and correct copy of the Twitter post is attached as Exhibit KK, produced under BATES PL_PRD6_02706.

83.    On Sept. 3 and 7 2021, I emailed Mr. Okpo asking to keep communications in writing and if he declined, to have Business Conduct review his denial – but he did not respond. A true and correct copy of the email is attached as Exhibit T, produced under PL-PRD-8-0157-PL-PRD-8-0159, and authenticated by Mr. Okpo during his deposition. I explained my reasoning was that "as I've complained previously, there have been frequent misrepresentations of my verbal conversations with my managers, with Human Resources, and with Employee Relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've heard from other employees in similar situations, this appears to be a pattern by Apple's HR & ER teams to misrepresent and mischaracterize, likely to intimidate & retaliate — and I won't allow you to do continue doing this to me." Exhibit T,

84.    In the same email I also wrote "I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance review this year." Mr. Okpo responded on Sept. 9 2021 simply saying "there are inconsistencies that have come up in the investigation. Since you have declined to speak with me, I will move forward based on the information I have." A true and correct copy of Okpo's response is at Exhibit T, produced by Apple under BATES APL-GAELG_00001135.

85.    There were a number of news articles about my dispute with Apple published prior to my termination. They discussed my complaints, my government charges (including NLRB, EEOC/DFEH, Cal. DIR/OSHA, EPA, and others). The articles noted they asked Apple for comment and sometimes Apple provided the reported a comment – indicating Apple was aware of the protected activity discussed in those articles. True and correct copies of some of these articles are attached at Exhibit LLL, including from Financial Times, Business Insider, Engadget, and

### VIII.  THE VERGE:  "APPLE CARES ABOUT PRIVACY UNLESS YOU WORK AT APPLE" (AUGUST 30 2021)

27

## A.    ZOE SCHIFFER/THE VERGE

86.    I contacted Zoe Schiffer at the Verge on June 30th, 2021 via the email address she posted on her Twitter/X account. A true and correct copy of that email is attached as Exhibit BB. Ms. Schiffer could be called to testify at trial to authenticate if needed. It was produced to Apple under BATES PL_PROD13_009694-009695.

87.    I wrote to Ms. Schiffer about an article she wrote about the use of NDAs by tech companies. I said "It's a very important topic and exposing these policies is critical to changing the toxic culture in tech." I asked if she had copies of Apple's corporate NDAs and asked her to keep me off the record and anonymous at that time. She responded that she had not seen any Apple NDAs yet and said "no one I have talked to has a copy of theirs." I sent her a copy and also noted there's additional "restrictive & invasive employee policies" on the HR website as well, and noted I thought I would need a lawyer to explain to me "exactly I can actually talk about publicly" because Apple's polices were "murky." Exhibit BB.

88.    I continued talking to Ms. Schiffer about work conditions at Apple, and provided her information for some of the articles she was writing about work conditions at that time. Some of the texts I sent the reporter, Zoe Schiffer, are attached as Exhibit CC, and were produced to Apple under the BATES numbers printed. If needed Ms. Schiffer could testify at trial to authenticate the texts.

## B.    THE PRIVACY ARTICLE

89.    When I shared the article, one of the things I posted was a statement about why I decided to complaint about Apple's privacy invasions, I wrote: "#Apple has an internal culture of surveillance, intimidation, & alienation. Employees are closely monitored & our data hoarded in the name of secrecy & quality. We're told we have no expectation of privacy, while Apple says publicly: privacy is a human right." A true and correct copy is attached as Exhibit PP. and produced under BATES PL_PROD14_01514.

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC      MAY 26 2026

90.    In the reply, I added "I still love #Apple products & brand. I devoted nearly 7 years & much blood/sweat/tears ensuring Apple's products are exceptional. However, Apple the corporation needs a reckoning. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity." Exhibit PP. I included a screenshot of text where I wrote the following:

> Working at Apple in "normal" times, | walked in circles around their glass-walled panopticon, only able to badge into select lockdowns (a constant reminder that Apple has absolute control over my resources and access), and was immersed in a culture where it is implicitly forbidden to critique Apple policies or even speak openly to your coworkers with concerns about your employment & work conditions, lest you upset the cronyism, ex-ClA/ex-FBI security teams, and other "powers that be." | realize now that during those times, | didn't question a lot of things that | should have. Not just the abuse | suffered, but also the constant invasion of privacy — and perhaps those two things are linked. There seems to be limitless ways Apple can access employee data and monitor us. | recently shared how violating it felt for Apple to demand to copy & permanently store my nudes for completely unrelated litigation. After the public outcry, I questioned other policies & actions Apple had taken. The internal "Glimmer" app had always troubled me, but | never voiced that concern, because inside we don't question the way things are or what we're asked to do. But now, in the light of day, considering everything Apple's already done to me, this app, the photos & data it gathers, and how little we know about what it does with all of that — is deeply troubling and | felt compelled to make it public. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

@ashleygjovik - Aug 30, 2021, 11:56 AM (PL_PROD14_01514). A true and correct copy is attached as Exhibit PP.

91.    On Aug. 30 2021, Schiffer posted on Twitter sharing the article: "New: Apple employees say the company hasn't done enough to protect their personal privacy. Now, they're pushing back against norms & rules that encourage them to use personal Apple IDs & iCloud accounts for work — making it nearly impossible to keep personal & work files separate" .A true and correct copy is at Exhibit QQ, produced under BATES PL_PROD13_009689, and available at https://x.com/ZoeSchiffer/status/1432381686428303360.

92.    A copy of The Verge article that includes the video of my face from the Gobbler app was produced under BATES PL_PROD_12_10530-10542, with the photo at PL_PROD_12_10539, and a true and correct copy is attached as Exhibit LL.

29

93.    On Aug. 31 2021, the online publication "TechDirt," via reporter Karl Bode, published a follow-on piece to the Verge article titled "*Apple's Dedication To Privacy Is Missing When It Comes To Its Workforce, Employees Say.*" A true and correct copy of the article is attached as Exhibit RR., produced under BATES PL_PROD13_002103-002104, and available at: https://www.techdirt.com/2021/08/31/apples-dedication-to-privacy-is-missing-when-it-comes-to-workforce-employees-say/ . The TechDirt article included the following commentary:

> "The forced integration is just a bizarre disconnect from the company's recent pro-privacy branding. Especially given the requirements have had a stunning privacy impact on the very people Apple expects to build privacy-friendly products and services" and "So in short Apple is demanding that employees fuse extremely personal accounts with oceans of sensitive data with their work accounts. While at the same time conducting significant internal surveillance, and making it extremely clear employees should have absolutely no expectation of privacy"    The intermingling of personal and work files has had real consequences for employees. @ashleygjovik was forced to hand over nude photos of herself when her team was involved in unrelated litigation — because, like many Apple employees, her personal messages were on a work device."

(PL_PROD13_002104).

94.    In 2023, the French magazine Telerama wrote an article about me and my Apple whistleblower disclosures and labor organizing. The article was written by Olivier Tesquet, is titled (). A true and correct copy is attached as Exhibit MM. A copy was also produced to Apple under BATES PL_PROD13_002583- 2587 (French/original) and PL_PROD13_002578-02582 (English translation)

95.    The reporter, Mr. Tesquet also posted on Twitter about the article and my complaints from his Twitter/X account at @oliviertesquet on Mar 14, 2023 including copies of screenshots of Gobbler/Glimmer with no blurring of the UI. Mr. Tesquet had asked Apple for comment on the article, I retweeted Mr. Tesquet's posts and believe Apple was monitoring my posts, and I had shared copies and links to these Twitter posts in this litigation prior. The most recent version was produced to Apple under BATES PL_PROD13_005100-005104 and is marked Exhibit NN.

30

96.     The screenshot of the Glimmer/Gobbler UI shows multiple photos of me, including a photo taken of me by the application/process where I'm topless and I had redacted my nipples. It also includes text strings and UI headers. (PL_PROD13_005101). To my knowledge, Apple has never complained about this post yet now appears to claim this content is what it terminated me over and claims its "very confidential." I do not understand how it could be "very confidential" if its been public for three years and also includes photos of my breasts.

97.     The German magazine Der Speigel also wrote about my disclosure, including Gobbler/Glimmer, in 2023 in an article titled "iPhone is watching you," written by Patrick Beuth and Alexander Demling. A true and correct copy of the article is attached as Exhibit OO. It was produced under BATES PL_PROD13_000125-000126 (German/original) and PL_PROD_7-001- (English translation).

### C.     COWORKER ORGANIZING & PUBLIC POLICY

98.     I was organizing with coworkers around privacy concerns, including specifically about Gobbler/Glimmer. I testified during my depositions that I spoke with a friend and coworker, Aidria Astravas, who is a Sr. Manager in Apple's Video Engineering organization and asked her if the photos of me in Gobbler/Glimmer were confidential and she told me no, they were not. I said: "I already talked to Aidria before I made the disclosures.· Aidria is a senior manager…I talked to Aidria before I posted this about my intention to share this information because I wanted a sanity check.· I said I don't think this is confidential.· I think this is not confidential, and I think it's important to share that I don't think Apple is going to do anything internally to ever make this better.· And I knew she also had concerns, and I knew she was in a leadership position in an Apple organization where she would know if Apple had the willingness or capability to ever do better about this specific thing that I knew she -- it also bothered her and she agreed." (Dkt. 377, p. 406-407, Decl. of Ashley Gjovik, Dec. 16 2025, 256:10-257:14).

99.    Apple's lawyer asked if she thought it was okay for me to post the photos on Twitter and I said yes she did. I added: "She encouraged me.· She thought it was the best chance we possibly had for Apple to do better and stop invading our privacy like this with Gobbler." (Dkt. 377, p. 407, Decl. of Ashley Gjovik, Dec. 16 2025, 257:4-14).

100.    I also said: "Aidria and I actually talked before I talked to Verge, and I was, like, I want to complain about this publicly because I don't like it at all. I don't think the way I want to complain about it is confidential, and I think Apple is not going to stop until it's public.· And she actually agreed with me. She's a senior manager of the video engineering organization, which includes stuff like the camera app stuff.· It also bothered her." (Dkt. 377, p. 355, Decl. of Ashley Gjovik, Dec. 16 2025, 159:12-22).

101.    I added, "Aidria Astravas was a very good friend of mine until I was fired and then she got very quiet. But we would frequently talk about our concerns about privacy invasions -- invasions of our privacy by the way these -- our work devices were set up and Apple's practices and some of these studies.· But also just -- we would participate a lot because we knew that the execs knew and it showed that we were loyal and helped, you know, our performance reviews and kind of standing with those executives, required that kind of sacrifice and participation and investment" (Dkt. 377, p. 378, Decl. of Ashley Gjovik, Dec. 16 2025, 219:11-22).

102.    Another coworker was also interviewed and quoted by name in this Verge article, Jacob Preson. Mr. Preston wrote a Declaration for me in support of my litigation against Apple which is attached as Exhibit FFF. This Declaration was signed by Mr. Preston, and Mr. Preston could be called to testify to authenticate it at trial.

103.    In 2017, members of the U.S. Congress wrote to Apple asking Apple where Apple got all the images it used to develop Face ID.  (Dkt. 377, p. 416-417, Decl. of Ashley Gjovik, Dec. 16 2025, 266:18-269:7). A true and correct copy of Senator Franken's letter to

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC      MAY 26 2026

Apple is attached as Exhibit GGG and a true and correct copy of the TechCrunch article covering Apple's response is attached as Exhibit HHH.

104.    I made formal complaints to privacy and consumer regulatory agencies about Gobbler/Glimmer and a number of Apple's other employee and consumer privacy invasions. My complaints were covered in domestic and international press. I'm attaching a true and correct copy of an article from "Biometrics Update" that specifically discussed the Gobbler/Glimmer data being the data Senator Franken was asking about. This is PL_PROD13_003613- 003614 and Exhibit III.

### D.    CHER SCARLETT (A.K.A. JOANNA APPLESEED)

105.    Apple's defense appears to be relying primarily on a concealed defense witness named Cher Scarlett – who filed multiple sworn declaration to this docket disclaiming any involvement in this litigation. (Dkt. 62, 66, 99, 176, etc.). Scarlett worked in Apple's Global Security department, which is part of Apple's Legal organization. (Dkt. 62, p.2).

106.    As discussed in the allegations in my prior complaints in this case, Cher Scarlett (a.k.a Joanna Appleseed) sued me in on Jan. 31, 2022 and Scarlett's litigation against me was filed under *Scarlett v Gjovik*, King County District Court of Limited Jurisdiction, 22CIV01704KCX (2022-2023); *Scarlett v Gjovik*, King County Superior Court, 22-2-03849 SEA (2022). Copies of some of these legal filings were filed by me at Dkt. 64, 64-1 in this instant case, in response to one of Scarlett's non-party Declarations in this litigation.

107.    On Feb. 5 2022, Scarlett sent me an email from what I believe is her personal email account (she used it in her Declarations filed to this court) and she also included copies of the same email in her evidence filing to the King County District Court as noted above, at pages 62-66 (produced to Apple under PL_PROD14_01843-01847). A true and correct copy of the email I received from her is attached as Exhibit DD and produced under BATES PL_PROD13_005021-005026. I did not redact any content because Scarlett did not redact any

33

content when she filed a copy of the same email to the public docket in the King County District Court.

108. In the Feb. 5 2022 email Scarlett wrote to me: "This is a last resort, not a block evasion." I had added her social media accounts to my social media account's block lists so she could not contact me, and the blocks were in place for at least a few months prior to her sending the email, and I had told her to stop communicating with me. Scarlett confirms the blocks at Dkt. 176, p.2. Scarlett's Feb. 2022 email was long, detailed, confusing, and contained a lot of contradictory, false, misleading, and unexpected information – and was sent as if it was replying to an ongoing conversation, but I had not been speaking with her, and the statements she was making were from her own initiative.

109. In the Feb. 5 2022 email, Scarlett wrote: "I am not testifying against you, nor on Apple's behalf. I wouldn't do that unless I was subpoenaed, and I don't believe they would have me do that, because cross-examination would allow me to answer questions that would discuss their culture of surveillance." In the email, Scarlett added: "I am named in their defense, which I was only informed of as a courtesy. I am upset by it, given what I've been through, which is why I mentioned it." Scarlett then went on to say she had "lied about [her] education," "invented whole companies," engaged in "check fraud," and enrolled "in college multiple times and withdrawing for the students loans." Exhibit DD

110. Scarlett also wrote that I "made it very clear [I] had a lot of savings and had no financial motivations," I had "plenty of savings to weather the storm," and I was in a "place of financial privilege." Scarlett also wrote she believed I was "forced into requesting the leave" and "discouraged from using Slack and communicating with coworkers." Scarlett added, regarding the leave that Apple "didn't give it an end-date, which is the definition of indefinite." Scarlett added she felt "that [I] have been treated terribly by Apple" and she "want[s me] to have justice." Exhibit DD

34

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

111.    In the email Scarlett referenced the text messages which Apple now appears to be citing as its primary defense in this litigation saying "Did [she] report [me] for it at that time? No. Not because [she] didn't believe it was an IP leak (there were internal documents of unreleased tools), but because [I] believed it was invasive and an example of surveillance culture at the company." She then added that "When [I] started saying [I] did NOT leak IP… [she] was confused." Scarlett wrote she "could get behind [me] saying [I] believed it was a PROTECTED leak, but not that it didn't happen." She added she "was literally saying if [I] said the same thing to the press and on Twitter [I] had said to [her, she] would have been supportive." Exhibit DD

112.    Around Oct. 2021, someone (account @richgel989) who followed my account on Twitter/X and had engaged with me previously contacted me to tell me Scarlett had sent them private messages about me and had included some of those screenshots. True and correct copies of the screenshots they sent me are attached as EXHIBIT EE.. These documents were produced to Apple as PL_PROD13_add. These included messages on Sept. 13 2021 with Scarlett writing I had "been lying about a bunch of stuff," that I had asked for a "paid exit," and that "all of this has been a bit overwhelming to [me] in general, hence some reckless decision[s]," (PL_PROD13_002669-002671) and on Oct. 29 2021 saying she could "show [him] screenshots" of my "leaking," and said she "can tell [him] that [she] know[s] 100% that Apple accessed [her] iMessages with [me] on [her] device." (PL_PROD13_ 002673-002675). In the message Scarlett sent on Oct. 29 2021 (PL_PROD13_002675) she included screenshots of internal Apple Confluence FAQ pages including one titled "Using Glimmer." EXHIBIT EE.

113.    Evidence submitted by Scarlett in *Scarlett v Gjovik*, King County District Court of Limited Jurisdiction, 22CIV01704KCX (2022-2023) included what appears to be screenshots of my messages with Scarlett that also appear to be the same messages Apple claims underly its accusations I leaked confidential information – including screenshots of the UI of Glimmer/Gobbler and screenshots of internal Apple Confluence FAQ pages about

35

Glimmer/Gobbler. These were at pages 85-86 of the evidence Scarlett filed to the District Court on Feb. 15 2022, and a true and correct copy are attached as Exhibit FF and produced to Apple as PL_PROD14_01866-01867.

114.    On Feb. 15 2023, Scarlett published a blog post on Medium titled "*Thirty years of oppressive spiritual cultivation at Apple: Part III: Inside the Church of Apple and the living word of Steve Jobs*." This was posted using an account she used to post other things previously and this article was at https://cherp.medium.com/connecting-dots-to-deaths-at-apple-cher-scarlett-e29d00774cce. Scarlett also shared these articles from her social media accounts and took credit for writing them. I was notified of the articles by my pre-set Google News Alerts because my name was in the posts. I saved a copy as a PDF and a true and correct copy of the that 29-page PDF is attached as Exhibit GG and was produced to Apple under BATES PL_PROD13_008652- 008680. If needed, Scarlett could be called to testify to authenticate the document at trial.

115.    The blog post talked about me and a "heinous radar from a team Ashley Gjøvik was on" with Scarlett's stating a coworker emailed her about it stating "Posting Radars on social media (even if it's a horrible Radar, is still internal to Apple — and the tool isn't something the outside world is supposed to be aware of)." (PL_PROD13_008665-008666). Scarlett then wrote about what appears to be an outcome of the investigation by Apple – which Apple has claimed is Privileged in this litigation – saying the "investigation into this found no policy violations, of course, because Ashley was not the only one that was subjected to a 'living hell' radar and participated with the others." (Exhibit GG, PL_PROD13_008667). This was not true and I do not understand why she would say that, or if that was Apple's position, why they would think that.

116.    Scarlett's blog post also stated that "On September 3, 2021, Apple tried to speak with [her] alone — these are the only circumstances they said they would speak to [her]. [She]

36

declined to do so and their internal counsel said [she] was 'unwilling to participate in the investigation' and that they would 'move forward with the information they have'. [She] reiterated that [she] was willing to participate if [her] counsel was present. This is the same messaging Ashley got a few days later. She was fired. (Apple said she had 'disclosed confidential product-related information in violation of Apple policies' — which she denies.)" (Exhibit GG; PL_PROD13_008669).

117.    Scarlett's Declaration at Dkt. 176, Scarlett wrote "On or around September 2, 2021, my attorney contacted me after Apple's internal counsel reached out to inquire if l would speak with them alone about a "sensitive intellectual property matter." (Id., p.3). She added "My attorney advised me not to speak with Apple without an attorney present and I did not hear about it again." Id. Scarlett added in the Declaration to this court: "after a mutual friend told me she was planning to hand over her device to Apple at the advice of her attorney, I realized that I had been subject to investigation for the leak of Alpha, and that's what she had been terminated for leaking. Within those messages I found screenshots of another internal application which described in detail the business purpose and other clearly trade secret type material regarding Alpha. On September 15, 2021, I filed a Business Conduct report… referred to myself as a "witness" after learning these screenshots were used in the Defendant's replies." (Id at p. 3-4).

118.    Scarlett's blog post added that "a few days earlier an article about Apple's employee privacy policies and an internal application was published. Why would they be investigating [her] for that ? A current and former employee spoke on the record. There was no indication an anonymous employee had contributed to the story." (PL_PROD13_008669). Scarlett wrote "Ashley provided screenshots of other internal applications about Glimmer questioning an employee's ability to give such consent in Apple's environment of coercion." Scarlett added "A week after Ashley was terminated mutual friends told me that Ashley planned to hand over all of her messages to management" (this is untrue and I do not know what she is

37

talking about) and "panicked and filed a report. Apple made that post-termination report a part of their justification against Ashley's retaliatory firing claims, despite that it serves no legal purpose." ([Exhibit GG](); PL_PROD13_008670).

119.    Scarlett's April 16 2024 filing to this case at Dkt. 62 includes the statement "I emailed Apple's attorney once when it was brought to my attention that I was being brought unnecessarily into this matter to ask for my options to have myself removed from a case I am not a party to… They did not reply." (Dkt. 62, p. 2). Scarlett's Aug. 16 2024 Declaration stated: "While I am not a named party, nor have I any legal connection with Apple, Inc., Plaintiff continues to reference me and make allegations against me in this lawsuit. This puts me in a rather unjust and unfair position. Plaintiff uses this public lawsuit against Apple, Inc., who has no stake in the way Plaintiff characterizes me, to make statements that Apple, Inc. 's lack of denial of her allegations about me is some kind of proof that what she has alleged is true…" (Dkt. 99 at 2). Scarlett also alleged I was trying to "mislead the court into the belief that [she] could be engaged in some sort of cabal with Apple, Inc." (Id at 3).

120.    In Scarlett's Feb. 26 2025 Declaration at Dkt. 176 she claims I sent her "screenshots of an internal application '*Alpha*'" that Scarlett says were sent to a journalist for an article about employee privacy." (Dkt. 176, p.3). When Apple's own corporate witness was asked what the litigation codename "Alpha" was, during the Rule 30(b)(6) deposition, Apple Inc itself did not know and stated the codenames were "confusing." (Dkt. 377 at 312, Apple Warner/Dep. 232:8-237:12). It's unclear how Scarlett thinks she knows what these codenames are or why she was filing Declarations explaining what the codenames are in the litigation. When asked if Apple interviewed Scarlett as a defense witness, Apple's lawyer responded "Objection.· Work product privilege.· Attorney-client privilege.· Not one of this· witness's topics." (Dkt. 377 at 299, Apple Warner/Dep. 177:15-19).

## IX.    **PUBLIC INFORMATION ABOUT FACE ID DEVELOPMENT**

## A.    MCKEON'S ARTICLES

121.    Apple Sr. Manager Robert McKeon-Aloe has published an extensive collection of articles (mostly LinkedIn and Medium) discussing Apple internal processes and strategy – including specific to Face ID development. ("He talked about the timeline of them doing it specifically for FaceID and all the challenges they had leading up to launching FaceID. The challenges of gathering all that information, privacy concerns, and then developing the team ongoing even after launch.") (Dkt. 377, p. 419-421, Decl. of Ashley Gjovik, Dec. 16 2025, 271:5-9). Examples of some of McKeon-Aloe's articles, all of which McKeon-Aloe stated are clearly not confidential, are attached as Exhibits AAA-BBB, and authenticated by McKeon-Aloe during his deposition.

## B.    APPLE'S ARTICLES

122.    I told Apple's lawyer during my deposition that Apple "talked really in detail of marketing and product specification details about how the camera works, how FaceID works, and then they published academic papers and white papers also talking in-depth about the engineering and architecture work to design all of it and ensure it worked." (Dkt. 377, p. 419-421, Decl. of Ashley Gjovik, Dec. 16 2025, 271:14-23). I added: "the fact that they were gathering images, training data for the FaceID is just a given.· They said that in their own marketing materials" (Dkt. 377, p. 421, Decl. of Ashley Gjovik, Dec. 16 2025, 269:6-270:14).

123.    I explained that the only thing that seemed unknown was that "apparently their entire data source for this development came from employees through that Gobbler app rather than purchasing the data or formally paying and contracting people for the data, which is more typical process." (Dkt. 377, p. 422, Decl. of Ashley Gjovik, Dec. 16 2025, 272:12-21).

124.    Examples of some of Apple's public information regarding Face ID, how the Face ID camera works, and the Face ID algorithm are attached as Exhibits CCC-EEE. These are

public documents, business records, and were produced to Apple under the designated BATES numbers, and could be authenticated by Apple during trial.

## X.    AUTHENTICATION & ADMISSIBILITY

125.    The exhibits attached are authenticated under one or more of following. Deposition excerpts with court reporter's certification, cited by page:line, and authenticated via declaration with declarant laying the foundation is self-authenticating including under FRE 902. Exhibits are authenticated by Plaintiff, and/or by Defendant's witnesses, and/or by Defendant producing said document which self-authenticates. BATES numbers are included as further authentication. *Maljack Productions, Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996). Business Records are certified under FRE 902(11)/(13). Documents authenticated by one party are authenticated as to all. *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773–78 (9th Cir. 2002). Public records under FRE 901(b)(7), 902(1)–(4) and may be self-authenticating.

126.    I believe all evidence included and cited could be admissible at trial even if it is not current admissible or the form provided is not current admissible. A party doesn't necessarily have to produce evidence in admissible form at trial as long as it could. *Block v. City of Los Angeles,* 253 F.3d 410, 418–19 (9th Cir. 2001*). Fraser v. Goodale,* 342 F.3d 1032, 1036–37 (9th Cir. 2003). Rule 56 excludes evidence only if it's clear that it cannot be presented in an admissible form at trial. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,* 657 F.3d 936, 964 n.7 (9th Cir. 2011). Noted throughout, were applicable, is: non-hearsay use including state of mind, verbal act, effect on listener, etc.; FRE exceptions; or that declarant can testify at trial (including which witness can authenticate the document at trial and the basis of there knowledge).

127.    If the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment. *Sandoval v. County of San Diego*, 985 F.3d 657, 665–66 (9th Cir. 2021). Among other cures for any deficiency, Plaintiff plans to testify at trial to authenticate any documents that may otherwise be subject to hearsay objections. *JL Beverage Co. v. Jim Beam Brands Co.,* 828 F.3d 1098, 1110 (9th Cir. 2016) — At summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony.

128.    ***Dual-Authentication of Performance Reviews***: I obtained copies of these documents from my supervisor David Powers and/or Apple's "myPage" HR website and I produced them to Apple under the following BATES numbers: my 2017 mid-year review feedback (Exhibit C) as PL_PROD_12_0310, my 2017 annual performance review (Exhibit D) as PL_PROD_12_3400-3408, my 2018 review (Exhibit E) as PL_PROD_12_5407- 5411, my 2019 (Exhibit F) review as PL_PROD_12_4004-4010, and my 2020 review (Exhibit G) as PL_PROD_12_5240-5243. Apple also produced redacted copies of these same reviews under the following BATES numbers: 2017 as APL-GAELG_00000480-486, 2018 as APL-GAELG_00000487-492, 2019 as APL-GAELG_00000493-499, and 2020 as APL-GAELG_00000501-503. Apple also produced my draft 2021 performance review as APL-GAELG_ (Exhibit H).

129.    ***Dual-Authentication of EPA emails***: Emails cited and included here and I the prior Declaration that included my correspondence with the EPA can be authenticated by me testifying at trial and/or EPA's production of the same emails through the FOIA process – which covers all emails in question.

## XI.    <u>REQUEST FOR LEAVE TO FILE LATE</u>

130.    I apologize I was not able to file this Declaration at the time I filed my Reply/Opposition at Dkt. 375, and that my final Reply/Opposition was filed several hours past

the deadline (Dkt. 375), and that the version I filed by the deadline was incomplete and contained errors (Dkt. 375). I also apologize again that my Motion for Summary Judgment and Preliminary Injunction was filed several hours late (Dkt. 359) and the Declaration filed later that day (Dkt. 360), and that the Motion contained errors – including regarding the deposition pincites and certifications, placeholder text, and other issues.

131.    I filed a request for leave to file my Motion and Declaration late at Dkt. 362, referencing Dkt. 359-360. I again ask the Court for leave, if needed, to consider the latest responsive documents now filed, including the corrected Reply/Opposition at Dkt. 375, the Opposition to Def.'s Request for Judicial Notice regarding some of the NLRB proceedings at Dkt. 376, my Declaration specific to deposition testimony and agency transcripts (including corrected pincites, certifications, and excerpts) at Dkt. 377, my Appendix/Request for Judicial Notice of relevant Cal. Code and pending legislation in the 2025-2026 Cal. Leg. session at Dkt. 378, and this substantive Declaration with attached and incorporated exhibits.

132.    I feel like I have good cause in so far as I am delayed by lack of resources; I have no ill intent; have not been negligent; Defendant has repeatedly caused delays, complexity, and obstacles – including which delayed deposition testimony, material evidence and disclosures, etc.; and many of the current issues pending in this matter were raised at least partially with motions I filed earlier in this case (i.e. Motions: Requesting Disc. Conf. at Dkt. 162-165, to Amend at Dkt. 155; to Disqualify at Dkt. 156; for More Def. Statement at Dkt. 191; to Strike Answer at Dkt. 192, 221; to Compel. Interrogatory #1 – termination reason -- at Dkt. 309, etc.).

133.    I am insolvent, disabled, *pro se*, and do not have the resources to complete the required work on time (*see* "Personal Background & Current Harm") – especially due to the Defendant's active and ongoing concealment of defenses and witnesses – including witnesses that have engaged with this Court over the last three years arguing they are not witnesses (*see* "Appleseed a.k.a. Cher Scarlett"); Defendant's use of footnotes, procedural-sounding motions,

42

and passing comments in its filings to incorporate complex, prejudicial allegations/inferences like implying I was running some sort of con on Apple and wanted to be fired (*see* "Hostile Work Environment" and "Settlement Negotiations"); or that informal NLRB statements arising from Apple's own prior defense counsel's recent leadership of the agency, should justify this Court dismissing this entire matter (*see* Pl.'s Opp. To Def.'s Req. for Judicial Notice, Dkt. 376).

134.    In this litigation, many of my discovery requests and claims were dismissed for years as post-termination and not attributable to Apple, with Apple denying connection to one of the primary actors. Yet, Apple's Opposition/Cross-Motion (Dkt. 367) now cites one of the actors as, apparently, their primary defense witness in the retaliation litigation. Apple never disclosed this witness, did state and imply she was not a witness, she filed Declarations disclaiming involvement in this matter, and Apple obstructed discovery about her. (Dkt. 365-366 – discovery dispute briefing including about this issue). Similarly, Apple now seems to use Robert Aloe-McKeon as their primary defense witness regarding confidentiality determinations – yet Mr. Aloe-McKeon was also never disclosed as a fact or expert witness until after I deposed him in April 2026 as a disparate-impact comparator.

135.    Concurrently, I've been trying to manage concurrent litigation in *Gjovik v. Apple Inc,* Case No. 5:25-cv-07360, N.D. California, San Jose Courthouse – an environmental Citizen Suit and public nuisance lawsuit filed separately after my personal tort claims about the same/similar subject matter were dismissed due to more concealment and misrepresentation by Apple Inc – including denying they were under investigation by the government when the were facing EPA inspections and enforcement action (*see*, Dkt. 48 at p. 72 – *Amended Complaint* citing Melinda Riechert's false statements to this Court). Apple has also used that litigation to try to dismiss claims pending in this lawsuit and agency proceedings, repeatedly requested Judicial Notice of filings/decisions from this case to try to create preclusion/estoppel issues

despite this Court deciding the cases were not related – and then having the Notice of Pendency to this Court about those issues sealed. (See, Dkt. 278 at p. 8).

136.    Further, discovery is not yet complete with pending disputes (Dkt. 363, 365, & 358, per Omnibus Order at 327) – and additional, new disputes – not yet briefed but pending leave to file additional briefing. Further, the transcript from the second day of Apple's Rule 30(6)(b) deposition has not been released yet – and Plaintiff was hoping it would be released by today to include in these filings, but there is no ETA from the service provider. Additional days of Rule 30(b)(6) deposition are needed for trial on liability due to Apple's witnesses' inability to answer many basic questions – an issue which was raised to Apple via meet/confer with Apple responding that no further issues can be raised to the court. (Declaration – *Depositions* – Exhibit M). Apple also had not produced the majority of documents requested related to Plaintiff's protected activity, Apple's investigation into Plaintiff's complaints, or Apple's investigation into the Plaintiff. *Burlington N. Santa Fe R.R. v. Assiniboine & Sioux Tribes*, 323 F.3d 767, 773–74 (9th Cir. 2003); *California ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998).

137.    This is further combined and exacerbated by the Defendant's abuse of the Court's Protective Order process which resulted dozens of filings (i.e., Dkt. 279, 280, 288, 293, 294, 295, 296, 297, 298, 302, 304, 312, 326, 328, 340, etc.), multiple scheduled hearings and conference calls, active gag orders against the Plaintiff, over twenty records on this docket being sealed in their entirety – and all based on information that has been public for years, the legal claims in this litigation itself, and the Plaintiff's protected labor complaints and whistleblower disclosures – including matters directly relevant to this Summary Judgment proceeding. (Dkt. 320-322; Gjovik Dep., April 8 2026, Dkt 377, 456-462).

138.    Now, case filings and evidence related to topics relevant to the Summary Judgement proceeding are sealed and the Plaintiff has prior restraint orders issued against her on

the topics Apple "designated" – past the deadline to do so, without complying with the Protective Order, and while refusing to meet/confer. Further, critical to this pending matter, is the concurrent combination of the Defendant's concealed defense of terminating the employee for reporting sexual harassment and possible violations of criminal sex crime statutes, with many of Defendant's pending confidentiality "designations" directly referencing the Plaintiff's body, genitals, sexual activity, sexual partners, and her management's direct connection to the sexual surveillance complained about.

139.    The Plaintiff asks the Court to consider this filing and the associated filings, despite being late and imperfect, out of fairness and in the interest of justice.

## XII.  <u>CONCLUSION</u>

140.    I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on May 26 2026 in San Jose, California.

Respectfully filed,

_____

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed May 24 2026 in San José, California
(408) 883-4428
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

XIII. **EXHIBITS**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026



02672

**A.**   **EXHIBIT A: APPLE DIRECTORY PROFILE**

47

Employment Summary

## Employment Summary
• Current (1/2017-Current) Hardware Engineering
• Summer of 2019 - Legal
• 2/2015-1/2017 - Software Engineering

## Promotions & Pay:
• Current: Salary is $169k, with 3,825 (~$590k) unvested RSUs
• 2020: Salary increase by 3.05% ($5k), $22k bonus, $130k 4yr RSU grant
• 2019: Salary increase by 3.9% ($5k), $22k bonus, $130k 4yr RSU grant
• 2018: Promotion to ITC4; Salary increase by 10.5% ($15k), $19k bonus, $175k 4yr RSU grant
• 2017: Salary increase by 7.31% ($9.5k), $15k bonus, $85k 4yr RSU grant
• 2016: Salary increase by 4% ($5k), $7k bonus, $60k 4yr RSU grant
• 2015: Salary increase by 4% ($5k), $7k bonus, $100k 4yr RSU grant
• Joined 2/23/2015:  $120,000 salary; $105,000 4yr RSU grant 401k w/ matching; ESPP stock options; relocation package

## Reviews
• 2021 - Pending
• 6/1/2020,
  • **Teamwork**: **Exceeded**
  • Innovation: Met
  • Results: Met
• 6/1/2019,
  • **Results**: **Exceeded**
  • Innovation: Met
  • Teamwork: Met
• 6/1/2018,
  • **Teamwork: Exceeded**
  • **Results**: **Exceeded**
  • Innovation: Met
• 6/1/2017,
  • **Results**: **Exceeded**
  • Innovation: Met
  • Teamwork: Met
• 6/1/2016,
  • **Results**: **Exceeded**
  • Innovation: Met
  • Teamwork: Met
• 6/1/2015,
  • **Teamwork**: **Exceeded**
  • Innovation: Met
  • Results: Met

## Total Apple Pay By Year
• 2021 - Pending
• 2020: $386,382.32
• 2019: $343,940.39
• 2018: $304,272.24
• 2017: $238,483.10
• 2016: $197,469.00
• 2015: $144,717.10

01769

**B.**   **<u>EXHIBIT B: EMPLOYMENT SUMMARY</u>**

**C.**     <u>**EXHIBIT C: MID-YEAR PERFORMANCE REVIEW (2017)**</u>

# Ashley Henderson - Dec 2017

| | Rating | Strengths | Opportunities |
|---|---|---|---|
| **Teamwork** | – | Constantly looking to open new doors and lines of communication with SWE<br><br>You regularly try to help the team through the various items you stay in tune on.  From the week ahead, to the product roadmap, this is all with team in mind.<br><br>You've had a number of opportunities to present at both Dan and Yannick's level.  This is great executive exposure.  There's some feedback you've been given about presentation style that you still need to work on, but overall, you look very comfortable in front of a large audience.<br><br>Always looking out for me (innovation emails, all-hands, etc) | Continue to drive connections between HW and SW organizations.  Going forward, this relationship is critical for delivering great products.<br><br>When closing sentences in presentations, you finish the sentence in a way that sounds like you're asking a question.  Something to pay attention to going forward.  **Actively addressed.**<br><br>Be unflappable.  Still have a tendency to say things like "I cant do living on.  This is going to kill me."  Or, "please don't make me do it!" As you move to a more senior role on the team, turn these requests into opportunities. |
| **Innovation** | – | Drove the Women in PSQ project for Dan's organization.  This has the potential to be a great venue for career growth and to bring greater diversity to the organization.  Delegated out various tasks within Women in PSQ so the work is more distributed.<br><br>Drove the Who to Go to for Answers project.  People like Reed Johnson are already using this document in on-boarding documentation.  Great work! | You will need to maintain the Who to Go to project to make sure that the web pages don't become stale.  It might be good to have a quarterly or bi-annual review to ensure it's still current. |
| **Results** | – | Delivered numerous projects for the organization in the past 6 months, including:<br><br>Compatibility project (still TBD, someday…)<br><br>Capacity planning<br><br>Women in PSQ project (tech talks, senior leader sessions)<br><br>Post-mortem action items<br><br>Dan demo day<br><br>Better faster bugs<br><br>Presented who to go to on stage at All-Hands<br><br>Living On | Drive the cross-functional flow charts from IMG and CoreOS.  I want you to push on those teams to ensure we are doing the right thing every time we file a bug.  If we don't stay on them, I fear it will just fall to the wayside.<br><br>Behave as the owner for your assignments until they are truly complete.  Once you got best status at Apple to a certain point, you wanted to hand it off.  Compatibility isn't done and you asked if I still wanted you involved.  For the capacity planning project, when I had questions about it, you wanted me to go work it out with the team.  For the latter, maybe my communication wasn't clear.  Net is that I want you to treat these as your projects until they are done.<br><br>"I'm just the messenger".  Own it. |

PL_PROD_12_0310

**D.**     <u>**EXHIBIT D: ANNUAL PERFORMANCE REVIEW (2017)**</u>

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

**Ashley (PI) Henderson**

## Last Review

Manager: **David Powers**        Effective: **Jun 1, 2017**

|  | **Manager's Rating** | **Self-Assessment** |
|---|---|---|
| **Teamwork** | **Achieved expectations**<br>Performed at the high level expected of the role | **Achieved expectations consistently** |
| **Innovation** | **Achieved expectations**<br>Performed at the high level expected of the role | **Exceeded expectations consistently** |
| **Results** | **Exceeded expectations**<br>Performed above the high level expected of the role | **Exceeded expectations consistently** |

## Performance and Accomplishments

Teamwork

- Within just a couple of months, Ashley has already developed into a strong voice within MSQ.  She is driving change and process improvements within the org, and is not afraid to push the team to deliver.  She got a lot of positive feedback from the team.  Said one, "she has quickly made a big impact in MSQ, is extremely driven, and quickly gets through a volume of work".  Said another, "she is smart, and always looking for what is actionable — essential traits to succeed in MSQ".

- Ashley has shown a lot of passion for the role, and for the team.  Said one leader, "She has a great attitude, find a problem fix a problem work ethic, and she is very good at using her cross functional contacts to help me out when looking for information."

- Ashley has shown an ability to develop relationships outside of MSQ.  She regularly

PL_PROD_12_3400

has one on ones with Vicki, Uma, Andrew, as well as people on the SW side.  These relationships are important to MSQ, and she can be a great liaison between our team and our partners.  In addition, her SW contacts have really helped drive visibility to our bugs.  Said one person, "In my view, this is one of the biggest improvements in MSQ recently.  We are seeing more traction with our bugs, and while there is still room for improvement, the critical bugs we have found in recent programs have been fixed more recently."

- One area for Ashley to focus on is her communication style. I'd like you to think you about a few things.  For one, when you hear something you may not necessarily like or agree with, have a poker face.  If you express anger, frustration, or are dismissive, that may cause hesitation with other people coming to you the next time.  I've seen in meetings where this happens, and it's something to watch out for.  There was peer feedback as well that picked up on this as a theme.

- Be careful about jumping in and trying to own or drive something when it is the responsibility of someone else.  Part of this will come as we cement your roles and responsibilities on the team.  But there have been times where you'll jump in when there is already an owner in MSQ and it causes confusion.  Understand who the leaders are and what their roles are in the room, and adjust appropriately.

- Finally, be more open to feedback.  If there are other people telling you something, sometimes your immediate reaction is to be dismissive or argumentative.  Be more willing to listen to what they say, pause, and then formulate a response.  I think it's important that you also try to understand the history behind why something is the way it is.  And if ultimately you're wrong, say you were wrong.

Innovation

- Ashley brought Confluence to the team, and we've already moved the org over to using it full-time.  The team has been very happy with it, and it's taken an additional load off of Brian's team.  I expect going forward that we will have all of our documentation and status reports moved over to this.

- As stated elsewhere in this review, status has turned out fantastic.  She came up with the styling of the report, reached out to our customers, and really created something unique to MSQ.  There is more to do here, including driving improvements to make it easier to *create* status.

- Ashley is now running one of the most critical innovation projects for MSQ going forward, our "Portfolio Planning Process".  This meeting will define, and deliver the major swings MSQ will take over the next year.  Ashley started from "what's the vision?", and has been methodically whittling it down to a list of projects the greater team finds most important.  Once we finish that, she will be asked to PM those projects, and ultimately, deliver them with high quality.  Said one person, "I think this process is going to really help uncover some major opportunities for improvement in the org."  Time is of the essence here, so it's important we get to some actionable steps as soon as possible.

- Ashley done a great job in a short amount of time within MSQ.  The goal now is to

PL_PROD_12_3401

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 58 of 427

see a sustained pattern of this, and to ensure these innovations are long-lasting. Great work!

Results

- For the first half of this review period, Ashley was in a different organization, managing the EFFA process for products in the field, including Mac, iPhone, iPad, iPod, and Apple TV.  In my experience on the Mac, Ashley showed great drive in pushing fixes in the EFFA process, and was a strong advocate in the room for software quality.  My experience with her in this time period was limited, so the main contents of this review will focus on her MSQ work from January - July.

- Ashley was asked to create and deliver the 'Best Status at Apple', and while this job is not finished yet, MSQ is now sending out a status that is lauded by our customers. What I particularly like about her approach to this is that she completely reversed the way we were doing status.  Instead of defining a status that MSQ leaders liked, she went to all of our customers and partners and asked what they wanted.  She was very methodical through this process, listing all the pros and cons, what messages our customers wanted to get from the status, and how to organize it.  Her upfront work was invaluable here.  The net is that for the first time, MSQ is producing a weekly status that is being sent out to customers, and our customers are actually happy with it.  We've had additional wins with other QA teams within Apple (Chris Depner, RDT) wanting to push their status updates into ours, which gets us closer to having an overall J137 system status.  Great job here Ashley.  I still expect that we continue to iterate on it, both to make it easier for people to write it, and to add additional modules to the status as those come online (power, perf, compatibility report).  But we've come a long way thanks to your work.

- In addition, Ashley was asked to take on the compatibility report project that had fallen on its face, and deliver it.  She started by going back to the basics, getting all the stakeholders in a room, and sitting down to define requirements.  During this process, she discovered a lot of poor communication between the teams, and got that out into the open.  After a period of time, the tools team had their requirements, and then Ashley stayed on them to deliver.  The net is that after ~2 months, we are about to go live with a tool that can be used by all teams, saving a lot of time for those teams.  This is a project that previously couldn't find its footing after a year of off and on development.  It has given me confidence that we have a model under her purview that we can use drive to future initiatives.

- Originally, one of Ashley's goals on the team was to manage the finance piece of our team, including audits and asset tracking.  Ashley dove in, and was able to articulate to an and I in a presentation the complexity and challenges of the role.  I think the work here helped inspire us to keep Tammy on board to manage this piece, and ultimately, this is likely to not be Ashley's responsibility going forward.

- For the first time, MSQ also has a product roadmap that Ashley has created, detailing major milestones for each of the projects, and staying on top of project schedules. This has helped the team understand what's coming, and to plan resources and innovations appropriately.  I no longer get questions from my team about upcoming

PL_PROD_12_3402

projects, so I view this as a big win.  :)

- Ashley also showed initiative in sending out 'The Week Ahead' reports.  This is a report that regularly goes out on Monday to my staff, detailing upcoming milestones, what HW is coming in, and in general, what my team should be thinking about.  What I like here is Ashley saw a need, and just went and did it w/o really needing guidance from me.

- Ashley has driven scheduling for the weekly Yannick updates.  Since the day I asked her to do it, the quality of these updates has gone WAY up, and the team's exposure to Yannick has grown.  She will continue to play a role here in figuring out what we bring to that meeting.  Other team members in PSQ have commented that they need to 'step their game up' since that change.

- At the beginning, Ashley was scheduling too many meetings.  We would have multiple prep for a prep meetings, and it ended up being really hard on the team.  I asked her to look to cut the number of meetings down, and she has.  Continue to be mindful of this, as the team has so much work to do.  She will also have to find a way to get what she wants from the leaders without being overbearing.  Said one, "For awhile, it seemed every day I was being asked for status.  That has calmed down recently".  In this case, clearly it was a source of stress.

- In addition, there has been feedback about additional work being created for the team, without clear benefit.  Said one, "I would caution her that adding too much documentation and and process is going to result in pushback from the team.  I was asked to fill out a long new project document, and these documents were never used."

## Goals and Development

Goals

- Continue to push on delivering the best status at Apple.  Continue to follow up with the customers of our report to make sure they're getting what they need.  We also need to continue look at it with a critical eye to see where we can improve, whether it be through making it easier to build, newer cleaner modules, etc.

- Continue to drive Confluence as the MSQ portal, not just for managers, but for ICs as well

- You will be driving strategic initiatives for MSQ.  A lot of these efforts will center around the tools that Brian's team creates.  The model that worked for the compatibility report and status reports went very well.  You can really help us tackle initiatives that we've never been able to get fully off the ground.

- Drive a strong post-mortem process that drives permanent improvement into the teams.  Follow up on lessons learned, actions, etc.

- Drive MSQ process, from test plans to architecture reviews to SRR.  This doesn't

PL_PROD_12_3403

necessarily mean you have to drive the creation of the deck (though it may). But it does involve insuring we know what we're doing at all phases of a project, and that we execute on our deliverables

- Be a strong information filter for me. Keep me aware of issues you think I should be aware of, but I also want you to shield me from stuff that can be managed by the MSQ leaders and ICs.

These are broad organizational objectives that are also important goals for you as you grow in MSQ:

- **Technical excellence & disciplined engineering depth** — help shape the organization to make it best-in-class, highly technical and innovative. We should continuously rely on deep engineering science and tight integration with the design teams with the objective to identify and resolve product issues as early in the development process as possible. Use a disciplined engineering approach and technical expertise to create and execute comprehensive yet targeted and prioritized validation plans, test stations & fixtures, compliance suites, failure analysis, etc. Constantly hone your technical strength and gain necessary expertise through training. Research and explore new technologies to bring world-class technical ideas and innovative methodologies to Apple, always keeping up with advancements in science.

- **Crisp data** -- Maintain a high level of accuracy, reliability, and credibility in producing data  Our team should do more qualitative analysis of the data it produces (for instance, ensure we properly characterize customer impact). Add value by carefully reviewing all data before it's published or presented. Ensure repeatability of the tests and trouble shoot when we have data to present that is inconsistent with previous test runs/investigations. Anticipate the next questions/tests/analysis the development team or executives would ask for to better characterize problems or narrow down issues.

- **Project leadership** -- Drive cross-functional issues, influence project decisions, work with your HW and SW development counterparts, or push for faster resolution of issues. Drive to milestone & deadlines instead of reacting to them.

- **Continuous improvement** -- That includes improving both our processes and test practices (e.g., increased use of automation). The objective is to keep increasing our efficiency and effectiveness so we can do more with less but as importantly, test more thoroughly to increase the integrity of our products.

- **Fiscal responsibility** -- Care for the bottom-line. Understand ROIs before spending/investing Apple $$. Leverage resources at the CMs or vendors (when confidentiality constraints allow it) so we limit our internal resource growth and keep the team as lean as possible.

- **Flexibility** -- As managers and in our ever-changing environment, it continues to be important to remain flexible, participate in shaping the changes, and most importantly, show leadership in helping the team through the changes.

PL_PROD_12_3404

## Second level manager comments

You were an absolute pleasure to work with when you were in the sw organization and this has continued after transitioning to the team. There are two items that I personally appreciate:

1 - Your willingness to speak truth to authority - It's not often employees feel confident enough to speak out to the senior leadership. You've struck a great balance in how you've delivered messages to me. In the process you've proven yourself to be thoughtful, opinionated (a good thing in my mind) and a leader. Keep doing this and good things will continue to follow.

2 - The way you handle set backs and frustration - We all get down from time to time. While this is normal, you seem to have the ability to bounce back quicker than most. This characteristic is infectious and leads to a better work environment for everyone.

Ashley - You're a great addition to the team. You've had a tremendous impact in a short time. Thank you!

## Employee comments from Self-Assessment

### SWE Failure Analysis EPM (June-Dec '16)

For the first half of the review period, I managed the Software Engineering Failure Analysis program for products in the field (Mac, iPhone, iPad, iPod, and Apple TV), and launch planning for new product introduction.

- I was the SWE DRI for the Early Field Failure Analysis of the iPad Pro 9.7" and 12.9", iPhone 7 and 7+, MacBook Pro 13" w/ and w/o Touch Bar, and the MacBook Pro 15" w/ Touch Bar.
- I was the single point of contact in Software Engineering for any major software issue causing signifiant returns in the field. I drove field issue triage and root cause analysis to resolution for customer software quality issues.
- I helped engineering teams understand customer facing issues and presented engineering root cause and corrective actions to senior executives. I facilitated failure analysis communication between Software Engineering and all other Apple organizations.

### Projects

- I was the SWE DRI for Early Field Failure Analysis of the iPad Pro 9.7" and 12.9", which spanned from March through end of June. In June, I oversaw the deployment of a RRU (Rapid Response Update) to mitigate the device's ███████ silicon failures (which I tracked with HW/EE in the previous months). I monit██████ n DPPM and live customer restore failure trends in Splunk to ensure field data matched our expectations of the mitigation -- which it did. In June, I also partnered with Core OS to isolate the HW and SW issues driving the top two customer facing panics for the system, and organized mitigations, test plans, and program escalations to bring the fixes into the next software update.
- I was the SWE DRI for EFFA of the iPhone 7 & 7+ (four unique systems with separate ████████████ basebands). ████████████████████████████

PL_PROD_12_3405

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 62 of 427    8/23/17, 10:29 AM

I drove issue resolution and provided updates at daily (7 d/wk) exec reviews for five weeks.

- I was the SWE DRI for the first month of an iPhone Quality Improvement Forum escalation where customers were reporting their iPhones were shutting down unexpectedly. Issue impact severity and international legal involvement required providing updates directly to and taking action items from senior leadership (Jeff W & Sabih K). Resolution of the issues was driven by a System EPM team manager after I changed roles.
- I was the SWE DRI for first month of EFFA for the Fall '17 MacBook Pros. I led root cause analysis and issue resolution with IMG for two top return driving categories (Image Flickering & Corruption). The remainder of the EFFA was driving by an EPM senior manager after I changed roles.
- I created a formal launch planning process (risk identification and mitigation, mapping of debug workflows, and triage DRI planning) and kicked the new process off with iPhone 7 and 7+, MacBook Pro 13" w/ and w/o Touch Bar, the MacBook Pro 15" w/ Touch Bar, and AirPods.

— — — — — — —

### MSQ (Jan-May '17)

I joined the MSQ organization in January as the first Engineering Program Manager in Product Integrity.

- Within the first month of the role I took over writing and sending weekly MSQ org status to the PSQ leadership team and started sending a weekly system quality status to our cross-functional partners and their leadership.
- I took over planning and scheduling MSQ's weekly updates for our senior leadership. I identified timely and relevant topics, and worked with MSQ managers to prepare presentations.
- I launched Confluence (wiki & productivity tool) for the organization within first week of joining the team. I'm continuing to help guide information architecture and security/access best practices. I also launched a Confluence space for Dan West, and am working with Dan to set it up for his PSQ organization.

### Projects

- I was asked to create and deliver "The Best Status at Apple". I partnered closely with cross-functional partners to gather data on what they want out of our status and what's working/not working. I analyzed data for trends and identified the top strategic changes to provide our partners with what they need. I socialized changes with MSQ teams, gathered their feedback, and created mockups and ran them by partners for buy in before launching. I'm continuing to check in to gauge success and gather more feedback on areas for improvement.
- I documented a Roadmap of all software, hardware, and program system milestones required for MSQ planning. Built partnerships with keepers of this often silo'd data, and continually update the Roadmap docs to ensure an accurate look Into the next year. I provided it to MSQ managers for resource and test planning. I documented a

PL_PROD_12_3406

planning dashboard of MSQ's major milestones and deliverables and scheduled them for the next four months based on the Roadmap dates. I publish it every Monday for MSQ managers as an "A Look Ahead" status email.

- Implemented a new Portfolio Planning process and framework to base MSQ projects on strategic organizational objectives, so teams are working on the right projects at the right time.
- Took over the post-mortem meetings for new hardware projects. Created a tracking document for action items identified and status of resolution.
- Asked to provide a PSQ EPM rating/success profile proposal that can be used to rate myself and any potential future EPMs. Working with cross-functional EPM managers and leads to gather data on how other orgs do this.
- Took over the Compatibility Module project after two years of the project being stuck in the planning phase. Within two weeks, worked with team to document complete scope of work and requirements. Then led spec review and project planning to document deliverables and schedule.
- Created documentation on program keyword escalation processes, and bought in System EPM teams to help maintain a table of MSQ's EPM contacts for each HW project.
- Drove a summary of all MSQ testing gaps when new hardware becomes sustaining to share with cross-functional parters for discussion.

——————

### FY18 Goals
*(in addition to ongoing activities like status, and scheduling exec updates)*
**Q1/Q2**

- Deliver the "Best Status at Apple" — close out Phase I, II, & III of the project
- Complete MSQ Portfolio of programs of projects, and develop and implement a project evaluation and intake process
- Complete phase I of Compatibly module project, and see product delivered to end users
- Create robust documentation with our external partners on best practices for how and where MSQ should escalate bugs
- Continue pushing on allocation & distribution process improvement initiatives
- Implement Sheriff for tracking and communicating MSQ disclosure status

**Q3/Q4**

- Implement a MSQ Project Management framework with standardized portfolio planning, project intake and review processes, project management tools and templates, and project statusing
- Create a PSQ EPM rating guideline with buy-in/approval from PSQ mgmt team
- Create tracking process and feedback loops for post-mortem items to ensure actions are addressed and mistakes/gaps are not repeated

——————

### FY18 Areas for Improvement

- Identify opportunities for projects which can streamline MSQ-wide processes/tasks and reduce workload in the future  (example: Sheriff for disclosures)
- Influence MSQ meetings to be more productive, action/task oriented, and with more tangible outcomes
- Build more knowledge of the Product Integrity organization; and more in depth expertise of the MSQ org, Quality programs and initiatives at Apple, and the Mac

PL_PROD_12_3407

Case 3:23-cv-04597-EMC     Document 379     Filed 05/26/26     Page 64 of 427

hw/sw roadmaps
- Continue to build strong, open, trusting relationships with MSQ managers, MSQ's key partners, as well as other orgs and leaders across the company
- Try to always provide a calm, collected, and logical approach to problem solving even in times of extreme stress or ambiguity
- Try to always provide clear, concise, articulate communications even when dealing with extremely complex data and/or filtering conflicting messages

PL_PROD_12_3408

**E.** **EXHIBIT E: ANNUAL PERFORMANCE REVIEW (2018)**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC     MAY 26 2026

Case 3:23-cv-04597-EMC  Document 379   Filed 05/26/26   Page 66 of 427    8/10/18 4:30 AM

# Ashley (Gjovik) Henderson

## Current Review

Manager: **David Powers**          Effective: **Jun 01, 2018**

|  | **Manager's Rating** | **Self-Assessment** |
|---|---|---|
| **Teamwork** | **Exceeded expectations**<br>Performed above the high level expected of the role | **Achieved expectations consistently** |
| **Innovation** | **Achieved expectations**<br>Performed at the high level expected of the role | **Exceeded expectations consistently** |
| **Results** | **Exceeded expectations**<br>Performed above the high level expected of the role | **Exceeded expectations consistently** |

## Performance and Accomplishments

Results:

- You've had a great year in terms of delivering results.  Due to your contributions, MSQ is a better run organization today.  We have more process (where it makes sense), better access to information, and a stronger network of resources due to your connections.

- This year, you've delivered a myriad of projects for this organization.  This includes "A Look Ahead", Dan status, the Bug Routing Page, Who to Go to for Answers, the Capacity Planning Heat Map, and the MSQ HW/SW roadmap.  These are just some of the improvements you've made to this organization (and in some cases, PSQ as well).

- One prime example is your work on Women at PSQ.  You, Monu, and Kai came up with the idea, and pitched it to Dan.  Once he accepted, you quickly moved into

delivering it.  To date, we've had 9 organization wide events that have gotten great feedback.  Some of these have been executive interviews, and some are panel discussions.  This type of work has had organization wide impact, and has been recognized by your colleagues.  Said one, "Her work with the Women of PSQ has been very informative.  I've grown quite a bit personally due to the work she and others have done in that space."  Said another, "I would attribute a high part of the success of the effort to Ashley's diligence and support."  Women of PSQ is now a staple of this organization, and you deserve tremendous credit for pioneering it.

- In cross-functional PM situations, you have been excellent.  For example, the BATS initiative was initially going all over the place.  I asked if you could help, and you came in and provided structure and organization to it.  After you joined the team, action items started falling off the list, and we made much better progress.  I got feedback from both Dan and Mark on how excellent you've been in that room.  You will be seeing more projects like this over the next year.

- You were the lead on the Who to Go To for Initiatives project with other leaders from around the organization.  You ended up going on stage in front of the entire organization and talking about the project to the group.  This project has helped many people in PSQ figure out where they can get help, or where the appropriate place to file bugs is.  The challenge here is going to be whether you can get engineering to keep it maintained.  One way would be to continue to call it out through new HW Care and Feeding emails.

- You also helped drive the capacity planning initiative.  You created a spreadsheet that allowed us views into the workloads we just didn't have before.  While it ultimately didn't result in us getting anyone hired, it did give us a framework to work from in the future.

- When I ask you to drive something, I know you're going to do so with passion and speed.  Others have noticed too.  Said one, "From establishing connections, getting us data, to taking on new initiatives. I can't think of someone in PSQ who is so proactive in driving this to closure."

- One area for you to consider with all the work you do is whether you're adding work for the right reasons.  It's the balance between adding process or systems to make life easier, vs. adding work.  It's something you will need to remain sensitive to.  One of the best ways to do this is to build consensus around your ideas before going full force.  Said one person "Be mindful about not losing flexibility and the start-up nature of Apple while being process oriented, so that we can still be nimble and adapt quickly."

Innovation:

- I've been impressed with the innovations you've brought to the table.  For example, for week of innovation, you came up with an idea to tie our project planning dashboard to Radar.  While I was initially concerned about the managers thinking

they had more work on their table, they really liked it. In turn, we get 'free' tracking of how we're doing through automation, rather than having a human track it.

- You've also used Radar as a way to track post-mortem action items. This is something in the past we would have lost, as we didn't have it written down anywhere but email. Now we do.

- There are a collection of smaller innovations that you've helped to think about or implement in efforts to make this organization stronger. Examples include the Insufficient Information emails to managers, where they can be notified when we get a bug that is II. Other examples include really being the driver of shifting us to primarily using Confluence as our document repository now. Please continue to drive these innovations. They are having an impact.

Teamwork:

- Feedback about your teamwork has been very positive. Here's a collection of quotes: "She is a great team player and reaches out to her peers for consensus building", "She's helped bridge some communication gaps between MSQ and the OS Reliability team." "Consistently one of my favorite people to work with and I hope we get together more this year." "She takes the time to not just help MSQ, but to help out other teams in PSQ. I have countless examples where she is proactively looking for opportunities to help out my team."

- I also continue to be impressed by how you manage your network. Your relationships into software have provided us early insight and opportunity that the organization didn't have before. You've gotten Dan's entire organization access to Confluence by leveraging your relationships. You've gotten us early looks at new HW that's coming down the pipeline. You're able to tell people who to go to because you've built so many of these relationships. Going forward, continue to drive connections between HW, SW, and PSQ. These relationships are becoming ever more critical. Said one person, "We've all benefitted from her connections to other parts of Apple."

- In a lot of ways, I consider you as the front person for Women of PSQ. You were working with 2 managers at the time, but I looked at you as the primary driver of getting this off the ground. This was a great example of cross-functional leadership (and PSQ-wide impact) from you.

- As you noted, one area to improve is composure during stressful situations. You've mentioned that when overwhelmed, you can have difficulties communicating in unclear ways, or losing composure. I've also called this out in mid-cycle reviews. Be unflappable. As you are becoming a more senior voice in the team, people will respond to you different based on whether the response is emotional. Said one colleague, "She can react to certain 'triggers' easily and lose sigh of the truth, which can cause anxiety for herself as well as people around her'. The good news is I've

seen you working to address this.

- I've been impressed at how you respond to feedback.  This year, I gave you some feedback about owning the project to the end.  You asked for a 1:1 where we could go through the feedback in detail, and we drew it out on the board.  What came out of it was any confusion around the feedback was clarified, and we were both in a better spot of understanding each other.

- You're always looking out for me.  You keep me aware of upcoming deadlines, will give me information on the side about how someone is feeling, pushing me down certain avenues, etc.  Thank you.

## Goals and Development

Goals:

- Drive training initiatives.  For example, you've put together OS tech talks for us.  The team wants more.  What about EFI, SMC, and other areas where we can train the team.  Your network should help here.  Help pull together slides / presentations on topics pertinent to the team like deep dives into key Mac HW / SW technologies, interviewing, and MSQ in general.

- There will be multiple projects I'll be having you PM this year.  One is finishing up the BATS project, and making sure we've been effective at delivering.  Another will be to help CoreOS and MSQ through a stability re-think.

- Continue to lead the Women of PSQ initiative.  While you've handed off a lot of responsibilities to other people within the group, you still need to be at the top helping to provide overall vision, and making sure it continues with the same vigor.

There will be many more goals over the year as the sands shift.  We'll talk about them going forward.

These are broad organizational objectives:
- **Technical excellence & disciplined engineering depth** — help shape the organization to make it best-in-class, highly technical and innovative.  We should continuously rely on deep engineering science and tight integration with the design teams with the objective to identify and resolve product issues as early in the development process as possible.  Use a disciplined engineering approach and technical expertise to create and execute comprehensive yet targeted and prioritized validation plans, test stations & fixtures, compliance suites, failure analysis, etc.  Constantly hone your technical strength and gain necessary expertise through training.  Research and explore new technologies to bring world-class technical ideas and innovative methodologies to Apple, always keeping up with advancements in science.
- **Crisp data** -- Maintain a high level of accuracy, reliability, and credibility in

producing data  Our team should do more qualitative analysis of the data it produces (for instance, ensure we properly characterize customer impact). Add value by carefully reviewing all data before it's published or presented. Ensure repeatability of the tests and trouble shoot when we have data to present that is inconsistent with previous test runs/investigations.  Anticipate the next questions/tests/analysis the development team or executives would ask for to better characterize problems or narrow down issues.

- **Project leadership** -- Drive cross-functional issues, influence project decisions, work with your HW and SW development counterparts, or push for faster resolution of issues. Drive to milestone & deadlines instead of reacting to them.
- **Continuous improvement** -- That includes improving both our processes and test practices (e.g., increased use of automation). The objective is to keep increasing our efficiency and effectiveness so we can do more with less but as importantly, test more thoroughly to increase the integrity of our products.
- **Fiscal responsibility** -- Care for the bottom-line. Understand ROIs before spending/investing Apple $$. Leverage resources at the CMs or vendors (when confidentiality constraints allow it) so we limit our internal resource growth and keep the team as lean as possible.
- **Flexibility** -- As managers and in our ever-changing environment, it continues to be important to remain flexible, participate in shaping the changes, and most importantly, show leadership in helping the team through the changes.

## Employee comments from Self-Assessment

**F.**     <u>**EXHIBIT F: ANNUAL PERFORMANCE REVIEW (2019)**</u>

# Ashley Gjovik



**Manager:** Powers, David M.                                                   **Effective:** 6/1/19

## Review Dashboard

|  | **Manager's Rating** | **Self-Assessment** |
|---|---|---|
| **Teamwork** | **Achieved expectations** Performed at the high level expected of the role | **Achieved expectations consistently** |
| **Innovation** | **Achieved expectations** Performed at the high level expected of the role | **Exceeded expectations consistently** |
| **Results** | **Exceeded expectations** Performed above the high level expected of the role | **Exceeded expectations consistently** |

## Performance and Accomplishments

Results:

- This year, Ashley launched the "PSQ portal".   This was a broad project that didn't have a lot of definition at first. She worked with Dan and his directs to focus the portal down to a set of initiatives, and then got to work.  She developed the design, and layout of the site.  She created new sections such as the innovation, community, and work/life balance ports.  She drove a PSQ new hire guide and PSQ Tools manager pages.  She worked with numerous people throughout PSQ to come up with "How I Got here" articles.  And she brought in Boomerang (more later) to PSQ in an attempt to help people further their career goals.  Throughout, I felt like she struck the perfect balance of driving relentlessly to get things done, while still cutting the team some slack in chaotic product shipping environment.  The PSQ portal has been released, and the early feedback has been positive.  I'm excited to see the impact to the team.

- Ashley has been relentless in driving the Boomerang initiative as well.  This is one of the most exciting projects PSQ is a part of this year.  Ashley has done a great job marketing and selling the program to the team, in an environment where numerous teams weren't too excited about losing a talented person for a period of time.  She's done numerous presentations at my staff, Dan staff, and at PSQ extended staff, ensuring everyone understands all the details and nuance of the program.  And she has really kept her eye on the North Star - letting people fulfill their own career goals, and using it as a PSQ branding opportunity.  I'm thankful for her work here.

- She also led the BATS initiative last year.   This was a chance to see her PM skills shine.  Frankly, it was a mess in the early meetings without her.  I asked her to join, and all of a sudden, we were moving.   She quickly brought order, assigning DRIs and action items to members of the team, and following up relentlessly.  Ultimately, we brought a lot more visibility on the BATS side to new HW, and have better testing in BATS now, which is resulting in less bugs that make it in our builds.

- Ashley led the Mac QA gaps initiative as well.  As with everything she does, relentlessness and relationships were the key here.  Over the course of a few weeks, she met with teams across the company to gather summaries, gaps,

PL_PROD_12_4004

risks, and next steps. She then worked with cross-functional leadership to vet and pre-flight. Overall, she prepped me well, and we ended up having a great presentation to Kim and Yannick. This ended up being successful to the point where iOS was asked to undergo a similar initiative. One point of feedback that I gave her at the time that I want to remind her of here. There was a point where teams were getting really freaked out and were starting to push back when started to call gaps out. I encourage Ashley to be the voice of calm in these moments. We weren't trying to call anyone out. We were simply trying to make our test coverage better, and we all own a piece of that. The messaging here is really important such that teams dont get wound up unnecessarily.

- She continues to publish high quality Dan status every week, which has taken a huge load off of me. She's super diligent in following up on schedules, gathering team updates, and getting my top of mind.

- Finally, for not being in the day to day QA, she is an amazing bug finder. Everything she touches seems to break. Said one person, "I'm impressed on ability to find bugs. It's odd that she just goes about her work yet finds so many panics/hangs on hardware that we say is solid." It helps that she's constantly living on as many unreleased products as she can, and is diligent about filing bugs. Good stuff!


Innovation:

- Ashley is always thinking about the team and organization, and what gaps need to be filled. From PSQ portal to Boomerang, she continues to engage the team in new ideas. Her "Who to Go To for Answers page" came up multiple times in peer feedback. Said one, "The Confluence page "Who to Go to for Answers" is one example of her amazing work. It's the combination of broad networking, collaboration, understanding of many technical and non-technical areas. It's a very useful and handy guidance for directing issues, and connecting people for more collaboration. It provides deep and meaningful insights."

- She also implemented ideas internally within MSQ that have had an impact. For example, we are trying to get better about checklists with respect to what we need to do in a given project. She came up with an innovative approach using Radar, and worked with Brian Reynolds to build a solution.

- She participates in multiple initiatives. Women of PSQ is an obvious one that has an impact across the organization. She also participated in the SWE Must Fix task force as a representative from HW. In this project, she helped to shape the Must Fix process and reporting, which ended up being rolled up to Seb and Craig.


Teamwork:

- Ashley's network across Apple is top notch. She is able to bridge gaps between multiple teams easily. She has helped so many people across the organization. Here's a sampling of quotes: "She is a great resource for asking vague questions around roles and responsibilities in other departments." Said another, "When my team needed more info on Mac, she made sure we were tied into the right groups and meetings." And a third, "She helped me out of a bind in the middle of an exec escalation, helping us out of a bad situation. She setup a meeting between EPQ and the hatrack team to share the experiences the team had with using hatrack."

- She brings energy, perseverance, and enthusiasm to any project she works on. Said one person, "I have nothing but positive things to say about Ashley. She is a powerhouse, she's able to juggle things, and she's able to successfully push on others for results." Said another, "she pulls folks together well, is fun to work with, and gets stuff done. I hope she never loses that relentless follow-through - it's fantastic." A this said, "She brings huge energy to everything she does. It's no mean task to keep everyone on schedule during one of the busiest times I've seen at Apple."

- Ashley is increasingly become a mentor to people around the organization. She has helped Bhava improve his relationship skills. She has met with Mike's team to help craft their presentations. She's worked with Fei Zhao to increase her visibility and network. She met with Karen Yang and helped coach her through having a tough conversation about moving organizations. I appreciate how she takes the time to give to others, and they are deeply appreciative too.

- An area for improvement is there are sometimes where you may be pushing too hard. Said one, "the communication can be intense. For example, there will be a flurry of texts for low priority items. I would like to see her scale the communication urgency based on importance." There's a fine balance to strike here between

PL_PROD_12_4005

pushing to get things done (which is part of what makes you so successful), and overdoing it to the point of making someone numb to what's important.

- As you and I discussed, you had a strong reaction to a meeting that happened last year where an initiative you had worked on was discussed in a Dan staff meeting.  This resulted in a number of texts to a Dan direct, which caught him off guard, and some discussions with me where you expressed your disappointment that you felt like you were being undermined. You didn't have all the data at the time, and I felt you rushed to judgement.   When I gave you the feedback on that later, you had a hard time hearing it.  There's a couple of things I asked you to think about at the time.  One was just coming in and getting a sense from me of what happened.  Two is to sleep on it before sending off a number of texts.   And three is, when I gave you the feedback, I was coming from a place of trying to help you get better.  But your reaction at the time caused me to second guess how I give you feedback, and frankly, you lose opportunities to develop if I can't give you the best feedback I know how.  To your credit, after those difficult conversations, there has been nothing but positive engagements with you and the team, and we're in a good place.


## Goals and Development

Goals:
- Continue to build patience and composure skills.  As you said, "it's never been my strong suit.  I want to exude calm in moments of chaos, while still driving urgency where appropriate."   The good news is you're aware. Finding the balance here will make you even more effective.

- Use feedback on PSQ portal to drive changes where applicable.  We've delivered Phase 1.  To be really successful, we are going to have to find a way to make it feel alive and fresh with new content delivered periodically.

- Deliver a presentation on your time spent in Legal.  What can we learn from your experience there?

- Now that you're coming back and the PSQ portal load is lightening, it's time to start thinking about MSQ again. This is the year we develop the 'chief-of-staff' role.

- Continue to lead Women of PSQ.   It's a great initiative and it's important we continue it.

As always, here are our organizational objectives:

**Technical excellence & disciplined engineering depth** — help shape the organization to make it best-in-class, highly technical and innovative.  We should continuously rely on deep engineering science and tight integration with the design teams with the objective to identify and resolve product issues as early in the development process as possible.  Use a disciplined engineering approach and technical expertise to create and execute comprehensive yet targeted and prioritized validation plans, test stations & fixtures, compliance suites, failure analysis, etc.  Constantly hone your technical strength and gain necessary expertise through training.  Research and explore new technologies to bring world-class technical ideas and innovative methodologies to Apple, always keeping up with advancements in science.

**Crisp data** -- Maintain a high level of accuracy, reliability, and credibility in producing data  Our team should do more qualitative analysis of the data it produces (for instance, ensure we properly characterize customer impact). Add value by carefully reviewing all data before it's published or presented. Ensure repeatability of the tests and trouble shoot when we have data to present that is inconsistent with previous test runs/investigations.  Anticipate the next questions/tests/analysis the development team or executives would ask for to better characterize problems or narrow down issues.

**Project leadership** -- Drive cross-functional issues, influence project decisions, work with your HW and SW development counterparts, or push for faster resolution of issues. Drive to milestone & deadlines instead of reacting to them.

**Continuous improvement** -- That includes improving both our processes and test practices (e.g., increased use of automation). The objective is to keep increasing our efficiency and effectiveness so we can do more with less but as importantly, test more thoroughly to increase the integrity of our products.

**Fiscal responsibility** -- Care for the bottom-line. Understand ROIs before spending/investing Apple $$. Leverage

PL_PROD_12_4006

resources at the CMs or vendors (when confidentiality constraints allow it) so we limit our internal resource growth and keep the team as lean as possible.

**Flexibility** -- As managers and in our ever-changing environment, it continues to be important to remain flexible, participate in shaping the changes, and most importantly, show leadership in helping the team through the changes.

### Employee Comments from Self-Assessment

> What were your key achievements?

## Results

- Launched the new "PSQ Portal." Personally developed the design, layout, and information architecture. Personally created brand new content/portals in partnership with senior leadership, including: a new Innovation Portal, Community Portal and Work/Life Balance Portal. Drove project teams to complete the brand new PSQ New Hire Guide and PSQ Tools Managers pages. Partnered with selected ICs and Managers to craft their career stories in the new "How I Got Here Articles." Worked closely with Mark McCrackens team to ensure we utilized existing code/formatting where possible, and that they supported our versions of their existing content (for the HIGH articles). Was able to deliver projects on time by driving parallel paths, borrowing resources where needed, and descoping unnecessary features.
- Kicked off PSQ's Boomerang pilot. Built up leadership buy-in, created documentation, ensured clear & timely communication, and worked with the leadership team to identify hosting managers and IC selection criteria/process.
- Lead the Mac Factory SW Pre-Sub Testing Project, which enabled major improvements to BATS testing capabilities (infrastructure, coverage, automation, etc.) and implemented brand new Factory SW test suites to be run on all Nightly/BATS runs. After the implementation of these changes, starting seeing no 100% issues blocking factory builds.
- Lead the Stability Re-Think project and transformed whiteboard brainstorms into project plan with concrete deliverables. Project output was the "Minerva" tool, and became freestanding and manageable by Simon alone.
- Created Mac QA Assessment slide content for the cross-functional exec review, by meeting with dozens of teams over only a few weeks to gather QA summaries, gaps, risk, and next steps. Worked with x-functional leadership to vet and pre-flight. Project feedback was very positive, and inspired a request for iOS to do the same thing, modeling after my our format.
- Worked closely with Tashneem in the SWE Core Analytics team to identify major gaps in their Mac reporting tools, champion fixes and improvements, and influence x-funtional teams to greatly improve the way we gather and report internal Mac data — including personally influencing the software change that allowed internal LiveOn Gibraltar Mac units to now report panic data to PanicTracer/StabilityWeb for the first time.
- Continued to publish detailed, high quality Dan Status, requiring extensive research and consolidation of info. Identified redundancy for "A Look Ahead" and was able to eliminate the work on our side and instead utilize the work being done by a partner team. Identified redundancy with our MSQ Roadmap and was able to personally influence SWE PO, Core

PL_PROD_12_4007

OS, and HWE teams to create one shared roadmap. MSQ no longer needs to update anything and an use the work from the teams that own the data we need to view.

- Lead the high-level test strategy planning for the 2019 PRQ-Like programs.

## Innovation

- Identified gaps in the PSQ organization and proposed solutions as part of the PSQ Portal for a PSQ-wide New Hire Guide and a directory of PSQ Tools Managers. Pages are now complete, launched, and have a group of owners to maintain them.
- Presented at several Dan-staff meetings the last year around PSQ Portal and Boomerang. Shared process proposals, participated in debate, and ensured alignment on outcome and decisions were made.
- Represented HWE in the SWE Must Fix Task Force during SWE's Month of Test. Provided input based on my previous SWE roles and current MSQ role — helped shape strategy for Must Fix process and reporting — status from the small tiger team rolled up to Seb and Craig F.
- Launched new SRR and Test Plan phased email lists with core partners included (PSQ, SWE, HWE, etc), to ensure they are aware of planning phases and can provide input where applicable. In the first 1/2 of the year, expanded A Look Ahead and Roadmap to a new PSQ Mac Notify audience of key PSQ Mac stakeholders. Also added the new list in test plans, weekly status, and other core communications.
- Influenced SWE PO to launch new OTR process for GM SW of new HW.
- Represented PSQ in the Apple-wide Chat Services Evaluation initiative. Partnered with HWTE, SPG, SWE, and others to discuss chat service options — worked with Yuan to set up Mattermost for PSQ, and handed off to Viktor to launch. Facilitated electing a Slack DRI from the PSQ Tools Managers to ensure clear communication when the tool roles out.
- During the first half of the year, continued updating & publishing status reports for the MSQ Planning Dashboard, capturing all critical MSQ milestones and deliverables. In the 2nd 1/2 of the year, worked with Brian Reynolds to automate the tool, and then handed off to Jason to manage himself (reducing a telephone game).
- Launched the new "Hand Me Down HW" process to help address testing enablement gaps in our partner teams with HW we'd otherwise be scrapping.
- Consolidated my answers to numerous Disclosure, Secrecy, & Access questions from MSQ managers and employees into the new Disclosures, Secrecy, & Access page. Received sign off from NPS and SWE Secrecy on the document. Dan and I have now rolled the page out to all of PSQ, not just MSQ.

## Teamwork

- Partnered closely with with Dan directs the last six months, around PSQ Portal, Boomerang, and other topics. Have been working with the FDE leaders (on behalf of Dan) to identify their process/employee resources and merge with PSQ Confluence resources.
- Continued cross-functional meetings w/ regular 1:1s with PI Leadership (Dan, Charlene) PSQ leadership (Reed, Marin), SWE (Naresh, Deepa, Alison, Anthony), HR (Kay), & HWE (Bryan, Dustin).
- Several folks have reached out to me over the last year for some sort of mentorship. I've met with them as requested and worked with them to help them achieve their goals. I worked with Mike's team (Shrey, Olivier, & Karen) around their presentations. I'm working with Fei Zhao to increase her visibility and network. I've worked with Bhava Avula to improve his networking skills. I've worked with Guari Jog (Mergard's Pro-Workflow EPM) to help her understand Apple and build her network.

PL_PROD_12_4008

- Launched new CE Experience portal – created documentations, and implemented new process for all PSQ managers to follow. Spent weeks gathering data and input from PSQ stakeholders and CE program reps, analyzed and consolidated into pilot program website.
- After noticing a major knowledge gap in MSQ around any other teams in PSQ who test Mac (no one seemed to know they did other than Kai and Michael) — I asked Reed and Yuan to present Roadshows at Dave staff, explaining what their teams do. Presentations directly led to new partnerships and increased communication.
- Inspired team members involved in PSQ Portal projects to the greater goal and bigger picture, to increase motivation and energy around the project.
- Continued to serve as one of the leaders for Women of PSQ, and oversaw several large events. Personally argued for and implemented Women of PSQ Phase II, in partnership with Dan and Kay. Events are now more focused on women's experiences, but because of some hot topics, those events now require more HR oversight. Partnered closely with Kay and she has been excited about the new direction, despite the need for more feedback. Women of PSQ attendees to the new events (men and women) have expressed excitement about the new direction.

## > In what areas could you improve or develop?

- Continue to build patience & composure skills. It's never been my strong suit, but continue trying to make progress in that area. I want to exudes calm in moments of chaos, while still driving urgency where appropriate
- Continue to refine and polish executive presentation skills. My "Advocacy" class in Fall term should further develop persuasive speaking and writing skills.
- I've had a lot on my plate the last year and have often been lacking time, but I want to ensure I always make time to explain "why" when addressing issues or decisions, and being understanding when people come to me with issues or concerns
- I want to continue perfecting my meeting moderation skills – and finding the right balance between stopping rathole arguments and interrupting productive discussion.
- Improve at more quickly reconciling conflicting information and identifying and eliminating redundancy. "Statutory Analysis" class in Fall term should further develop detailed analysis skills.

## > What goals would you like to establish for the coming year?

- Use feedback on PSQ Portal to drive changes where applicable, and launch the final version of Phase I to the entire PSQ organization in July.
- Drive a successful Boomerang pilot program for PSQ.
- Design, develop, & drive a successful PSQ Expo program.
- During my Legal rotation, I want to ensure I perform to Alex's expectations of me in the role. I want to create a new network across Legal/GA organizations, and integrate with PSQ leadership where applicable. I want to deliver on all analysis, contract, & acquisition projects with high quality and accuracy.
- As part of the Legal rotation, drive the framework for AI/ML internal policy at Apple (my main project of the rotation).
- Use learning's from Legal to not only inform my future legal career, but also bring learnings back to PSQ/MSQ. I'm going to want to implement at least some sort of OSS, ML, & NDA training for the organization.
- Continue to lead Women of PSQ and create events and content that empower and educate the organization.

PL_PROD_12_4009

**G.**      <u>**EXHIBIT G: ANNUAL PERFORMANCE REVIEW (2020)**</u>

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 79 of 427

## Ashley Gjovik

## Last Review

Manager: **David Powers**          Effective: **Jun 1, 2020**

|  | **Manager's Rating** | **Self-Assessment** |
|---|---|---|
| **Teamwork** | **Exceeded expectations**<br>Performed above the high level expected of the role | **Exceeded expectations consistently** |
| **Innovation** | **Achieved expectations**<br>Performed at the high level expected of the role | **Achieved expectations consistently** |
| **Results** | **Achieved expectations**<br>Performed at the high level expected of the role | **Exceeded expectations consistently** |

## Performance and Accomplishments

- Ashley spent a portion of this review cycle doing an internship in Legal. She received high marks during that period of time. One person said, "Ashley was a Dem to work with last summer. She's a terrific team player who has a wonderful can-do attitude." In this situation, Ashley jumped into a new area, and was quickly able to drive discussions around AI/ML with engineering leads throughout the company. As stated, "This information continues to influence some of our internal AI/ML policies even today." I'm really glad Ashley got this opportunity, and she made the most of it.
- Ashley has run a number of PSQ projects over the past year, working with Dan and his staff to drive important initiatives. These include the SWE Boomerang for PSQ, which was a great experience for all involved, the Innovation Portal with John Basanese, and the HIGH articles that profile unique people throughout the organization. She has helped mold PSQ's culture, and we've gotten a lot of positive feedback about it. Said one person, "She worked me closely to make sure I found the right candidate. Then, she stayed engaged in making sure my resource had a

PL_PROD_12_5240

great experience within MSQ."

- In addition, within MSQ, she helped me with the MSQ management bench, bottom 5%, and succession planning.  She drives the projects I give her hard and with high quality.  As one person noted, "Ashley is a great resource to the team, jumping in where needed to fill process gaps, lead program initiatives, and help to provide overall organization."
- She also played an early role in ████ helping to drive program ramp-up, onboarding, and access.  She helped the people getting disclosed quickly get brought up to speed.
- Strong voice for diversity within the organization, and she has helped to influence my thinking.  She always tries to find opportunities to raise concerns and awareness around this issue.  It's a critical area where we all need to get better.
- She has helped senior leaders in my organization.  One person commented on how Ashley helped him get over the hump and build relationships with other senior leaders at Apple, which in turn helped his team become more visible.

## Goals and Development

- Drive onboarding, training, and continual education.  Seek out and drive technical deep dives for key technologies that the organization needs to understand.  Help wrangle documentation and resources for the organization based on what currently exists today.  Let's talk about this in more detail at review time.

- Continue to drive PSQ Innovation Portal.
- Drive the MSQ dashboard initiative - Phase 2.  We have gotten sloppy, and we've left a number of things on the table.  I'd like to see you come up with a proposal, and make our data analysis great (again).  This will include Radar updates, TSTT, and team level dashboards that can be consumed by our customers.
- Continue to work with me on MSQ-wide initiatives (all-hands, Dan initiatives, etc.)

Management expectations for the coming year:
https://confluence.sd.apple.com/display/PSQ/PSQ+Management+Expectations
https://confluence.sd.apple.com/display/PSQ/PSQ+Expectations+for+All+Employees

## Employee comments from Self-Assessment

Accomplishments

- Managed ████ program ramp-up, onboarding, access
- Managed MSQ mgmt bench, succession planning, bottom 5%
- Managed SWE Boomerang for PSQ; HWE Boomerang for PI

PL_PROD_12_5241

- Managed Innovation Portal Phase 2; Dan-staff ESAT projs
- Published HIGH articles, Hiring Guide, Learn More pages; PSQ Portal metrics; Legal ref
- Presented for MSQ @ the PSQ tech summit
- Led Women of PSQ events/comms
- Partnered w/ Legal for PSQ training
- Invited by Apple U Sr. Dir to lead a voting workgroup focusing on employees; suggestions sent to Deidre and she rolled out 2+
- Invited by Sr Dir, Joyce, to complete a rotation program within SW Products Legal:
  - Performed comprehensive research around the industry direction of AI social responsibility policy. Led conversations with cross-functional sr AI leaders. Synthesized findings and distilled best practices for ongoing policy discussions
    - Analyzed and reviewed the major service integration contracts underpinning Siri. Created quick-reference compliance guide now used by Legal, Eng, and Marketing teams
  - Researched IP-infringement complaint processes associated w/ the distro of digital assets. Synthesized research findings and learnings, and presented summ to Legal leaders. Became foundation for implementing new process within Eng & Legal teams
    - Performed a high-level research survey of the legal landscape for new AR-based technologies. Findings were used as a baseline for additional in-depth research conducted by In-House Counsel & in strategy discussions with Marketing and Eng teams
    - Reviewed all OS SLAs and some major app SLAs; offered proposals to increase clarity and reduce ambiguity. Proposals red-lined for future rev
    - Analyzed the standalone Shortcuts app SLA and developed proposals on how to merge terms into the the new iOS 13 SLA; proposals were implemented

Strengths

- Broadened skill set; strengthened existing skills
- Presented to execs across very different functions. Brought many teams together to achieve common goals & connect dots across numerous groups
- Developed new info/platforms/strategy which created new ongoing processes for teams inside & outside our org

Opportunities

- Missed lots from being sick this year; catching up on what I missed
- Look for ways to show extra empathy w/ current world issues; understand where people are coming from

Career Interest

- Continue to look for opps @ Apple with a legal/policy focus
- In the meantime, appreciate any projects that focus on strategy, comms, research, or implementing new policy (transferable to next phase of career)

PL_PROD_12_5242

**Employee comments in response to this review (optional)**

Per Review conversation there is a typo in the first bullet. "Dem" actually = "gem."

**Date Acknowledged:**   Oct 1, 2020

PL_PROD_12_5243

**H.**     **<u>EXHIBIT H: ANNUAL PERFORMANCE REVIEW (2021)</u>**

I.        **EXHIBIT I: TARA BUNCH RECOMMENDATION**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC     MAY 26 2026

August 23, 2017

To Whom It May Concern,

I enthusiastically recommend Ashley Henderson for admission to Santa Clara University Law School.  Over the past few years, I have had the opportunity to work closely with Ashley in my role as a Vice President at Apple Inc.  During this time, Ashley has demonstrated herself to be highly intelligent, intellectually curious, committed to excellence, and extremely hard working.

Ashley is a great communicator and collaborator, who works effectively in teams and as an individual contributor.  She is also a good listener who seeks out the opinions and viewpoints of others, and has the personal courage to contribute her thoughts and speak out on important issues.

I have no doubt that Ashley's fierce intellect and commitment to having a positive impact on the world around her will make her a formidable attorney.  As a graduate of Santa Clara University's MBA program in 1990, I can say without hesitation that Ashley possesses all the talent, intellectual horsepower, and dedication to make a meaningful contribution to your law school and the legal profession.  It is without reservation that I give her my highest recommendation.

Kind regards,

Tara Bunch
Vice President
Apple
1 Infinite Loop
MS 90-1AC
Cupertino, California 95014
408-476-8955

PL_PROD_12_3409

**J.**     <u>**EXHIBIT J: JOSH COHEN RECOMMENDATION**</u>

**Law School**
**University of California, Berkeley**
**Berkeley, CA 94720**
**May 30, 2021**

**Letter of Recommendation for Ashley Gjovik**

Ms. Ashley Gjovik has asked me to write in support of her applications for jobs in the fields of human rights and of public policy. I am delighted to write and wish to recommend her with very great enthusiasm.

I know Ms. Gjovik because we worked together on a few projects at Apple, with her in an Engineering Project Manager role. We have also discussed her program at Santa Clara Law School, her work on issues about exposures to environmental toxins, and her interests in human rights and public policy. So I know her well.

Gjovik is a remarkable person. She has managed (I am not sure how!) to hold down a position as Senior Engineering Project Manager at Apple (with excellent performance evaluations), while attending law school (at 75% time), and investigating and writing about environmental exposures. She does all this work at a very level of accomplishment. In the projects we worked on at Apple, she was an essential player, both because she kept us focused on moving the work forward step by step, made sure all the meetings stayed focused, and contributed greatly, with real insight, to the substance of our discussions. I had always appreciated project managers (as Michael Lewis says in *The Fifth Risk*, they are the ones who make things work, to the extent that they do work). But I had never really understood how essential they are to great projects until I observed Gjovik in action.

Gjovik is very much a self-starter, with a sharp analytical mind, a passionate commitment to doing the right thing, a capacity to work with great energy and to great effect, and a deep sense of personal responsibility. She is also a wonderful collaborator: she listens attentively, respects the insights and expertise of the people she is working with, and expresses, clearly and forthrightly, her own insights and ideas.

If I were hiring someone for an organization working on issues of human rights or on issues of public policy—including research, advocacy, and project management positions—Gjovik would be a top candidate. I recommend her with great enthusiasm and without any hesitation: she will be a fantastic colleague and make everyone's work better, more interesting, and more enjoyable. Please let me know if I can provide any additional information.


Sincerely,

*J Cohen*

Joshua Cohen
Faculty, Apple University
Distinguished Senior Fellow in Law, Philosophy, and Political Science, UC Berkeley
Editor, *Boston Review*
▮▮▮▮▮▮▮ joshua_cohen@apple.com

**K.**     **<u>EXHIBIT K: JOSH COHEN EMAILS</u>**

# Apple Chemical Exposure, Ethical Concerns

---

**From: Ashley Gjøvik <agjovik@icloud.com>**  Thu, Apr 15, 2021 at 2:55 PM EDT (GMT-04:00)
To: Josh Cohen <joshua_cohen@apple.com>
Cc: Ashley Gjovik <ashleygjovik@apple.com>

---

Hey Josh,

I wanted to raise an ethical concern to you — as you know I like to do when I see something that I feel is morally wrong. Two updates below, one work-specific general ethics concern & one personal as an Apple employee.

**Background**
I work on the "Triple Site" in Sunnyvale (Apple calls it "Stewart 1", but the EPA Superfund program calls it the Triple Site). Three gross, huge, 80's silicon groundwater plumes that all merged into one giant mega-plume. I'm in the TRW Microwave site — which has a long history of indoor air vapor intrusion (TCE, vinyl chloride, Chloroform, etc. — see map below) It had vapor intrusion above industrial max risk limits until at least 2014, with my desk being on one of the hot spots. They did a few small, quick indoor air tests in 2015 and that was the first time it ever came back ok (though was high for other new chemicals but they didn't count it for any good reason). After 2015, they never tested or monitored again until this year — they're going to do some indoor air testing at some point in 2021.

I had a near fainting spell in my lockdown in Sept 2019 — very much like what I had in my apartment last year. It was the only other time I felt something like that. I've raised it at work last week that I think it was more likely than not a reaction to vapor intrusion issues in our work building. I've been talking to EHS and ER about the building and my questions and concerns in detail. I can forward if you're interested in the specifics.

One thing they said, I thought you'd be very interested in. **EHS said Apple feels it has no obligation to disclose to employees if their workspace is on a Superfund site or other chemical release site**. 😳

*My building & lockdown:*












Etc. I have a whole Keynote of this stuff if you're interested.

———

**General Ethical Concerns**
This issue is not specific to my building. Apparently most Apple buildings are on chemical release sites. You can use the search tools on my website (https://www.ashleygjovik.com/research.html) under *Research* to check yourself, but a few screenshots at the bottom of this email so you can see just how bad it is. When I asked why they aren't telling employees — what EHS told me was that Apple did an internal review and decided it has no legal obligation to disclose anything about these release sites to employees. I immediately challenged them, what about a moral and ethical obligation? And he said it would be a much bigger discussion and didn't give me any step forward on it. You're always my step forward on this stuff. :)

Actually, I was sharing all this with Nadine and she's apparently preparing a presentation for Lisa right now about a new Env Justice type project Apple wants to lead and then when I told her what Apple's actually doing… she's like, uh oh. She's been doing more

PL_PROD_12_5003

research and is preparing to raise the issue to Lisa in some way. But its even more complicated. I found an article from 2016 where apparently Apple was breaking hazardous waste laws and settled with the state gov for half a million. Alisha (Nadine's manager) was quoted as saying that *"We've worked closely with [the Department of Toxic Substance Control] to ensure that going forward we have the proper permits for our current site. As we do with all our facilities, we followed our stringent set of health and safety standards, **which go well beyond legal requirements.**"* But when it comes to working on contaminated chemical release sites, apparently Apple's stance is to only do what is absolutely legally required. At least that's what they told me.

There are also practical concerns about this — that I raised with EHS as well. I asked, what happens if someone starts messing with one of the seals on the subslat vents because they don't know what it is (and in my building, literal Hades is beneath) — and he's like OMG DO NOT LET ANYONE DO THAT. And then I was like, what happens if people start feeling sick and it could be VI and they don't know that's happening and he's like OMG IF YOU SMELL ANYTHING WEIRD CALL US IMMEDIATELY. And I'm like, listen you fools, how is anyone supposed to know to do that if they don't even know it's remediation site. I mentioned that 2018 issue where TCE vapor intrusion flooded a Google building and no one knew it was a release site or even that the VI was occurring until something caught on days later and evacuated them. Google had encouraged any pregnant woman who were exposed to speak with their doctors. (Article here). Still no good response from EHS.

So. I would like to find a way to have that "larger conversation." And it sounds like it might actually be perfectly timed since Lisa wants Apple to come out publicly talking about "healthy communities" and other EJ topics. And Apple generally likes to have it own house in order before it tells anyone else what to do.

———

**Personal Concern**
This all started to unravel for me when a few weeks ago EHS emailed me & our mgmt team casually saying they wanted to do vapor intrusion testing in our office building. I had known my building was a Superfund for a few years. A coworker who grew up in Sunnyvale warned me that its' one of the most contaminated Superfund sites in the country. I've always tried to not drink the water there. I had mentioned the Superfund status to a few coworkers casually, but it really worried me that most people had no idea. So when the strange VI email came in — I decided to use it as an opportunity to inform folks. I replied asking if the testing was specific to our site, or if it was across all of Apple's chemical release sites and linked to a bunch of article & the Superfund EPA page for our building.

My manager got very upset about this. He gave me "employee feedback" about it. He said it was only a warning because I'm suffering from "mental health issues" (A couple weeks earlier I had told him I had PTSD from what happened last year). He then forbid me from speaking to anyone about my concerns or the sites Superfund status other than him and our Env, Health, & Safety team.

I raised this to employee relations and they told me I have no prohibition, can speak freely, and they're investigating him now… which is leading to them unearthing all of the crazy stuff these tech managers do to us in addition. So I'm preparing to need to find another job if necessary. I haven't gotten along with my manager for years anyway.

I told our senior director he either needs to move me under him or another director, or I'm going to look for another job at Apple or elsewhere. I'm supposed to talk to ER again next week as well. We'll see.

———

Here's some of the maps. And I'm OoO until next Wed — but happy to talk about this more earlier. I'm thinking about it A LOT. Emailing from personal email too since I'll be checking that if there's anything you want to do or know sooner than later.

-Ashley

# Re: Favor to ask: Moral Character Ref & Letter of Rec

From: Josh Cohen <joshua_cohen@apple.com>

To:     Ashley Gjovik <ashleygjovik@icloud.com>

Date:  Sunday, May 30th, 2021 at 3:39 PM

Letter written….check your messages….want to be sure I have the right statement about the positions you are exploring.

So sorry for the long delay.

> On May 30, 2021, at 9:57 AM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:
>
> Hi! :-D
>
> —
> **Ashley M. Gjøvik**
> Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
> *I'm not a lawyer and nothing I say should be considered legal advice.*
> https://www.linkedin.com/in/ashleygjovik/
> (415) 964-6272
>
>> On May 15, 2021, at 6:53 AM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:
>>
>> Hi! :)
>>
>> Based on the events last week… you clearly need an extension for that letter of recommendation… please feel free to add another week. And hang in there.
>>
>> In exciting (good) news — I had another article published!!
>>
>> **Elon Musk's "City-State" on Mars: An International Problem**
>> https://moderndiplomacy.eu/2021/05/15/elon-musks-city-state-on-mars-an-international-problem/
>>
>> —
>> **Ashley M. Gjøvik**
>> **Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022**
>> *I'm not a lawyer and nothing I say should be considered legal advice.*
>> https://www.linkedin.com/in/ashleygjovik/
>> (415) 964-6272
>>
>>> On May 5, 2021, at 9:47 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:
>>>
>>> It's ok! I can't even imagine what you're dealing with right now. You were so unconscionably busy even before all this.
>>>
>>> Thank you!!!!!! 😀 😀 😀 🙏🏼 🙏🏼 🙏🏼
>>>
>>> Let's say by end of day **Sunday 5/16**?

PL_PROD_12_6929

Safe travels, Josh! Hang in there.

Sent from my iPhone

> On May 5, 2021, at 9:40 PM, Josh Cohen <joshua_cohen@apple.com> wrote:
>
> Thx for the note and sorry to be so out of touch: things have really intensified. I guess that is what happen when things fall on the desk and nothing falls off.
>
> When do you need the letter by? If you give me a deadline, I will meet it….and feel ABSOLUTELY free to bug me if the deadline is fast approaching.
>
>
> Off to Cambridge tomorrow….
>
>
> Best, Josh
>
>
>
>> On May 5, 2021, at 9:27 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:
>>
>> Hi Josh!
>>
>> I hope you and Ellen are well, and your family as well. And hope work is calming down some.
>>
>> This is probably the worst time to ask — sorry — but any chance you are still willing/able to write the letter of recommendation for me, please? A recommendation coming from you would carry so much weight & mean so much to me!
>>
>> Things are getting increasingly complicated at work & I'm not expecting an outcome in my favor, so looking externally. I've been looking at the UN, EDF, NRDC, EarthJustice, HRW, Obama Foundation, etc. All sorts of amazing stuff.
>>
>> If you wouldn't mind, a letter would be ideal — but at the very least a paragraph I could add to my "select recommendations" (page 2 of my cover letter) would be incredibly helpful.
>> (Note: University of Hawai'i fell through — they wanted me there full-time and in person — so you won't need to worry about the letter of rec for the LSAC application now).
>>
>> Thank you!!
>> -Ashley
>>
>> P.S. I still have your paella cookbook sitting on my cookbook bookshelf. I may have drank your Txakoli & Verdejo though — I will need to replace those. :-D
>>
>> <Ashley Gjovik Resume.pdf>
>> <Ashley Gjovik Cover Letter.pdf>
>>
>> —
>> **Ashley M. Gjøvik**
>> Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
>> https://www.linkedin.com/in/ashleygjovik/
>> (415) 964-6272
>>
>>> On Jan 18, 2021, at 6:23 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

PL_PROD_12_6930

Wonderful! Thank you so much, Josh! :)

Btw, meant to tell you, I starting reading the Norton Intro to Philosophy over holiday break for some "light reading." The content was unsurprisingly complicated and deep, but the way ya'll wrote the book, it was shockingly easy to follow and digest. Nicely done.

I'm excited to get back to it after this term calms down!

This summer I'm only taking 5 credits, but doing a "virtual" summer abroad with Oxford. I gave up on the idea of flying to Geneva (or anywhere) before I graduate, but this sounds pretty great as an alternative. Either studying international refugee law or transitional justice for states recovering from authoritarianism and/or war. We're supposed to get 1:1 tutorials with the Oxford professors. Pretty cool.

— Ashley Gjøvik

> On Jan 18, 2021, at 5:43 PM, Josh Cohen <joshua_cohen@apple.com> wrote:
>
> Sounds great, and yes, happy to provide both.
>
> Great that you can go to Mercury News. I am very interested to see where this goes!
>
>> On Jan 18, 2021, at 12:01 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:
>>
>> Hi Josh!! Hope you're well.
>>
>> Favor to ask, if you're willing and have time.
>>
>> After what happened to me last year and what's going on in the world right now, I decided last year that I will actually take the bar and practice law. I also decided to follow my love of nature and beautiful places, my passion for Hawai'i, and my desire to help indigenous people and the environment. After I graduate in May 2022, I'll take the California bar, but then I'll also take the Hawai'i bar in Feb 2023 and practice law on the islands.
>>
>> It's a secret at work for now though! I still want those sweet, sweet engineering RSUs until I graduate — to pay off my tuition & fund the relocation. ;)
>>
>> I'm applying to University of Hawaii to take visiting (online) student classes Fall 2021 & Spring 2022. I'll study Hawaiian specific law with UoH while I finish up at Santa Clara Law.
>>
>> Would you be willing to be a Moral Character witness for my applications to the California and Hawaii bars? You'd just need to respond to an email and click a couple boxes on a form saying I have integrity. I figure after the last few months…. You're a good witness for that! :)
>>
>> I also need letters of recommendation for my U of Hawaii application. A reference from you would be golden, if you're willing. Something brief would be totally fine. If you're down, LSAC would send you an email and ask for it (due by end of April). And since you'd already be writing one, if you wouldn't mind sharing a copy with me, I'd appreciate it. I'm trying to get scholarships to reduce the tuition load — and again, a letter from you would carry a lot of weight.

PL_PROD_12_6931

Inbox • ashley.gjovik@protonmail.com • ProtonMail

No worries if you're too busy or don't want to — enormous thanks if you are! You know you and Ellen will always be welcome at my future beach house regardless. :)

<Gjovik Transcript.pdf>
<Ashley Gjovik Resume.pdf>

Also, P.S., I finally got the green light to contact Mercury News about my poisoning last year. Professor Glancy is reaching out to her environmental writer contacts over there and hopefully we'll get this moving along. I've been struggling with not warning my neighbors, so I will feel so much better when we can get this out there. Definitely retaining an Anti–SLAPP attorney though. I'd be surprised if Irvine doesn't come after me. We'll see. I'll let you know when the article goes out!

Thanks!!

— Ashley Gjøvik

PL_PROD_12_6932

**L.**     <u>**EXHIBIT L: FEEDBACK ABOUT DAVID POWERS (AUG. 2020)**</u>

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC     MAY 26 2026

**2020 - Dave Powers Feedback**

As always, Dave is generally a kind and inspiring leader. He can drive impressive results and innovation from his organization. He is diplomatic and is able to manage difficult personalities. He is constantly searching for technical meaning and progress. He cares about his team and wants to do right by them.

He has been compassionate and supportive while I've been sick. It's not lost on me that I tied up backfilling my role for several months while I was out, after previously interviewing elsewhere — and that he was still very supportive. And he was very supportive while I've been looking for my next adventure as well, and I was very impressed by how patient he was while I was trying to find the right role.

However, I still have all the concerns I had about him last year, and also new ones.

Dave is still prone to give ambiguous and ever changing instructions, often changing his mind about the direction of a project at a moments notice and sending us reeling. Dave will get so focused on something, he gets tunnel vision & leaves his team behind, often not including us or consulting us at times he should (and often failing to notify us of changes he made to our projects/responsibilities until awkwardly after the fact).

Dave still doesn't understand project mgmt or the role of an EPM/PM. We had very serious and in depth conversations about my role this year, and I provided much training about the different types of PM roles at Apple and proposals of how I think my role could be specialized to best benefit the org and the person in the role (me or someone else). I explained, in depth, why his current treatment of my role is deeply flawed. After about two months of these conversations, he admitted my current role is broken and would likely never be formally approved if we needed HR and exec vetting, but that the current version of my role is useful to & convenient for him, so he wants to keep it as is, even if I don't like it. After we reached that point, that is when I started interviewing for other roles. However, he later said that we stopped trying to refine my role *because* I started looking elsewhere, and completely blocked out the fact he definitively said he wants to keep my role the way it is and not change anything.

This hasn't gotten any better. In fact, last week, within the 2nd day of me being back he asked me to do things that were in violation of my modified return to work instructions from my doctor — apparently, this was because he doesn't really understand what "leading meetings" or "presenting" means — or at least that was his excuse. My return to work instructions asked that I not lead any real time meetings or present in real time (among other things) until 9/7. This is to avoid putting stress on my nervous system while it heals from the damage that occurred in the Winter & Spring. Last Friday, during Staff he asked me to present the slide deck he had me create that week and asked me to walk through all the slides and discuss & gather action items for team. I felt too embarrassed to tell him no during the meeting, but I sent him a note after reminding him of my restrictions and telling him that I was actually feeling quite sick that day and it was an active struggle to do what he asked me to. His excuse was that it never occurred to him that asking me to do those things counted as leading a meeting or presenting… but, to me, those definitions aren't easy to confuse, unless you're seriously unplugged.

PL_PROD_11_10128

**2020 - Dave Powers Feedback**

Dave is a terrible, awful project sponsor. In addition to never actually formally, personally introducing the request for new projects (his "why") or my role in leading them, his propensity to cancel projects mid-stream & then just as quickly re-upping them, and being constantly restless about the scope of projects — his communication about project changes is also haphazard and often leaves egg on the face of the PM (me). Over the last few years, he often informs his staff of a new direction like it was the original plan all along and leaves me out to dry after I previously communicated his earlier instructions (so it looks like I misunderstood, and he's correcting me). He also very quickly gives into his more difficult directs (Jason, Bhava, etc) when they push back on an aspect of a project they disagree with or that inconveniences them. I try to work with them directly to appeal to them (if I think it's worth doing my way), but they know they can quickly go around me, text him, and then Daves texts me to just do what they say (even if he also agrees my way was the better way). I've told him numerous times that it's a miracle any of the MSQ managers respect me at all considering that he never introduces me as a project leader, rarely gives me public credit for my leadership or success, when he changes his mind never explains when he's the one changing his mind, or never backs me when the difficult managers push back on requests. This situation is extra problematic when you consider I am the only female in his mgmt team (even though he frequently stresses I'm not actually a manager, unless and only if he wants to claim he has a female manager). So read the above again and instead of just thinking about it as his EPM, think about it as the only women in his staff (that he's constantly contradicting the woman, not giving credit to her, not supporting her when the men question her, frequently undermining her, and almost entirely only siding with the men on his team).

A recent example of this was when we were documenting MSQ succeeding planning & the mgmt bench. First Dave said we're doing succession planning, then succession & mgmt bench, then just mgmt bench — and then finally back to both. Each time, he contradicted previous communications I made without explaining it was him who was changing — so it looks like I didn't understand the ask, or I was communicating poorly. I was trying to inspire all the managers to think creatively about managers in other orgs for the succession planning, especially when some of them claimed to be irreplaceable (Jason, Bhava, Simon). Dave and I previously agreed they should think creatively about other orgs and not leave the succession path completely blank — but as soon as I pushed on those three, each of them reached out to Dave directly and then Dave texted me to tell me to just do what the say. When Jason pushed back, Dave texted me at like 8:30pm one night when he knew I was suffering from dizzy spells & palpitations (two days before I ended up in the ER) to tell me to do whatever Jason said and to not do anything more than coordinate the text for the slides. When Dave tries to silence my opinions and strategy, I feel like he sees me as an entry level project coordinator or even a glorified admin. This year, Legal had me a lead a the project that will create the foundation for AI ethics policy at Apple, and had me personally draft a company-wide compliance guide for Siri contract obligations. Josh asked me to lead a team to determine how Apple should address voting engagement for their employees, and the feedback was rolled to and out by Deidre. You had me lead the Boomerang rotation program for all of PSQ, and partner with you to lead it for PI. Dave — he asked me to collate text and reprimanded me if I tried to consult on the process (if any of the men on his team disagreed with my thoughts).

Dave also sometimes blames me for the fall out from his poor communication. And I mean, formally, like last years performance review. Two years ago, when he gave me two weeks to document the status of all Mac QA at Apple (which was an unreasonable timeline to begin with), he again failed to

Page 2 of 6

PL_PROD_11_10129

**2020 - Dave Powers Feedback**

introduce my role or his vision for the project. I was stuck explaining it to each partner team and trying to get them to buy in. This worked overall, except with Stability — because Dave kept wanting to downgrade their status to red or orange but had no data why and wouldn't tell them directly. When I had explained the project originally, they were on board and inputing data. But when I had to call them (McCracken & Myrick's teams) and explain that Dave wanted to turn them red and guess at his reasoning why (because he refused to give me a reason to share with them), they got upset and McCracken called Dave to complain. Somehow my annual review had an item blaming me for McCracken's team being upset for Dave turning them red and not explaining why. When I asked for clarification during my review, reminding him of the circumstances, he agreed it wasn't right but said he wasn't going to change it. It also noted another person who sent a nasty reply to the ask, but that person is well known for frequently, unfounded nasty replies and I had told Dave that at the time — but somehow that also ended up on my review and he didn't want to change it.

I've called him out on not giving me credit (and worse, giving the men credit for my work) numerous times, and as recently as last week. For my first project back from leave last week he asked me to prepare a MSQ roadshow deck for the SEG VP in just a few days. I was only working two days to start, but because he really wanted to be able to present the next Monday, I focused nearly entirely on that to make it happen for him. I put together the overall format and structure, a dozen slides introducing the org and showing photos of labs & automation, and I also incorporated some content from Jason, & got the managers to input data for their teams. During Staff, Dave introduced the slides they were all working on as "Jason's" slides — despite me having spent my first two days back in the office after four months off, working heads down on this critical slide deck for him. When I called him out on it after the meeting, and he had no real explanation why he did it, and said he'd think about it.

Dave still struggles to receive feedback, even though he says he wants it, he often snaps back or only hears the parts where he feels he's in the right, and then ignores the rest. As part of the EPM role conversation, we talked in depth about his propensity to change his mind, not communicate in a timely fashion, etc. and he told me it was on me to call him out when he does that. I told him I've had mixed luck with that in the past, and sometimes he just snaps and shuts me down. He said if he does that, I should call him out on that too. I believed he meant it, but didn't see that working out well. And indeed, even a week after that conversation it happened again… he was asking me why I wasn't at a MSQ automation meeting series and I explained I didn't think I was required since I had been focusing on PSQ communications & employee engagement and I have such limited time in the office, that I thought I could just focus on that. And he snapped something at me like "any meeting I invite you do, you need to consider yourself mandatory." And I tried reasoning with him again that the meeting didn't seem to have anything to do with me, and he said something akin to "I'm your manager, do what I say." But then after I attended that meeting the next week and told him again that nothing about it was relevant to what I was working on it, he was like, yeah you're right, you can be optional. So he got there eventually… but he was quite snappish at the beginning. If he puts the responsibility on me to call him out, he needs to temper his snapping. It's not fair for me to have to talk him down while also taking a lashing from him. Additionally, when he does react ok to feedback initially, it's common for him to later turn that feedback against me and make it feedback for me, not for him. More on that later.

PL_PROD_11_10130

**2020 - Dave Powers Feedback**

He also still struggles to be an "IC manager" with me, neglecting basic perks like team lunches or career celebrations (i.e. when I got my 5 year award this year, he gave it to me a month early during a staff meeting and didn't bother trying to get it out of the box, he just handed me the 1/2 opened box after a 15sec mention and then moved on). During my last review he printed it off and gave it to me and said do you have any questions… and I was like… don't you want to walk through the feedback?… and he's like, well this is what Dan does with me & we don't talk through it…. And I'm like, I'm an IC and you're a Director…. And he's like, ok, what do you want to talk about. (insert face palm emoji here).

Dave still struggles with security and confidentiality rules and procedure. Not only does he outright resist &/or forget it exists, but he still gives me criticism when I try to ensure we follow the rules provided from NPS, etc. This came up again last year with the issue I raised to you about Jane/Megan & the very secret project. I thought I got him back on the rails, but looking at my emails from when I was gone, he went back and did it again, despite explicit instructions from NPS to not do what he did. I've explained to him that EPMs are expected to always be the adults in the room, and that I will be held accountable for his actions around secrecy if I'm aware of what he's doing. He still pushes back on me and appears angry when I bring it up.

One of the biggest drivers for me looking for my next role, probably equal to the lack of role definition & focus, is how quickly he throws me under the bus with the MSQ managers & his PSQ peers. Last year, I briefly mentioned an incident with Reed and Dave's poor handling of it — but this event, despite me being disrespected by Reed & Dave, somehow ended up being a piece of feedback for *me* to improve on, including formally documented in my last annual review. Dave's handling of this issue was so backwards, I knew it wasn't good for my mental health to continue in this role any longer. I didn't want to have to go in depth on this, even when I was so mad last year, but I think I have to now…

> 1 -Background: I created a brand new program, on my own initiative, to address feedback identified in the Mac QA gaps slide deck we created for the VPs a while back. One of the biggest gaps causing field issues was that SW wasn't getting their HW allocations in a timely fashion and there was 1-2month gap after ship where they didn't have devices to test, while on the flip side MSQ was done testing and was actively scrapping the devices that SW needed. So I worked with these SW directors & senior directors and created a way for us to transfer the HW we'd otherwise be scrapping to the teams who need it the most (those teams specifically identified in that gap exercise — (Sarcone, McCracken, etc.) I shared the idea with Yuan, John, & Reed to see if they had extra HW they were scrapping that they could also share. Reed immediately took issue with the program for the sole reason that he wanted to upgrade his teams admin machines and thought he should take precedence over SW. I explained the catalyst for the program (real world field issues caused by lack of HW to test on), but he persisted that his team was more important (he admitted he was being selfish, but said he didn't care). We talked about this several times and I made it clear that my program wasn't for admin machines, it was to address QA gaps.

> 2- The Conflict: A couple weeks later, I'm sitting in MSQ Staff and hear Pete ask Dave something about this program and the "pass down from extended staff" and Dave tells him to send an email with the "new process." I'm like, hello, that's my program, what are you talking

PL_PROD_11_10131

**2020 - Dave Powers Feedback**

about? Dave informs me that at extended staff it was decided to prioritize PSQ admin machines before SW. I ask him point blank if Reed initiated that, and he said: yes. I was furious and I wanted to let Dave know. He's not great with interpersonal interactions or conflict— so I wanted to ensure he understood how upset I was about the situation, so it stuck with him. I check my facts first…. I asked another person to confirm that Dave did say it was Reed, and they confirmed. I asked another person, sharing the whole story, if I should be so mad at Reed & Dave, and they're like omg yes. So I talked to Dave. I told him Reed purposely undermined me and he supported him in doing so. I told him he should have handled Reed's request by saying something like "Well that's Ashley's project and she's not here, so let's talk to her after the meeting." At the VERY LEAST, I told Dave he should have directly informed me of what happened instead of having a passing conversation with Pete in front of me. During this first conversation, Dave took all this feedback and apologized.  I also texted Reed and let him know I just heard what happened, and asked him to please not go behind my back and if he wants to provide input on my projects, to please work with me directly or at least wait until I'm in the room. Reed just claimed to be updating the SW on his phone and turned off his iMessage with me for like 2 weeks (I think he blocked me?)

3- The Aftermath: The next week, Dave told me Reed complained to him that I confronted Reed on what Reed did. At this point, Dave went into protective mode and completely threw me under the bus. He told me I should never confront his peers, and that I didn't even have the data and Reed wasn't the one who said anything at that meeting. I told Dave that he told me directly Reed was the one, and at least one other person heard him say that — but then he snapped at me and told me he never said that. Then he started (mis-)quoting a Women of PSQ speaker at me and told me that if I had slept on it and woke up the next morning before acting, that I wouldn't be upset anymore. He said I was being too emotional, and if I has stopped to think I wouldn't have been aggressive towards Reed. I told him that 1) it was offensive he's using loaded gender terminology on me (emotional, aggressive) 2) if he was trying to appeal to me as a woman by quoting a woman giving advice, he missed it by misrepresenting her message 3) he's getting the situation backwards — the only reason we were talking about this was because I was so deeply offended and felt so dis-respected by him & Reed, but now somehow this is turning into feedback on me.

4- Beating a Dead Horse: My "inability to control my emotions" & my "attack on Reed" became continuous feedback points during my mid-year reviews and a few other convos. The first few times I became so upset (because I felt even more unseen and unheard, since Dave completely ignored my initial feedback and then turned it against me) that I would start to getting really sad when he brought it up. One of these times, I had just gotten back from the doctor and my feet were actively bleeding after a surgery and I had to prop them up on a chair while we were talking to control the bleeding (and he knew that)— and he still decided to dig into this again… and I lost it, and started crying. Then he started saying that I can't take feedback (based solely on this pt). So the next few times I'd just stare at a spot on a wall behind him and try to zone out and not respond at all in hopes he'd drop it, but then he started saying I wasn't listening and I still can't take feedback. He also decided to use these convos to stress to me that if any of his peers in PSQ or other orgs disrespect me, that I should never stand up for myself and I should only bring it to him to decide if I should be upset and if so he'll decide what we should do to address it, and he'll be the one to address

Page 5 of 6

PL_PROD_11_10132

**2020 - Dave Powers Feedback**

it. Like, I don't know how to underline how offensive this was. I hope it's clear by the plain meaning of the text and doesn't even need an explanation. And again, this becomes even more atrocious when you consider I'm the only women in MSQ mgmt, and one of the only women in the PSQ "managers." Being told you're not allowed to stand up for yourself if the men do or say anything disrespectful to you, seems like its probably on one of those "things not to do" trainings HR does on gender discrimination. And this issue wasn't a one time thing…. John did something quite offensive & manipulative last January, and Dave told me I wasn't even allowed to tell anyone what he did (let alone talk to him about it).

Page 6 of 6

PL_PROD_11_10133

As always, Dave is generally a kind and inspiring leader. He can drive impressive results and innovation from his organization. He is diplomatic and is able to manage difficult personalities. He is constantly searching for technical meaning and progress. He cares about his team and wants to do right by them.

He has been compassionate and supportive while I've been sick. It's not lost on me that I tied up backfilling my role for several months while I was out, after previously interviewing elsewhere — and that he was still very supportive. And he was very supportive while I've been looking for my next adventure as well, and I was very impressed by how patient he was while I was trying to find the right role.

However, I still have all the concerns I had about him last year, and also new ones.

Dave is still prone to give ambiguous and ever changing instructions, often changing his mind about the direction of a project at a moments notice and sending us reeling. Dave will get so focused on something, he gets tunnel vision & leaves his team behind, often not including us or consulting us at times he should (and often failing to notify us of changes he made to our projects/responsibilities until awkwardly after the fact).

Dave still doesn't understand project mgmt or the role of an EPM/PM. We had very serious and in depth conversations about my role this year, and I provided much training about the different types of PM roles at Apple and proposals of how I think my role could be specialized to best benefit the org and the person in the role (me or someone else). I explained, in depth, why his current treatment of my role is deeply flawed. After about two months of these conversations, he admitted my current role is broken and would likely never be formally approved if we needed HR and exec vetting, but that the current version of my role is useful to & convenient for him, so he wants to keep it as is, even if I don't like it. After we reached that point, that is when I started interviewing for other roles. However, he later said that we stopped trying to refine my role "because" I started looking elsewhere, and completely blocked out the fact he definitively said he wants to keep my role the way it is and not change anything.

This hasn't gotten any better. In fact, last week, within the 2nd day of me being back he asked me to do things that were in violation of my modified return to work instructions from my doctor — apparently, this was because he doesn't really understand what "leading meetings" or "presenting" means — or at least that was his excuse. My return to work instructions asked that I not lead any real time meetings or present in real time (among other things) until 9/7. This is to avoid putting stress on my nervous system while it heals from the damage that occurred in the Winter & Spring. Last Friday, during Staff he asked me to present the slide deck he had me create that week and asked me to walk through all the slides and discuss & gather action items for team. I felt too embarrassed to tell him no during the meeting, but I sent him a note after reminding him of my restrictions and telling him that I was actually feeling quite sick that day and it was an active struggle to do what he asked me to. His excuse was that it never occurred to him that asking me to do those things counted as leading a meeting or presenting... but, to me, those definitions aren't easy to confuse, unless you're seriously unplugged.

# 2020 Powers Feedback

Pages Document - 462 KB

## Information

| Created | Tuesday, July 28, 2020 at 5:05 PM |
|---|---|
| Modified | Monday, August 3, 2020 at 1:52 PM |
| Last opened | Today, 3:18 PM |

PL_PROD_11_08189

**M.**      <u>**EXHIBIT M: DAN WEST TEXT MESSAGES – OCT. 13 2020**</u>

Ooooh good

It's literally what I told the team - our time is valuable. If you need to know who to mentor, this is the list

Are they though?

well, it's only been a month

It will happen

I'm confident in it

You told them to mentor the URM/ladies on mgmt bench & succ planning in like March I thought

No. The succession planning stuff took a long time to pull together for everyone

Ah

Everyone hasn't finished presenting either

Also - task assignment comes from that

Oh yeah, that's great

Btw, I can tell you have Powers some of my feedback this year. Sorry it was such a rant, ive been struggling with him. But I could the the difference immediately. He started actually thanking me for my work (instead of randomly thanking men), and taking accountability for stuff that was his fault — all the stuff I called out.

He is a really good guy, he can just be oblivious sometimes

I guess that's the Duffy message too… you need to have leaders who care deeply and hold their mgmt team accountable and steer them in the right direction… if not, the whole org goes off the rails

was jumping into another meeting - re:DP. Good to hear. I think you two are hot and cold

sometimes it's wonderful other times it's near the end of the world

I dont know if I'd ever call it wonderful

PL_PROD_12_6797

that's something both of you need to figure out how to regulate

oh...when you were detoxing you loved him

Yes, that's your comment about how its better than the other places

When I get really upset with him, I still try to remind myself of SWE

But that's not a great card to have to pull out to cope

that said, we can be better

and it's what we should strive for

good, better, best
never let me rest
until my good is better
and my better best

Continuous impromvent, on tech and humans

Whoa, that's so type A my god

my catholic upbring

it's a saint's prayer...I forget which – saint jude maybe?

No wonder Catholics are so haunted

anyway – It resonated with me from day 1

If I'm ever allowed to have an office again, I may actually put that in a frame in there

Haha

It does have a nice ring to it

the fact that I have it memorized is interesting

the things that stick with you from childhood...

Yeah!!

PL_PROD_12_6798

Maybe a tattoo for you

btw – I say this with care…your feedback is insanely long

it makes it far less likely to be used

I know, I'm sorry. I wrote it as an exit interview / therapy session.

lol

I felt bad, but I also wanted to document all the reasons I was about to leave the org

I just want you to be effective

so take it with the intent it is given

I def recognized it was too long and you'd think it was too long, the next step will me actually not doing that anymore

there is also the mark twain quote

I'm sorry this letter is so long, I did not have the time

something like that

basically, editing to the essence takes time

yeah. And honestly with Dave, im still so hurt by some of the stuff he's done, it was hard to stare it all the face long enough to distill

I'm glad you're seeing improvement

But I know my long emails are not isolated to reviews… so feedback taken

Yeah, he listens. He usually forgets really quickly after, but he at least listens. Hopefully sticks longer this time.

fwiw – the thing I hang my hat on with many if I'm convinced by the intent

Oh I would have full on quit MSQ/Apple/etc a long time ago if I thought he actually had bad intent

Ive never seen him do anything purposefully negative

PL_PROD_12_6799

**N.** **<u>EXHIBIT N: FEEDBACK ABOUT DAVID POWERS TO EMPLOYEE RELATIONS (2021)</u>**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC     MAY 26 2026

# Fwd: Wrap up call today

**Exhibit L**
**Okpo, E.**
04/07/26
@ aptus.

**From: Ashley Gjovik <ashleygjovik@apple.com>**                    Wed, Jul 28, 2021 at 6:42 PM EDT (GMT-04:00)
To: Ekelemchi Okpo <eokpo@apple.com>

Went on leave from 5/24-6/4

Jenna called 6/3 to tell me she finished and didn't find any issues. She never contacted me after 5/23 until she completed on 6/3. There were zero follow up questions from anything I sent her on 5/20-5/22.

June 3-10 below — clear to me Jenna didn't look into most of the stuff I sent her.

—
**Ashley M. Gjøvik**
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☏ (408) 204-9976

> Begin forwarded message:
>
> **From:** Ashley Gjovik <ashleygjovik@apple.com>
> **Subject: Re: Wrap up call today**
> **Date:** June 10, 2021 at 11:33:33 AM PDT
> **To:** Jenna Waibel <jwaibel@apple.com>
>
> Also if you still haven't read it, I implore you to read the 2020 feedback I gave Dan about Dave. Again, I asked Dan a few months ago about it and what's he's done to follow up. Dan told me he read it but thought it "wasn't actionable" and that I was just "hot & cold" about Dave (essentially, "emotional").
>
> I literally mentioned gender discrimination and sexism in the feedback, multiple times.
>
> —
> **Ashley M. Gjøvik**
> ☐ Engineering Program Manager
> ✦ Mac Systems Quality Strategic Planning & Communications
> ✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
> ☏ (408) 204-9976
>
>> On Jun 10, 2021, at 11:17 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
>>
>> Heads up in case you want to follow up on this at all before we talk — I just had my first 1:1 with Dave after being out.
>>
>> Dave made it clear he doesn't think he did anything wrong at all, related to managing me or his interactions with me. He also said he didn't get any coaching.

He definitely steering the conversation to insinuate that I was making baseless claims. He did encourage me to escalate issues to ER whenever I think I need too — but then again, mentioned that the focus is now just on me changing myself so I can continue to do my job.

I was clear with him that the concerns raised were about gender discrimination, sexism, and hostile work env — and that I think he and Dan have perpetrated those things. I also told him I expected, based on my convo with you last week, there would be changes to his behavior based on the "coaching" you mentioned, but he said none of that happened. I told him I'm very concerned.

I also asked him about Stewart 1 & safety (that I don't feel it's safe to return to that building) — but he said if EHS said it's safe, I have to come back. I told him again my concerns about EHS and the history of the building, and the lack of testing. After asking him numerous times, he finally agreed to ask Helen if there's another building I can work in.

I asked him if we can request that I fully work remotely and he said "that's not a thing." I told him it is, it's even on the remote FAQs, and that I might meet the rare exception because my job doesn't actually require me to be on site at all. He fought it a bunch but then after I asked a bunch of times he said he'd ask Helen about that too.

He seemed very unhappy about the last two weeks and our call today. I'm expecting my work relations with him to now get even more unpleasant.

-Ashley

—

**Ashley M. Gjøvik**
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

> On Jun 8, 2021, at 2:34 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
>
> Hi Jenna,
>
> That sounds good. Thank you.
>
> —
>
> **Ashley M. Gjøvik**
> ☐ Engineering Program Manager
> ✦ Mac Systems Quality Strategic Planning & Communications
> ✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
> ☎ (408) 204-9976
>
>> On Jun 8, 2021, at 1:27 PM, Jenna Waibel <jwaibel@apple.com> wrote:
>>
>> Hi Ashley,
>>
>> I'd like to set up time for us to discuss a few of these concerns, and options you have to address them. I'll put some time on the calendar to meet again later this week.
>>
>> **Jenna Waibel**
>>
>> ☐ Corporate Employee Relations
>> 510-396-7823 mobile
>> jwaibel@apple.com

This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication

is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

On Jun 3, 2021, at 4:16 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Jenna,

It was good to hear that based on the concerns I raised and the evidence I provided, that there was employee coaching provided to Dan West, David Powers, and some of the men on the MSQ Mgmt team (you didn't provide names). It was also good to hear that employee coaching will be provided ongoing for Dave and Dan related to my concerns. I also appreciate you offering to look into any future issues related to this that rise to retaliation against me or violations of company policy.

As mentioned on the phone call today, and documenting here, I do disagree with some of the findings. I do feel like some of the issues should have been considered violations of policy. I also feel like some issues were not properly investigated (including my 2020 feedback about Dave that I sent to Dan, of which you had no memory today of one of the most egregious statements). I also feel like the investigation into Rob Yepez's behavior towards me was closed prematurely — as he told me some very specific things that would have been independently verifiable (i.e. he told me he chartered a private plane in Santorini to fly out himself and a women he was cheating on his wife with after missing their planned flight, etc. — how else would I know that if he wasn't talking to me about how he cheats on his wife). However, I understand that you said the investigation is closed and you will not talk to me about any of these specific issues going forward.

Similarly, I don't feel like my concerns about workplace safety in Stewart 1 (aka the TRW Microwave Superfund site) were adequately investigated (no testing) or resolved (EHS & y'all also said you wouldn't answer any more of my questions about that either).

As you directed, I'll plan to return to work virtually on Monday with the status quo of my role and reporting structure, and no changes to my role, responsibilities, relationship with Dave or Dan, or anything else. As you directed, I'll reach out to Helen once "I've had time to process this" and work with her to help me figure out a "path forward." As mentioned, I'm not sure what Helen would do or what that means.

I raised my ongoing concerns about workplace safety with Dave and Dan before this two weeks off and I'll continue to work with them to identify a way I can "return to work" in September without having to put my health at risk. I also hope EHS will go forward with testing the indoor air in my office, despite their last statement that they might not now (despite years of indoor air vapor intrusion above max EPA industrial limits, and the latest tests showing Ethylbenzene and Tolulene above max EPA industrial limits), and no explanation provided by EHS why they'd decide not to do the testing after previously saying they would do it — other than me pointing out gaps and open questions about the history of the building and Apple's oversight of it). I'm also talking to the Federal EPA about this concurrently.

Thanks again for the two weeks off.

-Ashley

—

**Ashley M. Gjøvik**
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Jun 3, 2021, at 2:42 PM, Jenna Waibel <jwaibel@apple.com> wrote:

Hi Ashley,

Thank you for raising your concerns and for your cooperation in this investigation. As we discussed, Apple takes employee concerns seriously and I have completed a thorough investigation. As part of my process, I reviewed the information and documentation you provided me. I also spoke to others who had information relevant to the investigation.

PL-PRD-8-0101

Though I could not confirm that violation of Apple policies occurred, Apple has taken appropriate action to address the findings of the investigation.

If, in the future, you have any new concerns and/or experience behavior you feel is retaliatory, please contact your Helen or myself immediately.

Best,


**Jenna Waibel**

☐ Corporate Employee Relations
510-396-7823 mobile
jwaibel@apple.com


This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED.  If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

## Attachments

- 2020 Dave Feedback.eml
- Screen Shot 2021-06-10 at 11.32.45 AM.png
- 2020 Powers Feedback.pdf

PL-PRD-8-0102

**O.**     **EXHIBIT O: EPA COMPLAINT**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC      MAY 26 2026

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 114 of 427

ECHO Gov Login    Contact Us

> Your report has been successfully sent. Your confirmation is below.

# Report Environmental Violations - Submitted

Thank you for submitting information on a possible environmental violation. The information will be reviewed by EPA enforcement personnel.

This notice will be the only response you will receive regarding your submission. Due to the sensitive manner in which enforcement information must be managed by EPA, we cannot provide status reports or updates regarding any submission we receive through the Report Environmental Violations form.

Back to Report Environmental Violations page

# Report Confirmation

| | |
|---|---|
| **Received** | Aug 29, 2021 at 4:44pm EDT |
| | |
| **Your Name** | Ashley Gjovik |
| **Your Email** | ashleymgjovik@protonmail.com |
| **Your Phone Number** | 4159646272 |
| | |
| **Suspected Violator's Name *** | Apple Inc |
| **Suspected Violation Location *** | 825 Stewart Drive |

PL_PROD_11_05703

| | |
|---|---|
| **Suspected Violation City \*** | Sunnyvale |
| **Suspected Violation State \*** | California |
| **Suspected Violation ZIP Code \*** | 94086 |
| **Responsible Party** | Company |
| | |
| **Is the suspected violation still occurring?** | Yes |
| **Date of Incident** | |
| **Characterized incident as:** | |
| **Intention \*** | Intentional |
| **Violation Method \*** | Falsified |
| **Affected Subject(s)** | Air, Worker, Documents |
| | |

PL_PROD_11_05704

| | |
|---|---|
| **Violation Description *** | As reported to the EPA Superfund site community contact (Margot PerezSullivan), I've had concerns since March 2021 about Apple's oversight & lack of due diligence for the safety of their employees in the TRW Microwave Superfund site (825 Stewart). I've expressed concerns about negligence and even recklessness, possible violations of Right to Know & OSHA. Worse, Apple's response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site (e.g. cracks in the cement floor requiring repair). Apple has frequently told me they refuse to answer any of my questions about safety or the site, and even pressured me into requesting an ADA accommodation request to work remotely to not be exposed to the chemicals at the site, after pressuring me to file a worker's comp claim for a fainting spell I had in 2019, which I believe to be caused by vapor intrusion. Apple has refused to test the indoor air for vapor intrusion until after they seal the cracks, despite the last testing being done in 2015 and was limited (10hrs) and the only time the results ever came back without vapor intrusion above max EPA industrial limits (there was a long history of toxic indoor air vapor intrusion in the building). Further, Northrup Grumman is the responsible party and their ex-CEO/President, Ronald Sugar, is now on the Board of Directors of Apple & the Chair of the Finance & Audit committee. I can provide documentation for all of the above. I reported my concerns about conflicts of interest to Apple. I've also filed DOL OSHA Whistleblower retaliation complaints, and claims with the EEOC, NLRB, & CA DEFH. |
| **File(s) Uploaded** | No files uploaded. |
| | |

LAST UPDATED ON AUGUST 19, 2021

DATA REFRESH INFORMATION

PL_PROD_11_05705

**P.**      <u>**EXHIBIT P: EMAIL WITH ER (JULY 28 2021)**</u>

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC      MAY 26 2026

# Fwd: Ashley:Ekelemchi - 7/29 Notes

**From:** Ashley Gjovik <ashleygjovik@apple.com>                    Fri, Jul 30, 2021 at 12:42 AM EDT (GMT-04:00)
To: Ashley Gjovik <ashleygjovik@icloud.com>

—

**Ashley M. Gjøvik**
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

Begin forwarded message:

**From:** Ashley Gjovik <ashleygjovik@apple.com>
**Subject: Ashley:Ekelemchi - 7/29 Notes**
**Date:** July 29, 2021 at 9:39:35 PM PDT
**To:** "Ekelemchi Okpo (ER)" <eokpo@apple.com>
**Cc:** "Antonio Lagares (ER)" <alagares@apple.com>

Hi!

Added additional files per today's discussion here: https://apple.ent.box.com/folder/142254763453

I think I got everything we discussed as outstanding — let me know if I had any to-dos I didn't capture.

Also, I found a bunch of super weird texts between me and Dan I forgot about from March & April and added them into that folder. He was fully aware I was traumatized and also in physical danger — he was giving me recommendations about guns/knives vs home surveillance. In context its slightly less weird, but this spring he did also text me at one point "you're nasty af."

Talk to you monday!

——

**UPDATED**

**Spanking (Seat at the Table Panel)**

Date: 5/8/2018

Found the full Dan/John panel discussion with the Ashley/spanking bit, but it also included more. I uploaded the full video.

I included feedback notes that Monu, Kai & I sent including:

- Dan West made fun of Yannick's eyesight
- John disrespected someone's size & posture (his example of the guy who's really good when he's presenting, but doesn't seem like it before hand)
- John suggested people hug people who are honest
- Dan told a story when he was supposed to present on something but Yannick switched him out and had Dan's direct present instead — and Dan said he was mad until Yannick told him that Apple will probably get sued about whatever it was and that the direct can take the fall instead of Dan
- And then the spanking (around min 39)

**Ashley is not Confidential Garbage**



Time stamp was  Sept 27 2019 & added to folder

**Matchmaking**

Dan's daughter Allison took me to Stanford on May 29, 2020. Told me the family talks about the match making / pimping thing.

Dinner was on Dec 28th 2017. Texts with Dan were Dec 30th 2017.

**Unbutton His Shirt**

Date: Nov 10, 2020 10am-12pm

1:1 w/ Dan After, Nov 17 2020

**IN PROGRESS**

**Fleas**

On more note on Dan and I need to find documentation of it — he on several occasions responded to me giving him feedback that upset him with, "I guess sometimes when you invite dogs on the couch you get fleas."

**Dan asking us to delete videos**

I asked the new leads of the women's group to look for this email where Dan asked us to delete the videos, like the panel above. I don't have it in my mail, so I think it's in the shared box for the group I don't have access to anymore.

**2x Workers Comp**

Planning to file the workers comp claims for 2017 peanut poisoning & pertussis next week — didn't have time today.

**Listening Sessions**

I'll send that intro next week to Scott.

**John Rant**

Will upload full kickoff video.

**Ashley:Ekelemchi**
Scheduled: Jul 29, 2021 at 2:00 PM to 3:30 PM, CDT
Location: Virtual Conference One-Time Room
Invitees: Ekelemchi Okpo, Ashley Gjovik
----( Virtual Conference One-Time Room )----
[One-Time Room]

PL_PROD_12_0065

**Ashley M. Gjøvik**
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

---

**Ashley M. Gjøvik**
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

PL_PROD_12_0066

**Q.** <u>**EXHIBIT Q: EMAIL TO ER (JULY 29 2021)**</u>

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

# Re: Notes from our Friday call

**Exhibit Z**

Okpo, E.
04/07/26

@ aptus.

---

**From: Ashley Gjovik <ashleygjovik@apple.com>**                    Thu, Jul 29, 2021 at 8:18 PM EDT (GMT-04:00)
To: Ekelemchi Okpo (ER) <eokpo@apple.com>
Cc: Antonio Lagares (ER) <alagares@apple.com>

---

Hi guys,

I talked to Ekelemchi about Jenna's investigation at length today. As I've mentioned before, there are numerous areas I have reason to believe she didn't investigate at all. I forwarded several emails to Ekelemchi along with a timeline I find very suspicious for a quick resolution with no follow up questions from Jenna.

What I'd like to ask from y'all after you two chat, is for ER to provide me a list of the items which Jenna investigated and closed out finding there were "no Apple policy violations" and no action would be taken. I think we should get this from Jenna before Ekelemchi and I complete this pre-discovery phase — since if there's things she didn't close out, I want to ensure Ekelemchi looks at those — and it's very unclear what she did or did not actually investigate.

There was so much terrible stuff that happened to me at Apple and continues to happen to me — I think it will help everyone during litigation if we can draw a clear line of what events Apple has already closed investigation into (Jenna's round) and which things Ekelemchi will be investigating (which I know I still in progress) — and then the closure of each of Ekelemchi's items as well with outcomes. Ideally if we can also sort by area of law, it will help me route to the different lawyers (labor, ADA, FMLA, employment discrimination, whistleblower, toxic tort, etc).

When you send over the list of Jenna's items that she closed I'd also appreciate you noting whether or not she looked into my concerns about work place safety at the Superfund office and if so if she also closed that as an ER investigation as well (since she was so heavily involved in the communication of those conversations, and facilitated all dialogue between me & EHS, and I sent her numerous emails expressing my deep concerns and asking for help).

Thanks!

—

Ashley M. Gjøvik
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Jul 28, 2021, at 4:00 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

As I mentioned to you in today's meeting — I told Jenna on 4/27 that I had many other issues at Apple & with my team. **Jenna never addressed either of these notes verbally or in writing.**

*Me to Jenna, 4/27:*

**"My tenure at Apple has been full of horrors. I could give you a list of hundreds of things to look into."**

**"if I am not fulfilling Apple's expectations by holding back on other concerns I have about my time at Apple, or Dave, or other sexual harassment issues from coworkers — we're going to need A LOT more time."**

—

Ashley M. Gjøvik
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

Begin forwarded message:

**From:** Ashley Gjovik <ashleygjovik@apple.com>
**Subject: Re: Notes from our Friday call**
**Date:** April 29, 2021 at 5:24:55 PM PDT
**To:** Jenna Waibel <jwaibel@apple.com>

Quick update -

Talked to Dan West today (my bosses boss). He will not move me out from under Dave. He will not move me under him (Dan), or John, or anyone else. He says he doesn't want anymore re-orgs.

My choices are either I stay under Dave (I told him I cannot do this) or I leave the organization or Apple completely. He says he understood this likely means I will leave Apple.

Dan said when I leave, the role will likely be recycled into a standard Engineer or Manager role, and the PSQ EPM role will be dissolved.

No timeline was set.

—

**Ashley M. Gjøvik**
☐ Engineering Program Manager
(408) 204-9976

On Apr 27, 2021, at 6:57 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Jenna,

Thanks for the notes! Clarifications inline. Wrote in your view (you/me) for ease of translation inline, but of course not putting words in your mouth. Please fix as needed.

—

**Ashley M. Gjøvik**
☐ Engineering Program Manager
(408) 204-9976

On Apr 27, 2021, at 4:56 PM, Jenna Waibel <jwaibel@apple.com> wrote:

Hi Ashley,

Thank you for your time on Friday. As I explained, Apple takes your concerns seriously and I am the person from Employee Relations who will look into the issues you raised. In our conversation, I explained that my role is that of an objective fact-finder as I conduct the investigation into your concerns.

This email summarizes my understanding of the issues you raised. During our meeting, you stated that it is detrimental to your mental health to continue to report to Dave Powers, your current supervisor. You also have a concern about being sexually harassed by a Director in the Software organization. The points that you believe support both concerns are summarized below:

I'd like to state that the original reason I reached out to ER was because of comments Dave made to me in my 1:1 with him several weeks ago related to the TRW Microwave EPA Superfund site (aka our office building Stewart 1). I've captured my concerns in separate emails. I know you already talked to him — but I'd like the formal list of concerns to reflect that was the original and primary concern. I also let Dan know that was my primary concern on 4/9 and he also said he would talk to you about it.

<PastedGraphic-1.png>

Concerns related to Dave:

**R.**     <u>**EXHIBIT R: EMAIL WITH OKPO (8/20/21)**</u>

64

**Exhibit FF**
Okpo, E.
04/07/26
 aptus.



**From:** **Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: Welcome and Prep Work | AU Race & Justice
**Date:** August 20, 2021 at 12:05 PM
**To:** Ekelemchi Okpo (ER) eokpo@apple.com

Hello,

I continue to struggle to understand just how this current leave is not punishment, retaliation, or otherwise a negative employment action.

P.S. I should get you the updated Issue Confirm before Monday. It's taken a lot of time to sort through and make sense of.

—
Ashley M. Gjøvik
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Aug 20, 2021, at 8:55 AM, Ekelemchi Okpo <eokpo@apple.com> wrote:

Hi Ashley-

Thank you for reaching out. Given that you are on leave, you will need to reschedule and attend a session in the future.


Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.


On Aug 19, 2021, at 1:12 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi,

I hope you're well.

Yesterday you wrote, *"As we previously discussed, you are not expected to participate in any work related assignments while I conduct a thorough and objective investigation into the concerns you've raised."*

I was previously invited & registered for this course with Apple University. I was & am very excited to attend. The coursework actually directly complements my current studies at Oxford. Becuase this course is voluntary and not a "work related assignment" — can you please reply and let me know if I'm allowed to attend? The first class is next Tuesday 8/24 and then continues weekly for a several weeks.

I checked with Professors Cohen & Stout last night and they said they are still happy to have me in the course and can confirm that with you if needed. They asked me to confirm directly with you that I can attend though first, as they said they do not want my attendance to invite any sort of disciplinary action.

Thanks,
-Ashley

—
Ashley M. Gjøvik
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

Begin forwarded message:

**From:** Josh Cohen <joshua_cohen@apple.com>
**Subject: Welcome and Prep Work | AU Race & Justice**

PL-PRD-8-0161

**Date:** August 11, 2021 at 6:01:42 PM PDT
**To:** Joshua Cohen <joshua_cohen@apple.com>

Hello,

Welcome to Apple University's *Race and Justice in the United States: A Third Reconstruction?* This course explores the longstanding tensions between the promise of multiracial democracy in the United States and the realities of racial injustice.

Our first session is on **Tuesday, August 24 at 1:05 PM** hosted in Webex, you'll find details for joining in your calendar invite.

Before the first session, please be sure to read:

- **Read** *A Third Reconstruction?* (ePUB/PDF attached below — around 90 mins)
- **Review the historical timeline** (PDF attached below — around 30 mins)

The course is open to all employees; no prior knowledge on the topic of race and justice is needed. The course reading, *A Third Reconstruction?,* therefore provides essential background for the course, and the timeline should serve as a resource that you can refer back to for orientation.

As you can imagine, *Race and Justice in the United States* will address topics that are emotionally, intellectually, and morally demanding. We are going to try to address them directly and frankly. So it will be important to approach the class with an open mind, sense of humility, and willingness to be challenged (and to challenge).

**IMPORTANT**: If you can no longer attend **all four sessions**, please return to our website, find the session under My Invitations, then click Drop. Reply to this email to let us know if you'd like to be invited to the course at a later date.

We care about having a learning environment that is designed for everyone. If you require any assistance to participate, please contact us.

Please let us know if you have any questions.

**We look forward to seeing you in class.**

All best, Josh and Noelle

Click to Download
Timeline (2).pdf
364 KB

Click to Download
A Third Reconstruction_ (1).pdf
59.6 MB

Click to Download
A Third Reconstruction_ (1).epub
26.9 MB

PL-PRD-8-0162

# Re: Welcome and Prep Work | AU Race & Justice

---

**From: Ashley Gjovik <ashleygjovik@apple.com>**    Wed, Aug 18, 2021 at 6:50 PM EDT (GMT-04:00)
To: Josh Cohen <joshua_cohen@apple.com>; Noelle Stout <noelle_stout@apple.com>

---

Hi Folks,

At this point I'm sure you're fully aware of why I'd need to ask this… (sorry for all the drama, but I really hope I can drive some clearly well needed change at this company — I still care deeply about Apple and just want it to do better for itself & all of us).

Anyhow, I was seriously looking forward to these AU sessions!!! I'd love to still attend if you'd let me. Last I heard from my ER investigator just now he is only saying I don't need to  "participate in any work related assignments" while I'm on this leave. (If you've been following my Twitter, you'll understand the journey it took to get to that statement today… ) I think these classes would be allowed then, since it's not an assignment!

But I also don't want to cause drama and distract your other students, and I understand that's entirely possible if I attend. Maybe I could call in the background under a phone number or something so they don't see my name? Or video in but wear a fake mustache? Ugh. I was REALLY looking forward to this. Nadine said it was a phenomenal series.

Hope you're both well. Worst case, maybe you'd be willing to share the materials and I'll study on my own. It became quite clear a couple weeks ago that I'm not going to be allowed to come back to Apple after this leave…. Otherwise I'd say put me on the list for the next round.

Thank you both for everything you do.

I'm at ashleygjovik@icloud.com & 415-964-6272 if you want to chat about any of this outside the "workplace." I'm still doing FaceTimes and calls & stuff with lady coworkers I connected with before the embargo. There is so much interest in trying to give us more of a voice and also brainstorming how to drive change in the industry and within these walls. We all really care about Apple and each other and in true Apple employee fashion, are instinctively trying to collaborate together to address issues & innovate, even in the fact of adversity. We really do hire the best people, usually.

Best,
-Ashley

—

**Ashley M. Gjøvik**
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

> On Aug 11, 2021, at 6:01 PM, Josh Cohen <joshua_cohen@apple.com> wrote:
>
> Hello,
>
> Welcome to Apple University's **Race and Justice in the United States: A Third Reconstruction?** This course explores the longstanding tensions between the promise of multiracial democracy in the United States and the realities of racial injustice.
>
> Our first session is on **Tuesday, August 24 at 1:05 PM** hosted in Webex, you'll find details for joining in your calendar invite.
>
> Before the first session, please be sure to read:
>
> * **Read *A Third Reconstruction?*** (ePUB/PDF attached below — around 90 mins)
> * **Review the historical timeline** (PDF attached below — around 30 mins)
>
> The course is open to all employees; no prior knowledge on the topic of race and justice is needed. The course reading, *A Third Reconstruction?,* therefore provides essential background for the course, and the timeline should serve as a resource that you can refer back to for orientation.

PL_PROD_11_07089

As you can imagine, *Race and Justice in the United States* will address topics that are emotionally, intellectually, and morally demanding. We are going to try to address them directly and frankly. So it will be important to approach the class with an open mind, sense of humility, and willingness to be challenged (and to challenge).

**IMPORTANT**: If you can no longer attend **all four sessions**, please return to our website, find the session under My Invitations, then click Drop. Reply to this email to let us know if you'd like to be invited to the course at a later date.

We care about having a learning environment that is designed for everyone. If you require any assistance to participate, please contact us.

Please let us know if you have any questions.

**We look forward to seeing you in class.**

All best, Josh and Noelle

### Click to Download
Timeline (2).pdf
364 KB

### Click to Download
A Third Reconstruction_ (1).pdf
59.6 MB

### Click to Download
A Third Reconstruction_ (1).epub
26.9 MB

PL_PROD_11_07090



**From:** **Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: Welcome and Prep Work | AU Race & Justice
**Date:** August 19, 2021 at 11:18 AM
**To:** Josh Cohen joshua_cohen@apple.com
**Cc:** Noelle Stout noelle_stout@apple.com

Thank you very much, Josh. It is really great to hear from you too and I am very grateful for the continued invitation for this course. It is a very well needed area of study & discussion, and I am thrilled to participate.

I just emailed Apple employee relations (attached) and asked for him to expressly confirm I am able to attend. I'll forward his response to you for your records.



Fwd/ Welcome and Pr...Justice

Also, confirmed, I have no plans to and promise I will not, Tweet or otherwise share anything that happens in this course. You have my word. (I guess this is something I'm probably going to have to get used to confirming for the rest of my life now. 🤣 😭)

Appreciate you both, so much.

-Ashley

—

Ashley M. Gjøvik
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Aug 18, 2021, at 7:59 PM, Josh Cohen <joshua_cohen@apple.com> wrote:

Many thanks for the note, Ashley. Good to hear from you and good to hear that you will be able to attend the class. We are not worried about distraction: the topic commands people's attention.

Two thoughts to add:

1. Could you go back to the ER person and  nail down more explicitly that the conditions of the leave permit you to attend? Tell him that we are happy to have you in the course (we are glad to confirm that, should he want confirmation). We do not want the occasion of your attendance to provide some cause of action.

2. We know this goes without saying, but….nothing that happens in the class can end up online, even if someone says (improbably enough): "Professors Cohen and Stout…..how could you have let that Ashley attend this class!" What starts in the class stays in the class. As we said: goes without saying, but given all that has been happening, we feel it important to add this.

Hope that the ER guy does not raise any issues. If he does, let us know. Otherwise, see you soon.

Best, Josh and Noelle

On Aug 18, 2021, at 3:50 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Folks,

At this point I'm sure you're fully aware of why I'd need to ask this… (sorry for all the drama, but I really hope I can drive some clearly well needed change at this company — I still care deeply about Apple and just want it to do better for itself & all of us).

Anyhow, I was seriously looking forward to these AU sessions!!! I'd love to still attend if you'd let me. Last I heard from my ER investigator just now he is only saying I don't need to  "participate in any work related assignments" while I'm on this leave. (If you've been following my Twitter, you'll understand the journey it took to get to that statement today… ) I think these classes would be allowed then, since it's not an assignment!

But I also don't want to cause drama and distract your other students, and I understand that's entirely possible if I attend. Maybe I could call in the background under a phone number or something so they don't see my name? Or video in but wear a fake mustache? Ugh. I was REALLY looking forward to this. Nadine said it was a phenomenal series.

Hope you're both well. Worst case, maybe you'd be willing to share the materials and I'll study on my own. It became quite clear a couple weeks ago that I'm not going to be allowed to come back to Apple after this leave…. Otherwise I'd say put me on the list for the next round.

Thank you both for everything you do.

I'm at ashleygjovik@icloud.com & 415-964-6272 if you want to chat about any of this outside the "workplace." I'm still doing FaceTimes and calls & stuff with lady coworkers I connected with before the embargo. There is so much interest in trying to give us more of a voice and also brainstorming how to drive change in the industry and within these walls. We all really care about Apple and each other and in true Apple employee fashion, are instinctively trying to collaborate together to address issues & innovate, even in the fact of adversity. We really do hire the best people, usually.

Best,
-Ashley

—
Ashley M. Gjøvik
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Aug 11, 2021, at 6:01 PM, Josh Cohen <joshua_cohen@apple.com> wrote:

Hello,

Welcome to Apple University's ***Race and Justice in the United States: A Third Reconstruction?*** This course explores the longstanding tensions between the promise of multiracial democracy in the United States and the realities of racial injustice.

Our first session is on **Tuesday, August 24 at 1:05 PM** hosted in Webex, you'll find details for joining in your calendar invite.

Before the first session, please be sure to read:

- **Read *A Third Reconstruction?*** (ePUB/PDF attached below — around 90 mins)
- **Review the historical timeline** (PDF attached below — around 30 mins)

The course is open to all employees; no prior knowledge on the topic of race and justice is needed. The course reading, *A Third Reconstruction?,* therefore provides essential background for the course, and the timeline should serve as a resource that you can refer back to for orientation.

As you can imagine, *Race and Justice in the United States* will address topics that are emotionally, intellectually, and morally demanding. We are going to try to address them directly and frankly. So it will be important to approach the class with an open mind, sense of humility, and willingness to be challenged (and to challenge).

**IMPORTANT**: If you can no longer attend **all four sessions**, please return to our website, find the session under My Invitations, then click Drop. Reply to this email to let us know if you'd like to be invited to the course at a later date.

We care about having a learning environment that is designed for everyone. If you require any assistance to participate, please contact us.

Please let us know if you have any questions.

**We look forward to seeing you in class.**

All best, Josh and Noelle

Click to Download

Timeline (2).pdf

364 KB

Click to Download

A Third Reconstruction_ (1).pdf

59.6 MB

Click to Download

A Third Reconstruction_ (1).epub

26.9 MB

PL_PROD_11_04790

**S.**    <u>**EXHIBIT S: SLACK THREAD (JULY 28 2021)**</u>

From: **Ashley Gjovik** ashleygjovik@apple.com
Subject: Slack ER Chain
Date: July 28, 2021 at 2:46 PM
To: Ekelemchi Okpo eokpo@apple.com
Cc: Antonio Lagares (ER) alagares@apple.com



**Exhibit A**
**Okpo, E.**
04/07/26
aptus.

Hi,

The Slack chain we talked about yesterday & today: https://a1391194.slack.com/archives/CK1KDPQCF/p1627328464228400

Not even including DMs….

I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation — who has received no real help from HR or ER in resolving the issue. (Yes I know you're looking into things now — but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing).

There seems to be a growing group of us with very horrific stories to tell , who have tried to tell these stories, and have gotten no where at Apple.

As mentioned before, this is incredibly disappointing and unacceptable to me. Not just for my own situation — but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect. Pretends seems to be the important word there.

-Ashley

**Thread** #women-in-swe☺

 Added to your saved items

**Ashley Gjøvik** Jul 26th at 12:41 PM
I just read this article and I have a lot of thoughts. I know this is a sensitive area, but I'm wondering if this is a topic that might be benefici
discuss, at least for those of us that have tried to go through the employee relations process here, or know folks who have.

https://www.washingtonpost.com/technology/2021/07/23/amazon-gender-discrimination-investigation/

Do we think Apple does a sufficient job at handling employees complaints about discrimination? Do we feel comfortable even reporting
issues?

This group did an amazing job at essentially the first version of an Apple letter after the Craig promotion email reckoning that led to what
appears to be some major reforms and in at least communication and training in SWE. However, I can say personally I've had some awful
discriminatory experiences within both software engineering and hardware engineering in my six year tenure of this company. Hostile wc
environment, harassment, and just general, deeply engrained sexist cultures. I can also say that the culture not only seems to have
supported/supports bad behavior, but I felt much pressure to never go to Human Resources resources or employee relations about any o

I'm finally talking to employee relations now. But this is the second round, after the first round was essentially pages 128, 134, & 139 Sar
Cooper's "How to be Successful without Hurting Men's Feelings." They finally gave it some effort only after I escalated and sent some cho
words about the apparent disconnect between what Apple pretends to care about and what they actually do when faced with complaints

Again I know this is a very sensitive area, so if you want to chime in feel free to use the "I have a friend who…." approach. I'm also starting
this conversation here because y'all are so incredibly thoughtful about these types of things and willing to debate different sides of difficu
topics, and seemed to have had the most success with an internal reckoning. But I'm also wondering if this would be an important questic
for those with disabilities, subject to racial discrimination, etc. I suspect Apple has a variety of different culture issues depending on the
teams and locations, and I'm not sure if employee complaints might be handled differently depending. (edited)

3 files ▾





😢 18   THANK YOU 9   🙂

41 replies

🔖 Added to your saved items

**Ashley Gjøvik**  2 days ago

**Thread**  #women-in-swe∞

41 replies

🔖 Added to your saved items

**Ashley Gjøvik**  2 days ago
P.S. if this ends up hitting too close to home and we want a more private forum to discuss, maybe those who want the freedom to discu detail can do a Signal group chat or something. I'm kinda hoping my story is an outlier here, but I'm afraid it's not.

**Barbara Pitts**  2 days ago
I think there are a lot of problems with the current escalation process. I tried to escalate something that was being swept under the rug employee comments that were racist and racially insensitive, it wasn't happening directly to me but basically the options for resolving th issue we were given seemed ridiculous and not entirely helpful. I've also found it is highly dependent on the attitude of the manager tha approach, and many managers are NOT properly trained on how to handle it

💯 10   ‼️ 3   😢 1   👆 1   🙂

**Barbara Pitts**  2 days ago
Also I've heard a few stories of bullying and downright harassment in other orgs outside of SWE, not so much to that extent with anyor work with but the victims are afraid to say ANYTHING to anyone with authority for fear of retaliation. There have been multiple HR complaints about specific people and said person still acting in their role as a hostile manager etc. it's extremely unfortunate and it drive CRAZY. I don't know what I / we can do other than to continue being vocal when we see something that is wrong.

THIS 4   ➕ 1   💔 1   🙂

**Bri Chapman**  2 days ago
I think it's hard to address this topic generally because so much varies on a case-by-case basis. Cases I've brought forward were general handled, and were resolved. While I do wish I never had any problems to begin with, I also am cognizant that these changes take time a there is also a part of me that feels pride in taking a part in paving the way for others.

I will say that I've had more difficulty escalating things on behalf of others, which I think is unfortunate but also sort of fair. A lot of time when I am operating in that space, the information I have is hearsay so I can see why folks would wait to have a firsthand account befor making a move.

💯 3   🙂

🔖 Added to your saved items

**Ashley Gjøvik**  2 days ago
I'm in HWE and I'm now raising concerns about retaliation, based on raising concerns about retaliation, based on raising concerns abou sexism. The culture of impunity has crushed me enough to kick off the convo now. I hate it. (edited)

😢 10   🙂

**Barbara Pitts**  2 days ago
Not being able to escalate on behalf of others is a HUGE concern that I have.

🔼 9   🙂

**Barbara Pitts**  2 days ago
"We can't do anything unless said person comes forward themselves" is essentially what I have been told. Which is frustrating because

💙   👍   💯   🙂   🔖

More act

**Thread**  #women-in-swe∞

  

**Barbara Pitts**  2 days ago
Not being able to escalate on behalf of others is a HUGE concern that I have.

🔼 9   🙂

**Barbara Pitts**  2 days ago
"We can't do anything unless said person comes forward themselves" is essentially what I have been told. Which is frustrating because I extremely secure in my job and if other people don't they shouldn't be forced to go on record when there is someone already willing to c forward for them.

➕ 11   😑 1   ➕1 1   🙂

**Bri Chapman**  2 days ago

 yeah I hear you @Barbara Pitts . I also see both sides of that -- I think there is a lot of context that can be missing when folks escalate on behalf of others. When people don't act immediately on those reports, I tend to see it as waiting for more context to determine a right action, rather than not believing that it's a real problem that needs a resolution.

👍 1   😊⁺

🔖 Added to your saved items

 **Ashley Gjøvik**  2 days ago
Totally, Barbara! The other thing I've noticed is even coming forward yourself, they want to talk to witnesses, and then you're having to r people to come forward who may not be comfortable speaking up or could be in shitty teams were they know they'll be retaliated upon they speak up.

👎 1   THIS 5   😊⁺

 **Allie Cassidy**  2 days ago
I have a friend who is totally not me, that did experience harassment and bullying at Apple, some years back now. This was from their the new manager who had acquired their org and, by coincidence I'm sure, had only two women in their extensive org. Almost immediately, t trouble started.

That person didn't receive support from their management chain because said manager was a high-achiever who was "going places", so s chose to leave Apple but instead, got taken on by another org who have since been incredible. She basically had to rebuild her career fro the ground up. It felt easier than reporting the issue and risking retaliation and burning their career, based on that original feedback from their leadership.

The followup. Once that person did get safely distant, a situation came up which led to her relating the incidents to a member of the Peo team. This was over six months later. That HR rep *did* take it seriously, there *was* a followup investigation, and the harassing individual no longer works at Apple. Faith somewhat restored.

tl;dr - harassment certainly does happen and our leadership isn't always supportive or understanding. However the People team are, and they absolutely took this seriously.

This was outside SWE, by the way, and over 5 years ago now.  (edited)

9   😊⁺

 **Barbara Pitts**  2 days ago
I think what also leads to distrust in the process is that rarely are we told what the "resolution" is.

∧ 10   😊⁺

**Thread**  #women-in-swe∞

🔖 Added to your saved items
 **Ashley Gjøvik**  2 days ago
My first sham of an employee relations investigation ended with them telling me "actions were taken." But when I pried further, there wa actual resolution or actions because no Apple "policies" were violated. After some intense questioning from me on that rationale, I am no fairly certain that what they meant by Apple's "policies" are "would I survive a summary judgment motion if I sue Apple about it." And the had said there would be some informal coaching, but when I questioned them on what that was, apparently it was nothing.

Maybe there's a difference between escalating to leadership, to HR, and then to ER. But I got so disheartened between this, and the sim awful response to my raising concerns about workplace safety issues, I'm over it. I'm realizing if I don't speak out, if we don't speak out, nothing may ever change. (edited)

SAME 1   😊⁺

 **Rebecca Taylor**  2 days ago
I've been in AppleCare, SWE, and AIML and have witnessed and experienced a range of bullying, harassment, retaliation, and even illegal behavior. Never once has there been any kind of outcome where I felt heard and all of the perpetrators are still at Apple.

Edit: I feel odd calling co-workers perpetrators so I'm not sure what the best verbiage is. Also, to be clear this has happened over a 9-yea tenure at Apple and 99% of my interactions with my colleagues has been wonderful and meaningful. (edited)

😱 1   🥰 8   😢 2   🧸 1   😊⁺

 **Allie Cassidy**  2 days ago
@Ashley Gjovik absolutely on the witness issue. Chances are, they're in the same team or same org, and are aware the same will happen them if they stick their heads up. So, many choose to remain silent.

∧ 3   😊⁺

🔖 Added to your saved items

PL-PRD-8-0028

 **Ashley Gjøvik** 1 day ago
I wonder what we could do that might cause action to address some of the gaps we've seen?

 **Srivani Pinneli** 1 day ago
I feel like we really need a forum or a committee where we can go and talk about these issues while maintaining the confidentiality! This really help people who are hesitant to speak up!

 💙 7

 **Bryan Henry** 1 day ago

this is a great thread and it is much appreciated. i am here as an ally so im here to learn and "listen". I can contribute to this from persona
and exp from others who have confided in me. It seems in certain roles, individuals who have experienced discrimination from other
employees, felt like there was no action performed. For example, one stated they were discriminated against with a hate term and the
manager did nothing!

many employees feel that utilizing the peoples team is a waste of time bc the result is either "action has been performed" or not enough
information.

maybe its who I am, bc if I communicate with the Peoples team, i am very clear on the situation and am very adamant about protecting n
only myself but also protecting others that have been wrong.

I am currently in applecare and our members are exposed to customers as well who are discriminate however I and a few others have pu
together an initiative that was implemented a year ago to help protect our advisors and allow the ability to release the call.

now we if can employ the same thinking within our orgs, we can move in the right direction

**Thread**  #women-in-swe⊕

 **Bryan Henry** 1 day ago
this is a great thread and it is much appreciated. i am here as an ally so im here to learn and "listen". I can contribute to this from personal
and exp from others who have confided in me. It seems in certain roles, individuals who have experienced discrimination from other
employees, felt like there was no action performed. For example, one stated they were discriminated against with a hate term and the
manager did nothing!

many employees feel that utilizing the peoples team is a waste of time bc the result is either "action has been performed" or not enough
information.

maybe its who I am, bc if I communicate with the Peoples team, i am very clear on the situation and am very adamant about protecting n
only myself but also protecting others that have been wrong.

I am currently in applecare and our members are exposed to customers as well who are discriminate however I and a few others have pu
together an initiative that was implemented a year ago to help protect our advisors and allow the ability to release the call.

now we if can employ the same thinking within our orgs, we can move in the right direction.

 1   2

 **Gowri Somanath** 1 day ago
For those in engineering orgs, we wouldn't have calls recorded, nor can we record confidential meetings or talks. Thats where some of th
problem starts - there is not always direct evidence that someone is discriminative or passive aggressive. If other co-workers, esp
management, are not willing to corroborate then its even harder.

I wonder if each team should have an anonymous mailbox where people can write about such incidents - like a suggestion box. Every so
often at the team all-hands these should be read out loud. This brings in some level of protection if there is fear of retaliation and lack of
trust to discuss with anyone in management.
I feel sometimes bringing the incident out in the open can help people be more sensitive, or fear that their actions are not going un-notic
If the anonymous mail box is implemented throughout Apple then its easier to trust that its actually anonymous (maybe)!

 2

🔖 Added to your saved items
 **Ashley Gjøvik** 1 day ago
Not being able to record calls/meetings/1:1s is a big issue when everything seems to become he said/she said. I'm in the middle of an ER
investigation right now and asked them to ask the persons investigated to put everything in writing (no verbal private convos) until the
investigation completes, because some peculiar things have been said but denied later, but they said no. I'm like, why not, unless you kno
these guys are going to say inappropriate things and it makes it harder for you to ignore me when it's in writing?

 **Bryan Henry** 1 day ago
one thing ive learned is that sadly we cannot take people at face value and require documentation of some sort. When I assisted others a
submitted concerns, it was always documented and dated. Alot has come back in my life without that bc I trusted people to do the right

**T.    EXHIBIT T: OKPO EMAILS (9/3/2021-9/7/2021)**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

| | |
|---|---|
| **Subject:** | Re: Meeting Request |
| **From:** | "Ekelemchi Okpo" [Redacted] |
| **Received(Date):** | Thu, 09 Sep 2021 17:30:25 +0000 |
| **To:** | "Ashley Gjovik" [Redacted] |
| **Date:** | Thu, 09 Sep 2021 17:30:25 +0000 |

Ashley-

As I said in my email on September 7, there are inconsistencies that have come up in the investigation. Since you have declined to speak with me, I will move forward based on the information I have.


Best,

Ekelemchi Okpo

Corporate Employee Relations

[Redacted]

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Sep 7, 2021, at 8:45 PM, Ashley Gjovik [Redacted] wrote:

Hi Ekelemchi!

Happy belated Labor Day! I hope you're well.

**I. Updates in writing**

My previous email requested that we please keep future conversations in writing (9/3: "I'd like to request that we please keep our exchanges in writing.")Will you please send me your updates / questions in writing? Or are you refusing my request? If refusing my request, can you please document your justification for doing so?

I feel like you're implicitly denying my request otherwise — and because you're an attorney and you're in an adversarial position to me, if you are denying my request, I'd also like to request if there is there an appeal process (business conduct maybe?) to review my request to keep communications in writing?

APL-GAELG_00001135

## II. I'm also awaiting your reply about my review

 I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4 and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

## III. I'm also waiting your reply about the safety of my workplace

Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will not answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

Thanks!

-Ashley

P.S. Not sure if you've heard yet, maybe they didn't tell you - but I found Superior Court for the State of California for the County of Santa Clara Case 18CV330796 (2018) & 18CV330922 (2019) with for the NOTICE OF SETTLEMENT OF ENTIRE CASE for Retaliation, Failure to take Reasonable Steps to Investigate, Failure to take Reasonable Steps to Prevent Retaliation, Constructive Termination in Violation of Public Policy, & Intentional Infliction of Emotional Distress against Apple Inc, Dan West, and Employee Relations. Please feel free to respond now….otherwise we'll def address this later.

—

**Ashley M. Gjøvik**

   Engineering Program Manager

* Mac Systems Quality Strategic Planning & Communications

APL-GAELG_00001136

\* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

\*\* [ Redacted ]

On Sep 7, 2021, at 5:42 PM, Ekelemchi Okpo [ Redacted ] wrote:

Ashley-

Thank you for your email.

Based on interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information.

Please let me know when you have availability to connect tomorrow or later this week.


Best,

Ekelemchi Okpo
Corporate Employee Relations

[ Redacted ]

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Sep 3, 2021, at 4:10 PM, Ashley Gjøvik [ Redacted ] wrote:

Hi Ekelemchi. I hope you're well.

As mentioned, I'm not actively checking messages on work devices on this indefinite leave situation, so the 2hr notice of your text wasn't enough. (At 8:36am you texted me "Hi Ashley, Good morning. I will like to schedule time for us to connect today at 10:30am PT via WebEx for an update. Will this time with for you? Thank you.") As mentioned, please send email to my personal address if you need a quick response.

<PastedGraphic-1.png>

I'd like to request that we please keep our exchanges in writing. If you are going to require a call or video meeting, I'm requesting that you grant me permission to record it.

As I've complained previously, there have been frequent misrepresentations of my verbal

conversations with my managers, with Human Resources, and with Employee Relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've heard from other employees in similar situations, this appears to be a pattern by Apple's HR & ER teams to misrepresent and mischaracterize, likely to intimidate & retaliate — and I won't allow you to do continue doing this to me.

I didn't want to dignify the mis-characterizations in your 8/4 & 8/5 emails with a response, but I will say it explicitly in email now (as I did on our WebEx on 8/4) —  I didn't ask to be put on leave. I asked you to do a number of other things to mitigate the hostile work env. I said if you couldn't successfully do any of those other things (keep comms in writing, manage my workload, tell my managers and HR BP to stop harassing me and retaliating against me, etc.) then I said worst case we could discuss leave again, however I insisted if I went on leave, that I still be able to organize with other employees, gather evidence, and participate in the investigation.

On 8/4 we were supposed to meet at 10am for a WebEx to review the final Box folders of evidence. You had scheduled at 45min meeting, that was shortened to 30min due a scheduling conflict I had — a meeting with another Apple victim who wanted to share her concerns about discrimination at Apple & Apple's response to it. When I joined that 8/4 meeting you told me we were no longer going to review the evidence and instead you were "putting me on leave." I told you I didn't want to go on leave. I told you I wanted to continue reviewing evidence. I told you I wanted you to work with my managers & HR BP instead. You told me I didn't have a choice. I told you if you were going to force me on leave, I wanted to start the leave later in the week or even next week so I could wrap up some of my projects, exchange my personal information with the women I was organizing with, and reschedule meetings. You also knew, as I told you numerous times, I had planned to go to my office at Stewart 1 on 8/5 to get a laptop with "tons of evidence on it." I had also told you that on 8/3 that I was concerting with colleagues in Stewart 1 to gather evidence of the unsafe work conditions and Apple's activities around them, because myself and other colleagues have feared Apple has been covering up said unsafe work condition.

Despite all of this, your 8/4 email after our 10am conversation said "I was NOW on leave." You also said I was removed from the workplace, workplace interactions, and my actual job — which implied I was also to stop using Slack, stop organizing with employees, stop gathering evidence, and to not go to my office to get more evidence.

Your recent emails mischaracterizing the nature of our verbal conversations & our previous emails have brought even more harm to me through this process.

Due to all of the above, I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4y and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up

APL-GAELG_00001138

for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

-Ashley

—

**Ashley M. Gjøvik**
  Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement;
Inclusion, Equity, & Diversity
** [ Redacted ]

On Sep 3, 2021, at 10:07 AM, Ekelemchi Okpo [ Redacted ] wrote:

Hi Ashley,

I wanted to follow up on the text message I sent this morning. Are you available to connect with me today at 10:30am PT? If not, please suggest a time and I will be happy to reschedule.

Thank you.

Best,

Ekelemchi Okpo
Corporate Employee Relations

[ Redacted ]

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

APL-GAELG_00001139

**From:** **Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: Meeting Request
**Date:** September 7, 2021 at 6:45 PM
**To:** Ekelemchi Okpo (ER) eokpo@apple.com



**Exhibit EE**
**Okpo, E.**
04/07/26
@ aptus.

AG

Hi Ekelemchi!

Happy belated Labor Day! I hope you're well.

**I. Updates in writing**

My previous email requested that we please keep future conversations in writing (9/3: "I'd like to request that we please keep our exchanges in writing.")Will you please send me your updates / questions in writing? Or are you refusing my request? If refusing my request, can you please document your justification for doing so?

I feel like you're implicitly denying my request otherwise — and because you're an attorney and you're in an adversarial position to me, if you are denying my request, I'd also like to request if there is there an appeal process (business conduct maybe?) to review my request to keep communications in writing?

**II. I'm also awaiting your reply about my review**

> I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4 and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

**III. I'm also waiting your reply about the safety of my workplace**

> Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will not answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

Thanks!
-Ashley

P.S. Not sure if you've heard yet, maybe they didn't tell you - but I found Superior Court for the State of California for the County of Santa Clara Case 18CV330796 (2018) & 18CV330922 (2019) with for the NOTICE OF SETTLEMENT OF ENTIRE CASE for Retaliation, Failure to take Reasonable Steps to Investigate, Failure to take Reasonable Steps to Prevent Retaliation, Constructive Termination in Violation of Public Policy, & Intentional Infliction of Emotional Distress against Apple Inc, Dan West, and Employee Relations. Please feel free to respond now….otherwise we'll def address this later.

—
Ashley M. Gjøvik
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

> On Sep 7, 2021, at 5:42 PM, Ekelemchi Okpo <eokpo@apple.com> wrote:
>
> Ashley-
>
> Thank you for your email.
>
> Based on interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information.
>
> Please let me know when you have availability to connect tomorrow or later this week.
>
> 
> Best,
>
> Ekelemchi Okpo

PL-PRD-8-0157

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Sep 3, 2021, at 4:10 PM, Ashley Gjøvik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi. I hope you're well.

As mentioned, I'm not actively checking messages on work devices on this indefinite leave situation, so the 2hr notice of your text wasn't enough. (At 8:36am you texted me "Hi Ashley, Good morning. I will like to schedule time for us to connect today at 10:30am PT via WebEx for an update. Will this time with for you? Thank you.") As mentioned, please send email to my personal address if you need a quick response.

<PastedGraphic-1.png>

I'd like to request that we please keep our exchanges in writing. If you are going to require a call or video meeting, I'm requesting that you grant me permission to record it.

As I've complained previously, there have been frequent misrepresentations of my verbal conversations with my managers, with Human Resources, and with Employee Relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've heard from other employees in similar situations, this appears to be a pattern by Apple's HR & ER teams to misrepresent and mischaracterize, likely to intimidate & retaliate — and I won't allow you to do continue doing this to me.

I didn't want to dignify the mis-characterizations in your 8/4 & 8/5 emails with a response, but I will say it explicitly in email now (as I did on our WebEx on 8/4) —  I didn't ask to be put on leave. I asked you to do a number of other things to mitigate the hostile work env. I said if you couldn't successfully do any of those other things (keep comms in writing, manage my workload, tell my managers and HR BP to stop harassing me and retaliating against me, etc.) then I said worst case we could discuss leave again, however I insisted if I went on leave, that I still be able to organize with other employees, gather evidence, and participate in the investigation.

On 8/4 we were supposed to meet at 10am for a WebEx to review the final Box folders of evidence. You had scheduled at 45min meeting, that was shortened to 30min due a scheduling conflict I had — a meeting with another Apple victim who wanted to share her concerns about discrimination at Apple & Apple's response to it. When I joined that 8/4 meeting you told me we were no longer going to review the evidence and instead you were "putting me on leave." I told you I didn't want to go on leave. I told you I wanted to continue reviewing evidence. I told you I wanted you to work with my managers & HR BP instead. You told me I didn't have a choice. I told you if you were going to force me on leave, I wanted to start the leave later in the week or even next week so I could wrap up some of my projects, exchange my personal information with the women I was organizing with, and reschedule meetings. You also knew, as I told you numerous times, I had planned to go to my office at Stewart 1 on 8/5 to get a laptop with "tons of evidence on it." I had also told you that on 8/3 that I was concerting with colleagues in Stewart 1 to gather evidence of the unsafe work conditions and Apple's activities around them, because myself and other colleagues have feared Apple has been covering up said unsafe work condition.

Despite all of this, your 8/4 email after our 10am conversation said "I was NOW on leave." You also said I was removed from the workplace, workplace interactions, and my actual job — which implied I was also to stop using Slack, stop organizing with employees, stop gathering evidence, and to not go to my office to get more evidence.

Your recent emails mischaracterizing the nature of our verbal conversations & our previous emails have brought even more harm to me through this process.

Due to all of the above, I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4y and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

-Ashley

PL-PRD-8-0158

Ashley

—
**Ashley M. Gjøvik**
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Sep 3, 2021, at 10:07 AM, Ekelemchi Okpo <eokpo@apple.com> wrote:

Hi Ashley,

I wanted to follow up on the text message I sent this morning. Are you available to connect with me today at 10:30am PT? If not, please suggest a time and I will be happy to reschedule.

Thank you.


Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

PL-PRD-8-0159

**U.**     **EXHIBIT U: ER EMAIL (8/20/21)**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC     MAY 26 2026

## V.    EXHIBIT V: WAIBEL INVESTIGATION NOTES

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

| | |
|---|---|
| **Subject:** | Re: Summary for A. Gjovik, EEID293492 |
| **From:** | "Antonio Lagares" [Redacted] |
| **Received(Date):** | Sat, 05 Jun 2021 04:15:41 +0000 |
| **To:** | "Jenna Waibel" [Redacted] |
| **Date:** | Sat, 05 Jun 2021 04:15:41 +0000 |

Thank you Jenna.

TL

On Jun 4, 2021, at 20:58, Jenna Waibel < [Redacted] > wrote:

Hi Tony,

Thanks for our call Thursday. Here is a brief summary of the concerns raised by EE Ashley Gjovik, which may be escalated since she is not satisfied with the investigation results. We had three separate cases, all under guidance, as well as a related workers' comp claim.

- Ashley raised concerns to EHS about vapor intrusion in Stewart 1 after they sent a notice of intent to test the air quality in the building. Ashley claimed that the levels of vapor, and location on a superfund site, were putting herself and others at risk. She also called the EPA, who reached out to EHS to say they had no concerns about the most current information available about that location. EHS & I met with Ashley twice to discuss her concerns and share an overview of the Vapor Intrusion Program at Apple.

- Ashley filed a workers' comp claim for cumulative trauma due to exposure to vapor intrusion in Stewart 1, but also added all of the Apple buildings she has worked in since hire. Sedgwick communicated to Ashley that they denied the claim after one call with the adjuster.

[Redacted]

- Ashley alleged Dan West and Dave Powers, her skip level and direct manager respectively, have made decisions in her employment that were biased based on gender.

  * She alleged that they gave biased feedback and allowed others to do the same. For

example, they told her she needed to be "unflappable" rather than responding strongly when upset at work. I found many people had the goal of being "unflappable" in their review that year.

* She also alleged that Dan would not allow her to report to him directly because she was female and had never had a female direct. He has had a female direct, but denied Ashley's request because she's an IC and didn't feel that the function should report to him.

* Ashley alleged that Dan was not giving Dave any of her constructive feedback, which I found was not accurate. Dan did give Dave appropriate feedback about his management skills, but her feedback was not shared by others, so it was not the primary focus on the feedback given.

* I did not substantiate any policy violations for either Dave or Dan.

• Ashley also raised concern about feedback she received after presenting the I&D 5 Simple Things sessions. She got one constructive comment and felt that it was both a personal attack, and a concern that a manager on the team was not ready to represent the company message appropriately to the ICs in his org. Since the feedback was anonymous, we did not try to determine who gave that feedback, but I did speak with individuals to understand the situation and did not find concerns of ill prepared managers, or reason to not continue that roll out. I did not find that the feedback given was inappropriate, and since the rest of the feedback was positive, it will not be included in Ashley's performance review.

• Ashley has expressed that she is not comfortable returning to the office in September, given her EHS concerns, so we may be opening an Accommodations case shortly to pursue that piece with her.

I welcome your questions.

**Jenna Waibel**

**Corporate Employee Relations**

Redacted

**This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the**

APL-GAELG_00001381

**W.**    **EXHIBIT W: LAGARES EMAILS (JUNE-JULY 2021)**

| | |
|---|---|
| **Subject:** | Re: Some new information |
| **From:** | "Ekelemchi Okpo" [Redacted] |
| **Received(Date):** | Wed, 21 Jul 2021 02:06:00 +0000 |
| **To:** | "Antonio Lagares" [Redacted] |
| **Attachment:** | PastedGraphic-1.png |
| **Date:** | Wed, 21 Jul 2021 02:06:00 +0000 |

Received. Thanks.


Best,

Ekelemchi Okpo

Corporate Employee Relations

[Redacted]

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Jul 20, 2021, at 11:39 AM, Antonio Lagares [Redacted] wrote:

Hi Ekelemchi,

TL

Begin forwarded message:

**From:** Ashley Gjovik [Redacted]

**Subject: Re: Introduction; Hle**

**Date:** July 8, 2021 at 15:14:06 GMT-7

**To:** Antonio Lagares [Redacted]

Hi,

Unfortunately there's another new event— I just found out today.

APL-GAELG_00001452

In May, apparently Dan and Dave decided to reduce my ownership and supervision of one of my main projects and appear to have handed it off to a male colleague in another organization (Daniel) — and didn't even tell me directly. Dan reduced my supervision & gave Daniel the project <u>after</u> I started raising formal concerns to him about Dave creating a hostile work env & be sexist, raising work place safety concerns, and filed a workers comp claim.

One of Dan's directs, Yuan, sent me an email this morning adding me to an existing thread he had with Daniel:

———

Email between Yuan & Daniel:

On Jul 8, 2021, at 9:03 AM, Yuan Tan [Redacted] wrote:

Thanks for checking in on How I Go Here article. getting Daniel's help to publish this one soon.

Begin forwarded message:

**From:** "Daniel C. Carr" [Redacted]
**Subject: Re: editorial help with a PSQ profile**
**Date:** July 8, 2021 at 8:38:22 AM PDT
**To:** Yuan Tan [Redacted]
**Cc:** "Daniel C. Carr" [Redacted]

Absolutely! Please let me know the next steps.
Daniel

—

Daniel C. Carr
iPhone HW Systems QA (Product Systems Quality)

[Redacted]

On Jul 7, 2021, at 9:40 PM, Yuan Tan [Redacted] wrote:

Hi Daniel,
Dan and Ashley briefly mentioned a while back that you may be able to help with editorial review for PSQ team member profiles, such as the ones here:

[Redacted]

[Redacted] in my team has a draft version that's not yet published. Would you have time to take a look in the next week or two? I know we are the midst of busy project season. I greatly appreciate any help you can give.

APL-GAELG_00001453

thanks,
Yuan

_____

Apparently this engineer, Daniel Carr, asked Dan on 5/6 if he can help with our PSQ employee portal (that I created and oversee). [note: Daniel apologized today, saying he didn't realize I already owned the process.]

_____

On 5/6 Daniel emailed Dan:

I am wondering if there are any writing opportunities / content needed for [Redacted]. Perhaps a recap or summary of someone's innovation, an interview or spotlight of a DRI or team, or some other topic. If not, if there's any need to edit or proof someone else's draft copy, I am game for that as well.

Best regards,

Daniel

And on 5/6 Dan replied:

I need to think about this one a bit more. I'll likely take you up on it. There is always a need for more content for the team:
**How I got Here articles**
**From the desk of...**
**etc.**

My first thought would be to help curate the HIGH articles. I'm curious - is writing a passion of yours? Not many in the team volunteer to write stuff!

_____

I've been the sole owner of the process, editing, approval, and publishing of our *"How I Got Here"* career spotlight articles for over two years. I've also been the co-owner (with Dan) of the *From the Desk of Articles* for a year as well.

It appears Dan made the decision to reduce my role to only working on MSQ articles and appears to have given Daniel broader responsibility than me during a staff meeting I wasn't invited to — and no one told me until I saw the email from Yuan today. Yuan also insisted I was at the staff meeting, when I wasn't. Today Yuan said the following.

APL-GAELG_00001454

Further, if you remember from my 2020 review feedback — I raised a concerns about my projects being reassigned to male colleagues without consulting, or even informing me. It appears it happened again.

———

For context here's the overall timeline the best I can put together today. I put the above events in red.

**Timeline of Raising Formal Concerns within PSQ**

- 3/22- 1:1 with my manager, Dave Powers. Dave told me I'm not allowed talk to anyone other than him, EH&S, and Jenna about my safety concerns about Stewart or even tell anyone it's a Superfund site. He said he didn't want his team to "know" because they'd be "upset." He also gave me feedback about an I&D training I was hosting, that "I was being too hard on the white man." He also told me this all as employee feedback and said it's only a "warning" because of my "mental health."

- 3/29 - I start raising questions directly to EH&S about vapor intrusion in Stewart 1 (TRW Microwave)

- 4/3 - I email Jenna notifying her of Dave prohibiting me from speaking about workplace safety concerns and ask her to talk to him or send me an email I can forward with my rights

- 4/3-9 - Jenna doesn't respond

- 4/8 - After telling Dave numerous times I've suffering from severe PTSD from getting sick last year and "barely hanging on" he texts me and asks me to lead a huge project for a completely different org, dotted-line reporting to a SWE director who sexually harassed me in 2019 (which Dave knows about).

- 4/8 - I reach out to Helen and tell him I'm struggling with my mental health and ask for her support

- 4/9 - I met with Dan West and told him that Dave prohibited me from speaking about safety concerns at work and told Jenna I talked to Dan as well — I ask him to talk to Jenna about Stewart 1. I also tell Dave that I can't work for Dave any more and document my ask to him to "think about solutions for DP situation."

APL-GAELG_00001455

- 4/9 - Jenna then offers to launch a formal investigation into Dave

- 4/9 - I tell Jenna no on the formal investigation but ask her to talk with him

- 4/12 - Jenna says she'll talk to Dave

- 4/12 - I reiterate my safety concerns about Stewart 1 to Jenna

- 4/12 - Jenna asks for a list of witnesses to investigate Dave and offers to look into the Redact Redacte sexual harassment

- 4/12 - I ask Jenna to pull my peer feedback about Dave to Dan from the 2020 review cycle as well as other historical review feedback to show context on the systemic issues

- 4/13 - I notify Helen about the ER investigation into Dave and my concerns about Stewart 1

- 4/13 - I notify Jenna of Dave violating my 2020 "return to work" medical accommodations and also giving him feedback about thanking men publicly for my work

- 4/14 - Dave snapped at me during my I&D training and a witness confirmed it was in appropriate, and I notified Jenna

- 4/14 - I email Dan and tell him I want to report to him or John, and go to a 4-work day schedule — otherwise I'll quit his org. I mentioned again specifically my 2020 review feedback about Dave I sent him and working for Dave "is TERRIBLE for my mental health."

- 4/20 - Helen Polkes urged me to file a workers comp claim for my 2019 fainting spell in Stewart 1 that I now believe to be likely caused by vapor intrusion in the building (she basically insisted — she pushed me at least three times to file it).

- 4/21 - I noticed Jenna, Dan, Dave, & Helen of the workers comp claim being filed

- 4/21 - I reach out to the federal EPA about Stewart 1 for the first time

APL-GAELG_00001456

- 4/23 - I remind Jenna to pull the 2020 review feedback from me to Dan about Dave and ask her again if she's talked to Dave about telling me I can't talk openly about work place safety concerns

- 4/26 - I notify Jenna one of the MSQ managers submitted feedback about my I&D training that we shouldn't focus on "equal outcomes," "only equal opportunity." I also notify her that I'm worried about this comment being used against me or me not being able to raise it as sexism/racism concern because Dave often tells me simply to "smile" when his male managers say inappropriate things to me. I mention the manager I suspect wrote no equal outcomes has a long history of being very hostile towards me and Dan once told me another woman hated him so much she quit her company so she didn't have to work with him ⌈ Redacted ⌉).

- 4/27 - I have a phone call with Jenna, after asking for another time if she's talked to Dave about telling me I can't talk openly about workplace safety concerns, and she is extremely hostile and essentially also tells me I can't talk openly about workplace safety concerns. I document our call and send clarifying questions to her and Michael. She then says she never said what she said upon seeing it documented. During that call I also started crying and pleaded with her to stop the investigation because the way it's going it seems like she's going to side with my manager and Dan and only get me in trouble. She says she can't cancel and investigation after it begins.

- 4/29 - I talked to Dan West and notify him of the ER investigation into Dave, the workers comp claim, and the discussions I'm having with EH&S about Stewart 1. I also tell him about Jenna pressuring me not to speak openly about workplace safety concerns and ask him to help. I also ask him to follow up with Dave about the "no equal outcomes" comment because Dave refuses to follow up with his team on it. I expressed concerns again that Dave was creating a hostile work env that was severely detrimental to my mental health and asked him what can be done. I asked if he reviewed my review feedback about Dave from 2020 (Helen send you that document) and he said he did but "it wasn't actionable" and I'm just "hot & cold about Dave." I asked him if he had thought more about my request to report to him or another one of his directs (not Dave) and he said I can't report to him. I asked why, he said "no more re-orgs." I said, but my role is already more than half supporting you directly. He said no. I said, what about another direct, he said no. He wouldn't give me an explanation. I told him I will likely have to leave PSQ or Apple if he doesn't response the issue, and he said that's fine. I asked what he will do with my role if I leave and he said he'd cancel the EPM role, that "its an experiment that didn't work out," and convert it to engineering headcount. Dan did say that Dave needed to follow up on the "no equal outcomes" dogwhistle-type comment and that he'd talk to him about it.

- 4/29 - I document my meeting with Dan and what he said and send him notes, then forward

APL-GAELG_00001457

to Jenna and notify her what he said.

- 4/30 - phone call with the Federal EPA about Stewart 1 / TRW microwave safety concerns

- 5/1 - I give Jenna more background on the bizarre creation of my role, the lack of definition, the hostility from [ Redacted ], and my un-approved, HR-protested, forced transfer out of SWE — with reasoning directly related to ongoing lawsuits against Apple — and ask her to talk to [ Redacted ] for more background.

- 5/6 - I notify Jenna that in MSQ staff meeting they mention Helen & Dan are worried about attrition and that managers need to be mindful with communication and if someone is thinking about leaving to recommend other options to retain them and say that directly conflicts with Dan telling me he doesn't care if I quit apple because of the hostile work env with Dave.

- 5/6 - Jenna still hasn't gathered and reviewed the 2020 Dave feedback I sent to Dan. I find a copy and send it to her and ask her again to review it.

- 5/6 — Dan offers to Daniel that he can work on / take over my roles for How I Got Here & From the Desk of Articles

- 5/10 - I notify Dave I need to take sick time for a heart issue and for side effects from chemical exposure treatment

- 5/7-5/20 — I send Jenna many, many more examples of inappropriate comments and behavior by Dave.

- 5/17 - I raise more questions and concerns about the safety of Stewart 1

- 5/18 - Dan staff meeting where he apparently reduced my ownership of the How I Got Here articles to only PSQ and appears to have given Daniel the overall project

- 5/20 - Jenna tells me she will talk to [ Redacted ] about my sexual harassment claim and tell him I was the one who reported it. I ask her not to and that I dont' want him to know it was me and ask her not to look in to it and she says she will anyways and I can't stop her. She pressures me to give the witnesses name to her despite me raising concerns about her being on an H1B and worried about retaliation.

APL-GAELG_00001458

- 5/20 - I also share with Jenna Dave's argumentative response to concerns I raised about wanting more support from Apple around sexual assault during the Supreme Court justices hearings

- 5/20 - I email Helen, Dave, & Dan my concerns about Apple not speaking up in support of Palestinians and Muslims; Helen replies not really addressing my concerns

- 5/20 - I share with Jenna that both Dave and Dan were giving me very condescending and sexist feedback about my "vocal tone" and "uptalk"

- 5/21 - I reply to Helen, Dave, & Dan and re-iterate my concerns and further elaborate my concerns around Muslim inclusion with the recent news of Uyghur forced labor; Helen replies actually addressing this time and let's me know I&D is looking into the whole situation and I'm welcome to talk to them

- 5/21- Jenna offers me Paid Administrative Leave for two weeks starting 5/24 and I say yes. She then tells me I'm not allowed to work at all during that time.

- 5/21 - I notify Dan West that EH&S said they won't answer anymore of my questions about VI.

- 5/22 - I ask Jenna to also look into the sexist language in my annual reviews written by Dave

- 5/24-6/4 - PAID ADMINISTRATIVE LEAVE

- 6/3 - "wrap up call" with Jenna — she says she found no policy violations and the only next steps are for me "to process this" and work with Helen on "my path forward." I send notes after documenting all of my ongoing concerns that weren't addressed — including that it sounds like she never reviewed my 2020 feedback about Dave to Dan (she said she had no recollection about one of the events)

- 6/8 - I have to present the I&D training I did to Dan staff even though I asked Dave to do it while I was out and asked Jenna if Dave could do it because I don't feel comfortable marketing our I&D training while I'm reporting Dave and a manager (likely [Redact] for being sexist

APL-GAELG_00001459

- 6/10 - My first 1:1 back with Dave after leave & the investigation. He makes it clear he doesn't think he did anything wrong and it was just me overreacting / misinterpreting

- 6/10 - I notify Jenna what Dave said during that 1:1

- 6/10 - I then meet with Jenna and she tells me the only other steps are to "complain about her to her manager, but I'm not allowed to discuss any details of the investigation" and to "escalate safety concerns to EHS." She also suggests I request ADA accommodations for remote work so I don't have to go back to Stewart 1. She tells me "I don't need a diagnosis, I just need a doctor signature."

- 6/14 - Another PM and I email the Remote Work Advocacy letter to Tim Cook & Deirdre

- 6/20 - I notify Helen I talked to you and you're having your team take a 2nd look at my situation

- 6/21 - 1:1 with Dave and I ask to work remotely and he tells me its not a thing. Finally he agrees to ask Helen, but then says Helen said no. Later Helen said he never asked her and he needs to ask Dan instead. (He lied to me)

- 6/22 - I send you the email about [ Redacted ] & Dan West making sexist comments & inappropriate behavior, and Dan West recklessly endangering my health

- 6/28 - 1:1 with Dave where he makes the inappropriate I&D comments & acts hostile towards me

- 6/28 - I express concern to Helen about Dave making inappropriate and possibly sexist comments about an I&D project I'm working on

- 6/20 - 1:1 with Helen where she makes the aggressive comments about remote work and role definition

- 7/2 - Jenna tells me EH&S will actually test the air in Stewart 1 now and notifies me of cracks in the floor there and the need for "floor sealing" and that they'll test the air after the floor is fixed

APL-GAELG_00001460

- 7/2 - I ask EH&S and Jenna if they can test the air before the floor is fixed, to see if those cracks were causing vapor intrusion

- 7/2 - I submit ADA Medical Request for remote work due to needing to avoid industrial chemical exposure

- 7/4 - I email you with concerns about Helen, Dave, and EH&S

- 7/7 - I meet with EH&S and Jenna and they tell me they won't test the air before the cracks are fixed, they refuse to give me any details about what fixing the cracks entail, and again tell me they now won't answer anymore of my questions. I reiterate I don't feel safe in that building and I'm worried about vapor intrusion and I feel they're trying to misrepresent the situation internally

- 7/7 - I express concerns to Helen about her not helping with my role definition

- 7/7 - I send additional / updated concerns about the safety of Stewart 1 / TRW Microwave to the federal EPA

- 7/8 - I find out from Yuan that Dan appears to have re-assigned one of my projects without telling me

-Ashley

—

Ashley M. Gjøvik

Engineering Program Manager

* Mac Systems Quality Strategic Planning & Communications

* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

| Redacted |

On Jul 8, 2021, at 10:34 AM, Ashley Gjovik | Redacted | wrote:

Hi Tony,

APL-GAELG_00001461

Yeah… I'm very distressed by all of this. Thank you so much. Looking forward to talking to you tomorrow.

I hope you had a nice holiday.

—

Ashley M. Gjøvik
  Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement;
Inclusion, Equity, & Diversity
** [ Redacted ]

On Jul 7, 2021, at 2:39 PM, Antonio Lagares [ Redacted ] wrote:

Hi Ashley,
I saw that you spent your 4th writing this email. I'm sorry you felt compelled to use your holiday to write. I will schedule some time for us to address these new concerns. Please look for an iCal to propose time.

Best…

…TL

Begin forwarded message:

**From:** Ashley Gjovik [ Redacted ]

**Subject: Re: Introduction**

**Date:** June 22, 2021 at 10:25:53 GMT-7

**To:** Antonio Lagares [ Redacted ]

Hi Tony,

I hope you're well. Thank you again for talking last week and asking someone to do a secondary review. I really appreciate it and I look forward to our next conversation about findings/next steps.

The more I've thought about our last conversation, the more I've felt the need to clarify something you asked about. You asked if there's any new information/events worth including and I mentioned that there was a lot as far as past events that I didn't feel were included in the investigation but should have been, missed due to a lack of follow up & contextual questions from Jenna. I could see how me replying the way I did to you might be too vague. I wanted to share with you three concrete examples to show the magnitude of what I'm talking about. I

APL-GAELG_00001462

understand per Jenna the primary investigation is done, so I assume these might not actually be looked into at all, but I'd like you to see & decide how you'd like to proceed on your end.

1) [Redacted] is another director reporting to Dan West, peers with David Powers. A few years ago he was frequenting making comments to me and giving me a hard time about not being married or having kids. He expressed direct displeasure that I was single and dating at my age, and continued to comment its time for me to settle down. He brought this up during work settings and especially at work parties and gathering when others would bring their spouses. I told [Reda] to knock it off and he wouldn't so I asked Dan to step in. Dan said he told him to stop it and [Reda] did finally stop bringing it up directly.

2) When I was at the final Apple party at the Grace Hopper Convention in 2017, Dan West approached me and gave me a desert and told me to eat it. I asked him what was in it and he just said to eat it. I asked again, and again he said, just eat it. I took a bite and said "is there peanut in this??!" And he smiled and said proudly, "yes!" I yelled at him that I have a peanut allergy (I was fairly certain I told him that previously too). He just stared at me. I told him I need allergy medicine ASAP and I spit the peanut gelato back into the cup. He said he'd get some and disappeared. I started having symptoms of anaphylaxis and hadn't heard from him for about 15min so I tracked him down and he said he was drunk and forgot he was supposed to get me medicine. He said he'd go get it and be back. About maybe 45min after the peanut intake he finally showed up with a single Allegra-type allergy pill. I took it but it was too late and I told him I was having severe symptoms. He disappeared and I never saw him again that night. Another EPM looked after me at the party for a little bit but I felt so sick I wanted to go back to my room and lay down. I got lost walking through the hotel alone, circling for maybe an hour, and when I finally got to my room I puked my guts out in the bathroom and fell asleep on the marble floor there. Dan never followed up or reported it. I told Dave when I got back and Dave said he just sent a joking text to Dan complaining he was trying to "kill his EPM." I saw him text it, so if they both have their iMessage records from that time, it should still be there. Further, I contracted Pertussis/whooping cough during the flight to that conference and ended up getting a full-blown case for the full 100 days despite being fully vaccinated. The theory from the doctors was that I got so sick because while the Pertussis was taking hold, I also got so sick from the peanut allergy via Dan. In addition to standard Pertussis symptoms like coughing so hard I'd vomit every 20 min or so for months — I also bruised my ribs coughing and got bronchitis.

3) I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan insisted I try several times, so when I sat down I texted him that I looked forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, [Redacted] Apparently they told [Redacted] the same thing. [Redacted] was 24, ten years my junior. I expressed no interest in [Redacted] or dating him — but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us

APL-GAELG_00001463

to exchange numbers. It's was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's is a running topic in the household of how weird and inappropriate it was of Dan to do that.

Etc.

Hopefully this helps paint a better picture of what I meant but "lots of historical events not actually investigated."

—

Ashley M. Gjøvik

    Engineering Program Manager

* Mac Systems Quality Strategic Planning & Communications

* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

[Redacted]

On Jun 13, 2021, at 5:09 PM, Ashley Gjovik [Redacted] wrote:

Hi Antonio,
Sure! Please feel free to set something up.

Thanks.

—

Ashley M. Gjøvik
    Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
[Redacted]

On Jun 10, 2021, at 4:58 PM, Antonio Lagares [Redacted] wrote:

Hi Ashley,
I am following up on Jenna Waibel's introductory email. I lead the ER teams for the Corporate functions (non-Retail and non-AppleCare lines of business). I understand that you disagree with the findings and conclusions of Jenna's recent investigations. If you are agreeable, I would like to schedule time for us to talk next week and understand your concerns with the investigation and potential next steps.

Please let me know if you have any preferred days and/or time to meet next week and I will schedule time in iCal for us to meet via WebEx. Don't hesitate to reach out if you have any

APL-GAELG_00001464

questions in advance or our talking further.

Best....

...Tony

On Jun 10, 2021, at 15:17, Jenna Waibel [Redacted] wrote:

Hi Tony,
Ashley Gjovik (cc'd) is an employee in Hardware who would like to speak with you about two investigations I have recently wrapped up. Would you please reach out to Ashley to speak with her about her concerns?

Thank you,

**Jenna Waibel**

**Corporate Employee Relations**

Redacted

**This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.**

Begin forwarded message:

**From:** Ashley Gjovik [Redacted]

**Subject: Re: Introduction**

**Date:** July 4, 2021 at 17:37:41 GMT-7

**To:** Antonio Lagares [Redacted]

Hey Tony,

Dave's still acting worse than before — and I have more updates and questions. I already feel like I'm being retaliated against.

So, Jenna had told me during the investigation closure meeting I had with her that the only next step was for "me to work with Helen (my HR BP) on figuring out how to continue to do my job." Which was a super weird thing to say and I asked her to clarify and she told me Helen would help me with role definition & there's nothing else to say or something like that. So I've been

APL-GAELG_00001465

talking to Helen, and at first Helen seemed like she'd help and she almost seemed like she supported my concerns about Dave/Dan (sounds like she forwarded my feedback about Dave that I sent Dan in fall 2020 to you), but the last meeting I had with her was bizarrely adversarial.

She's been saying things to make me feel like everything about my concerns about Dave & my role are my own fault (like Jenna did in the last meeting). As far as role definition, she's been telling me I need to deal better with ambiguity. She said I should work with Dave to define the role again and even though he's never done it the million other times we've tried, she said it might help having a 3rd party. So I asked her if she's coaching Dave on what an EPM is (he doesn't know) and what the roles supposed to look like — and she said no, that she's just talking to me. Which leaves me very confused… because he's a director and its the req he created and he's admitted he needs to define the role… so how is this on me? I'm going forward you the latest email I sent her — which clearly outlines how I literally have no job description and I was even hired to a req that was a different code than what I am (PM v EPM).

The weirdest thing Helen's been saying is about ADA medical accommodations. During that last meeting with Jenna, I re-iterated my concerns about the safety of my office building on an active Superfund site. Jenna told me that we should just get me remote work accommodations so I don't have to go into the office. She said she'd send me the form and I "just need a doctor's signature, no medical diagnosis, and they'll push it through the system." When I got the form it was very detailed so I asked her again, are you sure I just need a signature? This is asking for a lot of data? And she's like, yeah just a doctors signature. In parallel I asked Dave to request the non-medical "100% telecommuting/remote work" thing that's mentioned on the People site & Deirdre's FAQs and he kept telling me it didn't exist, and then finally said he'd talk to Helen. He came back and said "Helen said no." I followed up with Helen and she said she doesn't approve it and he didn't ask her. I asked her to follow up with him and ask him to actually ask Dan+ like he's supposed to. The first time we talked, she said she would. The second time we talked, she laughed. She said, "DID YOU SEE DEIRDRE'S VIDEO?" And fake-smiled. [Helen knows I'm one of the two employees who emailed Tim and Deirdre the remote work advocacy letter/video/stories on 6/14. She seemed to be confirming what I already suspected, that Deirdre's video was a response to our letter, saying "no remote work, shut up, come back to the office."] But I kept my temper, and was like yes Helen, I did see the video, and it mentioned there is a rare exception for full remote work and I think I meet that exception since nothing I do needs to be in the office. I asked her again to talk to Dave about requesting it for me and she laughed again and told me there's no process for the request. And I was like, Helen, Dan can send an email to Dan, and Dan can email Yannick, and Yannick can email Ternus and if they all say yes then I have the role. That was the process before — why can't they do it now? And she's like, that process doesn't exist anymore, there will probably be a new process, but there's not one now. And I was like, wtf — but said, okay well I still feel very unsafe with the idea of going back to the active Superfund with poor oversight, that already made me faint in 2019, and with the delta variant circulating. Then she said… "well from Jenna it sounds like YOU THINK YOU MIGHT HAVE A MEDICAL ISSUE you can request an accommodation for." And I was like, wow… but said "yeah, Jenna did send me a medical form and said I could submit it to request remote work due to the chemical exposure…. " Then Helen said something like, "well I recommend you ATTEMPT that and you should do it quickly because it takes a long time — we will go back and forth with you negotiating to see what accommodations you ACTUALLY need and what we are actually WILLING to provide." Then she fake-smiled at me again. The whole thing was super

APL-GAELG_00001466

condescending and like she was trying to start an argument, or otherwise intimidate me.

The only way I can make sense of how Helen is acting is that she's trying to cover up the fact that this whole mess festered under her watch, so it's easier for her to blame/pressure/intimidate me then address the issues in a way that she had to admit things like she has employees working in unsafe buildings, or directors saying super inappropriate stuff to their female directs... or that her engineering partner (Dan) found it entertaining to sneak in a new req (mine) that she and his boss never approved and then brag later that he blind-sighted her, etc.

Meanwhile, Jenna finally got a response from EH&S and the guy, Michael, who has been overseeing these chemical clean up sites for Apple for eight years is now quitting / fired. The last meeting I had with him he read a script, I assume from legal, where he very uncomfortably said that he is the expert, and the oversight was all his decision, and he personally feels its safe. Literally an hour after that meeting he went on short term disability medical leave — and now apparently upon returning, he's leaving Apple. Also, Jenna's update from EH&S included the fact they did find cracks in the floor of my office (which is exactly how vapor intrusion from chemicals directly beneath the floor can end up in the indoor air). They said they would test the indoor air at a "TBD" time, but only AFTER fixing the floor. I specifically asked if they can test BEFORE they fix the floor since they haven't tested the indoor air for six years, since 2015 before any Apple employees were moved in — or anyone it was vacant forever — and despite a long history of indoor air vapor intrusion above max industrial limits, Apple only did "limited testing" and called it good, even though that testing showed industrial chemicals again above industrial limits. I told EH&S & Jenna I want to know which chemicals are in the air and at what levels — for future cancer monitoring, etc. The only reason I can think of that they're refusing to do this testing after they previously planned on doing it, was that all the questions I was asking were very good questions and revealed major gaps/issues — so they're going out of their way to not have evidence of their negligence.

I think everyone is forgetting I work in engineering & I'm in law school. I know how toxic torts work. I also know how employment discrimination & labor law works. I'm not an idiot.

I'm anxious to hear back from you on if there are any other next steps for my situation — because right now it feels like I'm not only being harassed by my manager and my HR BP, but it appears there's a conspiracy to force me back into what appears to be a very physically unsafe office building. I thought what I went through last year was bad, but this year has turned into another nightmare — & this time, it's Apple doing.

-Ashley

Sent from my iPhone

> On Jun 30, 2021, at 11:14 AM, Ashley Gjovik [ Redacted ] wrote:
>
> Hi Tony!
> Welcome back. Hope you had a nice break.
> Thanks! Appreciate it.
>
> Btw, turns out my instinct was right and my manager, David, has continued with more

APL-GAELG_00001467

inappropriate and offensive comments following the completion of Jenna's investigation. I've been sharing some updates with Helen to see if she can help reign him in. It really does feel like he was emboldened by whatever Jenna said to him, or whatever he interpreted Jenna said to him. He seems to think he's completely justified in all the biased and sexist stuff he said/says — and is really on a tear now.

I really don't know how I'm going to be able to continue. As mentioned, I don't want to quit Apple yet but I'm too close to graduating & passing the Bar exam to transfer to another role. And because Dan refused to move me to any other managers in PSQ, I'm stuck with Dave and the stuff he continues to inflict upon me. It's **miserable**.

-Ashley

—

Ashley M. Gjøvik
  Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement;
Inclusion, Equity, & Diversity
** [ Redacted ]

On Jun 30, 2021, at 11:04 AM, Antonio Lagares [ Redacted ] wrote:

Hi Ashley,
I'm just back from some full-time vacation days and catching up on email. Just wanted to acknowledge receipt of your email and that I'll review and respond accordingly shortly.

Best…

….TL

On Jun 22, 2021, at 12:25, Ashley Gjovik [ Redacted ] wrote:

Hi Tony,
I hope you're well. Thank you again for talking last week and asking someone to do a secondary review. I really appreciate it and I look forward to our next conversation about findings/next steps.

The more I've thought about our last conversation, the more I've felt the need to clarify something you asked about. You asked if there's any new information/events worth including and I mentioned that there was a lot as far as past events that I didn't feel were included in the investigation but should have been, missed due to a lack of follow up & contextual questions from Jenna. I could see how me replying the way I did to you might be too vague. I wanted to share with you three concrete examples to show the magnitude of what I'm talking about. I understand per Jenna the primary investigation is done, so I assume these might not actually be looked into at all, but I'd like you to see & decide how you'd like to proceed on your end.

1) [Redacted] is another director reporting to Dan West, peers with David Powers. A few years ago he was frequenting making comments to me and giving me a hard time about not being married or having kids. He expressed direct displeasure that I was single and dating at my age, and continued to comment its time for me to settle down. He brought this up during work settings and especially at work parties and gathering when others would bring their spouses. I told [Redac]to knock it off and he wouldn't so I asked Dan to step in. Dan said he told him to stop it and [Reda] did finally stop bringing it up directly.

2) When I was at the final Apple party at the Grace Hopper Convention in 2017, Dan West approached me and gave me a desert and told me to eat it. I asked him what was in it and he just said to eat it. I asked again, and again he said, just eat it. I took a bite and said "is there peanut in this??!" And he smiled and said proudly, "yes!" I yelled at him that I have a peanut allergy (I was fairly certain I told him that previously too). He just stared at me. I told him I need allergy medicine ASAP and I spit the peanut gelato back into the cup. He said he'd get some and disappeared. I started having symptoms of anaphylaxis and hadn't heard from him for about 15min so I tracked him down and he said he was drunk and forgot he was supposed to get me medicine. He said he'd go get it and be back. About maybe 45min after the peanut intake he finally showed up with a single Allegra-type allergy pill. I took it but it was too late and I told him I was having severe symptoms. He disappeared and I never saw him again that night. Another EPM looked after me at the party for a little bit but I felt so sick I wanted to go back to my room and lay down. I got lost walking through the hotel alone, circling for maybe an hour, and when I finally got to my room I puked my guts out in the bathroom and fell asleep on the marble floor there. Dan never followed up or reported it. I told Dave when I got back and Dave said he just sent a joking text to Dan complaining he was trying to "kill his EPM." I saw him text it, so if they both have their iMessage records from that time, it should still be there. Further, I contracted Pertussis/whooping cough during the flight to that conference and ended up getting a full-blown case for the full 100 days despite being fully vaccinated. The theory from the doctors was that I got so sick because while the Pertussis was taking hold, I also got so sick from the peanut allergy via Dan. In addition to standard Pertussis symptoms like coughing so hard I'd vomit every 20 min or so for months — I also bruised my ribs coughing and got bronchitis.

3) I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan insisted I try several times, so when I sat down I texted him that I looked forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, [Redacted]. Apparently they told [Redacted] the same thing. [Redacted] was 24, ten years my junior. I expressed no interest in [Redacted] or dating him — but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It's was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's is a running

topic in the household of how weird and inappropriate it was of Dan to do that.

Etc.

Hopefully this helps paint a better picture of what I meant but "lots of historical events not actually investigated."

—

Ashley M. Gjøvik
Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
** [Redacted]

On Jun 13, 2021, at 5:09 PM, Ashley Gjovik [Redacted] > wrote:

Hi Antonio,
Sure! Please feel free to set something up.

Thanks.

—

Ashley M. Gjøvik
Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
** [Redacted]

On Jun 10, 2021, at 4:58 PM, Antonio Lagares [Redacted] wrote:

Hi Ashley,
I am following up on Jenna Waibel's introductory email. I lead the ER teams for the Corporate functions (non-Retail and non-AppleCare lines of business). I understand that you disagree with the findings and conclusions of Jenna's recent investigations. If you are agreeable, I would like to schedule time for us to talk next week and understand your concerns with the investigation and potential next steps.

Please let me know if you have any preferred days and/or time to meet next week and I will schedule time in iCal for us to meet via WebEx. Don't hesitate to reach out if you have any questions in advance or our talking further.

Best…

…Tony

On Jun 10, 2021, at 15:17, Jenna Waibel < [Redacted] > wrote:

APL-GAELG_00001470

Hi Tony,
Ashley Gjovik (cc'd) is an employee in Hardware who would like to speak with you about two investigations I have recently wrapped up. Would you please reach out to Ashley to speak with her about her concerns?

Thank you,

**Jenna Waibel**

**Corporate Employee Relations**

Redacted

**This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.**

Begin forwarded message:

**From:** Jenna Waibel    Redacted

**Subject: Re: Introduction**

**Date:** June 30, 2021 at 15:19:28 GMT-7

**To:** Antonio Lagares    Redacted

Hi Tony,

These examples were not shared in any of the meetings I had with Ashley or Dan. In each meeting we had I asked if she had anything else to share, which often did not prompt more in that meeting, but did regularly prompt emails with more examples as she thought about it. I did explain twice that it's much more efficient for me to look into all of her concerns at once, and she said both times that her mind continued to process and come up with more examples after we talked.

Redacted    was one of the managers she had asked to report to, if she could not report directly to Dan. She did not raise any concerns about John during the investigation.

Happy to discuss further if helpful.

**Jenna Waibel**

**Corporate Employee Relations**

APL-GAELG_00001471



This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

On Jun 30, 2021, at 1:23 PM, Antonio Lagares [ Redacted ] wrote:

Hi Jenna,

Ashley sent the following examples below. Did she reads any of the three examples to you in the course of your discussions with her? In reading through your summaries, it certainly strikes me that there is not a full accounting from Ashley about how she engages with the team - e.g. her extending invites, offering edibles, being comfortable meeting family members, etc. I will likely try to understand further if there is in fact any new information to justify any additional review, but wanted to confirm if any of the below was new to you.

TL

Begin forwarded message:

**From:** Ashley Gjovik [ Redacted ]
**Subject: Re: Introduction**
**Date:** June 30, 2021 at 13:14:10 GMT-5
**To:** Antonio Lagares < [ Redacted ] >

Hi Tony!
Welcome back. Hope you had a nice break.
Thanks! Appreciate it.

Btw, turns out my instinct was right and my manager, David, has continued with more inappropriate and offensive comments following the completion of Jenna's investigation. I've been sharing some updates with Helen to see if she can help reign him in. It really does feel like he was emboldened by whatever Jenna said to him, or whatever he interpreted Jenna said to him. He seems to think he's completely justified in all the biased and sexist stuff he said/says — and is really on a tear now.

I really don't know how I'm going to be able to continue. As mentioned, I don't want to quit Apple yet but I'm too close to graduating & passing the Bar exam to transfer to another role. And because Dan refused to move me to any other managers in PSQ, I'm stuck with Dave and the stuff he continues to inflict upon me. It's **miserable**.

-Ashley

—

Ashley M. Gjøvik

APL-GAELG_00001472

Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement;
Inclusion, Equity, & Diversity

[Redacted]

On Jun 30, 2021, at 11:04 AM, Antonio Lagares [Redacted] wrote:

Hi Ashley,
I'm just back from some full-time vacation days and catching up on email. Just wanted to acknowledge receipt of your email and that I'll review and respond accordingly shortly.

Best…

….TL

On Jun 22, 2021, at 12:25, Ashley Gjovik [Redacted] wrote:

Hi Tony,
I hope you're well. Thank you again for talking last week and asking someone to do a secondary review. I really appreciate it and I look forward to our next conversation about findings/next steps.

The more I've thought about our last conversation, the more I've felt the need to clarify something you asked about. You asked if there's any new information/events worth including and I mentioned that there was a lot as far as past events that I didn't feel were included in the investigation but should have been, missed due to a lack of follow up & contextual questions from Jenna. I could see how me replying the way I did to you might be too vague. I wanted to share with you three concrete examples to show the magnitude of what I'm talking about. I understand per Jenna the primary investigation is done, so I assume these might not actually be looked into at all, but I'd like you to see & decide how you'd like to proceed on your end.

1) [Redacted] is another director reporting to Dan West, peers with David Powers. A few years ago he was frequenting making comments to me and giving me a hard time about not being married or having kids. He expressed direct displeasure that I was single and dating at my age, and continued to comment its time for me to settle down. He brought this up during work settings and especially at work parties and gathering when others would bring their spouses. I told [Reda] to knock it off and he wouldn't so I asked Dan to step in. Dan said he told him to stop it and [Reda] did finally stop bringing it up directly.

2) When I was at the final Apple party at the Grace Hopper Convention in 2017, Dan West approached me and gave me a desert and told me to eat it. I asked him what was in it and he just said to eat it. I asked again, and again he said, just eat it. I took a bite and said "is there peanut in this??!" And he smiled and said proudly, "yes!" I yelled at him that I have a peanut allergy (I was fairly certain I told him that previously too). He just stared at me. I told him I need allergy medicine ASAP and I spit the peanut gelato back into the cup. He said he'd get some and disappeared. I started having symptoms of anaphylaxis and hadn't heard from him

APL-GAELG_00001473

for about 15min so I tracked him down and he said he was drunk and forgot he was supposed to get me medicine. He said he'd go get it and be back. About maybe 45min after the peanut intake he finally showed up with a single Allegra-type allergy pill. I took it but it was too late and I told him I was having severe symptoms. He disappeared and I never saw him again that night. Another EPM looked after me at the party for a little bit but I felt so sick I wanted to go back to my room and lay down. I got lost walking through the hotel alone, circling for maybe an hour, and when I finally got to my room I puked my guts out in the bathroom and fell asleep on the marble floor there. Dan never followed up or reported it. I told Dave when I got back and Dave said he just sent a joking text to Dan complaining he was trying to "kill his EPM." I saw him text it, so if they both have their iMessage records from that time, it should still be there. Further, I contracted Pertussis/whooping cough during the flight to that conference and ended up getting a full-blown case for the full 100 days despite being fully vaccinated. The theory from the doctors was that I got so sick because while the Pertussis was taking hold, I also got so sick from the peanut allergy via Dan. In addition to standard Pertussis symptoms like coughing so hard I'd vomit every 20 min or so for months — I also bruised my ribs coughing and got bronchitis.

3) I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan insisted I try several times, so when I sat down I texted him that I looked forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, [Redacted]. Apparently they told [Redacte] the same thing. [Redacted] was 24, ten years my junior. I expressed no interest in [Redacted] or dating him — but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It's was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's is a running topic in the household of how weird and inappropriate it was of Dan to do that.

Etc.

Hopefully this helps paint a better picture of what I meant but "lots of historical events not actually investigated."

—
Ashley M. Gjøvik
    Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement;
Inclusion, Equity, & Diversity
    [Redacted]

On Jun 13, 2021, at 5:09 PM, Ashley Gjovik [Redacted] wrote:

Hi Antonio,
Sure! Please feel free to set something up.

Thanks.

—

Ashley M. Gjøvik
  Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement;
Inclusion, Equity, & Diversity
** [Redacted]

Begin forwarded message:

**From:** Jenna Waibel [Redacted]

**Subject: Introduction**

**Date:** June 10, 2021 at 15:17:51 GMT-7

**To:** Antonio Lagares [Redacted] >, Ashley Gjovik <_
[Redacted] >

Hi Tony,

Ashley Gjovik (cc'd) is an employee in Hardware who would like to speak with you about two investigations I have recently wrapped up. Would you please reach out to Ashley to speak with her about her concerns?

Thank you,

**Jenna Waibel**

**Corporate Employee Relations**

[Redacted]

This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

Begin forwarded message:

APL-GAELG_00001475

**From:** Ashley Gjovik [ Redacted ]

**Subject: Re: Introduction**

**Date:** June 30, 2021 at 11:14:10 GMT-7

**To:** Antonio Lagares [ Redacted ]

Hi Tony!

Welcome back. Hope you had a nice break.

Thanks! Appreciate it.

Btw, turns out my instinct was right and my manager, David, has continued with more inappropriate and offensive comments following the completion of Jenna's investigation. I've been sharing some updates with Helen to see if she can help reign him in. It really does feel like he was emboldened by whatever Jenna said to him, or whatever he interpreted Jenna said to him. He seems to think he's completely justified in all the biased and sexist stuff he said/says — and is really on a tear now.

I really don't know how I'm going to be able to continue. As mentioned, I don't want to quit Apple yet but I'm too close to graduating & passing the Bar exam to transfer to another role. And because Dan refused to move me to any other managers in PSQ, I'm stuck with Dave and the stuff he continues to inflict upon me. It's **miserable**.

-Ashley

—

Ashley M. Gjøvik

Engineering Program Manager

\* Mac Systems Quality Strategic Planning & Communications

\* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

\*[ Redacted ]

On Jun 30, 2021, at 11:04 AM, Antonio Lagares [ Redacted ]> wrote:

Hi Ashley,
I'm just back from some full-time vacation days and catching up on email. Just wanted to acknowledge receipt of your email and that I'll review and respond accordingly shortly.

APL-GAELG_00001476

Best…

…..TL

On Jun 22, 2021, at 12:25, Ashley Gjovik [ Redacted ] wrote:

Hi Tony,

I hope you're well. Thank you again for talking last week and asking someone to do a secondary review. I really appreciate it and I look forward to our next conversation about findings/next steps.

The more I've thought about our last conversation, the more I've felt the need to clarify something you asked about. You asked if there's any new information/events worth including and I mentioned that there was a lot as far as past events that I didn't feel were included in the investigation but should have been, missed due to a lack of follow up & contextual questions from Jenna. I could see how me replying the way I did to you might be too vague. I wanted to share with you three concrete examples to show the magnitude of what I'm talking about. I understand per Jenna the primary investigation is done, so I assume these might not actually be looked into at all, but I'd like you to see & decide how you'd like to proceed on your end.

1) [ Redacted ] is another director reporting to Dan West, peers with David Powers. A few years ago he was frequenting making comments to me and giving me a hard time about not being married or having kids. He expressed direct displeasure that I was single and dating at my age, and continued to comment its time for me to settle down. He brought this up during work settings and especially at work parties and gathering when others would bring their spouses. I told [Reda] to knock it off and he wouldn't so I asked Dan to step in. Dan said he told him to stop it and [Redac] did finally stop bringing it up directly.

2) When I was at the final Apple party at the Grace Hopper Convention in 2017, Dan West approached me and gave me a desert and told me to eat it. I asked him what was in it and he just said to eat it. I asked again, and again he said, just eat it. I took a bite and said "is there peanut in this??!" And he smiled and said proudly, "yes!" I yelled at him that I have a peanut allergy (I was fairly certain I told him that previously too). He just stared at me. I told him I need allergy medicine ASAP and I spit the peanut gelato back into the cup. He said he'd get some and disappeared. I started having symptoms of anaphylaxis and hadn't heard from him for about 15min so I tracked him down and he said he was drunk and forgot he was supposed to get me medicine. He said he'd go get it and be back. About maybe 45min after the peanut intake he finally showed up with a single Allegra-type allergy pill. I took it but it was too late and I told him I was having severe symptoms. He disappeared and I never saw him again that night. Another EPM looked after me at the party for a little bit but I felt so sick I wanted to go back to my room and lay down. I got lost walking through the hotel alone, circling for maybe an hour, and when I finally got to my room I puked my guts out in the bathroom and fell asleep on the marble floor there. Dan never followed up or reported it. I told Dave when I got back and Dave said he just sent a joking text to Dan complaining he was trying to "kill his EPM." I saw him text it, so if they both have their iMessage records from that time, it should still be there. Further, I contracted Pertussis/whooping cough during

the flight to that conference and ended up getting a full-blown case for the full 100 days despite being fully vaccinated. The theory from the doctors was that I got so sick because while the Pertussis was taking hold, I also got so sick from the peanut allergy via Dan. In addition to standard Pertussis symptoms like coughing so hard I'd vomit every 20 min or so for months — I also bruised my ribs coughing and got bronchitis.

3) I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan insisted I try several times, so when I sat down I texted him that I looked forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, [Redacted]. Apparently they told [Redacted] the same thing. [Redacte] was 24, ten years my junior. I expressed no interest in [Redacted] or dating him — but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It's was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's is a running topic in the household of how weird and inappropriate it was of Dan to do that.

Etc.

Hopefully this helps paint a better picture of what I meant but "lots of historical events not actually investigated."

—

Ashley M. Gjøvik
   Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
** [Redacted]

On Jun 13, 2021, at 5:09 PM, Ashley Gjovik [Redacted] wrote:

Hi Antonio,
Sure! Please feel free to set something up.

Thanks.

—

Ashley M. Gjøvik
   Engineering Program Manager

APL-GAELG_00001478

* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement;
Inclusion, Equity, & Diversity

[Redacted]

On Jun 10, 2021, at 4:58 PM, Antonio Lagares [Redacted] wrote:

Hi Ashley,
I am following up on Jenna Waibel's introductory email. I lead the ER teams for the
Corporate functions (non-Retail and non-AppleCare lines of business). I understand that
you disagree with the findings and conclusions of Jenna's recent investigations. If you are
agreeable, I would like to schedule time for us to talk next week and understand your
concerns with the investigation and potential next steps.

Please let me know if you have any preferred days and/or time to meet next week and I will
schedule time in iCal for us to meet via WebEx. Don't hesitate to reach out if you have any
questions in advance or our talking further.

Best…

…Tony

On Jun 10, 2021, at 15:17, Jenna Waibel [Redacted] wrote:

Hi Tony,
Ashley Gjovik (cc'd) is an employee in Hardware who would like to speak with you about
two investigations I have recently wrapped up. Would you please reach out to Ashley to
speak with her about her concerns?

Thank you,

**Jenna Waibel**

**Corporate Employee Relations**

[Redacted]

This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the
individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or
agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution,
or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error,
please immediately notify the sender by reply e-mail or telephone.

Begin forwarded message:

**From:** Ashley Gjovik [Redacted]

**Subject: Re: Introduction; Hle**

APL-GAELG_00001479

**Date:** July 8, 2021 at 15:17:04 GMT-7

**To:** Antonio Lagares < [ Redacted ] >

Ignore the ";Hle" in the subject line. I think that was my head hitting the keyboard a few times as I wrote all this out...

—

Ashley M. Gjøvik

Engineering Program Manager

* Mac Systems Quality Strategic Planning & Communications

* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

* [ Redacted ]

On Jul 8, 2021, at 3:14 PM, Ashley Gjovik [ Redacted ] wrote:

Hi,

Unfortunately there's another new event— I just found out today.

In May, apparently Dan and Dave decided to reduce my ownership and supervision of one of my main projects and appear to have handed it off to a male colleague in another organization (Daniel) — and didn't even tell me directly. Dan reduced my supervision & gave Daniel the project <u>after</u> I started raising formal concerns to him about Dave creating a hostile work env & be sexist, raising work place safety concerns, and filed a workers comp claim.
One of Dan's directs, Yuan, sent me an email this morning adding me to an existing thread he had with Daniel:

———

Email between Yuan & Daniel:

On Jul 8, 2021, at 9:03 AM, Yuan Tan [ Redacted ] wrote:

Thanks for checking in on How I Go Here article. getting Daniel's help to publish this one soon.
Begin forwarded message:

**From:** "Daniel C. Carr" [ Redacted ]
**Subject: Re: editorial help with a PSQ profile**

APL-GAELG_00001480

**Date:** July 8, 2021 at 8:38:22 AM PDT
**To:** Yuan Tan [Redacted]
**Cc:** "Daniel C. Carr" [Redacted]

Absolutely! Please let me know the next steps.
Daniel

—

Daniel C. Carr
iPhone HW Systems QA (Product Systems Quality)

Redacted

On Jul 7, 2021, at 9:40 PM, Yuan Tan [Redacted] wrote:

Hi Daniel,
Dan and Ashley briefly mentioned a while back that you may be able to help with editorial review for PSQ team member profiles, such as the ones here:

Redacted

Redacted in my team has a draft version that's not yet published. Would you have time to take a look in the next week or two? I know we are the midst of busy project season. I greatly appreciate any help you can give.

thanks,
Yuan

———

Apparently this engineer, Daniel Carr, asked Dan on 5/6 if he can help with our PSQ employee portal (that I created and oversee). [note: Daniel apologized today, saying he didn't realize I already owned the process.]

———

On 5/6 Daniel emailed Dan:

I am wondering if there are any writing opportunities / content needed for [Redacted] Perhaps a recap or summary of someone's innovation, an interview or spotlight of a DRI or team, or some other topic. If not, if there's any need to edit or proof someone else's draft copy, I am game for that as well.

Best regards,

Daniel

APL-GAELG_00001481

And on 5/6 Dan replied:

I need to think about this one a bit more. I'll likely take you up on it. There is always a need for more content for the team:
**How I got Here articles**
**From the desk of…**
**etc.**

My first thought would be to help curate the HIGH articles. I'm curious - is writing a passion of yours? Not many in the team volunteer to write stuff!

———

I've been the sole owner of the process, editing, approval, and publishing of our *"How I Got Here"* career spotlight articles for over two years. I've also been the co-owner (with Dan) of the *From the Desk of Articles* for a year as well.

It appears Dan made the decision to reduce my role to only working on MSQ articles and appears to have given Daniel broader responsibility than me during a staff meeting I wasn't invited to — and no one told me until I saw the email from Yuan today. Yuan also insisted I was at the staff meeting, when I wasn't. Today Yuan said the following.

<PastedGraphic-1.png>

Further, if you remember from my 2020 review feedback — I raised a concerns about my projects being reassigned to male colleagues without consulting, or even informing me. It appears it happened again.

———

For context here's the overall timeline the best I can put together today. I put the above events in red.

**Timeline of Raising Formal Concerns within PSQ**

• 3/22- 1:1 with my manager, Dave Powers. Dave told me I'm not allowed talk to anyone other than him, EH&S, and Jenna about my safety concerns about Stewart or even tell anyone it's a Superfund site. He said he didn't want his team to "know" because they'd be "upset." He also gave me feedback about an I&D training I was hosting, that "I was being too hard on the white man." He also told me this all as employee feedback and said it's only a "warning" because of my "mental health."
• 3/29 - I start raising questions directly to EH&S about vapor intrusion in Stewart 1 (TRW Microwave)
• 4/3 - I email Jenna notifying her of Dave prohibiting me from speaking about workplace safety concerns and ask her to talk to him or send me an email I can forward with my rights
• 4/3-9 - Jenna doesn't respond
• 4/8 - After telling Dave numerous times I've suffering from severe PTSD from getting

APL-GAELG_00001482

sick last year and "barely hanging on" he texts me and asks me to lead a huge project for a completely different org, dotted-line reporting to a SWE director who sexually harassed me in 2019 (which Dave knows about).

• 4/8 - I reach out to Helen and tell him I'm struggling with my mental health and ask for her support

• 4/9 - I met with Dan West and told him that Dave prohibited me from speaking about safety concerns at work and told Jenna I talked to Dan as well — I ask him to talk to Jenna about Stewart 1. I also tell Dave that I can't work for Dave any more and document my ask to him to "think about solutions for DP situation."

• 4/9 - Jenna then offers to launch a formal investigation into Dave

• 4/9 - I tell Jenna no on the formal investigation but ask her to talk with him

• 4/12 - Jenna says she'll talk to Dave

• 4/12 - I reiterate my safety concerns about Stewart 1 to Jenna

• 4/12 - Jenna asks for a list of witnesses to investigate Dave and offers to look into the [Redacted] sexual harassment

• 4/12 - I ask Jenna to pull my peer feedback about Dave to Dan from the 2020 review cycle as well as other historical review feedback to show context on the systemic issues

• 4/13 - I notify Helen about the ER investigation into Dave and my concerns about Stewart 1

• 4/13 - I notify Jenna of Dave violating my 2020 "return to work" medical accommodations and also giving him feedback about thanking men publicly for my work

• 4/14 - Dave snapped at me during my I&D training and a witness confirmed it was in appropriate, and I notified Jenna

• 4/14 - I email Dan and tell him I want to report to him or John, and go to a 4-work day schedule — otherwise I'll quit his org. I mentioned again specifically my 2020 review feedback about Dave I sent him and working for Dave "is TERRIBLE for my mental health."

• 4/20 - Helen Polkes urged me to file a workers comp claim for my 2019 fainting spell in Stewart 1 that I now believe to be likely caused by vapor intrusion in the building (she basically insisted — she pushed me at least three times to file it).

• 4/21 - I noticed Jenna, Dan, Dave, & Helen of the workers comp claim being filed

• 4/21 - I reach out to the federal EPA about Stewart 1 for the first time

• 4/23 - I remind Jenna to pull the 2020 review feedback from me to Dan about Dave and ask her again if she's talked to Dave about telling me I can't talk openly about work place safety concerns

• 4/26 - I notify Jenna one of the MSQ managers submitted feedback about my I&D training that we shouldn't focus on "equal outcomes," "only equal opportunity." I also notify her that I'm worried about this comment being used against me or me not being able to raise it as sexism/racism concern because Dave often tells me simply to "smile" when his male managers say inappropriate things to me. I mention the manager I suspect wrote no equal outcomes has a long history of being very hostile towards me and Dan once told me another woman hated him so much she quit her company so she didn't have to work with him ( [Redacted] .

• 4/27 - I have a phone call with Jenna, after asking for another time if she's talked to Dave about telling me I can't talk openly about workplace safety concerns, and she is extremely hostile and essentially also tells me I can't talk openly about workplace safety concerns. I document our call and send clarifying questions to her and Michael. She then

APL-GAELG_00001483

says she never said what she said upon seeing it documented. During that call I also started crying and pleaded with her to stop the investigation because the way it's going it seems like she's going to side with my manager and Dan and only get me in trouble. She says she can't cancel and investigation after it begins.

• 4/29 - I talked to Dan West and notify him of the ER investigation into Dave, the workers comp claim, and the discussions I'm having with EH&S about Stewart 1. I also tell him about Jenna pressuring me not to speak openly about workplace safety concerns and ask him to help. I also ask him to follow up with Dave about the "no equal outcomes" comment because Dave refuses to follow up with his team on it. I expressed concerns again that Dave was creating a hostile work env that was severely detrimental to my mental health and asked him what can be done. I asked if he reviewed my review feedback about Dave from 2020 (Helen send you that document) and he said he did but "it wasn't actionable" and I'm just "hot & cold about Dave." I asked him if he had thought more about my request to report to him or another one of his directs (not Dave) and he said I can't report to him. I asked why, he said "no more re-orgs." I said, but my role is already more than half supporting you directly. He said no. I said, what about another direct, he said no. He wouldn't give me an explanation. I told him I will likely have to leave PSQ or Apple if he doesn't response the issue, and he said that's fine. I asked what he will do with my role if I leave and he said he'd cancel the EPM role, that "its an experiment that didn't work out," and convert it to engineering headcount. Dan did say that Dave needed to follow up on the "no equal outcomes" dogwhistle-type comment and that he'd talk to him about it.

• 4/29 - I document my meeting with Dan and what he said and send him notes, then forward to Jenna and notify her what he said.

• 4/30 - phone call with the Federal EPA about Stewart 1 / TRW microwave safety concerns

• 5/1 - I give Jenna more background on the bizarre creation of my role, the lack of definition, the hostility from ⬚Redacted⬚ and my un-approved, HR-protested, forced transfer out of SWE — with reasoning directly related to ongoing lawsuits against Apple — and ask her to talk to ⬚Redacted⬚ for more background.

• 5/6 - I notify Jenna that in MSQ staff meeting they mention Helen & Dan are worried about attrition and that managers need to be mindful with communication and if someone is thinking about leaving to recommend other options to retain them and say that directly conflicts with Dan telling me he doesn't care if I quit apple because of the hostile work env with Dave.

• 5/6 - Jenna still hasn't gathered and reviewed the 2020 Dave feedback I sent to Dan. I find a copy and send it to her and ask her again to review it.

• 5/6 — Dan offers to Daniel that he can work on / take over my roles for How I Got Here & From the Desk of Articles

• 5/10 - I notify Dave I need to take sick time for a heart issue and for side effects from chemical exposure treatment

• 5/7-5/20 — I send Jenna many, many more examples of inappropriate comments and behavior by Dave.

• 5/17 - I raise more questions and concerns about the safety of Stewart 1

• 5/18 - Dan staff meeting where he apparently reduced my ownership of the How I Got Here articles to only PSQ and appears to have given Daniel the overall project

• 5/20 - Jenna tells me she will talk to ⬚Redacted⬚ about my sexual harassment claim and

tell him I was the one who reported it. I ask her not to and that I dont' want him to know it was me and ask her not to look in to it and she says she will anyways and I can't stop her. She pressures me to give the witnesses name to her despite me raising concerns about her being on an H1B and worried about retaliation.

• 5/20 - I also share with Jenna Dave's argumentative response to concerns I raised about wanting more support from Apple around sexual assault during the Supreme Court justices hearings

• 5/20 - I email Helen, Dave, & Dan my concerns about Apple not speaking up in support of Palestinians and Muslims; Helen replies not really addressing my concerns

• 5/20 - I share with Jenna that both Dave and Dan were giving me very condescending and sexist feedback about my "vocal tone" and "uptalk"

• 5/21 - I reply to Helen, Dave, & Dan and re-iterate my concerns and further elaborate my concerns around Muslim inclusion with the recent news of Uyghur forced labor; Helen replies actually addressing this time and let's me know I&D is looking into the whole situation and I'm welcome to talk to them

• 5/21- Jenna offers me Paid Administrative Leave for two weeks starting 5/24 and I say yes. She then tells me I'm not allowed to work at all during that time.

• 5/21 - I notify Dan West that EH&S said they won't answer anymore of my questions about VI.

• 5/22 - I ask Jenna to also look into the sexist language in my annual reviews written by Dave

• 5/24-6/4 - PAID ADMINISTRATIVE LEAVE

• 6/3 - "wrap up call" with Jenna — she says she found no policy violations and the only next steps are for me "to process this" and work with Helen on "my path forward." I send notes after documenting all of my ongoing concerns that weren't addressed — including that it sounds like she never reviewed my 2020 feedback about Dave to Dan (she said she had no recollection about one of the events)

• 6/8 - I have to present the I&D training I did to Dan staff even though I asked Dave to do it while I was out and asked Jenna if Dave could do it because I don't feel comfortable marketing our I&D training while I'm reporting Dave and a manager (likely Redact) for being sexist

• 6/10 - My first 1:1 back with Dave after leave & the investigation. He makes it clear he doesn't think he did anything wrong and it was just me overreacting / misinterpreting

• 6/10 - I notify Jenna what Dave said during that 1:1

• 6/10 - I then meet with Jenna and she tells me the only other steps are to "complain about her to her manager, but I'm not allowed to discuss any details of the investigation" and to "escalate safety concerns to EHS." She also suggests I request ADA accommodations for remote work so I don't have to go back to Stewart 1. She tells me "I don't need a diagnosis, I just need a doctor signature."

• 6/14 - Another PM and I email the Remote Work Advocacy letter to Tim Cook & Deirdre

• 6/20 - I notify Helen I talked to you and you're having your team take a 2nd look at my situation

• 6/21 - 1:1 with Dave and I ask to work remotely and he tells me its not a thing. Finally he agrees to ask Helen, but then says Helen said no. Later Helen said he never asked her and he needs to ask Dan instead. (He lied to me)

• 6/22 - I send you the email about [Redacted] & Dan West making sexist comments

& inappropriate behavior, and Dan West recklessly endangering my health
• 6/28 - 1:1 with Dave where he makes the inappropriate I&D comments & acts hostile towards me
• 6/28 - I express concern to Helen about Dave making inappropriate and possibly sexist comments about an I&D project I'm working on
• 6/20 - 1:1 with Helen where she makes the aggressive comments about remote work and role definition
• 7/2 - Jenna tells me EH&S will actually test the air in Stewart 1 now and notifies me of cracks in the floor there and the need for "floor sealing" and that they'll test the air after the floor is fixed
• 7/2 - I ask EH&S and Jenna if they can test the air before the floor is fixed, to see if those cracks were causing vapor intrusion
• 7/2 - I submit ADA Medical Request for remote work due to needing to avoid industrial chemical exposure
• 7/4 - I email you with concerns about Helen, Dave, and EH&S
• 7/7 - I meet with EH&S and Jenna and they tell me they won't test the air before the cracks are fixed, they refuse to give me any details about what fixing the cracks entail, and again tell me they now won't answer anymore of my questions. I reiterate I don't feel safe in that building and I'm worried about vapor intrusion and I feel they're trying to misrepresent the situation internally
• 7/7 - I express concerns to Helen about her not helping with my role definition
• 7/7 - I send additional / updated concerns about the safety of Stewart 1 / TRW Microwave to the federal EPA
• 7/8 - I find out from Yuan that Dan appears to have re-assigned one of my projects without telling me

-Ashley

—

Ashley M. Gjøvik
   Engineering Program Manager
* Mac Systems Quality Strategic Planning & Communications
* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
** [Redacted]

On Jul 8, 2021, at 10:34 AM, Ashley Gjovik [Redacted] wrote:

Hi Tony,
Yeah… I'm very distressed by all of this. Thank you so much. Looking forward to talking to you tomorrow.

I hope you had a nice holiday.

—

Ashley M. Gjøvik
   Engineering Program Manager

APL-GAELG_00001486

\* Mac Systems Quality Strategic Planning & Communications

\* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

\*\* [Redacted]

On Jul 7, 2021, at 2:39 PM, Antonio Lagares [Redacted] wrote:

Hi Ashley,
I saw that you spent your 4th writing this email. I'm sorry you felt compelled to use your holiday to write. I will schedule some time for us to address these new concerns. Please look for an iCal to propose time.

Best…

…TL

Begin forwarded message:

**From:** Ashley Gjovik [Redacted]

**Subject: Re: Introduction**

**Date:** June 13, 2021 at 17:09:50 GMT-7

**To:** Antonio Lagares [Redacted]

Hi Antonio,

Sure! Please feel free to set something up.

Thanks.

—

Ashley M. Gjøvik

   Engineering Program Manager

\* Mac Systems Quality Strategic Planning & Communications

\* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

\*\* [Redacted]

On Jun 10, 2021, at 4:58 PM, Antonio Lagares [Redacted] wrote:

Hi Ashley,

APL-GAELG_00001487

I am following up on Jenna Waibel's introductory email. I lead the ER teams for the Corporate functions (non-Retail and non-AppleCare lines of business). I understand that you disagree with the findings and conclusions of Jenna's recent investigations. If you are agreeable, I would like to schedule time for us to talk next week and understand your concerns with the investigation and potential next steps.

Please let me know if you have any preferred days and/or time to meet next week and I will schedule time in iCal for us to meet via WebEx. Don't hesitate to reach out if you have any questions in advance or our talking further.

Best…

…Tony

On Jun 10, 2021, at 15:17, Jenna Waibel [ Redacted ] wrote:

Hi Tony,
Ashley Gjovik (cc'd) is an employee in Hardware who would like to speak with you about two investigations I have recently wrapped up. Would you please reach out to Ashley to speak with her about her concerns?

Thank you,

**Jenna Waibel**

**Corporate Employee Relations**

[ Redacted ]

This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

APL-GAELG_00001488

## X. <u>EXHIBIT X: DAN WEST TEXT MESSAGES (2020-2021)</u>

the mailbox happens to be 10' from where they play frisbee

make up to walk to the mailbox...

Yeah teenagers getting the mail is unexpected

How are you dealing with the Chez TJ transition?

Also how do I get monk tea

I'm bummed for my friends

That was the best tea I've ever had

Sorry :(

Did he just want a change? Or pandemic biz hit?

I don't know the details yet

but I don't like the owner (George)

the guy is an absolute creep

Oh no

he tried to get ████ to sit with him and have Champagne

fucker

Eeeeeeeew

NO

rest of the staff got her back (thank god)

She says they're all like family

and she was already telling him no

yeah

Jesus

PL_PROD_12_6747

And he's staying?

he's the owner

only there every once in a while

pop in for an hour or two every couple of months

if that was a daily thing i would have suggested she quit

Yeah seriously

At least she has a bunch of protective big brothers with sharp knives

yeah. they all took her under their collective wings

very protective of her

I told her she can think of the TJ transition that now she's leaving for college, there's no point for them to go on without her

She laughed

oh. I bet she loved that

she hates the changes

It's a lot all at once

dunno

But she seems to have your spirit, she seems fierce

she has mom's spirit

I'm a flame that burns behind the scenes

I've only met ▮▮▮▮ that once

I miss her now that I deleted social media

dude...zuckerberg on the twitter controversy for fact checking trump?!

Huh? What did Zuck say?

The twitter / Trump thing is bananas

PL_PROD_12_6748



but typically on a sunday we'll do something like that

jealous

What is the pastry behind the pie?

Apple tart?

I did turkey confit this year

Im gonna need some of that

yeah. ▮▮▮ made the tart

the pie is coconut cream

I'm all about that tart

She did a great job

all from scratch

she's quite the baker

I just made ravioli and passed out on an administrative law text book

Wow

Whats his face should put her to work

oh! I made some ravioli a couple of months back. It's just a pain to make the dough

The blonde you tried to arrange marry me to left I guess, so she could be sous chef now

oh...lol

Not home made... I buy the fancy premade stuff

#awkward

PL_PROD_12_6845

sorry to do that to you

#veryawkward

of all the inappropriate things I've done. that might be top of the list

especially since I don't think you were comfortable telling me no

Hey I got like a $300 free meal out of it, and he gave me a takehome bottle of that the secret tea... It could have been worse



Um I think I texted you no in all caps a few time about you paying and the Andrew thing

He was like 24 man

I paid for it?

lol

Yes 🤣😭

I must have been drunk

that's over the top

And you and the owner both went 1/2ies to get me double the waygu

Yeah, I was cursing at you

And he wouldn't let me pay myself

I think I gave them like a hundred dollar tip

good

They charge you much more for mail order blondes in Russia

well...Andrew now works in the city

What a deal

PL_PROD_12_6846

He got dumped after he kept texting me at 3am, and spent his weekends gambling in Chino

Way to make me feel 70 years old

thanks for not yelling at me

I did in real time

I don't remember you yelling at me

I'm so sorry

I guess that's all that matters 🤣

now I feel even worse

It's funny – at the time I thought it was going to be a good thing

Its' okay... again free dinner... lots of extra treats.... It all worked out

LOL

You and whats his face too

Jarrod

You were both plotting

yeah!

Jarrod.

he's a good friend

I drank too much to remember but he kept telling me secrets about Yannick

it was actually his idea

I just keep remember thinking "Yannick would be pisssssed if he heard this"

probably

PL_PROD_12_6847

So we can call your dinner intervention a plot to get me too drunk to remember Yannick's dirty laundry

Jarrod had A LOT of options about YB not racing anymore

oh yeah. he wasn't happy

I can only imagine the three of you together

All live wires

God save Allison

dude... ██████ can hang

maybe you needed to worry 3 years ago

not anymore

she stirs the pot the steps back and laughs

LOL

Why you cliffing her like that

you sound like an old person when you use it incorrectly

I can never remember the grammar of it

But also can it be incorrect if it doesn't exist

- ██████ made it

it exists

But she made it solely to troll you

Dianetics is real too

If it exists we can't make fun of you as much

the was just a bet too

PL_PROD_12_6848

**Y.      EXHIBIT Y: OKPO TEXT MESSAGES (SPANKING/OBSTRUCTION)**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC     MAY 26 2026

**Exhibit Y**
**Okpo, E.**
04/07/26
aptus.

Thu, Jul 29, 4:42 PM

Found the full spanking video. It has other terrible stuff in it I forgot about too. Will upload it & send you a link — but here's the spanking preview.



Dan West on left, John Basanese in middle, Monu on right

Also I forgot in that video, he did the spanking, talked about that guys body size/posture, but also Dan made fun of Yannick's eyesight and then the real doozey

Dan told a story when he was supposed to present on something but Yannick switched him out and had Dan's direct present instead — and Dan said he was mad until Yannick told him that Apple will probably get sued about whatever it was and that the direct can take the fall instead of Dan

enjoy.

Delivered

 iMessage

**Z.**   **<u>EXHIBIT Z: 2018 OBSTRUCTION FEEDBACK</u>**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

# Re: Women of PSQ Event: Fireside Chat with Dan West and John Basanese on 5/8

---

**From: Dan West <dan.west@apple.com>**　　　　　　　　Thu, May 10, 2018 at 6:15 PM EDT (GMT-04:00)

To: John Basanese <jbasanese@apple.com>

Cc: Monu Mathur <monu_mathur@apple.com>; Kai Yun <yun@apple.com>; Ashley (PI) Henderson
<a_henderson@apple.com>

---

I 100% love this feedback. There are some great points and it's a great message that we can always get better. Thank you and I will continue to endeavor to improve. It's also a good reminder for me to summarize the point of my stories.

#BeCarefulWhatYouWishFor
#MAKTough

Sent from my iPad

On May 10, 2018, at 3:00 PM, John Basanese <jbasanese@apple.com> wrote:

> Hi Monu, Ashley and Kai (MAK),
>
> Thanks for the detailed feedback, I'm now feeling insecure! (Kidding). :) There is lots we can learn from this to make it better for next time.
>
> More importantly, thank you for holding this event. The feedback I've gotten personally is that people were really motivated by this, and that's on you three!
>
> Best,
> John

>> On May 10, 2018, at 2:42 PM, Monu Mathur <monu_mathur@apple.com> wrote:
>>
>> Hi Dan and John,
>>
>> Thanks again for taking the time for the Fireside Chat!
>> Detailed feedback below.
>>
>> Thanks
>> Team MAK
>>
>>
>> **<u>Moderator & Panel</u>**
>>
>> We have received positive feedback regarding the fireside chat. People enjoyed the up-close opportunity to hear Dan and John share their stories and advice.
>>
>> **Wins**
>>
>> - The interview and comments felt very authentic and honest — didn't feel staged at all
>> - The advice offered was very tactical (easily executable tips), and we loved that it was combined with strategic insights to help us understand the big picture too
>> - John & Dan's charisma was on point
>> - We are so glad Dan kept ▮▮▮▮ on the rails
>> - John and Dan made themselves very approachable — the ▮▮▮▮ moment was one, and it felt like there were other little things they did to open people up and help them feel ok to ask them questions
>> - John didn't talk about his brothers
>> - Monu was super engaged in the interview — good posture, eye contact with the panel, and lively tone

PL_PROD13_007247

**Opportunities for Improvement**

- Dan and John made many comments/questions about their intros at the beginning, it came across as disorganized for all three
- Dan confronted Monu in front of the room about one of her questions (the one he thought there were too many questions in one), and it came across like he didn't read the questions beforehand and put Monu in an awkward spot
- John mentioned at the beginning that he didn't read the questions so it felt more authentic. That felt like a staged comment - even though he was trying to be authentic overall
- Dan probably shouldn't have made fun of Yannick's eyesight
- We didn't hear it at the time, but after watching the video Monu was hitting the table a lot in the beginning and it sounds loud on the recording
- John probably shouldn't have talked about someone's body size and posture in a way that sounded like it was a disadvantage (his example of the guy who's really good when he's presenting, but doesn't seem like it before hand)
- John probably shouldn't have suggested people hug coworkers who are honest with them — but he did retract
- At some point, when Dan was sharing a story where he felt excluded that Yannick asked Dan's direct instead of Dan to present at a meeting. Later on, Dan found out that Yannick did it partially due to protecting Dan, as that meeting was involved with possibility of Apple being sued. This implicitly implied that it is OK to expense Dan's direct - even though Yannick out of good intention, wanted to protect Dan.
- ██████ question around feeling more included even without sitting at the table was a tough one. We think Dan touched on how you engage people who are not at the table - which was good, and asked for ideas. However the answer somehow felt incomplete.
- ██████ question at the very end was another hard one, and it came as we were winding up :(. Some women we talked to, felt that they didn't agree with the answer. They felt that women and minorities should try harder to sit at the table. They feel that its hard for them to get noticed, and not sitting at the table makes it harder.

## Overall

### Wins

- Really great turn out, maybe the best so far since the kickoff
- Our favorite fire side chat so far!

### Opportunities for Improvement

- Maybe we should have added to the introduction that this is a fireside chat about a very specific topic, we didn't really frame the interview in that context
- ██████s question felt a little awkward, like either she hadn't been listening, or she didn't really get what Dan or John had been saying
- MAK need to make it clear where the video feed will be, and ensure we don't have people sitting in the background, or if they do they already consented to being in the feed — that was a scramble in the moment

On May 9, 2018, at 1:50 PM, Dan West <dan.west@apple.com> wrote:

Team MAK,

Last time we discussed one of the benefits of taking part in these discussions is the ability to get feedback (good and bad) to help with development. With the spirit of continuous improvement, feel free to unleash. Knowing the 3 of you, this won't be a problem. :)

What comments resonated, what fell flat? Where could I have been better? I love to hear it all. Even if I disagree, it's still food for thought and it will help me be better. Nothing is too trivial. If you think it's noteworthy I'm happy to hear it.

Thanks,
Dan

On May 9, 2018, at 12:29 PM, Women of PSQ <wpsq@apple.com> wrote:

PL_PROD13_007248

Hello,

You can now view a recording of yesterday's fireside chat
here: ███████apple.com,███████/WPSQ/DanAndJohnInterview/

You can also find links to videos of previous events
here: https://confluence.sd.apple.com/display/PSQ/Women+of+PSQ+Group

*BCC: All PSQ Employees*

—

Monu, Kai, & Ashley
    Women of PSQ


On Apr 18, 2018, at 8:50 PM, Ashley Henderson <wpsq@apple.com> wrote:

Hello,

How many times have you heard the phrase "take a seat at the table"? If you've ever wondered what it means or why it's important — we have a new event series for you!

"Take a Seat at the Table" is a four-part series designed to provide guidance, inspiration, and opportunities to practice skills. At the conclusion, we hope that you'll feel more confident speaking up in meetings, asking tough questions, sharing your wisdom, and presenting to others.

We are kicking off this series with a "fireside chat" with Dan West (Senior Director of PSQ) and John Basanese (PSQ Director). Dan and John will be sharing their experiences and wisdom, providing advice, and answering your questions about this topic.

If you would like to attend, please RSVP here: https://meetups.apple.com/events/2384

If you have questions you would like asked of Dan and John during the interview, please email them to: women_of_psq@apple.com

*Note:*

- *There is limited seating availability due to room size — so RSVPs will be first come, first serve. If the event RSVP site shows as full, then unfortunately the room is already booked to capacity.*
- *We will try to record this session for future playback by the geos and anyone local that cannot attend.*


Hope to see you there!

—
Monu, Kai, & Ashley
☐ Women of PSQ

PL_PROD13_007249

**AA.**     <u>**EXHIBIT AA: OKPO EMAILS (8/23/21)**</u>

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC     MAY 26 2026

**From:** **Ekelemchi Okpo** eokpo@apple.com
**Subject:** Re: APPLE CONFIDENTIAL: Issue Confirmation
**Date:** August 24, 2021 at 2:53 PM
**To:** Ashley Gjovik  ashleygjovik@apple.com

 

**Exhibit C**
**Okpo, E.**
04/07/26
aptus.

Ashley-

I've received your revised issue confirmation.

The investigation is ongoing and I've started conducting witness interviews.  I am not able to communicate a timeframe on next steps, but as the investigation progresses, I will provide you with additional updates.


Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.


> On Aug 23, 2021, at 7:33 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
>
> Actually please reference V3 below.
>
> I added Dan West's obstructive of justice comments from the Fireside Chat video (that was missing too).
>
> I also elaborated on my concerns around conflicts of interest & corruption related to Ronald Sugar. I filed a Business Conduct ticket with my concerns & also attached this document. It's ticket HRC000017207, as noted in the v3 document.
>
>
>
> Gjovik - Issue
> Confir...d .docx
>
>
>
> Gjovik - Issue
> Confir...ed .pdf
>
> —
> Ashley M. Gjøvik
>  Engineering Program Manager
> ✦ Mac Systems Quality Strategic Planning & Communications
> ✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
> ☎ (408) 204-9976
>
> > On Aug 23, 2021, at 3:46 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
> >
> > Hi Ekelemchi,
> >
> > Please confirm you received this revised issue confirmation.
> >
> > I look forward to hearing your response and some sort of ETA for an update, even if it's "at least a week / month" etc. As of now I currently have zero timeframe from you on next steps whatsoever.
> >
> > -A

PL-PRD-8-0147

**Ashley M. Gjøvik**
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

Begin forwarded message:

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Subject: Re: Employee Relations Investigation: Ashley Gjovik's Issue Confirmation**
**Date:** August 22, 2021 at 6:36:30 PM PDT
**To:** "Ekelemchi Okpo (ER)" <eokpo@apple.com>
**Cc:** "Ashley G (Work)" <ashleygjovik@apple.com>

Hi Ekelemchi,

I hope you are well. Attaching my revised version of the Issue Confirmation, in both PDF & Word. It took me a long time to add all the missing items and rephrase all the misleading items — but there's probably more to do. Please let me know if you'd like to send another round of revisions. I'd be more than happy to work through any potential misunderstandings now.

Thanks!

P.S. hope to hear more about my office & safety soon!

<Gjovik - Issue Confirmation v2 - Revised.pdf>
<Gjovik - Issue Confirmation v2 - Revised.docx>

**Ashley M. Gjøvik**
Senior Engineering Program Manager, Apple
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
📞 (415) 964-6272

On Aug 17, 2021, at 11:32 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi,

Thanks for your reply. I will convert the PDF to a Word doc myself and send it to you with revisions after I've reviewed and feel it's accurate. I know you said to respond "immediately," but instead I will respond in a reasonable amount of time and not forsake accuracy for speed.

I'm glad our communications will be in writing going forward so there will not be any more he said/she said. As I mentioned many times, and in writing, this exact type of scenario is why I wanted my 1:1s with Dave, Dan, & Helen to be in writing during the investigation because verbal conversations were frequently being misrepresented and statements denied after the fact. I stand by my memory of the events on 8/4, and as you've seen/read (i.e. the vaccine corruption whiste-blowing), Apple senior leaders have trusted my recollection and interpretation of events/statements, even with major risk and consequences leading from that interpretation.

I will send you my updates in reasonable amount of time — and considering you took eight business days to send the issue confirmation, I assume you will be okay with waiting a few more days for corrections and clarifications.

Can you please elaborate what you mean by "your focus at this time should be on the investigation"? Are you implying that I not continue to raise work place safety concerns or monitor safety concerns I already raised? I remain concerned about the health and safety of my coworkers.

Best,
-Ashley

**Ashley M. Gjøvik**
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Aug 17, 2021, at 11:20 AM, Ekelemchi Okpo <eokpo@apple.com> wrote:

APPLE CONFIDENTIAL:

Ashley-

Please feel free to forward your revisions to the document to me in writing via email.

Based on what you've shared with me, I have identified a number of individuals who I believe have information about the  concerns you raised. I am going to speak with these individuals and keep you updated on the progress of the investigation.

Your description of our August 4, 2021 call is not accurate. As outlined in the issue confirmation, I am looking into all of the concerns you raised, and I did not convey to you that I was limiting the scope of the investigation to Dan West and David Powers. You also did not express concerns about my ability to conduct an impartial and objective investigation during our 8/4/21 call, or at any other point during my conversations with you.

As previously mentioned, EHS is investigating your building and workplace safety concerns, and they will be in contact with you when they have an update to share. Additionally, as I mentioned during our call on 8/4/21, you are not expected to participate in any work related assignments, and your focus at this time should be on the investigation. I understand that as a result of this, you are not frequently checking your work email. Therefore, I will send you a message via text to your work device (+1-408-204-9976), and inform you of any communication to your work email address pertaining to the investigation.

Please let me know if you have any further questions.


Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.


On Aug 16, 2021, at 9:47 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi,

I hope you're well. Good to hear from you… it's been a while.

Corrections will be needed to the document you sent. I will need to redline. If you'd prefer revisions to be inline, please send the document below in Word or Pages format so I can use the review feature (preferred). Otherwise, I'll resort to hand writing comments and scanning them to send back to you.

Can you please also specify which people will be investigated? On 8/4 you said only "Dan & Dave" because "it's simpler" that way, and that you won't be reaching out to me with any follow up questions because "you have everything you need." I protested that & that is when I told you I no longer trust you're going to actually do a good faith & thorough investigation.

The document you sent details many of things we discussed, but it is unclear if you plan to actually investigate anyone outside of Dan and Dave still. I was especially concerned when I heard that my teammates were being referred to Helen if they have questions about me & my situation, despite my request she herself be investigated…. So, I'd like the list of people being investigated to be made clear in the document, please & thank you.

Can you please also provide more details on my workplace safety concerns — the last I heard from EH&S (via Jenna, aka ER) was that they weren't going to answer any more of my questions and there was no ETA for any future updates. Do we know anything more? I've seen a lot of activity by EH&S at my building — and I also noticed they appear to have hired an enormous amount of vendors very recently. I'd love to learn more.

Thanks,
-Ashley

P.S. adding my personal email so it's easier for me to know when you reply, since on 8/4 you said I "don't need to check my work email or phone, since you have everything you need already" and when I kept asking for an ETA on when I'd hear fro you next, you said there is no ETA several times… aka indefinite (no defined start/end date, or checkpoint date). Would love a checkpoint! Thanks!

PL-PRD-8-0149

—
**Ashley M. Gjøvik**
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Aug 16, 2021, at 5:38 PM, Ekelemchi Okpo <eokpo@apple.com> wrote:

Apple confidential:

Hi Ashley-

Please see the attached.

<Apple Confidential_Issue Confirmation_8.16.21.pdf>

 
Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

PL-PRD-8-0150

**BB.    <u>EXHIBIT BB: SCHIFFER EMAIL (JUNE 2021)</u>**

# Re: Tech NDAs

From    Zoe Schiffer <zoeschiffer@protonmail.com>

To    Ashley Gjovik <ashleymgjovik@protonmail.com>

Date    Thursday, July 1st, 2021 at 9:19 AM

Hi Ashley,

Thank you so much for sending! These are super interesting to finally see. Would you be open to chatting on Signal in case I have other Apple questions in the future? Your name will never be used but it's always helping to have more people to speak to. Let me know. Are you in law school currently, while also working at Apple? That sounds nuts!

Zoe

Sent with [ProtonMail](#) Secure Email.

------- Original Message -------
On Wednesday, June 30th, 2021 at 6:45 PM, Ashley <ashleymgjovik@protonmail.com> wrote:

> Here you go. Also, there's a bunch of restrictive & invasive employee policies on our "People" internal website (the HR website). I don't see anything marked "Apple Confidential" or "Internal Only," so sharing a few anonymously too since I think you'll find them relevant. Apple seems to layer these on to the original NDA, and says they can change them as they feel like. I've never gotten a "push" notification when they change either, I guess they expect us to check the People site constantly to see what we're subject to.
>
> All of these policies are so complicated and Apple is so powerful, I'm planning on sitting down with an attorney after I graduate law school and quit Apple to figure out what exactly I can actually talk about publicly even after I don't work for Apple anymore. I feel fairly confident I'll be able to talk about stuff protected by labor and employment laws (like formal employee policies, etc), and nothing about IP, but everything in between seems fairly murky.
>
> -Ashley Gjovik
> [https://www.linkedin.com/in/ashleygjovik/](https://www.linkedin.com/in/ashleygjovik/)
> (415) 964-6272
>
> ------- Original Message -------
> On Wednesday, June 30th, 2021 at 6:01 PM, Zoe Schiffer <zoeschiffer@protonmail.com> wrote:
>
> > Hi Ashley,
> >
> > I don't actually have one from Apple yet! No one I have talked to has a copy of theirs. I'd be curious to see what it says, for sure. You can be anonymous.
> >
> > Zoe
> >
> > Sent with [ProtonMail](#) Secure Email.

PL_PROD13_009694

------- Original Message -------

On Wednesday, June 30th, 2021 at 4:36 PM, Ashley Gjovik <ashleymgjovik@protonmail.com> wrote:

> Hi Zoe,
>
> I saw your post about working on an article about tech NDAs. It's a very important topic and exposing these policies is critical to changing the toxic culture in tech. Thank you for tackling the subject. I hope your work will help SB331 get passed.
>
> Do you have an NDA from Apple corporate yet?
>
> They don't actually give us copies of the agreement we signed with our offer letters and I don't even know if there's a process to request a copy (*sketch*)— but I did take pictures of mine from 2015 before I mailed it back to them.
>
> Please keep this off the record for now & keep me anonymous.
>
> Thanks!
>
> -Ashley Gjovik
> https://www.linkedin.com/in/ashleygjovik/
> (415) 964-6272

PL_PROD13_009695

**CC.**    **<u>EXHIBIT CC: SCHIFFER TEXTS (JULY-AUG. 2021)</u>**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC      MAY 26 2026

**Zoe Schiffer** ⊚

  



Overall Score: -0.448044091463089
# of Frames Displayed: 9/15
Face ID Result: Success
Face Detection Result: Success          Aug 20 12:50pm ⊚



i think the best response is prob just this face i made

Aug 20 12:51pm ⊚

and htere's one topless in those pics i sent... so you can say, indeed an employee saw the app was taking pics of them naked

Aug 20 12:51pm ⊚

i was hoping it woudl have caught a more flattering view... but whatever....

Aug 20 12:51pm ⊚

i feel like you might be on the floor right now

Aug 20 12:53pm ⊚

Lmao this is my face the entire time I'm writing this article

Aug 20 12:53pm





PL_PROD_11_11512



im also changing my mood about maybe letting you use one of the pics it took of me

Aug 20 12:59pm



one of the least awful ones maybe

Aug 20 12:59pm

but remove any code / #s etc

Aug 20 12:59pm

a photo of me is not Apple IP

Aug 20 12:59pm

especially a photo fo me drunk making pirate faces

Aug 20 1:00pm

Hahahha

Aug 20 1:00pm

Your call but it def like illuminates how invasive this is

Aug 20 1:00pm

So you just lmk

Aug 20 1:00pm

And say which one you're ok with and I'll get the team to redact

Aug 20 1:00pm

righhhhht like did you watch the video is ent

Aug 20 1:08pm

omfg

Aug 20 1:08pm

PL_PROD_11_11509

**DD.** <u>**EXHIBIT DD: C.S. EMAIL (2/5/22)**</u>

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

# New Form Entry: Contact Form

**From: <no-reply@weebly.com>**
To: <ashleymgjovik@protonmail.com>

Sat, Feb 5, 2022 at 12:58 PM EST (GMT-05:00)

You've just received a new submission to your Contact Form.

Mark as Spam

## Submitted Information:

**Name**
Cher Scarlett

**Email**
me@cher.dev

**Website**

**Business, Institution, or Coalition**

**Message**
This is a last resort, not a block evasion.

I am reaching out in good faith in the hopes that we can resolve this conflict between us for the good of others, and each other. I will address some of the things I've seen/heard first. I do not wish to escalate, which is why I haven't participated.

I apologize for how my actions have made you feel. That does not justify your behavior.

Please remove my tweets that cannot be reasonably justified to be connected to you from your January NLRB memo, including medical information and information about my family. Please also remove your tweets that contain my former legal name. You are aware that it was changed for safety reasons, and I spent a long time ensuring they weren't connected anywhere.

1) I am not testifying against you, nor on Apple's behalf. I wouldn't do that unless I was subpoenaed, and I don't believe they would have me do that, because cross-examination would allow me to answer questions that would discuss their culture of surveillance.

I am named in their defense, which I was only informed of as a courtesy. I am upset by it, given what I've been through, which is why I mentioned it.

2) I have lied about my education in the past, and my role, tried to hide my gender, and invented whole companies. I had an infant, was making poverty wages at multiple hourly jobs, and I was trying to survive. I did what I needed to do, including enrolling in college multiple times and withdrawing for the students loans.

This is something I've talked openly about for several years in my advocacy against gatekeeping and sexism in tech, and the realities that not everyone in tech is rich. I was also on food stamps until I was almost 30 years old because of my low income, and my kid's dad never paid child support.

I've been very open about my past, going far beyond that. I WaPo did a very thorough background check on me and it would have taken more than the limit of 2,000 words to disclose everything. They chose to disclose the check fraud because it was the most extreme and fewest words.

3) Yes, I am a single parent. My marital status has been public -- I literally posted about when it happened. I've been separated since last July. I have never lived with my husband, and I don't live with him now. I am, however, supporting his household and my own while he works on his career, and makes very meager wages as a laborer. Our relationship is extremely unhealthy and I'm not ready to talk about any of it to the public, so I post occasional happy moments in trying to work on that relationship.

Do you think a parent who has a live-in partner and two incomes is a "single parent"? The point is the financial strain, not whether or not you are married. I don't get child support from my ex. My husband's kids' moms are strung out and can't help financially.

I qualify for food stamps. Does that tell you anything?

I am asking you to please remove his personal information from your Twitter, your NLRB charge, and anywhere else. His criminal history is literally no one's business. He's done his time. He also comes from an abusive home in poverty full of drugs and alcohol. The incident that happened when he was 12 years old was a manifest injustice in which he was also a VICTIM to an ADULT who got found "not guilty" in a trial and all of the information about what that adult did was stricken from my husband's case. We've been working with a program in our county to get it all fixed -- which is why we got married, because it's traumatic for him and legally, I can speak to his FREE attorney on his behalf to keep everything moving forward.

His life was destroyed by a new judge, and he was institutionalized as a child until he was 18. That same judge got us into the program. Words on a piece of paper with no context don't tell you what happened. It is deplorable for you to tell anyone's story based on what you "think" is public and fact.

4) I never called you "a racist". I said you tweeted something racist, "Pulling the race card", and spoke to you about it in a very diplomatic way. I also didn't care for the way you reacted to criticism over it, but still gave you advice on how to learn and grow from it as a friend.

5) Not all of my generalization tweets are about you. Most of them are not about you. While the GFM tweet happened at the same time as yours, there were multiple retail workers who came to me about yours the day you posted it extremely uncomfortable with the fact that you had posted very recently that you made almost $400,000 the year prior and spoke frankly about your financial comfort. The next day, another GFM popped up that was also asking for financial help without a clear use from someone from a place of financial privilege. I never told anyone not to donate to you. I wouldn't do that.

I stand by what I said -- and most of my followers and your followers do not cross over. GFM donations are not taxable. You made it very clear you had a lot of savings and had no financial motivations.

The Simpsons gif was not calling you a child. You are principal Skinner in that reference.

And "eject from amplification" means I blocked you. The tool I have for amplification is

PL_PROD13_005022

Twitter algorithms.

6) That brings me to my next point. I never told the press not to talk to you. You harassed a bunch of journalists using your Twitter account. Why on earth you thought it was somehow my doing, and not a consequence of your own actions is beyond me. My CNBC segment was live. There was no conversation before or after. I didn't even get to prepare, let alone have time to name drop you so they wouldn't talk to you. I didn't even know you were planning to speak with them. We weren't talking anymore at that point.

Even if I wanted to write you out, I don't have the power to do that. I only corrected misinformation, which honestly, I thought I was doing for your benefit. I am worried about what will happen to your mental health if any of your cases are dismissed due to any impropriety. I imagine you were told what I was told when I asked why they weren't covering the EPA stuff - there was absolutely no corroborating evidence and there were questions that couldn't be answered. The ones I spoke to about it were extremely disappointed that there wasn't anything they could write about yet.

You also convinced Chelsey I was trying to erase her from press coverage and the work. I literally talked about her every single time someone asked me about the WA bills, even though I had no idea what work she had done. The piece about Ifeoma was about her impact, not about the WA bill. Chelsey made it super clear she had been working with the senator on NDA law prior to Silenced No More Act. I invited her in to every single thing I was doing once I became aware of her. I talked about her on a podcast that she didn't even know about. I tried to get HER coverage for the EAP bill.

7) While I initially said you lied about being "suspended", though not publicly and to less than FIVE people, I never called you a liar. Those tweets were NOT about you. I was extremely bothered by the fact that you told me you discovered it was an adverse action, and started saying you were suspended, instead of that you felt forced into requesting the leave. You were never suspended from access to systems, though I do believe you were discouraged from using Slack and communicating with coworkers. I was told not to, and punished for doing it anyway.

I also never argued it wasn't indefinite. They didn't give it an end-date, which is the definition of indefinite.

I also stopped feeling that you were being purposefully dishonest, and empathize with what you were going through because of the situation you were in.

7) I added you to the AppleToo piece as a peace offering. I did not believe you would be okay with being left out. That being said, I'm sorry I picked something you didn't like. I also don't follow you on Twitter... we've blocked each other. You seem to remember me saying I have a shadow account. I don't. I told you I looked at Twitter in private browsing mode to see what trolls/harassers were saying in the past who blocked me back, but that I stopped doing it because ultimately what they want is attention.

The ordering was random, and I had no idea you had a trigger with the article. I essentially know nothing about your past. I have a lot of suicide in my family and I take those things seriously. I made sure you weren't next to a person you didn't like, and didn't do much beyond that.

Also, it wasn't a "rank and file" rating. I only numbered them to show how many they were as a count. Because it's A LOT.

When I said we "connected over your legal expertise" I didn't say you "gave me law advice". Once again, it was a peace offering. Rather than sharing that I felt like you were dismissive of vulnerable people, I pointed to why I re-engaged with you after that, and yes, it was your knowledge about the law. I trusted you on it, and not because I was taking legal advise, but because you helped me navigate to important parts of law that I wouldn't have known about, and told me I could ask for things of a lawyer I didn't know I could ask for. It was a COMPLIMENT.

8) Yes, I reported you to the FBI. I was in a terrible place mentally, had relapsed, and

PL_PROD13_005023

you were posting private/personal information about me because you thought I was testifying against you and just to do me harm, and I was BEGGING you to stop via Melissa, and you took it upon yourself to try to capitalize on my distress by finding a way to make a material gain via GFM and Twitter. It's abusive, Ashley. And another government agency with insight into this suggested I report it to the FBI because they believe what you did was a federal crime.

My family is now being harassed because of you. You didn't block out my mother's name on your post about her, and her facebook is not locked down, and she has my daughter and the rest of my family members on display.

Please remove the images of my facebook, my mother's facebook, and any other of my family's social media accounts.

And btw, saying because in the ONE family photo we have from 1989 (which is absent a fucking FATHER, btw) my mom is wearing makeup is such an offensive, classist remark. Poor people can wear makeup. They can also purchase a used ottoman with tassels at 60 years old. Poor people don't need to be resigned to having nothing. They also tend to treat themselves when they get a bit of money because barely surviving is MISERABLE.

I happen to eat at TV trays because I can't afford a dining room table and chairs. My mom had those things.

Also, she was an administrative assistant at construction companies, she didn't "sling concrete". The people who did that made way more money than she did and they were in a union.

9) It is my opinion that your retaliatory discharge is hard to prove because the onus on Apple is only to prove that they would have fired you anyway. Given our text exchange, I don't believe it is. I do apologize for talking about it on Blind and sharing my opinion there, but that is not a crime and it wasn't due to Apple's culture or being some kind of controlled opposition. When I said to you, "oh so you're just in full-on fuck it mode," I was communicating this very thing to you. Did I report you for it at that time? No. Not because I didn't believe it was an IP leak (there were internal documents of unreleased tools), but because you believed it was invasive and an example of surveillance culture at the company.

When you started saying you did NOT leak IP and saying it was because of photos you took of yourself on your phone, I was confused, because you seemed to be pretty well aware of what you were doing when you sent all those documents to Zoe and stood by it.

When I said to Dawn I could get behind you saying you believed it was a PROTECTED leak, but not that it didn't happen, I wasn't talking about TO ME. I was talking about publicly. I was literally saying if you said the same thing to the press and on Twitter you had said to me I would have been supportive. I couldn't support what you were doing.

I also wanted to warn her that what you told me was different than what you told her. Because it was. You told me they declined both of your asks in July to be placed in a new position on another team and your paid exit. You told me that I should tell my lawyer I'm not willing to sign an NDA, and that that was your plan. You also told me MORE THAN ONCE about the no lawyer would take you unless you got fired. Once was in the text you shared, the other was when you were SCREAMING at me on FaceTime because you were upset about the Signal group criticizing your behavior and motivations. I had said that we were in far more privileged places than others -- both because we're white and cisgender, and me for my career tenure; you for your savings. You were extremely upset and worried by the idea of tying our issues together, and being associated with unionizing and Corey Moll, even telling the Signal group that your moral character examination could be at risk.

10) My outing myself as the confidential source and SEC whistleblower was not "self-sabotage" in the way you think it was. There needed to be something on the public record so that shareholders had the ability to either vote, or sue over the no-action. SEC

PL_PROD13_005024

tips are not public. In order for journalists to write about this, they needed 5+ NDAs "anonymously on background". One journalist accomplished that, with my confidentiality in tact, and a story was written and scheduled. After editing, the story got canned because it was "no longer news". Do you know whose AppleInsider piece on a whistleblower tip which contained absolutely no material information shareholders could use caused that? Yours. No one was willing to give their NDAs to yet another journalist who might publish. No one was willing to go on the record. I sacrificed my severance, COBRA, and attorney's fees so that the public would have actual evidence of the clauses.

11) I did not report any harassment to Twitter from you except yours to me. I did not say who I alerted, I just said "them". Implying that people are trying to have you assassinated or cause you to kill yourself, me included, is extremely harmful, and I alerted APPLE about the chain of tweets involved in doing so. I was criticizing both Apple and Twitter for applying the rules to the tweets about the men and current employees, but not the tweets about me and my family which fell under the SAME rules. I deleted the tweets because a dozen people who DID report them to Twitter got notice they were deleted. They didn't realize it didn't include the ones of me and my family, and I wrongly assumed they checked.

12) I blocked Kate and JeansSquirrel or whatever because both of them were amplifying harassment, including actual defamation, of me. I also told that to Kate, who I only unblocked to ask to stop punching down on the other hundreds of Apple employees involved in organizing because I'm helping them.

13) I have stood up for you repeatedly. Even IN some of the threads you claim are me harassing you. It's extremely frustrating to watch you try to make something true because you think it is, but I guess this is the kind of thing that will make you a good lawyer.

Even in one of the posts you claim is discrimination because you... don't have kids... I said I was WORRIED for you. I am. I was saying you'd be fine financially because YOU TOLD ME you had plenty of savings to weather the storm. You also told the entire internet that on Twitter when you patted yourself on the back for how smart you'd been about saving and investing. You cut out the context that made it clear I was saying you'd be fine financially, which sure, I shouldn't have shared my opinion on Blind, but frankly, I was sick of being attacked because of your behavior in spite of my own being very different.

I feel that you have been treated terribly by Apple, and in spite of my personal issues with you, I want you to have justice, not only for the common good, but because having a government body hold an abusive corporation accountable is validating and therapeutic. The DFEH lawsuit against Blizzard changed me in a very good way.

-----

I'm sure there's plenty more things that are mixed in there but the main take aways are:

1) I hope you get justice
2) I apologize for sharing my personal opinion about the difficulty in proving your case, and sharing that you leaked internal docs/IP
3) I apologize for sharing my personal opinion that you would be fine financially
4) You need to delete the posts about my family and those that contain my previous legal name
5) You need to delete my tweets from your memo that contain personal information about me and my family, including my previous legal name, my medical information, any and all things pertaining to my family
6) You need to remove all assertions that I am accounts trolling you

Sincerely,
Cher



**Are you looking for a response?**
No reply required

PL_PROD13_005026

**EE.**    **EXHIBIT EE: C.S. TWITTER MESSAGES (SEPT.-OCT. 2021)**

at an airbnb, with friends/family, or a cabin

If she was really deeply involved with Apple, her whole world is melting down and mentally this will be quite a bit to handle

Sep 13, 2021, 3:44 PM ✓



I think all of this has been a bit overwhelming to her in general, hence some reckless decision that have put her in a bit of a bad spot

I hope she heeds your advice and goes and takes a bit of a break from it all

Sep 13, 2021, 3:48 PM

Just looking at her situation from the outside (I don't know her at all): She's meticulous, has some legal background, is good with the press, and has supporters in/outside of Apple. (Which makes sense – Apple wouldn't hire just anybody.)

Also, Apple is getting a lot of bad press lately about working conditions etc.

Anything that happens to her will be broadcasted so loudly the world will here it.

Sep 13, 2021, 3:52 PM ✓

She's not meticulous about everthing

That's why she got fired

My lawyer told me to distance myself from her because of the egregious inflammatory comments she was making



Sep 13, 2021, 3:58 PM

PL_PROD13_002669

That's why she got fired

My lawyer told me to distance myself from her because of the egregious inflammatory comments she was making

Sep 13, 2021, 3:58 PM

You can't just claim your workplace is threatening you with physical violence and the like, and you can't just leak IP with no real whistle to blow

I feel like she's put the entire movement at risk with some of the decisions she's made, and hurt her own case

Sep 13, 2021, 3:59 PM

I agree everybody is watching her now that she's been fired, but the EEOC and DFEH have already declined to pursue and given her the right-to-sue. Is it possible she'll end up with a lawyer that is willing to sue on contingency anyway? Maybe. I hope so for her sake.                                    •••

Sep 13, 2021, 4:01 PM

Hopefully she'll continue with law school and move on.

Sep 13, 2021, 4:01 PM ✓

well, really, for everyone's sake

Sep 13, 2021, 4:01 PM

Given what I know (which is just her Twitter/web site info) – that makes the most sense to me.

Sep 13, 2021, 4:01 PM ✓

I think she will continue with law school, she had asked for a paid exit last month that would have

PL_PROD13_002670



**Cher Scarlett**
@cherthedev

~~I met with the paralegale prior to signing~~

Sep 13, 2021, 5:27 PM

> Hang in there! I would follow your lawyer's advice. It'll work out.

> You're going to win

> You're still inside right? So it will take nerves of steel.

> Just hold firm

> And I wouldn't trust ANYBODY inside of Apple.

> period

Sep 13, 2021, 5:34 PM ✓



Yea, I'm still inside.

My lawyer said the same. Do not trust anyone inside, and don't talk to legal or business conduct or HR without one of my lawyers present.     ...

Sep 13, 2021, 5:35 PM

 **Richard Geldreich** @richgel999 · Oct 29, 2021
Replying to @ashleygjovik
Sorry - nothing you should have a panic attack over. The type of PR they are deploying against you is the usual manipulative lying BS. All this means is you are having an impact. That's the key message. They are angry.

Are you sure about this?



Ashley has been harassing journalists and lying about a bunch of stuff

PL_PROD13_002671



put up or shut up :)

Oct 29, 2021, 10:35 PM ✓

ok here

Oct 29, 2021, 10:35 PM



Ashley >

Using Glimmer

I gave all of this to Zoe as background. Some engineering told her about it a while back too.

But I'm letting her use those pics of me for the article

To show just how invasive it is

I chose the pretty ones cause most are not

There's about 12 pages of this from her

PL_PROD13_002675



Oct 29, 2021, 10:33 PM

I could be wrong but I'm following my spidey sense

If she's revealed proprietary information then *prove it*

Show us that it's true

Oct 29, 2021, 10:34 PM ✓

I can show you screenshots

Of her telling me

and I can tell you that I know 100% that Apple accessed my iMessages with her on my device    ...

because they asked me if I had any material information from a time period that she told me what she did



I'm sure they will show it

Oct 29, 2021, 10:34 PM

Apple needs to show the world that she's actually lying, or they are lying. Somebody is - who?

Oct 29, 2021, 10:35 PM ✓



I'm saying they have my iMessages with her

Oct 29, 2021, 10:35 PM

I'm actually betting that she is innocent of anything Apple is claiming she did.

Oct 29, 2021, 10:35 PM ✓

PL_PROD13_002674



Oct 29, 2021, 10:30 PM

Listen, I'm not invested in this. I'm just trying to help a whistleblower and try to educate others into not getting sucked into situations that hurt them like she did.

I don't really care about the details

Oct 29, 2021, 10:31 PM ✓

Do you care that she's lied about me, too?

Claiming I tried to have someone doxxed for asking what case she was posting screenshots of?

For dragging my name through the mud because editors couldnt' verify her story and they wouldn't write about her?

If they've lied about her, fine, that sucks, but I'd like to see it, because so far, she has tried desperately to use other victims for her own gain, made racist remarks, lied to the public, to the government, about what happened to her, and about me, and a bunch of other people who tried to help her

• • •



Oct 29, 2021, 10:33 PM

My opinion (which isn't worth shit – everybody has one) is Apple is lying

Oct 29, 2021, 10:33 PM ✓

and I cannot stand to watch good people such as yourself get wrapped up in her web



Oct 29, 2021, 10:33 PM

I could be wrong but I'm following my spidey sense

PL_PROD13_002673

**FF.**    **EXHIBIT FF: C.S. EVIDENCE (SEATTLE, WA – 2022)**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

| Help Center

FILED

FEB 1 5 2022

KCDC-East Division
Redmond Courthouse

22CIV01704 KCX

Requests

# ►Report copyright infringements and abuse

# 2022-02-06 10:32:09  Solved

FILED

FEB 1 5 2022

KCDC-East Division
Redmond Courthouse

**Ticket details**

Cher Scarlett

2 days ago

**THIS IS AN OFFICIAL NOTIFICATION THAT A USER OF SCRIBD OR SLIDESHARE (choose one):** *     has posted my personal information to Scribd or SlideShare.

**Please list the URL(s) on Scribd or SlideShare where the material is found:** *

https://www.scribd.com/document/555822358/Ashley-Gjovik-v-Apple-Inc-Propaganda-Campaign-Final-v4

**Describe, in as much detail as possible, the nature of the personal information and the exact page(s) where it is located.** *

My name is mentioned in this document nearly 400 times ("Cher Scarlett"), and the majority of it is republication of my tweets (which I own, per Twitter's content publication rules), and republication of my Medium posts (which I own, per Medium's content publication rules).

Most all of the content includes personal information about me, including linking to an old wedding registry containing more former legal name and the name of my husband, my medical diagnoses and other medical and or otherwise private, personal information that would be redacted via FOIA per HIPAA, my former legal name, which I changed for a safety reason and was found just by King County courts in Washington State to not have to be published together because it would pose a threat to my person. Much of the content is also containing republications of my family members' social media accounts, which she found by cyberstalking, and publishing their names. I am a public figure in the space we are working in, and my family members have now faced harassment because she has connected them to me publicly and pointed to their social media accounts without my or their consent.

I am seeking an anti-harassment order against her to stop her from posting such content, but it would be

PL_PROD14_01782



PL_PROD14_01866



PL_PROD14_01867

**GG.    EXHIBIT GG: C.S. MEDIUM BLOG POST (2023)**

2/15/23, 5:49 PM
Case 3:23-cv-04597-EMC Document 379 Filed 05/26/26 Page 231 of 427
Thirty years of oppressive spiritual cultivation at Apple. Part 20 | by Cher Scarlett | Sep. 2021 | Medium

On August 27th, I received an email from a colleague. It started with "this is in no way requested, inspired or coordinated by management". I'm sure they believe that. It's just not true. (*emphasis is theirs*)

> *This article crosses a major line for me… The final quote, in particular, suggests that you feel that it's ok to talk with the media about how Apple works internally … and not just about actual, specific issues of employment conditions…I especially think that it reflects very poorly on our team because **we are a part of Global Security** … I worry that this reflects poorly on all of us, and will undermine trust in our team … That is a trust that I have worked very hard to build and maintain … and I feel like I'm seeing it torn apart day after day … I don't feel comfortable sharing information with you that we have exposure to as part of our job. …what is and isn't a violation or an appropriate thing to discuss is ultimately a judgment call, and my confidence in your judgment has been shattered. …this impacts our standing as a team and our ability to work together…consider what harm you may be doing.*

The quote from the article that crossed his line?

> *"Slack and social media have been absolutely the biggest catalyst in giving workers the ability to organize," Scarlett said. "…a [NDA] doesn't mean you can't say anything bad about the company. You can openly talk about discrimination."*

These weren't the only messages I received like this from fellow employees, but it was the only one I got from someone I cared *deeply* about. Here's the top three runner ups: (*I cut out parts that were about another activist; the person in the second email reported me to business conduct and complained in Slack that I hadn't yet been fired; emphasis is mine.*)

1.

> *Cher, you seem to be totally unaware of what **people are frustrated about at Apple when it comes to your behavior**… **Apple takes confidentiality very seriously** — and jumping straight to Twitter/the media with every issue you have **isn't part of Apple's culture**… Are there issues? Of course-just like every company filled with humans. But you seem to find special joy in highlighting every internal issue publicly… **they are people too**… You think say you're standing up for the oppressed and those that don't have the courage to say anything? …in all reality **you're the oppressor**… **You haven't even worked at Apple long enough** to try and deal with this in a reason-headed manner… **Posting Radars on social media (even if it's a horrible Radar, is still internal to Apple — and the tool isn't something the outside world is supposed to be aware of). Imagine if you posted a screenshot of a tool used for the next iPhone-Neither is okay**… There is a clear pattern in your behavior: 1) Start at a new company, 2) Promote how you've started at that new company on Twitter, 3) Find an issue within a couple weeks/months, 4) Go public with said issue, 5) Shout out that you're "helping the oppressed with your platform" — and imply that you're a martyr for using*

PL_PROD13_008665

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 232 of 427

> *your platform for others, 6) Feel good from the few people that recognize you for your efforts, 7) Repeat 3–7 for a few months, 8) Start all over again at 1… Doing this while your boss is away. You had mentioned in a previous Tweet that you feel bad for your boss being on vacation and having to come back to this? Why would you feel bad if you didn't do anything wrong? Remember, **they are a human** as well. **Most people would die to have your role or work at Apple.**

2.

> *The irony that you work in security and don't realize that soliciting employees to capture pay data (on a public forum like Twitter) is a violation of privacy and security.*

3.

> *l've worked for Apple over 20 years. And I gotta say, **I really am hoping we let you go***. Not because what your doing is or isn't illegal. But because of the toxicity you bring to the culture. Steve Jobs would have kicked you of the door months ago.*

Powerful entities within Apple have — for decades — created institutionalized knowledge around protecting all of what is within Apple at all costs. It warps employee perception and behavior. Employees learn it is their responsibility to enforce policies — written and unwritten. Literally, in the Business Conduct Policies: "Any failure to comply with Apple's Business Conduct Policy — or **failure to report a violation** — may result in disciplinary action, up to and including termination of employment." Apple's culture has developed to be self-policing and it is not happening in a vacuum. The unseen force of influence is still causing the actions indirectly.

The closing sentiment in the first message, "**Most people would die to have your role or work at Apple,**" right after pointing out that people whom are bothered and frustrated with me are people and deserve to be considered is exactly why I spoke up and continue to do that. People are suffering within this company and people *are* **dying**.

The comment about Radar, an issue tracking tool that is available for public access so external parties can file bug reports, is about a heinous radar from a team Ashley Gjøvik was on, in which they all filed Radars about ruining each other's lives.

PL_PROD13_008666

Investigation into this found no policy violations, of course, because Ashley was not the only one that was subjected to a "living hell" radar and participated with the others. However, at Apple, unless you work in retail or AppleCare, you are lucky if there's more than one woman on your team. I was the only woman on my team. I spent a lot of time managing my feelings because of the total disconnect.

These environments are not psychologically safe for women. They often *lean in*, participating in their own harassment so they aren't seen as a victim, a complainer, or problematic. Minoritized people are encouraged to give the benefit of the doubt and be team players, enabling a hostile working environment that always seems to investigate itself to find no wrongdoing.



"We investigated ourselves and found no wrongdoing" meme.

PL_PROD13_008667

Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 234 of 427

Still, I couldn't let all our work be for nothing. I wanted to be a part of something bigger — to change Apple. It wasn't working from the inside, and now I had people I'd promised to positively impact — to deliver them the healthy change they were craving. There was no turning back. The only option I saw was using my platform (I had around 40,000 followers on Twitter at the time) to bring them all together. #AppleToo was born, exactly 10 years after Tim Cook became CEO, "Nothing has changed," I wrote, "It's time to Think Different."

I filed the first of my unfair labor practices charge with the NLRB a week later. The following day, on September 2, 2021, they asked me what I wanted. I sent them the following email:

> *1. A company-wide statement clearly condemning harassment and abuse on the company's behalf.*
>
> *2. A company-wide statement clarifying employee rights including: — discussing pay & pay equity — protected concerted activity, including discussing the forming of unions — speaking to the press about workplace issues from the employee's own perspective as an employee (not on behalf of the company)*
>
> *3. Add explicit clarification to the company's enterprise instance of Slack Terms of Use rules that no longer allows for the denial of channels for the purposes of protected concerted activity such as the discussion of*

PL_PROD13_008668

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 235 of 427

*pay equity and other workplace issues, and ensure that channels of this nature are at the top-most Apple level to ensure users with Slack access in AppleCare and Apple Retail continue to have access to these protected concerted activities.*

*4. Provide an avenue to hear collective employee concerns that arise from protected concerted activity, and ensure there is a feedback loop for groups of employees who wish to voice concerns regarding systemic issues.*

They asked me to negotiate a separation instead, with their *internal counsel*. That ended with me reporting them to the SEC for lying in a proxy statement to shareholders.

On September 3, 2021, Apple tried to speak with me alone — these are the only circumstances they said they would speak to me. I declined to do so and their internal counsel said I was "unwilling to participate in the investigation" and that they would "move forward with the information they have". I reiterated that I was willing to participate if my counsel was present. This is the same messaging Ashley got a few days later. She was fired. (Apple said she had 'disclosed confidential product-related information in violation of Apple policies' — which she denies.)

A few days earlier an article about Apple's employee privacy policies and an internal application was published. Why would they be investigating me for *that*? A current and former employee spoke on the record. There was no indication an anonymous employee had contributed to the story. The only possible thing they could try to use to tie it to me — and fire me — was a tweet I'd made a couple of weeks before about iCloud@Apple. People were talking about it on Blind and Reddit. I

PL_PROD13_008669

would be within my rights to discuss it as a working condition. My tweet wasn't in the article, either. There was no connection.

Because of that Tweet, I was iMessaged — which was co-mingled with work messages because my team had used iMessage when I started the year before — and provided detailed information about the very internal application that would later be the nexus of the employee privacy piece in *The Verge*. Gobbler (now Glimmer), was quite possibly named after and utilizing a tool called Gobbler that manages media storage. Apple had integrated Gobbler with iCloud (via Logic) without the advance knowledge from the CEO, Chris Kantrowitz. Glimmer was a tool used by employees, with their consent, to build face detection for what would become FaceID. Ashley provided screenshots of other internal applications about Glimmer questioning an employee's ability to give such consent in Apple's environment of coercion. To my understanding it was a Business Conduct violation to provide some of the documents she did and I now bore the responsibility to report it to Business Conduct or face termination.

When the article came out, I removed my iCloud from my work device and deleted the aforementioned conversation. A week after Ashley was terminated mutual friends told me that Ashley planned to hand over all of her messages to management. They had already investigated me and found nothing, this would give them a reason to fire me. I panicked and filed a report. Apple made that post-termination report a part of their justification against Ashley's retaliatory firing claims, despite that it serves no legal purpose.

PL_PROD13_008670

An hour later, my attorney called me and told me that Apple executives said they were going to grant me the medical leave and he would send over the packet. This was alarming, given that I hadn't told my attorney I was requesting medical leave.

For that information to get to him, my health status was disseminated to the executives, then to their internal counsel, and then to mine. It was violating and I immediately felt worse. Bullseye, direct-hit. HIPAA does not protect your health data in the workplace. Claims providers and HR are not medical providers.

At around 3pm, my attorney called me again. He informed me that Tim and the other executives said I was "giving them a lot of headaches" and asked if I would stop speaking about them externally and internally. It felt like getting medical leave was tied to this request, so I agreed. This is called temporal proximity.

Tim Cook is the most powerful person at Apple. Consider *Newton's* Apple. What goes up, must come down. Culture is top-down.

Referring to an Elon Musk tweet and the culture of sexual harassment at his companies.

September 21, 2021 @ 7pm PST (*emphasis is mine*)

PL_PROD13_008672

Thirty years of oppressive spiritual cultivation at Apple. Part 50. | by Cher Scarlett | Sep, 2023 | Medium

> *Dear Team,*
>
> *It was great to connect with you at the global employee meeting on Friday. There was much to celebrate, from our remarkable new product line-up to our values driven work around climate change, racial equity, and privacy. It was a good opportunity to reflect on our many accomplishments and to have a discussion about what's been on your mind.*
>
> ***I'm writing today because I've heard from so many of you who were incredibly frustrated to see the contents of the meeting leak to reporters.*** *This comes after a product launch in which most of the details of our announcements were also leaked to the press.*
>
> ***I want you to know that I share your frustration.*** *These opportunities to connect as a team are really important.* ***But they only work if we can trust that the content will stay within Apple. I want to reassure you that we are doing everything in our power to identify those who leaked. As you know, we do not tolerate disclosures of confidential information,*** *whether it's product IP or* ***the details of a confidential meeting.*** *We know that the leakers constitute a small number of people.* ***We also know that people who leak confidential information do not belong here.***
>
> *As we look forward, I want to thank you for all you've done to make our products a reality and all you will do to get them into customers' hands. Yesterday, we released iOS 15, iPadOS 15, and watchOS 8, and Friday marks the moment when we share some of our incredible new products with the world. There's nothing better than that.* ***We'll continue to measure our contributions in the lives we change, the connections we foster, and the work we do to leave the world a better place.***
>
> *Thank you, Tim*

The person they were frustrated with was *me*. They conflated trade secrets with federally protected concerns. Tim's email was a regurgitation of the same emails I'd received in the month prior. It doesn't matter that their emails arrived before Tim's did. Tim is the steward of the culture and he has made it clear he will protect it. Realistically, the conflations by the employees, including my teammate arguing I should consider the harm I'm doing, are baked into them by the obscuring of employee rights behind mountains of policies and a threatening culture that makes it very clear that leakers are terrible people who ruin lives. I think protecting trade secrets is valuable and important, but come on. You are selling gadgets.

The gaslighting wraps up the email. The juxtaposition between "measure our contributions in the lives we change" and "the work we do to leave the world a better place", and the reality of the domestic and international labor issues that do direct, horrifyingly wicked harm to *actual* people is nauseating.

PL_PROD13_008673

Tim does not clarify or affirm that our government charges or activism about workplace conditions are protected. He knows exactly what he's doing. He's dropping an apple — the man understands gravity — he knows what he drops from the top of the hierarchy will find its way through the organization.

While leakers of actual trade secrets are rightly persecuted, we should all take pause at the fervor and cruelty with which they do it. The tools are reminiscent of the military — the team tasked with guarding the company's confidentiality is even referred to as Apple's Gestapo — the secret police Hitler's Nazi government used. They've been accused of impersonating the police to track down lost property. They coerced one of their most fickle foes into spying on his own leaking and jailbreak community.

Blizzard had a toxic workplace environment, too.

Observers say the application of the militaristic "national security" structure is worse in a corporation because of at-will

PL_PROD13_008674

employment laws and a lack of checks and balances. There's no constitution at Apple; it's not a democracy.

Apple has also used these tools to hunt down employees who publicly dissent over protected information around workplace conditions. I should know, I was one of them. I worked in Apple's Global security team as a software engineer for over a year and half diligently helping the company manage disclosure to secrets, tracking company property, and managing and tracking anything related to loss prevention — including working on a tool called Dragnet, as in the most famous and influential police procedural crime drama in history, used to catch *actual* criminals. The name wasn't really surprising. The department is full of ex-government employees, namely ex-law enforcement, including NSA and the CIA. Believe me, they act like it.

I had access to almost everything in the company in my role. I could impersonate executives on most security tools. I never even considered misusing it — even when I was told by numerous colleagues inside of Global Security that frivolous investigations were opened about me. Even when some of those nonsense investigations moved forward.

> *Silence creates its own violence.*
>
> — Jeff VanderMeer*, Annihilation*

I somewhat regret this commitment to following the rules, but as the sole provider for my 9th grader, I was in no position to be fired for cause. (*People shouting that I'm married… my husband lived on the other side of the state at the time and just because my daughter's dad won't pay child support doesn't put my husband automatically on the hook. He has his own children to provide for.*) When I left, they ruined the job I had obtained at the Seattle Cancer Care Alliance because their secrecy rules are so ludicrous and draconian that Apple reports everyone's job title as an 'associate' with Equifax after they leave. The result is that they control whether or not the job title you report to future employers is verified accurately.

Perhaps the most insidious thing about Apple's oppressive culture of unqualified confidentiality are the coordinated leaks, which may extend past products into this co-mingling of legitimate confidentiality concerns and federally-protected rights to speech of employees. Apple is so big, popular, and valuable now, what's the point of keeping the Church of Apple's doors open?

Decade after decade, the same issues come out, and their marketing makes us forget that we've been hearing the same things about Apple in eternal recurrence. Apple was even praised for its openness, while journalists were investigating the depravity of its secrecy. Remember that time Apple was hacked? No, you don't.

PL_PROD13_008675

> *We know that no one ever seizes power with the intention of relinquishing it.*
>
> — George Orwell, *1984*

George Orwell warned us about a totalitarian state; Big Brother controlling us from the television. Apple's stance was that IBM was Big Brother, and the feisty, blonde Macintosh in orange shorts and white tank top was swooping in to save everyone from pale blue tyranny. He'd later bemoan that Microsoft's market control was a threat to innovation at the US economy.

Steve Jobs warning us that IBM ('Big Blue') is going cause an Orwellian dystopia.

> *Will 'Big Blue' dominate the entire computer industry? The entire information age? Was George Orwell right about 1984?*
>
> — Steve Jobs

Steve Jobs warned us about Apple.

Steve Jobs was an autocratic leader and the first person he delegated responsibility to was Tim Cook to run operations in 1998. Cook let Jobs shine in the spotlight while he worked in the shadows, streamlining operations with globalization — tying Apple to China. While Cook may stay out of the sun and give his leadership team autonomy in a hub and spoke leadership style, it is still authoritarian, and they are constantly monitoring messaging about the brand.

PL_PROD13_008676

> *Apple is this unique company, [this] unique culture that you can't replicate. And I'm not going to witness or permit the slow undoing of it because I believe in it so deeply.*
>
> — Tim Cook

Many lament that Tim Cook "is no Steve Jobs". Others are grateful he stays in the darkness so their tech guru can live on in the spotlight; the stoic, measured nice guy contrasted against the brilliant, emotionally reactive jerk. Charles R. Wolf said in 2009, "Apple is Steve Jobs and Steve Jobs is Apple." Leander Kahney argues that Cook does not get the credit he deserves for saving the company. Isn't that the point? Apple at its core is "people who shine a spotlight only to stand outside it." Apple *is not* Steve Jobs.

Apple is an enigma; an exquisite puzzle box with magic hidden within its dark labyrinth. Steve Jobs is the shining facade; Tim Cook is the hidden engine. A mercurial kaleidoscope obscuring decades of global human rights violations.

PL_PROD13_008677

**HH.    EXHIBIT HH: EPA RECORDS**

Message
_____

**From:**      Plate, Mathew [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2A7EDF98DF8C470C895094D9D93F04D6-MPLATE]
**Sent:**      8/16/2021 6:42:35 PM
**To:**        Qazzaz, Bilal [qazzaz.bilal@epa.gov]; Williams, Jennifer [Williams.Jennifer@epa.gov]
**Subject:**   RE: DRAFT—Travel Request for Pechanga Technical Systems Audit
**Attachments:** SFD 7 Branch SIP HS Framework - MEMORANDUM 1-29-2021R1.docx


It looks fine to me. Here is a copy of the Superfund Travel request for my work Thursday that was approved ... in case you have any questions on what to expect:

The  "Interim Decision Framework for Region 9 Field Actions During the COVID-19 Virus Pandemic"  is a SF document (attached) that links to:
Coronavirus (COVID-19) Guidance Documents for Field Activities | US EPA


## Title
TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA Travel Request Form
## Branch
["QA Staff","SFD 7 (CA Clean-up Section Branch)"]
## Name(s) of Staff
Michael Schulman (SFD-7-1); Matt Plate (QA)
## Destination
TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA
## Proposed Travel Start
2021-08-19
## Description of why this work is urgent and essential
A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health.

The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).
See less
## Phase and Staff Travel
EPA staff travel
## email
Schulman.Michael@epa.gov
## Guidance
["Pre-Travel considerations and checklist","Interim Decision Framework for Region 9 Field Actions During the COVID-19 Virus Pandemic","The National EPA Guidance: Interim Health and Safety Guidelines Related to COVID-19 for Conducting Superfund Site Work ","CDC recommendation that fully vaccinated wear masks indoors"]
See more

□Travel Method

Separate vehicles, one person per vehicle, local travel, no overnight stay.

□Key COVID Measures

Will follow County COVID 19 safety measures. Masks will be worn. EPA staff are vaccinated. Will monitor AQI and red flag warnings prior to travel.

---

**From:** Qazzaz, Bilal <qazzaz.bilal@epa.gov>
**Sent:** Monday, August 16, 2021 11:08 AM
**To:** Williams, Jennifer <Williams.Jennifer@epa.gov>; Plate, Mathew <Plate.Mathew@epa.gov>
**Subject:** FW: DRAFT—Travel Request for Pechanga Technical Systems Audit

Hey guys,

I'd like to send this to Matt by COB Wednesday so please give it a look by then.

---

**From:** Qazzaz, Bilal
**Sent:** Thursday, August 12, 2021 3:15 PM
**To:** Yoshimura, Gwen <Yoshimura.Gwen@epa.gov>
**Cc:** Johnson, AudreyL <Johnson.AudreyL@epa.gov>; Williams, Jennifer <Williams.Jennifer@epa.gov>; Plate, Mathew <Plate.Mathew@epa.gov>
**Subject:** DRAFT—Travel Request for Pechanga Technical Systems Audit

Hi Gwen,

Jennifer, Mat, and I discussed our options and decided to move forward to conduct the Pechanga TSA on-site.

Below is our draft justification for travel.  I'd appreciate if folks review and comment before we submit this to Matt Lakin.

Thank you

The Air and Radiation Division is requesting travel authorization for the following travel:

**Activity:** Technical Systems Audit on the Pechanga Band of Luiseno Indians
**Traveler(s):** Bilal Qazzaz, Jennifer Williams, and Mat Plate

**Travel Dates:** 2021-09-27—2021-09-30
**Destination:** Pechanga Reservation

**Essential Determination:** EPA's guidance document, *Conducting Technical Systems Audits of Ambient Air Monitoring Programs*, defines a TSA as "an on-site review and inspection of a monitoring organization's ambient air monitoring program to assess its compliance with established regulations and guidance governing the collection, analysis, validation, and reporting of ambient air quality data. A TSA is also an opportunity to highlight areas within a monitoring organization where it has shown innovation and improvement, identify areas where programs can be strengthened, and to provide feedback to the organization." The resumption of this essential oversight tool be conducted on-site, is necessary to ensure regulatory ambient air programs are in compliance with EPA regulations and guidance.

**Additional information and considerations related to the safety of the work:** EPA staff will follow all CDC, State of California, and Pechanga Band of Luiseno Indian's guidelines appropriate to their vaccination status.  Work will be conducted indoors and outdoors in small groups, not to exceed 6 persons.  Donning masks and social distancing measures will be taken into account in each work setting throughout the audit.  When necessary, EPA staff will utilize

N95 masks.

**COVID conditions in the departure location:** COVID cases in San Francisco County remain very low. The 7 day positivity rate is 4.7% https://covid19.ca.gov/state-dashboard/#location-san_francisco.  COVID cases in Napa County remain very low.  The 7 day positivity rate is 3.6% https://covid19.ca.gov/state-dashboard/#location-napa.  COVID cases in Los Angeles county remain very low.  The 7 day positivity rate is 4.6 % https://covid19.ca.gov/state-dashboard/#location-los_angeles.

**COVID conditions in the destination location:** COVID cases in Riverside county remains low. The 7 day positivity rate is 12.1% https://covid19.ca.gov/state-dashboard/#location-riverside.

**Travel Method:**
Travel by personal vehicle, rental vehicle, and by plane with three overnight stays.

Bilal Qazzaz | U.S. Environmental Protection Agency R9
Air & Radiation Division | Air Quality Analysis Office
75 Hawthorne St. (AIR-4-2) | San Francisco, CA 94105 | 415.947.3532

Message

---

**From:** Schulman, Michael [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=35D7024F00644B3D8B5DBA4940506834-SCHULMAN, M]
**Sent:** 7/26/2021 8:02:06 PM
**To:** Kurt Batsel [batsel@dextra-group.com]
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

HI Kurt,

I think we can do everything in one day as the reason for the visit will be to document a site walk and visual inspection. Matt may want to take some readings, but I think it would be minor. No plans to conduct indoor air sampling at this time. I think we need a site visit first.

Thank you for circulating.
Michael

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, July 26, 2021 12:58 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – I will circulate those dates with our team and get back to you before the end of the week. A few questions:

- For planning purposed, are you thinking that you can get everything you want to do in a one-day visit?
- Are you planning to do indoor air sampling at the same time? If so, I would want to let the building owner know.

Thanks and I will get back to you shortly

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, July 26, 2021 2:47 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA requests a site walk and inspection visit of the TRW Microwave Site 825 Stewart Drive building. Can you arrange for EPA access to the building from the current property owner, which I believe is GI DC Sunnyvale LLC? Myself and Matt Plate with EPA request reasonable access to visit the items addressed in the attached annual inspection memo and the 2014-2015 building mitigation measures that addressed the potential for vapor intrusion into the building, which included:

- The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
- The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- The emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

ED_006475B_00000350-00001
PL_PROD_12_7442

EPA also wants to review any post 2014-2015 building modifications or changes to the building.

Can you get back to me this week with some dates for a site visit in August? Northrup Grumman and your consultant are also invited to attend, understanding that there may be COVID-19 related restrictions in how many people can visit the building or congregate. I am available for a site visit any week, except for August 9-11 and the week of August 23-27 and Matt Plate typically has limited availability on Fridays.

Feel free to call me to go over,
Thank you,

_____
**Michael Schulman**
Remedial Project Manager
USEPA Region 9
75 Hawthorne St, San Francisco, CA 94105
415-972-3064 (o)
628-629-2421 (m)

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Tuesday, May 25, 2021 2:03 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Cc:** TWright@gesonline.com; Holbrook, Holly <Holly.Holbrook@aecom.com>
**Subject:** TRW Microwave - 2020 SSD Inspection Memo

Hi, Michael – As you requested during our last discussion on TRW Microwave, attached is a technical memorandum prepared by GES that summarizes the 2020 SSD system inspection conducted at the onsite building currently leased by Apple. Please let me know if you have any questions or need any additional info.

**Kurt R. Batsel, P.E.** | The Dextra Group, Inc.
**T:** 770.578.9696 | batsel@dextra-group.com

ED_006475B_00000350-00002
PL_PROD_12_7443

# 825 Site Visit - Aug 19, 2021

Thursday, August 19, 2021      8:03 AM

- 07:50: Meet on-site:  NGG: Michael Shannon; The Dextra Group: Kurt Batsel; AECOM: Holly Holbrook
- Meet Colin Scanlon - Apple Lease manager: cscanlon@apple.com / Apple, Real Estate & Development Mobile: 510.290.7726
    - HVAC - not sure how operating

- Pre-arrange Site Visit Agenda:
    - The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
    - The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
    - Past indoor air sampling locations.
    - The location where contaminated soil was excavated from underneath the building.
    - The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
    - The emulsified vegetable oil in-situ bioremediation system.
    - The location of groundwater monitoring wells.

- Holly: 4 HVAC zones 1st floor
    - Can't access vent riser pipes - no ports

- Building Elevator Maintenance:
    - Elevator shaft in GW in a pvc sleeve.

- IA-4: Open area in front of elevator.
- Matt: Roof, West Bldg Vents are exactly 10' from HVAC, just meeting code. Not great for VOCs bc venting into hvac. Would be better / need to extend 10' high.
- Matt: Roof, East bldg stack issues. Vents too close to chiller. Cut too low.
- Photo. PVC pipes in in service room; unk source. Suspect drain from roof (it's flat). Around pipe openings sealed (good). Room is has hvac air (good).
- Older concrete floor cracks well sealed. Photo examples.
- SS-05 under carpet (photo). Identified by Apple. Right SS diameter, but grout sealed. Seems mislabeled as SS-5 location not shown here in 2016 VI rpt. Matt: Seal sub slab ports. Not abandoned properly. Rusted. Use brass and SS. Reinstall or abandon.  Seal and can redrill if needed. Don't need a permanent SS port.
- SS-4 (photo) not poured well.
- Room 12-19 has drain. Room under negative pressure -4. It's hvac well balanced. Sample this room bc of drain and neg pressure.
- Matt: Room 12-14 (w/saw?) pressure 5.6 pascals.  Has positive pressure. Would sample in hallway because has lower pressure. Otherwise sampling vent air.
- Justin with Apple, part of tour. Rooms are supposed to be warm, but have high turn over. Bldg has turn over. Didn't change for COVID. On 24 hrs because do thermal testing overnight.
- IA-2. Environmental room. Raised floor.
- Cube office work area IA-7: 3 pascals lower then hallway.
- IA-8 Has a higher pressure. Unlikely to be an issue here.
- IA sample where pressure is lower
- Need to look at past SS concentrations
- IA-9: Bathroom neg pressure. -15.7 pascals. Drain has no measurable floor, but the drain cover are too small to get tubing down. Can't feel flow. EPA assumption is all drains leak, but not representative.

04292
ED_006475_00000111-00001

Negative means air comes in to roof.
- SS-3 (Photo): Cannot locate SS-10 and SS-11. Indoor building layout has had changes (?) since 2015. AECOM will look at their records.

<br>

- Matt / EPA Comments:
    - EPA samples with hvac off because venting changes with economizers and season and we can't control for those future scenarios.
    - 4 stacks need to be extended. Ok per code but not COCs. Main bldg is under chiller stack, not even sure how extend.
    - Be nice to get the HVAC test and balance reports to know where to sample. Want economizers to be closed and heater on. Usually in January.
    - Want HVAC off for worst case short-term exposure scenario.
    - Destroy the indoor SS ports.
    - Crack inspection documentation.
    - Locate the indoor SS missing ports.
    - Apple is operating bldg (HVAC) perfectly. Pressure right. But, long term we have no control over.
    - Recommend cages around ladders to roof.

- 

04293
ED_006475_00000111-00002



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION IX**
**75 Hawthorne Street**
**San Francisco, CA  94105**

October 7, 2021

Mr. Kurt Batsel                                                                    SENT VIA EMAIL
The Dextra Group, Inc.
On behalf of Northrup Grumman Corp
batsel@dextra-group.com

**Re:   EPA Site Visit and Vapor Intrusion Field Assessment, 825 Stewart Avenue**
**Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)**

Dear Mr. Batsel:

Thank you for organizing for me and Matt Plate to conduct the August 19, 2021 site visit of the 825 Stewart Drive building, which is currently leased by Apple, Inc. (Apple). The site visit was attended by Michael Shannon with Northrup Grumman Corp (NGC), you, and NGC's consultant Holly Holbrook with AECOM. During the site visit an Apple leasing manager provided access throughout the building. The purpose of the site visit was for EPA to inspect the following items to assess the potential for vapor intrusion into the building:

- The sub-slab depressurization (SSD) system that was installed underneath the three connected site buildings that passively vents soil gas vapors to the atmosphere.
- The building's concrete slab and the April 2015 cracks that where sealed to prevent potential vapor intrusion.
- The building's concrete slab and penetrations from pipes or seams.
- The previously installed soil gas sampling vapor ports.
- The locations where past indoor air sampling has been conducted.
- The operation of the HVAC system and the HVAC air venting and intakes on the roof.
- The location where contaminated soil was excavated in 2014 from underneath the building.
- The location where the spaces between the walls of the three buildings' sections were sealed in 2015.
- A review of any post-2015 building modifications or changes to the buildings.
- The groundwater emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

Based on EPA's inspection of the building and real-time indoor pressure readings, the building HVAC system is well balanced to maintain a positive pressure within the occupied building areas, and the likelihood for vapor intrusion is low and not expected. EPA understands that

Apple intentionally operates the HVAC system to balance room pressures, heating, and air turn-over to support long-term product development operations. EPA also noted that the exposed concrete floor was present throughout the building with adequately sealed cracks. However, during the site visit EPA did identify the following items that EPA asks NGC to address.

- **SSD System Vent Pipes:** From Matt Plate's visual inspection on the roof, four of the SSDS exhaust vents are approximately 10-feet of the HVAC's intakes vents and lower or at a comparable height to the intakes. This distance is an acceptable building code distance; however, a distance greater than 10-feet and/or a height that is elevated above the building ventilation system components need to be considered as the SSD system may vent low concentrations of site contaminants of concern outside, creating the potential for contaminates to be pulled into the HVAC intakes and into the building. This scenario and potential impacts to indoor air quality need to be evaluated and mitigated and EPA asks NGC to provide a proposal to do so. As the interior SSD system vertical vent pipes cannot be easily moved and rerouting of piping on the roof may compromise the effectiveness of the passive SSD system, consideration needs to be given to extending the height of vent pipes. For vent pipes that cannot be extended (e.g., under the east building chiller), consideration should be given to rerouting the vent pipes away from HVAC intakes and converting the SSD system to an active system with a blower fan.

- **HVAC Operation:** EPA's observations of the HVAC system and pressures within the building were limited to the day of the site visit and the operation of the building at the time. While a balanced HVAC system was observed maintaining a positive pressure, EPA requests that HVAC and building test and balance information for the HVAC systems be provided to EPA to confirm this.

- **Sub-slab Sampling Ports:** The historical concrete sub-slab vapor sampling ports, left in place, have not been regularly sampled or maintained and several could not be located (SS-10 and SS-11). These ports need to be located and maintained where future sub-slab sampling will be conducted, or decommissioned if a justification is provided that the ports are no longer needed. EPA also requests an updated figure for the building showing all sub-slab vapor sampling port locations including measurements from exterior and interior walls, their ID names, and callouts presenting historical VOC detections. The figure used to locate the sub-slab ports in the field only showed approximate locations.

- **SSD System Maintenance and Inspections:** In May 2021 GES, on behalf of NGC, prepared the first Annual Maintenance Inspection memorandum for the 825 Steward Ave SSD System. The memorandum documented a November 2020 inspection and NGC prepared the memorandum to address the 2019 EPA Five Year Review Report recommendation to incorporate "long-term stewardship measures for the current vapor mitigation measures in place." EPA asks that NGC document in a work plan or technical memorandum the scope of the annual SSD system maintenance inspections, including how and when the inspections will be reported to EPA.

EPA requests that NGC provide a written response in the next 30-days addressing EPA's comments above. Please feel free to contact me anytime at schulman.michael@epa.gov or

2

415-972-3064 if you have any questions or comments. Thank you again for your cooperation and participation in the site visit and these follow-up items.

Sincerely,

Digitally signed by MICHAEL SCHULMAN
Date: 2021.10.07 18:38:47 -07'00'

Michael Schulman
Remedial Project Manager
Superfund & Emergency Response Division

cc:   Joshua Nandi, Northrop Grumman Corp.

3

## II.    EXHIBIT II: BUSINESS CONDUCT TICKET (LEGAL WORK)



**From: Business Conduct Helpline** businessconduct@apple.com
**Subject:** Re: Question about Apple devices & law school clinic work DC119391-TG
**Date:** March 15, 2019 at 4:26 PM
**To:** Ashley Gjovik  ashleygjovik@apple.com

Hi Ashley,

Sorry for the delay on your question. I was able to get more clarifying details from the NPS team, as well as my partners in Legal.

While Apple does allow for reasonable personal use of AOUs, it is important to remember that they are first and foremost meant to be used for Apple-related work. That also means any information stored on an AOU becomes Apple property, which could cause problems with confidentiality should you be using the device to hold sensitive information from external parties.

We recommend using a personal, non-AOU device for your studies to protect that data and privacy of all parties you may be working with.

Best regards,

Timos
Business Conduct Office
businessconduct@apple.com

> On Mar 8, 2019, at 8:24 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
>
> Hi!
>
> Thanks — I assumed it would be more of an issue with someone being able to somehow claim that Apple was involved in the case(s) I worked on because I used Apple "resources." But maybe that's not a real thing and just something I saw on tv….
>
> —
> Ashley Gjovik
>  Mac Systems Quality EPM
>
> *"I've always been more interested in the future than in the past." —Grace Hopper*

> On Mar 8, 2019, at 7:18 AM, Business Conduct Helpline <businessconduct@apple.com> wrote:
>
> Hi Ashley,
>
> Thank you for reaching out to Business Conduct.
>
> We advise you reach out ot the Product Security team for guidance regarding your questions. I have copied them in for support. They can offer advisr on how to best protect Apple's information.
>
> Best regards,
>
> Timos
> Business Conduct Office
> businessconduct@apple.com

>> On Mar 5, 2019, at 1:42 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
>>
>> Hello!
>>
>> I work as an EPM in HWE and I'm currently attending Santa Clara Law school. I'm applying to join a clinic next Fall term. Specifically: http://ncip.org/educate/
>>
>> I talked with you lovely folks about a year ago, and you said that volunteer legal work not related to tech/biz should be fine. Hopefully that's still true.
>>
>> It did just occur to me that I should ask you about resources.
>>
>> Currently most of my computers are Apple owned. My only phones, watches, & iPads are Apple owned. They're all on internal Apple builds with internal Apple stuff. My cell service for my phone and watch are paid for by Apple. (My home internet is not the Apple plan though). My org encourage using these devices for personal stuff in addition to work, as we consider that "live on" and allows me to find bugs that a user might, and I file Radars for the bugs to the engineering teams to analyze.
>>
>> However… I assume clinic work on real cases is much different than normal school work.

PL_PROD_11_05286

Do I have to go full *Chinese wall* on devices and network for any work on real cases? I.e. only use my own customer mac, buy/use my own customer phone, pay for my own cell service for that phone, etc. Or is there some middle ground?

If full *wall*, does that also mean I should never connect to Apple public WiFI when working on stuff? For example, if I'm working on a case during lunch at Apple Park — should I only hotspot to my new personal phone and new personal cell plan for anything that requires internet connection? Or is the public wifi ok and I should just keep off "secure" (without VPN I dont think Secure is even an option though)?

Please let me know how to stay out of trouble.

Best,
-Ashley

—
Ashley Gjovik
 Mac Systems Quality EPM

**JJ.**    <u>**EXHIBIT JJ: GLANCY EMAIL (APRIL-MAY 2021)**</u>

# Re: I think I need a lawyer for work stuff

---

**From: Ashley Gjovik <agjovik@scu.edu>**                               Sun, May 2, 2021 at 3:58 PM EDT (GMT-04:00)
To: Professor Dorothy Glancy <dglancy@scu.edu>

---

Hi,

The work stuff is very very urgent now. They want me to sign a bunch of workers comp stuff. And it appears I'm being pushed out of my current role, maybe even apple.

I def need help on two fronts.

**1) workers comp** — apparently specialized with chemical exposure

I talked to ███████████ last week and he said a normal workers comp lawyer won't be able to help me — it will need to be someone who specializes in chemical exposure & workers comp. He said ███████████ is the specialist on this. I did intake last week.
███████████████

**2) general employment & labor**— retaliation, intimidation, etc.

Rene sent me to ███████████████, saying he referred me. They scheduled an intake for tomorrow.
████████████████████████

-Ashley

**Ashley M. Gjøvik**
Juris Doctor Candidate, Class of 2022
Public International Law Certificate Candidate
ACLU NorCal SCU Law Club; Environmental Law Society; International Law Students Association; Women & Law
Santa Clara University School of Law

---

On Apr 27, 2021, at 4:54 PM, Ashley Gjovik <agjovik@scu.edu> wrote:

Hi Professor Glancy! Congrats!!!!! Happy summer. :-D

And thank you!!! Appreciate it.

I might need a 2nd one too. My work is getting really shady about my speech rights related to our offices on chemical release sites. At first they were like, *Apple would never stop you from speaking openly about concerns about workplace safety…* but as of today, I talked to Employee Relations and she tried to tell me I'm only allowed to speak with coworkers about these chemical release sites if the information is 0) related to the terms and conditions of my employment 1) accurate 2) complete and 3) does not cause a panic. She also said that our Env Health & Safety (EHS) team would need to confirm if statements are accurate and complete. (Like I asked if I could just tell someone they work on a Superfund site, and she's like there's no way to know that's accurate information without EHS confirming — and I'm like there's a public EPA Superfund page with the building address and indoor maps — and she's like you need to talk to EHS). She also said that if anyone will speak to employees about safety concerns, it needs to be EHS. And if anyone asks me about the site, I shouldn't answer, I should send them to talk to EHS 1:1.

I told her she was confusing the f out of me. Told her I didn't understand what the rules are and why am I being held accountable if my coworkers learn they're on a superfund from me (that's public information) and are concerned about it (panic), because they probably should be concerned or even panicked. Somehow Apple is making their systemic problem —> an Ashley problem. I see a pattern with this tactic…

I wrote down what I think ER said, and a bunch of Y/N questions for EHS to weigh if complete/accurate (aka "my building is an active EPA superfund site"), and sent it all to her and EHS to confirm, and she quickly was like THAT'S NOT WHAT

01268

I SAID WE'LL GET BACK TO YOU. I think I freaked her out by documenting what she was saying and how bad it looked written down. As of right now there's enough confusion and pressure on me, that I don't feel like I can speak to anyone I work with about the status of these sites or anything related to the chemicals on site — without getting in trouble at work. That def seems like a labor law issue.

That all seems separate from the workers comp thing? (Though I def uploaded that email chain to the Sedgwick workers comp portal for my investigator to look at. She's really upset Apple has us on these sites at all).

-Ashley

P.S. Job wise, I'm actively applying to ACLU, UN, HRW, EDF, NRDC, etc. Decided if I need a Plan B, no reason it has to be a boring Plan B. ;)

<Ashley Gjovik Resume.pdf>

—

**Ashley M. Gjøvik**
Juris Doctor Candidate, Class of 2022
Public International Law Certificate Candidate
ACLU NorCal SCU Law Club; Environmental Law Society; International Law Students Association; Women & Law
Santa Clara University School of Law

On Apr 27, 2021, at 3:08 PM, Dorothy Glancy <dglancy@scu.edu> wrote:

Hi Ashly,
I just completed my last class. Yay!  Now I will have some time to answer email.  Workers compensation is a specialty area - I have a couple of people in mind and will contact them later today.
I do not believe that we have such a specialist on the faculty anymore.  Most HR departments suggest workers compensation claims - I am not sure quite why.
Take care, and try not to worry.
Professor Dorothy Glancy

On Tue, Apr 27, 2021 at 12:08 PM Ashley Gjovik <agjovik@scu.edu> wrote:

Hi Professor Glancy,

I hope you're well.

I think I should talk to a lawyer about my work situation. I've continued to raise concerns about my Superfund office at work and I'm very concerned with their oversight & policies, and they are also restricting my speech about my concerns.

Our HR BP suggested I file a workers comp claim about my fainting spell in fall 2019 at my Superfund office. She essentially insisted. I filed it last week and the workers comp administrator was actually all over it. Talked to the investigator for 2.5hr yesterday — she's marking it as "continuous trauma" and including not just my main Superfund office buildings — but the other Apple Superfund & state chemical release site buildings I've worked in since joining Apple in 2015.

I talked to a lawyer friend and they not only warned me to look out for retaliatory firing with this much whistle blowing — but that the HR BP may have pushed for workers comp because I guess it waives some litigation rights.

I'm thinking I should probably talk to an employment attorney who specializes in OSHA type stuff. If you know of anyone by chance, please do let me know. Otherwise I'll start calling around.

Thanks!

—

**Ashley M. Gjøvik**
Juris Doctor Candidate, Class of 2022
Public International Law Certificate Candidate
ACLU NorCal SCU Law Club; Environmental Law Society; International Law Students Association; Women & Law

01269

**KK.**   **EXHIBIT KK: TWITTER POST ABOUT CHARGES (8/31/21)**

← **Thread**

**Ashley M. Gjøvik** @ashleygjovik · Aug 31
U.S. Securities & Exchange Commission Whisteblower ✅

Y'all, the process is so broken. The only way I'm figuring out what paperwork I need to submit is by reading old lawsuits against #Apple & listing all the reasons Apple was able to act like Teflon (mostly missing paperwork).



**U.S. Securities and Exchange Commission**

HOME    COMPLAINT FORM

🖨 Print

Submission Number: ███████ was submitted successfully on Wednesday, September 01, 2021 at 02:02:09 AM EDT

Thank you for contacting the United States Securities and Exchange Commission. This automated response confirms that your submission has been received successfully. We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

**About you**

Submitter # 1

Q: Are you filing this tip under the SEC's whistleblower program?
A: Yes

Q: Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?
A: Yes

Q: Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?
A: Yes

💬 1        ⇄ 6        ♡ 21        ↑        ᶑ|        ⚠ Tip

**Ashley M. Gjøvik**
@ashleygjovik                                    ···

So far, I'm now:
🚨 SEC, OSHA, & CA DIR Whistleblowers
Claims/intake with:
😷 EEOC, DEFH, & NLRB
☢Federal EPA
But I'm sure I'm still missing something. This is the worst puzzle.

11:19 PM · Aug 31, 2021 · Twitter Web App

ᶑ| View Tweet activity

**1** Retweet    **15** Likes

02706

**LL.**     **EXHIBIT LL: APPLE CARES ABOUT PRIVACY UNLESS YOU WORK AT APPLE (WITH IMAGE OF ASHLEY'S FACE)**

The Verge

Menu +

TECH

# Apple cares about privacy, unless you work at Apple

The company has taken a strong stance on safeguarding its customers' data — but some employees don't believe it protects theirs

By **Zoë Schiffer**

Aug 30, 2021, 12:33 PM EDT

   |  **Comments (0 New)**

PL_PROD_12_10530

# The Verge



Illustration by Alex Castro / The Verge

J acob Preston was sitting down with his manager during his first week at Apple when he was told, with little fanfare, that he needed to link his personal Apple ID and work account.

PL_PROD_12_10531

**The Verge**

The request struck him as odd. Like anyone who owns an Apple product, Preston's Apple ID was intimately tied to his personal data — it connected his devices to the company's various services, including his iCloud backups. How could he be sure his personal messages and documents wouldn't land on his work laptop? Still, he was too giddy about his new job as a firmware engineer to care. He went ahead and linked the accounts.

Three years later, when Preston handed in his resignation, the choice came back to haunt him. His manager told him to return his work laptop, and — per Apple protocol — said he shouldn't wipe the computer's hard drive. His initial worry had come to pass: his personal messages were on this work laptop, as were private documents concerning his taxes and a recent home loan. Preston pushed back, saying some of the files contained highly personal information and there was no reasonable way to make sure they were all removed from the laptop without wiping it completely.

## "If they did this to a customer, people would lose their goddamn minds."

He was told the policy wasn't negotiable.

Preston's story is part of a growing tension inside Apple, where some employees say the company isn't doing enough to protect their personal privacy and, at times, actively seeks to invade it for security reasons. Employees have been asked to install software builds on

PL_PROD_12_10532

The Verge

their phones to test out new features prior to launch — only to find the builds expose their personal messages. Others have found that

when testing new products like Apple's Face ID, images are recorded every time they open their phones. "If they did this to a customer, people would lose their goddamn minds," says Ashley Gjøvik, a senior engineering program manager.

Apple employees also can't use their work email addresses to sign up for iCloud accounts, so many use their personal accounts.

The blurring of personal and work accounts has resulted in some unusual situations, including Gjøvik allegedly being forced to hand compromising photos of herself to Apple lawyers when her team became involved in an unrelated legal dispute.

Underpinning all of this is a stringent employment agreement that gives Apple the right to conduct extensive employee surveillance, including "physical, video, or electronic surveillance" as well as the ability to "search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises."

Apple also tells employees that they should have "no expectation of privacy when using *your or someone else's personal devices for Apple business*, when using Apple systems or networks, or when on Apple premises" (emphasis added).

Many employees have a choice between getting an Apple-owned phone or having the company pay for their phone plan. But one source tells *The Verge* that trying to maintain two phones can

The Verge

become impractical. In software engineering, certain employees are expected to participate in a "live-on" program that puts out daily builds with bug fixes. "You can't have a successful live-on program without people treating these devices exactly the same as a personal phone," the source says. "So a work device or a work account just won't cut it."

# "You must link your personal Apple ID with your AppleConnect work account"

None of these policies are unique. Tech companies almost always have rules in place to search employees' corporate devices, including personal devices used for work. It's also common practice for tech companies to ask employees to test new software, which could potentially expose personal information. But Apple sets itself apart from other tech giants through its commitment to consumer privacy. As Tim Cook said at the CPDP Computers, Privacy and Data Protection conference in January 2021, businesses built on buying and selling user data, without the knowledge or consent of consumers, "[degrade] our fundamental right to privacy first, and our social fabric by consequence." The lack of employee privacy has made the perceived hypocrisy particularly irksome to some workers.

Now, as employees begin to push back against a variety of Apple norms and rules, these policies are coming under the spotlight, raising the question of whether the company has done enough to safeguard personal employee data. It might seem like a company obsessed with secrecy would be sympathetic to its employees' wishes

PL_PROD_12_10534

The Verge

workforce.

---

This is how it starts: a new Apple employee is told during onboarding that collaborating with their colleagues will require them to make extensive use of iCloud storage, and their manager offers a two terabyte upgrade. This will link their personal Apple ID to their work account — in fact, the instructions for accessing this upgrade explicitly say "you must link your personal Apple ID with your AppleConnect work account." The connection will give them access to collaborative apps like Pages and Numbers that they might need to do their jobs. (Apple employees who do not have a business need to collaborate do not go through this process.)

Employees *could* pause during onboarding and say they want to create a new Apple ID specifically for work or use a different phone. But most do not — it seems a little paranoid, and the Apple instructions say to go ahead and use your personal account. What's more, most Apple devices don't support using multiple Apple IDs. To switch between iCloud accounts on an iPhone, you have to completely sign out of one ID and into another — a clunky, disruptive process. It is far easier culturally and technically to simply link personal and work accounts, which adds a new Apple Work folder to the employee's iCloud account.

PL_PROD_12_10535

**The Verge**

# "I get mad that I have to use my personal phone to text my boss."

In theory, this Apple Work folder is where all of the collaborative documents for employees are supposed to live in order to keep personal and work files separate. In practice, the owner of a document often forgets to store files in the work folder, and documents quickly become intermingled. In fact, when Apple employees create a document in, say, Pages, the app automatically enters the personal email address used for their Apple ID. "I asked my manager about it and it's just sort of an issue everyone deals with," Preston says.

Employees can choose to not sync certain folders, like their photo libraries. But others, like messages, can be trickier. Apple adopted Slack in 2019, but some teams still use iMessage as a primary way to communicate, which makes opting out of a message sync nearly impossible.

Over the past few weeks, employees have been discussing the difficulty of setting up different Apple IDs to keep work and personal files separate, noting that while it's possible, there are significant technical hurdles. "I don't understand why they didn't create an Apple ID and iCloud account from our work email address during the onboarding process," one employee said on Slack. "I get mad that I have to use my personal phone to text my boss," said another.

PL_PROD_12_10536

aware the company gave itself extensive rights to search their data, but — for various reasons — weren't overly worried about the fallout.

"When I joined Apple, I personally expected it to be pretty invasive and took some serious steps to separate my work and personal life," one source says.

For other employees, however, the mixing of personal and work data has already had real consequences. In 2018, the engineering team Ashley Gjøvik worked on was involved in a lawsuit. The case had nothing to do with Gjøvik personally, but because she'd worked on a project related to the litigation, Apple lawyers needed to collect documents from her phone and work computer.

# "All data that has your face in it is good data."

Gjøvik asked the lawyers to confirm that they wouldn't need to access her personal messages. She says her team discouraged the use of two phones; she used the same one for work and personal and, as a result, had private messages on her work device.

A member of the legal team responded that while the lawyers did not need to access Gjøvik's photos, they did not want her to delete any messages. During an in-person meeting, Gjøvik says she told the

PL_PROD_12_10537

The Verge

relevant to the lawsuit. Could she delete them? She says the lawyers told her no.

---

In 2017, Apple rolled out an app called Gobbler that would allow employees to test Face ID before it became available to customers. The process was routine — Apple often launched new features or apps on employees' phones, then collected data on how the technology was used to make sure it was ready for launch.

Gobbler was unique in that it was designed to test face unlock for iPhones and iPads. This meant that every time an employee picked up their phone, the device recorded a short video — hopefully of their face. They could then file "problem reports" on Radar, Apple's bug tracking system, and include the videos if they found a glitch in the system. "All data that has your face in it is good data," said an internal email about the project. After rumors of criticism, Apple eventually changed the codename to "Glimmer."

PL_PROD_12_10538

The Verge



Unlike other Apple features, Glimmer wasn't automatically installed on employee phones. It required an informed consent form so employees would know what they were getting into. Still, for some people on engineering teams, participation was encouraged — even expected, according to two staff members. Once it was installed, some data that didn't contain personally identifiable information would automatically upload to Radar, unless employees turned off this setting.

Apple was careful to instruct employees not to upload anything sensitive, confidential, or private. But it didn't tell people what was happening with the hundreds of images they didn't upload in Radar reports.

The reports themselves were also a cause for concern. When employees file Radar tickets, they include detailed information about the problems they are seeing. In 2019, Gjøvik filed a ticket about

The Verge

surgery to treat my endometriosis," she wrote, including four images in the ticket. The default sharing settings for the ticket included all of software engineering.

## "They're the one tech company that takes privacy seriously."

Radar tickets also are not removable. Even when the tickets are closed, they remain searchable. In training, employees say they are told: "Radar is forever."

What's more, when employees file Radar tickets, they are often asked to include diagnostic files, internally called "sysdiagnose" to give Apple more information about the problem. If they are filing a bug about iMessage, they might be asked to install a sysdiagnose profile that exposes their iMessages to the team tasked with fixing the issue. For employees using a live-on device, default settings can mean that, as they are filing a Radar ticket, a sysdiagnose profile is being automatically created in the background, sending data to Apple without the employee realizing it.

When sysdiagnose profiles are not included, employees have been known to post memes calling out the omission.

PL_PROD_12_10540

G jøvik is currently on administrative leave from Apple due to an ongoing investigation into claims she made about harassment and a hostile work environment. If she leaves the company, she'll likely face the same conundrum as Jacob Preston, related to the mixing of her personal and work files.

Employees likely wouldn't care too much about this were it not for another Apple rule that bars them from wiping their devices when they leave the company. If they do, they'll be in direct violation of their employment agreement, leaving them vulnerable to legal action.

After Preston gave notice, he received a checklist from his manager that explicitly said: "Do **not** wipe or factory reset any Apple owned units (such as laptops, Mac, ipads, and iPhones)."

"Before joining Apple I had a lot of respect for the company," Preston says. "They're the one tech company that takes privacy seriously. But then they go and have these policies that are hypocritical and go against their stated values. It's sort of hard to reconcile. It's like now that I'm leaving, my privacy isn't a concern anymore."

Apple did not respond to a request for comment from *The Verge.*

PL_PROD_12_10542

**MM.    <u>EXHIBIT MM: TELERAMA ARTICLE</u>**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

Ashley Gjøvik, whistleblower fired by Apple, alone against all odds

Home        Debates & Reports

# Ashley Gjøvik, whistleblower fired by Apple, alone against all odds

The fault of this employee, who will be dismissed in 2021: she revealed that the Californian firm turns its employees into guinea pigs. Even stalking them in their private lives.



Photo Pascal Perich pour Télérama

**By Olivier Tesquet**

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

Ashley Gjøvik, whistleblower fired by Apple, alone against all odds

Reserved for subscribers

Published on March 14, 2023 at 06:00    Updated on March 14, 2023 at 15:39

"**R**espect for privacy, that's the iPhone,"** trumpets a recent Apple advert. The Apple brand has long built its reputation on one promise: its impeccably-designed devices. are soft toys that don't snitch, so those who use them can rest easy. This is much less true for company employees.

Just ask Ashley Gjøvik. Head of the engineering program, this 36-year-old American was brutally fired in September 2021. Her fault? Revealing that, in order to improve the functionalities of its products, the Cupertino firm does not hesitate to turn its teams into guinea pigs, subjected to invasive surveillance and sworn to secrecy as if they were working for an intelligence service. With the help of hundreds of confidential documents cross-checked by multiple testimonies, *Télérama* can tell the story of a corporate culture where silence is a cardinal value and intimidation a practice deployed at the highest level. When contacted, Apple refused to comment.

## I became a revolutionary when I realized that they didn't care if we died.

Gjøvik's story begins like a remake of Erin Brockovich, the whistleblower immortalized in film by Julia Roberts. In early 2020, when she moves to Santa Clara, in the heart of Silicon Valley, her health takes a turn for the worse. Vertigo, palpitations, bleeding, vomiting... She becomes worried, consults cohorts of doctors and ends up discovering that her home is built on land eaten away by toxic waste. Toxic waste is particularly pervasive in this part of California: for decades, the massive production of semiconductors has polluted the soil with carcinogenic solvents, which have surfaced over the years. At her nearby workplace, the Apple campus in Sunnyvale, the young woman experienced similar symptoms. She notified her superiors and requested tests.

Her insistence annoyed her employer, who finally told her not to raise the issue with her colleagues. She notifies the U.S. Environmental Protection Agency. In 2021, on the messaging service Slack, in a channel created by

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

PL_PROD13_002579

Ashley Gjøvik, whistleblower fired by Apple, alone against all odds

salaried employees at a time when the #MeToo movement is hitting Apple, she's mincing her words less and less and gathering anger. Foremost among these is the fate that the temple of technological cool reserves for its flock. "*I became a revolutionary when I realized that they didn't care if we died,*" she recalls.

# I never really managed to fit in, which made it easier for me when it came time to burn the place down.

Gjøvik is not a product of California's tech elites, who only have to cross the street from the Stanford campus to join a multinational offering six-figure salaries and comfortable bonuses. She has lived
She *had a "shitty childhood"* on a farm on the outskirts of Portland, in rainy Oregon. She worked from the age of 14, protested against the war in Iraq at 16 and cut ties with her family at 20.

After starting out at Nike *("I was trying not to think about child labor"),* she landed somewhat by chance at Apple in 2015, broke and in debt. *"I started working in technology because I needed to understand complex systems,"* she explains in a laughing machine-gun voice, her dog Captain on her lap. She worked herself to the bone, seventy hours a week for five years. She grew in stature, but not in the local culture, which often resembled a social experiment in a closed environment: *"I never really managed to fit in, which made it easier for me when it came time to burn the place down.*

Tasting little of this wind of rebellion, Apple decided to put her on forced rest in August 2021, citing an internal investigation launched on the basis of her accusations. Undaunted, Gjøvik took her case to the federal agency responsible for enforcing labor law. At the end of August, she revealed on Twitter the existence of a clandestine program, Gobbler (later renamed Glimmer). Deployed to employees in 2017, this internal tool accompanied the launch of Face ID, Apple's facial recognition feature, which allows you to unlock your phone with your face. In an e-mail sent on August 3, 2017, and which we were able to consult, an engineer from the video team explains the broad outlines: to train the algorithm, you have to feed it. Once activated, Gobbler takes a photo as soon as it detects a face. It's an eye that never blinks. "*When it comes to data, we want more,*" adds the greedy engineer.

> **Read also:**

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

PL_PROD13_002580

Ashley Gjøvik, whistleblower fired by Apple, alone against all

From "The Social Network" to "Super Pumped", ten films and series that put Silicon Valley to shame

In another document, Apple specifies a few rules. The application cannot be used in France or Germany (it would be illegal there due to local regulations), and employees are asked not to download snapshots taken in intimate places. Gjøvik is recalcitrant, but to obtain the consent of her guinea pigs, the employer knows how to trick them. One summer day, she is invited to a 20-minute *"data collection aperitif"*, with no further details. She was forbidden to talk about it without a green light from the legal department. Once on site, a stone's throw from the company's historic headquarters, she discovers *"what looks like a military complex"* protected by guards. You have to hand over your phone, pass through a door, close it again, open another, and enter four by four into a cylindrical space in the middle of a hot summer to have your portrait taken. A real trombinoscope composed by force, with the aim of improving artificial intelligence.

A few days after her first revelations, on September 9, Apple fired her and summoned her within the hour, citing a violation of the company's intellectual property. She found herself in the crosshairs of the *Worldwide Loyalty Team*, in-house investigators who often had careers in the police or secret services. In the past, these privates have not hesitated to enter homes in order to track down a misplaced iPhone prototype. In 2017, Apple even boasted of having twelve overly talkative employees arrested. be trifled withThe industrial secrets of the world's largest market capitalization are not to . In a letter sent to the Department of Labor on March 4, 2022, Apple's lawyers justify Ashley Gjøvik's dismissal: *"She chose to disclose information that she was required to keep confidential."* Gobbler is never named, the company merely referring to *"the study"* under the code name Omega.

Over the years, Apple has multiplied experiments of this kind, recording and storing all kinds of intimate and biometric information on its employee-testers: ear canal scans to optimize AirPods ergonomics (the designers boast *"one of the largest ear libraries on the planet"*), sleep measurements, blood pressure and even menstrual cycle monitoring. On condition of anonymity, a former employee agreed to send us photos of a kit offered by Apple in 2019 in exchange for a $10 voucher, to measure the quality of cervical mucus in her uterus. Worried about the consequences of refusal, she agreed to take part in the exercise, which still haunts her.

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

PL_PROD13_002581

Ashley Gjovik, whistleblower fired by Apple, alone against all odds

# You should have no expectation of privacy when using your personal devices or someone else's for business purposes. Apple

If the tech giant doesn't hesitate to colonize the bodies of its employees, the latter are asked not to squawk. Apple's internal policy, also confidential, announces the color: *"You should have no expectation of privacy when using your personal devices or anyone else's for business purposes, when using Apple systems or networks, or when on Apple premises."* But it might not last. At the end of January, the labor law watchdog ruled that the company's omerta policy violated the law, paving the way for a lawsuit. At issue is an intimidating memo sent by CEO Tim Cook a week after the whistleblower's dismissal. *We know that leakers are a small number of people,"* he wrote. *We also know that people who disclose confidential information have no place here."*

> **Read also:**
>
> "Les désobéissants" on France.tv: 10 stories of citizens' struggles to get the truth out

For attorney Seth Goldstein, who recently helped Amazon workers fight Jeff Bezos' anti-union practices, this is an important signal: *"Ashley's revelations highlight the worst of corporate culture in Silicon Valley. I'm hopeful that her case will help shake things up, because people no longer trust these companies."* As for the whistleblower, she's not about to give up, even if the battle has taken its toll on her. "*I sometimes feel like I've lost my identity, and I've never been so close to suicide since I was a teenager,"* she explains, on the verge of tears, adding that she has found solace in a book about the moral wounds of GIs returning from war. In early February, she had an appointment with investigators from the Securities and Exchange Commission. In the complaint she sent to a dozen judicial and privacy protection authorities, she humorously announces her future reconversion to public international law, human rights and the protection of privacy. *"dystopian megacorporations".*

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

PL_PROD13_002582

**NN.**   <u>**EXHIBIT NN: TELERAMA TWEETS**</u>

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC      MAY 26 2026

| | |
|---|---|
| 🔍 Search | ✕ |

🏠 **Home**

🔍 **Explore**

🔔 **Notifications**

💬 **Chat**

✴️ **Grok**

🔖 **Bookmarks**

🚀 **Creator Studio**

✕ **Premium**  `50% off`

👤 **Profile**

⋯ **More**

**Post**


**Ashley M. Gjøvik**
@ashleygjovik    ⋯

---

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023    ∅  ⋯
∅ Translated from French  Show original

Apple protects the privacy of its users? Not that of its guinea pig employees. @ashleygjovik can testify: she was fired for speaking out. Backed by confidential documents, she reveals a corporate culture of appalling toxicity.

telerama.fr/debats-reporta…



💬 3    🔁 83    ♡ 111    📊 46K    🔖 ↥

---

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023    ∅  ⋯
∅ Translated from French  Show original

At the start of her story, which begins like a remake of *Erin Brockovich*, the toxicity is moreover very literal: in early 2020, she falls seriously ill and discovers that her life at Apple is built on California soil laden with carcinogenic solvents.



Elle a mis
une petite ville
à ses pieds et
une multinationale
à genoux.

**Julia Roberts est Erin Brockovich**
Seule contre tous

💬 3    ♡ 11    📊 4.6K    🔖 ↥

← **Post**

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023    ∅  ⋯

---

**Relevant peo**

**Olivier Tes**
@olivierte…

Enquêtes @
"Apocalypse
@EDivergen
tesq.37 ⚠️
BS.

**Live on X**

🎙 **Sen. Bernie Sand**
**LIVE: The Existent**
**AI and the Need fc**

**What's happe**

Politics · Trending
**President Biden**

Sports · Trending
**Kevin Knight**

Technology · Trending
**Java**

Sports · Trending
**Kenny Atkinson**

Show more

Terms of Service | Priva
Accessibility | Ads info



PL_PROD13_005100



Q Search

X

🏠 Home

🔍 Explore

🔔 Notifications

💬 Chat

✴️ Grok

🔖 Bookmarks

🚀 Creator Studio

✖️ Premium  **50% off**

👤 Profile

… More

**Post**

Ø Translated from French   Show original

She alerts her superiors, demands tests. Insists. Annoys. She's told to shut up. On an internal Slack channel, she rallies the anger, finds her calling: "I became a revolutionary when I realized they didn't care that we could die."

💬 1          🔁 3          ♡ 10          📊 2.8K          🔖  📤

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023          Ø  …

Ø Translated from French   Show original

If she holds a position of responsibility, the young woman is not a product of California's technological elites, whose ways she has never adopted. In August 2021, Apple placed her on enforced leave, citing an internal investigation based on her accusations.

💬 1          🔁 4          ♡ 9          📊 3K          🔖  📤

**Olivier Tesquet**
@oliviertesquet

Ø Show translation

Dès lors, elle fait feu de tout bois, et commence par dévoiler l'existence d'un programme clandestin, Gobbler (rebaptisé plus tard Glimmer), déployé en 2017 auprès des salariés pour entraîner Face ID, la fonctionnalité de reconnaissance faciale d'Apple.



9:57 AM · Mar 14, 2023 · **9,327** Views

💬 2          🔁 4          ♡ 11          🔖 2          📤

Relevant ⌄                                    View quotes ›

 **Post your reply**          Reply

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023          Ø  …
Une fois activé, Gobbler prend une photo dès qu'il détecte un visage. C'est un œil qui ne cligne jamais.  "En matière de données, nous en voulons plus", ajoute un ingénieur dans un email interne. Tous les moyens sont bons, même les plus tordus, pour constituer ce trombinoscope.

Dans un autre document, Apple précise quelques règles. L'application ne peut pas être utilisée en France ou en Allemagne (elle y serait illégale du fait des réglementations locales) et les salariés sont priés de ne pas télécharger de clichés immortalisés dans des lieux intimes. Gjøvik est récalcitrante, mais

**Relevant peo**

Olivier Tes⋯
@olivierte…
Enquêtes @
"Apocalypse
@EDivergen
tesq.37 ⚠️ .
BS.

**Live on X**

🔵 **Sen. Bernie Sand**
**LIVE: The Existent**
**AI and the Need f**

**What's happe**

Politics · Trending
**President Biden**

Sports · Trending
**Kevin Knight**

Technology · Trending
**Java**

Sports · Trending
**Kenny Atkinson**

Show more

Terms of Service  |  Priva
Accessibility        Ads info



Ashley M. Gjøvik          ⋯
@ashleygjovik

PL_PROD13_005101

Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 284 of 427




| | |
|---|---|
| 🔍 | X |

🏠 Home

🔍 Explore

🔔 Notifications

💬 Chat

✴️ Grok

🔖 Bookmarks

🚀 Creator Studio

✖️ Premium  **50% off**

👤 Profile

⚫ More

**Post**

pour arracher le consentement de ses cobayes, l'employeur sait ruser. Un jour d'été, elle est invitée à un « apéro de collecte de données » d'une vingtaine de minutes, sans plus de précisions. Interdiction d'en parler sans obtenir le feu vert du service juridique. Une fois sur place, à deux pas du siège historique de la société, elle découvre « ce qui ressemble à un complexe militaire » protégé par des gardes. Il faut donner son téléphone, passer une porte, la refermer, en ouvrir une autre, et pénétrer quatre par quatre dans un espace cylindrique en plein cagnard pour se faire tirer le portrait. Un vrai trombinoscope composé par la force, dont l'objectif est d'améliorer l'intelligence artificielle

💬 1          🔁 5          ❤️ 10          📊 2.5K          🔖 ⬆️

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023          ⌀ ···

Apple licencie Gjøvik et elle se retrouve dans le viseur de la "Worldwide Loyalty Team", des investigateurs maison qui ont souvent fait carrière dans la police ou les services. On ne badine pas avec les secrets industriels de la première capitalisation boursière de la planète.

💬 1          🔁 4          ❤️ 12          📊 2.4K          🔖 ⬆️

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023          ⌀ ···
⌀ Translated from French  Show original
But Gobbler is not an anomaly. Over the years, Apple has multiplied the experiments to collect biometric information on its flock: scanning of ear canals, sleep measurement, blood pressure, and even… monitoring of the menstrual cycle.

Au fil des ans, Apple a multiplié les expérimentations de ce type, enregistrant et stockant toutes sortes d'informations intimes et biométriques sur ses salariés-testeurs : scan des conduits auditifs pour optimiser l'ergonomie des AirPods (les designers s'enorgueillissant de posséder « l'une des plus larges bibliothèques d'oreilles de la planète »), mesure du sommeil, pression artérielle et même surveillance du cycle menstruel. Sous couvert d'anonymat, une ex-salariée a accepté de nous transmettre les photos d'un kit proposé par Apple en 2019 en échange d'un bon d'achat de 10 dollars, afin de mesurer la qualité des glaires cervicales de son utérus. Inquiète des conséquences d'un refus, elle a accepté de se prêter à l'exercice, qui la hante encore.

💬 1          🔁 4          ❤️ 11          📊 2.8K          🔖 ⬆️

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023          ⌀ ···
⌀ Translated from French  Show original
The color is announced right from the start: "You must have no expectation of privacy regarding your use of your personal devices or those of someone else for business purposes […] or when you are on Apple's premises."

**Workplace searches**

Only in cases where allowed under local law, Apple may:

- Access, search, monitor, archive, and delete Apple data stored on all of its property, as well as non-Apple property, if used for Apple business or if used for accessing Apple data, servers, or networks. This includes all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts) using Apple equipment, networks, or systems.

- Conduct physical, video, or electronic surveillance, search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises.

This means that you have no expectation of privacy when using your or someone else's personal devices for Apple business, when using Apple systems or networks, or when on Apple premises.

💬 1          ↑ 4          ♡ 12          📊 3K          🔖 ⬆️


**Ashley M. Gjøvik**
@ashleygjovik          ···

**Relevant peo**

**Olivier Tes**
@olivierte…
Enquêtes @
"Apocalypse
@EDivergen
tesq.37 ⚠️ .
BS.

**Live on X**

🔵 Sen. Bernie Sand
LIVE: The Existent
AI and the Need fo

**What's happe**

Politics · Trending
**President Biden**

Sports · Trending
**Kevin Knight**

Technology · Trending
**Java**

Sports · Trending
**Kenny Atkinson**

Show more

Terms of Service  |  Priva
Accessibility     Ads info



PL_PROD13_005102



| | X |

🏠 Home

🔍 Explore

🔔 Notifications

💬 Chat

✴️ Grok

🔖 Bookmarks

🚀 Creator Studio

✖️ Premium   **50% off**

👤 Profile

⋯ More

**Post**

---

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023

⊘ Translated from French  Show original

Surveillance is invasive, and silence, non-negotiable. One week after Gjøvik's dismissal, Tim Cook himself was applying pressure: "We know that people who disclose confidential information have no place here."

Tim Cook says employees who leak memos do not belong at Apple, according …

From theverge.com

💬 1    🔁 4   ♡ 9   📊 2K

---

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023

⊘ Translated from French  Show original

It should be noted that this doctrine of intimidation could burn out quickly. In late January, seized by the whistleblower, the labor law enforcer deemed Apple's omertà policy to violate the law, paving the way for a trial.

Apple Executives Violated Worker Rights, US Labor Officials Say

From bloomberg.com

💬 1   🔁 5   ♡ 11   📊 2K

---

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023

Pour cette enquête, j'ai évidemment sollicité Apple. Leur réponse tient en deux mots : "Aucun commentaire".

La courageuse Ashley Gjøvik, elle, a déjà trouvé sa reconversion : "droit international public, droits humains et méga-corporations dystopiques".

💬 1   🔁 4   ♡ 11   📊 2.3K

---

**Olivier Tesquet** @oliviertesquet · Mar 14, 2023

⊘ Translated from French  Show original

In addition, I take the liberty of reposting here the neighboring story of Thomas Le Bonniec, domestic spy on behalf of Siri. Enough to gradually build a salutary library of grains of sand.

> **Olivier Tesquet** @oliviertesquet · Feb 24, 2021
>
> ⊘ Translated from French
>
> The story of Thomas Le Bonniec is that of a spy movie without a plot. For months, in an Irish open-plan office, he listened to thousands of Siri recordings, in order to train Apple's AI. Until the one transcription too many. This week in @Telerama.

---



**Relevant peo**

**Olivier Tesc**
@oliviert...

Enquêtes @
"Apocalypse
@EDivergen
tesq.37 ⚠️ .
BS.

**Live on X**

🔵 **Sen. Bernie Sand**

LIVE: The Existent
AI and the Need fo

**What's happe**

Politics · Trending
**President Biden**

Sports · Trending
**Kevin Knight**

Technology · Trending
**Java**

Sports · Trending
**Kenny Atkinson**

Show more

Terms of Service | Priva
Accessibility | Ads info


**Ashley M. Gjøvik**
@ashleygjovik
⋯



PL_PROD13_005103

**OO.    <u>EXHIBIT OO: DER SPIEGEL ARTICLE</u>**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

Companies could face a fine of up to 50,000 euros.

And: "If the companies do not change their behavior, they are acting intentionally." Even prosecution for fraud with significantly higher fines is then possible.

All producers of the sausages that tested positive deny the use of se- parator meat. A company spokesman for a Tönnies subsidiary questions the testing method used by the Bremerhaven University of Applied Sciences: The markers indicated by the laboratory are not evidence of mechanically recovered meat, he writes. "We use processed meat from young poultry in the products mentioned. This may also contain a small proportion of cartilage cells."

One argument against this is that the method does not respond at all to a small proportion of the cartilage marker collagen II alpha I.

A law firm commissioned by Wiesenhof sent affidavits from the managing directors of the factories concerned stating that they did not use mechanically recovered meat, which could also be proven by the regular checks they carried out themselves on the basis of officially recognized histological examinations and by checking the calcium content.

Wittke's method is "certainly a new scientific approach ... which has not yet been used in practice" and is not yet officially recognized, the law firm writes. Collagens are also found in other parts of the body, in particular the eyes. Furthermore, the process has so far only been developed for chicken meat and not for turkey meat, the main component of the Wiesenhof sausage.

In fact, all products that tested positive also contain chicken. And according to a study by the University of Lyon, tendons do contain collagens - but not the specific protein collagen type II alpha 1, which is the target of the laboratory tests.

Inspection authorities are certainly impressed by the new testing method, which could soon become more widespread and provide new insights. "The method is very forward-looking for us," says Matthias Denker, Head of Department at the State Office for Food Safety in Mecklenburg-Western Pomerania. The necessary equipment is available in official laboratories; food inspectors could well use the method in their day-to-day testing.

Researcher Wittke is not satisfied with this. In the future - with funding from the Federal Ministry of Economics - he also wants to detect cuttlefish meat from other animals in sausages, especially pork, the most commonly sold meat in this country.

It could be that German sausage manufacturers will soon have to look for a new business model.

Claus Hecking, Anne Martin, Leonie Voss, Carolin Wahnbaeck                                    ∎



Apple boss Cook

# iPhone is watching you

**TECH CONCERNS** Whistleblower Ashley Gjøvik has revealed that Apple uses secretly taken photos of its employees to
to train facial recognition on iPhones. Now it wants to follow up.

The e-mail immediately struck Ashley Gjøvik as peculiar: On an August day five years ago, the Apple project manager received an invitation to a "Data Collection Social Hour". The party was to take place opposite Apple's UFO-like headquarters in Cupertino, California.

Her colleague from the user studies team promised drinks, music and "20 minutes of data collection in a social environment". Only permanent employees who were "not sensitive to light" were allowed to take part, according to his email. The event didn't really feel voluntary, Gjøvik says today. She went because it was expected. Her bosses often put pressure on her to be a team player.

What Gjøvik experienced back then triggered one of the biggest data scandals in the Apple empire last summer. She decided not to keep quiet about her findings: The company uses unnoticed photos of its employees to train its algorithm. Gjøvik became a whistleblower - with a mission that has since spread to Europe.

The fact that data protectionists from Germany may soon be fighting the most valuable tech

The world's largest logistics group has to do with Gjøvik.

The 35-year-old tells her story on a park bench in Santa Clara in Silicon Valley, a few miles from Cupertino. Gjøvik no longer works at Apple; the iPhone company fired her last September in a dispute over the snooping app. Gjøvik had revealed too much for Apple's taste. The company declined to comment on the allegations when asked.

Gjøvik remembers the data collection campaign from back then as follows: instead of a party, there was a parking lot with two rows of black-clad steel fences, three meters high. The place was guarded by security guards and cameras. At the bar, a disgruntled employee in a Hawaiian shirt served Gjøvik and four other Apple employees at a folding table and explained their task: to take selfies.

She signed a digital declaration of consent, of which she never received a copy. Then everyone received the new, as yet unreleased iPhone model X, with an app installed on it, which at the time was still in its infancy.
was called "Gobbler". In German "Verschlinger". It was only later that Apple changed the name to something less drastic: "Glimmer".

PL_PROD_7-001

Gjøvik reports that they sat in the sweltering sun at almost 40 degrees and photographed themselves sweating. From above, from the side, wearing sunglasses or grimacing. The camera and several sensors recorded biometric images in which faces are measured three-dimensionally in order to recognize a user even with a shiny forehead and in glaring sunlight.

Purpose of the exercise: Apple employees were to feed the algorithm behind Face ID. The feature of unlocking a phone using facial recognition was to be introduced a few months later on the next iPhone model. Today, Apple's smartphones would be unthinkable without it. Apple employees such as Gjøvik have also been improving the technology for years: involuntarily and with pictures taken unnoticed in the most intimate everyday situations. Last August, the whistleblower drew attention to what was happening when she tweeted a video and the images taken by the Glimmer app.

This is more than embarrassing for Apple. None of the major technology companies is as committed to data protection as the iPhone manufacturer. Tim Cook, Apple's otherwise rather mild-mannered boss, regularly attacks data giants such as Meta or Alphabet and likes to demonstratively distance himself from the industry's two-faced practices: With stricter privacy rules on Apple devices, Cook almost single-handedly stifled Meta's growth by allowing the hundreds of millions of iPhone and iPad users last year to prohibit other providers from tracking their behavior for advertising purposes. Meta, which was still called Facebook at the time, warned its investors of possible negative consequences for the business, and the share price did indeed collapse shortly afterwards.

Cook always acts as if he is concerned with something higher and as if everything is different in his own company: "When we start to feel constantly monitored, our behavior changes," he recently said at a Time magazine conference. "We start to do less. To think less."

Gjøvik now wants to reveal that the company is not only breaking its promises, but possibly also the law. She has just passed her law exams and now works for a non-governmental organization that fights against censorship in China. But she is not finished with Apple yet. She is in contact with California's data protection authority about the violation of her privacy, and German authorities are also involved.

"What Apple did to me, they could do to German employees (and their families and friends) or have already done to them.

## "All data containing your faces in the image are good data."

Mail from a study director
to Apple employees

have done," writes Gjøvik in an email to the Federal Data Protection Commissioner, which is available to SPIEGEL. He has since passed the case on to his Bavarian colleague, who is responsible. Apple's German headquarters are based in Munich - where they conduct research into image recognition and applications such as Face ID, among other things.

According to employment law expert Annegret Balzer, this could constitute a breach of data protection law if the people photographed did not know that they were being recorded or did not really participate voluntarily due to their relationship of dependence on their employer: If users did not give their informed and explicit consent for facial recognition, "processing is hardly conceivable and would therefore be unlawful".

A fine in the millions would then also be possible. For a company with more than 200 billion dollars in cash reserves, this would hardly be a problem. But the question is whether Apple only preaches the song of privacy when it harms its competitors.

Apple seems to be fully aware of how sensitive the use of mica is outside the USA: In August 2017, the head of the study wrote in an email to participants that employees from France and Germany were excluded. Such a user study would always be interpreted as coercion under local law, he later explained in a LinkedIn post.



Lawyer Gjøvik

Then Tuffs / mauritius images / Alamy

One month after the parking lot party, Gjøvik received an iPhone X, which she was supposed to "live on" - in Apple parlance. Apple employees are always encouraged to test their own products in everyday life, says Gjøvik.

To improve facial recognition, the Glimmer app continuously and automatically photographed its users for years as soon as they picked up the device. "Any data that has your faces in the picture is good data," the head of the study instructed the participants. The algorithm is "data-hungry". The employees should see the selfie route as a game: Those who uploaded 100 pictures per day or 2000 per month received a virtual medal.

At the end of 2020, the head of the study boasted in a blog post that Apple had collected one billion images for the launch of Face ID. Gjøvik believes that Apple was simply too stingy to pay only external test subjects for the task.

For around four years, the app photographed her when she was half asleep or on the toilet, and even nude pictures of her were stored. She estimates that the app took hundreds of pictures a day. The ones that Gjøvik wants to share publicly show how randomly the app took snapshots of her private life: sometimes half a head, sometimes with a mask, sometimes you can see far into her living room. The fact that Glimmer also photographs friends, siblings or complete strangers who have never consented to this can hardly be prevented, says Gjøvik.

She just wanted to get out of the study, but didn't dare to ask.
"Apple's culture of secrecy seeps deep into your consciousness. You're afraid to even talk to the authorities about obvious misconduct."

Gjøvik learned how important it was for Apple to keep the program secret after she published the controversial Glimmer recordings. A few weeks later, she received a letter from a lawyer hired by Apple asking her to delete the tweets.

In September, Apple fired her after six and a half years with the company. Gjøvik had breached her confidentiality obligation by publishing the images, Apple's lawyers argued in a statement to the US Department of Labor's whistleblower program in March. It is available to SPIEGEL. Gjøvik's lawyer, on the other hand, argues that Apple holds no copyright to Gjøvik's images.

She is now fighting her dismissal before the National Labor Relations Board (NLRB). According to SPIEGEL, the SEC is also interested in whether Apple wanted to shut down a whistleblower.

Such proceedings often take a long time. Only one separation went very quickly: Gjøvik now has an Android smartphone.

Patrick Beuth, Alexander Demling                ∎

PL_PROD_7-002

**PP.**     **EXHIBIT PP: MY PRIVACY ARTICLE TWITTER POST**



**Ashley M. Gjøvik** @ashleygjovik · Aug 30, 2021

#Apple has an internal culture of surveillance, intimidation, & alienation. Employees are closely monitored & our data hoarded in the name of secrecy & quality. We're told we have no expectation of privacy, while Apple says publicly: privacy is a human right.



**The Verge** ✓ @verge · Aug 30, 2021

Apple cares about privacy, unless you work at Apple
theverge.com/22648265/apple…

💬 7          🔁 48          ♡ 90          ⬆          ılı



**Ashley M. Gjøvik**
@ashleygjovik                                              ···

I still love #Apple products & brand. I devoted nearly 7 years & much blood/sweat/tears ensuring Apple's products are exceptional. However, Apple the corporation needs a reckoning. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

> Working at Apple in "normal" times, I walked in circles around their glass-walled panopticon, only able to badge into select lockdowns (a constant reminder that Apple has absolute control over my resources and access), and was immersed in a culture where it is implicitly forbidden to critique Apple policies or even speak openly to your coworkers with concerns about your employment & work conditions, lest you upset the cronyism, ex-CIA/ex-FBI security teams, and other "powers that be." I realize now that during those times, I didn't question a lot of things that I should have. Not just the abuse I suffered, but also the constant invasion of privacy — and perhaps those two things are linked.
>
> There seems to be limitless ways Apple can access employee data and monitor us. I recently shared how violating it felt for Apple to demand to copy & permanently store my nudes for completely unrelated litigation. After the public outcry, I questioned other policies & actions Apple had taken. The internal "Glimmer" app had always troubled me, but I never voiced that concern, because inside we don't question the way things are or what we're asked to do. But now, in the light of day, considering everything Apple's already done to me, this app, the photos & data it gathers, and how little we know about what it does with all of that — is deeply troubling and I felt compelled to make it public. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

11:56 AM · Aug 30, 2021 · Twitter Web App

PL_PROD14_01514

**QQ.**   <u>**EXHIBIT QQ: ZOE PRIVACY ARTICLE TWITTER POST**</u>

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 292 of 427

Search X

Home

Explore

Notifications

Chat

Grok

Bookmarks

Creator Studio

Premium    **50% off**

Profile

More

**Post**

← **Post**

**Zoë Schiffer** ✓
@ZoeSchiffer

New: Apple employees say the company hasn't done enough to protect their personal privacy. Now, they're pushing back against norms & rules that encourage them to use personal Apple IDs & iCloud accounts for work — making it nearly impossible to keep personal & work files separate

> **The Verge** ✓  @verge · Aug 30, 2021
> Apple cares about privacy, unless you work at Apple
> theverge.com/22648265/apple…

9:36 AM · Aug 30, 2021

💬 13        🔁 235        ♡ 580        🔖 41        ⬆️

**Relevant** ⌄                    **View quotes** ›

---

👤 **Post your reply**                    **Reply**

**Ashley M. Gjøvik** @ashleygjovik · Aug 30, 2021
#Apple has an internal culture of surveillance, intimidation, & alienation. Employees are closely monitored & our data hoarded in the name of secrecy & quality.  We're told we have no expectation of privacy, while Apple says publicly: privacy is a human right.

💬 4        🔁 9        ♡ 39        ılı        🔖 ⬆️

**Ashley M. Gjøvik** @ashleygjovik · Aug 30, 2021
We're learning about #Apple's long history of systemic oppression & retaliation against employees when employees express concerns about discrimination, harassment, & other abuse. Why wouldn't Apple try to use our data & their internal surveillance infrastructure against us?

💬        🔁 4        ♡ 10        ılı        🔖 ⬆️

**|🇰🇪#GoKFundEduWell🇰🇪|** @AcademiaKenya · Aug 31, 2021
THREAD …….!

#CyberSecurity

Apple users and contractors should be very careful. ^ON

@AcademicChatter @IngNdolo @BlkInEngineerng

💬 1        🔁        ♡        ılı        🔖 ⬆️

**Relevant peo**

Zoë Schiffe
@ZoeSchiff
Director of E
WIRED. Auth
Inside Elon I
zoeschiffer.

The Verge ✓
@verge
theverge.co

**Live on X**

Sen. Bernie Sand
LIVE: The Existen
AI and the Need fo

**What's happe**

Sports · Trending
**Kevin Knight**

Technology · Trending
**Java**

Sports · Trending
**Kenny Atkinson**

Medical drama · Tren
**#ChicagoMed**

**Show more**

Terms of Service    Priva
Accessibility    Ads info

**Ashley M. Gjøvik**
@ashleygjovik

PL_PROD13_009689

**RR.     EXHIBIT RR: TECHDIRT ARTICLE**

90

Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 294 of 427



Search Techdirt

Techdirt

| TECHDIRT | GREENHOUSE | FREE SPEECH | ERROR 402 | CTRL-ALT-SPEECH | | DEALS | JOBS | SUPPORT TECHDIRT |

Follow Techdirt

 PODCAST ▶ Techdirt – Infrastructure For The New Private Internet   ◄))) SOUNDCLOUD

Netflix's Announced 'Video Game Streaming' Foray Fizzle...    China's New Internet Regulations, Building On Western I...

# Apple's Dedication To Privacy Is Missing When It Comes To Its Workforce, Employees Say



Privacy

**from the** *consistently-inconsistent* **dept**
Tue, Aug 31st 2021 06:22am - **Karl Bode**

For a while it's been clear that Apple has been hoping to use "we care about privacy" as a marketing advantage in an internet economy that consistently… doesn't. For example Apple has **stood up to the FBI** when it comes to backdooring encryption. And in 2020 Apple unveiled **several new privacy features and policies** it hoped would differentiate it from its other "big tech" contemporaries repeatedly under fire in the press and in Congress. Granted there's been ongoing **hints** this dedication isn't exactly **consistent**, but it's the thought that counts, I guess.

But Apple employees say the company's outward-facing dedication to privacy isn't reflected in house. This week The Verge reported on how the company's decision to force Apple employees to link their personal Apple ID and work Apple accounts are creating **significant privacy headaches for employees**. Personal Apple ID accounts are obviously filled with all manner of sensitive personal and financial data that an employee might not want shared with an employer. And the requirement that employees fuse their personal and work lives in such a fashion is causing significant internal turmoil, the report claims:

> "…some employees say the company isn?t doing enough to protect their personal privacy and, at times, actively seeks to invade it for security reasons. Employees have been asked to install software builds on their phones to test out new features prior to launch ? only to find the builds expose their personal messages. Others have found that when testing new products like Apple?s Face ID, images are recorded every time they open their phones. ?If they did this to a customer, people would lose their goddamn minds,? says Ashley Gj?vik, a senior engineering program manager."

Apple devices don?t support using multiple Apple IDs, and while you can technically use several phones (say, an Android), that winds up being cumbersome and difficult if you want to actually get work done. The forced integration is just a bizarre disconnect from the company's recent pro-privacy branding. Especially given the requirements have had a stunning privacy impact on the very people Apple expects to build privacy-friendly products and services:

Subscribe to Our Newsletter

## Get all our posts in your inbox with the Techdirt Daily Newsletter!

Email Address *

Subscribe

*We don't spam. Read our* **privacy policy** *for more info.*





*A weekly news podcast from Mike Masnick & Ben Whitelaw*
Subscribe now to Ctrl-Alt-Speech »

Essential Reading

**The Techdirt Greenhouse**
*Read the latest posts:*

Winding Down Our Latest Greenhouse Panel: The Lessons Learned From SOPA/PIPA

PL_PROD13_002103



**Techdirt Deals**



BUY NOW

## The 2026 Complete Godot Stack Development Bundle

So in short Apple is demanding that employees fuse extremely personal accounts with oceans of sensitive data with their work accounts. While at the same time conducting significant internal surveillance, and making it extremely clear employees should have absolutely no expectation of privacy (very much the status quo at most companies):

> *"Underpinning all of this is a stringent employment agreement that gives Apple the right to conduct extensive employee surveillance, including ?physical, video, or electronic surveillance? as well as the ability to ?search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises."*

The story makes it very clear Apple hasn't tried very hard to make any of this any easier. Untangling your personal and work data when you leave Apple also winds up being a nightmare, given that Apple bans employees from wiping their company-owned devices (including the personal data that gets tangled up with work) when they leave the company, opening them to legal action for violating their employment agreement if they do.

So in short Apple's marketing insists that when it comes to privacy the company is ethical and different, but when it comes to the people actually tasked with building the products that adhere to those standards — these values suddenly and mysteriously disappear.

Filed Under: **apple id**, **employment**, **privacy**, **work life balance**, **work phone**
Companies: **apple**

**14 Comments** | **Leave a Comment**

*If you liked this post, you may also be interested in...*

- Wireless Giants To Get Off The Hook For Spying On Your Daily Movements For Years
- Arkansas Tried To Pass An Unconstitutional Social Media Law. Again. It Lost. Again.
- Netgear Gets Mysterious Exemption To Trump FCC 'Router Ban,' Refuses To Say How
- The EU Killed Voluntary CSAM Scanning. West Virginia Is Trying To Compel It. Both Cause Problems.
- Copyright Industry Continues Its Efforts To Ban VPNs

## Comments on "Apple's Dedication To Privacy Is Missing When It Comes To Its Workforce, Employees Say"

From The Revolt Against SOPA To The EU's Upload Filters

Did We Miss Our Best Chance At Regulating The Internet?

*Read All »*

**Techdirt Insider Discord**

*The latest chatter on the Techdirt Insider Discord channel...*

aabsurdity: He's making a list He's checking it twice Gonna find out if you're Nazi or nice. FAFO Claus is coming to town. :P

benv0727: Patterson v meta is now before the new york state court of appeals if patterson wins do you think that it will creates immediately a dilemma for online platforms, forcing them to choose between excessive censorship or allowing harmful content—undermining the protections granted by Section 230 of the 1996 Communications Decency Act (CDA), which was designed to encourage content moderation and protect free speech. Or before they will choose they will wait for scotus to decide ?

BentFranklin: [link]

John Roddy: Ahh, the double edged sword of an open protocol making it so easy to rapidly pull data on a single high profile account

https://bsky.app/profile/sky.sky...

**Become an Insider!**

**Recent Stories**

## Sunday
12:00 Funniest/Most Insightful Comments Of The Week At Techdirt (1)

## Saturday
12:00 Game Jam Winner Spotlight: I Could Do That! (0)

## Friday
19:39 RFK Jr. & White House Appear At Odds Over Attempts To Rein Him In (10)

15:12 Good News If You Have A Sony TV And Were Hoping It Would Become Less Useful For No Reason (12)

PL_PROD13_002104

**SS.    EXHIBIT SS: BOX FOLDERS & EVIDENCE**

91

```
Folder PATH listing for volume Windows
Volume serial number is 2AA7-7895
C:.
|   Cast of Characters.pages
|   Employment Summary.pages
|   output.doc
|
+---2017 - Negligence; Failure to Report Work Place Injuries
|       2021  Awarenss of Peanut Allergy .pdf
|       caught Pertussis on Apple's GHC business trip .pdf
|       Dave ordered an xmas tree again knowing about my allergy.pdf
|       Email to Tony.pdf
|       Fwd Whooping Cough Communication.pdf
|       Pertussis dr note.pdf
|       Pertussis notice.pdf
|       Re Ashley out sick  health advisory.pdf
|       Re Im allergic to Christmas please help .pdf
|       Re Sickness update no good news ?coughed lung out of place?.pdf
|       ?hazmat?.jpeg
|       ?nuke the building?.jpeg
|
+---2017 - Privacy Whisteblowing
|       Privacy concerns? rdarproblem33365311 Why does iPhoto need to creep all over my
Facebook.pdf
|
+---2017 - Sexual Assault Concerns
|       Fwd Missing Tim Cook Email about Women  Sexual Assault.pdf
|       Re Missing Tim Cook Email about Women  Sexual Assault.pdf
|       Re Missing Tim Cook Email about Women  Sexual Assault2.pdf
|       Top of Dave's mind? ?Brent K?.jpeg
|
+---2017 - Sexual Discrimination
|       Reported concerns of bullying.PNG
|       Uptalk feedback during 1 on 1.pdf
|       Uptalk vocal tone in formal mid-year review.key
|
+---2017-21 - SD01 Facilities Issues (Possible Impact to Workplace Safety on Superfund)
|       APPROVAL NEEDED WO 225485 Door near CR 1512.pdf
|       APPROVAL NEEDED WO 225485 Door near CR 15122.pdf
|       Facilities in SD01 Today.pdf
|       Fwd Did SD01 lose power temporarily on Wed 1219 173523.pdf
|       Fwd Re OUT OF COMPLIANCE SOR 94712  Annual Fire Safety Inspection.pdf
|       Fwd Re Pending SOR 94712  Annual Fire Safety Inspection.pdf
|       Fwd Refrain from using hot water.pdf
|       Fwd REMINDER Stewart Field Work.pdf
|       Fwd SD01 bad air quality for MSQ.pdf
|       HVACagain.pdf
|       Issue Resolved SD01 Break Room Water.pdf
|       Issue resolved Temperature in Metroid  Sim City.pdf
|       Maintenance Work.pdf
|       Parking Lot Closure.pdf
|       Power Outage.pdf
|       Re APPROVAL NEEDED WO 225485 Door near CR 15122.pdf
|       Re Broken AC In SD01  Sim City Lockdown is 84 Degrees.pdf
|       Re FIRE PANEL BEEPING SIGNAL.pdf
|       Re For when youre back .pdf
|       Re Grille has been installed.pdf
|       Re HVAC tomorrow 131  7am.pdf
|       Re Maintenance issue.pdf
|       Re Okay to move cube to 131112 in Sim City.pdf
|       Re Power outage.pdf
|       Re Power outage2.pdf
|       Re SD01 bad air quality for MSQ2.pdf
|       Re SD01 bad air quality for MSQ3.pdf
|       Re Stewart 1 Air Quality.pdf
|       Re Stewart Power Down.pdf
```

00644

```
|       Re Stewart Power Down2.pdf
|       Re Unplanned Power Outage.pdf
|       Re UPDATE WO 225485 Door near CR 1512.pdf
|       SD01 1113807.pdf
|       SD01 Break Room Water.pdf
|       SD01 Building Walk Through 2pm.pdf
|       SD01 Chamber Doors in Parking Lot.pdf
|       SD01 HVAC during Thanksgiving Shutdown.pdf
|       SD01 HVAC Work 222  229.pdf
|       SD01 HVAC Work.pdf
|       SD01 Parking Lot Work.pdf
|       SD01 Parking Lot Work2.pdf
|       Stewart 1 Field Work.pdf
|       Stewart 1 Smoking Policy Reminder.pdf
|       Stewart Field Work.pdf
|       Temperature in Metroid  Sim City.pdf
|       Unplanned Power Outage.pdf
|       Vendor in SD01 tomorrow Thu between 122p.pdf
|
+---2017-21 - Sexist Culture in PSQ
|       all male leadership team.png
|       bizarre John Basanese rant during large Women of PSQ kickoff -2017.MOV
|       Dan doesn't imagine me as a women's studies minor.PNG
|       Dan says to use a lower vocal tone.jpeg
|       DanJohn Feedback .pdf
|       Diversity sync.pdf
|       Fwd FYI UptalkUpspeak and Vocal Fry Articles copy.pdf
|       Fwd MSQ Staff 505.pdf
|       Fwd Status  71221.pdf
|       Fwd Textio Job Description Analysis.pdf
|       Gendered feedback concerns.pdf
|       httpwwwdailymailcoukfemailarticle3630457Whywomennaturallycolderbodiesmenhtml.pdf
|       inclusion & diversity article is just being ?provocative? .jpg
|       Lady Things.pdf
|       masculine office decor 1.jpg
|       masculine office decor 2.jpg
|       masculine office decor 3.jpg
|       Ping Pong Table - complained masculine .pdf
|       Re 2020 Dave Feedback.pdf
|       Re 323 Dave Staff Notes - not allowed to attend mgmt offsite .pdf
|       Re 5 Simple Poll Results  Questions for Dave  women HATE the video idea .pdf
|       Re 818 MSQ Projects  Agenda Proposal -- cannot have an office even though many open
offices.pdf
|       Re check in.pdf
|       Re Decorating Order.pdf
|       Re DELEGATION OF NOTETAKING DaveAshley 11  Action Items  Notes.pdf
|       Re EPM Role Definition  Initial MSQ Mgmt Survey Feedback.pdf
|       Re MSQ Onboarding  421- not told was first female manager.pdf
|       Re Thermometer in Sim City Lockdown.pdf
|       Re Wed 5 Simple Things  Nirupa .pdf
|       Re WofPSQ Vision Summit Lunch  Proposed Agenda.pdf
|       Re Women of PSQ Event Fireside Chat with Dan West and John Basanese on 58.pdf
|       Tony Re Introduction.pdf
|       upgraded tampons.jpeg
|       Upstairs ladies room.pdf
|       vocal tone.png
|       ?beer bash? - told them many times its masculine .pdf
|       ?dont tell HR?.jpeg
|       ?I am a bad man Ashley? .jpeg
|
+---2018 - Hostile Work Environment
|       Dan uptalk vocal tone text.jpeg
|       Dave apology for weird comment.png
|       Dave being aggressive.PNG
|       Dave called me emotional.pdf
|       Feedback with concerns about Dave Powers  and Jason Ivan - 2018.pdf
|       Fwd FYI UptalkUpspeak and Vocal Fry Articles.pdf
```

00645

```
|       I wasn't thanked for my work.pdf
|       IMG_0813.jpeg
|       IMG_2385.PNG
|       IMG_2391.PNG
|       IMG_2886.PNG
|       Out of Office - Dave sent ?unamused? face.pdf
|       PSQ Hand Me Down HW.pdf
|       Re Apologies.pdf
|       Re Feedback on David Powers.pdf
|       Screen Shot 2019-06-24 at 3.08.03 PM.png
|       Screen Shot 2021-11-11 at 8.30.51 PM.png
|       Screen Shot 2021-11-11 at 8.38.33 PM.png
|       Sometimes I feel like I'm your employee.jpeg
|       ?put in your review because its funny?.PNG
|
+---2018 - Sexual Harassment
|       Re Notes from our Friday call.pdf
|       Yepez.pdf
|
+---2018-21 - Sexual Comments
|       2020 - Dan Nudity.png
|       2020 - Unbutton Shirt Dan.pdf
|       Dan matchmaking - restaurant 1.jpg
|       Dan matchmaking - restaurant 2.jpeg
|       Dan matchmaking - restaurant 3.png
|       Open Kimono .pdf
|       Open Kimono Slack.png
|       Re Open Kimono 2.pdf
|       unbutton shirt.jpeg
|       "Open the Kimono"? 11 Assumptions Behind a Misogynist and Racist Business Phrase (Blog
Post) ? Catalyst.pdf
|
+---2019 - Hostile Work Environment
|       Dan West Steve Rozmus Dumpster text.jpeg
|       Dave 11 Notes ?reed situation?.pdf
|       Dave J129 NPS argument 1.jpeg
|       Dave J129 NPS argument 2.jpeg
|       Dave J129 NPS argument 3.jpeg
|       dumpster.pdf
|       HR panic.jpeg
|       My feet continue to plot against me .pdf
|       ?Ashley approved?.PNG
|       ?you should probably bring this up with your manager?.pdf
|       ?.PNG
|
+---2019-21 - Failure to Address Hostile Work Environment
|       2020 Powers Feedback timestamp.png
|       2020 Powers Feedback.pdf
|       Dan 11 Notes  - give Dave feedback.pdf
|       Dan all hands feedback.jpeg
|       Dave 2021 Review.jpeg
|       Dave demanded I don't send this.pdf
|       How I Got Here Ongoing DRI  Dave Said No .pdf
|       Re Ashley GjovikDan  49 Action Items .pdf
|       Re Dan Agenda  49 Notes on Dave.pdf
|       Re Dan W Agenda- Dave yelling at me.pdf
|       Re Request for feedback for David Powers.pdf
|       Re Succession  Bench Planning  Color Coding by Gender.pdf
|       Re Wrap up call today.pdf
|
+---2020 - Corruption Whistleblowing
|       Amr Kahhaleh ? LinkedIn.pdf
|       Illegally Selling Apple Products in Syria? pt2.pdf
|       Illegally Selling Apple Products in Syria?.pdf
|       powers that be.jpeg
|       Re COVID  Community Ethics.pdf
|       Re COVID  Community Ethics2.pdf
```

00646

```
|          Re DR All Hands HWE Follow Up Passdown.pdf
|          Riccio, post vaccine escalation.PNG
|          Syria - promotion- PSQ Devices Management Announcement.pdf
|          upper class privilege.jpeg
|
+---2020 - Disability Discrimination & FMLA Violation
|          Fwd Reminder of Return to Work Accommodations No RealTime Presentations.pdf
|          heart issues.png
|          ?review is damn hard to write because you were sick so much?.png
|          ?scolding? & sick 1.heic
|          ?scolding? & sick 2.heic
|          ?scolding? & sick 3.pdf
|
+---2020 - Racism Whistleblowing
|          Re Coverage removing noninclusive language from developer ecosystem.pdf
|
+---2020 - Voting Rights Advocacy
|          Fwd Pericles Next Steps.pdf
|          Re Pericles 1 Pager.pdf
|          Re pericles.pdf
|          Re Your Vote Matters.pdf
|
+---2020-2021 - Hostile Work Environment
|          equal outcome 2.png
|          Feedback on ID interview training.pdf
|          Fwd Dave Feedback.pdf
|          just coordinate.jpeg
|          Re No tent.pdf
|          Re Reminder of Return to Work Accommodations No RealTime Presentations.pdf
|          Re Request for a 11.pdf
|          Re Shared 5 Simple Things via Box Weird Survey Feedback Coming In .pdf
|          ?equal outcome?.pdf
|
+---2021 - ADA Violations & Whistleblowing
|          1128942.pdf
|          ADA Voilation Whistleblowing 1.png
|          ADA Voilation Whistleblowing 2.png
|          Apple ER Medical Release.png
|          Re Work place safety concerns  ADA Remote Work request process concerns .pdf
|          Work place safety concerns  ADA Remote Work request process concerns .pdf
|
+---2021 - Retaliation, IIED, Constructive Termination #3
|          Ashley GjovikDan  429 Meeting Notes .pdf
|          Ashley Job Role.pdf
|          Ashley OoO for Final Exams Summer and Fall School Schedules.pdf
|          Ashleys Manager Status  Week of 719.pdf
|          Fwd MSQ Staff 505.pdf
|          Fwd QUESTION 5 Simple Things Initiatives Unbiased Feedback  Task Reviews .pdf
|          Jenna Follow Up  6102021.pdf
|          Re Draft Kicking Off 5 Simple Things for Everyone.pdf
|          Re Introduction.pdf
|          Re Job role.pdf
|          Re MSQ Job Descpdf.pdf
|          Re Notes from our Friday call.pdf
|          Re QUESTION 5 Simple Things Initiatives Unbiased Feedback  Task Reviews .pdf
|          Re QUESTION 5 Simple Things Initiatives Unbiased Feedback  Task Reviews.pdf
|          Re Questions about speech related to Apples buildings on chemical release sites .pdf
|          Re Timeline of Prot Activity and Neg Employment Actions.pdf
|          Re Wrap up call today.pdf
|          Sick time  415420 .pdf
|          Sun Jul 18 Text.png
|
+---2021 - Workers Compensation
|          Gjovik Workers Comp - Signed.pdf
|          Re follow up.pdf
|
+---2021 - Workplace Safety Concerns
```

00647

```
|       +1 (650) 375-4296 John Brown.pdf
|       2016-0211-Microwave-VI Evaluation Report_FINAL.pdf
|       2021 May 19 Mike.png
|       A couple days off to deal with an arrhythmia .pdf
|       Apple Offices - Release Sites - Gjovik full.pdf
|       Ashley GjovikDan  429 Meeting Notes .pdf
|       Debra 2.jpeg
|       Debra.jpeg
|       Detailed Facility Report ? ECHO ? US EPA.pdf
|       Face ID Lasers 2.PNG
|       Face ID Lasers.PNG
|       Fwd Introductions.pdf
|       Fwd Questions about suspected longterm exposure to CAL HAZ hazardous materials Santa
Clara .pdf
|       Fwd SD01 EHS Request  42 Notes .pdf
|       GeoTracker.pdf
|       Gjovik Workers Comp - Signed.pdf
|       I thought I was dying My apartment was built on toxic waste.pdf
|       News_Release_T-19-16.pdf
|       Not Even Silicon Valley Escapes History.pdf
|       Questions about suspected longterm exposure to CAL HAZ hazardous materials Santa Clara
.pdf
|       Quick SD01 Update  History of Vapor Intrusion .pdf
|       Re Action Needed SD01 EHS Request.pdf
|       Re Ashley GjovikDan  429 Meeting Notes .pdf
|       Re Ashley GjovikDan  49 Action Items .pdf
|       Re Dave Agenda  519.pdf
|       Re EHS Follow up July 8.pdf
|       Re EHS Follow up July 9.pdf
|       Re Follow up call next week.pdf
|       Re Follow up call today need info before doctor appt tomorrow.pdf
|       Re Moving 925 Time Off .pdf
|       Re Out rest of the week for medical appts  health issues.pdf
|       Re PLEASE READ PSQ Family Day info for entire org.pdf
|       Re SD01 bad air quality for MSQ.pdf
|       Re SD01 bad air quality for MSQ2.pdf
|       Re Stewart 1 Air Quality - AC OFF.pdf
|       Re Stewart 1 Air Quality - CLOSED HVAC.pdf
|       Re Stewart 1 Air Quality0.pdf
|       Re Stewart 1 Air Quality22.pdf
|       Re Stewart 1 Air Quality33.pdf
|       Re Stewart 1 Air Quality4.pdf
|       Re Stewart 1 Air Quality44.pdf
|       Re Stewart 1 Air Quality5.pdf
|       Re Stewart 1 Air Quality6.pdf
|       Re Stewart 1 Air Quality66.pdf
|       Re Stewart 1 Air Quality7.pdf
|       Re Stewart 1 Air Quality8.pdf
|       Re Stewart 1 Air Quality9.pdf
|       safety at apple.png
|       Silicon Valley's Toxic Past Haunts Sunnyvale Neighborhood.pdf
|       SL721251223-4.PDF
|       SL721251223.PDF
|       Stewart 1 Air Quality3.pdf
|       TripleSite.pdf
|       TRW Land Rest.pdf
|       TRW Microwave.pdf
|
+---2021 - Workplace Safety Whistleblowing & Other Advocacy
|   |   Apple Chemical Exposure Ethical Concerns.pdf
|   |   Case HRC000003371  comments added.pdf
|   |   Case HRC000008184  comments added.pdf
|   |   Lets Welcome Everyone Forward.pdf
|   |   Re Case HRC000003371  comments added.pdf
|   |   Re iCal Context  DoriAshley.pdf
|   |   Re Request Apple to make a statement in support of Palestine.pdf
|   |
```

```
|   \---Apple Emails - vaccine whistleblowing
|           Re COVID  Community Ethics.pdf
|           Re COVID  Community Ethics2.pdf
|           Re COVID  Community Ethics3.pdf
|           Re DR All Hands HWE Follow Up Passdown.pdf
|           Riccio, post vaccine escalation.PNG
|
+---Ashley's Background
|       Gjovik - External Resume.pdf
|       Gjovik - Internal Resume.pdf
|       Gjovik - Reccomendation Examples.pdf
|
+---Ashley's Reviews
|       2015 annual review.pdf
|       2015 comp.jpeg
|       2016 Annual Review.pdf
|       2017 annual review .pdf
|       2018 comp.pdf
|       2018 Review.pdf
|       2019 annual review.pdf
|       2020 annual Review.pdf
|       2021 Review Self Assessment.pages
|       ashley fy21 comp.pdf
|       ashley henderson apr 2017 .key
|       Ashley_Gjovik_Review_115566505_11SEP2020_2016.pdf
|       MSQ EPM Preview.pdf
|
+---MSQ Diversity
|       IMG_3300.jpeg
|       IMG_7870.jpeg
|       IMG_8001.jpeg
|
\---Pertussis
        Your time away request has been Approved 2.eml
        Your time away request has been Approved 3.eml
        Your time away request has been Approved 4.eml
        Your time away request has been approved 5.eml
        Your time away request has been approved.eml
```

**TT.**     <u>**EXHIBIT TT: THE VERGE ADMIN. LEAVE ARTICLE**</u>

# THE VERGE

APPLE \ POLICY \ TECH

# Apple places female engineering program manager on administrative leave after tweeting about sexism in the office

*Ashley Gjøvik says the employee relations team implied she should stay off Slack pending an ongoing investigation*

By Zoe Schiffer | @ZoeSchiffer | Aug 4, 2021, 5:18pm EDT



PL_PROD13_002022

Apple places female engineering program manager on administrative leave after tweeting about sexism in the office – The Verge

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 305 of 427    8/4/21, 3:54 PM

Illustration by Alex Castro / The Verge

Apple has placed senior engineering program manager Ashley Gjøvik on indefinite administrative leave after she tweeted about sexism in the office. The company is currently investigating claims Gjøvik made about a hostile work environment.

"For months, I have been raising concerns with Apple employee relations about years of experiences with sexism, a hostile work environment, sexual harassment, unsafe working conditions, and retaliation," Gjøvik says in an interview with *The Verge.* "I asked them to mitigate the hostile work environment while they investigate, and they initially offered me EAP therapy and medical leave. I told them that made no sense, and said they should talk to my leadership and set up oversight and boundaries. I added that if there was no other option they could give me paid administrative leave. They apparently made no effort to set boundaries and instead said they were placing me on administrative leave and implied they did not want me on Slack where I had been vocal about my concerns with certain policies at the company. They also implied they didn't want me to meet one-on-one with other women at the company about their concerns with Apple policies, which I had been doing."

This afternoon, Gjøvik set an out of office message informing colleagues that the employee relations team had placed her on indefinite paid leave.

PL_PROD13_002023



This is the second time Apple has investigated Gjøvik's claims about sex discrimination at the company. The employee relations team closed an earlier investigation, allegedly finding that nothing was wrong, prompting Gjøvik to tweet screenshots with what she says is just a small portion of what she experienced:

PL_PROD13_002024

Apple places female engineering program manager on administrative leave after tweeting about sexism in the office – The Verge

8/4/21, 3:54 PM

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 307 of 427

**Ashley M. Gjøvik**
@ashleygjovik

Wanted to share: #Apple employee relations confirmed this #tonepolicing is totally ok feedback for me to get from my #bigtech #male leaders & not #sexist.

As this investigation rolls on, I've decided to start Tweeting the stuff they say is "ok." I mean, they did say it was ok?

7:14 PM · Aug 2, 2021

♡ 41          💬 8          ⬆ Share this Tweet

PL_PROD13_002025

Apple places female engineering program manager on administrative leave after tweeting about sexism in the office - The Verge

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 308 of 427

8/4/21, 3:54 PM



Apple is currently contending with a wave of employee activism, including multiple women tweeting about their dissatisfaction with the company culture. In May, employees wrote a letter demanding an investigation into the hiring of Antonio García Martínez, who'd written a book about Silicon Valley with descriptions of women many people found offensive. Hours later, García Martínez was fired.

Apple did not immediately respond to a request for comment from *The Verge*.

---

FEATURED VIDEOS FROM THE VERGE

# 2022 Mercedes-Benz EQS: an electric S-

PL_PROD13_002026

**UU.    EXHIBIT UU: SLACK POST (7/30/21)**

93

🔖 Added to your saved items



**Ashley Gjøvik**   Jul 30th at 9:43 AM

***"You're the Problem': When They Spoke Up About Misconduct, They Were Offered Mental Health Services"***
https://www.nytimes.com/2021/07/28/us/google-workplace-complaints-counseling.html

This article isn't just Google, I suspect it's Apple too. I know I've seen plenty of this here myself.

This year, when I complained about workplace sexism & a hostile work environment, HR & ER repeatedly recommended to reach out to EAP therapist, while also refusing to offer any accommodations to mitigate the trauma I was experiencing at work. When I complained that my complaints were now causing retaliation, and even *another* constructive termination at this godforsaken company, ER recommended I consider going on medical leave for my mental health. I shut that down quickly. July 27th from me to ER: "*Further, as mentioned **previously** and **on going,** I am requesting a **long term** solution to the hostile work environment and unsafe work conditions. At this point it is clear the sexism, harassment, discrimination, and retaliation will not stop— so I need to be removed from this situation. **As mentioned,** I refuse to quit or to take medical leave as a response to the hostility; **this is on Apple ER to resolve,** not for me to **hide from**.*"

Even before that, I've been raising concerns about an unsafe work environment. I have very good reason to believe I've been exposed to uncontrolled industrial chemicals. I've been complaining for months. ER has partnered with EH&S to dodge my questions and arguably misrepresent what's happening. I had to resort to getting the Federal EPA and State OSHA involved. Guess what Apple ER recommended? **Submit a medical accommodation request through Sedgwick to request remote work so I'm not exposed to the industrial chemicals.** Guess what the request form asked for? Me to release a very large scope of medical records directly to "Apple Inc." and have my doctor fill out a detailed form explaining why exposure to uncontrolled industrial chemicals, possibly at toxic levels, is bad for my heath and even referenced a workers comp form I filled out for a fainting spell in my office in 2019, directly referencing the recent vapor intrusion in my active Superfund office. Then what did Sedgwick do? Send me another detailed form for my doctor to fill out asking for more details about my health and also things like, what if we get you an air purifier by your desk? (Yes an air filter, to mitigate the levels of TCE known to be in the air at my desk above max industrial levels even less than ten years ago). What happens when I complain to ER again that I have to fill out paper work to not get poisoned? Literally nothing. But I did just get an email from HR today: "*At this time, Sedgwick is working with your provider to clarify and more fully understand your limitations. I will contact you as soon as I have information from Sedgwick so that we can engage in an interactive discussion around your limitations and your accommodation request.*"

**No. No. No. Hell to the no about all of this.** (edited)

 PDF ▾



Google Responded to Workplace Complaints With Counseling - The New York Times.pdf
91 kB PDF

## VV.     <u>EXHIBIT VV: LILLY SLACK POST (JULY 28 2021)</u>

**Scott Lilly** ⌄

I heard PBPs were starting to do outreach. Glad people have the chance to share their concerns and be heard

💙 1  😊⁺

Tip: Try ⌘ F to search this channel  ✕

─── Wednesday, July 28th ⌄ ───

**Ashley Gjøvik** 💬 2:14 PM
Hi!! Checking in on the PSQ Listening sessions. sorry i missed the last sessions.

Do we owe you two anything?

Also hope you're doing well!!

**Scott Lilly** 3:01 PM
Hiya! All is well...thanks. Stephanie is driving the sessions now. I don't think we need anything but I will ask her during my 1:1 this week. I may help with a session or two but want her to get the shine since her LOBs

Hope you're well these days!

Didn't you have your bar exam a few months back?

**Ashley Gjøvik** 💬 3:02 PM
Oh great!! I'll check in with her too. You must be so happy to have help with this. 🙂

**Scott Lilly** 3:02 PM
LOL

**Ashley Gjøvik** 💬 3:02 PM
hah now bar exam is next year, just final exams

oh i'm create, i'm knee deep in a massive ER investigation into Dan, Dave, and John for sexism and hostile work env

I told the invetigator to reach out to you btw

**Scott Lilly** 3:02 PM
It's fine...I am all for helping teammates out and these should be less draining than the one's in SWE as people were coming from a different place at that ttime

**Ashley Gjøvik** 💬 3:03 PM
there's a big Slack threat about how ER is a sham at this compnay

**Scott Lilly** 3:03 PM
Oh my

**Ashley Gjøvik** 💬 3:03 PM
i suggested listening sessions might help

he kept asking how they can learn more (he's new) (edited)

💙 👍 🙏 😊⁺ 💬 ↪ 🔖 ⋮

**Scott Lilly** 3:03 PM
The ER person is new?

**Ashley Gjøvik** 💬 3:03 PM

**Scott Lilly** ˅

**Scott Lilly** 3:03 PM

The ER person is new?

Tip: Try ⌘ F to search this channel ✕

**Ashley Gjøvik** 💬 3:03 PM

Ekelemchi Okpo

he's a lawyer too, new to apple i think like 1.5 years in

**Scott Lilly** 3:04 PM

ah...haven't heard the name yet

**Ashley Gjøvik** 💬 3:04 PM

after i screamed at our HWE ER BP for being literally the opposite of helpful, Antonio L stepped in and he and Ekelemchi are doing another round

Jenna is the worst

FYI

image.png ▾



https://a1391194.slack.com/archives/CK1KDPQCF/p1627328464228400

Barbara and I have been praising what you did with SWE

💙 👍 🙏 😊 💬 ↪ 🔖 ⋮

**Scott Lilly** 3:08 PM

Thank you for those kind words...I never know how it lands when I try to help people...this stuff isn't always a clear A/B answer

**Ashley Gjøvik** 💬 3:08 PM

lol, that's an understatement for sure, you're literally trying to create world peace but in an environment that prioritizes the opposite of the UN

PL_PROD13_008284

Search Apple Inc.

 **Scott Lilly** ˅

**Scott Lilly** 3:08 PM

Thank you for those kind words...I never know how it lands when I try to help people...this stuff isn't always a clear A/B answer

 **Ashley Gjøvik** 3:08 PM

lol, that's an understatement for sure, you're literally trying to create world peace but in an environment that prioritizes the opposite of the UN

it seems like you have a very good reputation

i was talking about you with Nadine de Coteau yestereday too

 **Scott Lilly** 3:09 PM

Well that's good to hear. I try to stay balanced and if you hear anything I could work on please share

Too funny...she and I were emailing a few minutes ago about something else...the timing! HAHA

 **Ashley Gjøvik** 3:11 PM

ive spent 20hrs in the last 2 week screaming at ER (Antonio & Ekelemchi) about Apple's ER being a sham & worthless & supporting the culture of discrimination and impunity - not to mention all of my workplace safety concerns actively being ignored, etc.

you get an A+ Scott

because you're good but also because THE BAR IS SO LOW

 **Scott Lilly** 3:13 PM

Let's keep our eye on the prize and get the bar up one notch at a time

 **Ashley Gjøvik** 3:14 PM

i feel like you must have a post it note with that written on it stuck to your monitor that you look at after deep breathing doesn't work but before you check eTrade

 **Scott Lilly** 3:16 PM

Pretty much sums it up LOL

 1

I do start my day with a meditation before I look at any work stuff...actually it's the first thing I do when I wake up...the few times I've skipped i have an awful day

 1

 **Ashley Gjøvik** 3:23 PM

that's very smart. i need to start doing that more.

this is one of my favs:

https://www.youtube.com/watch?v=92i5m3tV5XY

▶ **YouTube** | Jason Headley

**F*ck That: An Honest Meditation** ˅

## WW.   <u>EXHIBIT WW: SHIFFER MEDICAL LEAVE TWITTER POST</u>

 **Zoë Schiffer** ✔
@ZoeSchiffer

Wow — an Apple employee says the company told her to take medical leave after she spoke up about sexism and discrimination at work.

If you experienced something similar at Apple — my number on Signal is (805) 455-4772.

>  **Ashley M. Gjøvik** @ashleygjovik · 2h
>
> This happened to me at #Apple too: they offered EAP and suggested medical leave after I spoke up about #sexism, #discrimination, and a hostile work environment. They also suggested requesting #ADA #disability accommodations after I raised concerns about unsafe #workconditions. twitter.com/nytimes/status...
>
> Show this thread

1:30 PM · Jul 30, 2021 · Twitter Web App

**58** Retweets  **4** Quote Tweets  **150** Likes

    ♥

  Tweet your reply  `Reply`

 **The Real Sonny Crockett** @sonnycrockett40 · 2h
Replying to @ZoeSchiffer and @reckless
That's, like, retaliation, u know.

    ♡ 1

PL_PROD13_004520

## XX.     EXHIBIT XX: SLACK POSTS (AUG. 16 2021)



**Ashley Gjøvik** 💬 17 hours ago
Since Ashley is not allowed on Slack anymore, I think, even though they are not saying it directly, but they're implying it... So this is definitely Ashley's Chihuahua typing on the keyboard while Ashley is doing something else in the other room...

But Ashley's dog certainly heard Ashley say that Apple employee relations was only planning on, maybe, investigating a small scope of things 2017 and forward. So, this Radar would definitely not be included.

This Chihuahua also heard Ashley say that a goal of her Tweet storm has been to try to force Apple to investigate everything. And Apple ER was supposed to send an issue confirmation last week of what they'd actually investigate, but they sent nothing.

Doggo also heard Ashley say it appears two of the main people Ashley wanted investigated related to her current role seem like they are not going to be investigated. And, it also appears Ashley's not gonna be allowed back... Based on comments she heard from colleagues over the last week about the internal response & along with what employee relations has said, & hasn't said. Such as telling her there's no ETA for her to come back and she doesn't need to check work email or phone and will somehow magically know when they reach out to her with some sort of update at an unspecific point in time.

Ashley also has been talking to A LOT of other women currently at Apple (in purgatory) or who left (alumni) who have gone through the same thing where indefinite paid administrative leave was used as a forcing function to get them to quit or push them out, as retaliation for raising concerns to employee relations. These women also never got an actual investigation into anything, from what they're aware, just intimidation and retaliation.

So this doggo thinks that you probably shouldn't assume best intent and if you want to do anything to bring attention to the issue, it would be more welcome than even a dog treat. (edited)

🙏 2    🤭 5    😊

**Ashley Gjøvik** 💬 17 hours ago
DM me on Twitter or email at ashleygjovik@icloud.com if you want to talk more...

**Ashley Gjøvik** 💬 17 hours ago
I mean, bark bark, DM or email ASHLEY! I'm a dog. I'm totally a dog. 🐕 (edited)

**Ashley Gjøvik** 💬 15 hours ago
Not sure if it was the Tweet-storms and/or my first post on Slack since 8/4 (above) but I just got the issue confirmation and employee relations is now looking at everything I brought up. 🙂 Thank you, ER!

I mean, bark bark & ruff ruff. 😎

🐕 10    💜 5    😊

**Marina Aísa** 7 hours ago
Hi Ashley's Chihuahua!
I'm very happy that employee relations is finally looking at all these totally unacceptable behaviours.
Better late than never.

Please, keep us updated—as much as you can—of how this process goes on.
Your case is showing up how Apple really deals with harassment, bullying and misogyny. I think I can speak for many of us when I say that these are really big concerns and you have our full support on this. 💜

💙 1    🐕 1    😊

**YY.    EXHIBIT YY: SF BAY VIEW (MARCH 2021)**

The Wayback Machine - https://web.archive.org/web/20210419152752/https://sfbayview.com/2021/0...

# I thought I was dying: My apartment was built on toxic waste

March 26, 2021

*Ashley Gjovik is pictured here with one of many blood pressure monitors she used to monitor her vitals last year, after her first symptoms of illness prompted her to seek medical testing. Her blood pressure and heart rate monitoring revealed inexplicable fluctuations after moving into the new apartment, kicking off her hunt for an answer and eventual path to being an environmental justice advocate.*

### by Ashley Gjovik

There's another epidemic occurring today alongside COVID-19 – it's an outbreak of new housing developments on toxic land and water with laissez-faire oversight. The SF Bay Area and Silicon Valley are two of the most polluted regions in the entire country, yet the paperwork often appears to be rushed through to build residences on toxic soil and groundwater.

In some cases, there are claims the data was manipulated or ignored to reduce expenses and shorten project timelines. Some of these approvals and subsequent lawsuits include Hunters Point, Treasure Island, Point Isabel and the Richmond Zeneca site.

While much recent media coverage has focused on the development of these future residential sites, one looming question remains open: What happens if these sites are approved with inadequate remediation plans and the residents experience health issues due to the hazardous materials?

I moved into a new apartment complex, the Santa Clara Square Apartments, in February 2020. I was living on a remediation site but didn't know it until I was so sick that I thought I could be dying. Over the next seven months, I proceeded to live out the nightmare many feared following the bare-bones clean-up plans for sites like Hunters Point and Zeneca.

After I realized the site could be causing my mystery illness, I hit brick wall after brick wall trying to get help. I expect none of the current residents actually know what they're sitting on or what happened to me. I want to change that. I also want to shed light on the systemic failures I discovered and the extent that financial interests appear to be prioritized over public health by those in charge of these sites.

## My story

This apartment complex had no physical or written appearance of danger from chemicals, other than a brief and vague note about the presence of "agricultural chemicals" buried towards the end of the "Resident Handbook." Though I was in good health, I began experiencing chest pain, dizzy spells, palpitations and weakness within days of moving into my new apartment.

I feared the worst and headed to the emergency room. Over the next few weeks, my condition only worsened, with bizarre muscle numbness and spasms and the onset of daily near-fainting spells where I would get so dizzy that I would have to immediately lie down, sometimes for hours, before I could regain balance.

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 322 of 427

I spoke with dozens of doctors who performed extensive testing to try to identify the cause of my sudden and worsening cardiac and neurological issues. The doctors were perplexed. While the tests showed my blood pressure, heart rate and other vitals were abnormal, no tests or imaging could identify why.

*After moving into Apartment #349 in the Santa Clara Square Apartments (SCSA), Ashley's heart rate immediately decreased well below expected levels. Her doctors later explained to her that VOC exposure depresses the central nervous system and could cause exactly that type of report. Her heart rate returned to normal as soon as she moved out.*

My doctors screened me for all sorts of severe, permanent and often fatal illnesses. The symptoms were so debilitating and unpredictable that I felt I had no control over my body. I really thought I could be dying.

I bought books on coping with terminal illness; notified friends of the location of my will and power of attorney documentation. I slept with my phone by my bed in case I had to call 911 in the middle of the night. I was utterly terrified.

I spent the next six months on medical leave and disability, contemplating what my future would hold. I work full time as a program manager while attending law school to become a public interest attorney. But faced with an apparent severe long-term disability or even a fatal illness, I had to consider if I needed to quit my job and drop out of school – and what that would mean for my future.

In September 2020 I stumbled upon the first hint of what was actually happening to me. At that time, the wildfires were burning and smoky air covered the Bay Area. I have asthma, so I tried to weatherproof my apartment, blocking all outside air from entering and running air purifiers.

My indoor air quality monitors showed low particulate levels and everything looked great. However, shortly after, I started getting nosebleeds and hallucinations. I'd wake up almost every night thinking there were massive earthquakes shaking my bed.

A friend suggested I check if carbon monoxide might be causing hallucinations. I checked a new, more advanced air quality monitor and, to my surprise, the monitor showed very high levels of something called "tVOCs." I didn't know what that meant, but I noticed something compelling.

I thought I was dying: My apartment was built on toxic waste

*Ashley purchased numerous air quality monitors to be able to monitor the "tVOCs" in her apartment. She quickly found a long history of VOCs in the soil and groundwater on her apartment's property as well as at nearby sites, including several EPA Superfund sites less than a mile away.*

One of my most bizarre symptoms since moving in was waking up every few weeks exactly at 3 a.m. and feeling like I was choking and going to vomit. When I looked, the "tVOCs" on my monitor spiked exactly at 3 a.m. I also noticed the tVOCs seemed to rise and fall at different times of the day when I was having the worst symptoms. I began to think that there was an important correlation between this data and my symptoms.

*The air quality monitor read that the VOCs repeatedly spiked exactly at 3 a.m. each night – correlating directly to her sudden 3 a.m. feelings of nausea and choking.*

I spent the next few days buying more air quality monitors for additional data points, all of which showed high levels of tVOCs, rising and falling. I contacted my property manager, Irvine Company, about my concerns. Irvine Company knew I had been sick and was also helping me investigate the "earthquakes."

I told them about the high tVOCs and that I thought it could be causing my health issues and the earthquake hallucinations. I asked them to investigate, but they refused to help.

Within a few days, I learned that Volatile Organic Compounds (VOCs) are high vapor pressure compounds emitted as gases, and "tVOCs" are the total amount of VOCs present in a certain location. I learned from reading government documentation that unexpectedly high levels of tVOCs, especially when their emissions fluctuate, can be caused by something called "vapor intrusion," which is when solvents and other hazardous materials are in the ground – soil or water – and as they evaporate, the vapors rise up and "intrude" into buildings.

I was vaguely aware of the EPA Superfund program and knew there were sites all over Silicon Valley, so I started searching online to see the details of the sites closest to me. I found the environmental impact report for the property where I was living, which is when things really got eerie.

Apparently, the 1,800-unit Santa Clara Square apartment complex was built on industrially zoned land that required a clean-up – remediation – plan authorized by the California Department of Toxic Substances Control (DTSC). The site development notice stated, "Environmental investigations at the site have shown the presence of arsenic, lead and pesticides in shallow soils related to historical agricultural use."

The clean-up activities seemed to focus only on these specific contaminants. Per the report submitted to DTSC, most of the contaminants were apparently not removed as part of clean-up, but instead kept on-site. Thousands of cubic yards of hazardous soil were buried under the parking garages in "containment cells." They also wrote that they left toxic soil around certain trees for "1.5 times the tree canopy width" and simply put fabric on top of the toxic soil with "3 inches of clean soil or mulch."

There were also land use restrictions required by the government for the garages which were now the ceiling of the "containment cells" and the trees with toxic soil, which they called "TPZs." These areas, just yards away from me, were not to be used for "residential human habitation," hospitals, schools or day cares.

*"My beautiful view became haunting." The Department of Toxic Substances Control approved certain areas of the SCSA as "Tree Protection Zones" – areas specifically authorized to keep toxic soil on site and only protected by a thin fabric and a few inches of much.*

I was horrified to learn all of these facts and then see maps of the site with my apartment unit right above areas with the bright red "Class 1 hazardous waste" shading and to know the redwood trees outside my window were surrounded by hazardous soil. My beautiful view became haunting.

At that point, I started calling lawyers and doctors and reporting my concerns to government agencies. I knew the situation was likely going to be complicated and that the tVOC readings on my personal monitors were not going to be conclusive on their own, but my gut told me something was terribly wrong.

I'll spoil the surprise – if there is any – and tell you now: I never got an answer to what happened to me, nor was I able to get anyone in charge to earnestly investigate. I only have more questions. Let my situation illustrate all the ways the system is currently set up to support financial interests instead of public health.

## Will the property owner help?

I sent Irvine Company numerous emails and phone calls pleading for help. The day I found the high tVOCs I wrote, "I think my apartment might be poisoning me" and sent a description of "sick building syndrome," pointing out that I've been experiencing almost all of those symptoms since moving in.

That day, I asked Irvine to investigate and test to identify which VOCs were causing the issues and provide guidance on how to mitigate the exposure. I talked to the service manager on the phone and stressed the same message.

***"The chemicals are still pouring out full blast. I felt so terribly sick, I've ended up sitting in the outdoor courtyard with [my dog] waiting for it to hopefully stop tonight … [We] need a better plan than [me] sleeping outdoors."***

Two days later after no response I wrote, "I'm sitting by an open window right now trying to catch my breath. I feel like I'm choking." I sent them screenshots and photos of the air monitor readings, again asking for help. More days passed with no response.

One night was so bad I ended up sleeping outside on a community lounge chair out of desperation. At 2 a.m., I wrote them again: "The chemicals are still pouring out full blast. I felt so terribly sick, I've ended up sitting in the outdoor courtyard with [my dog] waiting for it to hopefully stop tonight … [We] need a better plan than [me] sleeping outdoors."

The general manager for the complex finally responded: "We had PGE out on Friday and they tested the surrounding stairwells, the area of your apartment home on the [exteriors as] well [as your] building, and there are no gas leaks or chemical spills. As of now, there is no evidence suggesting that your apartment home is unsafe. What are you wanting to do at this point? If you feel that your health and safety are in jeopardy you need to call 9-1-1 or emergency service."

I read her message and was like, "You have to be kidding me." However, a few days after I found the environmental impact report and started notifying agencies of my concerns, Irvine Company did make a suspiciously unsolicited offer to let me break my lease – with nearly a year remaining – and move out without penalty. It seemed bizarre that they would email me out of nowhere offering to let me leave without paying the $7,500 penalty to break my lease.

Irvine Company then rented out my unit with only eight days of turn-around, despite my protests demanding an investigation. They also hired a hazardous waste public relations

consultant, presumably to try to get me to let the issue go.

The consultant promoted herself as "one of the state's leading public affairs strategists for redevelopment of property in the Bay Area," but within a couple of days, she seemed convinced something bad was going on in my apartment and started requesting the company to investigate as well.

After her attempts, she said they stopped giving her updates. She said twice, in writing, "It sure seems something is going on [in your apartment]."

*Several maps of the Santa Clara Square Apartments area show grading and remediation plans along with soil sampling sites mapped by the property manager, Irvine Co., the developer, Roux, Inc., and the California Department of Toxic Substances Control (DTSC). In each of the first two maps, the areas lined in red are sites contaminated by "Class 1" hazardous materials. In the first photograph, you can see that Ashley's apartment, circled and labelled "#349," is right on top of a Class 1 site. Considering Ashley's symptoms and relief of those symptoms upon moving, it is very likely the remediation plans were faulty or inadequate or, as is claimed by Dr. Ahimsa Porter Sumchai to be the case with Hunters Point and Treasure Island – totally impossible.*

The consultant introduced herself to me saying, "I would be happy to talk with you about the steps that were taken to ready the site for the community and residential land use." And

I was like, "How on earth did you know I was looking into that?"

I also found it strange that I had not told Irvine Company that I discovered the environmental impact report, yet Irvine Company seemed to have found out I knew and proactively reached out to me about it via the consultant.

At one point, Irvine Company communicated through the consultant that they may do some testing, but only after they found out I was bringing in an industrial hygienist of my own. Both the California Department of Toxic Substances Control (DTSC) and the consultant told me they never heard if Irvine Company actually did any testing or not.

I did try to do my own testing, but it was incredibly expensive and turned out to be insufficient. I wanted to get some formal data in the brief time before I moved out, so I hired an industrial hygienist to sample the indoor air and some of the topsoil. Despite the $1,555 I had to pay for it, the results were inconclusive. Apparently a different test – a "summa canister" – over a longer period of time would have been better.

Then, through searching and public records requests, I found a number of reported issues at Irvine Company sites in the area. First, a report from 2019, where one of my neighbors at the same complex complained about blue tap water and paid for a private lab test showing "very high" levels of lead, copper and other contaminants in the water.

I found no records of any actions taken by Irvine Company to address that report. Next, I found an article from 2014 stating Irvine Company appeared to offer a quid pro quo to the Santa Clara city government as part of another development agreement for a site nearby, stating, "If the city would approve the … project" and "resolve litigation challenges," then "Irvine would donate one million dollars" to an unrelated city project.

Then, I found an article about another nearby Irvine Company site under litigation against the city of Sunnyvale over an incomplete environmental assessment report. So, my situation didn't sound like a one-off, even with this specific company.

> *In 2014 Irvine Company appeared to offer a quid pro quo to the Santa Clara city government as part of another development agreement for a site nearby, stating, "If the city would approve the … project" and "resolve litigation challenges," then "Irvine would donate one million dollars" to an unrelated city project.*

It's so broken that it's up to the property owner to test and confirm there's an issue in these situations – if they suspect the property could be making a tenant sick, it does not seem to be in their financial interest to actually confirm that suspicion. I also realized how intimidating, if not impossible, it is for an individual to go up against these big, powerful companies.

## Will the agency in charge help?

When I complained to DTSC about the VOCs in my apartment, the site manager initially offered to look into it. She admitted it sounded like my health issues were the result of VOC fumes in my unit, even putting in writing, "It seems like something is happening in your unit."

She said she contacted the Irvine Company's environmental attorneys to suggest testing, but quickly retreated, saying there was actually nothing she could do to help me. She wrote, "I'm not trying to shut down on you. We've been working collaboratively with our contacts at the Irvine Company. And they've started to push back that if the problem isn't related to the soil or groundwater contamination, that we [DTSC] don't have authority."

It was my understanding from our phone calls that DTSC only had authority over the chemicals that were listed as "contaminants of concern" in the Environmental Assessment Report, none of which were VOCs.

Then the DTSC manager tried to tell me that she suspected the VOCs were "coming from an indoor source, such as construction materials or [industrial] cleaning products." I kept asking if that was true, then who had authority over that type of issue. I never got a clear answer, other than DTSC saying "not us."

I tried asking local indoor air and public health agencies, but they said the same: "Not us." This was just the beginning of the story with DTSC.

The developer, Roux, Inc., claimed in their second clean-up completion report that "no volatile organic compounds (VOCs) in soil vapor were identified as COCs at the Site" and that "several different VOCs were detected in soil vapor samples [but well] below their respective [screening levels]." That wasn't even accurate according to the other reports!

Then they said, "Several VOCs were detected in groundwater beneath the site, but they were all below their applicable screening levels for risk to indoor air." The EIR states no VOCs pose a "significant risk with respect to potential vapor intrusions issues." Based on what I discovered next, this all appeared to be some expert wordsmithing and spin, possibly to avoid addressing data about onsite chemicals that would have made the clean-up much more costly.

In an environmental impact report conducted on the SCSA site by Impact Sciences, a firm hired by property manager Irvine Company, the report claims that no VOCs pose a "significant risk with respect to potential vapor intrusions issues." Impact Sciences also makes it clear the development and testing of the site were done on an "expedited schedule." What kind of costs were cut and timeframes shortened at this toxic site in the name of developer dollars?

*In an environmental impact report conducted on the SCSA site by Impact Sciences, a firm hired by property manager Irvine Company, the report claims that no VOCs pose a "significant risk with respect to potential vapor intrusions issues." Impact Sciences also makes it clear the development and testing of the site were done on an "expedited schedule." What kind of costs were cut and timeframes shortened at this toxic site in the name of developer dollars?*

In reading the EIR (Environmental Impact Report) response plan and thousands of pages of reports, I quickly noticed there seemed to be many VOCs found on site. The reports even said the VOCs were above residential limits and, in some cases, even above vapor intrusion risk levels.

When I first presented this to the DTSC manager, she acknowledged it is unusual to have chemicals above residential limits not considered contaminants of concern, saying, "In general, if the chemicals are present at the subsurface at concentrations exceeding residential levels, they would typically be considered contaminants of concern."

A few of the reports tried to explain why several specific VOCs weren't part of the clean-up plan, saying samples were only found in a couple spots or just a general statement that they do not believe the chemical will create a risk to public health. However, I couldn't find any explanations for some of the chemicals.

I was thinking: "If you don't want me to be worried about this chemical's impact to my health, you should tell me exactly why it wasn't included in the clean-up despite being above residential limits." All I heard was crickets and I got more suspicious.

One of the chemicals, vinyl chloride, was found above vapor intrusion risk levels, with no explanation that I could find as to why it was not included in the remediation plan. In fact, vinyl chloride is a breakdown product of the contaminants at one of the Superfund sites uphill from my apartment.

When I asked DTSC for reasoning as to why the VOCs weren't part of the clean-up plan, I never got a straight response. I began to get very worried about the integrity of everything that was approved. I raised additional questions to DTSC.

It appeared the least amount of pre-excavation testing, if any, was done on the property directly under my apartment building. Further, after excavation, Roux said they did no post-excavation testing on the remaining soil. I kept asking why so little testing was done there.

I asked why conclusive statements were being made about my apartment unit based on what appeared to be very little data. I never got a straight answer.

I asked about a rogue "500-gallon underground storage tank" filled or previously filled with an unknown chemical. Apparently, no one knows where it is under the property, though it was expected to be slightly uphill from my unit. I asked if that could be under my unit or leaking under my unit. No answer.

I asked why Roux and Irvine Company apparently planned to install a vapor intrusion mitigation system beneath one of the buildings, and why they originally planned for four buildings though the rest were cancelled mid-way.

The completion report said, "While not an environmental remedy, because there are no significant risks, a VIMS consisting of a vapor barrier and a sub-slab venting system has been designed and installed." Installing these apparently could cost millions of dollars. It's curious to me that Roux would plan to build four VIMS, or even build one, if they really thought VOCs were not an issue.

I argued back and forth with DTSC for months about next steps. At several points, she told me if I could give them proof of chemicals in my body and apartment that could cause my symptoms and be linked to the chemicals on site, then they "can continue to investigate further."

***One of the doctors even wrote in the visit notes that she recommended the government look into the VOCs in the soil and groundwater as the potential cause for my VOC exposure and subsequent illness.***

I kept pushing back that they were asking a normal resident to pay for and perform seemingly industrial testing. I was also very concerned that a government agency seemed to be asking for my medical records. At one point they said they were happy to talk directly with one of my doctors. WTF.

Despite all this complexity, a DTSC press release described the Santa Clara Square project as "fast-track[ed]" and that the department worked on "an accelerated schedule to help the developer meet certain deadlines." Impact Sciences, the firm that Irvine Company hired to create the final environmental impact report, also wrote on their public website that the final environmental assessment report for the Santa Clara Square Apartments was "completed on a highly expedited schedule."

When I inquired to DTSC about what fast-tracking means, they told me it's not a term that they "typically use." I then shared their own press release with DTSC, and they seemed to be surprised by it. Further, I found the Santa Clara Planning Commission meeting notes which state the commission asked Irvine Company to "proceed with construction as expeditiously as possible in contrast to utilizing the full-term length of the [development] agreement."

## Can doctors help?

I saw two doctors who specialize in chemical exposure, and they both decided that based on the timeline of my illness, the VOC readings in my unit and my specific symptoms, that my mystery illness sounded like symptoms of VOC exposure.

One of the doctors even wrote in the visit notes that she recommended the government look into the VOCs in the soil and groundwater as the potential cause for my VOC exposure and subsequent illness. I gave in and shared her note with DTSC, but apparently the doctor's recommendation was insufficient to make them act despite my begrudging acquiescence in sharing private medical data.

## Can other agencies help?

I talked to the city, county and state health departments. I talked to the planning and code enforcement agencies. I talked with several of the California EPA agencies. I've also been talking with the federal EPA. All of the agencies that did respond said the only agency who can act is DTSC. Otherwise, the property manager must act on their own initiative.

Many of these agency employees I talked to said over the phone said that they were concerned to hear about the conditions of the site and risk to the community and they offered apologies for not being able to help.

I talked to the federal EPA and state water boards regarding the Superfund site uphill from my apartment. They said they were confident I was not impacted by the contamination from that site, despite the historical chemical plume under the apartment's property. I asked them if they would do testing from a groundwater well closer to the location of my apartment – they hadn't for many years – but they said no.

*From 1974-1985, Synertek, Inc., leased the area directly uphill from where the Santa Clara Square Apartments currently stand. Synertek manufactured semiconductors, crucial to the production of microchips for computers and other technologies. The manufacturing involved highly toxic chemicals, and several tanks stored underground on site leaked VOCs into the groundwater, contaminating the soil around the area. In 1987, the area was deemed a Superfund site by the Environmental Protection Agency. In spite of this, or the VOCs known to be on site of the SCSA property, the DTSC did not make VOCs a part of their remediation plan for the apartments, further increasing Ashley's concern about the integrity of DTSC, the developer, property manager and City of Santa Clara.*

When I asked generally if there was a way for someone to test one of the groundwater wells near my apartment to see what could be under my apartment since there's so many chemical release sites nearby, they said only Irvine Co. could do so.

## Will the city help?

I wrote and left voicemails with the mayor of Santa Clara and the district representative for the property, explaining what happened and asking for help. I received no response for five weeks. I finally received a response and will meet with the mayor in April.

I wonder – do they even want to help me? On top of the city's request for Irvine Company to expedite development, I found additional reports that make me worry the city will quickly side with Irvine Company.

In Irvine Company's pitch to the Santa Clara City Council, in addition to other benefits, they promoted the increased valuation of the property for tax purposes by $1.6 billion. Apparently, they expected the city would make over $1.5 million every year in new tax revenue from the site. Irvine's presentation told the City Council they would receive more than $50 million in fees and benefits to the City of Santa Clara as result of the development agreement. The pitch also boasted over 10,000 new jobs.

There's a housing crisis in Silicon Valley. Not all developers have the money to invest in cleaning up sites and building large-scale developments. Irvine Company is one of the few who can. In addition, an influx of that much money and jobs must be very enticing for a city council.

## Can the legal system help?

I reached out to environmental attorneys. It quickly became an issue that my lease agreement included litigation and class action waivers. I was also advised that it is extremely difficult to pursue the default lawsuit for what I experienced in these types of situations, a "toxic tort," especially against a powerful company with deep pockets like Irvine Company.

The owner, Donald Bren, is reportedly worth $15.3 billion. Beyond that, I was advised that court actions to force DTSC to act after the fact are rarely successful.

Some familiar with Irvine Company warned me that the company can be highly litigious, and if I fought them on this issue, it would be an uphill battle the entire way. As such, I was also advised not to warn my neighbors, since the company may try to retaliate.

*I was faced with so many walls and dead ends and no real solution at the end. I kept asking myself, how do people facing poverty have any chance to advocate for themselves? How do Black and Brown people have any chance of being heard when they might face bias and discrimination at every point along the way?*

This was one of the hardest parts – I desperately wanted to warn my neighbors and tell everyone what I found. I believed the warning and took the advice because of a few

Case 3:23-cv-04597-EMC          Document 379       Filed 05/26/26      Page 335 of 427

previous experiences with Irvine Company, including the bizarre and mandatory class action and litigation waivers.

After discovering all this information about the property, my previous interactions with them and all the warnings I was given by folks who knew of their reputation, I realized I had no idea what Irvine Company was actually capable of. However, I refuse to stay silent.

This article is my first public statement on what happened, and I'm doing it despite my fear of retaliation, because I am deeply worried about the health and safety of the folks living on that property and the apparent systemic failures in preventing and addressing these types of issues.

## Better, but no help

I moved out of the Santa Clara apartment two weeks after the email from Irvine Company letting me break my lease. My health seemed to return to normal within a week. No more fainting spells, chest pain, numbness or the like.

I now live in San Francisco and continue my fight over what happened to me in Santa Clara. I'm also starting to study environmental law so I can advocate for others harmed by these types of situations.

So, what made me sick? While in the end everyone agreed it was VOCs, I may never know for certain if it was the chemicals in the soil or groundwater and, if so, which ones.

We need a better system. My story does not bode well for the recent approvals of laissez-faire remediation plans across the Bay Area. We all know who will be most impacted by these types of sites. It was not lost on me for a moment that my experience dealing with this issue was going to result in a best-case scenario ending because of how much privilege and how many resources I have.

I was faced with so many walls and dead ends and no real solution at the end. I kept asking myself, how do people facing poverty have any chance to advocate for themselves? How do Black and Brown people have any chance of being heard when they might face bias and discrimination at every point along the way?

I knew that if I couldn't find a solution, there's no way these folks would. It's well known now that toxic waste sites are often located near low-income and racial and ethnic minority communities. So, these folks are more likely to suffer from these issues and have fewer resources to deal with the issues when they face them. It was the moment I really started to understand environmental justice.

What can be done to address the situation? From my experience, I think in the near term we need to put an enormous amount of pressure on the city councils approving these sites. With the current process for dealing with issues, it seems whatever is approved by these cities will be binding on their community for generations to come.

I emailed the Richmond City Council saying as much before they proceeded to approve the Zeneca site – an action for which they are currently being sued by environmental and community groups.

I also wish everyday people were better equipped to understand environmental exposure with tools to empower them to access data about the specific environments around them. I want people to be able to efficiently identify potential sources of chemical exposure and know the right agency and representative to call if they want to learn more about nearby sites.

I'm working on a project to create a portal for this now and I'm really looking forward to launching it. I wish I had these tools and this knowledge last year.

We need to re-think the general oversight of these sites in the SF Bay Area. There are so many of these sites and there seems to be very little accountability. Maybe it's due to resource constraints. I do want to believe most people are acting in good faith, but something needs to change.

The toxicity of the land coupled with seemingly blind support of financial interests really seems to have become a public health hazard with the worst impact on our already-marginalized communities.

*Ashley Gjovik is an advocate for human rights and civil liberties, including healthy environments. She is currently a law student studying public interest law and policy. Ashley can be reached at agjovik@icloud.com.*

## Update

Could thousands more be sick from chemical exposure? To learn more, visit the new chemical exposure education website Ashley has launched her: whatsintheair.org.

## ZZ.   **EXHIBIT ZZ: NYT ARTICLE & QUOTE OF THE DAY**

**AAA.  <u>EXHIBIT AAA: MCKEON-ALOE ARTICLE 1</u>**

Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 339 of 427



 Published in Towards Data Science

Robert McKeon Aloe    Follow

Nov 17, 2020 · 6 min read

# Face Recognition: 3D Face Recognition from Infancy to Product

A dream turned reality faster than I could have imagined

When I went to grad school, I didn't choose 3D face recognition because I was interested in biometrics. I wanted to do <u>computer vision for cars</u>, and the professor I wanted to work with had left the university. So I went to the Computer Vision Research Lab (CVRL), and I asked what research they had available. Most of their work at the time was biometrics, and 3D face sounded interesting. It could pay the bills and give me experience that would translate to autonomous vehicles. Little did I know, I would still be in biometrics 13 years later.

## Grad school

For my dissertation project, I built a 3D face scanner that the subject would walk through. Data sets were small; the biggest data set was FRGCv2 at 4,006 images of a few hundred subjects. I went through a few prototypes, and I got to a point where I did small scale data collection.

I was bent on quantity at the time, and if I did it all over again, I would have spent more time improving the quality before scaling up. So I scaled up from ~300 face scans to ~4,500. I encountered major drop frame issues for a quarter of the data, calibration issues for another chunk of data, and I found getting people to comply with protocol to be difficult (i.e. they walked far too fast through the setup).

PL_PROD_7-799





Image by author

<u>For all the mistakes,</u> I learned. A Ph.D. is a vehicle to make mistakes doing research to help form your character towards <u>the research process</u>. I also fell in love with 3D face recognition, and I saw the problem in the same realm of difficulty as autonomous vehicles.

I did not want to do biometrics because at the time, most biometric research was government funded, and I could only imagine the bad scenarios coming out of the research. However, it was an interesting problem, and I thought one day, it would be used for non-government entities. My thinking was "One day, 15 to 20 years from now, every phone will use 3D face to authenticate because it has more potential and raw data to do comparisons."

PL_PROD_7-800

Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 341 of 427



## DSC

I went to work for Digital Signal Corp (DSC) doing 3D face recognition research. I did move out of sensor design, but I stayed in my sliver of expertise in the realm of biometrics and computer vision. I was excited that I could hit the ground running and push the pearls of my research into a product.



Image by author

I solved some interesting problems there like handling sunglasses, assessing quality, greatly improving recognition performance, and fixing bad quality data. However, two elements held us back from reaching true greatness for our algorithms:

1. This was in the era pre-CNN (Convoluted Neural Network, i.e. the ring to rule them all).

2. We were algorithm focused rather than data focused, so our dataset was tiny.

In my time there, I did DOE for only 4 large collections in 4 years, or they were large by our standards. One was for glasses, one was for pose, one was miscellaneous, and one was system validation for a customer. They involved between 10 and 50 subjects with a total of 1,000 scans between all four.

I had pushed for more data collection, but to get more data required pulling

PL_PROD_7-801



the algorithm was the data. The reality is that everyone wanted a quick solution to a very challenging problem.

3D face recognition works fantastic for frontal images and one aggressor, but to get to the real world, one has to work with data across multiple aggressors and environments plus the intrinsic variables like ethnicity, age, and gender.

Again, the technology was cool but also creepy. DSC's sensor was for surveillance for building security. Their scanner worked at 15 to 25 meters away even while the subject was walking. That's a whole new level of creepy if in the wrong hands. It was worth considering who their main financial backer was at the time.

## Apple

When I started at Apple, I thought I was out of biometrics. I was sad, but the Watch work didn't have the downsides of face recognition. Then I found out about Face ID, and I just had to work on it. I switched over, and I was surprised at how well it worked as well as how the aggressors were being addressed.

Face ID was a huge project. On initial launch, about 1,000 engineers were working on the entire hardware module, software, and infrastructure. Everyone was driving hard, so the amount of motivation and ambition was very intriguing. Just being in that environment changed how I looked at problems, and I had to figure out how to get my work done more efficiently. We knew this would make a huge impact, and so it was exciting knowing this new user experience was coming.

We collected an amazing amount of data. 1,000,000,000 images were collected as announced in the Keynote. That's a number difficult to imagine and not just the collection, but the infrastructure and processing requirements to even train an algorithm on such a set of data.

We all learned very quickly that data would solve almost any issue. Find the

PL_PROD_7-802



trusted us. It was a great feeling. We weren't asked to limit our thinking to what was affordable or possible but to expand our thinking to what was necessary to drive innovation.

Face ID was scary too because we were all in. There was no backup plan. Face ID just had to work. It was also scary because until a few months before announce, nobody had lived on phones with Face ID because they didn't exist. We weren't sure we had accounted for everything, and we all were digging deep to make sure we didn't leave anything unturned. The trick was always prioritizing which aggressors were more important. I really enjoyed it.

Of course, the project has changed, and I still like it, but it doesn't have the new edge as before. It doesn't have the same bang. It's just another problem crushed by the power of CNN's.

. . .

For me, my dissertation and previous work in 3D face recognition meant I had been in this niche field for a decade from research to mass consumer product. CNN's and data solved this huge problem much faster than I had expected. It's really amazing to have seen 3D face recognition from its infancy to impacting millions of people every day.

. . .

If you like, follow me on Twitter and YouTube where I post videos espresso shots on different machines and espresso related stuff. You can also find me on LinkedIn.You can also follow me on Medium.

Further readings of mine:

Coffee Data Sheet

Data Science: Essentials

PL_PROD_7-803



[Part of the Team](#)

[How to Interview a Company](#)

[Thoughts on Leaving](#)

[A Day in the Life of a Data Scientist](#)

[Design of Experiment: Data Collection](#)



About    Help    Terms    Privacy

PL_PROD_7-804

**BBB.   EXHIBIT BBB: MCKEON-ALOE ARTICLE 1**

Open in app ↗

Sign up    Sign in

**Medium**    🔍 Search

Write  👤

Becoming Human: Artifici…



# Privacy in Machine Learning: PII

Protecting what we value little but companies value highly

👤 Robert McKeon Aloe    ( Follow )    7 min read  ·  May 10, 2019

👏 50    💬                              🔖  ▶️  ⬆️

Privacy is not a value explicitly written into the US Constitution, but the essentials are there. As a democratic republic, we expect to have privacy as a lack of privacy is tied to tyranny. The founding of our nation was opposed to tyranny, at least ideologically, even though we have had some major issues with the subject. Overtime, we have been able to fix many, and the major issue du jour is privacy with respect to machine learning. So, what is PII, and why is it so important to the future of machine learning?



PL_PROD_7-805

On April 10th, 2018, the term PII was introduced to the American people thanks to Mark. Mark had a small company that violated privacy by selling people's Personally Identifiable Information (PII), and Congress wanted to chat with him. In the introduction to the hearing, the head of the committee used the term PII, and my heart jumped. We had been having the PII discussion ever since I started at Apple, and the protocols to keep it secure only increased. PII is also close to my heart because I had found it very important to me personally and professionally back when I started grad school; I just didn't have a better name other than privacy.

PII covers any data that could be linked back to the original subject just by having that data or some combination of data. Face images are inherently PII data. Some times data is PII because when combined with other subject information, you could determine the subject's identity. The resulting issues with Face ID is clear, but with health data, it may not be obvious to everyone. For example, if I participate in a user study, and some health issue is discovered. If my health insurance company gets a hold of that data, maybe they would increase my rates. I'm not sure what they would do with that data, but people have been known to misuse data and PII data before.

## Grad School

Originally, I wanted to work on autonomous vehicles, but I ended up doing biometrics. Back in 2006, biometrics paid the bills for many computer vision projects. My lab collected data every year. People would sign a consent form (ICF), get 5 Domer dollars, and go through a few stations to give some biometric data. Their data was de-identified with a subject ID, but there was a list tying the two together in case someone withdrew from the study. This list was more limited in who could see it for privacy reasons of course. The data collected could be used in publications, so people's faces were shown even though they didn't have a name tied to them. This was a normal part of the Informed Consent Form (ICF).

PL_PROD_7-806



However, I did not participate in having my data collected. I was an anomaly for other researchers. I didn't feel comfortable with it, and data collection was voluntary. Not everyone was happy with the concept that I would ask for people's help but wouldn't help myself. I was stubborn in my belief that I didn't feel the system was private enough. I didn't want my picture in research papers either. Ultimately, my advisors said nothing about it, which is in keeping with voluntary data collection. I proposed a system that would not keep any information to tie to the subject, but instead use a face or iris scan to recognize return people and enter new subjects into the database. That would have been a dream.



PL_PROD_7-807

8/13/25, 11:10 PM Case Privacy in Machine Learning. PII. Privacy is noted value explicitly. by Robert McLeon AI Jobs Becoming Human: Artificial Intellige…

AI Jobs

I then went on to collect 4,600 3D face scans of ~500 subjects. I did my underline:dissertation, and I graduated.

## DSC

I went to work at <u>Digital Signal Corp</u> (DSC), and again, I declined to participate in data collection again. This time was a bit different. I was the one asking for more data. We didn't do external data collections, and we actually didn't even use an ICF. People were asked and volunteered, and I think more people were rubbed the wrong way that I didn't participate. I would have if I had some assurance that my privacy would have been kept.

DSC had a long range (15 to 25 meters) 3D face scanner that could provide decent scans even while the subject was walking. Two years after I started, two were mounted in the hallways for tests and demos. We had a few others for data collection. However, these two scanners were constantly collecting data as people walked down the hall. Again, no ICF was signed by the employees or any visitors. Most people didn't mind. I did and covered my face every time I walked by. I was so good at it that two years later, some guys in QA we're thrilled when the face detector got a partial of my chin.



PL_PROD_7-808

## Trending AI Articles

[1. Microsoft Azure Machine Learning x Udacity — Lesson 4 Notes](#)

[2. Fundamentals of AI, ML and Deep Learning for Product Managers](#)

[3. Roadmap to Data Science](#)

[4. Work on Artificial Intelligence Projects](#)

The ICF was eventually addressed and baked into the employment agreement. I'm not sure the legal implications of this method, and they wanted all the employees to sign a new employment contract. Many refused at first. They offered stock options, but that's just paper to me. Unless the company has a chance at going public, stock options are as valuable as the paper they're printed on. The amount also paled in comparison to what I had been given in a round of stock options a year previous.

**9. CONSENT AND RELEASE FOR VIDEO SURVEILLANCE AND IMAGING.**

    **9.1** I understand that, to promote the safety of the Company's employees and visitors, as well as the security of its facilities, the Company may conduct video surveillance of any portion of its premises at any time, the only exception being private areas of restrooms, showers, and dressing rooms, and that video cameras may be positioned in appropriate places within and around the Company's buildings and used to help promote the safety and security of people and property. I hereby give my consent to such video surveillance at any time the Company may choose.

    **9.2** I understand that, during my employment with the Company, I may be asked by the Company to help test its security system products. I shall, and hereby do, consent to the creation and use by the Company of images, pictures and photographs of me ("**Recordings**"), which may feature my name, likeness, or biographical information (collectively, my "**Personal Depiction**") whether in original form or as edited or altered at the sole discretion of the Company.

    **9.3** I shall, and hereby do, give permission to the Company to use the Recordings and my Personal Depiction, for inclusion in any product development, third party due diligence or use by a DSC employee in the marketing of products and/or services. I agree that this permission is during employment and for 2 years post employment. I waive any rights I may have to review or approve the Company's of the Recordings or my Personal Depiction. I also waive any rights I may have to receive attribution for use of the Recordings or my Personal Depiction.

    **9.4** I understand that the Recordings and my Personal Depiction will not be kept private. If I am an employee of the Company, I also acknowledge that the Recordings and my Personal Depiction may be used for purposes other than employment purposes. I hereby acknowledge that I will not be paid or provided any compensation for the Company's use of the Recordings or my Personal Depictions pursuant to this Section 9.

    **9.5** I acknowledge that the Company is and will be the owner of all rights, including but not limited to all copyrights, in the Recordings. To the extent I have any rights in the Recordings, I shall, and hereby do, assign all my right, title, and interest in the Recordings, and all results and proceeds from them, to the Company. I irrevocably waive any rights I cannot assign to the Company under any applicable law.

    **9.6** I hereby release the Company from and against any and all claims whatsoever arising out of any exercise of the rights I have granted to the Company under this Section 9.

PL_PROD_7-809

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 351 of 427

I may have been the last holdout. I refused to sign a brand new agreement, only an addendum. The addendum said that if they happened to capture data of me while in the office, it was okay to use. After this fun event, I lost all trust in them. I was also in charge of the data we had, and I continued to ask for more because algorithms always needs more data. I was working on the algorithms, determining scan quality, validating data, design of experiment for more data, and failure analysis.

---

### Get Robert McKeon Aloe's stories in your inbox

Join Medium for free to get updates from this writer.

| Enter your email | Subscribe |

---

I don't regret the stance I took especially given that the company went under a few years after I left. I have no idea what happened to the PII data they had. The company was bought, and fat chance without a lawsuit, anyone would be able to get their data deleted.

## Fruit Company

I left DSC to come out to California. I participated in data collection because it was heart rate and the benefits for healthcare seemed very clear. I also wasn't giving my image. Something interesting happened: I got to see how they handled private information. I saw how everyone including myself took privacy seriously. We had ICF's for everything. There is a Human Studies Review Board (HSRB) for any human user study collecting any data.

On top of that, I got more insight into the metrics collected from customers when they opt-in. Any metric could not be used in combination with others to uniquely identify any specific person. The only desirable data was what could help make a better product without compromising the customer's privacy. Privacy is an essential component in the company's DNA. Privacy was just as important as the user experience because it was part of the user experience.

PII: To consent or not consent, that is the question.

PL_PROD_7-810

Then I switched to Face ID. Would I participate in data collections? Would I use my own data to improve the customer experience? More importantly, could I trust my company to securely store and use my PII?

I decided, <u>I could trust them.</u> I saw how they acted in the previous two years, and I didn't see any intention from anyone I worked with to convince me otherwise. Everyone I've worked with have been professional and steeled with integrity with respect to PII data.

## Privacy is a virtue I hold dear.

My PII journey may seem very boring, but if you've read this article to this point, maybe you find it interesting. Only when a user experience is important to us do we care so much about it to make it right for them. I have cherished my privacy for years, and I'm glad to have worked on a project that collected so much data while working so hard to make sure it is secure and kept safe.

. . .

If you like, follow me on <u>Twitter</u> and <u>YouTube</u> where I post videos espresso shots on different machines and espresso related stuff. You can also find me on <u>LinkedIn</u>.

## Don't forget to give us your 👏 !



PL_PROD_7-811

**CCC.  <u>EXHIBIT CCC: APPLE ARTICLE 1</u>**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC      MAY 26 2026

# About Face ID advanced technology

Learn how Face ID helps protect your information on your iPhone and iPad Pro.

Much of our digital lives are stored on iPhone and iPad, and it's important to protect that information. In the same way that Touch ID revolutionized authentication using a fingerprint, Face ID revolutionizes authentication using facial recognition. Face ID provides intuitive and secure authentication enabled by the state-of-the-art TrueDepth camera system with advanced technologies to accurately map the geometry of your face.

With a simple glance, Face ID securely unlocks your iPhone or iPad Pro. You can use it to authorize payments with Apple Pay, purchases from the App Store, Book Store, and other Apple media services, and more. Developers can also allow you to use Face ID to sign into their apps.

## Advanced technologies

The technology that enables Face ID is some of the most advanced hardware and software that we've ever created. The TrueDepth camera captures accurate face data by projecting and analyzing thousands of invisible dots to create a depth map of your face and also captures an infrared image of your face. A portion of your device's neural engine — protected within the Secure Enclave — transforms the depth map and infrared image into a mathematical representation and compares that representation to the enrolled facial data.

Face ID automatically adapts to changes in your appearance, such as wearing cosmetic makeup or growing facial hair. If there is a more significant change in your appearance, like shaving a full beard, Face ID confirms your identity by using your passcode before it updates your face data. Face ID is designed to work with hats, scarves, glasses, contact lenses, and many sunglasses. Furthermore, it's designed to work indoors, outdoors, and even in total darkness. With iPhone 12 or later, Face ID even works with face masks.

To start using Face ID, you need to first enroll your face. You might do this during the initial set up process, or at a later time by going to Settings > Face ID & Passcode. To unlock your device using Face ID, simply glance at it. Face ID requires that the TrueDepth camera sees your face or your eyes, whether your device is lying on a surface or you're holding it in a natural position. The TrueDepth camera has a similar range of view as when you take a photo or make a FaceTime call with the front camera. Face ID works best when the device is arm's length or less from your face (25–50 cm away from your face). To use Face ID while wearing a mask, set up the feature and make sure the camera can see your eyes.

The TrueDepth camera is intelligently activated; for example, by tapping to wake your screen, from an incoming notification that wakes the screen, or by raising to wake your iPhone. Each time you unlock your device, the TrueDepth camera recognizes you by capturing accurate depth data and an infrared image. This information is matched against the stored mathematical representation to authenticate.

## Security safeguards

Security is important to all of us to protect information on our devices. We have done some important things to safeguard your information, the same way we did with Touch ID. Face ID uses the TrueDepth camera and machine learning for a secure authentication solution. Face ID data — including mathematical representations of your face — is encrypted and protected with a key available only to the Secure Enclave.

The probability that a random person in the population could look at your iPhone or iPad Pro and unlock it using Face ID is less than 1 in 1,000,000 with a single enrolled appearance whether or not you're wearing a mask. As an additional protection, Face ID allows only five unsuccessful match attempts before a passcode is required. The statistical probability is higher — and further increased if using Face ID with a mask — for twins and siblings that look like you, and among children under the age of 13, because their distinct facial features might not have fully developed. If you're concerned about this, we recommend using a passcode to authenticate. You can also use Face ID without enabling Face ID with a mask.

Face ID matches against depth information, which isn't found in print or 2D digital photographs. It's designed to protect against spoofing by masks or other techniques through the use of sophisticated anti-spoofing neural networks. Face ID is even attention-aware, and Face ID with a mask will always confirm attention. Face ID recognizes if your eyes are open and your attention is directed towards the device. This makes it more difficult for someone to unlock your device without your knowledge (such as when you are sleeping).

To use Face ID, you must set up a passcode on your device. You must enter your passcode for additional security validation when:

- The device has just been turned on or restarted.
- The device hasn't been unlocked for more than 48 hours.
- The passcode hasn't been used to unlock the device in the last six and a half days and Face ID hasn't unlocked the device in the last 4 hours.
- The device has received a remote lock command.
- After five unsuccessful attempts to match a face.
- After initiating power off or Emergency SOS by pressing and holding either volume button and the side button simultaneously for 2 seconds.

If your device is lost or stolen, you can prevent Face ID from being used to unlock your device by marking your device as lost in Find My.

## Privacy

At Apple, we believe privacy is a fundamental human right and we've designed Face ID to protect your privacy. Face ID data — including mathematical representations of your face — is encrypted and protected by the Secure Enclave. This data will be refined and updated as you use Face ID to improve your experience, including when you successfully authenticate. Face ID will also update this data when it detects a close match but a passcode is subsequently entered to unlock the device. Face ID data doesn't leave your device and is never backed up to iCloud or anywhere else.

If you choose to enroll in Face ID, you can control how it's used or disable it at any time. For example, if you don't want to use Face ID to unlock your device, open Settings > Face ID & Passcode, and disable iPhone Unlock or iPad Unlock. You can also use Face ID without setting up the ability to use it with a face mask. To disable Face ID entirely, open Settings > Face ID & Passcode, and tap Reset Face ID. Doing so will delete Face ID data,

including mathematical representations of your face, from your device. If you choose to erase or reset your device using Find My or erasing all content and settings, all Face ID data will be deleted.

Even if you don't enroll in Face ID, the TrueDepth camera intelligently activates to support attention aware features, like dimming the display if you aren't looking at your device or lowering the volume of alerts if you're looking at your device. For example, when using Safari, your device checks to determine if you're looking at your device and turns the screen off if you aren't. If you don't want to use these features, you can open Settings > Face ID & Passcode and turn off Attention Aware Features.

Within supported apps, you can enable Face ID for authentication. Apps are notified only as to whether the authentication is successful. Apps can't access Face ID data associated with the enrolled face.

## Safety

iPhone and iPad Pro and the TrueDepth camera system have been thoroughly tested and meet international safety standards. The TrueDepth camera system is safe to use under normal usage conditions. The system will not cause any harm to eyes or skin, due to its low output. It's important to know that the laser system might be disabled for safety reasons if the device is damaged or malfunctions. If you receive a notification on your iPhone or iPad Pro that Face ID has been disabled, you should have a trained technician who uses genuine Apple parts repair your device. Improper repair, modification, or use of nongenuine Apple components in the laser systems might prevent the safety mechanisms from functioning properly, and could cause hazardous exposure and injury to eyes or skin.

Learn what to do if you see an alert that says Face ID has been disabled ›

When viewed through certain types of cameras, you might notice light output from the TrueDepth camera. This is expected as some cameras might detect infrared light. Some might also notice a faint light output from the TrueDepth camera when viewed in a very dark room. This is expected in extremely dark settings.

## Accessibility

Accessibility is an integral part of Apple products. Users with physical limitations can select "Accessibility Options" during enrollment. This setting doesn't require the full range of head motion to capture different angles and is still secure to use but requires more consistency in how you look at your iPhone or iPad Pro.

Face ID also has an accessibility feature to support individuals who are blind or have low vision. If you don't want Face ID to require that you look at your device with your eyes open, you can open Settings > Accessibility > Face ID & Attention, and turn off Require Attention for Face ID. This setting is automatically turned off if you enable VoiceOver during initial set up.

## Learn more

- Learn which iPhone and iPad models support Face ID ›
- Set up and use Face ID ›
- Use Face ID while wearing a mask ›

Case 3:23-cv-04597-EMC        Document 379        Filed 05/26/26        Page 357 of 427

- Get help with Face ID ›

Published Date: December 09, 2024

---

**Helpful?**    Yes    No

---

Support        About Face ID advanced technology

---

Copyright © 2026 Apple Inc. All rights reserved.        Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Site Map        United States

**DDD.  <u>EXHIBIT DDD: APPLE ARTICLE 2</u>**

About Face ID advanced technology - Apple Support

# About Face ID advanced technology

Learn how Face ID helps protect your information on your iPhone and iPad Pro.

Much of our digital lives are stored on iPhone and iPad, and it's important to protect that information. In the same way that Touch ID revolutionized authentication using a fingerprint, Face ID revolutionizes authentication using facial recognition. Face ID provides intuitive and secure authentication enabled by the state-of-the-art TrueDepth camera system with advanced technologies to accurately map the geometry of your face.

With a simple glance, Face ID securely unlocks your iPhone or iPad Pro. You can use it to authorize payments with Apple Pay, purchases from the App Store, Book Store, and other Apple media services, and more. Developers can also allow you to use Face ID to sign into their apps.

## Advanced technologies

The technology that enables Face ID is some of the most advanced hardware and software that we've ever created. The TrueDepth camera captures accurate face data by projecting and analyzing thousands of invisible dots to create a depth map of your face and also captures an infrared image of your face. A portion of your device's neural engine — protected within the Secure Enclave — transforms the depth map and infrared image into a mathematical representation and compares that representation to the enrolled facial data.

Face ID automatically adapts to changes in your appearance, such as wearing cosmetic makeup or growing facial hair. If there is a more significant change in your appearance, like shaving a full beard, Face ID confirms your identity by using your passcode before it updates your face data. Face ID is designed to work with hats, scarves, glasses, contact lenses, and many sunglasses. Furthermore, it's designed to work indoors, outdoors, and even in total darkness. With iPhone 12 or later, Face ID even works with face masks.

To start using Face ID, you need to first enroll your face. You might do this during the initial set up process, or at a later time by going to Settings > Face ID & Passcode. To unlock your device using Face ID, simply glance at it. Face ID requires that the TrueDepth camera sees your face or your eyes, whether your device is lying on a surface or you're holding it in a natural position. The TrueDepth camera has a similar range of view as when you take a photo or make a FaceTime call with the front camera. Face ID works best when the device is arm's length or less from your face (25–50 cm away from your face). To use Face ID while wearing a mask, set up the feature and make sure the camera can see your eyes.

The TrueDepth camera is intelligently activated; for example, by tapping to wake your screen, from an incoming notification that wakes the screen, or by raising to wake your iPhone. Each time you unlock your device, the TrueDepth camera recognizes you by capturing accurate depth data and an infrared image. This information is matched against the stored mathematical representation to authenticate.

## Security safeguards

PL_PROD14_00053

Security is important to all of us to protect information on our devices. We have done some important things to safeguard your information, the same way we did with Touch ID. Face ID uses the TrueDepth camera and machine learning for a secure authentication solution. Face ID data — including mathematical representations of your face — is encrypted and protected with a key available only to the Secure Enclave.

The probability that a random person in the population could look at your iPhone or iPad Pro and unlock it using Face ID is less than 1 in 1,000,000 with a single enrolled appearance whether or not you're wearing a mask. As an additional protection, Face ID allows only five unsuccessful match attempts before a passcode is required. The statistical probability is higher — and further increased if using Face ID with a mask — for twins and siblings that look like you, and among children under the age of 13, because their distinct facial features might not have fully developed. If you're concerned about this, we recommend using a passcode to authenticate. You can also use Face ID without enabling Face ID with a mask.

Face ID matches against depth information, which isn't found in print or 2D digital photographs. It's designed to protect against spoofing by masks or other techniques through the use of sophisticated anti-spoofing neural networks. Face ID is even attention-aware, and Face ID with a mask will always confirm attention. Face ID recognizes if your eyes are open and your attention is directed towards the device. This makes it more difficult for someone to unlock your device without your knowledge (such as when you are sleeping).

To use Face ID, you must set up a passcode on your device. You must enter your passcode for additional security validation when:

- The device has just been turned on or restarted.
- The device hasn't been unlocked for more than 48 hours.
- The passcode hasn't been used to unlock the device in the last six and a half days and Face ID hasn't unlocked the device in the last 4 hours.
- The device has received a remote lock command.
- After five unsuccessful attempts to match a face.
- After initiating power off or Emergency SOS by pressing and holding either volume button and the side button simultaneously for 2 seconds.

If your device is lost or stolen, you can prevent Face ID from being used to unlock your device by marking your device as lost in Find My.

## Privacy

At Apple, we believe privacy is a fundamental human right and we've designed Face ID to protect your privacy. Face ID data — including mathematical representations of your face — is encrypted and protected by the Secure Enclave. This data will be refined and updated as you use Face ID to improve your experience, including when you successfully authenticate. Face ID will also update this data when it detects a close match but a passcode is subsequently entered to unlock the device. Face ID data doesn't leave your device and is never backed up to iCloud or anywhere else.

If you choose to enroll in Face ID, you can control how it's used or disable it at any time. For example, if you don't want to use Face ID to unlock your device, open Settings > Face ID & Passcode, and disable iPhone Unlock or iPad Unlock. You can also use Face ID without setting up the ability to use it with a face mask. To disable Face ID entirely, open Settings > Face ID & Passcode, and tap Reset Face ID. Doing so will delete Face ID data,

PL_PROD14_00054

including mathematical representations of your face, from your device. If you choose to erase or reset your device using Find My or erasing all content and settings, all Face ID data will be deleted.

Even if you don't enroll in Face ID, the TrueDepth camera intelligently activates to support attention aware features, like dimming the display if you aren't looking at your device or lowering the volume of alerts if you're looking at your device. For example, when using Safari, your device checks to determine if you're looking at your device and turns the screen off if you aren't. If you don't want to use these features, you can open Settings > Face ID & Passcode and turn off Attention Aware Features.

Within supported apps, you can enable Face ID for authentication. Apps are notified only as to whether the authentication is successful. Apps can't access Face ID data associated with the enrolled face.

## Safety

iPhone and iPad Pro and the TrueDepth camera system have been thoroughly tested and meet international safety standards. The TrueDepth camera system is safe to use under normal usage conditions. The system will not cause any harm to eyes or skin, due to its low output. It's important to know that the laser system might be disabled for safety reasons if the device is damaged or malfunctions. If you receive a notification on your iPhone or iPad Pro that Face ID has been disabled, you should have a trained technician who uses genuine Apple parts repair your device. Improper repair, modification, or use of nongenuine Apple components in the laser systems might prevent the safety mechanisms from functioning properly, and could cause hazardous exposure and injury to eyes or skin.

Learn what to do if you see an alert that says Face ID has been disabled ›

When viewed through certain types of cameras, you might notice light output from the TrueDepth camera. This is expected as some cameras might detect infrared light. Some might also notice a faint light output from the TrueDepth camera when viewed in a very dark room. This is expected in extremely dark settings.

## Accessibility

Accessibility is an integral part of Apple products. Users with physical limitations can select "Accessibility Options" during enrollment. This setting doesn't require the full range of head motion to capture different angles and is still secure to use but requires more consistency in how you look at your iPhone or iPad Pro.

Face ID also has an accessibility feature to support individuals who are blind or have low vision. If you don't want Face ID to require that you look at your device with your eyes open, you can open Settings > Accessibility > Face ID & Attention, and turn off Require Attention for Face ID. This setting is automatically turned off if you enable VoiceOver during initial set up.

## Learn more

- Learn which iPhone and iPad models support Face ID ›
- Set up and use Face ID ›
- Use Face ID while wearing a mask ›

PL_PROD14_00055

- Get help with Face ID ›

Published Date: December 09, 2024

---

**Helpful?**    ( Yes )    ( No )

 > Support > About Face ID advanced technology

Copyright © 2026 Apple Inc. All rights reserved.    Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Site Map    United States

PL_PROD14_00056

### EEE.  <u>EXHIBIT EEE: APPLE ARTICLE 3</u>

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC      MAY 26 2026



# Face ID Security

September 2017

PL_PROD14_01475

# Face ID Security Overview

With a simple glance, Face ID securely unlocks iPhone X. It provides intuitive and secure authentication enabled by the TrueDepth camera system, which uses advanced technologies to accurately map the geometry of your face. Face ID confirms attention by detecting the direction of your gaze, then uses neural networks for matching and anti-spoofing so you can unlock your phone with a glance. Face ID automatically adapts to changes in your appearance, and carefully safeguards the privacy and security of your biometric data.

## Face ID and passcodes

To use Face ID, you must set up iPhone X so that a passcode is required to unlock it. When Face ID detects and matches your face, iPhone X unlocks without asking for the device passcode. Face ID makes using a longer, more complex passcode far more practical because you don't need to enter it as frequently. Face ID doesn't replace your passcode, but provides easy access to iPhone X within thoughtful boundaries and time constraints. This is important because a strong passcode forms the foundation of your iOS device's cryptographic protection.

You can always use your passcode instead of Face ID, and it's still required under the following circumstances:

- The device has just been turned on or restarted.

- The device hasn't been unlocked for more than 48 hours.

- The passcode hasn't been used to unlock the device in the last 156 hours (six and a half days) and Face ID has not unlocked the device in the last 4 hours.

- The device has received a remote lock command.

- After five unsuccessful attempts to match a face.

- After initiating power off/Emergency SOS by pressing and holding either volume button and the side button simultaneously for 2 seconds.

When Face ID is enabled, the device immediately locks when the side button is pressed, and the device locks every time it goes to sleep. Face ID requires a facial match—or optionally the passcode—at every wake.

The probability that a random person in the population could look at your iPhone X and unlock it using Face ID is approximately 1 in 1,000,000 (versus 1 in 50,000 for Touch ID). For additional protection, Face ID allows only five unsuccessful match attempts before a passcode is required to obtain access to your iPhone. The probability of a false match is different for twins and siblings that look like you as well as among children under the age of 13, because their

PL_PROD14_01476

distinct facial features may not have fully developed. If you're concerned about this, we recommend using a passcode to authenticate.

## Face ID security

Face ID is designed to confirm user attention, provide robust authentication with a low false match rate, and mitigate both digital and physical spoofing.

The TrueDepth camera automatically looks for your face when you wake iPhone X by raising it or tapping the screen, as well as when iPhone X attempts to authenticate you to display an incoming notification or when a supported app requests Face ID authentication. When a face is detected, Face ID confirms attention and intent to unlock by detecting that your eyes are open and directed at your device; for accessibility, this is disabled when VoiceOver is activated or can be disabled separately, if required.

Once it confirms the presence of an attentive face, the TrueDepth camera projects and reads over 30,000 infrared dots to form a depth map of the face, along with a 2D infrared image. This data is used to create a sequence of 2D images and depth maps, which are digitally signed and sent to the Secure Enclave. To counter both digital and physical spoofs, the TrueDepth camera randomizes the sequence of 2D images and depth map captures, and projects a device-specific random pattern. A portion of the A11 Bionic chip's neural engine—protected within the Secure Enclave—transforms this data into a mathematical representation and compares that representation to the enrolled facial data. This enrolled facial data is itself a mathematical representation of your face captured across a variety of poses.

Facial matching is performed within the secure enclave using neural networks trained specifically for that purpose. We developed the facial matching neural networks using over a billion images, including IR and depth images collected in studies conducted with the participants' informed consent. We worked with participants from around the world to include a representative group of people accounting for gender, age, ethnicity, and other factors. We augmented the studies as needed to provide a high degree of accuracy for a diverse range of users. Face ID is designed to work with hats, scarves, glasses, contact lenses, and many sunglasses. Furthermore, it's designed to work indoors, outdoors, and even in total darkness. An additional neural network that's trained to spot and resist spoofing defends against attempts to unlock your phone with photos or masks.

Face ID data, including mathematical representations of your face, is encrypted and only available to the Secure Enclave. This data never leaves the device. It is not sent to Apple, nor is it included in device backups. The following Face ID data is saved, encrypted only for use by the Secure Enclave, during normal operation:

- The infrared images of your face captured during enrollment.
- The mathematical representations of your face calculated during enrollment.

PL_PROD14_01477

- The mathematical representations of your face calculated during some unlock attempts if Face ID deems them useful to augment future matching.

The neural networks may be updated over time.  To avoid a user having to re-enroll to Face ID when these neural network changes are made, iPhone X will be able to automatically run stored enrollment images through the updated neural network. In addition to being encrypted and protected by the Secure Enclave, these enrollment images are cropped to your face, minimizing the amount of background information. Face images captured during normal unlock operations aren't saved, but are instead immediately discarded once the mathematical representation is calculated for comparison to the enrolled Face ID data.

## How Face ID unlocks an iOS device

With Face ID disabled, when a device locks, the keys for the highest class of Data Protection—which are held in the Secure Enclave—are discarded. The files and keychain items in that class are inaccessible until you unlock the device by entering your passcode.

With Face ID enabled, the keys aren't discarded when the device locks; instead, they're wrapped with a key that's given to the Face ID subsystem inside the Secure Enclave. When you attempt to unlock the device, if Face ID recognizes your face, it provides the key for unwrapping the Data Protection keys, and the device is unlocked. This process provides additional protection by requiring cooperation between the Data Protection and Face ID subsystems to unlock the device.

When the device restarts, the keys required for Face ID to unlock the device are lost; they're discarded by the Secure Enclave after any conditions are met that require passcode entry (for example, after not being unlocked for 48 hours or after five failed Face ID match attempts).

To improve unlock performance and keep pace with the natural changes of your face and look, Face ID augments its stored mathematical representation over time. Upon successful unlock, Face ID may use the newly calculated mathematical representation—if its quality is sufficient—for a finite number of additional unlocks before that data is discarded. Conversely, if Face ID fails to recognize you, but the match quality is higher than a certain threshold and you immediately follow the failure by entering your passcode, Face ID takes another capture and augments its enrolled Face ID data with the newly calculated mathematical representation. This new Face ID data is discarded after a finite number of unlocks and if you stop matching against it. These augmentation processes allow Face ID to keep up with dramatic changes in your facial hair or makeup use, while minimizing false acceptance.

## Face ID and Apple Pay

You can also use Face ID with Apple Pay to make easy and secure purchases in stores, apps, and on the web.

PL_PROD14_01478

To authorize an in-store payment with Face ID, you must first confirm intent to pay by double-clicking the side button. You then authenticate using Face ID before placing your iPhone X near the contactless payment reader. If you'd like to select a different Apple Pay payment method after Face ID authentication, you'll need to reauthenticate, but you won't have to double-click the side button again.

To make a payment within apps and on the web, you confirm intent to pay by double-clicking the side button, then authenticate using Face ID to authorize the payment. If your Apple Pay transaction is not completed within 30 seconds of double-clicking the side button, you'll have to reconfirm intent to pay by double-clicking again.

## Face ID Diagnostics

Face ID data doesn't leave your device, and is never backed up to iCloud or anywhere else. Only in the case that you wish to provide Face ID diagnostic data to AppleCare for support will this information be transferred from your device. Enabling Face ID Diagnostics requires a digitally signed authorization from Apple that's similar to the one used in the software update personalization process. After authorization, you'll be able to activate Face ID Diagnostics and begin the setup process from within the Settings app of your iPhone X.

As part of setting up Face ID Diagnostics, your existing Face ID enrollment will be deleted and you'll be asked to re-enroll in Face ID. Your iPhone X will begin recording Face ID images captured during authentication attempts for the next 7 days; iPhone X will automatically stop saving images thereafter. Face ID Diagnostics doesn't automatically send data to Apple. You can review and approve Face ID Diagnostics data—including enrollment and unlock images (both failed and successful) that are gathered while in diagnostics mode— before it's sent to Apple. Face ID Diagnostics will upload only the Face ID Diagnostics images you have approved; the data is encrypted before it's uploaded, and is immediately deleted from your iPhone X after the upload completes. Images you reject are immediately deleted.

If you don't conclude the Face ID Diagnostics session by reviewing images and uploading any approved images, Face ID Diagnostics will automatically end after 90 days, and all diagnostic images will be deleted from your iPhone X. You can also disable Face ID Diagnostics at any time. All local images are immediately deleted if you do so, and no Face ID data is shared with Apple in these cases.

## Other uses for Face ID

Third-party apps can use system-provided APIs to ask the user to authenticate using Face ID or a passcode, and apps that support Touch ID automatically support Face ID without any changes. When using Face ID, the app is notified only as to whether the authentication was successful; it can't access Face ID or the data associated with the enrolled face. Keychain items can also be protected with Face ID, to be released by the Secure Enclave only by a facial

PL_PROD14_01479

match or the device passcode. App developers also have APIs to verify that a passcode has been set by the user before requiring Face ID or a passcode to unlock keychain items. App developers can:

- Require that authentication API operations don't fall back to an app password or the device passcode. They can query whether a face is enrolled, allowing Face ID to be used as a second factor in security-sensitive apps.

- Generate and use ECC keys inside Secure Enclave that can be protected by Face ID. Operations with these keys are always performed inside the Secure Enclave after the Secure Enclave authorizes their use.

You can also configure Face ID to approve purchases from the iTunes Store, the App Store, and the iBooks Store so you don't have to enter an Apple ID password. With iOS 11 and later, Face ID-protected Secure Enclave ECC keys are used to authorize a purchase by signing the store request.

© 2017 Apple Inc. All rights reserved. Apple, the Apple logo, Apple Pay, iPhone, Touch ID, and Face ID are trademarks of Apple Inc., registered in the U.S. and other countries. AppleCare, App Store, iCloud, iBooks Store, and iTunes Store are service marks of Apple Inc., registered in the U.S. and other countries. iOS is a trademark or registered trademark of Cisco in the U.S. and other countries and is used under license. Other product and company names mentioned herein may be trademarks of their respective companies.

September 2017

PL_PROD14_01480

**FFF.    EXHIBIT FFF: PRESTON DECLARATION**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

**Ashley M. Gjovik**
Juris Doctor Candidate & Public International Law Certificate Candidate
Santa Clara University, School of Law, Class of 2022
Santa Clara, California
ashleymgjovik@protonmail.com

MS. ASHLEY GJOVIK

               Complainant,

v.

APPLE INC., *et al.*,

               Respondent.

**Case No.:**
U.S. Dept of Labor: 9-3290-22-051

**WITNESS STATEMENT**

**Federal Charges**:
-CERCLA, 42 U.S.C. §9610
-SOX 18 U.S.C.A. §1514A
-OSH Act §11(c) 29 U.S.C. §660

**Associated Cases:**
U.S. SEC: 16304-612-987-465
U.S. EPA Complaint
U.S. NLRB: 32-CA- 282142, 283161,
284428, 284441, & 288816

PL_PROD_12_7351

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC.
CASE: APPLE INC./GJOVIK/9-3290-22-051

# Witness Statement

**Date**: March 7, 2022

I, Jacob Preston, residing at 3963 Sand Dollar Rd W, Bremerton, WA, make the following statement freely and voluntarily:

---

**Topic of Witness Statement**: Witness to Apple Inc's "egregious" conduct towards employees

---

I was employed at Apple from April 2, 2018 to August 13, 2021. I worked in Hardware Technologies as part of the Human Interface Device team as a firmware engineer.

During my time at Apple it was immediately clear that Apple wanted total control of their employees and sometimes this control would leak into personal lives of employees as well. From Apple wanting employees to "live on" devices 24/7 to test new features to barring employees from activities outside of work such as tutoring, speaking, or contributing to open source projects, Apple didn't want employees doing much other than contributing to Apple. My first day of employment I was asked to use my personal Apple ID account to integrate into Apple's corporate services for employees. While this wasn't a strict requirement, it was strongly encouraged. As a new employee not wanting to cause issues with my management on my first day of work, I agreed to do this, albeit I felt pressured from my manager as he told me it's something everyone does. I felt it was strange because it blurs the boundary between work and home life, especially since iMessage was used as Apple's primary means to communicate among employees when I first started there. This means employees could never "turn off" from Apple work, as that would mean they'd have to disable the iMessage app on their phone or use a different phone entirely. I noticed this type of culture adversely affected my mental health, ultimately contributing to my reasons for searching for a new job elsewhere on top of Apple's requirement that everyone, at some point, must return to an Apple office after the COVID-19 pandemic.

This integration with my personal Apple account became especially concerning when I ended my employment, and it was requested that I return my work devices without wiping them and providing a means for my manager to be able to log in to the devices. I didn't realize this would ever be asked of me, but this would mean that I would have to spend an unreasonable amount of time disabling settings and deleting all personal files that may have automatically synced between devices as the result of using my personal Apple account for work. Doing this for over 3 years of data is an unreasonable thing to ask of employees. I asked my management several times why this was necessary and why I couldn't just wipe the devices as I had already shared with them all necessary work files and documents for someone to continue the work I was

ASHLEY M. GJØVIK, B.S., P.M.P.
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University
Ex-Apple Sr. Engineering Program Manager from February 2015 to September 2021

Page 2 of 4

PL_PROD_12_7352

leaving behind. My management had no answer other than "It's just the policy." While I can't say for certain, this made me feel that Apple wanted my devices back to look through them for other than work related documents. Since iCloud can sync anything among Apple devices using the same Apple account (i.e. pictures, texts and iMessages, emails, etc.), I was strongly concerned that my privacy would be violated.

It was engrained into employees' heads from day one at new employee orientation that everything that takes place at Apple is confidential. Everything. This blanket statement was used constantly, and it made me feel as if I couldn't even talk about what I was having for lunch that day or even how many meetings I had. Apple developed a culture of secrecy beyond just their product development, and I could see this cause issues among teams just trying to work together that had different management chains. You weren't always allowed to talk to another Apple employee about what you do unless you both were disclosed on that device, yet they also wanted everyone to work in an open and collaborative environment so anyone could give helpful input. It was a conflicting and confusing culture, but ultimately it was one where I was under constant fear that I may get disciplined or fired for unknowingly doing something that may seem innocent to someone else outside of Apple's culture. Many employees, myself included, would just try to take the least risky path and avoid talking about something at all if we felt it may violate the rules that weren't always clear to us.

Towards the very end of my employment, I brought up several issues including reports of Apple's suppliers in China using forced labor and Ashley Gjovik's case that was published in The Verge when she was first put on leave. I never got clear direction or an immediate response to these concerns other than blanket statements that just pointed me to Apple's existing documentation on human rights and employee discrimination. It was difficult to have a conversation with someone that curated these policies as my management didn't seem to know how to handle my inquires on the topics. I sent emails to relevant departments as well, and I'd only get delayed responses without much meaning. It seemed they'd just want to dance around my concerns until I either forgot or gave up. My direct manager did seem to want to help me with these concerns, but he seemed powerless in getting any more information to truly resolve my concerns. Ultimately, I ended my employment with Apple.

**ASHLEY M. GJØVIK, B.S., P.M.P.**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University
Ex-Apple Sr. Engineering Program Manager from February 2015 to September 2021

PL_PROD_12_7353

*I certify under penalty of perjury under the laws of the United States that the above is true and correct. No threats or promises have been made to me and no pressure or coercion of any kind has been used against me.*

Dated: March 7, 2022 at 8:44 AM located at Bremerton, WA, USA.

*Jacob W Preston*
**Signature of Witness**

**Name of Witness**: Jacob W Preston
**Email Address**: pres2300@gmail.com
**Phone Number**: 208-406-8220

**ASHLEY M. GJØVIK, B.S., P.M.P.**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University
Ex-Apple Sr. Engineering Program Manager from February 2015 to September 2021

**Page 4 of 4**

PL_PROD_12_7354

**GGG.  <u>EXHIBIT GGG: LETTER FROM CONGRESS</u>**

105

AL FRANKEN
MINNESOTA

SUITE
SH–309
202–224–5641

# United States Senate

WASHINGTON, DC 20510–2309

September 13, 2017

Mr. Tim Cook
Chief Executive Officer
Apple, Inc.
1 Apple Park Way
Cupertino, CA 95014

Dear Mr. Cook:

I am writing to request more information on Face ID – Apple's new facial recognition system and the core feature of the recently unveiled iPhone X. While details on the device and its reliance on facial recognition technology are still emerging, I am encouraged by the steps that Apple states it has taken to implement the system responsibly. However, substantial questions remain about how Face ID will impact iPhone users' privacy and security, and whether the technology will perform equally well on different groups of people. To offer clarity to the millions of Americans who use your products, I ask that you provide more information on how the company has processed these issues internally, as well as any additional steps that it intends to take to protect its users.

Yesterday, Apple announced that the highly anticipated iPhone X features an edge to edge screen, meaning that the device will not include a home button. Instead of relying on Apple's fingerprint technology – Touch ID – a user will be able to unlock the phone and confirm purchases through iOS by holding up the device and allowing it to recognize his or her face. Phil Schiller, Apple's senior vice president of marketing said of the new technology, "[n]othing has ever been simpler, more natural and effortless."[1] Since the announcement, however, reporters, advocates, and iPhone users have raised concerns about how Face ID could impact Americans' fundamental right to privacy, speculated on the ways in which Apple could use faceprint data in the future, and questioned the quality and security of the technology. For example, it has previously been reported that many facial recognition systems have a higher rate of error when tested for accuracy in identifying people of color, which may be explained by variety of factors, including a lack of diversity in the faces that were used to train a system.[2] Furthermore, some have expressed concern that the system could be fooled, and thus the device unlocked, by a photo or a mask of the owner of the device.

---

[1] Andrea Chang, *How the iPhone X's Facial Recognition Technology Works*, L.A. TIMES (Sept. 12, 2017), http://www.latimes.com/business/la-fi-apple-iphone-updates-face-id-how-the-iphone-x-s-facial-1505248709-htmlstory.html.
[2] Clare Garvie & Jonathan Frankle, *Facial-Recognition Software Might Have a Racial Bias Problem*, THE ATLANTIC (Apr. 7, 2016), https://www.theatlantic.com/technology/archive/2016/04/the-underlying-bias-of-facial-recognition-systems/476991/.

1

PL_PROD14_00013

As I have previously highlighted in communications with Apple regarding Touch ID, there are significant differences between the privacy and security of passwords versus that of biometric data, such as fingerprints and faceprints.[3] Unlike a password, an individual's faceprint is permanent, public, and uniquely identifies its owner. As a result, should a bad actor gain access to the faceprint data that Face ID requires, the ramifications could last forever, particularly if Apple's biometric technology comes to be used in other devices and settings. Furthermore, Apple itself could use the data to benefit other sectors of its business, sell it to third parties for surveillance purposes, or receive law enforcement requests to access it facial recognition system – eventual uses that may not be contemplated by Apple customers. For these reasons, it is incumbent on Apple to provide as must transparency on this complex new technology as possible.

In light of the aforementioned uncertainties, I respectfully request that you respond to the following questions by October 13, 2017:

1. Apple has stated that all faceprint data will be stored locally on an individual's device as opposed to being sent to the cloud.
   a. Is it currently possible – either remotely or through physical access to the device – for either Apple or a third party to extract and obtain usable faceprint data from the iPhone X?
   b. Is there any foreseeable reason why Apple would decide to begin storing such data remotely?

2. Apple has stated that it used more than one billion images in developing the Face ID algorithm. Where did these one billion face images come from?

3. What steps did Apple take to ensure its system was trained on a diverse set of faces, in terms of race, gender, and age? How is Apple protecting against racial, gender, or age bias in Face ID?

4. In the unveiling of the iPhone X, Apple made numerous assurances about the accuracy and sophistication of Face ID. Please describe again all the steps that Apple has taken to ensure that Face ID can distinguish an individual's face from a photograph or mask, for example.

5. Apple has stated that is has no plans to allow any third party applications access to the Face ID system or its faceprint data. Can Apple assure its users that it will never share faceprint data, along with the tools or other information necessary to extract the data, with any commercial third party?

6. Can Apple confirm that it currently has no plans to use faceprint data for any purpose other than the operation of Face ID?

---

[3] Letter from Senator Al Franken, Chairman, Senate Judiciary Subcommittee on Privacy, Technology and the Law, to Tim Cook, CEO, Apple, Inc. (Sept. 19, 2013), https://www.franken.senate.gov/files/documents/130919AppleTouchID.pdf.

2

PL_PROD14_00014

7. Should Apple eventually determine that there would be reason to either begin storing faceprint data remotely or use the data for a purpose other than the operation of Face ID, what steps will it take to ensure users are meaningfully informed and in control of their data?

8. In order for Face ID to function and unlock the device, is the facial recognition system "always on," meaning does Face ID perpetually search for a face to recognize? If so:
    a. Will Apple retain, even if only locally, the raw photos of faces that are used to unlock (or attempt to unlock) the device?
    b. Will Apple retain, even if only locally, the faceprints of individuals other than the owner of the device?

9. What safeguards has Apple implemented to prevent the unlocking of the iPhone X when an individual other than the owner of the device holds it up to the owner's face?

10. How will Apple respond to law enforcement requests to access Apple's faceprint data or the Face ID system itself?

Again, I appreciate Apple's efforts to implement Face ID responsibly and your ongoing willingness to engage with my office on issues of privacy and security. Thank you for your prompt attention to this important matter, and please do not hesitate to contact me, or Leslie Hylton on my staff at (202) 224-5641.

Sincerely,

Al Franken
U.S. Senator

3

PL_PROD14_00015

**HHH.  <u>EXHIBIT HHH: TECHCRUNH ARTICLE</u>**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 380 of 427



# iPhone X's Face ID raises security and privacy questions

Natasha Lomas

8:34 AM PDT · September 13, 2017

The new top-of-the-range iPhone does away with the home button and its built-in fingerprint reader in favor of a new biometric — called Face ID — which uses a 3D scan of the user's face for authenticating and unlocking their device. It also replaces Touch ID for Apple Pay too.

Apple suggests this is an advancement over a fingerprint reader because it's an easier and more natural action for the user to perform — you just look at the phone and it unlocks; no need to worry if you have wet fingers and so on. Apple is working the convenience angle hard.

However offering to gate the smorgasbord of personal content that lives on a smartphone behind a face biometric inevitably raises lots of security questions.

And of course there's already a mountain of high-pitched Twitter chatter on the topic, including speculation about whether the face of someone who is dead or sleeping, or otherwise unwilling to unlock their device in your presence, could be used to do so against their will.

This is exacerbated by existing face unlock systems on smartphones having a dire reputation.

A different facial recognition unlock feature used by Samsung has, for example, been shown to be fooled with just a photo of the face in question — making it laughably insecure in a digital era where selfies are traded publicly as the standard social communication currency...



Not found

Using your face as an authentication factor is a very bad idea, Part 383855 of an endless series. https://t.co/i815zU8dAd

— Eva (@evacide) September 7, 2017

Not to single Samsung out here. Android had a face unlock feature that could be just as easily spoofed way back in 2011. Even a subsequent

version of Android Face Unlock, which required users to blink before it would unlock and give up its secrets, was shown to be conquerable with [a sly bit of photoshopping](#).

However it's clear that Apple has packed in both a lot more hardcore technology and a lot more thought to try to put its implementation of facial biometrics on a more solid footing.

The iPhone X's camera is not just looking for a 2D image of a face; the sensor-packed notch at the top of the device includes a dot projector, flood illuminator and infrared camera, as well as a traditional camera lens, so it's able to sense depth and read face-shape (including in the dark).

As we wrote yesterday, it's [essentially an Xbox Kinect](#) miniaturized and put on the front of your phone. Ergo, Face ID would interpret a photo of a face as a flat surface — and therefore not actually a face.

Although the proof of the pudding will be in the eating, as they say.

There was a brief on-stage [demo fail](#) when an iPhone X apparently failed to identify Craig Federighi's face, and therefore wouldn't unlock — displaying the other potential problem here, given that a tech that's too unyielding in opening up to its owner may be highly secure but it won't be at all convenient.

The Apple exec's first reaction at being unexpectedly locked out appeared to be to wipe sweat from under his eyes — suggesting the sensors may be confused by shine. We'll have to wait and see.

## Face ID needs your attention

Yesterday, Apple showed how the iPhone X user has to record a 3D scan of their face from multiple angles, with the interface asking them to tilt and turn their head to enroll the biometric.

| Latest | Security |
|--------|----------|
| Startups | AI |
| Venture | Apps |



Apple

Events

Podcasts

Newsletters

million.

It also said Face ID cannot be fooled by photographs of faces, and noted testing the system against face masks — seeming confident that even a photorealistic face mask won't fool it, likely on account of the infrared sensor. (Though one wonders whether a heated silicone face mask might not do the trick… )

It did confirm that Face ID does get confused by identical twins, as you'd expect.

More interestingly, Apple said that Face ID needs "your attention" — specifying that means a user's eyes have to be open and on the device for Face ID to work. So it appears it will require some kind of user interaction to successfully unlock it, not just for the face to be in the sensors' line of sight.

This is one of the most interesting unknowns here.

Demos of Face ID yesterday in Cupertino were locked to Apple staff, so we haven't yet had the chance to freely play and test its parameters. But TechCrunchers who were in Cupertino suggested it was not that easy to trigger Face ID, and that a person would only have to screw up their eyes for it not to work.

5/21/26, 8:35 PM
iPhone Xs Face ID raises security and privacy questions | TechCrunch
Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 384 of 427

Again, though, it's unclear how much and how active a user's ocular attention needs to be for the device's virtual padlock to pop open.

Could someone pry open a sleeping or deceased person's eyeball to pass muster with Face ID? Or do eyes have to be seen to move — and to move willingly — towards the phone before it will unlock?

What about if you sweep your eyes intentionally elsewhere to try to avoid looking at the device? Will the phone read that as your attention being willingly averted?

We don't know yet. Testing this phone is going to be fun for sure.

But forcing someone to put a finger on a phone screen seems at least theoretically easier than compelling a person to open their eyes and look a particular way if they don't want to. So you could argue that Face ID is a slight step up on Apple's Touch ID fingerprint biometric.

Albeit, that might also depend on how much time you have on your hands to try to trick the iPhone X user into looking at their phone. Or how much force you're willing to expend…

https://twitter.com/shanerichmond/status/907695795029377024

Safe to say, a lot rides on how Apple is interpreting and reading the user's gaze.

But even if Cupertino's engineers have designed this aspect of the tech in a very thoughtful and highly attention-tuned way, there's no getting away from the fact that biometric security tends to make security experts uncomfortable.

## Biometrics vs passcodes

And with good and multiple reasons. Not least the salient fact that you can't change a biometric if that highly detailed 3D scan of your face, say, happens to leak.

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 385 of 427

Biometrics are also less secure than using a (strong) passcode. Though of course a poorly chosen passcode is a security nightmare. (Apple offers multiple options for iOS passcodes — default requiring a six-digit passcode, but also supporting longer strings of letters and numbers if a user chooses. Though it also lets users revert to a four-digit passcode if they really want to.)

Security is, as ever, a spectrum. And consumer-grade biometrics sit pretty low down the ladder — best used in combination with additional, more robust measures in multi-factor authentication scenarios. If you're going to deploy them at all.

Passcodes and passwords have another advantage over biometrics too — in that they appear to offer more legal safeguards against state agents forcibly unlocking a device against an owner's will.

In early 2016, Forbes found what it described as the first known case of a warrant being used to compel an iPhone owner to unlock their device with their biometric information — in that case using the Touch ID fingerprint biometric on an iPhone which had been seized by police.

While, in a landmark ruling in 2014, a U.S. judge said that while a defendant could not be forced to hand over a passcode they could be made to provide their biometric information to unlock their device.

Device security at borders has also become a matter of growing concern under the current U.S. administration — which has shown an appetite to expand Homeland Security's powers to being able to demand passwords off visitors.

And while legislation is being proposed to outlaw such extralegal intrusions, it's not clear whether forced unlocking of devices based on requiring a person to apply their biometric information might not present a continued loophole for border agents to go on accessing the content of devices without a warrant.

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 386 of 427

So there could be a wider risk attached to Apple encouraging people to adopt facial biometrics if overreaching state agents are able to use the tech as a route for circumventing individuals' rights.

That said, the company has evidently been thinking about ways to mitigate this risk — adding a feature to iOS 11 that lets users quickly disable Touch ID, via an SOS mode than can be triggered to require the full passcode.

It has been confirmed there will be a similar shortcut to quickly disable Face ID, too.



In iOS 11, the passcode will also be specifically required to be entered before any data can be pulled off a device — limiting searches of unlocked devices at borders to agents being able to manually sift through contents there and then, rather than giving them unfettered access and the ability to easily download all the data.

Looking at how Apple is deploying a facial biometric within a wider security system is key.

Case 3:23-cv-04597-EMC iPhone XS, Face ID raises security and privacy questions | TechCrunch Document 379 Filed 05/26/26 Page 387 of 427

If it was pushing Face ID as a complete replacement for a passcode that would indeed be irresponsible.

But, at the end of the day, it's offering the tech as an option for users who want added usability convenience, while also providing a fallback of stronger security safeguards that can be invoked or can step in to gate content at key moments.

For a mainstream consumer player like Apple that looks — at this untested stage of the Face ID feature — to be a fairly thoughtful approach to the age-old security vs convenience problem.

There is another, wider concern here too, though.

## Always watching me

Human faces inherently contain a wealth of personal information — from physical identity and features, to gender and ethnicity, mood/emotional state, even an approximation of age. A face could even indicate sexuality, if recent research is to be believed.

So technologies that normalize mass scanning of facial features do inexorably push in an anti-privacy direction — carrying the uncomfortable risk of misuse.



And it's clear that for Face ID to function at least some of the iPhone X's sensors will need to be always on, scanning for potential faces.

Which means it could be gathering very sensitive data without users being aware.

Face ID therefore opens a potential conduit for users to be surreptitiously spied on, say by scanning their faces to try to determine how happy or otherwise they look when contemplating a particular bit of on-screen content; or even to glean insights about the domestic context of the device owner, such as by identifying and counting multiple different faces in the same location to estimate family size.

And even if only some of the sensors that are in play on the iPhone X powering Face ID are always on, some of this hardware and software has to be continuously watching, no matter where you are, who you're with, what you're doing...

Remember, people carry smartphones with them, on their person, everywhere they go — even from room to room within their own home. So while the Amazon Echo Look proposes to view you in your bedroom, the iPhone X has no such restrictions on the places it can watch you.

How third parties with apps on the iOS platform will be allowed to access the iPhone X's camera and sensor hardware is a key consideration. It doesn't take much imagination to consider what a data gathering behemoth like Facebook might like to do with this kind of technology — even if it can only make use of it when its own app is open and running on the device.

And it's not yet clear whether or what kind of controls Apple might put in place to limit how app makers are able to access the X's face scanning capabilities (yes, we're asking). But the fact the hardware has been created and will soon be pushed out — doubtless promoted with the help of millions of Apple marketing dollars — already represents the next wave of tech-fueled privacy erosion.

So while smartphone technology has taught us to be accustomed to being continuously disturbed by digital prods and pings, at any and all times of the day or night — to the point of mobile OSes including a 'do not disturb' setting to manually switch off intrusions we otherwise now expect — Apple's championing of facial recognition technology positions face-scanning and face-reading to become the new normal.

And from facial recognition for identity and authentication it's but a small step to ushering in even more personally intrusive technology systems — like emotion-tracking timestamped against the content you're browsing. As just one off-the-top-of-my-head example.

Perhaps future smartphones will come with a new type of underused control-toggle in the settings menu — which simply states: 'Stop watching me.'

Topics:   AI   Apple   Apple Pay   authentication   biometrics   cupertino   face id

facial biometrics   Fingerprint   iOS   iPhone   iphone 5s   iPhone X

Media & Entertainment   Privacy   privacy   Security   security

smartphones   Touch ID

*When you purchase through links in our articles, we may earn a small commission. This doesn't affect our editorial independence.*



**Natasha Lomas**
Senior Reporter
𝕏  in

Natasha was a senior reporter for TechCrunch, from September 2012 to April 2025, based in Europe. She joined TC after a stint reviewing smartphones for CNET UK and, prior to that, more...



00:23:52:23

**The first StrictlyVC of 2026 hits SF on April 30. Tickets are going fast. Register now.**

Latest          Security

Startups          AI

Venture          Apps

Apple

Events

Podcasts

Newsletters

# Ex-Apple employee takes Face ID privacy complaint to Europe

Natasha Lomas

10:58 AM PDT · April 11, 2022

PL_PROD13_003591

4/29/26, 5:07 PM
Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 391 of 427
Ex-Apple employee takes Face ID privacy complaint to Europe | TechCrunch

Privacy watchdogs in Europe are considering a complaint against Apple made by a former employee, Ashley Gjøvik, who alleges the company fired her after she raised a number of concerns, internally and publicly, including over the safety of the workplace.

Gjøvik, a former senior engineering program manager at Apple, was fired from the company last September after she raised concerns about her employer's approach toward staff privacy, some of which were covered by The Verge in a report in August 2021.

At the time, Gjøvik had been placed on administrative leave by Apple after raising concerns about sexism in the workplace, and a hostile and unsafe working environment which it had said it was investigating. She subsequently filed complaints against Apple with the U.S. National Labor Relations Board.

Those earlier complaints link to the privacy complaint she's sent to international oversight bodies now because Gjøvik says she wants scrutiny of Apple's privacy practices after it formally told the U.S. government its reasons for firing her — and "felt comfortable admitting they'd fire employees for protesting invasions of privacy", as she puts it — accusing Apple of using her concerns over its approach to staff privacy as a pretext to terminate her for reporting wider safety concerns and organizing with other employees about labor concerns.

The U.K.'s Information Commissioner's Offie (ICO) and France's CNIL both confirmed receipt of Gjøvik's privacy complaint against Apple.

A spokesperson for the ICO told TechCrunch: "We are aware of this matter and we will assess the information provided."

France's CNIL also sent confirmation that it's looking at Gjøvik's complaint.


**Meet your next investor or portfolio startup at Disrupt**

PL_PROD13_003592

**Your next round. Your next hire. Your next breakout opportunity. Find it at TechCrunch Disrupt 2026, where 10,000+ founders, investors, and tech leaders gather for three days of 250+ tactical sessions, powerful introductions, and market-defining innovation. Register now to save up to $410.**

**San Francisco, CA**  |  October 13-15, 2026

**REGISTER NOW**

"We have received this complaint which it is currently being investigated," a CNIL spokesperson told us, adding: "I cannot communicate any further details at this time."

The development was first covered by the Telegraph — which reported yesterday that it's thought to be the first time Gjøvik has sought to press her privacy complaint against Apple in the U.K.

Ireland's Data Protection Commission (DPC), which is Apple's main data protection regulator in the European Union for the pan-EU General Data Protection Regulation (GDPR) — and which would, under the regulation's one-stop-shop mechanism, likely take a lead role on any inquiry related to a GDPR complaint that's also been lodged with other EU privacy regulators (such as France's CNIL) — declined to comment. Nor would the DPC confirm or deny receiving Gjøvik's complaint.

A spokesperson for the DPC said: "The DPC cannot comment on individual cases. All queries that come before the DPC are assessed and progressed in line with the DPC's complaint-handling functions, where it is appropriate to do so."

Ireland has a number of GDPR probes ongoing into Apple data processing practices — including into the company's privacy policies — but the DPC

PL_PROD13_003593

Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 393 of 427

has not yet issued any decisions in relation to those multi-year-long investigations.

Were the DPC to decide this complaint merits opening a fresh investigation into Apple, it would likely take years to reach a public outcome given the Irish regulator's extensive GDPR case file backlog.

In a conclusion to the complaint, Gjøvik urges the regulators to "investigate the matters I raised and open a larger investigation into these topics within Apple's corporate offices globally", further alleging: "Apple claims that human rights do not differ based on geographic location, yet Apple also admits that French and German governments would never allow it to do what it is doing in Cupertino, California and elsewhere."

## Face ID Gobbler app

The 54-page "privacy invasion complaint", which Gjøvik says was submitted to European regulators earlier this month, takes issues with the company's approach to employee privacy — raising concerns about a number of practices including an internal program by Apple to gather biometrics data from staff using an app called "Gobbler" (later "Glimmer"), apparently as part of the product development process for Face ID.

More broadly, the complaint centers on the breadth of Apple's secrecy and "anti-employee privacy" policies, as well as what Gjøvik alleges to be "unlawfully restrictive" NDAs.

Apple was contacted for comment on the complaint but at the time of writing the company had not responded.

The tech giant's approach to inviting employees to engage in product testing, which involved capturing biometrics at times, left Gjøvik feeling that her participation was mandatory, per the complaint, and — in one instance that she details — she describes responding to what she thought was a "mandatory social event" which turned out to involve manually

PL_PROD13_003594

testing Face ID using the Gobbler app while being penned into a secure outdoor compound in full sunshine.

According to the complaint, information Apple provided internally to staff about Gobbler urged employees to upload data from the app captured in their homes.

"Apple was pressuring employees to upload their 'faceprint data' to Apple internal servers, capturing secret photographs and videos of employees, and told employees that face-related logs were automatically uploaded from their iPhones daily," Gjøvik alleges.

"It was extraordinarily unclear what data was being automatically uploaded, how and when," she also claims. "My open questions included whether my personal data was being backed up on employee iCloud backups, synced via iCloud, and/or accessed/copied by Apple's corporate MDM profiles – or other Global Security surveillance of employee phones. It also disturbed me that the app was taking photos/videos without any notification (sound, signal, etc), which made me think that Apple, if it wanted to, could activate my device cameras and watch me without me knowing at any time as well. I talked to other employees, including managers, with similar concerns."

Gjøvik cites a public statement by Apple that more than one billion images were used in the development of its Face ID algorithm — claiming the company never answered questions raised by Senator Al Franken who had asked it where those images came from following the launch of Face ID. "What [Apple VP Craig] Federighi did not say is that those images came from employees just like me, whether I wanted to share them or not," she suggests.

Per the complaint, Apple informed staff of restrictions on employees uploading data to Gobbler in countries outside the U.S. — although the complaint also cites an email from an Apple manager which states that one such study was being conducted in "the USA, Brazil, Tel Aviv," and the EU "but not France or Germany".

PL_PROD13_003595

"I also saw in notes that the app was forbidden to be used in Japan and China, but then at some point, Apple decided to gather some logs there anyways," Gjøvik further suggests.

Apple does have offices in Europe — including in the U.K., France, Ireland and elsewhere in the region — so it's at least possible that employees at those locations used the Gobbler app to upload their biometric data. If that happened, it could engage data protection considerations, such as over the legal ground Apple would be able to rely on for processing this data. But whether or not the European regulators who have received her complaint decide there's something here for them to investigate remains to be seen.

Under the GDPR, consent is one of several possible legal grounds for processing personal data. However for consent to be a valid legal basis, it must be informed, specific and freely given — and, even setting aside questions over whether staff were provided with adequate information on what would be done with their biometric data, an employer-employee power dynamic might undermine their ability to freely consent (i.e. versus feeling they must participate in such testing because it's their employer asking). So there could be reasons for closer scrutiny.

Gjøvik's complaint has also been addressed to the European Data Protection Supervisor (EDPS), although a spokesman for the body confirmed the EDPS would not investigate such a matter as its oversight function is focused on the EU's own institutions, bodies or agencies.

The complaint also lists the Canada's Office of the Privacy Commissioner as another body to which it has been submitted, along with digital rights groups EFF and Big Brother Watch.

Beyond the Gobbler/Glimmer app, Gjøvik raises concerns about the potential for Apple's software development ticket/bug reporting system to harvest personal data without staff being properly aware — claiming that the system defaults to sharing reports to all of the company's software engineering function (potentially tens of thousands of people). It also says these tickets could ask employees to include diagnostic files —

PL_PROD13_003596

which Gjøvik suggests could result in additional personal data from an employee's personal device, such as their iMessages for example, being passed to Apple without the employee fully realizing it.

In The Verge's article last year, which quoted Gjøvik and a number of other Apple employees, it was reported that staffers at the company were routinely told to link their personal Apple ID to their work account.

"The blurring of personal and work accounts has resulted in some unusual situations, including Gjøvik allegedly being forced to hand compromising photos of herself to Apple lawyers when her team became involved in an unrelated legal dispute," The Verge reported, before referencing what it described as a "stringent employment agreement that gives Apple the right to conduct extensive employee surveillance, including 'physical, video, or electronic surveillance' as well as the ability to 'search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises'".

Another Apple policy The Verge's report highlighted was a ban on staff wiping any devices before returning them to the company, including if/when they leave Apple — suggesting employees who have linked their personal Apple ID to their work accounts are potentially exposing privacy data to the company when they hand back corporate devices.

## Apple's IDFA gets targeted in strategic EU privacy complaints

A unique device identifier that Apple assigns to each iPhone for third parties to track users for ad targeting — aka the IDFA (Identifier for Advertisers) — is itself now the target of two new complaints filed by European privacy campaign not-for-profit, noyb. The complaints, lodged with German and Spanish data protection authorities, contend that … Continue reading

 TechCrunch

PL_PROD13_003597

4/29/26, 5:07 PM
Ex-Apple employee takes Face ID privacy complaint to Europe | TechCrunch
Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 397 of 427

# Apple's handling of Siri snippets back in the frame after letter of complaint to EU privacy regulators

Apple is facing fresh questions from its lead data protection regulator in Europe following a public complaint by a former contractor who revealed last year that workers doing quality grading for Siri were routinely overhearing sensitive user data. Earlier this week the former Apple contractor, Thomas le Bonniec, sent a letter to European regulators laying ... Continue reading

 TechCrunch

Topics:    AI    al franken    Apple    apple inc    Ashley Gjøvik    Brazil    China

Craig Federighi    data protection    Data Protection Commission

data security    digital rights    Europe    Europe

European Data Protection Supervisor    european union    France

General Data Protection Regulation    human rights    iOS    ireland

Privacy    privacy    Tel Aviv    United Kingdom    United States

us government

*When you purchase through links in our articles, we may earn a small commission. This doesn't affect our editorial independence.*



**Natasha Lomas**
Senior Reporter
𝕏  in

PL_PROD13_003598

### III.   <u>EXHIBIT III: BIOMETRICS UPDATE ARTICLE</u>



About Us | Subscribe

  

All Content ▾  Search  →

| BIOMETRICS NEWS | DIGITAL ID FOR ALL | BUYER'S GUIDES | FEATURES & INTERVIEWS | INDUSTRY INSIGHTS | BRAND FOCUS | BIOMETRICS COMPANIES | WEBINARS & WHITE PAPERS | BIOMETRICS EVENTS | BIOMETRICS PODCAST |



f Share

X/Tweet

in Link

💬 Comment

# Ex-employee accuses Apple of training iPhone biometrics by violating staff privacy

🕐 Apr 20, 2022, 6:51 pm EDT | Chris Burt

CATEGORIES      Biometric R&D | Biometrics News | Mobile Biometrics



Apple was questioned about where it collected the 1 billion images it trained the Face ID biometric algorithm with by a member of U.S. Congress back in 2017, but no direct answer was offered. Now, an ex-employee of the company is taking it to court in Europe over sourcing those training images from its staff, The Telegraph reports.

Minnesota Senator Al Franken requested information on a range of points when Apple first introduced face biometrics to the iPhone X, some but not all of which was provided in the company's response.

Former Apple employee Ashley Gjøvik was placed on administrative leave after complaining to the company about a sexist work environment, and then was fired, she says for raising concerns about violations of staff privacy. She has also filed a complaint with the National Labor Relations Board in the U.S.

## BIOMETRIC MARKET ANALYSIS AND BUYER'S GUIDES

**Biometric Physical Access Control**

**Digital Identity Verification**

**Deepfake Detection**

**Online Age Assurance**

**Facial Liveness Detection**

## MOST VIEWED THIS WEEK

**Amadeus unveils planned €1.2B Idemia PS acquisition to extend travel biometrics**

**EES faces scrutiny over border delays, proportionality**

**ADVP and NO2ID back DVS framework from opposing perspectives**

**Biometrics demand holds firm across core and emerging use cases**

**UK to launch spending, delivery inquiry into national digital identity scheme**

**Australia plans biometric liveness detection refresh for national digital ID**

**IATA digital ID trial shows interoperability across countries, wallets and biometrics**

**French gov't confirms hack of at least 18M records from ID document database**

PL_PROD13_003613

The company invited its employees to participate in product testing, and sometimes to have their biometrics collected, but Gjøvik says the testing and collection seemed to be mandatory. She describes the use of Apple's internal Gobbler app (later called Glimmer) to upload personal data employees had collected to company servers, and directly claims that employee data is the source of the billion images used to train Face ID.

France's data protection authority CNIL and the UK's Information Commissioner's Office have each confirmed that they are investigating the allegations, according to TechCrunch, and other regulators are listed in the complaint but have not confirmed investigations.

Ultimately, Gjøvik is alleging non-disclosure agreements and employee privacy policies that do not meet legal standards.

Controversy around the origin of biometric training data has led to lawsuits and recent ethical commitments from biometrics developers.

## Article Topics

Apple | biometric data | biometrics | CNIL | data collection | data protection | face biometrics | Face ID | iPhone | privacy

## Latest Biometrics News



### Governance, not tech, needs interrogating in UK digital ID consultation: Tony Allen

🕐 Apr 29, 2026, 4:07 pm EDT

Few people in the world, if any, know as much about

Sri Lanka sets roles for digital ID rollout with DRP, GovTech split

AI agents are already inside your digital infrastructure

Armenia approves legal framework for biometric passport and ID rollout

US lawmakers push national data privacy rules amid state preemption concerns

**Daily Biometrics News**  »

**FEATURED COMPANY**



As a global top-tier biometrics powerhouse, Xperix provides end-to-end biometric identity solutions which offers industry-leading performance, reliability and simpler integration.

**LEARN MORE**

**More Biometrics Companies**  »

**BIOMETRICS INSIGHT, OPINION**

Taking a smarter approach to anti-cheat with behavioral biometrics

Under AMLA, 95% false positives become a regulator's problem

ADVP and NO2ID back DVS framework from opposing perspectives

Your regulation-compliant KYC is not enough to protect customer data

Continuous AI biometric identification: Why manual patient

PL_PROD13_003614

**JJJ.    EXHIBIT JJJ: COVID-19 PETITION RECORDS**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026



### Welcome Everyone Forward

Channel
Remote Work Advocacy

Collection
Remote Work Advocacy

Duration
9min 29sec

Available
June 12, 2021

Expires
June 12, 2023

+ Add to Watch Later

⬆ Share

Find us on Slack at: #remote-work-advocacy

View the letter and footnotes at: https://apple.box.com/v/remoteworkadvocacy

Video recording team:
› 24 people
› Based in 4 different countries
› Spread across 5 different timezones (maximum distance of 9 hours)
› (US-based individuals) Located in 5 different states
› From 13 different cities
› Members of 7 orgs across Apple
› Associated with 20 different office buildings (according to Apple directory)

Recorded, edited, and published in just two days time.

02684

**From:** **Remote Work Advocacy** Remote_Work_Advocacy@group.apple.com
**Subject:** Let's Welcome Everyone Forward
**Date:** June 14, 2021 at 5:00 AM
**To:** tcook@apple.com, obrien.d@apple.com



# Remote Work Advocacy

**June 2021**

Welcome *everyone* forward.

Dear Tim and Deirdre,

We all agree that we are here at Apple to make insanely great products that enrich people's lives and the world. We are convinced that we can create the same, and even better products by adding more flexibility to the announced return to office policy. We would like to share some thoughts and ideas with you from the Apple community.

Linked here is a detailed and heartfelt letter signed by 1,768 of our colleagues. Supporting documents like survey results can be found here.

We'd like to especially highlight the more than 90 personal anecdotes our colleagues wrote about how this new policy will affect them personally. We urge you to take some time this week and read through some of their touching stories.

## From our home offices...

number of colleagues
ished to personally voice
his letter to you, available
ere:

02685

- Phantom
- Box *(Only accessible to Tim & Deirdre)*

---

## Highlights of the data gathered:

- 87.1% (1,519) voiced their concern that some of our colleagues will leave Apple
- 67.7% (1,175) are worried that they themselves will have to make the difficult decision to resign

---

We understand the situation is complicated, and there is a large burden on the People team and managers in considering more change. Now that the frenzy of WWDC has died down, we hope you will allow this feedback to help shape a future of location-flexible and inclusive work at Apple which enables us all to achieve the goal of making the absolute best products.

Sincerely,
*The Undersigned (only accessible to Tim & Deirdre)*

---

*Note: The resources shared here will also be shared with our #remote-work-advocacy Slack channel at 9am PDT this morning.*

---

For internal use only. Sent from IS&T Composer.

02686



02687

**KKK.  <u>EXHIBIT LLL: NEWS ARTICLES PRIOR TO TERMINATION</u>**

P'S DECL. IN SUPPORT OF PLAINTIFF'S MSJ & REPLY | 3:23-CV-04597-EMC    MAY 26 2026

HOME  ›  TECH

# An Apple employee on leave after publicly alleging sexism says co-workers kept a scoreboard to make her quit

Martin Coulter    Aug 17, 2021, 8:51 AM



**Ashley Gjøvik claimed she was offered counseling after speaking up about workplace misconduct.**   Thomas Trutschel/Photothek via Getty Images

- **Apple faces a big new headache: Unhappy workers are speaking up publicly on Twitter.**

- **Senior engineering manager Ashley M. Gjøvik tweeted multiple allegations of bullying and harassment.**

- **The Verge reported and Gjøvik herself says she is currently on leave from Apple.**

---

**Insider recommends waking up with 🟦 Morning Brew, a daily newsletter.**

| Email address | SIGN UP |

By clicking "Sign Up," you also agree to marketing emails from both Insider and Morning Brew; and you accept Insider's Terms and Privacy Policy. Click here for Morning Brew's privacy policy.

An Apple employee who was placed on leave in early August after tweeting about sexism at the company has shared further allegations of bullying and mismanagement.

Ashley Gjøvik, a senior engineering program manager at the company, has added to earlier public claims of "sexism, a hostile work environment, sexual harassment, unsafe working conditions, and retaliation."

Gjøvik's comments coincide with a rise in Apple's employees speaking out publicly about their dissatisfaction with working conditions at the notoriously secretive tech firm.

On Monday night, Gjøvik tweeted she had only shared "~5%" of the evidence of misconduct she had submitted to Apple's employee relations department, including allegations of assault, sexual discrimination, and retaliation.

Jump to
Main content
Search
Account

PL_PROD_11_03488



**Ashley M. Gjøvik**
@ashleygjovik · **Follow**

Y'all, you're gonna need to catch your breath: this is a marathon.

We're only through ~5% of the evidence I gave ER. We haven't even got to the 1st of 3 (4?) constructive terminations, let alone all the whistleblowing & safety concerns, & retaliation.

Buckle up.

> **Ashley M. Gjøvik** @ashleygjovik
> Brace yourselves... I'd like to share with y'all an email I sent #Apple employee relations on July 16th detailing a list of my concerns & complaints (with associated Box folders & relevant evidence). #Harassment, #Discrimination, #Assault, #Retaliation, more...

5:38 PM · Aug 16, 2021

♥ 32    💬 Reply    🔗 Copy link

Read 1 reply

In a series of tweets, she claimed senior employees kept a whiteboard tally of votes on how they could make her "life a living hell", that she was regularly excluded from important emails, and that some were known to peer-pressure other employees into drinking alcohol during working hours.

Gjøvik also claimed an unnamed senior employee yelled at her in public and private, called her an "idiot", and "locked me in a conf room alone & screamed at me while I cried, & kept threatening to smack me."

Gjøvik publicly shared screenshots and internal messages alongside some of her claims.

Insider has not independently verified Gjøvik's statements and has approached her for comment.

Gjøvik's LinkedIn states that she has been working at Apple for more than six years.

She first began tweeting allegations of sexism against colleagues at Apple in late July and early August.

In these initial tweets, she claimed she was offered counseling after speaking up about workplace misconduct, and shared a series of private messages from male coworkers.

Jump to

Main content
Search
Account

PL_PROD_11_03489

In one apparent exchange, a male coworker commented on a presentation given by Gjøvik: "I didn't hear you go up an octave at the end of your statements," adding: "came across as much more authoritative."

In another, shortly after Gjøvik says she sent a lengthy email asking if Apple's leadership would issue a statement on sexual assault following allegations of sexual misconduct against then-Supreme Court nominee Brett Kavanaugh, one coworker responded by texting her a news article in which Ruth Bader Ginsburg defended him, adding "FWIW".

The Verge reported that Gjøvik was placed on leave after her tweets on August 4.

Another Apple engineer, Kiran Kumar, stated on Twitter on August 17 that Gjøvik was listed internally at Apple as being on "indefinite paid administrative leave via employee relations."

Insider approached Apple for comment.

*Are you a current or former Apple employee with more to share? You can contact this reporter securely using the encrypted messaging app Signal (+447801985586) or email (mcoulter@businessinsider.com). Reach out using a nonwork device.*

**Read next**

Apple    Bullying    workplace bullying    More...

\* Copyright © 2023 Insider Inc. All rights reserved. Registration on or use of this site constitutes acceptance of our Terms of Service , Privacy Policy  and  Cookies Policy .

Contact Us    |    Masthead    |    Sitemap    |    Disclaimer    |    Accessibility    |    Commerce Policy    |    Advertising Policies    |    CA Privacy Rights    |    Coupons    |    Made in NYC

|    Jobs @ Insider

Stock quotes by finanzen.net    |    Reprints & Permissions

International Editions:    INTL    |    AS    |    AT    |    DE    |    ES    |    IN    |    JP    |    MX    |    NL    |    PL

PL_PROD_11_03490

Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 410 of 427

 ≡  Apple faces probe from US labor board over complaints of hostile working c...

Big Tech ▸ Apple

# Apple faces probe from US labor board over complaints of hostile working conditions

Two employees have files a case with the US National Labor Relations Board.

by Mariella Moon • Sept. 3, 2021 4:32 am EST



Wachiwit via Getty Images

☰  e  **Apple faces probe from US labor board over complaints of hostile working c...**

Board is looking into cases filed against the tech giant by two of the main voices accusing the company of permitting a hostile work environment, according to _Reuters_ and _The Financial Times_. The first complaint was filed by Ashley Gjøvik, the senior engineering program manager who said she spent months talking with the company about unsafe working conditions and sexism in the workplace.

In a tweet, she said that after raising her concerns, she was put on indefinite paid administrative leave while Apple looks into them. Further, she said Apple implied that the company didn't want her to use Slack, where she'd been vocal about her criticisms. Gjøvik filed a "Charge against Employer" complaint, _The Times_ says, alleging 13 instances of alleged retaliation against her. Those instances include workplace harassment, reassigning her supervisory responsibilities to colleagues and giving her undesirable tasks

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 412 of 427

☰   **Apple faces probe from US labor board over complaints of hostile working c...**

---

I also filed a Retaliation Complaint with the @CA_DIR Dept of Industrial Relations Labor Commissioner's Office.

Q: "How did your employer (#Apple) know about the protected right you exercised?"

A: "I kept saying, 'Stop it, you guys. There's Labor laws about this.'"

10:39 PM · Sep 1, 2021                                                ⓘ

♥         💬 **Reply**      🔗 **Copy link**

**Read more on X**

---

The second complaint the labor board is investigation was filed by Cher Scarlett, on behalf of herself and other employees, on September 1st. Scarlett is a security engineer at the company and is the face of the #AppleToo movement made up of current and former

Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 413 of 427

☰    **Apple faces probe from US labor board over complaints of hostile working c...**

retaliation, and it recently started sharing them five stories at a time. Her case accuses Apple of suppressing workers' organizing efforts, specifically when they involve pay surveys and gender pay equity.



**AppleTogether**
@AppleLaborers · **Follow**                                          ✕

75% of the stories we've received involved some form of discrimination, and nearly half involved reports of sexism, retaliation, and HR reports that were dismissed. 1/4 involved racism or ableism. More than a third involved harassment or assault, the majority of which was sexual.

11:21 AM · Aug 30, 2021                                            ⓘ

❤    💬 **Reply**    🔗 **Copy link**

**Read more on X**

It's worth noting that the labor board looks into all the complaints it receives, and it will only prosecute a case if it finds merit in them. As for Apple, the company told the publications in a statement: "We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised and, out of respect for the privacy of any individuals involved, we do not discuss specific employee matters."



**Conversation**  11 Comments

Commenting as **Guest**                          🔔  Log in | Sign up

👤     What do you think?                                ☺  GIF

Sort by **Best** ⌄

Ⓞ   **OrangePin**
     3 September, 2021



02708

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 415 of 427

**Whistleblowing**

## Apple faces probe over whether it retaliated against whistleblower

US labour department inquiry follows claims by ex-senior engineering programme manager



The Department of Labor investigation will focus on whether Apple retaliated against a whistleblower who claimed there were poor working conditions at the company © Reuters

**Patrick McGee** in San Francisco and **Patrick Temple-West** in New York 11 MINUTES AGO

The US Department of Labor is investigating Apple over claims that it retaliated against an employee who complained of workplace harassment and unsafe working conditions.

Ashley Gjovik, 35, had been a senior engineering programme manager for six years at Apple when she was fired in September for allegedly leaking confidential information by tweeting about allegations of harassment, surveillance and workplace safety issues. Gjovik alleged that she was dismissed under a false pretext following numerous complaints that led to more than a dozen instances of retaliation including job reassignment.

The labour department declined to comment but confirmed its investigation in a letter to Gjovik seen by the Financial Times, dated December 10.

PL_PROD14_01487

12/13/21, 12:09 PM
Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 416 of 427
Apple faces probe over whether it retaliated against whistleblower | Financial Times

Stephen Kohn, an employment lawyer and an expert in US whistleblowing law, said the burden of proof needed for the agency to open an investigation was high, as the employee must have already established enough evidence that, unless rebutted, would prove the case.

He said the case would be closely watched because it was especially rare for a labour dispute with Big Tech "to break into the public" domain. The DoL rarely investigates such cases, he added, because of the widespread use of non-disclosure agreements to "silence and intimidate whistleblowers".

Apple declined to discuss specific employee matters out of respect for privacy, but said: "We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised."

Mary Inman, head of the international whistleblower practice at the law firm Constantine Cannon, described the case as "a breath of fresh air" as Joe Biden's administration signals a more aggressive stance to hold companies to account.

Last month the labour department's top attorney announced a new initiative to collaborate with other civil law enforcement agencies to protect workers from discrimination and misconduct.

For Apple, the investigation could mark the most significant setback in a string of labour disputes this year including a shareholder proposal requesting more information about the company's use of nondisclosure agreements. The proposal alleged the iPhone maker extends its culture of secrecy into workplace areas protected by state and federal laws.

Gjovik's original complaints stem from mid-March when she cited "chemical exposure" concerns at her Apple office in Sunnyvale, California. The facility is located on a so-called Superfund site, requiring special oversight owing to previous contamination by hazardous waste materials beneath the building.

When Apple sent an email about wanting to test the site for "vapour intrusion", Gjovik's questions about it were rebuffed by Apple's employee relations department and "they intimidated me not to speak about my safety concerns", she alleged.

The DoL will examine whether Apple retaliated over claims about occupational safety and hazardous waste management liability, alongside a third allegation that falls under the Sarbanes Oxley Act, or Sox, which sets out the rules for financial record keeping.

PL_PROD14_01488

Keeping.

Gjovik pointed to a potential conflict of interest regarding Apple board member Ronald Sugar, chair of the audit committee, as he was previously chief executive of Northrop Grumman, the defence company responsible for the dump — and maintenance — of waste materials beneath the Sunnyvale office.

Sugar could not be immediately reached for comment.

Gjovik's case was "especially unusual" and noteworthy because of the three separate statutes or laws that may have been broken, said Michael Duff, a former attorney at the National Relations Labor Board.

"Federal agencies exercise what in the context of criminal law is known as prosecutorial discretion," he said. "They are very careful of what cases they move forward because they have scarce resources, so they must have a strong reason to believe they can prevail."

Other prominent investigations by the labour department include allegations that Google had a "systemic" problem underpaying female employees. The case was resolved this year with the search giant agreeing to pay $3.8m. Palantir, an analytics company, in 2017 paid the DoL $1.6m to settle allegations that it discriminated against Asian candidates when recruiting new engineers.

Seth Goldstein, a pro-bono attorney who has been representing Amazon employees alleging unfair labour practices, said Gjovik's actions were a reflection of her generation wanting companies to live up to the values they espoused. "It's a sea change in the fact that people are standing up for what's right," he said.

## Daily newsletter



PL_PROD14_01489

Technology

3 minute read · September 3, 2021 5:12 AM EDT · Last Updated 2 years ago

# U.S. labor agency probes two complaints from Apple workers

By Julia Love



[1/3] The Apple logo is seen through a security fence erected around the Apple Fifth Avenue store as votes continue to be counted following the 2020 U.S. presidential election, in Manhattan, New York City, U.S., November 5, 2020. REUTERS/Andre    **Read More**

    1   2   3

SAN FRANCISCO, Sept 2 (Reuters) - A U.S. national labor agency is investigating two charges against tech giant Apple Inc **(AAPL.O)** filed by employees, records on its website show, amid a wave of worker activism at a company known for its secretive culture.

The charges, filed on Aug. 26 and Sept. 1, are being reviewed by the U.S. National Labor Relations Board's office in Oakland, California. The agency declined to comment.

"We take all concerns seriously and we thoroughly investigate whenever a concern is raised," Apple, which is based in Cupertino, California, said in a statement that cited employee privacy in declining to discuss specifics.

Advertisement · Scroll to continue

Ashley Gjovik, a senior engineering program manager at Apple, told Reuters that she filed the Aug. 26 charge, which cites harassment by a manager, reduction of responsibilities and increases in unfavorable work, among other complaints.

The Sept. 1 charge was filed by Cher Scarlett, an Apple software engineer who said the company repeatedly stopped discussions of pay among employees.

The documents she sent the agency, which she provided to Reuters, say Apple "engaged in coercive and suppressive activity that has enabled abuse and harassment of organizers of protected concerted




Exclusive news, data and analytics for financial market professionals    REFINITIV

REUTERS®    World ⌄   Business ⌄   Markets ⌄   Legal ⌄   More ⌄          ⊞ My View ⌄   🔍   Sign In   Register

The labor relations agency investigates all charges it receives, and launches a prosecution against the employer if merited.

PL_PROD_11_03558

Workers in Silicon Valley, and especially those of Apple, are known to avoid publicity, reflecting companies' desire to keep new products tightly under wraps.

In recent weeks, some current and former Apple workers have critiqued company culture on Twitter, using the hashtag #AppleToo. U.S. law allows employees to openly discuss certain topics, such as working conditions.

In addition, workers have engaged in a heated debate on the messaging platform Slack about Apple's move to scan U.S. customer phones and computers for child sex abuse images, **Reuters reported**. **read more**

In a letter accompanying her NLRB charge, Scarlett wrote that Apple employees began a pay equity survey in April, but the company blocked them, citing privacy concerns.

Advertisement · Scroll to continue

It also halted subsequent surveys, including one that aimed to address the privacy issues, Scarlett added.

In late August, Apple denied employees' request to create a Slack channel to discuss pay equity, which Scarlett told Reuters was "the last straw" that led her to file the complaint.

Gjovik told Reuters that after Apple started investigating her complaints, as well as accusations of sexism, her managers began re-assigning her work to colleagues and loading her up with undesirable tasks.

The company put her on paid administrative leave in early August. She said Apple had not finished its investigation.

Gjovik said she felt encouraged after seeing more employees speaking out about the company's culture in recent weeks.

"The biggest obstacle for making progress at Apple is the culture of secrecy and alienation," she said.

Reporting by Julia Love; Additional reporting by Stephen Nellis; Editing by Leslie Adler and Clarence Fernandez

Our Standards: **The Thomson Reuters Trust Principles.**

### Read Next






Technology **Apple TV down for thousands of US users - Downdetector**

United States **Montana lawmakers vote to ban TikTok in the state**

Technology **Elon Musk plans AI startup to rival OpenAI, Financial Times reports**

Technology **Analysis: Twitter's advertising business seen facing slow recovery**

**Newsletter | Daily.**
**Technology Roundup**
From startups to the FAANGs, get the latest news and trends in the global technology industry.
Sign up

### More from Reuters



PL_PROD_11_03559

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 420 of 427

Latest

Home

Browse

World
Business
Legal
Markets
Breakingviews
Technology
Investigations ⬀
Lifestyle

Media

▭ Videos ⬀
◎ Pictures ⬀
▨ Graphics ⬀

About Reuters

About Reuters ⬀
Careers ⬀
Reuters News Agency ⬀
Brand Attribution Guidelines ⬀
Reuters Leadership ⬀
Reuters Fact Check ⬀
Reuters Diversity Report ⬀

Stay Informed

Download the App ⬀
Newsletters ⬀

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

🐦 📘 📷 ▶ in

Thomson Reuters Products

**Westlaw** ⬀

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⬀

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⬀

The industry leader for online information for tax, accounting and finance professionals.

Refinitiv Products

**Refinitiv Workspace** ⬀

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Refinitiv Data Catalogue**    ⬀

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**Refinitiv World-Check** ⬀

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

Advertise With Us ⬀    Advertising Guidelines ⬀    Cookies ⬀    Terms of Use ⬀    Privacy ⬀    Digital Accessibility ⬀    Corrections ⬀    Site Feedback ⬀

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.    © 2023 Reuters. All rights reserved

PL_PROD_11_03560



# insidetelecom

NEWS

NEWS

# Apple sends female employee home after raising sexist concerns

BY **RIM ZREIN** - AUGUST 05, 2021
READING TIME: 2 MIN
POST VIEWS: 466



   

 shley Gjøvik, senior engineering program manager at Apple has been coming to work for years complaining about her experiences with sexism, a hostile work environment, sexual harassment, unsafe working conditions, and retaliation.

Her request was simple, she asked Apple to mitigate the hostile work environment while they investigate.

"Initially Apple offered me EAP therapy and medical leave. I told them that made no sense and said they should talk to my leadership and set up oversight and boundaries. I added that if there was no other option, they could give me paid administrative leave," Gjøvik told *The Verge.*

However, Apple didn't seem so keen on putting effort into solving Gjøvik's concerns, prompting her to take the issue publicly.

PL_PROD14_00232

After tweeting her sexist concerns grounded in Apple's workplace, the program manager surely didn't expect the reaction to her worries.

The world's most valuable tech company placed the female employee on an indefinite leave, causing a severe backlash after Gjøvik took to Twitter, yet again, to publicize Apple's blow.

"So, following raising concerns to #Apple about #sexism, #hostileworkenvironment, & #unsafeworkconditions, I'm now on indefinite paid administrative leave per #Apple employee relations, while they investigate my concerns. This seems to include me not using Apple's internal Slack," Gjøvik said in a tweet.

https://twitter.com/ashleygjovik/status/1423014977661591552

In addition to being informally kicked out of Apple's workforce, Apple's employee relations team implied that she should remain off the company's internal Slack, as it's prohibited to discuss with other employees the company's policies.

Unfortunately, this isn't the first time Gjøvik raises concerns over gender discrimination in what's supposed to be a "futuristic" environment. In the past, Apple closed an investigation prompted by the engineering program manager, concluding that nothing inappropriate was found.

Yet, Gjøvik's tweets showcasing messages received from her male coworkers tell a different story.

https://twitter.com/ashleygjovik/status/1422380335703101443

https://twitter.com/ashleygjovik/status/1422953562724737024

Apple is undoubtedly in hot water, as the tech giant's employees are coming together to speak out about the company's work environment.

In May, former Facebook product manager Antonio Garcia Martinez was hired by Apple, then quickly fired, following public and internal demands for his removal, citing Martinez's sexist statements made in the past.

However, there may be a silver lining.

Tech firms that are newly emerging to the scene are becoming more aware of the social issues faced by employees, with an emphasis on gender issues. For example, Slack, the business communication platform is widely praised for ensuring diversity during its early stages, instead of going back later on to reconfigure it.

When Slack was awarded the TechCrunch prize for Fastest Rising Startup, the tech firm sent four black female software engineers, instead of CEO Stewart Butterfield, to accept the award.

Maybe Apple isn't the only one learning a lesson from Ashley Gjøvik.

🏷 **TAGS:**    APPLE    NEWS

‹ Previous Post                                                      Next Post ›

PL_PROD14_00233

Case 3:23-cv-04597-EMC    Document 379    Filed 05/26/26    Page 423 of 427



**Shared Destiny. Shared Responsibility.**

**Respect**    **Sustainability**    **Resilience**    **Enrichment**    **Well-Being**    **Opinion**    **Video**

**Who We Are**

Respect  ❯  Equality

# Apple employees allege harassment, retaliation

Two separate claims were filed with the U.S. National Labor Relations Board regarding the tech company's employee treatment.

*By Alexandra Kelley | Sept. 3, 2021*

PL_PROD13_001794



The Apple logo set up on a retail storefront.

Getty Images

## Story at a glance

Two claims filed with the U.S. National Labor Relations Board cite retaliatory business practices among Apple management.

Both of the current employees who filed the separate claims describe harassment and suppressive managerial behavior.

PL_PROD13_001795

9/3/21, 11:53 PM

**These claims have spurred the #AppleToo movement, which encouraged former and current Apple employees to come forward with incidents of harassment and retaliation.**

A labor oversight agency is reviewing two separate charges filed against software and hardware titan Apple amid allegations of retaliation and threats, among other charges.

Filed on Aug. 26 and Sept. 1 with the U.S. National Labor Relations Board (NLRB) in Oakland, Calif., the charges allege the company engaged in various retaliatory and unwarranted disciplinary actions. Details from the complaint submitted in August allege that Apple management forced the employee on paid administrative leave and reduced work responsibilities, as well as subjected them to harassment from a manager alongside botched Employee Relations investigations.

The employee who filed the August complaint, Ashley Gjovik, came forward to Reuters about her claim against Apple. Gjovik, an engineering program manager, previously raised concerns about Apple's work environment.

"So, following raising concerns to #Apple about #sexism, #hostileworkenvironment, & #unsafeworkconditions, I'm now on indefinite paid administrative leave per #Apple employee relations, while they investigate my concerns," she wrote on Twitter on Aug. 4. She has been outspoken in raising concerns of the company's business practices and treatment of employees.

Gjovik further stated that after raising complaints about her work environment in July, Apple's Employment Relations department placed her on leave rather than

PL_PROD13_001796

Apple employees allege harassment, retaliation | TheHill
Case 3:23-cv-04597-EMC   Document 379   Filed 05/26/26   Page 426 of 427
9/3/21, 11:53 PM

collaborating with her on solutions.

Another Apple employee, Cher Scarlett, also stated on Twitter that she filed the most recent September complaint against the company, citing violations against the federal National Labor Relations Act.

"These all revolve around unlawful conduct and unlawful rules that have been engaged in over the past 5 months, particularly over the last month," she added.

Upon reviewing the documents, Reuters reported that Scarlett's claim alleges Apple "engaged in coercive and suppressive activity that has enabled abuse and harassment of organizers of protected concerted activity."

This included denying employees a Slack channel to discuss pay equity and blocking employee-run surveys surrounding salary data.

Scarlett is also part of a larger body of professionals who launched #AppleToo, a hashtag and website stemming from the #MeToo movement intended for former and current Apple employees to discuss experiences of harassment or unfair labor practices they endured at the company.

PL_PROD13_001797



"For too long, Apple has evaded public scrutiny," the website reads. "The truth is that for many Apple workers -- a reality faced disproportionately by our Black, Indigenous, and other colleagues from minoritized racial, gender, and historically marginalized groups of people -- the culture of secrecy creates an opaque, intimidating fortress."

The Hill reached out to both Apple and the NLRB for comment. The NLRB had no comment, and Apple said in a previous statement that "We take all concerns seriously and we thoroughly investigate whenever a concern is raised."

Like many other Silicon Valley behemoths, Apple has been notoriously secretive about its work culture. A buildup of complaints about working conditions among the elite tech industry has ushered in a wave of unionization efforts, seen recently with Google and Amazon, while employees from other companies like Pinterest have filed lawsuits alleging discrimination among senior management.

PL_PROD13_001798