UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY M GJOVIK,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>APPLE INC.,<br><br>　　　　　Defendant. | Case No.  23-cv-04597-EMC<br><br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>Docket Nos. 359, 361, 367 |

　　　　Plaintiff Ashley Gjovik, proceeding *pro se*,[1] filed suit against her former employer, Apple Inc., alleging that Apple retaliated against her – ultimately firing her – because she made complaints about various issues, including environmental safety, workers' rights, and sex discrimination and harassment.[2]  According to Apple, it terminated her employment for legitimate, nonretaliatory reasons: in particular, because she disclosed confidential business information on Twitter and to a reporter.  Now pending before the Court is each party's motion for summary

---

[1] Although Ms. Gjovik is proceeding *pro se*, she appears to have received a J.D. from Santa Clara University.

[2] While this case has been narrowed to retaliation claims, Ms. Gjovik's initial complaints against Apple alleged a variety of claims.

　　　　For example, in her third amended complaint ("TAC"), Ms. Gjovik asserted fifteen causes of action, including claims for violation of RICO, violation of the Sarbanes-Oxley Act, violation of the Dodd-Frank Act, nuisance, ultrahazardous/abnormally dangerous activities, violation of the Bane and Ralph Civil Rights Acts, and intentional and negligent infliction of emotional distress. Ms. Gjovik asserted, *inter alia*, that Apple created environmentally unsafe conditions at two different locations; engaged in illegal conduct such as bribery, witness tampering, witness retaliation, wire fraud, securities fraud, and possessing and using chemical weapons; and, post-termination, harassed her, surveilled her, and broke into her apartment and handled her dog.

judgment. In addition, Apple has filed a motion to strike all of Ms. Gjovik's briefs and supporting evidence on the basis that they were not timely filed.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of the parties, the Court hereby **DENIES** Ms. Gjovik's motion for summary judgment, **GRANTS** Apple's motion for summary judgment, and **GRANTS** in part Apple's motion to strike.

## I.    FACTUAL & PROCEDURAL BACKGROUND

The evidence submitted by the parties in conjunction with summary judgment reflects the following. The underlying facts are, for the most part, undisputed. To the extent there are or may be any disputes of fact, they are so noted.[3]

Ms. Gjovik was formerly an employee of Apple. During the relevant period prior to her termination, Ms. Gjovik worked in an Apple office that was located on a Superfund site, known as the TRW Microwave Superfund Site. Apple leased the building from a third party. Another third party, Northrup Grumann, had responsibility for site cleanup. Ms. Gjovik's immediate supervisor was David Powers. Mr. Powers, in turn, reported to Dan West, and Dan West to Yannick Bertolus.

In March 2021, approximately six months before her termination, Ms. Gjovik began to express concern to Apple about the environmental safety of the office where she worked. Ms. Gjovik's concerns were prompted by an email from Apple, informing employees that it would be conducting, *inter alia*, a vapor intrusion survey of the building. The following month, Ms. Gjovik began to relay her concerns to the Environmental Protection Agency ("EPA").

In April 2021, Ms. Gjovik made complaints to Apple about sex discrimination and/or a hostile work environment. Apple began an investigation. The investigation was led by Jenna Waibel of Employee Relations. Ms. Gjovik asked to be put on paid administrative leave during the investigation, and Apple agreed. Ms. Gjovik was put on leave from late May to early June 2021. According to Ms. Gjovik, Ms. Waibel ultimately determined there were no issues, and thus Ms. Gjovik did not obtain any relief.

---

[3] In addition, the evidence the Court considers here is informed by its ruling on Apple's motion to strike, which includes a request to strike all evidence submitted by Ms. Gjovik.

United States District Court
Northern District of California

In early June 2021, the EPA informed Ms. Gjovik that, in essence, it did not have any concerns about the Apple office.

In early July 2021, Apple met with Ms. Gjovik because she continued to be troubled about the environmental safety of the office. Apparently, Ms. Gjovik was not satisfied with the meeting because she reached out to the EPA again, asserting that there had been significant changes to the site condition which warranted agency review. Based on Ms. Gjovik's claim, the EPA decided – in or about late July 2021 – to conduct a site visit. That site visit was conducted in mid-August 2021. The EPA ultimately concluded that the likelihood of vapor intrusion was low.[4]

Starting in late July 2021 and continuing into August 2021, Apple employees began to submit Business Conduct Tickets to Apple about Ms. Gjovik. (Business Conduct Tickets are a means by which an employee can report a violation of Apple policies.) For example, in late July 2021, two employees filled out separate tickets noting that Ms. Gjovik was speaking to the press about Apple's return-to-work practice (post-COVID) that was to go into effect in the fall. As another example, in early August 2021, an employee reported that Ms. Gjovik was posting Apple information on Twitter that the employee believed should not be publicly shared.[5]

In or about this same timeframe (*i.e.*, July-August 2021), Ms. Gjovik made another complaint to Apple about sex discrimination and a hostile work environment, as well as a number of other matters.[6] Apple began to investigate. This time the investigator was Ekelemchi Okpo of Employee Relations. During her communications with Mr. Okpo, Ms. Gjovik indicated that she wanted to be put on paid administrative leave pending an investigation into her managers. Apple gave Ms. Gjovik the paid administrative leave. After Ms. Gjovik complained to others that the leave was involuntary and/or indefinite, Mr. Okpo informed Ms. Gjovik on two different

---

[4] It is not clear from the record whether Apple knew the EPA's site inspection was spurred by a complaint from Ms. Gjovik. For purposes of this order, the Court assumes Apple had such knowledge and/or otherwise knew that Ms. Gjovik had made complaints about environmental safety to the EPA.

[5] These facts are contained in the Business Conduct Tickets that Ms. Gjovik submitted in support of her motion for summary judgment.

[6] Ms. Gjovik identified a multitude of issues in a 34-page, single-spaced document which she refers to as the "Issue Confirmation" document.

occasions that she could return to work.  However, Ms. Gjovik did not respond to Mr. Okpo's offers.

In or about mid-August 2021, Ms. Gjovik contacted the EEOC about her employment at Apple, and an interview was scheduled.  There is no evidence that Apple knew about Ms. Gjovik's communications with the EEOC before it terminated her.

On or about August 26, 2021, Ms. Gjovik filed a charge with the NLRB, asserting, *inter alia*, that she had been instructed to refrain from talking about environmental safety with other employers.  Several days later, Ms. Gjovik filed a charge with the California Labor Commissioner, claiming retaliation.  Apple appears to admit it knew about the NLRB charge (or at least one of Ms. Gjovik's NLRB charges) prior to Ms. Gjovik's termination, but there is no evidence that Apple knew about the complaint with the Labor Commissioner prior to her termination.

On August 28, 2021, Ms. Gjovik tweeted about a user study that Apple was conducting for an unreleased product under development.  The user study was related to ear scans.  Ms. Gjovik was invited to participate in the study but she did not do so.  Below is Ms. Gjovik's tweet.

United States District Court
Northern District of California

On August 29, 2021, Ms. Gjovik filed a retaliation complaint with the California Department of Industrial Relations. There is no evidence that Apple knew about the complaint prior to Ms. Gjovik's termination.[7]

On August 30, 2021, Ms. Gjovik posted three more tweets – this one about a different user study that Apple was conducting related to Face ID. Ms. Gjovik voluntarily participated in this user study.[8] Through the study, Apple employees could upload data, including images captured on their iPhones, "to help develop, test, and train the next version of the algorithm underlying Face ID." Aloe Decl. ¶ 3. Specifically, as explained by an Apple witness:

> Gobbler/Glimmer is an internal Apple application that Apple uses to allow employees to securely encrypt data from the phone and send it to a backend server to upload user study data from the phone.[9] Employees must individually select images to upload through the Glimmer application; no images are ever auto-uploaded. **The images that can be uploaded through Glimmer are not just photographs (like an iPhone user would see in their Photos app); they are images from a separate module of the phone that provide insights into confidential intrinsic camera characteristics that are relevant to Face ID's operation, and these images are only viewable with confidential Apple tools.** Images that an employee chooses to upload through Glimmer (if any) remain encrypted on Apple's servers and can only be accessed by individuals authorized to view data related to the specific user study in which the employee is participating (e.g., here, a small group of engineers working on Face ID). Employees who need to use this data for their jobs use specific software that allows them to view the encrypted data.

Aloe Decl. ¶ 7 (emphasis added).[10]

---

[7] In her second reply/opposition declaration, Ms. Gjovik provides evidence that, at or about this same date, she also made a report to the EPA about a possible environmental violation. In the report, she largely reiterated her concerns about environmental safety at the Apple office where she worked. As discussed below, the Court is striking all evidence contained in Ms. Gjovik's two reply/opposition declarations. However, the Court also notes there is no evidence that Apple knew about this report Ms. Gjovik made to the EPA prior to her termination.

[8] Ms. Gjovik signed an Informed Consent Form before participating in the user study. The Form stated that participation in the study was voluntary and that an individual could decline to stop at any time. Ms. Gjovik never asked to be removed from the study.

