**Pages 1 - 26**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| ASHLEY M. GJOVIK,<br><br>Plaintiff,<br><br>VS.<br><br>APPLE INC.,<br><br>Defendant. | **NO. 3:23-cv-04597-EMC** |

San Francisco, California
Thursday, June 11, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
ASHLEY M. GJOVIK
2108 N Street, Suite 4553
Sacramento, CA 95816
**BY: ASHLEY M. GJOVIK, PRO SE**

For Defendant:
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
**BY: MELINDA S. RIECHERT, ATTORNEY AT LAW**

ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497
**BY: NICHOLAS J. HORTON, ATTORNEY AT LAW**

REPORTED REMOTELY BY: Kendra A. Steppler, RPR, CRR
Official United States Reporter

Thursday - June 11, 2026 2:31 p.m.

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:** All rise. Court is now in session, the Honorable Edward M. Chen presiding.

**THE COURT:** I apologize for the sauna effect. The condenser's broken. That's why we're getting hot air instead of cool air. Have a seat, everyone.

**THE COURTROOM DEPUTY:** First case the court will be calling is Gjovik v. Apple Inc., Case Number 23-4597.

Please state your appearance for the record, beginning with the plaintiff.

**MS. GJOVIK:** I'm the plaintiff, Ashley Gjovik.

**THE COURT:** All right. Thank you, Ms. Gjovik.

**MS. RIECHERT:** My name is Melinda Riechert from Orrick, representing Apple.

**THE COURT:** All right. Thank you, Ms. Riechert.

So we are here on cross-motions for summary judgment. And the question is whether or not there are material issues of fact that will require a trial. And although there are a lot of disputed issues of fact, I think, clearly, there are questions about -- there's enough here to show that Ms. Gjovik did engage in protected activity -- some protected activity. I don't think -- that's not disputed. There is enough here to suggest potential causal relationship between those activities

and her termination. And, on the other hand, the defendant has raised neutral reasons -- at least two, if not three -- for the termination.

And so under the traditional test that would apply here -- what we refer to as the McDonnell Douglas test, which is kind of a three-step -- the critical issue is whether or not the plaintiff has met her burden of showing that these neutral reasons, such as disclosure of confidential information, was pretextual, not the true reason. The true reason was because of the protected activity.

But I do want to make sure that the plaintiff does not contend -- there is another set of cases and tests for what's called a mixed motive test. But I don't see that being raised here. This is more traditional McDonnell Douglas test. So I'm not hearing -- not much was cited on the mixed motive -- I just want to make sure I don't go off on a tangent there.

**MS. GJOVIK:** I believe all the reasons I've stated for the termination were unlawful, themselves.

**THE COURT:** Okay. Well, there is also a bit of a twist. Labor Code 1102.5, I think it is, kind of states it just a little differently. And it seems to place, under some circumstance, the burden on the employer just so that the -- the termination would have been -- would have occurred anyway, but by a clear and convincing evidence.

But what -- I want to spend a little bit of time -- and

I've got four or five matters today, so -- and it's hot in here -- I want to try to get to the heart of the matter. The question is whether or not what the evidence of pretext is here that would suggest the true reason was the activities engaged in.

And so, first, we have timing. A lot of things happened. And there's a timeline. It is clear that when it was discovered that the information, which is alleged to have been confidential, was reached and given to a reporter and tweeted, et cetera, that within a span of about ten days, between that first happening and the termination on the 9th -- so that proximity is never a dispositive factor. But that suggests, you know, there's a causal relationship.

On the other hand, there were activities not too far off in time in terms of reporting. And I think there was one activity -- one reported -- was that to the -- just shortly within that time frame. And maybe you can remind me which agency you sent a complaint to. I think that was the --

**MS. GJOVIK:** I will, Your Honor. This one I --

**THE COURT:** The NLRB -- the last one -- the closest one was NLRB; right? That was, like, shortly. And then there was the EPA. So we have a situation where there has been a number of things happening in sort of -- you know -- before. There's some reportage to, like, environmental concerns that were stated sort of earlier on. And then some things that were

reported closer in time. But -- so that's -- you know -- that's one factor. You could argue sort of both things. But I think the law also states that proximity alone is not -- doesn't prove. I mean, it's maybe one factor.

