Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY M. GJOVIK,**
*an individual*,

Plaintiff,

vs.

**APPLE INC.,**
*a corporation,*

Defendant.

**CASE NO.**
**3:23-CV-04597-EMC (KAW)**

**OPPOSITION TO APPLE'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS & MOTION TO SEAL**
**(DKT. 304-305)**

**HEARING:**
**DATE: APRIL 16 2026**
**TIME: 1:30 PM PST**
**LOCATION: OAKLAND, TBD**

# TABLE OF CONTENTS


**INTRODUCTION** .......... 3

**PROCEDURAL BACKGROUND** .......... 4

I. APPLE OBTAINED THE PROTECTIVE ORDER ON FALSE PRETENSES .......... 4

II. APPLE NEVER USED THE ORDER FOR ITS STATED PURPOSE .......... 4

III. APPLE'S BLANKET DESIGNATION AND AUTOMATIC WAIVER .......... 5

IV. APPLE'S DEFICIENT "NARROWED" DESIGNATIONS .......... 5

V. APPLE'S ESCALATION AND REFUSAL TO MEET AND CONFER .......... 5

**ARGUMENT** .......... 6

VI. THE DESIGNATED INFORMATION FALLS OUTSIDE THE PROTECTIVE ORDER'S SCOPE .......... 6

*A. Plaintiff's Experiential Testimony Is Independently Known Information* .......... *6*

*B. The Information Is Also in the Public Domain* .......... *7*

*C. Apple's Argument That the Challenge Process Applies to Out-of-Scope Information Is Wrong* .......... *7*

VII. THE PROTECTIVE ORDER LACKS A VALID LEGAL FOUNDATION .......... 7

VIII. APPLE'S DESIGNATIONS ARE PROCEDURALLY VOID .......... 8

IX. APPLE CANNOT MEET ITS BURDEN ON THE MERITS .......... 9

*A. The Correct Legal Standard Is Good Cause, Not Pansy Balancing* .......... *9*

*B. What Apple Actually Designated—And What It Told the Court* .......... *9*

*C. The DiVincent Declaration Fails Under Binding Ninth Circuit Standards* .......... *10*

*D. The "Product-Related" Category Fails Under Binding Authority* .......... *11*

*E. Apple's Pansy Factor Analysis Is Wrong on Every Factor That Matters* .......... *12*

*F. Apple's IPA/NDA Is Irrelevant to the Designation Analysis* .......... *13*

*G. Apple Is Seeking a Ruling, Not a Redaction—The Bootstrapping Problem* .......... *14*

*H. Apple's Claimed Competitive Harm Is the Harm of Losing the Advantage of Noncompliance* .......... *15*

*I. The Reproductive Biology Designations Are Especially Indefensible* .......... *20*

X. APPLE'S CONDUCT WARRANTS SANCTIONS .......... 22

XI. APPLE'S MOTION TO SEAL SHOULD BE DENIED .......... 23

*A. Apple Has Not Met the Compelling Reasons Standard* .......... *23*

*B. Apple Failed to Serve Plaintiff With Its Sealed Filings* .......... *23*

*C. The Sealing Request Is Part of the Same Pattern* .......... *24*

**REQUESTED RELIEF** .......... 24

**CONCLUSION** .......... 25

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Cryovac, Inc.,* 805 F.2d 1, 7 (1st Cir. 1986) ---------- 18

*Beckman Indus., Inc. v. Int'l Ins. Co.,* ---------- 7

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.,* 712 F.3d 1349 (9th Cir. 2013) ---------- 11

*Cahill v. Nike, Inc.,* No. 3:18-cv-01477-JR, 2022 WL 4667364 (D. Or. Sept. 30, 2022) ---------- 13

*Callsome Solutions Inc. v. Google Inc.*, 2018 NY Slip Op. 32716(U) (N.Y. Sup. Ct. 2018) ---------- 22

*Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016) ---------- 12

*Center for Auto Safety v. Chrysler Group, LLC,* 809 F.3d 1092, 1101 (9th Cir. 2016) ---------- 23

*Cipollone v. Liggett Group, Inc.,* 649 F. Supp. 664 (D.N.J. 1986) ---------- 18

*Citizens First Nat'l Bank v. Cincinnati Ins. Co.,* 178 F.3d 943, 945 (7th Cir. 1999) (Posner, C.J.) ---------- 11

*Del Campo v. American Corrective Counseling Services, Inc.,* No. C-01-21151 JW (PVT), 2007 WL 3306496 (N.D. Cal. 2007) - 23

*Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1133–35 (9th Cir. 2003) ---------- 7

*Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) ---------- 10

*In re Burbank Envtl. Litig.,* 42 F. Supp. 2d 976 (C.D. Cal. 1998). ---------- 12

*In re Halkin,* 598 F.2d 176 (D.C. Cir. 1979) ---------- 6

*Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) ---------- 23

*Montana v. United States*, 440 U.S. 147 (1979) ---------- 14

*Oliner v. Kontrabecki*, 745 F.3d 1024, 1026-27 (9th Cir. 2014) ---------- 13, 23

*Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994 ---------- 9

*Phillips ex rel. Estates of Byrd v. General Motors Corp.,* 307 F.3d 1206, 1211 (9th Cir. 2002) ---------- 9

*Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 677-78 (9th Cir. 2010) ---------- 23

*Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993) ---------- 14

*Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 510 (1984) ---------- 14

*Procaps S.A. v. Patheon Inc.,* No. 12-24356-CIV, 2015 WL 4430955 (S.D. Fla. 2015) ---------- 22

*Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 225 (6th Cir. 1996) ---------- 24

*Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir. 1996) ---------- 11

*Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 790 (1st Cir. 1988) ---------- 6

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 n.15 (1984) ---------- 12, 18

*San Jose Mercury News, Inc. v. U.S. District Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) ---------- 9

*Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 37 (1984) ---------- 6

*United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J.) ---------- 19

## STATUTES

18 U.S.C. § 1839(3). ---------- 10

Cal. Civ. Code § 3426.1(d)(1). ---------- 18

Cal. Pen. Code Section 637.7 ---------- 18

UTSA § 1(4) ---------- 10

RULES

Rule 26(c)(1)(G) ---------- 11

Rule 26(g) ---------- 8

**OMNIBUS OPPOSITION TO APPLE'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS & MOTION TO SEAL (DKT. 304-305)**

## INTRODUCTION

1. Apple's Motion to Retain Confidentiality Designations (Dkt. 304) asks this Court to declare that 107 rows of Plaintiff's own deposition testimony are "Confidential" under the Protective Order. This omnibus opposition addresses that motion and Apple's related Motion to Seal.

2. The Court should understand what Apple designated and what it did not. Apple did not designate a single produced document. Apple did not designate trade secrets, product specifications, source code, or financial data. Apple designated one thing: Plaintiff's words. Specifically, Apple designated Plaintiff's testimony about product code names that have been in press articles and on Wikipedia for years, the name "[redacted]" — a consumer product Apple sold on its own website — and Plaintiff's complaints about Apple pressuring employees to participate in invasive reproductive health studies involving [redacted]. Apple then sought contempt, sanctions, and a gag order when Plaintiff discussed those complaints publicly.

3. Apple's motion tells the Court that many of these designations are "unchallenged." That is false. Plaintiff challenged every designation on Feb. 4, 2026 — the same day Apple sent them — in a detailed email that Apple has never responded to on the substance and again after. Where Plaintiff offered to allow Apple to redact certain immaterial items as a courtesy, Apple rejected the redactions and instead asks this Court to issue a judicial finding that the information "is Confidential." There is a reason Apple wants a ruling rather than a redaction: Apple intends to cite that ruling at summary judgment as evidence that Plaintiff's disclosures violated her confidentiality obligations and that her termination was lawful. This Court should not allow a discovery management tool to be bootstrapped into a merits adjudication.

