Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

**Ashley M. Gjovik,**
*an individual,*

Plaintiff,

vs.

**Apple Inc.,**
*a corporation,*

Defendant.

**Case No.**
**3:23-CV-04597-EMC (KAW)**

**Reply in Support of Motion for 26(g) Sanctions (Dkt. 302)**

**Hearing:**
**Date: April 16 2026**
**Time: 1:30 PM PST**
**Location: Oakland, TBD**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... 1

**THERE IS NO LEGAL OR FACTUAL BASIS TO APPLE'S DEFENSE** .......... 1

I. Rule 26(g) Requires Mandatory Striking of Unsigned Documents .......... 1
II. Confidentiality Designations Require a Signature or They Have No Legal Effect .......... 2
III. The Automatic Waiver Deadline Was Missed and Apple's Waiver Argument Fails .......... 4
IV. This Is Not a Rule 37 Motion .......... 5
V. Either Confidentiality Designations Require a Signature or They Have No Legal Effect .......... 6
VI. Apple Certified Nullities .......... 6

**APPLE'S ACTIONS ARE SUBSTANTIALLY UNJUSTIFIED** .......... 7

VII. The Designations Are Technically Deficient and Substantively Indefensible .......... 7
VIII. Apple Continues to Designate Public Information as Confidential .......... 8
IX. Apple's Motion to Retain Designations Confirms Bad Faith and Improper Purpose .......... 10
X. Apple's Own IRB Is Now Investigating Based on Plaintiff's Complaints About These Designations .......... 10
XI. Apple Dismisses Major International Publications as "Obscure Websites from Foreign Countries" .......... 11
XII. There Is No Protected Interest in Unlawful Conduct .......... 11

**PRO SE DAMAGES** .......... 12

**CONCLUSION** .......... 13

# REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR 26(G) SANCTIONS

1. The Plaintiff filed a Motion for Sanctions under 26(G) at Dkt. 302. Apple's opposition (Dkt. 316) rests on a single premise: that Rule 26(g) does not apply to confidentiality designations, and therefore Apple had no obligation to sign its designations, no obligation to cure deficiencies, and no exposure to sanctions. If that premise fails, Apple's entire defense collapses, because Apple does not dispute any of the operative facts. Instead, Apple's brief relies on ad hominin attacks -- repeatedly characterizing the Plaintiff as a rogue litigant violating court orders — "flagrant and deliberate violations," "vexatious litigant," "inexcusable." The Plaintiff objects and disputes these characterizations, but additionally, Apple never actually engages with Plaintiff's substantive arguments.

2. Apple's lead argument is that the signature requirement in 26(g)(1) only applies to "disclosures under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection" — and that a confidentiality designation chart is none of those things. Therefore, Apple says, it had no obligation to sign it, and there can be no 26(g) violation. Apple fails to explain how a designation could then be legally binding upon the Plaintiff – with the equivalent of Apple leaving a handwritten PostIt note on a fridge with words Apple now claims are unlawful for the Plaintiff to speak, and if she does speak them, she should be held in contempt and sanctioned by a federal court – because Apple said so.

3. Apple's Opposition also never addresses the deposition transcript showing counsel imposed the blanket designation the moment Gjovik started discussing the NLRB settlement. Apple never addresses the fact that it obtained the Protective Order to produce the Gobbler document and then never produced it under the order. Apple never addresses the seven written refusals to meet and confer. Apple never addresses the re-designation of material it had already de-designated. Apple never addresses the February 20 hearing where the judge expressed skepticism about exactly what Apple was doing.

# THERE IS NO LEGAL OR FACTUAL BASIS TO APPLE'S DEFENSE

## I. Rule 26(g) Requires Mandatory Striking of Unsigned Documents

4. The Rule 26(g) violation is not limited to the unsigned chart itself (which generated no certification because nobody signed it). The majority of the violations flow from what came after: when Orrick attorneys signed and filed the Dkt. 280 emergency letter, the Motion to Enforce (Dkt. 294), the Motion to Seal (Dkt. 293), and the Motion to Shorten Time (Dkt. 295), each filing necessarily certified to the Court that valid, enforceable designations existed. But at the time those filings were signed, Apple's counsel knew the underlying designations were unsigned, knew the blanket designation had lapsed, and knew Plaintiff had been demanding cure for weeks. The certification in the enforcement papers is the 26(g) violation—and that violation triggers mandatory sanctions.