[9] The application was originally named Gobbler but was subsequently renamed Glimmer.

[10] Ms. Gjovik never ended up uploading any images from her Glimmer application in 2021. Therefore, the images that she tweeted (see *infra*) "were only on her device [*i.e.*, iPhone], and they were encrypted and only accessible by her through the internal Glimmer application." Aloe Decl.

5

Below are Ms. Gjovik's tweets related to the Face ID user study. As reflected below, Ms. Gjovik's tweets consisted of not only text but also screenshots and images.





/ / /

_____

¶ 12.

6



Ashley M. Gjøvik
@ashleygjovik

Follow

#Apple's Global Security team of ex-U.S. intelligence employees includes ex-NSA, ex-FBI, ex-military, and ex-Secret Service workers.

"Very little is know about the way it operates."

Why wouldn't they use this internal data?

theoutline.com/post/1766/leak …
vice.com/en/article/3aq …

9:35 AM - 30 Aug 2021

/ / /

United States District Court
Northern District of California

Ashley M. Gjøvik
@ashleygjovik

Totally normal. Nothing weird about any of this. Just the video/photos my internal #Apple iPhone captures of me while I'm not paying attention, and stores on device, and also maybe uploads too?
volume-assets.voxmedia.com/production/773...

10:49 AM · Aug 30, 2021 · Twitter Web App

/ / /

One of Ms. Gjovik's tweets above included a link to an article published in the Verge on August 30, 2021.  The article is titled "Apple cares about privacy, unless you work at Apple."  Ms. Gjovik spoke to the Verge reporter and provided the reporter with information for the article.  That information that Ms. Gjovik gave to the reporter included the screenshots and images that she tweeted above (but in "unredacted" form[11]).  The Verge article that was ultimately published included a "video" consisting of images that Ms. Gjovik's phone had collected for the Face ID study.

According to Apple, the images that Ms. Gjovik disclosed in her tweets and in the article revealed confidential information belonging to Apple.[12]  As explained by Dr. Aloe, who was Apple's "Directly Responsible Individual . . . for user studies utilizing the Glimmer app that Apple was conducting prior to Ms. Gjovik's termination,"  Bertolus Decl. ¶ 13, the images "uploaded through Glimmer are not just photographs (like an iPhone user would see in their Photos app); they are images from a separate module of the phone that provide insights into confidential intrinsic camera characteristics that are relevant to Face ID's operation."  Aloe Decl. ¶ 7.  Furthermore, the "images are only viewable with confidential Apple tools."  Aloe Decl. ¶ 7.  Thus, when Ms. Gjovik posted the images and the images were published as part of the article, "information [1] not visible to customers, competitors, or hackers about [2] how the camera used for Face ID operates and [3] the data Apple uses to develop the algorithm behind Face ID" was disclosed.  Aloe Decl. ¶ 8.  Ms. Gjovik has not provided any evidence suggesting that, *e.g.*, the images could, in fact, be accessed by customers, competitors, or hackers or otherwise viewed without confidential Apple tools.

Apple learned quickly about Ms. Gjovik's tweets and the Verge article.  In the days that followed, Mr. Bertolus – who was one of Ms. Gjovik's superiors and who made the ultimate decision to terminate – had multiple communications with legal counsel, Human Resources, and

---

[11] Ms. Gjovik had the reporter blur out certain information for the published article.

[12] Apple does not assert that any text included by Ms. Gjovik in her tweets constituted confidential information.

Employee Relations about Ms. Gjovik's conduct.[13]  Mr. Bertolus viewed at least one image that Ms. Gjovik had tweeted and got confirmation that the image was confidential and that Ms. Gjovik was not authorized to disclose it.

On September 9, 2021, Apple terminated Ms. Gjovik's employment.  The immediate events leading up to the termination were as follows.  At 2:08 p.m., a member of the Global Security team, Mr. Kagramanov, reached out to Ms. Gjovik by email, stating that he wanted to connect with her as soon as possible that day, "within this hour."  Gjovik Decl., Ex. 41 (ECF Page 521) (email from Mr. Kagramanov, dated 9/9/2021).  Ms. Gjovik responded within 2 minutes, asking for everything to be written.  Then, about 15 minutes after that, she told the investigator that she had forwarded his email to the NLRB because his communication felt like witness intimidation.

At 2:50 p.m., Mr. Kagramanov stated that, because she had chosen not to participate in the discussion, Apple was moving forward with the information that it had and, given the seriousness of her conduct, it had suspended her access to the company systems.  Several hours later, at 6:07 p.m., Ms. Gjovik wrote back, stating that she was willing to participate in the investigation: "I only asked that the discussion be kept to email . . . . [¶] I offered to help via email to ensure we have a documented recored [sic] of our conversations considering everything that's currently going on with my investigation and my complaints to the government."  Gjovik Decl., Ex. 41 (ECF Page 520) (email from Ms. Gjovik).  Ms. Gjovik also reiterated that "this really does feel like intimidation and additional retaliation and I will consider it as such."  Gjovik Decl., Ex. 41 (ECF Page 520).

At 6:20 p.m., Ms. Bowman of Human Resources emailed Mr. Bertolus.  She stated:

> This afternoon, Sophi Jacobs and Aleks Kagramanov, members of
> our Global Security and [Employee Relations] teams, reached out to

---

[13] During this same timeframe (early September 2021), it appears Mr. Okpo was still communicating with Ms. Gjovik regarding his investigation.  Mr. Okpo asked to meet with Ms. Gjovik about certain inconsistencies.  After Ms. Gjovik asked that all conversations be written, Mr. Okpo wrote in an email: "Since you have declined to speak with me, I will move forward based on the information I have."  2d Gjovik Reply Decl., Ex. T (email from Mr. Okpo, dated 9/7/2021).

10

> Ashley to talk with her about allegations that she had disclosed confidential production-related information on Twitter.
>
> Ashley chose not to talk with the team and asked for all communication to be in writing.  She was informed that because she chose not to participate in the discussion, Apple would move forward with the information that we had, and that due to the seriousness of the allegations her systems access would be suspended.
>
> Ashley disclosed confidential product-related information on Twitter, and this conduct, *on its own*, warrants termination.  In addition, she failed to cooperate in Apple's investigative process today and during the [Employee Relations] investigation into her workplace concerns.  More specifically, she failed to accurately and completely provide information, including actively redacting relevant information from documents that she presented to Apple's [Employee Relations] investigator.
>
> Based on her conduct which violates Apple policies,[14] the People team recommends that her employment be terminated.

Gjovik Decl., Ex. 30 (ECF Pages 245-46) (email from Ms. Bowman) (emphasis added); *see also* Bertolus Decl. ¶ 9.

Several minutes later, Mr. Bertolus responded, stating: "Understood.  I agree with the termination decision."  Gjovik Decl., Ex. 30 (ECF Page 245) (email from Mr. Bertolus, dated 9/9/2021).  In his declaration, Mr. Bertolus states that he considered Ms. Gjovik's disclosure of information egregious because (1) "it was intentional" and (2) it "involved what was then confidential and sensitive information about unreleased product features."  Bertolus Decl. ¶ 6.  Mr.

---

[14] For the relevant Apple policies, see generally the Bowman Declaration.  The policies that Apple contends were violated were:

- The Confidentiality and Intellectual Property Agreement.  *See* Bowman Decl., Ex. A.
- The Business Conduct Policy.  *See* Bowman Decl., Ex. B.
- The Misconduct and Discipline Policy.  *See* Bowman Decl., Ex. C.
- The Employee Use of Electronic Systems and Communications Policy.  *See* Bowman Decl., Ex. D.
- The Social Media and Online Communications Policy.  *See* Bowman Decl., Ex. E.

Most of these policies included warnings that violations of confidentiality could result in termination.  *See, e.g.*, Bowman Decl., Ex. A (Confidentiality and Intellectual Property Agreement ¶¶ I.A, IV) (prohibiting disclosure of proprietary information (*i.e.*, information not generally known outside of Apple and/or kept confidential by Apple) and providing that, if there is a breach of the agreement, "Apple is entitled to take any action to the extent permissible under applicable laws and this Agreement, including but not limited to terminating employment").

United States District Court
Northern District of California

Bertolus adds that "I am aware of at least two employees who were terminated for similar conduct in my organization during my time at Apple.  I was directly involved in terminating one of those employees for publishing an image that showed an unreleased airpod product in the background."[15]  Bertolus Decl. ¶ 6.  According to Mr. Bertolus, although he was

> generally aware that Ms. Gjovik had raised a variety of concerns to Apple over time, . . . the fact that she had raised concerns was not a factor in my decision to terminate her employment.  Additionally, at the time I made the decision to terminate Ms. Gjovik's employment, I was not aware that Ms. Gjovik had filed any complaints against Apple with any government or administrative agencies.[16]  But even if she had filed any such complaints, that would not have motivated me or been part of my decision making. I terminated Ms. Gjovik's employment for the independent reason that she disclosed confidential product information.