But what I want to do is look at some of the arguments that the plaintiff has asserted in terms of reasons to believe that the real intent was retaliatory and not genuine. So one argument that Ms. Gjovik just made is shifting explanations that Apple had given. And several reasons, but the reasons were not always exactly the same.

So, Ms. Riechert, I want to give you a chance to respond to that -- why that doesn't hold much water, in your view.

**MS. RIECHERT:** Would you like me to do that now?

**THE COURT:** Yeah. I just -- yeah. I want to hear why that -- because I'm looking to see whether there's enough here to create a disputed issue of fact in whether the burden has been met.

**MS. RIECHERT:** I don't think there are any shifting explanations. Apple has been consistent from the time of the termination letter to the present that the reason that it terminated the plaintiff's employment is because she posted Apple confidential information on Twitter and she sent Apple confidential information to The Verge. That has never changed in any of the documents that have come forth since then. So there have been no changing, shifting, conflicting reasons.

**THE COURT:** All right.

And your response to that, Ms. Gjovik?

**MS. GJOVIK:** Thank you, Your Honor.

I would highlight, as I outlined in my motion, in the opposition, that basically all of the reasons have shifted or were not disclosed. The first one was the -- about 3-D scans of ears. They pointed out --

**THE COURT:** The first one was what?

**MS. GJOVIK:** The one that they were emailing me asking me to do three-dimensional scans of my ears and ear canals. And I complained about that as an invasion of privacy. And they had pled that to the agencies and this Court as a reason they fired me. And then, under deposition, their corporate witness said that's actually not a reason I was ever fired and it was not confidential. But their own filings, including their interrogatory on the reason I was fired, specifically said that was one of the reasons I was fired, as well as my Department of Labor filings.

They always used code words for what the reasons were I was fired. I believe the ears were called "omega." But under the 30(b)(6) deposition of the corporate witness, she could not decipher the code names used by Apple's attorneys in this matter or the Department of Labor. She could not identify what those were actually related to.

Regarding the post about privacy invasions with the face

Gobbler application, Apple's witnesses were unable to identify which photos were actually supposedly leaked. When showed multiple photos, they could not identify which ones. They were shifting. They could not provide a coherent explanation of why they were confidential. These are also photos taken of me in my own home. And there was shifting of whether -- who saw the tech -- it was very unclear.

The Verge article -- the responses have gone back and forth about whether they knew about it before I was fired or after, and what part is after acquired versus the termination reason, with some witnesses even implying that it was not part of the decision, or some implying it was, but not able to identify the title of the article, the content of the article, or to even describe the supposed photo or video included in the article that was supposedly leaking. And this was a video of -- photo -- photos and videos taken of me in my home, by my phone, that I was complaining about.

And then there was the -- an explanation -- a complaint that I was requesting documented communications with pending federal charges, and anticipated litigation with Apple, and claimed that my request to have the communications in writing was somehow misconduct, that I would not get on a phone for oral communication. And that has --

**THE COURT:** Okay. I want to take the main inconsistency you believe is -- the major shift that you think

is most indicative of a pretext. Which of those things would you say is most compelling?