4. Apple's motion also misrepresents the meet-and-confer process. Apple told the Court that Plaintiff's challenges did not begin until February 18, 2026. The email chain attached to the Declaration proves otherwise. Apple told the Court that Plaintiff filed a sanctions motion "in lieu of responding" to Apple's narrowed designations. Plaintiff responded on March 6, 2026. Apple ignored that response and filed this motion five days later. And at the February 20 hearing, this Court instructed Apple to narrow its 160 designations through good-faith meet-and-confer. Apple withdrew 16 — a 15% reduction — reclassified the rest as "unchallenged," and presented the result as compliance.

5. On the merits, every designation fails. [redacted] is a publicly sold consumer product. The reproductive biology designations concern studies that Apple itself published in a peer-reviewed journal (AJOG, 2022), registered on ClinicalTrials.gov, and promoted in a press release. The code names are

publicly available for years. Apple's own declarant concedes the information may be publicly available and he cannot tell based on what was shared if the Plaintiff was talking about public or internal information. What Apple claims is secret is not the information — it is the employee's experience of being asked and her complaints about the asking. That is not a trade secret. It is a claim of ownership over the employee's complaints.

6. Apple's motion should be denied. Apple's Motion to Seal should be denied. Every designation should be stripped. And any ruling should state explicitly that it is limited to discovery management and does not constitute a finding on trade secret status, NDA enforceability, or merits issues.

## PROCEDURAL BACKGROUND

### I. Apple Obtained the Protective Order on False Pretenses

7. Apple's stated justification for a protective order evolved over months, but the representation that ultimately induced entry was that Apple needed the order to show Plaintiff the unredacted "Gobbler" informed consent form—a document Apple described as the evidentiary basis for its termination defense—for authentication at deposition. (Dkt. 220-9, May 2, 2025 M&C Tr.). Apple's counsel stated on the record at the July 2, 2025 conference that the Protective Order was needed to produce this document. (July 2, 2025 Cert. Tr. at 10:17–11:11, Dkt. 302 Ex. D).

8. Plaintiff opposed the Protective Order extensively and repeatedly. (Dkt. 211, 213, 214, 220). Plaintiff warned the Court on the record that Apple's actual intended use was to designate deposition testimony about whistleblower disclosures and protected activity as confidential and prevent Plaintiff from speaking about the basis of her termination and her workplace complaints—not to facilitate document production or any legitimate discovery purpose. (July 2, 2025 Tr. at 6:10–21). The Court did not address this warning on the merits. The Court entered the Protective Order on July 7, 2025 (Dkt. 235) over Plaintiff's preserved objections, without requiring a formal motion or good cause showing from Apple.

### II. Apple Never Used the Order for Its Stated Purpose

9. Apple never produced the Gobbler informed consent form under the Protective Order. Apple never designated a single produced document as confidential. Apple confirmed this expressly: "All documents used in the deposition were produced either by Apple or by you. None was designated confidential." (Feb. 6, 2026 email). The document Apple cited as the entire justification for the order was never produced under it, is available on the public docket at Dkt. 250 pp. 52–54, and is apparently not confidential at all.

10. The Protective Order's sole use has been exactly what Plaintiff warned: designating Plaintiff's deposition testimony about own workplace complaints as "Apple Confidential," and then seeking contempt, sanctions, and a gag order. Apple acknowledged this connection in its own filing,

claiming the "breach" is independently actionable under Plaintiff's employment agreement and that "it was her public disclosure of confidential Apple product-related information that led to her termination from Apple in the first place." (Dkt. 280, fn. 2). Apple is using the Protective Order to relitigate its termination defense through the contempt power and obtain gag orders were it could not on the merits.

## III. Apple's Blanket Designation and Automatic Waiver

11. At the December 16, 2025 deposition, Apple declared a blanket designation covering pages 66–305 of the 336-page transcript—approximately 72% of Plaintiff's testimony. Plaintiff objected contemporaneously on the record. Apple acknowledged the objection and agreed to narrow. Under Protective Order § 6.3, the 21-day clock to file a motion to retain ran from Plaintiff's on-record challenge on December 16, 2025. Apple did not file any motion within 21 days. Under § 6.3, "[f]ailure by the Designating Party to make such a motion including the required declaration within 21 days … shall automatically waive the confidentiality designation for each challenged designation." The blanket designation automatically lapsed on or about January 6, 2026.

## IV. Apple's Deficient "Narrowed" Designations

12. On February 4, 2026—50 days after the deposition—Apple emailed the court reporter (not Plaintiff) an unsigned, undated "chart" of narrowed designations. Plaintiff was copied "for notice purposes" only. The chart bore no attorney signature, no date, and no certificate of service. Rule 26(g)(1) requires every discovery response to "be signed by at least one attorney of record in the attorney's own name." Rule 26(g)(2) provides that "[o]ther parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention."

13. Plaintiff raised the signature deficiency, the absence of a date, and the failure to serve repeatedly in writing beginning February 4, 2026. Apple expressly refused to cure: "Apple declines your request that it do more than it is required to do. Nothing else is required from Apple." (Feb. 6, 2026 email). Under Rule 26(g)(2), the unsigned chart is a legal nullity that the Court must strike.

## V. Apple's Escalation and Refusal to Meet and Confer

14. Rather than curing its deficiencies or engaging in the challenge process the Protective Order requires, Apple escalated. Apple filed an emergency letter (Dkt. 280) seeking sanctions, contempt, and a gag order. The Court convened a February 20, 2026 conference and ordered Apple to complete a meet-and-confer before filing motions. (Dkt. 288). Apple refused to communicate with Plaintiff for nearly six days. Then, on February 26, 2026, Apple announced it refused to meet and confer—stating "nothing further to discuss" seven times in writing—and filed three motions at approximately 10:00 PM: a Motion to Seal (Dkt. 293), a Motion to Enforce Protective Order (Dkt. 294), and a Motion to Shorten Time (Dkt. 295).

15. Apple's March 4, 2026 letter purports to respond to some of Plaintiff's designation challenges but addresses only a portion. Apple de-designated approximately 23 lines of prior designations but failed to respond to 53 lines. Apple retained designations only on testimony involving female reproductive biology and the studies at issue in Plaintiff's NLRB charge—providing no Rule 26(c) justification for any retained designation. Apple has never addressed the threshold procedural deficiencies that are the subject of Plaintiff's pending Motion for Sanctions (Dkt. 302). Apple now files its Motion to Retain Confidentiality Designations (Dkt. 304), supported by a declaration from Michael DiVincent and a declaration from counsel Melinda Riechert. For all the reasons set forth below, the motion should be denied.

# ARGUMENT

## VI. THE DESIGNATED INFORMATION FALLS OUTSIDE THE PROTECTIVE ORDER'S SCOPE

16. Section 3 of the Protective Order (Dkt. 235) provides that its protections "do not cover": (a) information "in the public domain" and (b) information "known to the Receiving Party prior to the disclosure." This is a scope exclusion, not an affirmative defense. Information outside the order's scope was never subject to its protections. A designation stamped on such information is a nullity. No challenge process under Section 6 is required.

### *A. Plaintiff's Experiential Testimony Is Independently Known Information*

17. Every designation Apple seeks to retain concerns Plaintiff's own deposition testimony about her own experiences: her complaints about Apple's workplace studies, her account of what she was asked to do, her objections to those requests. This is information Plaintiff knew before discovery, before the Protective Order was entered, and before this lawsuit was filed. Plaintiff lived these experiences. They are "information known to the Receiving Party prior to the disclosure" under Section 3(b). The order's protections "do not cover" them.

18. Under *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 37 (1984), a protective order is constitutional only because it "does not restrict the dissemination of the information if gained from other sources." The D.C. Circuit drew the same line in *In re Halkin,* 598 F.2d 176 (D.C. Cir. 1979), dividing a protective order into information obtained through deposition and information independently acquired, and holding that restricting the right to disseminate independently acquired information was unconstitutional. Plaintiff gained this information from her own life. She can tell anyone what happened to her at Apple without the Protective Order being implicated—because the order, by its own terms, does not reach independently known information. See also *Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 790 (1st Cir. 1988) (blanket protective orders are "by nature overinclusive and are, therefore, peculiarly subject

to later modification").