5. The foundational facts are undisputed. Did an attorney sign the February 4 designation chart? No. The document exists; it has no signature; Apple does not dispute this. Did Plaintiff call the omission to Apple's attention? Yes. The emails are timestamped: February 4 at 4:39 PM, 8:27 PM, and 9:08 PM; February 6 at 2:11 PM. Each specifically demands a signed, dated document. Apple does not dispute receiving these emails. Did Apple promptly cure? No. Apple's response is on the record: "Apple declines your request that it do more than it is required to do. Nothing else is required from Apple." That is an express refusal to cure, in writing, after the omission was specifically identified.

6. Rule 26(g)(2) provides that the Court "must strike" an unsigned document when the omission has been called to the attorney's attention and not promptly cured. "Must" is mandatory. There is no balancing test. There is no substantial justification exception for the striking itself—that standard applies to sanctions under 26(g)(3), but the striking under 26(g)(2) is automatic once the three elements are met: unsigned, called to attention, not cured.

7. Once the Court strikes the February 4 chart, there are no valid narrowed designations. If there are no valid narrowed designations, the only designation that ever existed was the blanket designation from December 16—which auto-waived under Section 6.3 when Apple failed to file a motion to retain within 21 days. If both the blanket designation and the narrowed designations are void, then no valid designation has ever existed at any point. And if no valid designation has ever existed, then every enforcement filing Apple made—Dkts. 280, 293, 294, and 295—was signed by counsel certifying the validity of designations that did not exist. That is the 26(g)(3) violation. And 26(g)(3) sanctions are mandatory: the Court "must impose an appropriate sanction."

## II. Confidentiality Designations Require a Signature or They Have No Legal Effect

8. Rule 26(g)(1) requires signatures on "every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection." The Advisory Committee Notes (1983) state the rule "provides a deterrent to both excessive discovery and evasion by imposing a certification requirement." The rule is modeled on Rule 11 and imposes comparable obligations in the discovery context. Designations are functionally discovery responses because they constrain the opposing party's conduct and are a prerequisite to enforcement. The signature ensures accountability.

9. Apple claims that designations are not disclosures, requests, responses, or objections, but rather exercises of rights under the Protective Order. Apple cites *Starlight International Inc. v. Herlihy*, 186 F.R.D. 626, 647 (D. Kan. 1999). If designations are exempt from Rule 26(g), there is no Federal Rule requiring accountability for the substance of designations until a challenge motion is filed. If the designation chart is not a discovery document subject to Rule 26(g), then what is it? An informal

communication? A letter to the court reporter? If Apple's position is that the chart is not a discovery instrument, then it has no legal force. Apple cannot simultaneously argue the chart is not subject to Rule 26(g) requirements and that it creates binding confidentiality obligations enforceable through contempt. Either it is a legally operative discovery document—in which case it must comply with Rule 26(g)—or it is not—in which case Plaintiff had no obligation to treat it as anything. Apple never grapples with this paradox.

10. Apple's argument proves too much. If confidentiality designations are not "discovery responses" under Rule 26(g), then no federal rule requires any formality, any signature, or any accountability for the substance of those designations. Under Apple's theory, a party could impose enforceable speech restrictions on its opponent through an anonymous, undated document sent to a third party—and then seek contempt if the opponent fails to comply. That cannot be the law. Either (a) designations are subject to Rule 26(g) because they are functionally equivalent to discovery responses, or (b) the Court's inherent authority and the Protective Order itself require comparable formality as a precondition to enforcement. Under either path, Apple's unsigned chart cannot support the enforcement proceedings Apple has filed.