Bertolus Decl. ¶ 11.

After Mr. Bertolus stated that he wanted to terminate, Ms. Bowman provided him with documents that he could send to Ms. Gjovik informing her of the termination.  *See* Gjovik Decl., Ex. 30 (ECF Page 245) (email from Ms. Bowman).  At 6:54 p.m., Mr. Bertolus emailed Ms. Gjovik the termination letter.  *See* Gjovik Decl., Ex. 31 (email from Mr. Bertolus).  The letter stated in relevant part:

> Apple has determined that you have engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies.  You disclosed confidential product-related information in violation of Apple policies and your obligations under the Intellectual Property Agreement (IPA).  We also found that you failed to cooperate and to provide accurate and complete information during the Apple investigatory process.

Gjovik Decl., Ex. 29 (ECF Page 242) (termination letter).

/ / /

---

[15] Ms. Bowman has also submitted a declaration, stating that there have been terminations of at least 13 employees "for disclosing confidential product-related information."  Bowman Decl. ¶ 7 & Exs. F-R (notices of termination of employment).  Ms. Gjovik has not submitted any evidence to the contrary.

[16] Although Apple has admitted that it had knowledge of an NLRB complaint prior to Ms. Gjovik's termination, there is no evidence establishing that Mr. Bertolus specifically knew about that complaint or any other complaint that Ms. Gjovik had made to a governmental agency. There is also no evidence that Mr. Bertolus was involved in any of the prior investigations handled by Employee Relations.

As indicated above, the termination letter referred to not only the disclosure of confidential information but also a failure to cooperate and misrepresentations. The claimed failure to cooperate referred to Ms. Gjovik's refusal to speak directly and live with Mr. Kagramanov, as well as Mr. Okpo, as part of their investigations. The asserted misrepresentations related to statements Ms. Gjovik had made about one of her managers, Mr. West. Ms. Gjovik charged Mr. West with "pimping & pandering with receipt of indirect benefits." Gjovik Decl., Ex. 19 (ECF Page 163) ("Issue Confirmation"). In her "Issue Confirmation" document,[17] Ms. Gjovik described the incident (that took place some four years earlier) as follows.

- I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan [West] insisted I try several times, so when I sat down I texted him that I looked forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, Andrew. Apparently they told Andrew the same thing. Andrew was 24, ten years my junior. I expressed no interest in Andrew or dating him – but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It's [sic] was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's [sic] is a running topic in the household of how weird and inappropriate it was of Dan to do that.
- Ashley texted Dan in Dec after the dinner and told him she's dating a professor now and needs to turn down the sous chef and Dan said "I'm not even a little concerned. Regarding Andrew – to [sic] bad it didn't work out, but there was absolutely no pressure from me. I don't know him too well. Just learn and move on."

Gjovik Decl., Ex. 19 (ECF Page 163).

/ / /

_____

[17] The "Issue Confirmation" document was dated August 23, 2021.

13

According to Mr. Bertolus, Ms. Gjovik's characterization of the events was misleading.

> I . . . reviewed a single text message Ms. Gjovik provided to Mr. Okpo in the course of his investigation into her workplace concerns, and I also reviewed additional messages that Ms. Gjovik did not share that were part of the same text exchange that provided additional context to the conversation.  My assessment of the text exchange was that Ms. Gjovik was attempting to mislead the investigator through her selective disclosure of the lone message she shared. . . . I was also aware that Ms. Gjovik refused to meet with Mr. Okpo about the text exchange.

Bertolus Decl. ¶ 8.[18]

On September 9, 2021, the same day as her termination, Ms. Gjovik filed a discrimination charge with the EEOC and DFEH,  In the charge, Ms. Gjovik claimed, *e.g.*, discrimination on the basis of sex and disability, failure to address discrimination and harassment, and retaliation (including because she had raised concerns about environmental safety and resulting disability).  It is not clear from the record whether Ms. Gjovik filed her charge before or after the actual termination.[19]  Even assuming the former (especially as the charge does not refer to any termination), there is no evidence that anyone at Apple, including but not limited to Mr. Bertolus, knew about the EEOC/DFEH charge prior to Ms. Gjovik's termination.

On September 15, 2021, Apple (through its attorneys) asked Ms. Gjovik to remove certain images contained in her tweets as well as the Verge "video" showing the images collected by her iPhone.

Several years later, in September 2024, the NLRB issued a complaint against Apple based on one of the charges filed by Ms. Gjovik.  The NLRB alleged that, through various policies, Apple was interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in § 7 of the NLRA, in violation of § 8(a)(1) of the NLRA.  That dispute settled later in the spring of 2025.  Under the settlement agreement, Apple agreed to post a notice informing employees that they had the right to discuss working conditions and that Apple would not interfere

---

[18] The full text exchange between Mr. West and Ms. Gjovik can be found at Exhibit 36, attached to the Gjovik Declaration.  *See* Gjovik Decl., Ex. 36 (West Depo.) (ECF Pages 420-59).

[19] The digital signature on the DFEH charge appears to be 7:27 pm *ET*.  The relevant Apple emails have the time of around 6:30 pm, though it is not clear if that was PT or ET. Either way, they were very close in time.

14

with the exercise of that right.  For instance, employees had the right to publish articles; however, Apple could still require employees to receive approval about articles about Apple products or services.  The NLRB case appears to have been opened based on a complaint from Ms. Gjovik, but her complaint does not appear to be tied to any action that Apple took against her specifically. The NLRB matter in 2024-2025 is not consequential to the issues addressed herein.

<b>II.      APPLE'S MOTION TO STRIKE</b>

Before addressing the parties' summary judgment motions, the Court addresses Apple's motion to strike.  Apple moves to strike all of Ms. Gjovik's summary judgment filings, including all evidence submitted in support of her briefs, on the basis that they were not timely filed.[20] Apple emphasizes that the Court previously warned Ms. Gjovik that she "risks being sanctioned if she continues to make late filings.  While a filing that is not unduly late may not be so prejudicial to the opposing party as to warrant severe sanctions, a pattern or practice of late filings is a different matter."  Docket No. 137 (Order at 3 n.3).

Apple is correct that all of Ms. Gjovik's filings were late.

- Ms. Gjovik's motion for summary judgment was due on **April 23, 2026**.
  - She filed her opening brief on April 24, 2026, at 9:59 a.m.
  - She filed the evidence in support of her opening brief on April 24, 2026, at 4:20 p.m.
- Ms. Gjovik's reply/opposition was due on **May 21, 2026**.
  - Ms. Gjovik filed a reply/opposition brief at midnight on May 22, 2026 (Docket No. 374) but then filed a "corrected" or "replacement" version at 11:31 a.m. on the same day (Docket No. 375).  The corrected/replacement brief was not simply a brief with minor changes from the prior version. Rather, as Apple argues, the corrected/replacement brief was essentially "a

---

[20] This Court set up a four-brief summary judgment process.  The four briefs are as follows:

(1) Ms. Gjovik's motion for summary judgment.
(2) Apple's opposition and cross-motion for summary judgment.
(3) Ms. Gjovik's reply/opposition to the cross-motion.
(4) Apple's sur-reply/reply in support of the cross-motion.

complete rewrite of the timely filing." Sur-Reply at 1.

o Although Ms. Gjovik's reply/opposition cited to evidence in support, she did not provide any evidence to the Court or Apple until days later. Specifically, Ms. Gjovik filed her first reply/opposition declaration, containing evidence in support of her brief, on **May 25, 2026**, at 4:26 p.m. (Docket No. 377). The declaration, with supporting exhibits, was more than 600 pages long (although some of the evidence had been previously submitted).

o Ms. Gjovik then filed a second reply/opposition declaration, containing additional evidence in support of her brief, on **May 27, 2026**, at 12:09 a.m. (Docket No. 379). This declaration, with supporting exhibits, was almost 500 pages long. The declaration is problematic not only because it was filed the day before Apple's sur-reply/reply was due but also because it contains evidence that Ms. Gjovik could – and should – have filed in conjunction with her opening motion for summary judgment.

The Court could, in its discretion, reject all of Ms. Gjovik's filings. However, in the interest of justice, the Court shall take a more measured approach. It shall accept most of Ms. Gjovik's filings since they were not unduly late. But it shall strike Ms. Gjovik's two reply/opposition declarations. This evidence was unfairly prejudicial to Apple as it was submitted just one or three days before Apple's sur-reply/reply was due. The evidence consisted of more than a thousand pages. *See Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010) (stating that, "as part of its power to 'manage [its] own affairs,' a district court can use less drastic measures such as striking documents from the docket to address litigation conduct that does not warrant outright dismissal"); *Wood v. Santa Barbara Chamber of Commerce*, 705 F.2d 1515, 1519 (9th Cir. 1983) (holding that district court did not abuse its discretion in striking untimely affidavits in opposition to summary judgment motion where party failed to request extension of time or show excusable neglect).