**MS. GJOVIK:** First, Your Honor, I'd like to clarify, I believe all of these are not -- these are unlawful in their own right and under the statutes in this case. So this is actually kind of maybe a modified analysis where I am arguing that there was pretext that they fired me for other protected reasons, but that each of the reasons they're saying they fired me for --

**THE COURT:** Okay. I understand that argument.

**MS. GJOVIK:** Oh, sorry.

**THE COURT:** But I'm focusing on the pretext question.

**MS. GJOVIK:** Okay. I would say their hidden reason for firing me -- for reporting sexual harassment -- and then which they were advised to --

**THE COURT:** When you say "hidden reason," what --

**MS. GJOVIK:** They would not -- they had not disclosed the nature or any details of this reason they fired me. But under deposition, their witnesses said, concretely, I was fired for reporting various versions of sexual harassment. And even citing a criminal statute was somehow misconduct by me. There's complete shifting explanations between all witnesses. It was never disclosed in any of their discovery responses or filings. And I believe that also shows that they're concealing shifting and --

**THE COURT:** Well, I mean, I have to look at the

termination letter and the various documents that are appended to the Bowman declaration. And they seem consistent in terms of at least asserting that this was confidential Apple information that was leaked, violation of policy. I mean, that part of it seems to be consistent throughout.

**MS. GJOVIK:** Well, further than that, they seem to be now saying the confidential information was the Gobbler photos. They've backpedaled on the 3-D ear scans, which is in their prior statements. And then regarding the photos, the witnesses could not identify which photos were --

**THE COURT:** Okay. So let me just ask Ms. Riechert to respond to that.

**MS. RIECHERT:** I'm not sure I caught all of that. But on ear scans, the ear scans was background information that was provided to these agencies in connection with the history of Ms. Gjovik posting information about Apple products on Twitter. Apple was consistent in its response to the -- to OSHA -- to the DOL that she was fired for posting confidential information.

In the O'Melveny letter that she cites, that does -- has nothing to do with the reasons for termination. That just tells her to take down posts. So there was nothing in these documents that was inconsistent with the reasons for termination that she posted confidential information.

**THE COURT:** And the documents -- do the documents

identify precisely which documents? They all talk about termination, violation of the business conduct policy. Is there -- is there identification more specific in these termination memos?

**MS. RIECHERT:** So we have the termination letter that gives the primary reason -- and Mr. Bertolus confirmed -- the primary reason that she was let go was because she posted confidential information. Even if she had done nothing else, she would have been terminated for that. But --

**THE COURT:** And does it identify precisely what that confidential information --

**MS. RIECHERT:** Correct. The confidential information was the posting of the pictures on Twitter and the sending of the pictures to The Verge so that they could post them in their article that were pictures that were taken on a confidential app that she was provided with the phone. She agreed to keep everything confidential. And she violated her obligation to keep that confidential information confidential by publishing it. And that is why she was fired.

And doing -- why do we know that's why she was fired? Because Mr. Bertolus, who was retired, gave -- came and gave a deposition in the case and signed a declaration. And he said that's why she was fired.

**THE COURT:** All right. Let me ask you this: There's -- she's also referred to -- as another basis for

asserting pretext -- there's a document that was issued before her termination that was entitled the "Draft Exit Outcomes ACP.key," which sounds like a decision to -- or a predetermined decision to terminate. Why doesn't that raise an inference of a --

**MS. RIECHERT:** So that's a privileged document. And we're not required to breach the privilege by saying what was in that document. But as Ms. Gjovik has admitted, she had asked Apple about leaving the company and having -- getting paid severance in exchange for leaving. And so, again, I'm not going to reveal what was in that document, because I'm not allowed to, and I will not waive the privilege. But she has, herself, provided a potential explanation for what was in that document. But we cannot be forced to waive the privilege and reveal what was in that document. But it does not evidence pretext.

**THE COURT:** And I understand there's a privilege. And you have the right to assert the privilege. In this context, is there any authority to draw an inference -- an adverse inference -- from the nondisclosure?

**MS. RIECHERT:** Right. That's my understanding, is that you cannot draw an adverse inference from the fact that we've asserted the privilege.

**THE COURT:** And there's -- the *St. John* case says that, among others.

So what am I supposed to do with that then? There's a document. It's got a title that might be suggestive. But it's -- it can be explained by the fact that you had already made some indication that you might want to leave the company. And this well could have been in response to that.