***B. The Information Is Also in the Public Domain***

19. Plaintiff filed NLRB Charge No. 32-CA-381277, which describes the designated testimony. Apple itself referenced the NLRB charge in its filings. (Dkt. 280). The substance of the designated testimony—that Plaintiff complained about Apple's workplace studies involving employee data—has been the subject of public reporting, public NLRB proceedings, and Plaintiff's own public advocacy for years. This information is "in the public domain" under Section 3(a). The order's protections do not cover it.

***C. Apple's Argument That the Challenge Process Applies to Out-of-Scope Information Is Wrong***

20. Apple's position throughout this dispute has been that regardless of whether information is public or independently known, Plaintiff must treat it as confidential while the challenge process runs its course. This reads Section 6 as overriding Section 3—applying the challenge procedure to information the order excludes from its scope. That inverts the order's own structure. Section 3 defines the order's boundaries. Section 6 governs disputes within those boundaries. Designations on information outside Section 3 are void ab initio.

21. The interim protection provision—treating material as confidential pending a ruling—cannot transform out-of-scope information into in-scope information. It preserves the status quo for information that might qualify. For information the order categorically excludes, the status quo is no protection. Applying interim confidentiality to public information about workplace conditions creates an unconstitutional prior restraint under *Seattle Times.* The Plaintiff's pending Petition for Rulemaking filed with the Advisory Committee on Civil Rules in February 2026 (Rules Suggestion 26-CV-6) identifies this exact problem, describing it as "functionally identical to a secret prior restraint—the most constitutionally disfavored form of speech restriction in American law."[1]

## VII. THE PROTECTIVE ORDER LACKS A VALID LEGAL FOUNDATION

22. Rule 26(c)(1) permits a protective order only "for good cause." *Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 476 (9th Cir. 1992). Apple never made a particularized showing. The order was entered because the Court directed the parties to use its model template after Apple represented it needed to produce a specific document. That representation was false—Apple never produced that document and never designated any document as confidential. *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1133–35 (9th Cir. 2003) (blanket orders "typically do not make a 'good cause' showing"). Where the "stipulation" was coerced and the stated justification was pretextual, the order's foundation is weaker still.

[1] *Ashley Gjovik* (26-CV-6), Released on: February 23, 2026, Rules Status: Pending consideration; Rule or Form: Rules 26 and 83, https://www.uscourts.gov/forms-rules/records-rules-committees/suggestions/ashley-gjovik-26-cv-6

23. Apple told the Court and Plaintiff that it needed the Protective Order to produce the Gobbler informed consent form for authentication. Apple never produced it. Apple confirmed no documents were designated. The order's sole use was the one Plaintiff predicted and warned about: designating Plaintiff's testimony as confidential to prevent her from discussing her own termination and workplace complaints. The Court should consider whether Apple's misrepresentation of the order's purpose warrants vacating the order entirely under Rule 60(b)(3) or, at minimum, stripping designations made for a purpose the order was not obtained to serve.

24. Section 6.3 directs Apple to file a motion "under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable)." Local Rule 7 is procedural mechanics. Local Rule 79-5 is a sealing standard that expressly provides: "Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Civil L.R. 79-5(c). The phrase "applicable legal principles" in Section 1 of the order defines nothing. Apple must identify, for each retained designation, the specific legal principle and specific harm that justify continued confidential treatment. Apple has not done so.

## VIII. APPLE'S DESIGNATIONS ARE PROCEDURALLY VOID

25. Apple's December 16, 2025 blanket designation of 72% of the deposition was challenged on the record the same day. Under § 6.3, Apple had 21 days to file a motion to retain. Apple did not file. The designation automatically lapsed. Apple cannot revive a lapsed designation through a "narrowed" chart sent 50 days later. The automatic waiver provision is self-executing: "Failure by the Designating Party to make such a motion … shall automatically waive the confidentiality designation."

26. Apple's "narrowed" designations were unsigned, undated, and unserved. Rule 26(g)(1) requires every discovery response to be signed by an attorney. Rule 26(g)(2) provides that unsigned documents are legal nullities: "Other parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention." Plaintiff called the omission to Apple's attention repeatedly. Apple expressly refused to cure. The Court must strike the chart.

27. Section 6.2 of the Protective Order requires that the parties "attempt to resolve each challenge in good faith" through "voice to voice dialogue." Apple refused to meet and confer—in writing, seven times—stating "nothing further to discuss." Apple filed motions to enforce, seal, and shorten time without completing the meet-and-confer the Court ordered on February 20, 2026. Apple's March 4, 2026 letter responded to only a portion of Plaintiff's challenges, ignoring 53 lines of designations entirely. Apple now seeks to retain designations in this motion that were never the subject of a meet-and-confer. Those designations should be deemed waived for failure to comply with the mandatory prerequisites of Sec. 6.

## IX. APPLE CANNOT MEET ITS BURDEN ON THE MERITS

### *A. The Correct Legal Standard Is Good Cause, Not Pansy Balancing*

28. Apple frames its motion around the *In re Roman Catholic Archbishop* factors, which derive from the Third Circuit's *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994) balancing test. But Pansy balancing is a secondary inquiry that applies only after the designating party has made the threshold showing of good cause. The correct sequence is: first, the designating party must demonstrate, for each specific designation, that "specific prejudice or harm will result" from disclosure (*Foltz*, 331 F.3d at 1130; *Beckman*, 966 F.2d at 476); second, only if that threshold is met does the court proceed to balance competing interests. *Phillips ex rel. Estates of Byrd v. General Motors Corp.,* 307 F.3d 1206, 1211 (9th Cir. 2002) requires "a particularized showing of good cause with respect to any individual document." *San Jose Mercury News, Inc. v. U.S. District Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) recognizes that "the fruits of pre-trial discovery are, in the absence of a court order to the contrary, presumptively public." Apple skips the threshold and jumps directly to balancing because it cannot make the threshold showing—its declaration is conclusory, its designations are categorical, and its harm allegations are generic.

29. Moreover, *In re Roman Catholic Archbishop* involved a motion to modify a protective order to allow public access to settlement documents—a different procedural posture from a Section 6.3 designation challenge. The *Pansy* factors were developed for motions to lift or modify protective orders, not for challenges to initial designations that were never supported by good cause in the first instance. The court should evaluate Apple's designations under the good cause standard of Rule 26(c) as articulated by *Beckman, Foltz,* and *Kamakana*. Even if the court applies the Pansy factors, Apple loses on every factor that matters, as shown below.

### *B. What Apple Actually Designated—And What It Told the Court*

30. The Court cannot evaluate Apple's motion without knowing what the designated testimony actually says. Apple describes its designations as concerning "internal code words for products" and "descriptions of internal product-related research and development studies." Apple's DiVincent declaration discusses Apple's R&D culture and competitive position for six pages. A judge reading only Apple's papers might conclude this case involves source code or chip designs.

31. It does not. Apple's retained designations are grouped by Apple into the following categories, all of which Plaintiff will address with specific public sources:

32. **Category 1: Product code names.** Apple designated individual words and short phrases that it claims are internal product code names. Plaintiff will demonstrate that each designated code name has been publicly reported, publicly discussed, or is otherwise in the public domain. A code name that is publicly known fails the threshold secrecy requirement of trade secret law. Code names also conceal the

actual substance of the content and themselves are not secret or sensitive – their entire purpose is to provide a term that can be discussed. Publication destroys trade secret status. See UTSA § 1(4); DTSA, 18 U.S.C. § 1839(3).

33. **Category 2: Study-related testimony.** Apple designated Plaintiff's testimony about internal Apple user studies. But Plaintiff's testimony is not a description of study methodology, data analysis, or results. It is Plaintiff's account of her complaints about being asked to participate in studies she found invasive—studies involving things like employee reproductive biology, health monitoring, and biometric data collection. Plaintiff's complaints about workplace practices are analytically distinct from the proprietary details of those practices. Much of this information is also already publicly available.