11. Apple misreads *Starlight*. That case held that Rule 26(g) sanctions apply when counsel signs deficient written discovery documents—and that other misconduct (such as unprepared deposition witnesses) is sanctioned under Rule 37(d). *Starlight International Inc. v. Herlihy*, Civ. A. No. 97-2329-GTV (D. Kan. June 3, 1999). *Starlight* actually supports Plaintiff's logic. The entire framework of Rule 26(g) exists because the signature is the accountability mechanism—it is how counsel takes personal professional responsibility for the propriety of discovery conduct. Apple's position is that confidentiality designations require no signature, no date, and no service, meaning no attorney has ever certified that these designations comply with the rules, were not interposed for an improper purpose, and are not unreasonably burdensome. Yet Apple simultaneously asks the Court to hold Plaintiff in contempt for violating those unsigned designations. *Starlight's* emphasis on the signature as the mechanism of professional responsibility cuts against enforcement of unsigned documents, not in favor of it.

12. The *Starlight* court's observation that Rule 26(g)(2) "applies only to written discovery requests, responses, or objections" was a textual description, not a holding that parties may impose enforceable discovery-related obligations through unsigned documents. The *Cherrington* court—citing *Starlight*—explained the same distinction: sanctions under Rule 26(g) require the movant to tie the sanctionable conduct "directly to an improper certificate related to discovery responses." *Cherrington Asia Ltd. v. A & L Underground, Inc.*, Case No. 05-1214-EFM-DWB (D. Kan. Jan. 8, 2010). Because the plaintiffs in *Cherrington* conceded that opposing counsel should not be sanctioned and never claimed the

signed certifications were improper, Rule 26(g) did not apply. Here, Plaintiff does claim the certifications—on the enforcement papers—were improper. Further, even if Rule 26(g) does not apply, Judge Chen warned Apple on March 9, 2026 that it "has a Rule 11 obligation to make confidentiality designations in good faith." (Order, Dkt. 303).

13. As a matter of standard practice, confidentiality designations are never freestanding, untethered documents. In document productions, designations appear within signed Rule 34 responses—the Rule 26(g) signature on the response covers the designation because it is part of the discovery response. In depositions, designations are made on the record by a named attorney before a court reporter, which is functionally equivalent to a signature. Apple did neither. It created a standalone post-hoc document that imposed enforceable obligations on the opposing party, with no attorney's name on it, no date, and no service. This is not how designations work in any standard practice guide.

## III. The Automatic Waiver Deadline Was Missed and Apple's Waiver Argument Fails

14. Apple argues it did not waive its designations because the parties "agreed on the record" that Apple would narrow after receiving the transcript. But Apple never addresses the specific Section 6.3 auto-waiver provision Plaintiff invoked. Protective Order § 6.3 uses mandatory language: designations "shall automatically be considered waived" if the designating party fails to file a motion to retain within 21 days of a written objection.

15. Apple does not dispute the text of § 6.3. Apple does not dispute that Plaintiff objected on the record on December 16, 2025. Apple does not dispute that it filed no motion to retain confidentiality within 21 days. Apple instead argues that the parties' informal on-record discussion about narrowing somehow suspended the Protective Order's automatic waiver provision. But parties cannot modify a court order by informal agreement, and nothing in § 6.3 provides for tolling, extension, or equitable excuse. The provision is self-executing: if no motion is filed within 21 days, the designation "shall automatically be considered waived." Apple's blanket designation was waived no later than January 6, 2026. Every subsequent action Apple took—the February 4 chart, the February 19 letter, the enforcement motions—was built on a designation that no longer existed.

16. The Protective Order is an order of the Court. It has specific procedures and specific deadlines with specific consequences. Parties cannot informally agree to override a court order's mandatory provisions any more than they could agree to waive a jurisdictional statute of limitations. If Apple wanted to extend the § 6.3 timeline, the proper procedure would have been a stipulation filed with the Court or a motion to modify the order. Apple did neither.

17. Moreover, when Apple agreed on the record to narrow its designations, it was effectively

conceding that the blanket designation was improper—which is what § 5.1 prohibits ("mass, indiscriminate, or routinized designations"). A party does not agree to "narrow" something that was proper in the first place. Apple's on-record concession confirms that the original designation violated the Order, which strengthens the argument that the § 6.3 clock was running. Apple says it received the transcript January 7. Apple sent its chart February 4. That is 28 days—exceeding the 21-day deadline even measured from Apple's own preferred start date. Apple does not explain why it needed 28 days to review a transcript of a deposition it conducted. It knew what questions it asked. It knew what testimony it wanted to designate.