/ / /

Ms. Gjovik argues that she should be given, in effect, an extension for her filings under Federal Rule of Civil Procedure 6(b). *See* Fed. R. Civ. P. 6(b) ("When an act mayor must be done within a specified time, the court may, for good cause, extend the time: . . . on motion made after the time has expired if the party failed to act because of excusable neglect."). Ms. Gjovik's assertion that there is excusable neglect for the late filings lacks merit. The fact that Ms. Gjovik is a pro se litigant does not mean that she should not be held to deadlines. Ms. Gjovik has a J.D., and the Court expressly warned her about late filings. Ms. Gjovik claims that she lacks resources to litigate, but this is belied by the docket sheet in this matter which demonstrates Ms. Gjovik's ability to make numerous and voluminous filings – and in a short timeframe. Ms. Gjovik's charge that Apple prevented her from working on summary judgment is not supported. Apple is entitled to defend itself, and Apple was reasonably working on discovery matters given the schedule set by this Court and Judge Westmore. Ms. Gjovik's contention that Apple came up with a new reason for termination – which upended her work on summary judgment – is also unsupported. Apple's termination letter gave notice to Ms. Gjovik that she had purportedly failed to provide accurate and complete information during the investigation. Although the letter did not give specifics, Ms. Gjovik knew by April 6, 2026 (from an interrogatory response that Apple provided) that the alleged misrepresentations were related to the incident regarding a sous chef at a local restaurant. This was more than two weeks before her summary judgment motion was due. It is also worth noting that Ms. Gjovik's reply/opposition declarations covered evidence far beyond the sous chef incident; for example, in the declarations, Ms. Gjovik provided for the first time evidence related to Apple's claim that the images disclosed were confidential. As noted above, the belated reply/opposition declarations had more than 1,000 pages attached.

Accordingly, the Court grants in part and denies in part Apple's motion to strike. The motion is denied with two exceptions. Specifically, the Court strikes both of Ms. Gjovik's reply/opposition declarations. *See* Docket Nos. 377, 379 (reply/opposition declarations).

/ / /

/ / /

/ / /

17

### III.   APPLE'S MOTION FOR SUMMARY JUDGMENT

A.   Legal Standard

Having resolved what evidence the Court shall consider in conjunction with summary judgment, the Court now turns to the parties' motions.

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

The Court begins with Apple's motion because, if Apple is entitled to summary judgment, then – necessarily – Ms. Gjovik's motion must be denied.  Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  As indicated above, because Ms. Gjovik is the nonmoving party with respect to Apple's motion, the Court draws all justifiable inferences in her favor.

B.   Retaliation Claims

There are four retaliation claims at issue in this case: (1) wrongful termination in violation of public policy; (2) violation of California Labor Code § 1102.5; (3) violation of California Labor Code § 6310; and (4) violation of California Labor Code § 98.6.

- A claim for wrongful termination is predicated on a termination being "substantially motivated by a violation of public policy." *Nosal-Tabor v. Sharp Chula Vista Med. Ctr.*, 239 Cal. App. 4th 1224, 1234-1235 (2015).
- As for § 1102.5, it basically "provides whistleblower protections to employees who

United States District Court
Northern District of California

disclose wrongdoing to authorities [including a government authority or a person with authority over the employee]." *Lawson v. PPG Arch. Finishes, Inc.*, 12 Cal. 5th 703, 709 (2022).

- In turn, § 6310 is designed, among other things, to "prevent retaliation against those who in good faith report working conditions they believe to be unsafe." *Freund v. Nycomed Amersham*, 347 F.3d 752, 759 (9th Cir. 2003).

- Finally, § 98.6 "prohibits an employer from retaliating against an applicant or employee because the applicant or employee exercised a right afforded him or her under the Labor Code." *Garcia-Brower v. Premier Auto. Imports of CA, LLC*, 55 Cal. App. 5th 961, 972 (2020). Those rights include the right to disclose information about an employer's working conditions. *See* Cal. Lab. Code § 232.5(a) (providing that "[n]o employer may . . . [r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions"). *But see id.* § 232.5(d) (providing that "[t]his section is not intended to permit an employee to disclose proprietary information, trade secret information, or information that is otherwise subject to a legal privilege without the consent of his or her employer").

The parties are in agreement that all of the claims, except for the § 1102.5 claim, are evaluated under the same basic framework. The § 1102.5 claim follows a similar, but a slightly different, framework.

### 1. Wrongful Termination, § 6310, and § 98.6 Claims

For the wrongful termination, § 6310, and § 98.6 claims, courts apply, at summary judgment,

> the burden-shifting analysis of *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973), to determine whether there are triable issues of fact for resolution by a jury. In the first stage, the plaintiff must show (1) he or she engaged in a protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. If the employee successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate,

19

> nonretaliatory reason for the adverse employment action. If the employer produces evidence showing a legitimate reason for the adverse employment action, the presumption of retaliation drops out of the picture, and the burden shifts back to the employee to provide substantial responsive evidence that the employer's proffered reasons were untrue or pretextual.

*Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1108-09 (2007) (internal quotation marks omitted). *See, e.g.*, *id.* (applying *McDonnell Douglas* to a wrongful termination claim); *Rounds v. Bd. of Trs. of the Cal. State Univ.*, No. 1:20-cv-00170-DAD-CKD, 2024 U.S. Dist. LEXIS 175877, at *75 (E.D. Cal. Sept. 26, 2024) (applying *McDonnell Douglas* to a § 6310 claim); *Cervantes v. Concentra Health Services, Inc.*, No. 2:21-cv-02502-SB (AGRx), 2021 U.S. Dist. LEXIS 248667 (C.D. Cal. Dec. 21, 2021) (applying *McDonnell Douglas* to a § 98.6 claim).

Notably, at the third step, there must be substantial evidence of pretext. *See Loggins*, 151 Cal. App. 4th at 1109. The plaintiff cannot simply rest on their prima facie case. *See id.* at 1113 ("[A]n employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual.").

To be clear, the Court is applying the *McDonnell Douglas* framework because Ms. Gjovik has presented a pretext case only, and not a mixed motive case. *See Lawson*, 12 Cal. 5th at 714 ("Although we acknowledged in *Harris* that courts have adopted the *McDonnell Douglas* test for FEHA employment discrimination cases that do not involve mixed motives, we declined to adopt the same test to govern mixed-motives cases."). Ms. Gjovik confirmed at the hearing that she was bringing a pretext case only.[21] In contrast to a mixed motive case, a pretext case is predicated on the contention that "the *only* actual motive is the discriminatory one and the purported legitimate reasons are fabricated in order to disguise the true motive." CACI 2512, Directions for Use (emphasis added).

/ / /

/ / /

---

[21] The relief available in a pretext case is more extensive than that available in a mixed motive case. *See* CACI 2512 (Directions for Use) (noting that, "in a mixed motive case, the employer is *relieved* from an award of damages but may still be liable for attorneys' fees and costs and injunctive relief") (emphasis added).

2.    Section 1102.5 Claim

Unlike the claims above, a claim brought under § 1102.5 follows a slightly different approach dictated by statute – specifically, § 1102.6.

> By its terms, section 1102.6 describes the applicable substantive standards and burdens of proof for both parties in a section 1102.5 retaliation case: First, it must be "demonstrated by a preponderance of the evidence" that the employee's protected whistleblowing was a "contributing factor" to an adverse employment action. (§ 1102.6.) Then, once the employee has made that necessary threshold showing, the employer bears "the burden of proof to demonstrate by clear and convincing evidence" that the alleged adverse employment action would have occurred "for legitimate, independent reasons" even if the employee had not engaged in protected whistleblowing activities.

*Lawson*, 12 Cal. 5th at 712. The analytical frame of §1102.6 appears to track (roughly) the analytical framework used in a mixed motive case. *See Lampkin v. County of Los Angeles*, 112 Cal. App. 5th 920, 924 (2025) (noting that "section 1102.6 affords employers an affirmative defense, if they prove the alleged retaliatory action 'would have occurred for legitimate, independent reasons' had the employee not been a whistleblower"; "[c]ases where this defense may apply are known as 'mixed-motive' cases"). Once the plaintiff demonstrates retaliation was in fact a contributing factor to the employer's decision, the employer may escape liability if it proves it would have terminated the plaintiff anyway, though under §1102.5, the employer must do so by clear and convincing evidence. As discussed below, the focus in this case is whether Apple's decision to terminate was motivated (at all) by retaliation. For the reasons set forth below, the Court holds that no reasonable jury could so find.

C.    Protected Activity and Adverse Employment Action

As reflected by the above, although there are some differences between the claims governed by *McDonnell Douglas* and the § 1102.5 claim, all of the claims require that Ms. Gjovik establish both protected activity and an adverse employment action.

According to Ms. Gjovik, Apple retaliated against her because she made complaints about various issues, including environmental safety, workers' rights, and sex discrimination and hostile work environment. For purposes of the pending motion, Apple does not dispute that Ms. Gjovik engaged in at least some protected activity.