**MS. GJOVIK:** I think the overall timeline of the complaints being made, starting in March and April, and then two investigations from employee relations through that time, with the second one starting in July and August, with that detailed issue confirmation of the 33 pages of what they were supposed to be investigating, in addition to the emails to employees relations complaining of a constructive termination and a hostile work environment back in June and July of 2021, the termination in September, are very instructive, as well as the emails of me saying, if Apple will not address the issues and correct the hostile work environment, I'll be forced to leave. Because no one would stay in this type of environment. So we could discuss an exit package. But I was urging them to try to investigate and resolve those issues.

And then, concurrently, I, again, argue that all the things I've listed were protected activity. Like these supposed photos, they've not been able to explain why they are confidential. They're just photos of me taken by something I called spyware of me in my living room with my phone.

And I also object to the -- Counsel's assertion that I

consented to keeping this stuff quiet. In fact, an evidence of pretext would be them citing this informed consent form, saying that somehow made me consent to being secret in 2021, when the form itself was dated for 20 minutes in 2017. And Apple had --

**THE COURT REPORTER:** I'm sorry. "And Apple had" what?

**MS. GJOVIK:** I apologize.

Apple had withheld that for some time in discovery. And I had filed a pending motion to compel that specific document when they finally produced it. And Apple's own witness familiar with the program that was running this application also agreed with me that if you sign something in 2017 for a 20-minute period, it would be unreasonable to expect that it would cover any terms of ongoing activities in 2021.

**THE COURT:** Well, I'm referring to -- there's one particular document that you've cited that has this title. And the explanation was you had indicated in a prior role that, you know, you may not be at Apple after December 31st, 2022. One option is an exit package that you were looking for -- getting benefits and compensation. So there had been some discussion about your separating and that the -- that well could explain what this document was about, even though we don't know what the document -- we don't see it. It's privileged. And they don't have the -- Apple doesn't have the obligation to waive the privilege.

**MS. GJOVIK:** If I can add one more thing specific to

that?

**THE COURT:** I'm sorry?

**MS. GJOVIK:** May I please add one more thing specific to that? I apologize.

**THE COURT:** Yeah.

**MS. GJOVIK:** So there was discussions of an exit package in July 2021 with Mr. Okpo. And it would be through that time. That would be when I graduated law school. And it was a large amount. I've posted in some of the joint statements it was over $500,000. It was an exit package.

And I had complained that Apple denied it on the terms I had to waive all rights, including toxic exposures for the hazardous waste in my office. And I was concerned about potential cancer exposure. And they would not include any additional compensation or carve-out if I was to get cancer. And so it was taken off the table. And I was told there would be no agreement. And, instead, they were going to launch this investigation. And the only next steps would be regarding the investigation, implying there would be no further discussion on severance.

**THE COURT:** Well, let me ask Ms. Riechert, the date of this particular document -- it was emailed in August of 2021. The discussion about Ms. Gjovik leaving and possibly an exit package seemed to be -- well, I guess, that wasn't too far ahead of that. That was in July.

**MS. RIECHERT:** Late July I believe.

**THE COURT:** So -- so you would argue that there's -- that suggests there's a causal relationship, even though we can't see -- unless you waive the privilege, we can't see it. But is -- that discussion about the exit package is not far off in time. About a month -- looks like about a month before the memo.

**MS. RIECHERT:** I don't want to represent what was in that document. I'm just pointing out that the plaintiff herself admitted that she was talking about an exit package in late July. And that may or may not be --

**THE COURT:** Right. I mean, it's close in time.

**MS. RIECHERT:** Close in time.

**THE COURT:** The question is whether this document, in and of itself, raises enough of an inference to raise a question of fact. But -- all right. Let me go to another question here.