34. **Category 3: Designations Apple raised in this motion that were not the subject of a completed meet-and-confer**, or that Plaintiff had already agreed could be redacted. Apple cannot contest designations Plaintiff did not challenge, then argue those designations are "unchallenged." And Apple cannot raise new designations (including 167:20, admitted in fn. 2 of Apple's motion) in a motion to retain that were never discussed in meet-and-confer.

35. Plaintiff will provide a designation-by-designation chart with public sources as a declaration and exhibit to this opposition.

***C. The DiVincent Declaration Fails Under Binding Ninth Circuit Standards***

36. Apple's motion is supported by the declaration of Michael DiVincent, a Senior Director of Human Engineering at Apple. The declaration is six pages long and does not meet the requirements of *Kamakana*, *Foltz*, or any other applicable standard. Its deficiencies are not technical—they are fundamental.

37. **First, DiVincent never identifies a single specific transcript passage.** He says he "reviewed Apple's confidentiality designations" (¶ 7) but never states: "The testimony at page X reveals Y, which is not publicly known and would cause Z competitive harm." Under *Foltz*, 331 F.3d at 1130, the burden is "for each particular document" the party "seeks to protect." A declaration that never links its assertions to any specific designation does not satisfy this burden.

38. **Second, DiVincent's harm allegations are generic and hypothetical.** He states that "disclosure of this information will cause harm to Apple" (paragraph 7) and that competitors could "leverage Apple's processes and methods" (paragraph 6). *Kamakana*, 447 F.3d at 1179, prohibits reliance on "hypothesis or conjecture." *Cipollone*, 785 F.2d at 1121: "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) rejected "general allegations of embarrassment and injury to professional reputations" as insufficient. *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.,* 712 F.3d 1349

(9th Cir. 2013) rejected a party's claim to continued confidentiality where the party "had not pointed to any particular portion of the transcript that remains confidential information that should be withheld." DiVincent's declaration could be attached to any motion by any company about any document—it is the definition of a non-particularized showing.

39. Third, DiVincent describes "content, methods, and processes" of studies, but Plaintiff's testimony is about her complaints about the studies. There is a category difference between "the specific equipment and methodology Apple uses in Study X" (which might be confidential) and "I told my supervisor I didn't want Apple monitoring my [redacted]" (which is an employee's complaint about a workplace condition). DiVincent's declaration addresses the former. The designated testimony is the latter. The declaration does not connect to the designations.

40. **Fourth, DiVincent concedes the existence of publicly known, public, and external studies.** At ¶ 11, DiVincent states: "there are external studies related to women's health regarding some of the issues Plaintiff testified about." He then claims Apple's internal studies "could differ" in "content, scope, duration, questions asked, information gathered, and, in some cases, equipment used." But Plaintiff is not testifying about Apple's internal methodology. She is testifying about her complaints—which are her own experiences, independently known, and not within Apple's control regardless of whether the internal studies differ from external ones.

41. **Fifth, Apple's reliance on *Lin v. Solta Med., Inc.* is misplaced.** Apple cites *Lin*, 2024 WL 2112893, for the proposition that "ongoing business processes" for "products that remain in the market" can be designated confidential. But Lin involved actual product development processes and manufacturing information disclosed in discovery documents. Here, the "information" is an employee's complaints about her employer's workplace practices. Lin does not hold that an employee's objections to being studied are the employer's confidential business process.

### ***D. The "Product-Related" Category Fails Under Binding Authority***

42. Apple's motion rests on the assertion that all designated testimony concerns "confidential product-related information." But "product-related" is not a recognized basis for confidentiality under Rule 26(c)(1)(G), which protects "trade secret or other confidential research, development, or commercial information"—not "anything that occurs in physical or conceptual proximity to a trade secret." *Citizens First Nat'l Bank v. Cincinnati Ins. Co.,* 178 F.3d 943, 945 (7th Cir. 1999) (Posner, C.J.) (designation of "other confidential information, not further specified" is "absurdly overbroad"). *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir. 1996) found a designation standard of information "considered to be of a confidential nature" facially overbroad. Apple's "product-related" category is the same structural problem: defining confidentiality by proximity to a product rather than by what the information actually

reveals.

43. Apple must identify, for each passage, what specific trade secret or confidential commercial information is revealed—not merely that the testimony concerns events in a product-development setting. Testimony about workplace conditions, management decisions, and employee complaints must be analyzed independently from testimony about product specifications. An employee saying "I objected to Apple monitoring my body" is categorically different from an employee describing Apple's data collection algorithms. The first reveals nothing about the product; it reveals how Apple treats its workers.

44. The Supreme Court has held that information about the harmful or invasive nature of a product or practice cannot constitute a trade secret. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 n.15 (1984): "If a public disclosure of data reveals, for example, the harmful side effects of the submitter's product, [that] cannot constitute the taking of a trade secret." Applied here: Plaintiff's testimony about the invasive nature of Apple's workplace studies is information about the nature and impact of Apple's practices on employees—not a trade secret protecting those practices from scrutiny. The Ninth Circuit confirmed in *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016) that the public interest in safety and health information outweighs a manufacturer's confidentiality claims. A confidentiality interest in the product does not create a confidentiality interest in the harm. *See In re Burbank Envtl. Litig.,* 42 F. Supp. 2d 976 (C.D. Cal. 1998).

***E. Apple's Pansy Factor Analysis Is Wrong on Every Factor That Matters***

45. **Factor 1 — Privacy.** Apple argues that "no privacy rights are at issue" because Plaintiff's testimony is about "the general methods and processes of the studies—not, contrary to her repeated protestations, her body or her personal experiences." (Dkt. 304 at 7). This characterization is factually false. The retained designations concern Plaintiff's testimony about her [redacted]—and her complaints about Apple monitoring these things and invading her and her coworkers privacy. Plaintiff has a privacy interest in her own reproductive biology and medical information. The privacy interest weighs against Apple's designation, not for it: Apple is using the designation to claim ownership over Plaintiff's descriptions of her own body.

46. **Factor 2 — Legitimate vs. Improper Purpose.** Apple argues that Plaintiff's alleged protective order violations show an "improper purpose." But Factor 2 asks whether confidentiality is being sought for a legitimate or improper purpose—not whether the challenge to confidentiality has a proper purpose. Apple obtained the Protective Order on false pretenses. Apple used it for the exact purpose Plaintiff warned the Court about. Apple's own filing tied the designations to its termination defense (Dkt. 280, fn. 2). The improper purpose is Apple's, not Plaintiff's.

47. **Factor 4 — Public Health and Safety.** Apple claims its studies "do not relate to matters

of important public health and safety." This is wrong. The studies involve monitoring employee reproductive biology—[redacted], sexual activity. An employer conducting invasive biometric surveillance of employees is a matter of public health and safety. This implicates workplace safety, employee privacy, medical ethics, informed consent. It is the subject of a pending NLRB charge (32-CA-381277) and Plaintiff's Cal. Bus. & Prof. Code § 17200 claims alleging these practices and Apple's studies are unlawful business practices. Factor 4 weighs heavily against confidentiality.

48. **Factor 7 — Important Public Issues.** Apple claims "this case does not involve important public issues." This case involves: (a) employer surveillance of employee reproductive biology; (b) a pending NLRB charge; (c) § 17200 claims alleging the studies are unfair and unlawful business practices; (d) international media reporting on Apple's workplace practices (Der Spiegel); (e) Plaintiff's Petition for Rulemaking to the Advisory Committee on Civil Rules (Rules Suggestion 26-CV-6) specifically targeting the protective order system Apple is deploying; and (f) claims under RICO, whistleblower retaliation, and wrongful termination statutes. By any measure, this case involves important public issues.