18. If a party can avoid automatic waiver simply by agreeing on the record to narrow "eventually," then § 6.3's deadline is meaningless. Any designating party could impose a blanket designation, agree when challenged to narrow it later, and then take as long as it wants—leaving the opposing party under enforceable speech restrictions indefinitely with no recourse. That is the opposite of what the automatic waiver provision was designed to prevent.

## IV. This Is Not a Rule 37 Motion

19. Plaintiff's theory is not that the enforcement motions are discovery certifications in the traditional sense. The theory is that when Apple's counsel signed enforcement papers, they necessarily represented to the Court that valid designations existed. Apple responds by saying "these filings are motions requesting relief based on good faith legal arguments" and cites Rule 37 as the proper framework. But that does not address the predicate problem: the underlying designations were void, so everything built on them—the emergency letter, the Motion to Enforce, the Motion to Seal, the Motion to Shorten Time—was built on a false premise. Apple's response is essentially "we are allowed to file motions," which does not answer the question of whether the designations those motions were premised on were valid.

20. Apple's "substantially justified" argument is circular. Apple argues that even if there is a Rule 26(g) violation, sanctions are unwarranted because Apple was "substantially justified" in seeking to enforce the Protective Order. But that is the entire question—whether the enforcement filings were justified when the underlying designations were procedurally void. Apple's argument reduces to: "Our enforcement motions were justified because Plaintiff violated the designations; therefore, our certification of those designations was substantially justified." That is circular. The question is whether the designations were valid. If they were not, the enforcement motions were not justified. Apple skips the predicate question entirely.

21. Apple cites *Ma v. San Francisco Estuary Institute*, No. 23-CV-05060-JCS, 2026 WL 388720, at *5 (N.D. Cal. Feb. 11, 2026), for the "flagrant and deliberate violation" language. But *Ma* involved a party who violated designations that were procedurally proper. Here, the designations were unsigned, the

blanket designation had lapsed, and the information was excluded from the Order's scope under Section 3. Apple never distinguishes *Ma* on those facts.

## V. EITHER CONFIDENTIALITY DESIGNATIONS REQUIRE A SIGNATURE OR THEY HAVE NO LEGAL EFFECT

22. Apple argues that Rule 26(g) does not require a signature on confidentiality designations because they are not "disclosures, or discovery requests, responses, or objections." That is a defensible technical reading of the rule's text. But Apple never grapples with the functional reality that a confidentiality designation under a protective order is how a party exercises its rights under Rule 26(c), which is part of the discovery framework. It is a discovery-related action that constrains the other party's conduct. Apple cites one case from the District of Kansas from 1999 and moves on. If the Court does not accept that narrow textual reading, Apple has nothing underneath it.

23. If a confidentiality designation is not a "discovery response" requiring a signature under Rule 26(g), it is at minimum a document that constrains the opposing party's conduct under a court order—and no court should enforce such a document when no attorney has taken professional responsibility for its content. Either Rule 26(g) applies directly, or the Court's inherent authority requires comparable formality before enforcement. Under either path, an unsigned, undated chart emailed to a court reporter cannot support contempt proceedings.

24. If Rule 26(g) does not apply, what does? Apple identifies no rule, standard, or authority governing the form, service, or accountability for confidentiality designations. The Protective Order itself does not specify a format for post-deposition narrowed designations—Section 5.2(b) contemplates designations being made "on the record, before the close of the deposition." Apple's post-hoc chart is Apple's own invention outside any specified procedure. Apple's argument creates an accountability vacuum: a party could impose enforceable speech restrictions on its opponent through an anonymous, undated document sent to a third-party court reporter, and then seek contempt if the opponent fails to comply. That cannot be the law.

## VI. APPLE CERTIFIED NULLITIES

25. When Apple's counsel signed enforcement papers (Dkts. 280, 293, 294, 295), those papers necessarily certified that valid, enforceable designations existed. That certification was false because: (1) the blanket designation had lapsed under § 6.3; (2) the February 4 chart was a Rule 26(g)(2) nullity; and (3) Plaintiff had put Apple on written notice of both deficiencies, and Apple refused to cure.