21

As for adverse employment action, Apple concedes that its termination of Ms. Gjovik constitutes such an action. However, Apple maintains that Ms. Gjovik did *not* suffer an adverse employment action when she was put on paid administrative leave on August 4, 2021, *i.e.*, about a month before her termination. The Court agrees. Based on the undisputed evidence of record, no reasonable jury could find that the paid administrative leave constituted an adverse employment action. The undisputed evidence shows that Ms. Gjovik *asked* to be put on such leave (*i.e.*, so that she would not have to interact with her managers while Mr. Okpo investigated her complaints). Furthermore, when Ms. Gjovik complained to others that the leave was indefinite and/or involuntary, Mr. Okpo told her on two separate occasions that she could return to work if she wanted, but she did not respond to either overture.

In her deposition, Ms. Gjovik suggested that she was "testing the water" for a return to work when she asked if she could take a class Apple was offering, but Apple told her she could not take the class. From this, Ms. Gjovik seems to suggest a jury could infer that she would not be allowed to return to work either. But asking Apple for permission to take a single class is different from asking Apple for a return to work. In any event, even assuming Ms. Gjovik was testing the water for a return, no reasonable jury could find that the paid administrative leave was an adverse employment action because it is undisputed that, several days *after* Mr. Okpo told Ms. Gjovik she could not take the class, Mr. Okpo told Ms. Gjovik that she could return to work if she wanted, but Ms. Gjovik still did not respond.

In her papers, Ms. Gjovik also asserts that Apple put her on leave because it wanted to "remove[] [her] from the workplace to block her access to evidence." Pl.'s Mot. at 21; *see also* Pl.'s Mot. at 4-5 (asserting that, when Apple put her on leave on August 4, 2021, she "was planning to retrieve from her office the next day, August 5, a laptop containing text-message evidence relevant to her harassment complaint against West[;] Okpo later cited Plaintiff's inability to product the full text exchange as the basis for his 'misleading complaint' finding"). This is sheer speculation on Ms. Gjovik's part. Ms. Gjovik has not pointed to evidence suggesting that Mr. Okpo, or anyone else at Apple, knew Ms. Gjovik was intending to get her laptop so that she could access evidence. More important, even if someone did know, the fact remains that Ms.

22

Gjovik had asked to be put on leave and she never responded to Mr. Okpo's offers for her to return to work which would have allowed her to access any evidence she needed.

Accordingly, the only adverse employment action at issue here is Ms. Gjovik's termination.  No reasonable jury could find that the paid administrative leave was an adverse employment action. The only adverse action cognizable under Ms. Gjovik's claims is her termination.

D.    Claims Governed by *McDonnell Douglas*

Having addressed the elements of protected activity and adverse employment action, the Court now turns to the claims governed by the *McDonnell Douglas* framework – *i.e.*, the wrongful termination, § 6310, and § 98.6 claims.

1.    First Stage

Under the first stage of *McDonnell Douglas*, "the plaintiff must show (1) he or she engaged in a protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Loggins v*, 151 Cal. App. 4th at 1109 (internal quotation marks omitted).  A plaintiff who establishes these elements establishes a prima facie case.

For purposes of summary judgment, Apple effectively assumes that Ms. Gjovik has presented sufficient evidence to establish a prima facie case.  Presumably, Apple has proceeded with this assumption because a causal link between Ms. Gjovik's protected activity and the adverse employment action (her termination) could arguably be inferred for purposes of this motion from timing: (1) on or about August 26, 2021, Ms. Gjovik filed a charge with the NLRB, asserting, *inter alia*, that she had been instructed to refrain from talking about environmental safety with other employers; (2) Apple does not dispute that it knew about at least one NLRB charge prior to terminating Ms. Gjovik; and (3) Ms. Gjovik was terminated on September 9, 2021.

2.    Second Stage

The Court thus moves on to the second step of the *McDonnell Douglas* analysis.  *See also Batarse v. Serv. Emps. Int'l Union, Loc. 1000*, 209 Cal. App. 4th 820, 831 (2012) (noting that "[a] defendant moving for summary judgment "may skip to the second step of the analysis and

23

demonstrate that it had a legitimate business reason, unrelated to . . . retaliation, for taking its employment action"). Apple has satisfied its burden of production at this step. *See Loggins*, 151 Cal. App. 4th at 1109 (stating that, if a plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence showing a legitimate reason for the adverse employment action).

According to Apple, it terminated Ms. Gjovik because she had disclosed confidential business information to the public, *i.e.*, through her tweets and the Verge article. In this regard, the timing supports Apple. Ms. Gjovik's tweets and the Verge article took place on August 30, 2021. She was terminated approximately a week later, on September 9, 2021, after an investigation took place into the disclosure, which included Mr. Bertolus (the final decisionmaker) seeing at least one image that had been disclosed and getting confirmation that the image was confidential.

The undisputed evidence also reflects that the information Ms. Gjovik disclosed was, in fact, confidential. To be clear, Apple did not terminate Ms. Gjovik because of the *text* contained in her tweets where she complained about, *e.g.*, "systemic oppression & retaliation" at Apple. Rather, she was terminated because of the *images* she posted in the tweets (which she also gave to the reporter from Verge). Dr. Aloe has explained why that information was confidential: the images "uploaded through Glimmer are not just photographs (like an iPhone user would see in their Photos app); they are images from a *separate module* of the phone that provide insights into confidential intrinsic camera characteristics that are relevant to Face ID's operation." Aloe Decl. ¶ 7 (emphasis added). Furthermore, the "images are *only* viewable with confidential Apple tools." Aloe Decl. ¶ 7 (emphasis added). Thus, when Ms. Gjovik posted the images and the images were published as part of the article, "information [1] not visible to customers, competitors, or hackers about [2] how the camera used for Face ID operates and [3] the data Apple uses to develop the algorithm behind Face ID" was disclosed.[22]  Aloe Decl. ¶ 8.

---

[22] In her papers, Ms. Gjovik has suggested there are disputes about, *e.g.*, whether the images were ever uploaded to Apple, but that issue is not material. The critical question here is whether the images Ms. Gjovik posted were confidential. *See* Sur-Reply at 6 n.9.

24

The Court acknowledges that, in her most recent filings (*i.e.*, her first and second reply/opposition declarations), Ms. Gjovik submitted – for the first time – evidence to support her contention that the information she posted did not contain anything confidential.  But the Court does not consider this evidence because, as discussed above, it has stricken the evidence as untimely filed.  (It is also problematic that Ms. Gjovik waited until her reply/opposition to provide any evidence on confidentiality.  In other words, Ms. Gjovik easily could, and should, have provided such evidence in conjunction with her opening brief.)

Moreover, even if the Court were to consider the untimely-filed information, no reasonable jury could find in Ms. Gjovik's favor.

- For example, Ms. Gjovik claims that, before she disclosed the images, a co-worker told her that they were not confidential.  But Ms. Gjovik has failed to establish that the co-worker had the requisite knowledge to make this determination.  The mere fact that the co-worker was in Apple's Video Engineering organization is not (by itself) enough to create a genuine dispute of material fact on the question of confidentiality.  There is no indication that the co-worker even worked on Face ID.
- Ms. Gjovik also points to disclosures of the images by Cher Scarlett (another former Apple employee with whom Ms. Gjovik once had a friendly relationship) and a French reporter.  But even if Apple knew about these disclosures, they came well *after* Ms. Gjovik had already publicly disclosed the images – *i.e.*, the cat was already out of the bag.

In her papers, Ms. Gjovik further suggests she was entitled to post the images because they shed light on the working conditions at Apple.  In other words, Ms. Gjovik appears to take the position that, even if the information at issue *was* confidential, she was still allowed to disclose it because she was making complaints about Apple's working conditions.  That is not supported by the law.  Although California Labor Code § 232.5 states that "[n]o employer may . . . [r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions," it also states that "[t]his section is not intended to permit an employee to disclose proprietary information … without the consent of his or her employer." Cal.

25

Lab. Code § 232.5(a), (d); *see also Joaquin v. City of Los Angeles*, 202 Cal. App. 4th 1207, 1223 (2012) (stating that "[a]n employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action") (internal quotation marks omitted); *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 354 (2008) (stating that "[p]recedent does not prevent [an employer] from removing . . . an employee [who performs poorly, engages in improper work conduct, or severely disrupts the workplace] simply because the employee [recently] engaged in a protected work activity") (internal quotation marks omitted).  In short, because the information was confidential, Ms. Gjovik had no right to post and claim it as protected activity.

In her reply/opposition, Ms. Gjovik, argues: "Apple's reliance on § 232.5(d)'s proprietary-information carve-out fails for many reasons including on this ground: information whose disclosure is independently protected under § 1102.5(b), Gov. Code § 12964.5, and Cal. Civ. § 1668 cannot be 'proprietary' within the meaning of § 232.5(d), or the carve-out would swallow each independent protection."  Reply at 22.  But Ms. Gjovik cites no concrete authority to support her position.  Moreover, none of these statutes affords protection to Ms. Gjovik.  For example:

- Section 1102.5(b) provides that there can be no retaliation against an employee for disclosing information "to a government or law enforcement agency" or a "person with authority over the employee."  Cal. Lab. Code § 1102.5(b).  Here, Ms. Gjovik made a disclosure to the public (via Twitter) and to the press (Verge).