I know there are some other arguments made. But one of -- another one is disparate treatment. Dr. Aloe published some information. And -- and he got differential treatment, I guess, from Ms. Gjovik. What's your response to that one?

**MS. RIECHERT:** Yes, Your Honor.

Dr. Aloe did not publish any confidential information. There's no evidence that he was ever told that he was publishing confidential information. He said he was never

reprimanded for publishing confidential information. The information in his articles is very general. Nothing about pictures of existing Apple studies that were being undertaken, which is what Ms. Gjovik published about.

So there's no comparison between the articles that he published, which she attached to her motion, and the pictures that she posted. They're just totally different and nothing to suggest that anything in his articles was confidential. And he agreed, they were not.

**THE COURT:** Okay.

Do you have any concrete evidence that your situation was comparable?

**MS. GJOVIK:** Yeah. I would say Apple's own filings in this case and the prior Department of Labor case, where they originally said the disclosure of confidential information included a user study and any details of a user study, with Mr. Aloe testifying during his deposition that Gobbler was not a user study and said it was -- there's no user study.

Apple's filings have since now been citing the photos as their supposed content that was supposedly confidential and leaked; however, the photos were noted marked "confidential." There was no warning they were confidential. Mr. Aloe also indicated he was not aware of what process was running on these phones that I even captured these photos and videos. He said the Gobbler app was just a, like, user interface application,

where you can view files on the phone itself, but it's not taking them itself. And he did not know which team owned that process or how it worked or where they were coming from.

So I would say all of that is very inconsistent. And Apple has also been unable to articulate exactly where these photos of me in my living room in my pajamas were confidential.

**THE COURT:** What was it about Mr. -- Dr. Aloe's publication that you feel was particularly sensitive and confidential that he should have been disciplined for?

**MS. GJOVIK:** Oh, sorry. I missed your question.

I don't believe anything he shared was confidential. I also don't believe anything I shared was confidential.

**THE COURT:** Okay. So your attack is he didn't do anything that was confidential, and you didn't do anything that was confidential.

**MS. GJOVIK:** And he detailed the face ID development process, including user studies and biometrics development and the cameras. The deposition went through many of these articles. He felt very confident none of it was confidential. I agreed with him on every single one. In fact, it was Apple indicating I was the one that suggested he should be terminated, which I find very improper and potentially, like, retaliation against him. I'm concerned about that. I think what she shared was fine, and Apple employees should be encouraged to share more about their work.

**THE COURT:** All right. Let me ask, Apple also contends that others had been disciplined or terminated, I believe, for breaching confidentiality. One question is, what -- maybe you can point to me where, in the record, I could find the strongest evidence that others -- this is not an aberration -- what happened here -- that others were terminated. And I take it terminated without a progressive disciplinary -- kind of done in a very expedient way. Where is the best evidence of that?

**MS. RIECHERT:** Yeah. It's in the declaration, I believe, of Megan Bowman, is where we talk about that and the evidence that she mentions other people. Obviously, it's very confidential who those people are and what they did. And so we didn't get into a lot of detail about it, because we know that what gets filed in this case gets published on Twitter or X.

But there's no dispute -- the plaintiff has not disputed that these people were fired for posting confidential information. And, again, that's further evidence, just in addition to all the other evidence we have, that this is -- the way the plaintiff was treated was not an aberration. It wasn't different to the way that Apple has treated other people.

**THE COURT:** Whose declaration?

**MS. RIECHERT:** I think it was Megan Bowman. Document number...

**THE COURT:** That's 371, I believe. That's her

declaration. But what she says in paragraph 7 -- "I'm aware that Apple has terminated over a dozen employees, in addition to Ms. Gjovik, for disclosing confidential information in violation of policy." And is that the extent of it?

**MS. RIECHERT:** Yes. That is item number 371 on the docket, declaration of Megan Bowman. And that's what she said. And, again, it's not disputed that that's what happened.