49. *Cahill v. Nike, Inc.,* No. 3:18-cv-01477-JR, 2022 WL 4667364 (D. Or. Sept. 30, 2022) is directly on point: in a gender discrimination class action, Nike designated nearly every produced document as confidential, and the court rejected Nike's "mere desire to keep this information confidential" as "inadequate," finding Nike "proffered little more than broad assertions of harm." Apple's showing is indistinguishable from Nike's. See also *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026-27 (9th Cir. 2014) ("the final word on whether documents can be filed under seal or remain under seal rests with the courts, not the parties"). Factor 7 weighs heavily against confidentiality.

***F. Apple's IPA/NDA Is Irrelevant to the Designation Analysis***

50. Apple argues (Section IV.C.3 of its motion) that "Information Plaintiff Learned During Her Employment Pursuant to Her Confidentiality Agreements with Apple Can Also Be Properly Designated Under the Protective Order." Apple's emergency letter (Dkt. 280, fn. 2) tied the designation dispute to Plaintiff's employment IPA, claiming the "breach" was independently actionable under the employment agreement and that "it was her public disclosure of confidential Apple product-related information that led to her termination from Apple in the first place."

51. This conflates two entirely separate legal instruments. The IPA is a private contract between Apple and Plaintiff (which the NLRB prosecuted Apple over due its unlawful terms). The Protective Order is a court order governing discovery management. They have different standards, different enforcement mechanisms, and different scope. The question before this Court is whether the specific testimony qualifies for protection under Rule 26(c) and the Protective Order's terms—not whether Apple considers it covered by a private employment agreement. If IPA-covered information were

automatically designable under a protective order, every employer with an NDA could designate every piece of testimony about workplace conditions as confidential—because employees learn about workplace conditions during employment. That would gut the entire framework for public access to employment litigation. The Court should decline to use the Protective Order as an enforcement mechanism for Apple's private contract.

***<u>G. Apple Is Seeking a Ruling, Not a Redaction—The Bootstrapping Problem</u>***

52. Apple contests designations that Plaintiff said could be redacted. Apple fights to retain designations on information Plaintiff is not even challenging. Why? Because Apple does not want redactions. Apple wants a judicial finding that this information "is confidential."

53. Plaintiff's § 17200 claims allege that Apple's workplace studies are unfair and unlawful business practices. Apple faces summary judgment on those claims. If this Court rules that the study-related testimony is "confidential," Apple will argue: (1) the Court already found this information is confidential proprietary R&D, therefore Plaintiff's disclosure violated her IPA, therefore her termination was lawful; (2) the § 17200 claims should be dismissed because the Court has effectively recognized these as legitimate confidential business practices rather than the unlawful practices Plaintiff alleges; and (3) on appeal, the district court's own discovery ruling supports Apple's position that Plaintiff was terminated for disclosing genuinely confidential information.

54. The Court should not allow a discovery designation ruling to be bootstrapped into a finding on the merits. Any ruling should state explicitly that it is limited to discovery management and does not constitute a finding on trade secret status, NDA enforceability, the lawfulness of Apple's studies, or any other merits issue. See *Montana v. United States*, 440 U.S. 147 (1979) (issue preclusion requires the issue was "actually litigated and decided" and "essential to the judgment"). Apple's transparent attempt to engineer a quasi-adjudication of the confidentiality question through the designation process is itself evidence of the "improper purpose" that warrants sanctions under Rule 26(g)(1)(B)(ii) and Protective Order Section 5.1.

55. The Court should also note that a confidentiality designation is a discovery management tool, not an evidentiary ruling. It has no effect on admissibility, which is governed exclusively by the Federal Rules of Evidence. All of the designated testimony will be used at trial in open court. *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993) ("the ordinary showing of good cause which is adequate to protect discovery material from disclosure cannot alone justify protecting such material after it has been introduced at trial"). *Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 510 (1984) (presumption of openness at trial "can be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest"). Apple's designations are

temporary labels that will be stripped the moment this evidence is introduced at trial. The only question is whether they should be stripped now or later—and given their procedural and substantive deficiencies, the answer is now.

***H. Apple's Claimed Competitive Harm Is the Harm of Losing the Advantage of Noncompliance***

56. Even accepting every factual assertion in the DiVincent declaration at face value, Apple's claimed competitive harm is not harm the law recognizes—because the "competitive advantage" Apple seeks to protect is the cost advantage it derives from conducting these studies without complying with the laws that govern them.

57. **What compliance looks like.** If Apple wanted biometric data on [redacted], ear canal geometry, and facial features for product development, it could do what its competitors do: contract with an independent research institution with IRB (Institutional Review Board) oversight; recruit voluntary participants through proper channels with genuine informed consent disclosed before agreement; pay participants fair market rates for their data and time; comply with medical research regulations, state medical data protection laws, and the CPRA; allow participants to withdraw without career consequences; and submit to external oversight and audit. That is expensive. It requires compliance infrastructure, compensation, transparency, and the ability for participants to say no.

58. **What Apple did instead.** As alleged in the operative complaint and not contested by Apple for purposes of this motion: Apple used its own employees as test subjects in its own facilities under its own control. Participation was nominally "voluntary" but noted in performance reviews. (5AC ¶ 195). Employees were not told what studies involved until after they arrived at secure buildings with security personnel. (4AC ¶ 196). Employees were not compensated beyond minimal "reimbursement." (DiVincent Decl. ¶ 4). Employees were required to sign confidentiality agreements making all study details "Apple Confidential Information." (DiVincent Decl. ¶ 4). And the employee who complained was terminated. (5AC ¶ 215). Apple then designated her complaints as Apple's confidential business information.

59. **Why this is cheaper.** No IRB. No independent oversight. No market-rate compensation. No genuine informed consent process. No regulatory compliance infrastructure. No ability for participants to complain externally (because it is all "confidential"). No whistleblower protection (because Apple fires complainants and calls it a breach of the IPA). No public accountability (because the Protective Order seals everything). The cost savings are enormous. Running a properly consented, IRB-overseen study on hundreds of participants costs millions. Getting employees to do it under secrecy oaths and career pressure costs almost nothing.

60. **Apple's SEC filings confirm this is the business model.** Apple's own SEC disclosures, quoted in the Third Amended Complaint at paragraph 125, state that Apple's competitive edge requires

"aggressive price competition and resulting downward pressure on gross margins"; that some competitors compete by using "illegitimate means" to develop products; that Apple's operations are subject to "complex and changing laws and regulations" including privacy, consumer protection, labor and employment, and environmental health and safety; that "compliance with these laws and regulations is onerous and expensive"; and that laws and regulations "can adversely affect" Apple's business "by increasing costs."

61. **Apple's most recent 10-K, filed October 2025, repeats and expands these admissions.** Apple Inc., Form 10-K for the fiscal year ended September 27, 2025, Item 1A (Risk Factors), confirms that Apple's "global operations are subject to complex and changing laws and regulations worldwide on subjects including antitrust; privacy, data security and data localization; consumer protection; labor and employment; and environmental, health and safety." Apple confirms that "compliance with these laws and regulations is onerous and expensive" and that laws and regulations "can adversely affect the Company's business by increasing the Company's costs, limiting the Company's ability to offer a product, service or feature to customers." Apple further acknowledges it is "subject to civil antitrust lawsuits in the U.S. alleging monopolization or attempted monopolization."[2]

62. Apple's 10-K expressly acknowledges that biometric data is subject to heightened legal obligations—and that noncompliance leads to exactly the proceedings now before this Court. Apple tells the SEC it is "subject to specific obligations relating to the collection and processing of data associated with minors, as well as information considered sensitive under applicable laws, such as health, biometric, financial and payment card data." Apple further states: "health, biometric, financial and payment card data are subject to additional privacy, security and breach notification requirements, and the Company is subject to audit by governmental authorities regarding the Company's compliance with these obligations. If the Company fails to adequately comply with these rules and requirements, the Company can be subject to litigation or government investigations, can be liable for associated investigatory expenses, and can incur significant fees or fines." Apple acknowledges to the SEC that failure to comply with biometric data rules leads to litigation. This case is that litigation. The operative complaint alleges Apple did not comply. And now Apple asks this Court to designate the evidence of that alleged noncompliance as confidential.