26. Apple argues that enforcement motions are not "discovery certifications" but rather motions requesting relief, properly brought under the Court's inherent authority and Rule 37. Apple cites *Somers v. Digital Realty Trust Inc.*, No. 14CV05180EMCKAW, 2018 WL 2134020, at *15 (N.D. Cal. May

9, 2018), and *Apple, Inc. v. Samsung Electronics Co.*, No. 511CV01846LHKPSG, 2014 WL 12596470, at *5 (N.D. Cal. Jan. 29, 2014). These cases establish that enforcement of protective orders is typically handled under Rule 37 and inherent authority, but they do not address the separate question of whether the designations themselves were properly made. If the underlying designations are void, the enforcement motion has no foundation regardless of which procedural vehicle it uses.

27. Striking of the unsigned papers is statutorily prescribed under Rule 26(g)(2). If Apple had not filed enforcement papers based on the unsigned designations, the Court might reject a standalone Rule 26(g) sanctions motion. But Apple did file enforcement papers—papers premised on a nullity that "must be" stricken—and any further sanctions beyond the striking are at the Court's discretion.

28. Apple argues that Plaintiff was required to follow the Protective Order's challenge procedures (§ 6.2) rather than engage in "self-help." Apple cites *Harmston v. City & County of San Francisco*, No. C 07-01186SI, 2007 WL 3306526, at *6 (N.D. Cal. Nov. 6, 2007); *Gonzales v. Charter Communications, LLC*, No. 2:20-CV-08299-SB-AS, 2022 WL 570003, at *4 (C.D. Cal. Jan. 26, 2022); and *I.F. v. City of Vallejo*, No. 2:18-CV-0673-JAM-CKD, 2021 WL 601054, at *11 (E.D. Cal. Feb. 16, 2021). This is Apple's strongest procedural argument, and the case law supports it—if the designations were validly made. But every case Apple cites involved designations that were procedurally proper. None involved a situation where the designations were unsigned, undated, unserved, made after the automatic waiver deadline had passed, and based on publicly available information subject to the Protective Order's own scope exclusions.

29. The logical problem is circularity: Apple says Plaintiff must follow § 6.2 to challenge designations, but Plaintiff's position is that no valid designation exists to challenge—because the blanket designation was waived under § 6.3 and the February 4 chart was a nullity. A party cannot be required to follow challenge procedures for a designation that was never validly made. Apple's argument assumes the validity of the very thing in dispute. Moreover, Plaintiff did raise challenges. She objected on the record at the deposition. She emailed Apple repeatedly identifying the procedural deficiencies. She demanded cure. Apple refused. Then Apple filed enforcement motions. Plaintiff's position is not that she ignored the challenge process—it is that Apple's designations were void before the challenge process began.

## APPLE'S ACTIONS ARE SUBSTANTIALLY UNJUSTIFIED

### VII. THE DESIGNATIONS ARE TECHNICALLY DEFICIENT AND SUBSTANTIVELY INDEFENSIBLE

30. The designations are void because unsigned, unserved, auto-waived, and never cured. The transcripts prove this in real time. The emails prove Plaintiff raised every deficiency and Apple refused to cure. Even if the designations were valid, what Apple actually designated—[redacted],

[redacted]—destroys any claim of good faith.

31. At the February 20, 2026 hearing (Dkt. 302-2), when Plaintiff told Judge Westmore that what Apple designated as confidential was her "workplace complaints, whistleblower complaints, stuff I pled in my complaint for this lawsuit," the Court responded: "I'm not talking about those things." The Court did not believe Apple would designate the Plaintiff's own pled claims as confidential. But that is exactly what Apple did.

32. Plaintiff's Opposition to the Motion to Retain Confidentiality Designations (Dkt. 320) introduces the SEC filings argument, the competitive-harm-as-noncompliance-advantage framework, the bootstrapping problem, the *Ruckelshaus* analysis, and the RICO connection. The present motion establishes that the designations are technically deficient. The opposition establishes they are substantively indefensible. Together they foreclose every possible defense—Apple cannot prevail on procedure and cannot prevail on substance.

33. The Request for Judicial Notice (Dkt. 321) places 197 pages of publicly available evidence directly into the Court's record in a form the Court is legally required to accept under Fed. R. Evid. 201. Every code name appears on Wikipedia. Every study appears in a peer-reviewed journal. Every product appears on Apple's own website. Every press tour was led by Apple's own executives. The Court does not need to credit Plaintiff's characterizations. The Court need only compare Apple's own publications to Apple's designations. The mismatch is self-evident.