- Section 12964.5 provides in relevant part that an employer cannot, "as a condition of employment or continued employment, . . . require an employee to sign a nondisparagement agreement or other document to the extent it has the purpose or effect of denying the employee the right to disclose information about unlawful acts in the workplace."  Cal. Gov't Code § 12964.5(a)(1)(B)(i).  There is no allegation or evidence that Ms. Gjovik was forced to sign such an agreement.

- Section 1668 states: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful

United States District Court
Northern District of California

26

injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668. Similar to above, Ms. Gjovik has not pointed to any contract between herself and Apple that violates the statute.

The bottom line is that § 232.5 articulates a public policy that an employer still has a legitimate interest in protecting its confidential business information even if there is also a public policy that an employee has the right to comment on their working conditions. In this regard, it is worth noting that Ms. Gjovik could easily have made criticisms about Apple's capturing of her images without showing the actual images themselves.

Apple has satisfied its burden of showing it had a legitimate nonretaliatory business reason for terminating Ms. Gjovik. It has done so as a matter of law as no reasonable jury could conclude otherwise.

3.    Third Stage

Because Apple has met its burden of production at step two of *McDonnell Douglas*, the Court moves on to the third step which focuses on pretext. "In a pretext case, the *only* actual motive is the discriminatory one and the purported legitimate reasons are *fabricated* in order to disguise the true motive." CACI 2512, Directions for Use (emphasis added). Ms. Gjovik has the burden at this stage, and there must be substantial evidence of pretext. *See Loggins*, 151 Cal. App. 4th at 1109. Ms. Gjovik is not entitled at the third stage to simply rest on her prima facie case. *See id.* at 1113 ("[A]n employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual.").

Based on the undisputed evidence of record, no reasonable jury could find substantial, let alone modest, evidence of pretext. The evidence reflects that Apple terminated Ms. Gjovik very soon after her tweets and the Verge article, both of which disclosed confidential information. The disclosure was serious: the information could only be viewed with confidential Apple tools, and it could have benefited competitors of Apple as well as hackers. Furthermore, Ms. Gjovik's disclosure was intentional and designed to be disseminated as broadly as possible, as demonstrated

27

United States District Court
Northern District of California

by the fact that Ms. Gjovik provided the images to a reporter for publication. Apple's decision to terminate Ms. Gjovik because of the disclosure of confidential information was consistent with several of its policies where it expressly warned that an employee could be terminated for such a disclosure. Ms. Gjovik was cognizant of this risk as she asked that the reporter blur out at least some of the information in the images she collected. Other employees had also been terminated for their disclosure of confidential information. Ms. Gjovik was not subject to selective treatment. If Apple had wanted to terminate Ms. Gjovik for making complaints about environmental safety, then it could have done so in March 2021 when she first raised the issue or in July 2021 when she and Apple had a meeting to discuss her continued concerns about environmental safety. It did not do so. If Apple had wanted to terminate Ms. Gjovik for making complaints about sex discrimination or a hostile work environment, it could have done so in April 2021 when she first raised the issue or in July-August 2021 when she made additional complaints about such conduct. It did not. When Ms. Gjovik submitted her 34-page "Issue Confirmation" document to Apple in or about August 23, 2021, Apple still did not terminate her. Nor did it terminate her after it learned that she had made a complaint with the NLRB. (There is no evidence that Apple knew about any complaints Ms. Gjovik had made to governmental agencies other than the NLRB, and possibly the EPA, before it terminated her.) There is also no evidence of, *e.g.*, any internal comments by Apple decision makers suggesting they were upset or unhappy about Ms. Gjovik's complaints. Instead, Apple only terminated Ms. Gjovik after she disclosed confidential images on Twitter and via a news article, and only after investigating and giving her an opportunity to give her side of the story on her actions – which she declined to do, unless communications were reduced to written form only. Ms. Gjovik never even made a written claim to Apple that she did not believe the information she had disclosed was not confidential. Nor did she make a modest request that any interview with an investigator be recorded to protect her rights. *See also* Part III.F, *infra* (discussing Ms. Gjovik's failure to cooperate as one of the reasons supporting Apple's decision to terminate).

The Court has considered Ms. Gjovik's various arguments on pretext, both on an individual or collective basis. They do not alter the Court's analysis on pretext.

**Shifting explanations.** According to Ms. Gjovik, it can reasonably be inferred that the termination was retaliatory because Apple provided shifting explanations for her termination. That is incorrect. Ms. Bowman (Human Resources) identified three reasons to terminate. Mr. Bertolus agreed with those three reasons (although he emphasized that the first, *i.e.*, the disclosure of confidential information, was the most important). Apple's actual termination letter gave the same three reasons. Apple's operative answer did the same. That Apple did not give *specifics* about the third reason (related to the sous chef incident) until it served an interrogatory response in early April 2026, does not at all establish that Apple's reasons for termination *changed*. Furthermore, Apple's decision to terminate based on the disclosure of confidential information did not target Ms. Gjovik in any way, as demonstrated by the fact that other people (as many as a dozen) have also been terminated based on breach of confidentiality.

Ms. Gjovik argues that there was still some shifting in explanation because, in an interrogatory response, Apple indicated that she had disclosed confidential information about not only Face ID but also ear scans. This was, according to Ms. Gjovik, inconsistent with the deposition testimony of Apple's 30(b)(6) witness who disclaimed reliance on the confidentiality of the ear scans. Apple disagrees with Ms. Gjovik's characterization of its interrogatory response, maintaining that its discussion of ear scans in the response was simply background information. Even assuming in Ms. Gjovik's favor that Apple once claimed that information about ear scans was confidential, that does not detract from Apple's clear and consistent reliance on the disclosure of confidential information related to Face ID.

**Timing.** Ms. Gjovik suggests that it can reasonably be inferred from the timing that she was fired for retaliatory reasons – *e.g.*, the termination came "14 days after the NLRB filing; 11 days after the OSHA and Labor Commissioner filings; 21 days after EPA's inspection [of the Apple building]; 28 days and hours after the EEOC/DFEH charge; and 17 days after the Issue Confirmation was transmitted to [Apple]." Pl.'s Mot. at 20. As an initial matter, the Court notes that Ms. Gjovik's reliance on timing alone is not enough to establish pretext. Case law is clear on this point. *See Arteaga*, 163 Cal. App. 4th at 353 (stating that, "[b]ecause the employee's burden of establishing a prima facie case under *McDonnell Douglas* is fairly minimal, the temporal

29

proximity between an employee's disclosure of his symptoms and a subsequent termination may satisfy the causation requirement at the *first step* of the burden-shifting process," but "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination") (emphasis in original); *Loggins*, 151 Cal. App. 4th at 1112 (stating that "temporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual"). Second, Ms. Gjovik presents no evidence that Apple knew about any of Ms. Gjovik's complaints or reports to government agencies other than the NLRB (and possibly the EPA) prior to her termination. Third, Ms. Gjovik's reliance on timing ignores the fact that, as mentioned above, Ms. Gjovik had a long history of making complaints to Apple but, for months, Apple did not terminate her or take any steps towards termination. Ms. Gjovik began to make complaints to Apple about environmental safety starting in March 2021, but Apple did not terminate her at that point. Nor did Apple terminate her after, *e.g.*, she complained to Apple in April, July, and August 2021 about various matters, including environmental safety, sex discrimination, and a hostile work environment. Rather, Apple did not terminate Ms. Gjovik until some six months after her first complaint – and within days after her disclosure of confidential information (and refusal to engage in a live interview about her actions).

**Privileged document.** Ms. Gjovik also argues that it is reasonable to infer her termination was "pre-planned" based on a document listed on Apple's privilege log. Pl.'s Mot. at 22. Ms. Gjovik notes that, four days before she made the tweets on August 30, 2021, "Apple circulated by email an internal Keynote file entitled 'Draft Exit Outcomes ACP.key." Pl.'s Mot. at 5-6.

The inference Ms. Gjovik attempts to draw is not reasonable given the timing. The document is dated long after (*i.e.*, months after) Ms. Gjovik first engaged in protected activity in filing complaints with Apple and the EPA.

In addition, the title of the document – "Draft Exit Outcomes" – is hardly damning in light of the full record. Ms. Gjovik ignores the fact that she herself had, in late July 2021, suggested

"an exit package that will compensate me and provide benefits through that time."  Okpo Decl., Ex. A (email from Ms. Gjovik, dated 7/28/2021) ("I'm still looking for a short-term response to mitigate the current hostile work environment I'm experiencing reporting to Dave and Dan and Helen. . . . [¶] Further, . . . I am requesting a long term solution to the hostile work environment and unsafe work conditions.  There are two options we've discussed.  First, a new role at Apple that is not a hostile work environment and not in unsafe work conditions (and I mentioned that because I will not be at Apple after Dec 31, 2022, I cannot find a new role to transfer to for such a short period of time, so I need your assistance with placement).  *The 2nd option is an exit package that will compensate me and provide benefits through that time.*") (emphasis added).  Given the obvious alternative explanation for the document when viewed in context, Ms. Gjovik's assertion that the content of the privileged document would show her termination was preplanned as retaliation is speculative and not based on a reasonable inference.