**THE COURT:** Okay.

Do you have any evidence that that's not accurate, Ms. Gjovik?

**MS. GJOVIK:** Yes, Your Honor. As I argued in my opposition, the notice is extremely vague. And it was unclear what the factual basis for any of these were, as well as Ms. Bowman's declaration. It was extremely high level. There were no details. And Ms. Riechert here has now added that I was posting content. But I don't even think that was in any of those letters or her declaration.

**THE COURT:** But do you have any evidence of people posting comparable information that you did who were not disciplined?

**MS. GJOVIK:** The photos taken by the phone -- it is difficult if anyone taking a photo of themselves on their phone maybe is comparable -- their work phone. There's many employees who share information. The question is, what is confidential, I would argue. And I think that's where we would

look to 1102.5, 232.5, et cetera, that employees have a right to talk about their work conditions, make complaints about them --

**THE COURT:** They do. But they can't disclose confidential information.

**MS. GJOVIK:** Okay. I argue -- yep. I argue this is not confidential. And they've made no showing that any of this is confidential.

In fact, the declaration I filed included my deposition taken by Apple, where I explained to them, in December of 2025, that I, in fact, escalated this matter to a senior manager in the video engineering department of Apple before I shared any of this content asking her her opinion if these photos would be confidential or not. I thought they were not. She agreed they were not.

I gave her name of who I talked to. And she encouraged me to share them, also expressing concern about all these photos being gathered. So I escalated to management at Apple. I asked if this was confidential or not. She suggested she did not believe they were and encouraged me to share them, in hoping to reform Apple's practices regarding privacy of employees.

**THE COURT:** Ms. Reichert, direct me to the most probative evidence about -- on the subject of confidentiality. That what specifically was posted and disclosed was indeed

confidential.

**MS. RIECHERT:** Right.

**THE COURT:** Where would I find that?

**MS. RIECHERT:** So Dr. Aloe's deposition and declaration were both the most detailed, if subtle, description of what was confidential. So Ms. Gjovik asked him in his deposition what was confidential. I can get you the page number for that. And then in his declaration, he, again, explains what was confidential. That's document number 370 on the Court's docket. And he explains what was confidential about it.

**THE COURT:** All right. So he's -- his declaration -- does it say anything different than what he said in his deposition?

**MS. RIECHERT:** No. They're essentially the same. Again, we couldn't get into the real detail about what it is about the pictures that's confidential, because we were not allowed to produce testimony under the protective order and accept it as being honored, as Your Honor well knows.

And so he gave information that he believed that it was confidential. Bertolus gave information that he believed it was confidential; therefore, Apple determined that it was confidential. And Ms. Gjovik has not rebutted that by saying that anybody else was treated differently, that other people who published confidential information were not punished. So

Apple had the right to decide that it was confidential, and they did so.

**THE COURT:** Would you agree that, under the Labor Code Section 1102.5, that the burden is on the employer to prove that the same decision -- if the plaintiff shows a -- at least raises a plausible issue of fact of causal relationship between the retaliation -- alleged retaliation -- or the protected activity and the termination -- that the burden shifts to the employer to show by clear and convincing evidence?

**MS. RIECHERT:** I absolutely agree with that. That what the legislature intended, in my opinion, is just because you engage in protected activity, does not protect you from being terminated. That's what that statute says. That's what the case law says. So an employee cannot engage in protected activity, and then engage in misconduct, and then say, oh, you can't fire me for the misconduct, because I engaged in protected activity.

**THE COURT:** That allows the employer to terminate, but it has to do so by a fairly high burden of proof.

**MS. RIECHERT:** Right. And we have absolutely presented and met, in our opinion, the burden of proof to show that she was fired because she posted confidential information. We have the Bertolus declaration. We have the timing issue, which Your Honor pointed out. She had been complaining for a long time. We didn't terminate her when she started

complaining. It wasn't until the posting, and then we have the Labor Day weekend, and then she's terminated on the 9th. So between the posting on the 3th and the termination on the 9th, we have temporal proximity to show that it was the posting and not the fact that for many, many, many months before that, she had been complaining about a number of things.