63. **Apple admits its public privacy commitments create legal liability when Apple fails to honor them.** The 10-K states: "The Company makes statements about its use and disclosure of personal data through its privacy policy, information provided on its website, press statements and other privacy

---

[2] SEC, Apple 10-K, Oct. 31 2025, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000320193/000032019325000079/aapl-20250927.htm#i719388195b384d85a4e238ad88eba90a_70

notices provided to customers. Any failure or perceived failure by the Company to comply with these public statements or with federal, state or international privacy or data protection laws and regulations could result in inquiries, proceedings and penalties from governmental entities or others." Apple markets itself as the privacy company. The operative complaint alleges that marketing is false—that Apple secretly collected biometric data, monitored employees through Gobbler, and required secrecy oaths. Apple's own 10-K acknowledges that if these allegations are true, they create legal liability. The "harm" Apple fears from disclosure is not competitive—it is reputational and legal. Reputational harm and exposure to further litigation are categorically insufficient to support confidentiality under Kamakana, 447 F.3d at 1179, and Nixon, 435 U.S. at 598.

64. **Apple's 10-K contradicts its Pansy Factor 7 argument to this Court.** Apple told this Court that "this case does not involve important public issues." Apple told the SEC: "The technology industry, including, in some instances, the Company, is subject to intense media, political and regulatory scrutiny, which exposes the Company to increasing regulation, government investigations, legal actions and penalties." Apple cannot tell the SEC its legal proceedings involve "intense" public scrutiny and tell this Court the same proceedings involve no important public issues.

65. **Apple's 10-K reveals that the "harm" it fears is accountability, not competitive injury.** Apple tells the SEC: "If such investigations or litigation are resolved against the Company, the Company can be exposed to significant fines and may be required to make further changes to its business practices." This is not a description of competitive harm from trade secret disclosure. This is a description of the consequences of being caught engaging in unlawful practices and being forced to change them. The risk Apple identifies to its shareholders is not that competitors will learn its methods—it is that courts and regulators will make Apple stop using those methods. That is accountability, not competitive injury, and it is not protectable under Rule 26(c).

66. Apple told its shareholders: compliance costs money, it hurts margins, and competitors break laws. The RICO claims allege this is not a passive observation but an active strategy: Apple refrains from regulatory compliance to increase profits (3AC paragraph 123(a)), promotes a false reputation of compliance (3AC paragraph 123(b)), and uses intimidation, retaliation, and overbroad NDAs to conceal the gap (3AC paragraph 123(c)).

67. **The DiVincent declaration, read in this context, confirms the argument.** DiVincent states that disclosure would "enable competitors to bring products and services to market at a lower cost because they are not required to spend as much time and money on refining their testing processes." (DiVincent Decl. ¶ 10). But competitors already spend time and money on testing because they do it legally—through properly consented, compensated, and overseen channels. The "cost" Apple avoided is

not the cost of iterative R&D. It is the cost of compliance. DiVincent's declaration inadvertently establishes that Apple's "competitive advantage" in this area is the cost savings from conducting studies outside the legal and ethical framework that its competitors follow.

68. **This is not harm the law recognizes.** Under every applicable test, the "harm" of losing a competitive advantage derived from noncompliance with law is not protectable: Rule 26(c)(1)(G) protects "confidential research, development, or commercial information"—not the cost savings from conducting that research without complying with applicable laws. The rule presupposes lawful activity. It does not provide a mechanism for shielding unlawful practices by calling them "R&D." Trade secret law requires that information derive "independent economic value" from secrecy. Cal. Civ. Code § 3426.1(d)(1). If the economic value derives not from the information itself but from the ability to continue an unlawful practice undetected, that is not "independent" economic value within the meaning of the statute. The value is dependent on the illegality, not the secrecy.

69. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 n.15 (1984) holds that information about the harmful nature of a practice "cannot constitute the taking of a trade secret." When the practice itself is alleged to violate constitutional privacy rights, the CPRA, the FTC Act, and Cal. Pen. Code Section 637.7 (5AC paragraph 214), information about how that practice operates is Ruckelshaus information. It is categorically unprotectable. See also *Anderson v. Cryovac, Inc.,* 805 F.2d 1, 7 (1st Cir. 1986) (in the Woburn groundwater contamination litigation, holding that environmental contamination information—which companies routinely classify as "product-related" or "process-related"—is subject to strong public interest in disclosure); *Cipollone v. Liggett Group, Inc.,* 649 F. Supp. 664 (D.N.J. 1986) (ordering release of tobacco industry internal documents about product health hazards despite claims that all product information was proprietary).

70. Pansy Factor 4 asks whether confidentiality is sought over information "important to public health and safety." Coercive employee biometric surveillance conducted without genuine consent, outside medical research regulatory frameworks, with termination as the consequence for complaining, is a public health and safety issue. This factor does not merely weigh against Apple—it forecloses the claim.

71. Public policy prohibits courts from being used to help companies maintain competitive advantages that derive from lawbreaking. That is the opposite of what courts exist to do. The entire structure of Cal. Bus. & Prof. Code § 17200 exists to prevent exactly this: businesses gaining unfair competitive advantages through unlawful practices. Apple's motion asks the Court to use its Protective Order power to shield the very practices that § 17200 is designed to expose and enjoin. The Court should decline.

72. **Apple's pattern of anticompetitive conduct reinforces this conclusion.** Apple is not a

company entitled to a presumption of good faith on matters of competitive harm and lawful business practices. The United States Department of Justice and sixteen state attorneys general have a pending antitrust action against Apple, *United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J.), filed March 21, 2024, alleging Apple maintains a smartphone monopoly through anticompetitive and exclusionary conduct in violation of Section 2 of the Sherman Act. Apple's motion to dismiss was denied in its entirety on June 30, 2025. This is not Apple's first antitrust lawsuit: Apple previously settled a DOJ ebooks price-fixing action for $450 million after being found liable for conspiring to raise ebook prices. Apple's claimed concern about "competitive harm" must be evaluated against a documented, decades-long history of anticompetitive conduct.

73. **Apple's confidentiality and surveillance practices are being challenged in a separate PAGA action.** In *Bhakta v. Apple Inc.,* filed in Santa Clara County Superior Court in December 2024, a current Apple employee brought a PAGA action alleging that Apple's confidentiality policies unlawfully restrict employees from discussing compensation and working conditions, that Apple compels employees to install surveillance software on personal devices providing Apple access to personal data including health information, and that Apple's speech suppression policies violate California labor law. The Bhakta complaint describes Apple's confidentiality ecosystem as a "prison yard" of continuous monitoring. These are the same confidentiality and surveillance practices at issue in the designations Apple seeks to retain in this case. (See request for Judicial Notice).

74. **Apple already promised to stop doing this.** In April 2025, Apple entered into a settlement with the NLRB in Case 32-CA-284428, resolving unfair labor practice charges arising from the same overbroad confidentiality policies at issue here. Under that settlement, Apple revised its IPA to expressly state that nothing restricts employees' right to "discuss or disclose information about Your or others' wages, hours, or working conditions," or to "discuss or disclose information about unlawful acts in the workplace." The settlement notice remains posted on Apple's own legal website at apple.com/legal/more-resources. Apple's current designation of Plaintiff's testimony about working conditions as "Apple Confidential" directly contradicts the commitments Apple made to the NLRB and the promises it posted for its own employees to read. The settlement included a self-executing default provision: upon noncompliance, the Regional Director can reissue the prior complaint, Apple's allegations are deemed admitted, and a full remedy order can be entered without trial.