34. The Declaration (Dkt. 322) provides 120 pages of contemporaneous documentation—emails showing the meet-and-confer process in real time, Apple's false statements to the Court about the timeline, the detailed response Apple ignored, and the IRB investigations Apple's motions triggered.

35. Each filing answers the questions the others raise. The present motion asks: were the designations valid? Dkt. 321 answers: the information was public. Dkt. 320 asks: was there good cause? Dkt. 322 answers: Apple never provided any, refused to engage when asked, and misrepresented the timeline to the Court. Dkt. 320 asks: what was Apple's purpose? Dkt. 302 answers: the designation was triggered at the exact moment Plaintiff invoked her NLRA rights, and Apple's own Dkt. 280 ties the enforcement to its termination defense.

## VIII. Apple Continues to Designate Public Information as Confidential

36. Section 1 of the Protective Order states it "does not confer blanket protections on all disclosures" and that protection extends "only to the limited information or items that are entitled to confidential treatment under the applicable legal principles." Section 3 excludes from coverage: (a) information in the public domain at the time of disclosure; and (b) information known to the receiving party prior to disclosure or obtained from a lawful outside source. *Seattle Times Co. v. Rhinehart*, 467 U.S.

20, 37 (1984), holds that protective orders do not restrict dissemination of information gained from sources outside discovery.

37. Apple argues it "did not designate internal research and development information that is already in the public domain." Apple's entire response to Plaintiff's public domain argument is a single footnote asserting that Plaintiff "provides no evidence or link to allow for Apple or this Court to assess the validity of these claims." That was filed March 20. Five days later, Plaintiff filed the 197-page Request for Judicial Notice with timestamped Wikipedia pages, peer-reviewed journal articles, SEC filings, ClinicalTrials.gov registrations, and press articles from The Guardian, WIRED, Forbes, and Apple's own press releases. Apple's "no evidence" argument was obliterated before the ink was dry.

38. Apple's "internal R&D" characterization is conclusory. Apple repeatedly calls the designated testimony "internal product-related research and development" but the record documents that what Apple actually designated was testimony about Apple asking employees to track their [redacted], and sexual activity. That subject matter—the existence and general nature of these requests—appears in published court orders. Judge Chen described Apple's conduct as "invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA test, biometrics data collection (like the Gobbler app), and other highly personal studies." (Dkt. 73 at 7–8). A federal judge's published order describing this conduct makes it extremely difficult to argue the existence and nature of these programs is confidential.

39. Apple's own filing confirms the connection to its termination defense. Dkt. 280, fn. 2, states that Plaintiff's "public disclosure of confidential Apple product-related information . . . led to her termination from Apple in the first place." This is Apple expressly connecting the Protective Order enforcement to the merits of its affirmative defense—exactly what Plaintiff warned would happen before the Order was entered. (July 2, 2025 Tr. at 6:10–21). Judge Westmore's own statement that "that's not how the protective order is used" (July 2, 2025 Tr. at 7:12–13) further supports the improper purpose finding.

40. Apple cites *Collateral Analytics LLC v. Nationstar Mortgage LLC*, No. 18-CV-00019-RS (JSC), 2019 WL 3779191 (N.D. Cal. Aug. 12, 2019), for the proposition that pre-litigation confidentiality obligations survive into litigation. But this is the bootstrapping problem Plaintiff identified. Apple is using the Protective Order to enforce its private NDA—the same NDA the NLRB required Apple to rescind in April 2025. Apple settled with the NLRB, agreed to stop telling employees that workplace conditions are confidential, and then used a court order to reimpose the same restriction through the designation process. Apple's opposition never addresses the NLRB settlement and never explains how it can enforce through the Protective Order terms it agreed with the federal government to withdraw.

## IX. Apple's Motion to Retain Designations Confirms Bad Faith and Improper Purpose

41. Apple told the Court it engaged in good-faith narrowing. But Apple de-designated material during the meet-and-confer process and then re-designated the same material in its Motion to Retain (Dkt. 304). The "narrowing" was theater. The Court ordered Apple to narrow through good-faith meet-and-confer, and Apple's response was to temporarily narrow, file a motion, and then re-expand. That makes every representation Apple made about the meet-and-confer process suspect.