To the extent Ms. Gjovik asserts that a negative inference can be made from the fact that Apple asserted a privilege over the document's contents, courts have commonly held that it is not appropriate to draw such an adverse inference from the mere assertion of the attorney-client privilege.  *See United States v. St. John*, 267 Fed. Appx. 17, 22 (2d Cir. 2008) (stating that, "in the civil context, we have held that there is no basis for the jury to draw an adverse inference because of the assertion of the attorney-client privilege"); *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772 (4th Cir. 1990) (stating that, to protect the right to effective counsel, "a client asserting the privilege should not face a negative inference about the substance of the information sought"); *Yue v. Chordiant Software, Inc.*, No. C 08-00019 JW, 2010 U.S. Dist. LEXIS 159634 (N.D. Cal. Apr. 22, 2010) (holding that "any presentation of evidence or line of questioning designed to show Defendant's assertion of the attorney-client privilege would serve no relevant purpose and would unduly prejudice Defendant by allowing the jury to infer that Defendant was improperly withholding evidence"); *Sharer Inc. v. Tandberg*, No. 06-626, 2007 U.S. Dist. LEXIS 22391, 2007 WL 983849, at *9 (ED. Va. Mar. 27, 2007) (noting that attorney-client communication "is only relevant to the extent that an inference may be drawn as to the substance of legal communications" but "any such inference would intrude upon the protected realm of the attorney-

31

client privilege") (internal quotation marks omitted).

**No progressive discipline.**  Ms. Gjovik further asserts that a retaliatory animus can be inferred from the fact that Apple immediately fired her – *i.e.*, no progressive discipline was used. But there is no evidence that Apple's policies required it to use progressive discipline, particularly given the kind of conduct at issue here, *i.e.*, intentional disclosure of confidential information. Moreover, Apple's policies expressly indicated that termination was a possibility for a disclosure of confidential information, and Apple has provided evidence that it has terminated other individuals' employment for disclosing confidential information.  Ms. Gjovik has provided no contrary evidence.

**Cat's paw theory.**  Ms. Gjovik suggests that animus can reasonably be inferred under a cat's paw theory. *See Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (describing the cat's paw theory as follows: "if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process").  But it is not even clear from Ms. Gjovik's papers who harbored the retaliatory animus and then influenced Mr. Bertolus (the final decisionmaker on the termination).  To the extent Ms. Gjovik suggests that those persons are Ms. Bowman and/or Mr. Kagramanov, it is not clear how there was a retaliatory animus on the part of either individual: each was simply part of the process of Apple's looking into the disclosure of confidential information.  Ms. Gjovik has not pointed to evidence establishing a connection between either of them and, *e.g.*, her earlier complaints about workplace conditions such as environmental safety or a hostile work environment.

**Deviation from procedure/inadequate investigation.**  Ms. Gjovik further argues that a reasonable inference can be made of a retaliatory animus because Apple deviated from procedure and conducted an inadequate investigation.  But while Mr. Kagramanov did cut off the investigation quickly, that was because Ms. Gjovik refused to engage in a live voice-to-voice interview, which, as discussed below, was a reasonable request from Mr. Kagramanov.  Moreover,

given that Ms. Gjovik had intentionally disclosed the confidential information through a series of actions (multiple tweets and the Verge article), no reasonable jury could infer something nefarious from the mere fact that Mr. Kagramanov moved quickly. There is no evidence that, *e.g.*, Ms. Gjovik informed Mr. Kagramanov she believed the images she disclosed were not confidential in nature.

**Disparate treatment.** Finally, in her papers, Ms. Gjovik seemed to suggest that retaliation can be inferred from the fact that Dr. Aloe disclosed confidential information about Face ID but was not terminated. At the hearing, however, Ms. Gjovik clarified that she did *not* believe Dr. Aloe's disclosures (made in articles he published) were confidential. Ms. Gjovik's position, therefore, seems to be that her disclosures were just as innocuous as Dr. Aloe's (*i.e.*, in neither situation was there a disclosure of confidential information); thus, she should not have been terminated just as Dr. Aloe was not terminated. Ms. Gjovik is essentially arguing that her conduct and Dr. Aloe's conduct are comparable.

But notably, Ms. Gjovik did not even provide Dr. Aloe's publications until her untimely filed second reply/opposition declaration, which the Court has stricken. And even when Ms. Gjovik did provide the publications, she did not point to anything concrete therein to support her contention that her conduct and Dr. Aloe's were materially identical. Dr. Aloe's articles, for instance, did not include any images nor did it contain any specifics about the data that was collected for Face ID. In any event, Apple has provided evidence establishing that other people have also been terminated for disclosing confidential information. Notably, Mr. Bertolus was also the decisionmaker in one of these instances. Ms. Gjovik has provided no evidence contradicting this information.

4.      Summary

Even assuming Ms. Gjovik established a prima facie case for her wrongful termination, § 6310, and § 98.6 claims under the first stage of *McDonnell Douglas*, Apple has satisfied its burden of production at the second stage. Apple had a legitimate, nonretaliatory reason to terminate – *i.e.*, because Ms. Gjovik had disclosed confidential information related to Face ID. At the third stage of *McDonnell Douglas*, Ms. Gjovik has the burden of providing substantial evidence to support

33

pretext – *i.e.*, that Apple's reason to terminate was fabricated and the only reason why it terminated her was to retaliate against her for having engaged in protected activity. No reasonable jury could find pretext based on the undisputed evidence of record. Apple, therefore, is entitled to summary judgment on all claims governed by *McDonnell Douglas*.

E.      Section 1102.5 Claim

Unlike the claims above, Ms. Gjovik's § 1102.5 claim is not subject specifically to the *McDonnell Douglas* framework. Instead, § 1102.6 dictates the following two-step analysis for a § 1102.5 claim.

> First, it must be "demonstrated by a preponderance of the evidence" that the employee's protected whistleblowing was a "contributing factor" to an adverse employment action. (§ 1102.6.) Then, once the employee has made that necessary threshold showing, the employer bears "the burden of proof to demonstrate by clear and convincing evidence" that the alleged adverse employment action would have occurred "for legitimate, independent reasons" even if the employee had not engaged in protected whistleblowing activities.

*Lawson*, 12 Cal. 5th at 712. Although the second step does impose a significant evidentiary burden on Apple, the first step puts the initial burden on Ms. Gjovik and that burden involves more than just establishing a prima facie case. Ms. Gjovik must establish by a preponderance of the evidence that Apple's retaliatory motive was a contributing factor to her termination.

For largely the same reasons discussed above, the Court concludes that, at the first step, no reasonable juror could find Ms. Gjovik's protected activity was a contributing factor to her termination. As the Court has concluded above, Apple is entitled to a finding as a matter of law that there was no pretext, and thus the *sole* reason for the termination was based on legitimate nonretaliatory business reasons. Accordingly, retaliation was not a contributing factor in the decision to terminate.

Furthermore, even assuming a reasonable jury could find in Ms. Gjovik's favor on the first step, no reasonable jury could find in her favor on the second step. The undisputed evidence shows that, on August 30, 2021, Ms. Gjovik tweeted images from the Face ID study, that the Verge article published the same and/or similar images on the same date, that the images were confidential, that Apple's policies specified an employee could be terminated for disclosing

34

confidential information, that Apple promptly began to investigate Ms. Gjovik's disclosures, and that Ms. Gjovik was terminated approximately 10 days after the initial disclosure after Mr. Bertolus viewed at least one image and received confirmation that the image was in fact confidential.  Under § 1102.5, "if an employer satisfies its burden at the second step in making a same decision showing, the employer is not liable regardless of whether the employee made an initial showing that his or her protected disclosure was a 'contributing factor.'" *Veverka v. Dep't of Veterans Affairs*, 102 Cal. App. 5th 162, 173-74 (2024) (agreeing with the defendant's position; plaintiff's contention that "a plaintiff may be entitled to certain relief even if the employer satisfies its burden under section 1102.6 is belied by the statute's plain language"); *see also Lampkin*, 112 Cal. App. 5th at 929 (stating that, if the defendant proves their same-decision defense, the case ends; § 1102.6 "does not include an exception to the same-decision defense [or] a limitation on its extent").

F.    Failure to Cooperate

Because the disclosure of confidential information by itself was a basis to terminate (as Mr. Bertolus testified in his deposition, the disclosure was "so egregious that that in itself warranted termination," Gjovik Decl., Ex. 32 (Bertolus Depo. at 99)), the Court need not consider the additional reasons offered by Apple to bolster the termination – *i.e.*, Ms. Gjovik's failure to cooperate with the investigation and her misrepresentations about the sous chef incident.  The additional reasons, however, were also legitimate, nonretaliatory reasons to terminate.