**THE COURT:** So the sequence, in your view, proves the exact opposite. That is, had there been a retaliatory intent, it would have manifested itself much earlier. The true triggering incident was the postings.

**MS. RIECHERT:** Exactly. We have complaint, complaint, complaint, complaint, complaint, posting, and almost immediate termination. So I think the timing supports this. And that's what meets the burden in 1102.5 that shows that it was the posting, not the protected activity, that resulted in the termination. And she would have been fired anyway, even if she had never made a complaint.

And then the fact that other people were fired for the same conduct further supports that people who post or reveal confidential information are fired. And the fact that they did or didn't make complaints is irrelevant.

**THE COURT:** All right.

I'll give you the last word, Ms. Gjovik.

**MS. GJOVIK:** Thank you, Your Honor.

I would look closer at the timeline between the postings

and then Apple's actions leading up to and after the termination, in that median time frame, where the postings and the article were around August 30th and August 31st. Apple did not contact me for their depositions about this post until August -- September 9th, 2021.

And I have deposition testimony that management was aware of these articles. Apple was aware of the article. Their privilege log shows they were aware of the article at the time it was published. Their request for admission admitted they were asked for comment on this article before it was published. So they had a time to intervene if they were concerned about any of the content.

And they had known about it for nine to ten days before they apparently reached out. And when they contacted me, they never asked me to delete any content. They never warned me to stop posting any specific type of content. And when I asked them what their concerns are, they refused to detail any of their concerns about what I supposedly did wrong.

And it was not until September 15th, six days after I was fired, that I got an email from a law firm, OMM, asking me to delete several posts. But Ms. Riechert has now testified during this hearing, that that was unrelated to the termination, as well, and severed it, which means that they had never followed up with any specific warning of what was confidential and that I need to stop sharing anything

confidential or what I need to delete.

And the first I actually heard of these details as their supposed reason for termination would be their Department of Labor position statement in March of 2022. So I would argue that if Apple really thought this content was confidential, they would have acted very swiftly, not waited nine or more days. They would have been very clear about what supposedly was confidential and what needed to be removed.

I was a very good employee. They could have given me a warning and said, hey, maybe you didn't realize this is confidential. We think it is. We did not have a conversation about it. And the email they sent about a week after still did not detail it specifically was confidential. I emailed a response, I don't think any of this is confidential. And it's only in litigation that Apple is starting to begin to point to what supposedly may or may not be confidential. So I'd say that Apple's own timeline is evidence of pretext.

**THE COURT:** All right. I --

**MS. RIECHERT:** I think Apple acted --

**THE COURT:** Okay.

**MS. RIECHERT:** -- very speedily. Between August 30th and September 9th, with the Labor Day weekend in between, they acted speedily. They tried to interview her to get her point of view. She refused to be interviewed. They made the decision to terminate. And then a few days thereafter, they

had a law firm write a letter to her telling her to take it all down because it was confidential. I think that's very speedy.

**THE COURT:** All right. I will take the matter under submission -- the cross-motions.

**MS. RIECHERT:** Yeah. I'd would like to just make one more point, Your Honor.

**THE COURT:** Okay.

**MS. RIECHERT:** I would like to strike her motion, her oppositions, her replies. Everything was filed late again.

**THE COURT:** I understand that.

**MS. RIECHERT:** Okay.

**THE COURT:** I will take that under submission, as well.

**MS. RIECHERT:** Thank you.

**THE COURT:** Thank you.

Thank you, Ms. Gjovik.

**MS. GJOVIK:** Thank you, Your Honor.

**THE COURT:** Thank you.

(Proceedings adjourned at 3:06 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Saturday, June 27, 2026

Kendra Steppler

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court