75. **The designation dispute is the RICO scheme in real time.** The operative complaint alleges a three-pronged scheme: (a) Apple refrains from regulatory compliance to increase profits; (b) Apple promotes a false reputation of compliance; (c) Apple bridges the gap through witness intimidation, retaliation, and overbroad NDAs to conceal its actual practices. (3AC ¶¶ 122-127). Apple conducted the

studies (prong a). Apple markets itself as an ethical, privacy-respecting company (prong b). When the employee who complained was deposed, Apple designated her complaints as confidential and sought contempt when she discussed them publicly (prong c). The Protective Order is being used as the instrument of concealment the RICO claims describe. Granting Apple's motion would not protect legitimate confidential information. It would advance the scheme.

***I. The Reproductive Biology Designations Are Especially Indefensible***

76. The designations Apple fights hardest to retain concern Plaintiff's testimony about Apple's [redacted] and [redacted] studies—specifically, her complaints about being asked to [redacted]. These designations fail for every reason stated above, but they also fail for reasons specific to this category.

77. **First, Plaintiff never participated in the [redacted] or [redacted] studies.** She declined. (Dkt. 307-1 ¶ 23). She possesses no internal methodology, no equipment specifications, no process documentation, no data, and no results. She possesses only her experience of being asked—and her complaints about the asking. DiVincent's declaration discusses "methods and processes" and "equipment," but Plaintiff has none of that information to disclose. The designated testimony is not a description of how Apple conducts its studies. It is an employee's account of what Apple asked her body to do, and her objection to being asked.

78. **Second, Apple itself has published the methodology of its reproductive health studies in a peer-reviewed journal.** Mahalingaiah et al., "Design and methods of the Apple Women's Health Study," American Journal of Obstetrics and Gynecology, vol. 226, no. 4 (2022), is a 24-page article authored by Apple-affiliated researchers describing the study's survey design, research platform, study population, eligibility and consent procedures, recruitment methods, survey data collection, sensor and usage data, HealthKit integration, principal findings, clinical implications, research implications, and limitations. (Dkt. 307-1 Ex. I). The study is also federally registered on ClinicalTrials.gov as NCT04196595, with Apple Inc. listed as the responsible party, and its status listed as "recruiting." (Dkt. 307-1 Ex. J). Apple's own September 2019 press release promoted the study as "the first long-term study of this scale focused on menstrual cycles and gynecological conditions." (Dkt. 307-1 Ex. K).

79. Apple has published the methodology in a medical journal, registered the study with the federal government, and promoted it in a press release—and now tells this Court that an employee's testimony about being invited to participate in the same type of study is Apple's confidential trade secret. The Court should reject this contradiction.

80. **Third, the designated information has been public for years across multiple**

**jurisdictions.** As documented in Plaintiff's Opposition at Dkt. 307 and supporting declaration at Dkt. 307-1, the specific subject matter Apple designated as confidential has appeared in: (a) six successive public complaints on this docket, cited in Judge Chen's published orders at Dkt. 73 and Dkt. 179; (b) international media coverage in Der Spiegel (Germany, June 2022), Telerama (France, March 2023), and The Telegraph (UK, April 2022); (c) Plaintiff's public comment to the White House OSTP, docketed on regulations.gov, describing the sleep study, cosleeper NDAs, and menstruation study invitations; (d) GAO Report GAO-24-107639, which referenced Plaintiff's public comment in its findings; (e) NLRB filings dating to 2021; (f) an FTC complaint (Report No. 154835129); (g) privacy complaints filed with the UK ICO, France's CNIL, and the German federal data protection authority; and (h) an OHRP complaint to HHS regarding Apple's federally registered study. Apple has not moved against any of these other entities. Apple offers no explanation as to why Plaintiff must be subject to injunctive relief while the same information remains freely available through a peer-reviewed journal, a federal database, a GAO report, and news archives in at least three countries.

81. Fourth, Apple's own declarant concedes he cannot determine whether the information was already public—and reveals the true nature of Apple's claim. DiVincent states at paragraph 11 that "there are external studies related to women's health regarding some of the issues Plaintiff testified about" but asserts a "belief" that Plaintiff was "referring to internal studies and not external studies based on her testimony about the methods and processes she believes were used." As Plaintiff's Dkt. 307 opposition established, DiVincent's belief is factually wrong: Plaintiff never participated in the internal studies, declined to participate, and was testifying about her complaints, not internal methodology.

82. But DiVincent's framing reveals something more important. Apple does not claim that the information itself is secret—Apple concedes the information "may be publicly available." What Apple claims is secret is the employee's experience of being asked. Apple's position is that even though the existence of reproductive health studies is public (Apple published the methodology in a peer-reviewed journal, registered the study with the federal government, and promoted it in a press release), the fact that a specific employee was invited to participate and complained about it is Apple's confidential business information. That is not a trade secret claim. It is a claim of ownership over the employee's complaints. And it confirms what Apple's SEC filings reveal: the "harm" Apple fears is not that competitors will learn about reproductive health research (they already know); it is that courts, regulators, and the public will learn how Apple treated its employees in the course of that research. Apple's own 10-K admits that "any failure or perceived failure by the Company to comply with" its public privacy commitments "could result in inquiries, proceedings and penalties" and "significant legal liability." That is the harm Apple is trying to prevent—and it is not protectable.

83. This pattern extends beyond the reproductive biology designations to every category Apple designated. Apple's VP of Product Marketing publicly discussed ear scanning studies ("We had done work with Stanford to 3D-scan hundreds of different ears," Dkt. 307-1 Ex. F). Apple's [redacted] study is described in Plaintiff's public OSTP comment and the GAO report that cited it. The code names Apple designated have been publicly reported. In every case, the underlying information is public; what Apple claims is secret is the employee's testimony about her experience with that information. That is not how trade secret law works. The employee's complaints are her own, independently known under Seattle Times, and Apple has no protectable interest in silencing them.

## X. APPLE'S CONDUCT WARRANTS SANCTIONS

84. Plaintiff's Motion for Sanctions under Rule 26(g) is pending at Dkt. 302. Plaintiff incorporates that motion by reference and notes that the arguments set forth therein—including the Rule 26(g)(1) signature deficiency, the automatic waiver under § 6.3, the improper purpose of the designations, and Apple's refusal to cure—apply with full force to this opposition.

85. Apple is represented by Orrick, Herrington & Sutcliffe LLP—one of the largest and most sophisticated law firms in the country. Orrick knows what a trade secret is. Orrick knows that an employee's testimony about her own workplace complaints is not confidential commercial information. Orrick knows that publicly known information cannot be designated confidential. And Orrick knows that the purpose of a protective order is to protect genuinely confidential information from competitors—not to suppress a whistleblower's testimony about the employer's practices that are the subject of NLRB charges and this federal lawsuit.

86. When Orrick designated this testimony anyway—and then escalated to enforcement motions, sealing motions, and shortened-time motions based on those designations—it was not making a good-faith mistake. It was deploying the Court's protective order machinery for an improper purpose: silencing the plaintiff about the very conduct this lawsuit exists to adjudicate. Rule 26(g)(3) provides that sanctions are mandatory when a certification violates the rule without substantial justification. Section 5.1 of the Protective Order independently authorizes sanctions for "clearly unjustified" designations made for "an improper purpose." The Court's inherent authority under Chambers v. NASCO, Inc., 501 U.S. 32 (1991) reaches bad-faith abuse of judicial process. All three bases are satisfied here.

87. Courts have imposed substantial sanctions for comparable conduct. *Procaps S.A. v. Patheon Inc.,* No. 12-24356-CIV, 2015 WL 4430955 (S.D. Fla. 2015) imposed $25,000 in fees against counsel personally for designating 95% of documents as "Highly Confidential" and held that "attorneys bear personal responsibility for over-designation." *Callsome Solutions Inc. v. Google Inc.*, 2018 NY Slip Op. 32716(U) (N.Y. Sup. Ct. 2018) imposed monetary sanctions for overuse of "Attorneys' Eyes Only"

designations and found that "a party cannot over designate documents then hold improperly designated documents hostage until the adversary surrenders." *Del Campo v. American Corrective Counseling Services, Inc.,* No. C-01-21151 JW (PVT), 2007 WL 3306496 (N.D. Cal. 2007) awarded sanctions against defense counsel in this district for over-designating documents as confidential without justification. Apple's conduct here—blanket-designating 72% of a deposition, abandoning 99% of designations, retaining only the testimony most damaging to its litigation position, and then filing enforcement motions on void designations—is more egregious than any of these cases.