42. When a party de-designates material in negotiations and then re-designates the same material in a motion to the court, it demonstrates that the designation decisions are not being made based on whether the information is actually confidential—they are being made based on litigation strategy. Genuinely confidential information does not stop being confidential during meet-and-confer and then become confidential again when a motion is filed.

43. Apple's declarant, Michael DiVincent, reviewed the designations and opined that disclosure would cause competitive harm. But if Apple itself already conceded those designations were not worth retaining three weeks earlier, how does DiVincent now testify that disclosure of the same information will harm Apple? Either Apple's counsel did not tell DiVincent about the prior de-designation, or DiVincent is rubber-stamping whatever Apple's lawyers put in front of him. Either way, it undercuts the declaration's reliability.

44. Apple blanket-designated 72% of the deposition. Apple was told to narrow. Apple narrowed to reproductive biology testimony. Then Apple re-expanded to 107 rows covering code names, study descriptions, and other topics. The designation scope has been expanding and contracting based on Apple's litigation needs, not based on any consistent analysis of what is actually confidential. That pattern is the definition of designations "interposed for an improper purpose" under Rule 26(g)(1)(B)(ii).

## X. Apple's Own IRB Is Now Investigating Based on Plaintiff's Complaints About These Designations

45. Based on Apple's recent conduct on this topic, including its pending motions about the asserted designations, Plaintiff filed new complaints with federal agencies and institutional review boards regarding Apple's workplace studies. The Declaration at Dkt. 322, Exhibit B, attaches correspondence with the National Institutes of Health and the Office for Human Research Protections at the U.S. Department of Health and Human Services regarding Apple's federally registered reproductive health study (ClinicalTrials.gov Identifier NCT04196595). Plaintiff raised concerns about Apple's use of its own employees as study participants, the adequacy of the informed consent process, the lack of independent oversight, and Apple's pending motions seeking gag orders and sanctions.

46. Exhibit C attaches correspondence with the Harvard T.H. Chan School of Public Health IRB regarding its role as a collaborating institution on Apple's Women's Health Study. Harvard confirmed it is investigating Plaintiff's complaints, including complaints about Apple's pending motions in this proceeding.

47. Exhibit D attaches correspondence with the Advarra Institutional Review Board, which served as the reviewing IRB for Apple's study. Advarra confirmed it is investigating and asked Plaintiff to provide copies of the type of evidence that Apple is claiming is secret and must be sealed. As of March 27, 2026, the IRB confirmed it has contacted Apple and requested information and documentation regarding the [redacted] and [redacted] studies.

48. Apple asks this Court to seal information that the IRBs responsible for overseeing human research protections are actively requesting. The Court should consider the implications of a ruling that would designate as confidential information that federal oversight bodies need to evaluate whether Apple's studies complied with applicable regulations.

## XI. Apple Dismisses Major International Publications as "Obscure Websites from Foreign Countries"

49. In footnote 6 of its opposition (page 8), Apple dismisses Plaintiff's public domain evidence as "obscure websites from foreign countries based on anonymous sources who purport to be Apple employees." This describes *Der Spiegel*—one of the largest and most respected publications in Europe—and a peer-reviewed article in the *American Journal of Obstetrics and Gynecology*. By the time Plaintiff filed her Opposition to the Motion to Retain (Dkt. 320), the full record included Wikipedia pages, WIRED, The Guardian, Forbes, Apple's own press releases, Apple's own ClinicalTrials.gov registration, and Apple's own 10-K filing with the SEC. Apple's dismissal of this evidence as "obscure" did not age well.

50. Apple cites *DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004), for the proposition that "publication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient." But the publications Plaintiff identified are not obscure. They include Apple's own peer-reviewed journal article, Apple's own ClinicalTrials.gov registration, Apple's own press release, a Wikipedia page with 114 footnotes, and articles in The Guardian and Forbes. Characterizing those as "obscure" is untenable.