Regarding Ms. Gjovik's failure to cooperate, this was predicated on Ms. Gjovik being willing to participate in a "written" interview only; she refused the investigators' request to engage with her live voice-to-voice.  No reasonable jury could find in Ms. Gjovik's favor that the request for a live voice-to-voice interview was retaliatory.  Rather, the undisputed evidence reflects that Apple had legitimate, nonretaliatory reasons for wanting live voice-to-voice communications.  As explained by Mr. Kagramanov, who investigated the disclosure made by Mr. Gjovik,

> the intention for having a live conversation is to ensure that we have a natural recollection of . . . whatever the discussion is at hand relating to the investigation.  It also allows for natural follow-up questions in the moment and also to kind of just gauge tone, behavior in the call where we have that natural live dialogue.

Kagramanov Depo. at 59. Mr. Okpo, who conducted the investigation into Ms. Gjovik's complaints about, *inter alia*, a hostile work environment, provided similar testimony in his deposition, stating, *e.g.*, that

> [t]he work that we do, investigating claims, it would be very difficult to get to the heart of the issue and fact-find via email. What I mean by that is, as investigators, similar to what you're doing here, it's important to receive answers . . . from . . . the person you're interviewing in realtime so that you could ask follow-up questions where appropriate. And so . . . it's just not part of my process or our ER investigate [sic] process to conduct investigations via email.

Okpo Depo. at 104.

Mr. Kagramanov and Mr. Okpo's reasoning makes sense. Indeed, as Mr. Okpo suggested, this is consistent with how litigation is typically run. For instance, although the Federal Rules of Civil Procedure allow for depositions by written questions, *see* Fed. R. Civ. P. 31, the vast majority of the time, parties take live depositions instead. A live deposition better allows for natural/noncomposed responses, assessment of demeanor, and follow-up questions.

Ms. Gjovik's contention that the requirement of a voice-to-voice interview was retaliatory because she had requested a "written" investigation to "preserve a record for her NLRB proceedings and her other pending complaints," Pl.'s Mot. at 1, is entirely speculative. Tellingly, Ms. Gjovik could have consented to voice-to-voice live interviews and requested that they be taped/recorded, but she did not do so. To the extent Ms. Gjovik asserts that there was no formal policy requiring voice-to-voice interviews, the absence of a formal policy is not enough to create a genuine dispute of material fact about the reasonableness of the investigators' request and the unreasonableness of her refusal, particularly here because the *practice* was to conduct such interviews. As Mr. Okpo testified in his deposition: "Yes [other employees have asked for communications to be kept in writing. But] [d]uring the actual investigation process, I've been consistent around the need to have live conversations." Riechert Decl., Ex. E (Okpo Depo. at 105). There is no evidence that Apple did not have such a practice, particularly when the concern was that an employee had disclosed confidential information.

Apple thus has a second legitimate business reason for terminating Ms. Gjovik.

36

United States District Court
Northern District of California

G. Misrepresentations about the Sous Chef Incident

Finally, contrary to what Ms. Gjovik contends, there is no evidence that Apple terminated her simply because she had made a complaint that Mr. West sexually harassed her (or was engaging in pimping and pandering in violation of California criminal law). *See* Mot. at 1. Rather, the record is clear and undisputed that Apple took issue with the fact that Ms. Gjovik had *misrepresented* the text exchange between her and Mr. West (giving only a single text message). The full text exchange did not show "pimping" or "pandering" as Ms. Gjovik had claimed in her "Issue Confirmation" document.

The text exchange (see Gjovik Decl., Ex. 36) began when Ms. Gjovik texted Mr. West to let him know she was dining at a restaurant which Mr. West knew well and which was run by a chef with whom Mr. West had a personal relationship. At one point, Mr. West noted in one of his texts that his wife, with whom Ms. Gjovik was apparently friendly, "tells me you want to set you up with someone," to which Ms. Gjovik responded: "LOL!  I think I told her I need to find the male version of her since you & I are so similar." Gjovik Decl., Ex. 36 (ECF Page 428).  Mr. West then replied: "So I may have mentioned to the chef that you are single and that his sous chef should introduce himself to you." Gjovik Decl., Ex. 36 (ECF Page 429).  Ms. Gjovik stated in response: "Oh no.  Dan!!  [¶] Is he cute?" Gjovik Decl., Ex. 36 (ECF Page 429).  After Mr. West said at least one plate would be delivered by the sous chef, Ms. Gjovik stated: "Oh Lordy.  Ok. Than you for the good intentions!" Gjovik Decl., Ex. 36 (ECF Page 430).  Mr. West responded in part: "He's a nice guy though." Gjovik Decl., Ex. 36 (ECF Page 431).  Mr. West also stated that the "chef said they will treat you like family." Gjovik Decl., Ex. 36 (ECF Page 432).  Ms. Gjovik later stated: "[The sous chef] Andrew's a cutie," but "[h]e also looked super uncomfortable.  Was he a willing participant in this?" Gjovik Decl., Ex. 36 (ECF Page 434-35).  Additional texts from Ms. Gjovik included the following:

- "We were both blushing the entire time.  Poor guy," Gjovik Decl., Ex. 36 (ECF Page 436);

- "Andrew came back.  He said he's giving me complementary wagyu.  Ok, maybe you two are Cupids after all.  Im [sic] a sucker for both blonde guys and wagyu,"

37

Gjovik Decl., Ex. 36 (ECF Page 438);

- "I'll leave my # for Andrew.  Should take care of it," Gjovik Decl., Ex. 36 (ECF Page 446); and

- "He already bought me a 100 [dollar] dinner.[23]  At least deserves a #."  Gjovik Decl., Ex. 36 (ECF Page 447).

Mr. West's texts in response included the following statement: "In all candor . . . no pressure from me.  [¶] I only know Andrew a little."  Gjovik Decl., Ex. 36 (ECF Page 449).  Ms. Gjovik replied: "I wouldn't do it if I wasn't actually interested.  I'm very picky."  Gjovik Decl., Ex. 36 (ECF Page 450).  Then, after Ms. Gjovik was told the cost of the meal was being covered by Mr. West and the chef, she texted: "Would you please tell [the chef] I say huge thank you for the generosity, the delicious, amazing food, and the cute blondes."  Gjovik Decl., Ex. 36 (ECF Page 457).

As reflected by the above, Apple had a sufficient basis to conclude that Ms. Gjovik's characterization of the events was not pimping or pandering – at the very least, was not complete.  To be sure, this is not to say that Mr. West behaved appropriately.  One could still argue that Mr. West's conduct was not proper given that he was her supervisor, and Mr. West was apparently reprimanded (or at least counseled) for not separating friendship from work.  But the full text exchange gave Apple a sufficient basis to conclude that Ms. Gjovik's characterization of the sous chef incident was not entirely accurate.  *See Joaquin*, 202 Cal. App. 4th at 1226 (stating that, "in appropriate circumstances, an employer may discipline or terminate an employee for making false charges, *even where the subject matter of those charges is an allegation of sexual harassment*") (emphasis added); *see also id.* at 1223 (noting that this principle applies so long as the employer took the adverse employment action based on a *good faith belief* that the employee had engaged in misconduct) (emphasis added).  Apple's third reason for termination was not retaliatory.

/ / /

/ / /

_____

[23] It appears that Mr. West and the chef paid for Ms. Gjovik's meal.

H.      Summary

For the foregoing reasons, the Court concludes that Apple is entitled to summary judgment on all of her retaliation claims: both those governed by *McDonnell Douglas* and the § 1102.5 claim.  A reasonable jury could reach only one conclusion based on the undisputed evidence of record: Apple had legitimate, nonretaliatory reasons to terminate Ms. Gjovik's employment, and there was no evidence sufficient to support a finding of retaliatory motive by Apple.

### IV.      MS. GJOVIK'S MOTION FOR SUMMARY JUDGMENT

Because Apple prevails on its motion for summary judgment, Ms. Gjovik necessarily fails on her cross-motion.  *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, [*e.g.*] because he is the plaintiff . . . , he must establish beyond peradventure all of the essential elements of the claim . . . to warrant judgment in his favor") (emphasis omitted); *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992) (noting that, where a plaintiff moves for summary judgment on claims that it has brought (*i.e.*, for which it has the burden of proof), it "must prove each element essential of the claims . . . by undisputed facts").

Similarly, because Apple prevails on its summary judgment motion, Ms. Gjovik's additional request for a preliminary injunction (*i.e.*, reinstatement of pay and benefits) is denied. The Court further notes that the relief Ms. Gjovik seeks is in the nature of damages, which also establishes that any injunction is not warranted.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

## V.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Apple's motion to strike, grants Apple's motion for summary judgment, and denies Ms. Gjovik's motions for summary judgment and a preliminary injunction.

The Clerk of the Court is instructed to enter a final judgment in accordance with this order and close the file in this case.

This order disposes of Docket Nos. 359, 361, and 367.

**IT IS SO ORDERED**.

Dated: June 24, 2026

_____

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

40