## XI. APPLE'S MOTION TO SEAL SHOULD BE DENIED

### *A. Apple Has Not Met the Compelling Reasons Standard*

88. Apple has filed a motion to seal portions of its filings in connection with this designation dispute. Under *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006), a party seeking to seal judicial records bears the burden of articulating "compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure." *Center for Auto Safety v. Chrysler Group, LLC,* 809 F.3d 1092, 1101 (9th Cir. 2016) holds that the compelling reasons standard applies to any filing "more than tangentially related to the merits of a case." A motion to retain confidentiality designations on deposition testimony that is central to the merits of this employment litigation is plainly more than tangentially related to the merits. The compelling reasons standard applies.

89. Apple cannot meet that standard for the same reasons it cannot meet its burden on the designations themselves. The information Apple seeks to seal is the same information Apple seeks to keep designated: Plaintiff's testimony about her own workplace complaints, publicly known study descriptions, and publicly reported code names. If the information does not qualify for confidential designation under the Protective Order—and it does not—it certainly does not qualify for sealing under the more demanding compelling reasons standard. Civil Local Rule 79-5(c) expressly provides: "Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Apple's designation is not even a valid designation, as shown above. It is categorically insufficient to support sealing.

90. *Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 677-78 (9th Cir. 2010) confirmed that the compelling reasons standard applies regardless of whether a third party seeks access. *Oliner v. Kontrabecki,* 745 F.3d 1024, 1026-27 (9th Cir. 2014) held that "the final word on whether documents can be filed under seal or remain under seal rests with the courts, not the parties" and that "conclusory allegations of harm do not meet the 'compelling reasons' standard." Apple has offered nothing beyond conclusory allegations.

### *B. Apple Failed to Serve Plaintiff With Its Sealed Filings*

91. Apple filed materials under seal without providing Plaintiff copies of the sealed filings. A

party is entitled to see and respond to all materials filed in support of a motion against her. Apple's failure to serve Plaintiff with copies of its own motion papers is a fundamental due process violation. Plaintiff cannot meaningfully oppose a motion when she has not been permitted to see what Apple filed. The Court should either unseal the filings or order Apple to serve Plaintiff immediately with complete, unredacted copies of everything it filed under seal.

92. Apple's counsel previously wrote to Plaintiff asserting that if Plaintiff opens files Apple designates as provisionally sealed, that act itself constitutes a new violation of the Protective Order—even if the underlying information is public. This position is untenable. A party cannot be held in contempt for reading a court filing in her own case. Provisional sealing is a procedural mechanism to preserve the status quo while the court evaluates a sealing request. It does not create a new gag order. It does not prohibit the opposing party from reviewing filings served on her. And it cannot transform public information into sealed information merely because Apple stamped it and filed it with a sealing request. The Court should make clear that provisional sealing imposes no restriction on Plaintiff's ability to review, respond to, and discuss the substance of Apple's filings.

***C. The Sealing Request Is Part of the Same Pattern***

93. Apple's motion to seal is not an independent request for judicial protection of sensitive information. It is part of the same pattern documented throughout this opposition: Apple designates public information as confidential, then uses the designation as the basis for sealing, then uses the sealing as a basis for enforcement, then uses the enforcement as a basis for contempt. Each step builds on the prior step, and the entire edifice rests on designations that are void for the reasons set forth in Sections I through IV above. If the designations fail—and they do—the sealing request fails with them. The Court should deny the motion to seal in its entirety. See *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 225 (6th Cir. 1996) ("the court may not enter the order solely on the basis of the parties' agreement" and "any blanket order prohibiting the parties from releasing information acquired through discovery to third parties would constitute an impermissible prior restraint").

## REQUESTED RELIEF

94. Plaintiff respectfully requests that the Court:

- Deny Apple's Motion to Retain Confidentiality Designations (Dkt. 304) in its entirety and strip every challenged designation;
- Declare that the designated information falls outside the Protective Order's scope under Section 3 as information that is in the public domain and/or known to the Receiving Party prior to disclosure, and that no challenge process was required;
- Declare that Apple's December 16, 2025 blanket designation automatically lapsed under Section 6.3 for failure to file a motion to retain within 21 days, and that Apple's February 4, 2026 unsigned

chart does not constitute a valid re-designation;

- Strike Apple's February 4, 2026 designation chart under Rule 26(g)(2) as an unsigned discovery response that Apple refused to cure after the deficiency was specifically identified;
- Find that Apple's designations were clearly unjustified and made for an improper purpose within the meaning of Protective Order § 5.1 and Rule 26(g)(1)(B)(ii);
- Impose sanctions under Rule 26(g)(3), including reasonable attorney's fees and costs incurred in challenging the designations and opposing this motion;
- Clarify that the Court's ruling on the designations is limited to discovery management restrictions and does not constitute a finding on trade secret status, NDA enforceability, the lawfulness of Apple's workplace studies under Cal. Bus. & Prof. Code § 17200, or any other substantive issue—and that the ruling may not be cited by either party as evidence of or against the confidentiality of the designated information in any motion for summary judgment, at trial, or on appeal;
- Order Apple to pay Plaintiff's reasonable fees and costs incurred in opposing the Motion to Enforce Protective Order (Dkt. 294), the Motion to Seal (Dkt. 293), and the Motion to Shorten Time (Dkt. 295), all of which were premised on designations that were procedurally void and substantively unjustified; and
- Deny Apple's Motion to Seal in its entirety and unseal all provisionally sealed filings related to this designation dispute;
- Order Apple to serve Plaintiff immediately with complete, unredacted copies of all materials Apple filed under seal, and declare that provisional sealing does not prohibit Plaintiff from reviewing, responding to, or discussing the substance of Apple's filings in her own case;
- In the alternative, if the Court finds any information warrants continued protection, order targeted redaction of only the specific information that qualifies—not blanket confidentiality over entire transcript passages—and require Apple to submit within 14 days a re-designation log identifying the specific legal principle (trade secret, confidential commercial information, or other recognized doctrine) and particularized factual basis for each designation.

## CONCLUSION

95. Apple obtained a Protective Order by representing it needed to authenticate a document. It never produced that document. It never designated a single document as confidential. Its sole use of the order has been to designate a whistleblower-plaintiff's testimony about her own workplace complaints—testimony about her own body, her own experiences, and her own objections to her employer's practices—as "Apple Confidential." It then sought contempt, sanctions, and a gag order when she discussed those complaints publicly. Apple now seeks a judicial finding of confidentiality that it intends to leverage in summary judgment on Plaintiff's § 17200 claims and in support of its termination defense.

96. The designated information falls outside the Protective Order's scope. The order was entered without good cause. The designations are procedurally void. The DiVincent declaration is

conclusory and never links its generic assertions to any specific designation. Apple's "product-related" category is not a recognized basis for confidentiality. Information about the harmful or invasive nature of an employer's practices is not a trade secret under Ruckelshaus. Apple's Pansy factor analysis is wrong on privacy, purpose, public health, and public importance. And Apple's attempt to bootstrap a discovery ruling into a merits adjudication should be rejected.

97. Apple's motion to retain designations should be denied. Apple's motion to seal should be denied. Every challenged designation should be stripped. All provisionally sealed filings should be unsealed. Sanctions should be imposed. And the Court should state explicitly that its ruling is limited to discovery management and does not constitute a finding on trade secret status, NDA enforceability, the lawfulness of Apple's studies, or any other merits issue.

Respectfully submitted,



**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 25 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816