## XII. There Is No Protected Interest in Unlawful Conduct

51. Apple's reliance on *Collateral Analytics* is distinguishable. That case involved documents containing confidential commercial information produced pre-litigation under contractual obligations. Here, the question is whether a person's testimony about her own bodily experiences and workplace complaints can be designated confidential simply because the employer considers the underlying program

proprietary.

52. Rule 26(g)(1)(B)(ii) prohibits designations "interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Apple obtained the Protective Order for one purpose (document production) and used it for another (silencing testimony). This is supported by Apple's own statements and the Gobbler ICF timeline. Apple argues it was "entitled to" a protective order and "cannot be limited to examples given in a hearing." But no Federal Rule or case authority establishes that any party is "entitled" to a confidentiality protective order. Apple's response confirms the Order was obtained unilaterally rather than through mutual stipulation. Apple obtained it by misrepresenting its intended purpose to the Court.

53. Apple's "improper purpose" response is one sentence: "Plaintiff's belief that Apple obtained the protective order and made its designations for an improper purpose is pure speculation and legally irrelevant." That is Apple's complete response to five pages of documented evidence—the false pretenses for obtaining the PO, the Gobbler ICF that was never produced under it, its sole use for deposition designations, the connection to the termination defense, and the NLRB violations. No engagement with the timeline. No explanation for why Apple never produced the Gobbler ICF under the Order. No explanation for why Apple never designated a single document. No response to Apple's own Dkt. 280 tying the designations to the termination defense. No response to Judge Westmore's July 2 statement. One sentence, from four named attorneys at one of the largest law firms in the country.

54. The opposition's most significant omission is its silence on the documented gap between the Protective Order's stated purpose and its actual use. The motion presents a detailed timeline: Apple told the Court it needed the PO to produce the Gobbler ICF; the Court entered the Order on that basis; Apple then withheld the ICF for months until Plaintiff moved to compel; Apple produced it without invoking the PO; Apple then never used it at the deposition. Apple's opposition says nothing about this sequence.

## PRO SE DAMAGES

55. Apple is largely correct that pro se litigants face limitations on fee recovery. However, Rule 26(g)(3) authorizes "an appropriate sanction" which "may include" expenses and fees. The mandatory nature of the sanction ("must impose") is separate from the question of what form the sanction takes. The Court may impose non-monetary sanctions—striking the designations, declaring them void, denying Apple's enforcement motions—without reaching the fee question.

56. Plaintiff did incur actual out-of-pocket costs—certified transcript costs, filing fees, postage, and printing expenses—that are recoverable even under the pro se limitation. More importantly, the fee issue is secondary to the substantive relief. If the Court finds Apple's designations void and its enforcement

motions baseless, the declaratory relief matters far more than the dollar amount.

## CONCLUSION

57. Apple's opposition was written for the version of this case Apple wishes existed—one where a difficult pro se plaintiff is posting confidential documents online and the Court need only enforce its order. But that is not this case. This is a case where Apple designated publicly available information as confidential, never signed the designations, refused to cure after repeated notice, filed enforcement proceedings based on void designations, and now asks the Court to sanction Plaintiff for discussing her own body publicly.

58. The most telling feature of Apple's opposition is what it does not say. It does not identify the specific trade secret in the designated testimony. It does not articulate the competitive harm from disclosure of [redacted]. It does not explain why Apple obtained the Protective Order and then never used it for its stated purpose. It does not explain why Apple designated 72% of a deposition before the testimony was given. It asserts only: we had the right, she violated it, sanction her and not us.

59. That is not a legal argument. It is an assertion of authority. And it is precisely the kind of response that tells a court the party cannot defend its position on the merits and is instead asking the court to enforce it on procedure alone—which is, as Plaintiff has documented throughout this litigation, exactly how Apple operates.

60. Apple offers 13 pages of conclusory assertions, no engagement with the substantive arguments, no response to the public domain evidence, one sentence on improper purpose, and a circular justification defense. Plaintiff has filed hundreds of pages of documented evidence, SEC filings, peer-reviewed articles, certified transcripts, timestamped emails, judicial notice of public records, and legal analysis citing binding Ninth Circuit authority. Plaintiff should prevail, Apple must be sanctioned, and this litigation should proceed to summary judgment and trial on the merits.

Respectfully submitted,

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 27 2026 in San José, California
(415) 964-6272

ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816